Dennis F. Dunne, Esq. (admitted *pro hac vice*)
Evan R. Fleck, Esq. (admitted *pro hac vice*)
Michael W. Price, Esq. (admitted *pro hac vice*)
**MILBANK, TWEED, HADLEY & M<sup>C</sup>CLOY LLP**
28 Liberty Street
New York, New York 10005
Telephone:     (212) 530-5000
Facsimile:     (212) 530-5219

Michael A. Condyles, Esq. (VA 27807)
Peter J. Barrett, Esq. (VA 46179)
Jeremy S. Williams, Esq. (VA 77469)
Brian H. Richardson, Esq. (VA 92477)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:     (804) 644-1700
Facsimile:     (804) 783-6192

*Proposed Co-Counsel for Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| GYMBOREE GROUP, INC., *et al.*,[1] | ) | Case No. 19-30258 (KLP) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

## DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING DEBTORS TO ENTER INTO FIRST AMENDMENT AND WAIVER TO THE SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT

The above-captioned debtors in possession (collectively, the "Debtors") respectfully state

as follows in support of this motion (this "Motion"):

### Background

1.     On January 17, 2019, this Court entered the *Amended Interim Order (I) Authorizing*

*the Debtors to Obtain Postpetition Financing, (II) Authorizing the Use of Cash Collateral,*

*(III) Granting Liens and Superpriority Administrative Expense Claims, (IV) Granting Adequate*

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Gymboree Group, Inc. (6587); Gymboree Intermediate Corporation (1473); Gymboree Holding Corporation (0315); Gymboree Wholesale, Inc. (6588); Gym-Mark, Inc. (6459); Gymboree Operations, Inc. (6463); Gymboree Distribution, Inc. (8669); Gymboree Manufacturing, Inc. (6464); Gymboree Retail Stores, LLC (6461); Gym-Card, LLC (5720); and Gymboree Island, LLC (1215).  The Debtors' service address is 71 Stevenson Street, Suite 2200, San Francisco, California 94105.

*Protection to the Prepetition Lenders, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 88] (the "Interim DIP Order").[2]   The Interim DIP Order, among other things, authorized the Debtors to execute the DIP Documents and obtain the DIP Facility.

2.      The DIP Facility provided the Debtors with $30 million of new money loans to fund their operations as debtors in possession and pursue a sale process for certain of the Debtors' assets (including the assets related to the Janie and Jack® brand), with the goal of maximizing value for the estates and preserving the ability to effectuate a sale of the Janie and Jack® business on a "going concern" basis.

3.      Also on January 17, 2019, the Court approved the Debtors' entry into an agency agreement (the "Agency Agreement") with a consortium of third party liquidators (the "Agents") to conduct store closing sales at the Debtors' Gymboree® and Crazy 8® store locations and managed promotions at their Jane and Jack® stores (together the "Sales").[3]   Importantly, the Agency Agreement provides an option for the Debtors to suspend the Sales at their Janie and Jack® stores and exclude the inventory at those locations from assets being sold by the Agents (the "J&J Option"), which would allow the Debtors to sell the Janie and Jack® business to a bidder on a "going concern" basis.

4.      The sale process remains ongoing, and the Debtors wish to preserve the flexibility to exercise the J&J Option (and thereby effectuate a sale of the Janie and Jack® assets on a going

---

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Interim DIP Order.

[3]    *Amended Order (I) Authorizing Entry into the Agency Agreement, (II) Authorizing and Approving the Conduct of Store Closing Sales, and (III) Granting Related Relief* [Docket No. 104].

concern basis if contemplated by the winning bid), but they do not presently have access to sufficient liquidity do so.

5.      Accordingly, the Debtors negotiated a form of DIP Facility amendment and waiver with their DIP Lenders in the form attached hereto as <u>Exhibit A</u> (the "<u>DIP Amendment</u>"),[4] which provides, among other things, for the potential upsizing of the DIP Facility by up to $37,000,000 in incremental commitments to exercise the J&J Option with the consent of the DIP Lenders (the "<u>Incremental Commitments</u>").[5]  In addition, the DIP Amendment contains an agreement of the DIP Lenders to waive certain events of default that could otherwise be asserted by the DIP Lenders under the DIP Documents and threaten the Debtors' ability to fund their operations during these cases.

6.      The Debtors therefore request that the Court enter an order authorizing the Debtors to enter into the DIP Amendment and obtain the Incremental Commitments on the terms and conditions set forth therein.

## **Jurisdiction and Venue**

7.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference from the United States District Court for the Eastern District of Virginia*, dated July 10, 1984.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[4]      Attached hereto as **Exhibit B** is an amended and restated version of the DIP Agreement, as amended by the DIP Amendment (the "<u>A&R DIP Agreement</u>").  Attached hereto as **Exhibit C** is a redline of the DIP Agreement marked against the A&R DIP Agreement.

[5]      The DIP Amendment provides that upon its effectiveness, the DIP Lenders will make available approximately $680,000 in additional commitments to finance payments to certain employees that are integral to the continued operation of the Janie and Jack® business and/or the wind down of the Debtors' estates to the extent such payments are earned under the proposed employee retention and incentive plans described in the *Debtors Motion for Entry of an Order (I) Approving Their (A) Key Employee Retention Plans and (B) Key Employee Incentive Plan, and (II) Granting Certain Related Relief* [Docket No. 195], and regardless of whether the J&J Option is exercised.

8.    The bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, and 507 of the Bankruptcy Code, rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), and Rule 4001(a)-1 of the Local Rules of the United States Bankruptcy Court for the Eastern District of Virginia (as amended, the "Local Bankruptcy Rules").

9.    The Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

## Relief Requested

10.    By this Motion, the Debtors request that the Court enter an order authorizing the Debtors to enter into the DIP Amendment and obtain the Incremental Commitments on the terms and conditions set forth therein.[6]

## Basis for Relief

## I.    The Debtors Should Be Authorized to Obtain the Incremental Facility Under the DIP Amendment.

11.    Courts grant considerable deference to a debtor in possession's business judgment in determining whether to obtain postpetition credit, the amount of such credit, and the structure of the financing arrangements. *See, e.g.*, *In re Trans World Airlines, Inc.*, No. 92-00115 [Docket No. 1419] (Bankr. D. Del. Dec. 12, 1994) (approving postpetition credit facility because such facility "reflect[ed] sound and prudent business judgment"); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a

---

[6]    The Debtors intend to incorporate the relief sought herein into the proposed order authorizing their entry into the DIP Facility on a final basis.

debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (stating that courts should defer to debtor's 's "reasonable business judgment . . . so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest").

12.    To determine whether a debtor has properly exercised its business judgment, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006), *rev'd on other grounds* 607 F.3d 957 (3d Cir. 2010); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

13.    The decision to obtain the Incremental Commitments from the DIP Lenders on the terms set forth in the DIP Amendment is well within the Debtors' sound business judgment.  The DIP Amendment will afford the Debtors sufficient liquidity to exercise the J&J Option and thereby preserve their ability to effectuate a going concern sale of the Janie and Jack® business (to the extent contemplated by the highest and best bid).  In addition, the DIP Amendment contains an agreement of the DIP Lenders to waive certain events of default that could otherwise be asserted by the DIP Lenders and threaten the Debtors' ability to continue to fund their operations during these cases.  These benefits of the DIP Amendment will inure to the benefit of all stakeholders.

14.    Moreover, the Debtors negotiated the DIP Amendment with the DIP Lenders in good faith, at arms' length, and with the assistance of their advisors, and the Debtors believe the Incremental Commitments contemplated under the DIP Amendment represent the best (and only

available) source of financing to exercise the J&J Option.  Accordingly, the Court should authorize

the Debtors to enter into the DIP Amendment.

## II.    The Debtors Should Be Authorized to Grant DIP Liens and DIP Superpriority Claim on Account of the Incremental Commitments.

15.    Section 364 of the Bankruptcy Code authorizes a debtor in possession to obtain

financing under certain circumstances.  In the event that a debtor is unable to obtain unsecured

credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense (as

authorized under sections 364(a) and 364(b)), section 364(c) provides that a court "may authorize

the obtaining of credit or the incurring of debt (1) with priority over any or all administrative

expenses of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code; (2) secured by

a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien

on property of the estate that is subject to a lien."

16.    Further, section 364(d) of the Bankruptcy Code provides that a debtor may obtain

credit secured by a senior or equal lien on property of the estate already subject to a lien where the

debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest

of the holder of the lien on the property of the estate on which such senior or equal lien is proposed

to be granted."  11 U.S.C. § 364(d)(1)(A)-(B).

17.    A debtor need only demonstrate "by a good faith effort that credit was not available

without" the protections afforded to potential lenders by sections 364(c) and/or (d) of the

Bankruptcy Code.  *In re Snow shoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell

Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).  Moreover, in circumstances

where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be

unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for

financing."  *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*

*Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 F.2d at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37-39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

18.     As set forth in the DIP Motion, the Debtors are unable to obtain postpetition financing as unsecured credit pursuant to sections 364(a) or (b) of the Bankruptcy Code, allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, or as secured credit pursuant to section 364(c) of the Bankruptcy Code. Accordingly, as described above, the DIP Liens, which will be granted in favor of the DIP Lenders as providers of the Incremental Commitments, consist of continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition, security interests in and liens on all real and personal property, whether now existing or hereafter arising and wherever located, tangible and intangible, of the Borrower and the Guarantors pursuant to section 364(d) of the Bankruptcy Code.

19.     The Court should authorize the granting of liens under section 364(d)(1) because the Debtors are not able to obtain credit on any other terms and the Prepetition Secured Parties have consented to priming.

20.     Likewise, the Debtors would be unable to obtain the Incremental Commitments without providing the DIP Agent, on behalf of itself and the DIP Lenders, allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code in the chapter

11 cases of the Borrower and the Guarantors, without which the DIP Lenders would be unwilling to provide the Incremental Commitments.

### III.    The Debtors Should Be Authorized to Pay the Fees of the DIP Agents and the DIP Lender on Account of the Incremental Commitments.

21.    As described in the DIP Motion, under the DIP Documents, the Debtors have agreed, subject to Court's approval, to pay certain fees and interest to the DIP Agents and the DIP Lenders, including in connection with the repayment of the DIP Loans.  These terms will extend to the Incremental Commitments provided under the DIP Amendment.

22.    As set forth in the DIP Motion, the types of fees and interest the Debtors seek to pay to the DIP Lenders have been approved in other large chapter 11 cases, and the DIP Facility does not impinge upon the fundamental rights of the Bankruptcy Code and interests of the Debtors' creditors; in fact, the Debtors believe the DIP Facility (including the Incremental Commitments) is likely the best and only option to maximize chances that junior creditors can improve their recoveries.

23.    Accordingly, the Debtors submit that the Court should authorize the Debtors to pay the fees provided under the DIP Amendment in connection with obtaining the Incremental Commitments.

### IV.    The DIP Lenders Are Good-Faith Lenders Under Section 364(e).

24.    Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its liens securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Specifically, section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this
> section [364 of the Bankruptcy Code] to obtain credit or incur debt,
> or of a grant under this section of a priority or a lien, does not affect
> the validity of any debt so incurred, or any priority or lien so granted,

to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

25.    As explained herein, the DIP Amendment is the result of:  (a) the Debtors' reasonable and informed determination that the DIP Lenders offered the most favorable terms for obtaining the Incremental Commitments, (b) no other lender offering alternative financing on any other basis, and (c) arms'-length, good-faith negotiations between the Debtors and the DIP Lenders.  The terms and conditions of the DIP Amendment are reasonable and appropriate under the circumstances, and the proceeds of the Incremental Commitments will be used only for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being provided to any party other than as described herein.  Accordingly, the Court should find that the DIP Lenders are "good-faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

**V.    The Automatic Stay Should Be Modified on a Limited Basis.**

26.    The Debtors further request that the automatic stay provisions of section 362 of the Bankruptcy Code be modified to (a) allow the DIP Lenders to file any financing statements, security agreements, notices of liens, and other similar instruments and documents in order to validate and perfect the DIP Liens, (b) permit the Debtors to grant the DIP Liens and the DIP Superpriority Claims to the DIP Lenders and to incur liabilities and obligations to the DIP Lenders in accordance with the DIP Amendment, and (iii) following the occurrence of an Event of Default, to permit the DIP Agent to exercise all rights and remedies in accordance with the DIP Documents and applicable law.

27.    Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements and, in the Debtors' business judgment, are

reasonable and fair under the circumstances of these chapter 11 cases.  *See*, *e.g.*, *In re The Gymboree Corporation*, No. 17-32986 (KLP) [Docket No. 384] (Bankr. E.D. Va. July 11, 2017); *In re Toys "R" Us, Inc.*, No. 17-34665 (KLP) [Docket No. 711] (Bankr. E.D. Va. Oct. 24, 2017); *In re Penn Va. Corp.*, No. 16-32395 (KLP) [Docket No. 219] (Bankr. E.D. Va. June 8, 2016) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Alpha Nat. Res., Inc.*, No. 15-33896 (KRH) [Docket No. 465] (Bankr. E. D. Va. Sept. 17, 2015); *In re Patriot Coal Corp.*, No. 15-32450 (KLP) [Docket No. 230] (Bankr. E.D. Va. June 4, 2015) (same); *In re Magnum Hunter Res. Corp.*, No. 15-12533 (KG) [Docket No. 264] (Bankr. D. Del. Dec. 15, 2015); *In re Peak Broad., LLC*, No. 12-10183 (PJW) [Docket No. 118] (Bankr. D. Del. Feb. 3, 2012) (terminating automatic stay after occurrence of termination event); *In re TMP Directional Mktg., LLC*, No. 11-13835 (MFW) [Docket No. 169] (Bankr. D. Del. Jan. 17, 2012).

## VI.    Failure to Obtain Immediate Access to the Incremental Facility Would Cause Immediate and Irreparable Harm.

28.     Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than fourteen days after the service of such motion.  Upon request, however, the court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

29.     For the reasons noted above, the Debtors have an immediate need to be able to access the Incremental Commitments and obtain the waivers provided pursuant to the DIP Amendment.  Absent such relief, the Debtors will not be able to, among other things, execute the J&J Option and will suffer immediate and irreparable harm to the detriment of all parties in interest.

30.     The Debtors request that the Court authorize the Debtors to incur obligations under the Incremental Commitments on the terms and subject to conditions set forth in the DIP Amendment.  This relief will enable the Debtors to preserve and maximize value of their assets for the benefit of their estates and creditors.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

31.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

### Waiver of Memorandum of Points and Authorities

32.     The Debtors respectfully request that this Court treat this motion as a written memorandum of points and authorities or waive any requirement that this motion be accompanied by a written memorandum of points and authorities as described in Local Bankruptcy Rule 9013-1(G).

### Reservation of Rights

33.     Nothing contained herein is intended or shall be construed as:  (a) an admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim, (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors'

estates; or (g) a waiver of any claims or causes of action which may exist against any entity under the Bankruptcy Code or any other applicable law.

### **Notice**

34.     The Debtors have provided notice of this Motion to:  (a) the Office of the U.S. Trustee, 701 East Broad Street, Suite 4304, Richmond, Virginia 23219, Attn: Robert B. Van Arsdale, Esq.; (b) proposed counsel to the Committee, Pachulski Stang Ziehl & Jones, 780 Third Avenue, 34th Floor, New York, New York 10017; Attn: Robert J. Feinstein, Esq., Bradford J. Sandler, Esq.; (c) proposed co-counsel to the Committee, Whiteford Taylor & Preston, LLP, 3190 Fairview Park Dr., Suite 800, Falls Church, Virginia 22042, Attn: Christopher A. Jones, Esq.; (d) counsel to the Debtors' postpetition secured lenders, King & Spalding LLP ("K&S"), 1185 Avenue of the Americas, New York, New York 10036-4003, Attn: W. Austin Jowers, Esq. and Christopher G. Boies, Esq. and Morgan Lewis & Bockius LLP, One Federal Street, Boston, Massachusetts 02110-1726, Attn: Julia Frost-Davies, Esq. and Amelia C. Joiner, Esq. ("Morgan & Lewis"); (e) co-counsel to the Debtors' postpetition secured lenders, McGuireWoods LLP, Attn: Dion W. Hayes, Esq., Douglas M. Foley, Esq., and Sarah B. Boehm, Esq., 800 East Canal Street, Richmond, Virginia 23219-3916; (f) counsel to Bank of America, N.A. as administrative agent under the ABL Credit Agreement, Morgan & Lewis; (g) co-counsel to Bank of America, N.A. as administrative agent under the ABL Credit Agreement, Hunton Andrews Kurth LLP, 951 East Byrd Street, Richmond, Virginia 23219, Attn: Tyler P. Brown, Esq. and Justin F. Paget, Esq.; (h) counsel to Goldman Sachs Specialty Lending Group, L.P. as administrative and collateral agent under the Term Loan Credit Agreement, K&S; (i) any banking or financial institution that holds the Debtors' accounts; (j) the Internal Revenue Service; (k) the office of the attorneys general for the states in which the Debtors operate; (l) the National Association of Attorneys General; and (m) all other

parties entitled to notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that no other or

further notice of this Motion need be given.

### **No Prior Request**

35.     No prior request for the relief sought in this Motion has been made to this or any

other court.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors respectfully request entry of an order authorizing the Debtors to enter into the DIP Amendment and obtain the Incremental Commitments on the terms and conditions set forth therein and granting such other relief as appropriate under the circumstances.

Dated: February 13, 2019
Richmond, Virginia

/s/ *Brian H. Richardson*
Michael A. Condyles, Esq. (VA 27807)
Peter J. Barrett, Esq. (VA 46179)
Jeremy S. Williams, Esq. (VA 77469)
Brian H. Richardson, Esq. (VA 92477)
**KUTAK ROCK LLP**
East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:    (804) 644-1700
Facsimile:    (804) 783-6192
Email:        Michael.Condyles@KutakRock.com
              Peter.Barrett@KutakRock.com
              Jeremy.Williams@KutakRock.com
              Brian.Richardson@KutakRock.com
-and-

Dennis F. Dunne, Esq. (admitted *pro hac vice*)
Evan R. Fleck, Esq. (admitted *pro hac vice*)
Michael W. Price (admitted *pro hac vice*)
**MILBANK TWEED, HADLEY & McCLOY LLP**
28 Liberty Street
New York, New York 10005
Telephone:    (212) 530-5000
Facsimile:    (212) 530-5219
Email:        ddunne@milbank.com
              efleck@milbank.com
              mprice@milbank.com


*Proposed Co-Counsel to the Debtors in Possession*

## Exhibit A

**DIP Amendment**

**FIRST AMENDMENT AND WAIVER
TO SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

THIS FIRST AMENDMENT AND WAIVER TO THE SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT (this "Amendment"), dated as of February [_], 2019, is by and among Gymboree Intermediate Corporation, a Delaware corporation and a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code ("Holdings"), Gymboree Group, Inc., a Delaware corporation and a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code (the "Lead Borrower" or the "Company" and together with each other Person signatory hereto the "Borrowers" and each individually, a "Borrower"), the other Loan Parties, the undersigned Lenders (which constitute all of the Lenders), and Special Situations Investing Group, Inc., as the administrative agent (the "Administrative Agent") and the collateral agent (the "Collateral Agent"). Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed thereto in the Credit Agreement (as defined below).

**W I T N E S S E T H**

**WHEREAS,** Holdings, the Borrowers, the other Loan Parties, the Administrative Agent and the Lenders are parties to that certain Superiority Secured Debtor-in-Possession Credit Agreement dated as of January 18, 2019 (as amended modified, extended, restated or supplemented from time to time, the "Credit Agreement"; the Credit Agreement as in effect immediately prior to this Amendment, the "Existing Credit Agreement");

**WHEREAS,** the Loan Parties and Lenders have mutually agreed that the GS Lenders may provide a Class A Commitment Increase and Class B Commitment Increase subject to the terms and limitations set forth herein;

**WHEREAS**, the Loan Parties have requested that the Lenders waive certain Events of Default as described herein; and

**WHEREAS**, subject to the terms and conditions of the Credit Agreement (as amended pursuant to this Amendment), the Lenders have agreed to extend to a Class A Commitment Increase as set forth on Schedule 2.01 hereto.

**NOW, THEREFORE,** in consideration of the agreements hereinafter set forth, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

**ARTICLE I
AMENDMENTS TO EXISTING CREDIT AGREEMENT**

**1.1    Amendments to the Existing Agreement**.  On the First Amendment Effective Date (as defined below), the parties hereto agree that the Existing Credit Agreement is hereby amended to incorporate the changes shown on the marked pages attached hereto as Annex A.  The markings contained in Annex A showing deletions and additions are for convenience only and such markings (as opposed to the additions and deletions themselves) shall not constitute part of the amended text of the Credit Agreement.

**1.2** **Schedules.** (a) On the First Amendment Effective Date the Lenders hereby agree that Schedule 2.01 to the Credit Agreement shall be amended and restated to reflect the First Amendment Effective Date Commitment set forth on Schedule 2.01 hereto.

(b) On the First Amendment Effective Date the Lenders hereby agree that Schedule I to the Credit Agreement shall be updated to reflect the Approved Budget set forth on Schedule I hereto.

## ARTICLE II
## WAIVER

**2.1** **Waiver**. The Lenders party hereto hereby waive (i) any Event of Default arising under Section 8.01(b) of the Credit Agreement as a result of the failure to comply with Section 6.21(c) of the Credit Agreement for the Budget Testing Periods ending February 1, 2019 and February 8, 2019, (ii) any Event of Default arising under Section 8.01(b) of the Credit Agreement as a result of the failure to comply with Section 6.17(b) of the Credit Agreement for the Budget Testing Periods ending February 8, 2019, (iii) any Events of Default arising under Section 8.01(k)(xxi) of the Credit Agreement as a result of exceeding the Permitted Variances under the Approved Budget for the Budget Testing Periods ending February 1, 2019 and February 8, 2019, (iv) any Event of Default arising under Section 8.01(k)(xxvi) of the Credit Agreement as a result of the failure to deliver a Variance Report on the Budget Testing Period ending February 8, 2019, (v) any Event of Default arising under Section 8.01(b) of the Credit Agreement as a result of the failure to comply with Section 6.21 of the Credit Agreement, for the Borrowers failure to deposit proceeds of Term Priority Collateral into a Segregated Operating Account in accordance with paragraph 31(c) of the Interim Order, (vi) any Event of Default arising under Section 8.01(b) of the Credit Agreement as a result of the failure to comply with Section 7.17(c) of the Credit Agreement, for the Borrowers' withdrawal of funds from deposit account(s) consisting of Term Priority Collateral in violation of the Approved Budget and the Interim Order, (vii) any Event of Default arising under Section 8.01(c) of the Credit Agreement as a result of the failure to comply with Section 6.11(b) of the Credit Agreement, for the Borrowers' failure to obtain account control agreements in form and substance reasonably satisfactory to the Administrative Agent over deposit account(s) consisting of Term Priority Collateral, and (viii) any related Event of Default which would result from the failure to give any notice with respect to any of the above (collectively, the "Specified Defaults").

## ARTICLE III
## CONDITIONS TO EFFECTIVENESS

**3.1** **Closing Conditions.** This Amendment shall be deemed effective upon satisfaction of the following conditions in form and substance acceptable to the Administrative Agent and the Lenders in their sole discretion (the "First Amendment Effective Date"):

(a) Executed Amendment. The Administrative Agent shall have received a copy of this Amendment duly executed by each of the Loan Parties and each of the Lenders constituting Required Lenders.

(b) No Default. Prior to, and after giving effect to this Amendment on the date hereof and the other transactions contemplated hereby, no Default or Event of Default (other than the Specified Defaults) shall exist.

(c) Representations and Warranties. Each of the representations and warranties made by the Borrowers or any other Loan Party in or pursuant to the Credit Agreement and/or the other Loan Documents and in or pursuant to Article III of this Amendment shall be true and correct in all material respects on the date hereof; provided that, in each case, to the extent that such

2

representations and warranties expressly refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; provided, further, that any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates.

(d)    <u>Certificates</u>. Administrative Agent and Lenders shall have received a certificate signed by a Responsible Officer of the Lead Borrower certifying that the condition set forth in clauses (b) and (c) above are satisfied.

(e)    <u>Amended and Restated Fee Letter</u>. Administrative Agent shall have received a fully executed Amended and Restated Fee Letter, dated as of the date hereof, in form and substance satisfactory to Administrative Agent.

**ARTICLE IV**
**MISCELLANEOUS**

**4.1**    **<u>Representations and Warranties of Loan Parties</u>.** Each of the Loan Parties represents and warrants as follows:

(a)    It has taken all necessary action to authorize the execution, delivery and performance of this Amendment.

(b)    This Amendment has been duly executed and delivered by such Person and constitutes such Person's legal, valid and binding obligation, enforceable in accordance with its terms.

(c)    Other than the Orders, no consent, approval, authorization or order of, or filing, registration or qualification with, any court or governmental authority or third party is required in connection with the execution, delivery or performance by such Person of this Amendment, except for (i) the approvals, consents, exemptions, authorizations, actions, notices and filings which have been duly obtained, taken, given or made and are in full force and effect and (ii) those approvals, consents, exemptions, authorizations or other actions, notices or filings, the failure of which to obtain or make, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(d)    After giving effect to this Amendment and the transactions contemplated hereby, the representations and warranties set forth in Article V of the Credit Agreement are true and correct in all material respects as of the date hereof; provided that, in each case, to the extent that such representations and warranties expressly refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; provided, further, that any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates.

(e)    After giving effect to this Amendment and the transactions contemplated hereby, no event has occurred and is continuing which constitutes a Default or an Event of Default (other than the Specified Defaults).

**4.2**    **<u>Reaffirmation of Obligations</u>.** Each Loan Party hereby ratifies the Loan Documents to which it is a party and acknowledges and reaffirms (a) that it is bound by all terms of the Loan

Documents applicable to it and (b) that it is responsible for the observance and full performance of its respective Obligations.

**4.3**   **Loan Document.** This Amendment shall constitute a Loan Document under the terms of the Credit Agreement.

**4.4**   **Further Assurances.** The Loan Parties agree to promptly take such action, upon the reasonable request of the Administrative Agent, as is necessary or desirable to carry out the intent of this Amendment.

**4.5**   **Entirety.** This Amendment, the Credit Agreement and the other Loan Documents embody the entire agreement among the parties hereto and supersede all prior agreements and understandings, oral or written, if any, relating to the subject matter hereof.

**4.6**   **Counterparts; Telecopy or Other Electronic Means.** This Amendment may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Delivery by telecopier or other electronic transmission of an executed counterpart of a signature page to this Amendment shall be effective as delivery of an original executed counterpart of this Amendment.

**4.7**   **No Actions, Claims, Etc.** Except for the Chapter 11 Cases (and claims related thereto), of the date hereof, each of the Loan Parties hereby acknowledges and confirms that it has no knowledge of any actions, causes of action, claims, demands, damages and liabilities of whatever kind or nature, in law or in equity, against the GS Lenders or the Administrative Agent, or their respective officers, employees, representatives, agents, counsel or directors arising from any action by such Persons, or failure of such Persons to act under the Credit Agreement on or prior to the date hereof.

**4.8**   **GOVERNING LAW**. EXCEPT TO THE EXTENT SUPERSEDED BY THE BANKRUPTCY CODE, THIS AMENDMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

**4.9**   **Successors and Assigns.** This Amendment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

**4.10**   **Incorporation by Reference.** The severability, jurisdiction, service of process and waiver of jury trial provisions set forth in Sections 10.11 (Waiver of Jury Trial), 10.12 (Severability) and 10.15 (Jurisdiction; Consent to Service of Process) of the Credit Agreement are hereby incorporated by reference, *mutatis mutandis.*

#4828-8093-5816v3

IN WITNESS WHEREOF the parties hereto have caused this Amendment to be duly executed on the date first above written.

GYMBOREE INTERMEDIATE
CORPORATION,
as Holdings

By: _____
Name:
Title:

GYMBOREE GROUP, INC.,
as the Lead Borrower

By: _____
Name:
Title:

GYMBOREE MANUFACTURING, INC.,
as a Borrower

By: _____
Name:
Title:

GYMBOREE OPERATIONS, INC.,
as a Borrower

By: _____
Name:
Title:

GYMBOREE RETAIL STORES, LLC,
as a Borrower


By: _____
Name:
Title:


GYM-CARD, LLC,
as a Borrower


By: _____
Name:
Title:


GYMBOREE WHOLESALE, INC.,
as a Borrower


By: _____
Name:
Title:


GYM-MARK, INC.,
as a Borrower


By: _____
Name:
Title:


GYMBOREE DISTRIBUTION, INC.,
as a Borrower


By: _____
Name:
Title:


GYMBOREE ISLAND, LLC,
as a Borrower


By: _____
Name:
Title:

GYMBOREE HOLDING CORPORATIONS,
as a Guarantor


By: _____
Name:
Title:

[Signature Page to First Amendment to DIP Credit Agreement]

SPECIAL SITUATIONS INVESTING
GROUP, INC.,
as Administrative Agent, Collateral Agent and a
Lender


By: _____
Name:
Title:

GOLDMAN SACHS SPECIALTY LENDING
HOLDINGS, INC.,
as a Lender


By: _____
Name:
Title:

**Schedule 2.01**

| Lender | Address | Closing Date Commitment Type | Closing Date Commitment Amount | First Amendment Commitment Type | First Amendment Effective Date Commitment |
|---|---|---|---|---|---|
| Special Situations Investing Group, Inc. | 200 West Street New York, NY 10282 | Class A New Money Commitment | $10,000,000 | Class A New Money Commitment | $[_____] |
| Goldman Sachs Specialty Lending Holdings, Inc. | 200 West Street New York, NY 10282 | Class B New Money Commitment | $20,000,000 | Class A New Money Commitment | $[_____] |
| Total | | | $30,000,000 | | $680,000 |

## ANNEX A

**Amendments to the Existing Agreement**

**(See attached.)**

## **Exhibit B**

**A&R DIP Agreement**

**EXECUTION VERSION**

*As amended by that First Amendment to the DIP Credit Agreement,*
*dated as of February [__], 2019*

**Milbank Comments to K&S DRAFT 2/13/19**

SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT

dated as of

January 18, 2019

among

GYMBOREE GROUP, INC., as Lead Borrower,

THE OTHER BORROWERS PARTY HERETO FROM TIME TO TIME
and, together with the Lead Borrower, as debtors and debtors-in-possession under Chapter 11 of
the Bankruptcy Code

GYMBOREE INTERMEDIATE CORPORATION, as Holdings,

THE OTHER GUARANTORS PARTY HERETO FROM TIME TO TIME,

THE LENDERS PARTY HERETO FROM TIME TO TIME

and

SPECIAL SITUATIONS INVESTING GROUP, INC.,

as Administrative Agent and Collateral Agent

**TABLE OF CONTENTS**

PAGE

**ARTICLE 1** DEFINITIONS ...................................................................................................................1
    Section 1.01 . *Defined Terms.* ........................................................................................................1
    Section 1.02 . *Other Interpretive Provisions.* ..............................................................................25
    Section 1.03 . *Accounting Terms* .................................................................................................25
    Section 1.04 . *[Reserved].* ...........................................................................................................26
    Section 1.05 . *References to Agreements, Laws, Etc.* ..................................................................26
    Section 1.06 . *Times of Day.* ........................................................................................................26
    Section 1.07 . *Timing of Payment of Performance.* ....................................................................26
    Section 1.08 . *[Reserved].* ...........................................................................................................26
    Section 1.09 . *[Reserved].* ...........................................................................................................26
    Section 1.10 . *Certain Accounting Matters.* ................................................................................26
    Section 1.11 . *Classification of Loans and Borrowings.* .............................................................26
    Section 1.12 . *Currency Equivalents Generally.* .........................................................................26

**ARTICLE 2** THE CREDITS......................................................................................................................26
    Section 2.01 . *Commitments.* ........................................................................................................26
    Section 2.02 . *Loans* ....................................................................................................................28
    Section 2.03 . *Borrowing Procedure.* ..........................................................................................29
    Section 2.04 . *Evidence of Debt.* ..................................................................................................30
    Section 2.05 . *Fees.* ......................................................................................................................30
    Section 2.06 . *Interest on Loans.* .................................................................................................30
    Section 2.07 . *Default Interest.* ....................................................................................................31
    Section 2.08 . *Alternate Rate of Interest.* ....................................................................................31
    Section 2.09 . *Termination and Reduction of Commitments.* .......................................................31
    Section 2.10 . *[Reserved].* ...........................................................................................................31
    Section 2.11 . *Repayment of Term Borrowings.* ..........................................................................31
    Section 2.12 . *Voluntary Prepayment* ..........................................................................................31
    Section 2.13 . *Mandatory Prepayments.* .....................................................................................31
    Section 2.14 . *Pro Rata Treatment.* ............................................................................................33
    Section 2.15 . *Sharing of Setoffs.* ................................................................................................33
    Section 2.16 . *Payments.* ..............................................................................................................33
    Section 2.17 . *Joint and Several Liability of Borrowers* ..............................................................34
    Section 2.18 . *No Discharge; Survival of Claims* ........................................................................35
    Section 2.19 . *[Reserved].* ...........................................................................................................36
    Section 2.20 . *Waiver of any Pari or Priming Rights* ..................................................................36

**ARTICLE 3** TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY .............................36
    Section 3.01 . *Taxes* .....................................................................................................................36
    Section 3.02 . *Illegality.* ...............................................................................................................39
    Section 3.03 . *[Reserved].* ...........................................................................................................39
    Section 3.04 . *Increased Cost and Reduced Return; Capital Adequacy; Reserves on Eurodollar Loans.* ...39
    Section 3.05 . *Funding Losses.* ....................................................................................................40
    Section 3.06 . *Matters Applicable to all Requests for Compensation.* .........................................40
    Section 3.07 . *[Reserved].* ...........................................................................................................41
    Section 3.08 . *Survival.* ...............................................................................................................42

**ARTICLE 4** CONDITIONS PRECEDENT TO CREDIT EXTENSIONS.............................................42
    Section 4.01 . *Conditions Precedent to Closing Date.* .................................................................42
    Section 4.02 . *Conditions to each Borrowing after the Closing Date.* .........................................43

i

**ARTICLE 5** REPRESENTATIONS AND WARRANTIES ................................................................44
    Section 5.01 .  *Existence, Qualification and Power; Compliance with Laws.* ...............44
    Section 5.02 .  *Authorization; No Contravention.* .............................................................44
    Section 5.03 .  *Governmental Authorization; Other Consents.* .......................................45
    Section 5.04 .  *Binding Effect.* ...........................................................................................45
    Section 5.05 .  *Financial Statements; No Material Adverse Effect.* ................................45
    Section 5.06 .  *Litigation.* ..................................................................................................45
    Section 5.07 .  *Compliance With Laws; No Default.* ......................................................46
    Section 5.08 .  *Ownership of Property; Liens; Casualty Events.* .....................................46
    Section 5.09 .  *Environmental Matters.* ...........................................................................46
    Section 5.10 .  *Taxes.* .........................................................................................................47
    Section 5.11 .  *ERISA Compliance, Etc.* .........................................................................47
    Section 5.12 .  *Subsidiaries* ...............................................................................................47
    Section 5.13 .  *Margin Regulations; Investment Company Act.* ......................................47
    Section 5.14 .  *Disclosure* .................................................................................................48
    Section 5.15 .  *Labor Matters.* ..........................................................................................48
    Section 5.16 .  *Intellectual Property; Licenses, Etc* .......................................................48
    Section 5.17 .  *[Reserved].* ...............................................................................................48
    Section 5.18 .  *[Reserved].* ...............................................................................................48
    Section 5.19 .  *Collateral Documents.* ...............................................................................48
    Section 5.20 .  *[Reserved].* ...............................................................................................49
    Section 5.21 .  *Sanctions; Anti-Corruption Laws; Anti-Money Laundering Laws.* .......49
    Section 5.22 .  *Capitalization* ...........................................................................................49
    Section 5.23 .  *Chief Executive Office* .............................................................................49
    Section 5.24 .  *Insurance* ...................................................................................................49
    Section 5.25 .  *Deposit Accounts and Other Accounts* ...................................................50
    Section 5.26 .  *Approved Budget* .......................................................................................50
    Section 5.27 .  *Chapter 11 Cases; Orders.* .......................................................................50

**ARTICLE 6** AFFIRMATIVE COVENANTS .............................................................................51
    Section 6.01 .  *Financial Statements, Reports, Etc.* ........................................................51
    Section 6.02 .  *Certificates; Other Information.* ...............................................................51
    Section 6.03 .  *Notices.* .....................................................................................................52
    Section 6.04 .  *[Reserved].* ...............................................................................................53
    Section 6.05 .  *Preservation of Existence, Etc.* ...............................................................53
    Section 6.06 .  *Maintenance of Properties.* .......................................................................53
    Section 6.07 .  *Maintenance of Insurance.* .......................................................................53
    Section 6.08 .  *Compliance with Laws.* ............................................................................54
    Section 6.09 .  *Books and Records.* ..................................................................................54
    Section 6.10 .  *Inspection Rights* ......................................................................................54
    Section 6.11 .  *Additional Collateral.* ..............................................................................54
    Section 6.12 .  *Compliance with Environmental Laws.* ...................................................54
    Section 6.13 .  *Further Assurances.* .................................................................................54
    Section 6.14 .  *[Reserved].* ...............................................................................................55
    Section 6.15 .  *[Reserved].* ...............................................................................................55
    Section 6.16 .  *[Reserved].* ...............................................................................................55
    Section 6.17 .  *Approved Budget and Variance Report.* ..................................................55
    Section 6.18 *Update Calls.* ..............................................................................................56
    Section 6.19 . *Milestones* .................................................................................................56
    Section 6.20 .  *Collateral Proceeds.* .................................................................................58
    Section 6.21 .  *Bankruptcy Covenants.* ............................................................................58

**ARTICLE 7** NEGATIVE COVENANTS .....................................................................................59
    Section 7.01 .  *Liens.* .........................................................................................................59

Section 7.02 . *Investments.* ............................................................................................61
Section 7.03 . *Indebtedness.* ...........................................................................................61
Section 7.04 . *Fundamental Changes.* ............................................................................62
Section 7.05 . *Dispositions.* ............................................................................................62
Section 7.06 . *Restricted Payments.* ...............................................................................63
Section 7.07 . *Change in Nature of Business.* ................................................................63
Section 7.08 . *Transactions with Affiliates.* ...................................................................63
Section 7.09 . *Burdensome Agreements.* .........................................................................63
Section 7.10 . *Use of Proceeds* .......................................................................................64
Section 7.11 . *Negative Pledge* .......................................................................................65
Section 7.12 . *Fiscal Year* ...............................................................................................65
Section 7.13 . *Prepayments, Etc. of Indebtedness.* .........................................................65
Section 7.14 . *Permitted Activities.* ................................................................................65
Section 7.15 . *[Reserved].* ..............................................................................................65
Section 7.16 . *Chapter 11 Modifications.* .......................................................................65
Section 7.17 . *Segregated Operating Accounts and DIP Funding Accounts.*....................66
Section 7.18 . *Right of Subrogation.* ...............................................................................66
Section 7.19 . *Subsidiaries* .............................................................................................66

**ARTICLE 8** EVENTS OF DEFAULT AND REMEDIES ..............................................66
Section 8.01 . *Events of Default.* .....................................................................................66
Section 8.02 . *Remedies Upon Event of Default.* .............................................................70
Section 8.03 . *Application of Funds.* ...............................................................................70

**ARTICLE 9** THE ADMINISTRATIVE AGENT AND THE COLLATERAL AGENT .........70

**ARTICLE 10** MISCELLANEOUS ................................................................................72
Section 10.01 . *Notices; Electronic Communications* ......................................................72
Section 10.02 . *Survival of Agreement* ............................................................................75
Section 10.03 . *Binding Effect.* ........................................................................................75
Section 10.04 . *Successors and Assigns.* .........................................................................75
Section 10.05 . *Expenses; Indemnity.* .............................................................................78
Section 10.06 . *[Reserved].* .............................................................................................80
Section 10.07 . *Applicable Law.* ......................................................................................80
Section 10.08 . *Waivers; Amendment* ..............................................................................80
Section 10.09 . *Interest Rate Limitation.* .........................................................................81
Section 10.10 . *Entire Agreement.* ...................................................................................81
Section 10.11 . *WAIVER OF JURY TRIAL* .....................................................................81
Section 10.12 . *Severability.* ............................................................................................81
Section 10.13 . *Counterparts.* ..........................................................................................82
Section 10.14 . *Headings.* ................................................................................................82
Section 10.15 . *Jurisdiction; Consent to Service of Process.* ...........................................82
Section 10.16 . *Confidentiality.* .......................................................................................82
Section 10.17 . *Lender Action.* ........................................................................................83
Section 10.18 . *USA PATRIOT Act Notice.* ......................................................................83
Section 10.19 . *Collateral And Guaranty Matters.*..........................................................83
Section 10.20 . *[Reserved].* .............................................................................................84
Section 10.21 . *Payments Set Aside.* ...............................................................................84
Section 10.22 . *No Advisory or Fiduciary Responsibility.* ...............................................84
Section 10.23 . *Special Indemnity Obligation.* ................................................................85
Section 10.24 . *Acknowledgement and Consent to Bail-In of EEA Financial Institutions.* .........86
Section 10.25 . *Conflicts*..................................................................................................86

**ARTICLE 11** GUARANTEE..............................................................................................................86
  Section 11.01 . *The Guarantee.* ............................................................................86
  Section 11.02 . *Obligations Unconditional.* ............................................................87
  Section 11.03 . *Certain Waivers. Etc.* ....................................................................87
  Section 11.04 . *Reinstatement.* ...............................................................................88
  Section 11.05 . *Subrogation; Subordination.* ..........................................................88
  Section 11.06 . *Remedies.* ........................................................................................88
  Section 11.07 . *Instrument for the Payment of Money.* ............................................88
  Section 11.08 . *Continuing Guarantee.* ..................................................................88
  Section 11.09 . *General Limitation on Guarantee Obligations.* ................................88
  Section 11.10 . *Release of Guarantors.* ..................................................................88
  Section 11.11 . *Right of Contribution.* ....................................................................89
  Section 11.12 . *Additional Guarantor Waivers and Agreements.* .............................89

SCHEDULES

| 1.01 | Subsidiary Guarantors |
|------|----------------------|
| 2.01 | Lenders and Term Loan Commitments |
| 5.05 | Certain Liabilities |
| 5.06 | Pending Litigation |
| 5.08 | Real Property |
| 5.09 | Environmental Matters |
| 5.10 | Taxes |
| 5.12 | Subsidiaries and Other Equity Interests |
| 5.12(b) | Ownership Interests |
| 5.15 | Labor Matters |
| 5.16(c) | Intellectual Property |
| 5.22 | Capitalization |
| 5.23 | Chief Executive Office |
| 5.25 | Deposit Accounts and Other Accounts |
| 7.01(b) | Existing Liens |
| 7.01(h) | Existing Leases |
| 7.02(c) | Existing Investments |
| 7.03(b) | Existing Indebtedness |
| 7.05(d) | Dispositions |
| 7.08 | Transactions with Affiliates |
| 7.09 | Certain Contractual Obligations |
| Schedule I | Approved Budget and Annex of Anticipated Ordinary Business Expense Shortfalls |

EXHIBITS

| Exhibit A | Form of Administrative Questionnaire |
|-----------|-------------------------------------|
| Exhibit B | Form of Assignment and Acceptance |
| Exhibit C | Form of Borrowing Notice |
| Exhibit D | Form of Intercompany Note |
| Exhibit E-1 | Form of United States Tax Compliance Certificate (For Non-U.S. Lenders that are not Partnerships) |
| Exhibit E-2 | Form of United States Tax Compliance Certificate (For Non-U.S. Lenders that are Partnerships) |
| Exhibit E-3 | Form of United States Tax Compliance Certificate (For Non-U.S. Participants that are not Partnerships) |
| Exhibit E-4 | Form of United States Tax Compliance Certificate (For Non-U.S. Participants that are Partnerships) |
| Exhibit F | Form of Variance Report |
| Exhibit G | Form of Term Note |
| Exhibit H | Form of Interim Order |

SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT, dated as of January 18, 2019, among GYMBOREE GROUP, INC., a Delaware corporation and a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code ("**Lead Borrower**" or the "**Company**"; and together with each other Person signatory hereto as a "Borrower" as of the date hereof (or that becomes a "Borrower" hereunder after the date hereof in accordance with the terms hereof), are referred to hereinafter each individually as a "**Borrower**", and individually and collectively, jointly and severally, as the "**Borrowers**"), GYMBOREE INTERMEDIATE CORPORATION, a Delaware corporation and a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code ("**Holdings**"), the other Guarantors party hereto from time to time, the Lenders (such term and each other capitalized term used but not defined in this introductory statement having the meaning given it in Article 1), and SPECIAL SITUATIONS INVESTING GROUP, INC., as administrative agent (in such capacity, including any successor thereto, the "**Administrative Agent**") and as collateral agent (in such capacity, including any successor thereto, the "**Collateral Agent**") for the Lenders.

WHEREAS, on January 16, 2019 (the "**Petition Date**"), the (i) Lead Borrower, Holdings, Gymboree Retail Stores, LLC, a California limited liability company, Gymboree Manufacturing, Inc., a California corporation, Gymboree Operations, Inc., a California corporation, Gym-Mark, Inc., a California corporation, Gym-Card, LLC, a Virginia limited liability company, Gymboree Wholesale, Inc., a California corporation, and Gymboree Distribution, Inc., a Delaware corporation (collectively the "**Debtors**" and each individually a "**Debtor**"), commenced Chapter 11 Case No. 19-30258 with the United State Bankruptcy Court for the Eastern District of Virginia (the "**Bankruptcy Court**"). The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

WHEREAS, prior to the Petition Date, the Lenders provided financing to the Borrowers pursuant to that certain Credit Agreement, dated as of September 29, 2017, by and among the Borrower, Holdings, the Prepetition Term Agent, the Lenders, and the other parties party thereto the (the "**Prepetition Term Loan Agreement**").

WHEREAS, the Borrowers have requested, and, upon the terms and conditions set forth in this Agreement, the Lenders have agreed to make available to the Borrowers, a secured, superpriority debtor-in-possession term loan facility in the maximum principal amount of $30,000,000 in the aggregate (the "**Term DIP Facility**"), for the purposes set forth herein;

WHEREAS, each Borrower and each Guarantor has agreed to secure all of their Obligations under the Loan Documents by granting the Administrative Agent, for the benefit of the Administrative Agent and the other Secured Parties, a security interest in and lien upon substantially all of their existing and after-acquired personal and real property (subject to the limitations contained in the Loan Documents and the Orders (as hereinafter defined));

WHEREAS, the Borrowers desire that all Obligations of the Borrowers under the Loan Documents will be joint and several (and guaranteed by each other) and that all of the Guarantors will guaranty all of the Obligations under the Loan Documents.

NOW, THEREFORE, in consideration of the premises and the mutual agreements contained herein, the parties hereto agree as follows:

# ARTICLE 1
## DEFINITIONS

Section 1.01.    *Defined Terms.*    As used in this Agreement, the following terms shall have the meanings specified below:

"**ABL Priority Collateral**" shall have the meaning assigned to such term in the Prepetition Intercreditor Agreement.

"**ABR**" when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

"**Acceptable Confirmation Order**" means an order of the Bankruptcy Court confirming an Acceptable Plan, in form and substance satisfactory to the Required Lenders in their reasonable discretion (as the same may be amended, supplemented, or modified from time to time after entry thereof with the consent of the Required Lenders in their reasonable discretion); *provided* that an order confirming a plan of reorganization that provides for the indefeasible payment in full in cash of the Term DIP Loans and the Prepetition Term Loans and a release of the Agents, the Lenders, the Prepetition Term Agent and the Prepetition Term Lenders shall be deemed an Acceptable Confirmation Order.

"**Acceptable Disclosure Statement**" means the disclosure statement relating to the Acceptable Plan that is satisfactory to the Required Lenders in their reasonable discretion (as the same may be amended, supplemented, or modified from time to time after the initial filing thereof with the consent of the Required Lenders in their reasonable discretion).

"**Acceptable Plan**" means the plan of reorganization or liquidation that is satisfactory to the Required Lenders in their reasonable discretion (as the same may be amended, supplemented, or modified from time to time after the initial filing thereof with the consent of the Required Lenders in their reasonable discretion); *provided* that a plan of reorganization that provides for the indefeasible payment in full in cash of the Term DIP Loans and the Prepetition Term Loans and a release of the Agents, the Lenders, the Prepetition Term Agent and the Prepetition Term Lenders shall be deemed an Acceptable Plan.

"**Account Control Agreement**" shall have the meaning set forth in Section 6.11(b).

"**Adjusted LIBO Rate**" shall mean, with respect to any Eurodollar Borrowing for any Interest Period, an interest rate per annum equal to the greater of (a) 2.00% per annum and (b) the LIBO Rate in effect for such Interest Period.

"**Administrative Agent**" shall have the meaning assigned to such term in the introductory statement to this Agreement.

"**Administrative Questionnaire**" shall mean an Administrative Questionnaire in the form of Exhibit A, or such other form as may be supplied from time to time by the Administrative Agent.

"**Affiliate**" shall mean, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"**Agency Agreement**" shall have the meaning set forth in Section 6.19(j).

"**Agents**" shall have the meaning assigned to such term in Article 9.

"**Agreement**" or "**this Agreement**" shall mean this Superpriority Secured Debtor-In-Possession Credit Agreement, as the same may be amended, supplemented or otherwise modified from time to time.

"**Alternate Base Rate**" shall mean, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus 1/2 of 1%, (c) the Adjusted LIBO Rate for a one month Interest Period on such day (or if such day is not a Business Day, the immediately preceding Business Day) plus 1.00% and (d) zero percent (0%) per annum; provided that, for the avoidance of doubt, the Adjusted LIBO Rate for any day shall be based on the rate determined on such day at approximately 11 a.m. (London time) by reference to the British Bankers' Association Interest Settlement Rates for deposits in Dollars (as set forth by any service selected by the Administrative Agent that has been nominated by the British Bankers' Association as an authorized vendor for the purpose of displaying such rates). If the Administrative Agent shall have

determined (which determination shall be conclusive absent manifest error) that it is unable to ascertain the Federal Funds Effective Rate for any reason, including the inability or failure of the Administrative Agent to obtain sufficient quotations in accordance with the terms of the definition thereof, the Alternate Base Rate shall be determined without regard to clause (b) of the preceding sentence until the circumstances giving rise to such inability no longer exist.  Any change in the Alternate Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate shall be effective on the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate, as the case may be.

"**Amended and Restated Fee Letter**" means the amended and restated fee letter entered into on the First Amendment Effective Date, among the Lead Borrower, Holdings and the Administrative Agent.

"**Anti-Corruption and Anti-Bribery Laws**" shall mean any and all applicable requirements of law related to the prevention of corruption and bribery, including, without limitation, the U.S. Foreign Corrupt Practices Act of 1977, as amended.

"**Anti-Terrorism and Anti-Money Laundering Laws**" shall mean any and all applicable requirements of law related to engaging in, financing, or facilitating terrorism or money laundering, including the PATRIOT Act, The Currency and Foreign Transactions Reporting Act (also known as the "Bank Secrecy Act", 31 U.S.C. §§5311-5330 and 12 U.S.C. §§1818(s), 1820(b) and 1951-1959), Trading With the Enemy Act (50 U.S.C. §1 et seq.), Executive Order 13224 (effective September 24, 2001) and each of the laws, regulations, and executive orders administered by OFAC (31 C.F.R., Subtitle B, Chapter V).

"**Anticipated Ordinary Business Expense Shortfalls**" shall mean the excess of anticipated ordinary course expenditures for the upcoming three-month period over the anticipated cash receipts available to be used for those expenditures. Such anticipated expenditures shall only qualify to the extent that they (i) are anticipated to be deductible by the Loan Parties under Section 162 of the Code, as determined by the Lenders in their reasonable discretion; or (ii) are for the payment of amounts included in the cost of goods sold. Anticipated Ordinary Business Expense Shortfalls shall not take into account professional fees, other non-recurring costs or expenses related to the Chapter 11 Cases or any Expenses (as such term is defined in the Agency Agreement) to the extent payable or reimbursable by the Agent pursuant to the terms of the Agency Agreement. As of the Closing Date, the Anticipated Ordinary Business Expense Shortfalls are as set forth on the Annex attached to Schedule I hereto, which such Annex shall be updated and delivered to the Administrative Agent concurrently with any update to the Approved Budget.

"**Applicable Margin**" shall mean, for any day (a) with respect to any Eurodollar (x) Class A DIP Loan, 8.25% per annum or (y) Class B New Money DIP Loan, 11.25% per annum and (b) with respect to any ABR (x) Class A DIP Loan, 7.25% per annum or (y) Class B New Money DIP Loan, 10.25% per annum.

"**Approved Budget**" means the budget prepared by the Borrower in the form of Schedule I and initially furnished to the Administrative Agent on the Closing Date and which has been approved by the Required Lenders on the date hereof, as the same may be updated, modified or supplemented from time to time and approved by the Administrative Agent as provided in Section 6.17.

"**Assignment and Acceptance**" shall mean an assignment and acceptance entered into by a Lender and an Eligible Assignee, and accepted by the Administrative Agent, in the form of Exhibit B or such other form as shall be approved by the Administrative Agent.

"**Assignment Taxes**" shall have the meaning assigned to such term in Section 3.01(b).

"**Attorney Costs**" shall mean and shall include all reasonable fees, expenses and disbursements of any law firm or other external legal counsel.

3

"**Attributable Indebtedness**" shall mean, on any date, in respect of any Capitalized Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP as in effect on the Closing Date.

"**Australian Dollars**" shall mean lawful money of Australia.

"**Bail-In Action**" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"**Bail-In Legislation**" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time that is described in the EU Bail-In Legislation Schedule.

"**Bankruptcy Code**" shall mean Title 11 of the United States Code (11 U.S.C. Section 101 et seq.) as now or hereafter in effect, or any successor thereto.

"**Bankruptcy Court**" shall have the meaning assigned to such term in the recitals to this Agreement.

"**Board**" shall mean the Board of Governors of the Federal Reserve System of the United States of America.

"**Borrower**" and "**Borrowers**" shall have the meaning assigned to such term in the introductory statement to this Agreement.

"**Borrower Materials**" shall have the meaning assigned to such term in Section 10.01(c).

"**Borrowing**" shall mean Loans of the same Class and Type made, converted or continued on the same date and as to which a single Interest Period is in effect.

"**Borrowing Notice**" shall mean a request by the Lead Borrower in accordance with the terms of Section 2.03 and substantially in the form of Exhibit C, or such other form as shall be approved by the Administrative Agent.

"**Budget Testing Date**" means the date that is the Friday of the first full week after the Closing Date by (no later than 5:00 p.m. (New York time)), and each subsequent Friday (no later than 5:00 p.m. (New York time)).  For the avoidance of doubt, the first Budget Testing Date following the Closing Date shall be based on the First Test Period.

"**Business**" means the business of designing, manufacturing, procuring, marketing, licensing, selling (including through retail and outlet stores, concessions and e-commerce sites) and/or distributing contemporary apparel, footwear, and jeanswear products and related accessories (including jewelry and handbags) or any other business reasonably related to the foregoing.

"**Business Day**" shall mean any day other than a Saturday, Sunday or day on which banks in New York City are authorized or required by law to close; *provided, however*, that when used in connection with a Eurodollar Loan, the term "**Business Day**" shall also exclude any day on which banks are not open for dealings in Dollar deposits in the London interbank market.

"**Canadian Dollars**" shall mean lawful money of Canada.

"**Capitalized Leases**" shall mean all leases that have been or are required to be, in accordance with GAAP as in effect on the Closing Date, recorded as capitalized leases; *provided* that for all purposes hereunder the amount of obligations under any Capitalized Lease shall be the amount thereof accounted for as a liability in accordance with GAAP as in effect on the Closing Date.

"**Carve-Out**" shall have the meaning assigned to such term in the Interim Order or the Final Order, as applicable.

"**Cash Equivalents**" shall mean any of the following types of Investments, to the extent owned by Holdings, the Borrowers or any Subsidiary:

(a)        Dollars, Australian Dollars, Canadian Dollars and euros;

(b)        in the case of any Foreign Subsidiary, such local currencies held by them from time to time in the ordinary course of business and not for speculation;

(c)        direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America), in each case maturing within one year from the date of issuance thereof;

(d)        investments in commercial paper maturing within 270 days from the date of issuance thereof and having, at such date of acquisition, the highest credit rating obtainable from S&P or from Moody's;

(e)        investments in demand deposits, certificates of deposit, banker's acceptances and time deposits maturing within one year from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, the Administrative Agent or any domestic office of any commercial bank organized under the laws of the United States of America or any State thereof that has a combined capital and surplus and undivided profits of not less than $500,000,000 and that issues (or the parent of which issues) commercial paper rated at least "Prime 1" (or the then equivalent grade) by Moody's or "A 1" (or the then equivalent grade) by S&P;

(f)        fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clause (c) above and entered into with a financial institution satisfying the criteria of clause (e) above;

(g)        investments in "money market funds" within the meaning of Rule 2a-7 of the Investment Company Act of 1940, as amended, substantially all of whose assets are invested in investments of the type described in clauses (a) through (e) above; and

(h)        other short-term investments utilized by Foreign Subsidiaries in accordance with normal investment practices for cash management in investments of a type analogous to the foregoing.

"**Casualty Event**" shall mean any event that gives rise to the receipt by the Borrowers or any Subsidiary of any insurance proceeds or condemnation awards in respect of any equipment, fixed assets or Real Property (including any improvements thereon) to replace or repair such equipment, fixed assets or Real Property or as compensation for such condemnation event.

"**CFC Holding Company**" shall have the meaning assigned to such term in the definition of "Excluded Subsidiary".

"**Change of Control**" shall be deemed to occur if:

(a)        any person or group other than Permitted Holders owns more than 50% of the outstanding economic and voting Equity Interests of Holdings; or

(b)        a "**change of control**" (or similar event) shall occur under any Indebtedness for borrowed money; or

(c)        except pursuant to a transaction permitted under this Agreement, Holdings ceases to beneficially own and control, directly or indirectly, 100% on a fully diluted basis of the economic and voting Equity Interests of the Borrower or any of its Subsidiaries.

"**Chapter 11 Cases**" shall mean the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the United States Bankruptcy Court for the Eastern District of Virginia.

"**Charges**" shall have the meaning assigned to such term in Section 10.09.

"**Class**" when used in reference to (a) any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are Term DIP Loans, and (b) any Lender, refers to whether such Lender has a Loan or Term Loan Commitment with respect to a particular Class of Loans or Term Loan Commitments.  For the avoidance of doubt, Class A DIP Loans and Class B New Money DIP Loans shall constitute separate Classes for purposes of this Agreement.

"**Class A Lender**" shall mean any Lender holding a Class A DIP Loan and/or a Class A New Money Commitment.

"**Class A DIP Loans**" shall mean the Class A New Money DIP Loans, if any, and the Roll-Up Loans.

"**Class A New Money Commitment**" shall mean, with respect to each Class A Lender, the commitment, if any, of such Lender to make a Class A New Money DIP Loan hereunder, as may be increased pursuant to Section 2.01(c) and the First Amendment Effective Date Commitment.

"**Class A New Money DIP Loans**" shall have the meaning set forth in Section 2.01(a).

"**Class B DIP Funding Account**" shall mean a segregated deposit account where Borrowers maintain the proceeds of any Class B New Money DIP Loans.

"**Class B Lender**" shall mean any Lender holding a Class B New Money Commitment.

"**Class B New Money Commitment**" shall mean, with respect to each Class B Lender, the commitment, if any, of such Lender to make a Class B New Money DIP Loan hereunder, as may be increased pursuant to Section 2.01(c).

"**Class B New Money DIP Loans**" shall have the meaning set forth in Section 2.01(b).

"**Class B Segregated Operating Account**" shall mean the deposit account established by the Borrower for the purpose of receipt of the Class B Withdrawals.

"**Class B Withdrawal**" shall mean a disbursement of funds from the Class B DIP Funding Account.

"**Closing Date**" shall mean January 18, 2019.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"**Collateral**" shall mean all the "**Collateral**" as defined in any Collateral Document or any Order and any assets, property or proceeds that are subject to the Collateral and Guarantee Requirement.

"**Collateral Agent**" shall have the meaning assigned to such term in the introductory statement to this Agreement.

"**Collateral and Guarantee Requirement**" shall mean, at any time, the requirement that:

(a)        on the Closing Date the Administrative Agent and the Collateral Agent shall have received the Security Agreement and the Account Control Agreement, each duly executed by each Loan Party party thereto;

(b)        subject to the Orders and the Prepetition Intercreditor Agreement, the Obligations shall have been secured by a first-priority perfected security interest in substantially all of the Loan Parties' respective assets, both tangible and intangible, real and personal, and all proceeds thereof, including but not limited to (i) a valid and perfected first priority lien and security interest in the "Term Priority Collateral" (as such term is defined in the Prepetition Intercreditor Agreement), including, without limitation, the accounts of all of the Loan Parties that constitute Term Priority Collateral and (ii) a second priority lien and security interest in the "ABL Priority Collateral" (as such term is defined in the Prepetition Intercreditor Agreement) (it being understood that ABL Priority Collateral shall exclude, in any event, all interests in Real Property, including, without limitation, leasehold interests in Real Property and the accounts of all of the Loan Parties that constitute ABL Priority Collateral), excluding in any event "Excluded Assets" (as defined in the Security Agreement); and

(c)        subject to the Orders and the Prepetition Intercreditor Agreement, the Obligations shall have been secured by a perfected security interest in, and mortgage lien on, substantially all tangible and intangible assets of the Borrowers and each Guarantor (including Equity Interests and intercompany debt, accounts, inventory, equipment, investment property, contract rights, IP Rights, other general intangibles, Real Property, deposit accounts, securities accounts and proceeds of the foregoing), in each case, subject to exceptions and limitations otherwise set forth in this Agreement and the Collateral Documents (to the extent appropriate in the applicable jurisdiction);

"**Collateral Documents**" shall mean, collectively, the Security Agreement, collateral assignments, security agreements, pledge agreements, Intellectual Property Security Agreements or other similar agreements delivered to the Administrative Agent or the Collateral Agent pursuant to Section 4.01, Section 6.11 or Section 6.13 and each of the other agreements, instruments or documents that creates or purports to create a Lien in favor of the Collateral Agent for the benefit of the Secured Parties.

"**Commitment Increase**" shall have the meaning assigned to such term in Section 2.01(c).

"**Committee**" shall mean the official committee of unsecured creditors appointed in the Chapter 11 Case.

"**Commodity Exchange Act**" shall mean the Commodity Exchange Act (7 U.S.C. § 1 *et seq*.), as amended from time to time, and any successor statute.

"**Communications**" shall have the meaning assigned to such term in Section 10.01(c).

"**Company**" shall have the meaning assigned to such term in the introductory statement to this Agreement.

"**Contractual Obligation**" shall mean, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"**Control**" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"**Debtor Relief Laws**" shall mean the Bankruptcy Code of the United States and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**Debtor**" shall have the meaning assigned to such term in the preamble hereto.

"**Default**" shall mean any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"**DIP Funding Account**" shall mean (i) the General Purpose DIP Funding Account and the Class B DIP Funding Account, as applicable, and (ii) solely for the purposes of funding any First Amendment DIP Loans, any other deposit account necessary to segregate the proceeds of the First Amendment DIP Loans pursuant to the terms of Section 7.10(a) hereof, which for the avoidance of doubt, shall be subject to a Account Control Agreement.

"**DIP Termination Date**" shall mean the date that all Obligations will be due and payable in full in cash, unless otherwise agreed to by the Lenders in writing, which such date shall be the earliest of (i) the date that is two hundred and ten (210) calendar days after the Petition Date, (ii) the consummation of any sale of all or substantially all of the assets of the Debtors pursuant to Section 363 of the Bankruptcy Code (other than the sales contemplated by the Milestones contained herein), (iii) if the Final Order has not been entered, the date that is 35 calendar days after the Petition Date, (iv) the acceleration of the Loans and the termination of the Term Loan Commitments pursuant to an Event of Default, and (v) the substantial consummation of any plan of reorganization or liquidation in the Chapter 11 Cases.

"**Disposition**" or "**Dispose**" shall mean the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction and any sale or issuance of Equity Interests in a Subsidiary) of any property by any Person, including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"**Disqualified Equity Interests**" shall mean any Equity Interest that, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable and the termination of the Term Loan Commitments), (b) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests), in whole or in part, (c) provides for the scheduled payments of dividends in cash, or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is ninety-one (91) days after the Maturity Date; *provided* that if such Equity Interests are issued pursuant to a plan for the benefit of employees of Holdings (or any direct or indirect parent thereof), the Borrowers or their Subsidiaries or by any such plan to such employees, such Equity Interests shall not constitute Disqualified Equity Interests solely because it may be required to be repurchased by the Borrowers or their Subsidiaries, as applicable, in order to satisfy applicable statutory or regulatory obligations.

"**Dollars**" or "**$**" shall mean lawful money of the United States of America.

"**Domestic Subsidiary**" shall mean any Subsidiary that is organized under the Laws of the United States, any state thereof or the District of Columbia; *provided*, that Gymboree Island, LLC, a Puerto Rico entity, shall be deemed not to be a Domestic Subsidiary.

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in any EEA Member Country that is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country that is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country that is a subsidiary of an institution described in clause (a) or clause (b) of this definition and is subject to consolidated supervision with its parent.

"**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

8

"**EEA Resolution Authority**" means any public administrative authority or any other Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Eligible Assignee**" shall mean (i) a Lender, (ii) an Affiliate of a Lender, (iii) a Related Fund of a Lender, and (iv) any other Person (other than a natural person) approved by the Administrative Agent.

"**Environmental Laws**" shall mean all former, current and future federal, state, local and foreign laws (including common law), treaties, regulations, rules, ordinances, codes, decrees, judgments, directives, orders (including consent orders), and agreements in each case, relating to the environment, natural resources, human health and safety or the presence, Release of, or exposure to, hazardous materials, or the generation, manufacture, processing, distribution, use, treatment, storage, transport, recycling or handling of, or the arrangement for such activities with respect to, hazardous materials.

"**Environmental Liability**" shall mean all liabilities, obligations, damages, losses, claims, actions, suits, judgments, orders, fines, penalties, fees, expenses and costs (including administrative oversight costs, natural resource damages and investigation or remediation costs), whether contingent or otherwise, arising out of or relating to (a) compliance or non-compliance with any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"**Environmental Permit**" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"**Equity Interests**" shall mean, with respect to any Person, all of the shares, interests, rights, participations or other equivalents (however designated) of capital stock of (or other ownership or profit interests or units in) such Person and all of the warrants, options or other rights for the purchase, acquisition or exchange from such Person of any of the foregoing (including through convertible securities).

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time.

"**ERISA Affiliate**" shall mean any trade or business (whether or not incorporated) that, together with a Loan Party or any Subsidiary, is treated as a single employer under Section 414(b) or (c) of the Code, or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"**ERISA Event**" shall mean (a) a Reportable Event; (b) the failure to satisfy the minimum funding standard with respect to a Plan within the meaning of Section 412 of the Code or Section 303 or 304 of ERISA, whether or not waived (unless such failure is corrected by the final due date for the plan year for which such failure occurred), (c) a determination that a Plan is or will be in "at risk" status (as defined in Section 303(i)(4) of ERISA or Section 430(i)(4) of the Code); (d) the receipt by a Loan Party, any Subsidiary or any of their respective ERISA Affiliates of notice pursuant to Section 305(b)(3)(D) of ERISA that a Multiemployer Plan is or will be in "endangered status" or "critical status" (as defined in Section 305(b) of ERISA); (e) the filing pursuant to Section 431 of the Code or Section 304 of ERISA of an application for the extension of any amortization period; (f) the failure to timely make a contribution required to be made with respect to any Plan; (g) the filing of a notice to terminate any Plan if such termination would require material additional contributions in order to be considered a standard termination within the meaning of Section 4041(b) of ERISA; (h) the filing under Section 4041(c) of ERISA of a notice of intent to terminate any Plan or the termination of any Plan under Section 4041(c) of ERISA; (i) the filing pursuant to Section 412(c) of the Code of an application for a waiver of the minimum funding standard with respect to any Plan; (j) the incurrence by a Loan Party, any Subsidiary or any of their respective ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan, other than for the payment of Plan contributions or of

premiums to the PBGC; (k) the receipt by a Loan Party, any Subsidiary or any of their respective ERISA Affiliates from the PBGC of any notice of an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan under Section 4042 of ERISA; (l) the receipt by a Loan Party, any Subsidiary or any of their respective ERISA Affiliates of any notice, or the receipt by any Multiemployer Plan from a Loan Party, any Subsidiary or any of their respective ERISA Affiliates of any notice, concerning the imposition of Withdrawal Liability; (m) the occurrence of any event or condition that constitutes grounds under ERISA for the termination of a Plan or the appointment of a trustee to administer a Plan; (n) any Foreign Benefit Event or (o) the occurrence of a nonexempt prohibited transaction (within the meaning of Section 406 of ERISA or Section 4975 of the Code) with respect to any Plan which could reasonably be expected to result in liability to a Loan Party, any Subsidiary or any of their respective ERISA Affiliates.

"**EU Bail-In Legislation Schedule**" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person).

"**Eurodollar**", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"**Event of Default**" shall have the meaning assigned to such term in Article 8.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Excluded Subsidiary**" shall mean (a) any Subsidiary that is not a wholly owned Subsidiary of a Borrower or a Guarantor, (b) [reserved], (c) any Subsidiary that is prohibited by applicable Law or Contractual Obligations existing on the Closing Date (or, in the case of any newly acquired Subsidiary, in existence at the time of acquisition but not entered into in contemplation thereof) from Guaranteeing the Obligations or if Guaranteeing the Obligations would require governmental (including regulatory) consent, approval, license or authorization, (d) any other Subsidiary with respect to which a guarantee could result in an adverse tax or regulatory consequence to Holdings or its Subsidiaries (including as a result of the operation of Section 956 of the Code as determined in good faith by the Lead Borrower), (e) any Subsidiary where the burden or cost of obtaining a guarantee (including any adverse tax or regulatory consequence) outweighs the benefit to the Lenders, as mutually determined by the Lead Borrower and the Administrative Agent, (f) any Foreign Subsidiary of a Borrower or of any other direct or indirect Domestic Subsidiary or Foreign Subsidiary, (g) any special purpose securitization vehicle (or similar entity), (h) any direct or indirect Domestic Subsidiary (x) that is treated as a disregarded entity for federal income tax purposes and (y) substantially all of the assets of which are (1) the Equity Interests of a Foreign Subsidiary (including, for this purpose, any debt or other instrument treated as equity for U.S. federal income tax purposes) in, or debt or other instrument issued by, one or more (A) non-U.S. subsidiaries, each of which is a "controlled foreign corporation" within the meaning of Section 957 of the Internal Revenue Code and/or (B) other CFC Holding Companies and (2) cash, cash equivalents and incidental assets related thereto held on a temporary basis (a "**CFC Holding Company**"); provided that, for the avoidance of doubt, a subsidiary that would otherwise qualify as a CFC Holding Company will not fail to qualify as a CFC Holding Company due to the temporary receipt of cash payments in respect of its stock or debt in a CFC Holding Company so long as such subsidiary promptly distributes such cash), (i) any Domestic Subsidiary that is a Subsidiary of a Foreign Subsidiary that is a controlled foreign corporation within the meaning of Section 957 of the Code, and (j) any joint venture.

"**FATCA**" shall mean Sections 1471 through 1474 of the Code, as in effect on the Closing Date (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any applicable Treasury regulation promulgated thereunder or published administrative guidance implementing such Sections whether in existence on the Closing Date or promulgated or published thereafter, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities entered into in connection with the implementation of the foregoing.

"**Federal Funds Effective Rate**" shall mean, for any day, the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for the day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"**Fee Letter**" shall mean the Fee Letter dated January 18, 2019, among the Lead Borrower, Holdings and the Administrative Agent.

"**Fees**" shall have the meaning assigned to such term in Section 2.05.

"**Final Order**" means the final order of the Bankruptcy Court, approving the Term DIP Facility on a final basis, in form and substance satisfactory to the Administrative Agent and the Required Lenders in their sole discretion, as the same may be amended, modified or supplemented from time to time with the express written consent of the Required Lenders (and with respect to amendments, modifications or supplements that affect the rights or duties of the Administrative Agent).

"**Final Order Roll-Up Loan**" shall have the meaning assigned to such term in Section 2.01(a)(ii).

"**First Amendment DIP Loans**" shall have the meaning assigned to such term in Section 7.10(a).

"**First Amendment Designated Expenses**" shall have the meaning assigned to such term in Section 7.10(a).

"**First Amendment Effective Date Commitment**" shall mean, with respect to each Lender, the commitment, if any, of such Lender to make a Class A New Money DIP Loan on the First Amendment Effective Date.

"**First Test Period**" shall have the meaning assigned to such term in the definition of "Permitted Variance".

"**Foreign Benefit Event**" shall mean, with respect to any Foreign Pension Plan, (a) the existence of unfunded liabilities in excess of the amount permitted under any applicable law or in excess of the amount that would be permitted absent a waiver from applicable governmental authority, (b) the failure to make the required contributions or payments, under any applicable law, on or before the due date for such contributions or payments (including any applicable grace period), (c) the receipt of a notice by applicable Governmental Authority relating to the intention to terminate any such Foreign Pension Plan or to appoint a trustee or similar official to administer any such Foreign Pension Plan, in either case to protect the interests of the participants or to avoid any unreasonable deterioration of the financial condition of the Foreign Pension Plan or any unreasonable increase in liability with respect to the Foreign Pension Plan or alleging the insolvency of any such Foreign Pension Plan, (d) the incurrence by a Loan Party, any Subsidiary or any Affiliate of any liability under applicable law on account of the complete or partial termination of such Foreign Pension Plan or the complete or partial withdrawal of any participating employer therein or (e) the occurrence of any transaction that is prohibited under any applicable law and that could reasonably be expected to result in the incurrence of any liability by a Loan Party, any Subsidiary or any Affiliate, other than for the payment of Foreign Pension Plan contributions or of premiums to the applicable Governmental Authority.

"**Foreign Lender**" shall mean any Lender that is organized under the laws of a jurisdiction other than that in which the Lead Borrower is located. For purposes of this definition, the United States of America, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"**Foreign Pension Plan**" shall mean any defined benefit plan described in Section 4(b)(4) of ERISA that under applicable law is required to be funded through a trust or other funding vehicle other than a trust or funding vehicle maintained exclusively by a Governmental Authority.

"**Foreign Subsidiary**" shall mean any direct or indirect Subsidiary of the Borrowers which is not a Domestic Subsidiary; *provided*, that Gymboree Canada shall be deemed to be a Foreign Subsidiary.

"**GAAP**" shall mean generally accepted accounting principles in the United States of America, as in effect from time to time; *provided, however*, that if the Lead Borrower notifies the Administrative Agent that the Borrowers request an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Lead Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then, if the Administrative Agent accepts such request from the Lead Borrower, such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith; *provided*, *further* that GAAP as applied herein with respect to Attributable Indebtedness and Capitalized Leases shall be GAAP as in effect on the Closing Date.

"**General Purpose DIP Funding Account**" shall mean a segregated deposit account where Borrowers maintain the proceeds of any Class A New Money DIP Loans.

"**General Purpose Segregated Operating Account**" means the deposit account established by the Borrower for the purpose of receipt of the General Purpose Withdrawal and proceeds of Term Priority Collateral.

"**General Purpose Withdrawal**" means a disbursement of funds from the General Purpose DIP Funding Account.

"**GOB and Lease Sale Motion**" shall have the meaning set forth in Section 6.19(j).

"**Governmental Authority**" shall mean any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, administrative tribunal, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"**Granting Lender**" shall have the meaning assigned to such term in Section 10.04(i).

"**GS Lenders**" shall mean Special Situations Investing Group, Inc. and Goldman Sachs Specialty Lending Holdings, Inc.

"**Guarantee**" shall mean, as to any Person, without duplication, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other monetary obligation payable or performable by another Person (the "**primary obligor**") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other monetary obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other monetary obligation of the payment or performance of such Indebtedness or other monetary obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other monetary obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other monetary obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other monetary obligation of any other Person, whether or not such Indebtedness or other monetary obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien) or (c) to be an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation; *provided* that the term "Guarantee" shall not include endorsements for collection or deposit, in either case in the ordinary course of business, or customary and reasonable indemnity obligations in

12

effect on the Closing Date or entered into in connection with any acquisition or disposition of assets permitted under this Agreement (other than such obligations with respect to Indebtedness. The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "**Guarantee**" as a verb has a corresponding meaning.

"**Guaranteed Obligations**" shall have the meaning specified in Section 11.01.

"**Guarantors**" shall mean (i) Holdings, (ii) each wholly owned Domestic Subsidiary of Borrowers as of the Closing Date (other than an Excluded Subsidiary) and (iii) each wholly owned Subsidiary that issues a Guarantee of the Obligations after the Closing Date pursuant to Section 6.11 (which Section 6.11, for the avoidance of doubt, does not require that any Excluded Subsidiary provide such a Guarantee) or otherwise. For avoidance of doubt, the Borrowers may cause any Subsidiary that is not a Guarantor to Guarantee the Obligations by causing such Subsidiary to execute a joinder to this Agreement in form and substance reasonably satisfactory to the Administrative Agent, and any such Subsidiary shall be treated as a Guarantor hereunder for all purposes.

"**Guaranty**" shall mean, collectively, the guaranty of the Obligations by the Guarantors pursuant to this Agreement.

"**Gymboree Canada**" shall mean that certain Subsidiary of Holdings that is organized under the Laws of the province of New Brunswick, Canada as "Gymboree, Inc.".

"**Hazardous Materials**" shall mean (a) any petroleum products, distillates or byproducts and all other hydrocarbons, coal ash, radon gas, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, chlorofluorocarbons and all other ozone-depleting substances and (b) any chemical, material, substance or waste that is prohibited, limited or regulated by or pursuant to any Environmental Law.

"**Holdings**" shall have the meaning assigned to such term in the introductory statement to this Agreement.

"**Increase Date**" shall have the meaning assigned to such term in Section 2.01(c).

"**Indebtedness**" shall mean, as to any Person at a particular time, without duplication, all of the following:

(a)    all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)    the maximum amount (after giving effect to any prior drawings or reductions which may have been reimbursed) of all outstanding letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds, performance bonds and similar instruments issued or created by or for the account of such Person;

(c)    net obligations of such Person under any Swap Contract;

(d)    all obligations of such Person to pay the deferred purchase price of property or services (other than (i) trade accounts payable in the ordinary course of business and (ii) liabilities accrued in the ordinary course);

(e)    indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements and mortgage, industrial revenue bond, industrial development bond and similar financings), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)    all Attributable Indebtedness; and

13

(g)       all obligations of such Person in respect of Disqualified Equity Interests; whether or not the foregoing would constitute indebtedness or a liability in accordance with GAAP;

(h)       the principal and interest portions of all rental obligations of such Person under any Synthetic Lease, tax retention operating lease, off-balance sheet loan or similar off-balance sheet financing where such transaction is considered borrowed money indebtedness for tax purposes but is classified as an operating lease in accordance with GAAP; and

(i)       to the extent not otherwise included above, all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or joint venturer, except to the extent such Person's liability for such Indebtedness is otherwise limited.  The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date.  The amount of Indebtedness of any Person for purposes of clause (e) that is limited in recourse to the property encumbered thereby shall be deemed to be equal to the lesser of (i) the aggregate unpaid amount of such Indebtedness and (ii) the fair market value of the property encumbered thereby as determined by such Person in good faith.

 "**Indemnified Taxes**" shall have the meaning assigned to such term in Section 3.01(a).

"**Indemnitee**" shall have the meaning assigned to such term in Section 10.05(b).

"**Information**" shall have the meaning assigned to such term in Section 10.16.

"**Initial New Money DIP Loans**" shall have the meaning assigned to such term in Section 2.01(a)(ii).

"**Initial Roll-Up Loan**" shall have the meaning set forth in Section 2.01(a)(ii).

"**Intellectual Property Security Agreement**" shall have the meaning given to the term "Grant of Security Interest" in the Security Agreement.

"**Intercompany Note**" shall mean a promissory note substantially in the form of Exhibit D.

"**Interest Payment Date**" shall mean (a) with respect to any ABR Loan, the first Business Day of each calendar month, and (b) with respect to any Eurodollar Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part.

"**Interest Period**" shall mean, the period commencing on the date of such Borrowing and ending on the numerically corresponding day (or, if there is no numerically corresponding day, on the last Business Day) in the calendar month that is 1, 2 or 3 months thereafter (or any shorter period agreed by all applicable Lenders), as the Lead Borrower may elect; *provided, however,* that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, (b) any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period and (c) no Interest Period for any Loan shall extend beyond the maturity date of such Loan.  Interest shall accrue from and including the first day of an Interest Period to but excluding the last day of such Interest Period. For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made.

14

"**Interim Order**" means, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Cases after an interim hearing (assuming satisfaction of the standard prescribed in Section 324 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), together with all extensions, modifications, and amendments thereto, substantially in the form of Exhibit H hereto or otherwise in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders, which, among other matters but not by way of limitation, (i) authorizes, on an interim basis, the Borrowers and Guarantors to execute and perform under the terms of this Agreement and the other Loan Documents and (ii) approves the Initial Roll-Up Loan.

"**Interim Order Entry Date**" means the date on which the Interim Order shall have been entered on the docket of the Bankruptcy Court.

"**Investment**" shall mean, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests or debt or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of Indebtedness of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person, (c) the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person or (d) the purchase or other acquisition of a Store. For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"**IP and Online Business Assets**" shall have the meaning set forth in Section 6.19(h).

"**IP and Online Business Bid Procedures Motion**" shall have the meaning set forth in Section 6.19(h).

"**IP and Online Business Bid Procedures Order**" shall have the meaning set forth in the Order.

"**IP and Online Business Sale**" shall have the meaning set forth in Section 6.19(h).

"**IP and Online Business Sale Motion**" shall have the meaning set forth in Section 6.19(h).

"**IP Rights**" has the meaning set forth in Section 5.16.

"**J&J Option**" shall have the meaning set forth in the Agency Agreement.

"**Laws**" shall mean, collectively, all international, foreign, federal, state and local laws (including common law), statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, requirements, and agreements with, any Governmental Authority.

"**Lease Rejection Motion**" shall have the meaning set forth in Section 6.19(i).

"**Lease Sale**" shall have the meaning set forth in Section 6.19(j).

"**Leasehold Property**" shall mean any leasehold interest of any Loan Party as lessee under any lease of Real Property.

"**Lender**" shall mean each Class A Lender and Class B Lender from time to time party hereto, together with their permitted successors and assigns.

"**LIBO Rate**" shall mean, with respect to any Eurodollar Borrowing for any Interest Period, the rate per annum determined by the Administrative Agent at approximately 11:00 a.m. (London time) on the date that is two

15

Business Days prior to the commencement of such Interest Period by reference to the British Bankers' Association Interest Settlement Rates for deposits in Dollars (as set forth by any service selected by the Administrative Agent that has been nominated by the British Bankers' Association as an authorized information vendor for the purpose of displaying such rates) for a period equal to such Interest Period; *provided* that, to the extent that an interest rate is not ascertainable pursuant to the foregoing provisions of this definition, the "**LIBO Rate**" shall be the interest rate per annum determined by the Administrative Agent to be the average of the rates per annum at which deposits in Dollars are offered for such relevant Interest Period to major banks in the London interbank market in London, England by the Administrative Agent at approximately 11:00 a.m. (London time) on the date that is two Business Days prior to the beginning of such Interest Period.

"**Lien**" shall mean any mortgage, deed of trust, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to Real Property, and any Capitalized Lease or financing lease having substantially the same economic effect as any of the foregoing).

"**Loan**" shall mean any Term DIP Loan.

"**Loan Documents**" shall mean this Agreement and the Collateral Documents, the Fee Letter, the Prepetition Intercreditor Agreement, and any other agreement, instrument, report and other document executed and delivered pursuant hereto or thereto or otherwise evidencing or securing any Obligation.

"**Loan Parties**" shall mean, collectively, the Borrowers and each Guarantor.

"**Make-Whole Amount**" shall mean, with respect to certain prepayments of the Class A DIP Loans as provided in Section 2.13(e) hereof, made on or before the Maturity Date, an amount equal to (i) 4.25% of the aggregate principal amount of the Class A DIP Loans being prepaid on the date of prepayment plus (ii) all required interest payments that would have been due on the Class A DIP Loans being prepaid on the date of prepayment through and including the Maturity Date had such Class A DIP Loans not been so prepaid assuming that all such interest accrues at the Adjusted LIBO Rate (assuming a one-month Interest Period) plus the Applicable Margin for Eurodollar Loans.

"**Margin Stock**" shall have the meaning assigned to such term in Regulation U.

"**Master Agreement**" shall have the meaning specified in the definition of "**Swap Contract.**"

"**Material Adverse Effect**" shall mean a (a) material adverse effect on the ability of the Loan Parties (taken as a whole) to fully and timely perform any of their payment obligations under any Loan Document to which the Borrowers or any of the Loan Parties is a party; (b) material adverse effect on the rights and remedies available to the Lenders, the Administrative Agent or the Collateral Agent under any Loan Document; (c) material adverse effect on the legality, validity or enforceability of any Loan Document or the Orders or (d) material adverse effect on the perfection or priority of the Liens granted pursuant to the Loan Documents or the Orders (it being agreed that the commencement of the Chapter 11 Cases and the events leading up to the Chapter 11 Cases shall not be deemed to be a Material Adverse Effect).

"**Maturity Date**" means the DIP Termination Date.

"**Maximum Rate**" shall have the meaning assigned to such term in Section 10.09.

"**Milbank**" mean Milbank, Tweed, Hadley & McCloy LLP.

"**Moody's**" shall mean Moody's Investors Service, Inc., or any successor thereto.

16

"**Multiemployer Plan**" shall mean any multiemployer plan as defined in Section 4001(a)(3) of ERISA subject to the provisions of Title IV of ERISA to which a Loan Party, any Subsidiary or any of their respective ERISA Affiliates is an "employer" as defined in Section 3(5) of ERISA.

"**Net Proceeds**" shall mean:

(a)        100% of the cash proceeds actually received by the Borrowers or any of their Subsidiaries (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, including but not limited to any rent value adjustment or other purchase price adjustment of any kind, and including casualty insurance settlements and condemnation and similar awards, but in each case only as and when received) from any Disposition or Casualty Event, net of (i) attorneys' fees, accountants' fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, required debt payments and required payments of other obligations that are secured by a senior Lien which is senior in priority of the Lien of the Term DIP Loans in such asset or property on the applicable asset or property (including without limitation principal amount, premium or penalty, if any, interest and other amounts) (other than pursuant to the Loan Documents), other expenses and brokerage, consultant and other fees actually incurred in connection therewith, (ii) in the case of any Disposition or Casualty Event by a non-wholly owned Subsidiary, the pro rata portion of the Net Proceeds thereof (calculated without regard to this clause (ii)) attributable to minority interests and not available for distribution to or for the account of the Borrowers or a wholly owned Subsidiary as a result thereof, (iii) taxes paid or reasonably estimated to be payable as a result thereof (provided, that if the amount of any such estimated taxes exceeds the amount of taxes actually required to be paid in cash in respect of such Disposition or Casualty Event, the aggregate amount of such excess shall constitute Net Proceeds at the time such taxes are actually paid), and (iv) the amount of any reasonable reserve established in accordance with GAAP against any adjustment to the sale price or any liabilities (other than any taxes deducted pursuant to clause (i) above) (x) related to any of the applicable assets and (y) retained by the Borrowers or any of their Subsidiaries including, without limitation, pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations (however, the amount of any subsequent reduction of such reserve (other than in connection with a payment in respect of any such liability) shall be deemed to be Net Proceeds of such Disposition or Casualty Event occurring on the date of such reduction); and

(b)        100% of the cash proceeds from the incurrence, issuance or sale by the Borrowers or any of their Subsidiaries of any Indebtedness, net of all taxes paid or reasonably estimated to be payable as a result thereof and fees (including investment banking fees and discounts), commissions, costs and other expenses, in each case incurred in connection with such issuance or sale, *provided*, that, if the amount of any estimated taxes exceeds the amount of taxes actually required to be paid in cash, the aggregate amount of such excess shall constitute Net Proceeds at the time such taxes are actually paid.

For purposes of calculating the amount of Net Proceeds, fees, commissions and other costs and expenses payable to Holdings, the Borrowers or their Subsidiaries shall be disregarded.

"**New Money DIP Loans**" means Class A New Money DIP Loans and Class B New Money DIP Loans. The aggregate amount of the New Money DIP Loans on the Closing Date is $30 million.

"**New Money Term DIP Claims**" shall mean each Lender's claim for amounts owed pursuant to the New Money DIP Loans.

"**Obligations**" shall mean all advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party and its Subsidiaries arising under any Loan Document or otherwise with respect to any Loan, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Loan Party or Subsidiary of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding (or would accrue but for the operation of applicable Debtor Relief Laws), regardless of whether such

interest and fees are allowed or allowable claims in such proceeding.  Without limiting the generality of the foregoing, the Obligations of the Loan Parties under the Loan Documents (and of their Subsidiaries to the extent they have obligations under the Loan Documents) include (a) the obligation (including guarantee obligations) to pay principal, interest, reimbursement obligations, charges, expenses, fees, Attorney Costs, indemnities and other amounts payable by any Loan Party under any Loan Document and (b) the obligation of any Loan Party to reimburse any amount in respect of any of the foregoing that any Agent or Lender, in its sole discretion, may elect to pay or advance on behalf of such Loan Party.

"**OFAC**" means the Office of Foreign Assets Control of the U.S. Department of the Treasury and any successor Governmental Authority.

"**Order(s)**" means, as applicable, and as the context may require, the Interim Order or the Final Order.

"**Organization Documents**" shall mean (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"**Other Taxes**" shall have the meaning assigned to such term in Section 3.01(b).

"**Participant Register**" shall have the meaning assigned to such term in Section 10.04(f).

"**PBGC**" shall mean the Pension Benefit Guaranty Corporation referred to and defined in ERISA.

"**Permitted Holders**" shall mean means any holder, directly or indirectly, of Equity Interests in Holdings as of the Closing Date and expressly set forth on a list provided to the Administrative Agent on or prior to the Closing Date.

"**Permitted Variance**" shall mean (A) all favorable variances, (B) with respect to actual disbursements made to the Loan Parties' professionals, a variance of no more than 10% on a cumulative basis for each rolling two week period, (C) with respect to net cash flow (excluding disbursements with respect to the Lenders' professionals) a variance of no more than 10% on a weekly basis, (D) with respect to actual cash receipts, a variance of no more than 10% on a weekly basis (excluding Initial US Guaranty Payments and Initial Canadian Guaranty Payments (each as defined in the Agency Agreement)), and (E) with respect to actual disbursements (other than disbursements specified in clause (A) of this definition and disbursements with respect to the Lenders' professionals) a variance of no more than 7.5% on a weekly basis (each such period, a "**Testing Period**"). The Permitted Variance with respect to each Testing Period shall be determined and reported to the Administrative Agent and the Lenders not later than the Budget Testing Date that concludes such Testing Period.  Additional variances, if any, from the Approved Budget, and any proposed changes to the Approved Budget, shall be subject to the approval of the Administrative Agent as provided in Section 6.17. For the avoidance of doubt, the first Testing Period following the Closing Date shall begin on the Petition Date and continue through and including the Friday of the first full week after the Closing Date (the "**First Test Period**").

"**Person**" shall mean any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"**Petition Date"** shall have the meaning specified in the preamble hereto.

18

"**Plan**" shall mean any employee pension benefit plan subject to the provisions of Title IV of ERISA or Sections 412 and 430 of the Code or Sections 302 and 303 of ERISA and in respect of which a Loan Party, any Subsidiary or any of their respective ERISA Affiliates is (or if such plan were terminated would under Section 4069 of ERISA be deemed to be) a "contributing sponsor" as defined in Section 4001(a)(13) of ERISA.

"**Platform**" shall have the meaning assigned to such term in Section 10.01(c).

"**Post-Petition**" means the time period commencing immediately upon the filing of the applicable Chapter 11 Case.

"**Prepetition**" means the time period immediately prior to the filing of the applicable Chapter 11 Case.

"**Prepetition ABL Agent**" means (i) Bank of America, N.A. in its capacity as administrative agent under any of the Prepetition ABL Documents, or (ii) any successor administrative agent.

"**Prepetition ABL Collateral Agreement**" means the "Security Agreement", dated as of September 29, 2017 (as amended and supplemented from time to time) by and among the Loan Parties and the Prepetition ABL Agent.

"**Prepetition ABL Collateral Documents**" means, collectively, the Prepetition ABL Collateral Agreement, each of the mortgages, collateral assignments, supplements to all of the foregoing, security agreements, pledge agreements, control agreements or other similar agreements delivered to the Prepetition ABL Agent in connection with the Prepetition ABL Credit Agreement, and each of the other agreements, instruments or documents (including, without limitation, patent, trademark or copyright filings) that creates or purports to create a Lien in favor of the Prepetition ABL Agent for the benefit of the Prepetition ABL Lenders.

"**Prepetition ABL Credit Agreement**" means that certain Amended and Restated Credit Agreement, dated as of September 29, 2017, by and among the Borrower, the Guarantors party thereto, the Prepetition ABL Agent and the Prepetition ABL Lenders, as amended, restated, supplemented or otherwise modified from time to time.

"**Prepetition ABL Documents**" means the Prepetition ABL Credit Agreement, the Prepetition ABL Collateral Documents and each of the other agreements, instruments or documents executed pursuant thereto.

"**Prepetition ABL Indebtedness**" shall mean Indebtedness of Holdings, the Borrower, or any Subsidiary outstanding, or secured, under the Prepetition ABL Documents.

"**Prepetition ABL Lenders**" means the lenders party to the Prepetition ABL Credit Agreement, from time to time, under and as defined in the Prepetition ABL Credit Agreement.

"**Prepetition Intercreditor Acknowledgment**" means that certain Acknowledgment and Agreement, dated as of the Closing Date, by and among the Prepetition Administrative Agent, the Prepetition ABL Agent and the Administrative Agent and acknowledged by the Loan Parties.

"**Prepetition Intercreditor Agreement**" means that certain Intercreditor Agreement dated as of September 29, 2017, by and among the Prepetition ABL Agent and the Prepetition Term Agent, as supplemented by the Prepetition Intercreditor Acknowledgment and as amended, supplemented or otherwise modified prior to the date hereof.

"**Prepetition Obligations**" means "Obligations" (as defined in the Prepetition Term Loan Agreement).

"**Prepetition Term Claim**" shall have the meaning set forth in Section 2.01(a)(ii).

19

"**Prepetition Term Agent**" means (i) Goldman Sachs Specialty Lending Group, Inc., in its capacity as administrative agent under any of the Prepetition Term Loan Documents, or (ii) any successor administrative agent.

"**Prepetition Term Lenders**" means the lenders party to the Prepetition Term Loan Agreement, from time to time, under and as defined in the Prepetition Term Loan Agreement.

"**Prepetition Term Loan Agreement**" has the meaning set forth in the Recitals.

"**Prepetition Term Loan Documents**" means the "Loan Documents" as defined in the Prepetition Term Loan Agreement.

"**Prepetition Term Loans**" means the "Loans" under and as defined in the Prepetition Term Loan Agreement.

"**Prime Rate**" shall mean the rate of interest per annum determined from time to time by the Administrative Agent as its prime rate in effect at its principal office in New York City and notified to the Lead Borrower.  The prime rate is a rate set by the Administrative Agent based upon various factors including the Administrative Agent's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such rate.

"**Pro Rata Share**" shall mean, for each Class of Loans hereunder and with respect to each Lender within such Class at any time, a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the amount of such Lender's unfunded Term Loan Commitments plus the outstanding principal amount of the Loans held by such Lender under the Term DIP Facility at such time and the denominator of which is the amount of the aggregate unfunded Term Loan Commitments plus the outstanding principal amount of the Loans held by all Lenders under the Term DIP Facility.

"**Public Lender**" shall have the meaning assigned to such term in Section 10.01.

"**Qualified Equity Interests**" shall mean any Equity Interests that are not Disqualified Equity Interests.

"**Qualifying Insurance Policy**" means (i) with respect to any Special Indemnity Beneficiary that is an independent director or officer, an available director and officer liability insurance policy purchased by the Company or (ii) with respect to any other Special Indemnity Beneficiary, an available director and officer liability insurance policy purchased by the Company or the entity that designated such person as a director.

"**Qualifying Special Indemnity Losses**" mean any and all actual costs, expenses, losses, or liabilities imposed on or suffered by a Special Indemnity Beneficiary directly arising from any failure to pay any amounts payable by the Company or its parent or affiliates under or otherwise required by the WARN Act in the Chapter 11 Cases, (i) that is not covered by such Special Indemnity Beneficiary's Qualifying Insurance Policy or (ii) that is covered by such Special Indemnity Beneficiary's Qualifying Insurance Policy and where Company and/or the Special Indemnity Beneficiary, as applicable, shall have used commercially reasonable efforts to seek coverage under such Qualifying Insurance Policy; provided, however, that no costs, expenses, losses or liabilities shall be deemed Qualifying Special Indemnity Losses to the extent arising in connection with (x) any Special Indemnity Beneficiary's bad faith, gross negligence or willful misconduct, or (y) failure of the Company or any Special Indemnity Beneficiary to comply with the WARN Act or any other Applicable Law (except to the extent that the court considering the relevant claims determines that (A) failure to pay any amounts payable by the Company under or otherwise required by the WARN Act during the Chapter 11 Cases, or (B) the time when notices required by the WARN ACT were delivered, constitutes bad faith, gross negligence, willful misconduct or a violation of the WARN ACT or other Applicable Law).

"**Real Property**" shall mean, collectively, all right, title and interest (including any leasehold, mineral or other estate) in and to any and all parcels of or interests in real property owned or leased by any Person, whether by

lease, license or other means, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures and equipment, all general intangibles and contract rights and other property and rights incidental to the ownership, lease or operation thereof.

"**Register**" shall have the meaning assigned to such term in Section 10.04(d).

"**Regulation T**" shall mean Regulation T of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Regulation U**" shall mean Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Related Fund**" shall mean, with respect to any Lender that is a fund or commingled investment vehicle that invests in bank loans, any other fund that invests in bank loans and is managed or advised by the same investment advisor as such Lender or by an Affiliate of such investment advisor.

"**Related Parties**" shall mean, with respect to any specified Person, such Person's Affiliates and the respective directors, trustees, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"**Release**" shall mean any release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into or through the environment or within or upon any building, structure, facility or fixture.

"**Reportable Event**" shall mean any of the events set forth in Section 4043(c) of ERISA or the regulations issued thereunder, other than events for which the thirty (30) day notice period has been waived with respect to a Plan.

"**Required Class Lenders**" shall mean, as of any date of determination, Lenders of a Class having more than 50% of the sum of the outstanding Loans and unused Term Loan Commitments of the applicable Class.

"**Required Lenders**" shall mean, at any time, subject to the provisions of Section 10.08, Lenders having Loans and unused Term Loan Commitments representing more than 50% of the sum of all Loans outstanding and unused Term Loan Commitments at such time.

"**Required Liquidation**" means the sale contemplated by the Agency Agreement of all or substantially all, or such lesser amount as is agreed by the Required Lenders in their sole discretion, of the assets of the Borrowers commencing on or after the Petition Date on terms and in a manner and with a liquidator satisfactory in all respects to the Administrative Agent and the Required Lenders and pursuant to procedures acceptable to Administrative Agent the Required Lenders and approved by order of the Bankruptcy Court.

"**Responsible Officer**" shall mean the chief executive officer, president, vice president, chief financial officer, treasurer, assistant treasurer, director of treasury or other similar officer of a Loan Party and, as to any document delivered on the Closing Date, any secretary or assistant secretary of such Loan Party.  Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed by the recipient of such document to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed by the recipient of such document to have acted on behalf of such Loan Party.

"**Restricted Payment**" shall mean any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of Holdings, the Borrowers or any Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such Equity Interest of Holdings,

the Borrowers or any Subsidiary, or on account of any return of capital to Holdings', the Borrowers' or a Subsidiary's stockholders, partners or members (or the equivalent Persons thereof).

"**Roll-Up**" has the meaning specified in the applicable Order.

"**Roll-Up Facility**" shall have the meaning assigned to such term in Section 2.01(a)(ii).

"**Roll-Up Loan**" shall have the meaning set forth in Section 2.01(a)(ii).

"**Roll-Up Term DIP Facility Claims**" shall mean each Lender's claim under the Roll-Up Facility.

"**S&P**" shall mean Standard & Poor's Ratings Service, or any successor thereto.

"**Sanctioned Country**" shall mean, at any time, a country, region or territory that is, or whose government is, the subject or target of any comprehensive Sanctions, including, as of the Closing Date, the Crimea region of Ukraine, Cuba, Iran, North Korea, Sudan, and Syria.

"**Sanctioned Person**" shall mean, at any time, any Person with whom dealings are restricted or prohibited under Sanctions, including (i) any Person listed in any Sanctions-related list of designated Persons maintained by the U.S. (including by OFAC, the U.S. Department of the Treasury, or the U.S. Department of State), or by the United Nations Security Council, the European Union or any EU member state, Her Majesty's Treasury of the United Kingdom or any other relevant sanctions authority, (ii) any Person located, operating, organized or resident in a Sanctioned Country or (iii) any Person owned or controlled, directly or indirectly, by any such Person described in clause (i) or (ii) of this definition.

"**Sanctions**" shall mean sanctions or trade embargoes enacted, imposed, administered or enforced from time to time by (i) the U.S. government, including those administered by OFAC, U.S. Department of State, or U.S. Department of Treasury, (ii) the United Nations Security Council, the European Union or any of its member states, Her Majesty's Treasury of the United Kingdom, or (iii) any other relevant sanctions authority.

"**Secured Parties**" shall have the meaning assigned to such term in the Security Agreement.

"**Security Agreement**" means the Security Agreement, dated as of the Closing Date, among the Borrower, the guarantors party thereto, and the Collateral Agent.

"**Segregated Operating Accounts**" means collectively, the General Purpose Segregated Operating Account and the Class B Segregated Operating Account.

"**Special Indemnity Beneficiary**" means each natural person that, as of the Petition Date, serves as a director and/or officer of Gymboree Holding Corporation. For the avoidance of doubt, the Debtors and their Affiliates that are not natural Persons are not Special Indemnity Beneficiaries.

"**Special Indemnity Cap**" means $6,000,000.

"**Special Indemnity Grantor**" means Special Situations Investing Group, Inc.

"**Special Indemnity Period**" means the period commencing on the earliest to occur of: (i) the dismissal of the Chapter 11 Cases, (ii) the conversion of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code and (iii) the emergence of the Debtors from the Chapter 11 Cases and ending on the earlier to occur of (i) the date that is three years therefrom and (ii) the date on which the applicable statute of limitations under the WARN Act shall have expired.

"**SPV**" shall have the meaning assigned to such term in Section 10.04(i).

"**Stalking Horse Agreement**" has the meaning set forth in Section 6.19(h).

"**Stalking Horse Bidder**" has the meaning set forth in Section 6.19(h).

"**Store**" means any retail store (which includes any real property, fixtures, equipment, inventory and other property related thereto) operated, or to be operated, by a Borrower or any Subsidiary.

"**Subsidiary**" of a Person shall mean a corporation, partnership, joint venture, limited liability company or other business entity of which (i) a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned or (ii) the management of which is otherwise controlled, directly or indirectly, through one or more intermediaries, or both, by such Person.  Unless otherwise specified, all references herein to a "**Subsidiary**" or to "**Subsidiaries**" shall refer to a Subsidiary or Subsidiaries of the Borrowers.

"**Subsidiary Guarantor**" shall mean any Guarantor other than Holdings.  The Subsidiary Guarantors as of the Closing Date are set forth on Schedule 1.01.

"**Supplemental Carve-Out**" shall have the meaning assigned to such term in the Interim Order or the Final Order, as applicable.

"**Swap Contract**" shall mean (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "**Master Agreement**"), including any such obligations or liabilities under any Master Agreement.

"**Swap Termination Value**" shall mean, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"**Synthetic Lease**" shall mean any lease or other agreement for the use or possession of property creating obligations which do not appear as Indebtedness on the balance sheet of the lessee thereunder but which, upon the insolvency or bankruptcy of such Person, may be characterized as Indebtedness of such lessee without regard to the accounting treatment.

"**Taxes**" shall mean all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Term Borrowing**" shall mean a Borrowing comprised of the Term DIP Loans.

"**Term DIP Claims**" shall mean the Prepetition Term Claims, the New Money Term DIP Claims, and the Roll-Up Term DIP Facility Claims, as applicable.

"**Term DIP Facility**" shall have the meaning assigned to such term in the recitals to this Agreement.

"**Term Loan Commitment**" shall mean, with respect to each Lender, such Lender's Class A New Money Commitment and/or Class B New Money Commitment, if any, as such commitment may be (a) reduced from time to time pursuant to Section 2.09, (b) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to an Assignment and Acceptance, and (c) increased pursuant to a Commitment Increase, solely to the extent permitted by Section 2.01(c) hereof. The initial amount of each Lender's Term Loan Commitment is set forth on Schedule 2.01 or, otherwise, in the Assignment and Acceptance pursuant to which such Lender shall have assumed its Term Loan Commitment.  The initial aggregate amount of the Term Loan Commitments as of the Closing Date is $30,000,000.

"**Term DIP Loan(s)**" shall mean the Roll-Up Loan and New Money DIP Loan.

"**Term Note**" means a promissory note of the Borrowers payable to any Lender or its registered assigns, in substantially the form of Exhibit G hereto, evidencing the aggregate Indebtedness of the Borrowers to such Lender resulting from the Term DIP Loans made by such Lender.

"**Term Priority Collateral**" shall have the meaning assigned to such term in the Orders.

"**Testing Period**" shall have the meaning assigned to such term in the definition of "Permitted Variance".

"**Type**", when used in respect of any Loan or Borrowing, shall refer to the Rate by reference to which interest on such Loan or on the Loans comprising such Borrowing is determined. For purposes hereof, the term "**Rate**" shall mean the Adjusted LIBO Rate and the Alternate Base Rate.

"**Uniform Commercial Code**" or "**UCC**" shall mean the Uniform Commercial Code as the same may from time to time be in effect in the State of New York or the Uniform Commercial Code (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"**United States**" and "**U.S.**" mean the United States of America.

"**United States Tax Compliance Certificate**" shall have the meaning assigned to such term in Section 3.01(d).

"**USA PATRIOT Act**" shall mean the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)).

"**Variance Report**" shall mean a report setting forth actual cash receipts and disbursements of the Borrowers for the prior week and setting forth all the variances, on a line-item and aggregate basis, from the amount set forth for such week as compared to (1) the most recent Approved Budget delivered prior to such Variance Report on a weekly and Testing Period basis (which shall be subject to the variances set forth herein), (2) the most recent Weekly Cash Flow Forecast (as applicable) delivered by the Borrowers on a weekly and cumulative basis, and (3) the most recent disbursements to the Loan Parties' professionals on a cumulative basis for each rolling two week period.  Each such Variance Report shall include the explanations for all material variances and shall be certified by the Chief Financial Officer or the Chief Restructuring Officer of the Borrowers.

"**WARN Act**" means the Worker Adjustment and Retraining Notification Act of 1988 or any similar state or local law.

"**Weekly Cash Flow Forecast**" shall mean an updated 13-week cash flow forecast including the spreadsheet or other document demonstrating the backup for the calculation of such forecast, in form and substance satisfactory to the Administrative Agent at the direction of the Required Lenders for the subsequent 13 week period following delivery of the Approved Budget, and each month thereafter during the Chapter 11 Cases.

"**wholly owned**" shall mean, with respect to a Subsidiary of a Person, a Subsidiary of such Person all of the outstanding Equity Interests of which (other than (x) director's qualifying shares and (y) shares issued to foreign nationals to the extent required by applicable Law) are owned by such Person and/or by one or more wholly owned Subsidiaries of such Person.

"**Withdrawal**" means either a General Purpose Withdrawal or a  Class B Withdrawal. "Withdraw" and "Withdrawn" shall have correlative meanings thereto.

"**Withdrawal Liability**" shall mean liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"**Write-Down and Conversion Powers**" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

Section 1.02.  *Other Interpretive Provisions.*  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)     The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)     (i)     The words "herein," "hereto," "hereof" and "hereunder" and words of similar import when used in any Loan Document shall refer to such Loan Document as a whole and not to any particular provision thereof.

(ii)     Article, Section, Exhibit and Schedule references are to the Loan Document in which such reference appears.

(iii)     The term "including" is by way of example and not limitation.

(iv)     The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(c)     In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including."

(d)     Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(e)     The word "or" is not exclusive.

Section 1.03.  *Accounting Terms.*  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, except as otherwise specifically prescribed herein.

Section 1.04. *[Reserved].*

Section 1.05. *References to Agreements, Laws, Etc.* Unless otherwise expressly provided herein, (a) references to Organization Documents, agreements (including the Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, restatements, extensions, supplements and other modifications thereto, but only to the extent that such amendments, restatements, extensions, supplements and other modifications are not prohibited by any Loan Document; and (b) references to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Law.

Section 1.06. *Times of Day.* Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

Section 1.07. *Timing of Payment of Performance.* Except as otherwise expressly provided herein, when the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment (other than as described in the definition of Interest Period) or performance shall extend to the immediately succeeding Business Day (subject to Section 2.16(b)).

Section 1.08. *[Reserved].*

Section 1.09. *[Reserved].*

Section 1.10. *Certain Accounting Matters.* Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to any election under Statement of Financial Accounting Standards 159 (or any other Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of the Borrowers or any of their Subsidiaries at "fair value", as defined therein.

Section 1.11. *Classification of Loans and Borrowings.* For purposes of this Agreement, Loans may be classified and referred to as either Roll-Up Loans or New Money DIP Loans.

Section 1.12. *Currency Equivalents Generally.* For purposes of determining compliance with Sections 7.01, 7.02 and 7.03 with respect to any amount of Indebtedness or Investment in a currency other than Dollars, no Default shall be deemed to have occurred solely as a result of changes in rates of currency exchange occurring after the time such Indebtedness or Investment is incurred (so long as such Indebtedness or Investment, at the time incurred, made or acquired, was permitted hereunder).

# ARTICLE 2
### The Credits

Section 2.01. *Commitments.*

(a)    Class A New Money DIP Loans and Roll-Up Loans.

(i)    Class A New Money DIP Loans. Subject to the terms and conditions as set forth herein and in the Orders and relying upon the representations and warranties herein set forth, each Class A Lender severally and not jointly agrees upon satisfaction of the conditions to Borrowing set forth in Sections 4.01 or 4.02, as applicable, to make to the Borrowers one or more, New Money DIP Loans, if any, denominated in Dollars in an amount not to exceed such Lender's Class A New Money Commitment set forth on Schedule 2.01 (together with any Commitment Increase allocated by the Administrative Agent pursuant to Section 2.01(c) hereof, the "**Class A New Money DIP Loans**").

(ii)    Class A Roll-Up Loans.

(A)     On the Closing Date, in connection with the funding of any New Money DIP Loans (the "**Initial New Money DIP Loans**"), the Prepetition Term Lenders shall be deemed to have exchanged a portion of their claims in respect of Prepetition Obligations ("**Prepetition Term Claims**") in an aggregate principal amount equal to the Initial New Money DIP Loans funded on the Closing Date for Loans hereunder (each such Loan deemed to be exchanged, an "**Initial Roll-Up Loan**").

(B)     So long as permitted by the Final Order, upon the entry of the Final Order, the Prepetition Term Lenders shall be deemed to have exchanged the entire remaining outstanding balance of their Prepetition Term Claims for Loans hereunder (each such Loan deemed to be exchanged, a "**Final Order Roll-Up Loan**", and collectively with the Initial Roll-Up Loan, the "**Roll-Up Loans**"). Notwithstanding anything herein or in any other Loan Document to the contrary, if the terms of the Final Order do not permit such additional exchange (or permits an exchange in a lesser amount than the exchange contemplated hereby), the portion of Prepetition Term Claims not permitted to be so exchanged shall remain outstanding as Prepetition Term Claims.

(C)     All Prepetition Term Claims exchanged in accordance with the terms of the Orders and the foregoing clauses (i) and (ii) shall be deemed repaid in full and no longer outstanding. The facility described in this Section 2.01(a)(ii) is referred to herein as the "**Roll-Up Facility**".

(b)     Class B New Money DIP Loans. Subject to the terms and conditions as set forth herein and in the Orders, upon satisfaction of the conditions to Borrowing set forth in Sections 4.01 or 4.02, as applicable, and relying upon the representations and warranties herein set forth, each Class B Lender severally and not jointly agrees, to make to the Borrowers a New Money DIP Loan denominated in Dollars in an aggregate principal amount not to exceed such Lender's Class B New Money Commitment set forth on Schedule 2.01 (together with any Commitment Increase allocated by the Administrative Agent pursuant to Section 2.01(c) hereof, the "**Class B New Money DIP Loans**").

(c)     Incremental Increase in Commitments for New Money DIP Loans.

(i)     First Amendment Effective Date Class A New Money DIP Loans.  As of the First Amendment Effective Date, each of the GS Lenders hereby consents to the First Amendment Effective Date Commitment increase as set forth on Schedule 2.01.  Each such GS Lender severally and not jointly agrees to make to the Borrowers a New Money DIP Loan denominated in Dollars in an aggregate principal amount not to exceed such GS Lender's First Amendment Effective Date Commitment.

(ii)     Commitment Increase Requests.  Subject to the terms and conditions set forth herein, after the entry of the Final Order, and pursuant to and to the extent permitted thereby, Borrowers shall have the right, to request, by written notice to Administrative Agent and GS Lenders one or more additional increases in the Term Loan Commitments  in an aggregate amount not to exceed $[37,000,000] (each a "**Commitment Increase**"); *provided,* that (a) Borrowers shall only be permitted to request a Commitment Increase during the term of this Agreement from the GS Lenders pursuant to the terms set forth herein, and (b) any Commitment Increase shall be in a minimum amount of $500,000.

(iii)     Procedure for Increasing Commitments.  Each notice submitted by Borrowers under this Section 2.01(c)(ii) requesting a Commitment Increase shall specify the amount of the Commitment Increase requested.  Upon receipt of a notice from the Borrowers for a Commitment Increase, GS Lenders shall have the right (individually or through one or more of its Affiliates) but not the obligation to provide the requested Commitment Increase. Such Commitment Increase, if any,  shall become effective (such date, the "**Increase Date**") upon the satisfaction of terms and conditions satisfactory to the Administrative Agent, including without limitation, each of the following conditions: (1) no Event of Default shall exist on the Increase Date

27

before or after giving effect to such Commitment Increase and the making of the Loans; (2) the Final Order shall have been entered by the Bankruptcy Court; (3) the conditions set forth in Section 4.02; (4) to the extent requested by the Administrative Agent, the Commitment Increase shall be effected pursuant to a supplement to Schedule 2.01 to reflect such Commitment Increase delivered by the Administrative Agent (on behalf of the Lenders) to the Borrowers, each of which shall be in form and substance satisfactory to GS Lenders in their sole discretion; (5) proceeds of Term Loans made pursuant to any Commitment Increase shall be used solely in accordance with Sections 7.10 and 7.17 hereof, (6) subject to Section 2.01(c)(v), the Borrowers shall have paid to Administrative Agent and GS Lenders such additional fees as may be required to be paid by Borrowers pursuant to the Amended and Restated Fee Letter, and (7) for any Commitment Increase and New Money DIP Loan made pursuant thereto, Borrowers shall deliver to the Administrative Agent all such documents requested by the Administrative Agent or GS Lenders relating to the J&J Option under the Agency Agreement or any other anticipated transactions relating to the Commitment Increase, each of which shall be in form, scope and substance reasonably satisfactory to GS Lenders in their sole discretion. For the avoidance of doubt, unless the GS Lenders (or any of their respective Affiliates) request that the Seller (as defined in the Stalking Horse Agreement) exercise the J&J Option (or seek financing in order to exercise such option), no Lender or GS Lender shall have any obligation to provide any Commitment Increase  (and in which case the amount of such obligation shall not exceed the lesser of (x) the amount required to consummate the exercise of the J&J Option in accordance with its terms or (y) an amount to be agreed and set forth in the Approved Budget) and any Commitment Increase shall be made in the sole discretion of the GS Lenders.  In the event of any Commitment Increase and New Money DIP Loans made pursuant thereto, the Agent shall, in its sole discretion, allocate such Commitment Increase to any single Class or between the Class A New Money Commitments and Class B New Money Commitments.

           (iv)      <u>Settlement of Outstanding Loans</u>.  On the Increase Date, upon fulfillment of the conditions set forth in this Section 2.01(c), (A) GS Lenders shall make a Class A New Money DIP Loan or Class B New Money DIP Loan, as applicable, to Borrowers in respect of their ratable portion of the Commitment Increase such that 100% of the requested Commitment Increase is funded on the Increase Date, (B) to the extent necessary in connection with such Commitment Increase, Administrative Agent shall effect a settlement of all outstanding New Money DIP Loans, as applicable among Lenders that will reflect the applicable adjustments to the Term Loan Commitments as a result of the Commitment Increase, (C) Administrative Agent shall promptly notify Lenders and the Borrowers of the occurrence and the allocation among Classes of the Commitment Increase to be effected on the Increase Date, (D) Schedule 2.01 shall be deemed modified to reflect the revised Term Loan Commitments of the GS Lenders, and (F) the funded Commitment Increase on the Increase Date shall be deemed a New Money DIP Loan hereunder.

           (v)      <u>Terms and Provisions of Increase</u>.  The terms and provisions of any Commitment Increase and any New Money DIP Loans made pursuant thereto shall be identical to the New Money DIP Loans and Term Loan Commitments except as expressly set forth herein and, for purposes of this Agreement and the other Loan Documents, all New Money DIP Loans made pursuant to any Commitment Increase shall be deemed to be New Money DIP Loans. Without limiting the generality of the foregoing, (A) the maturity date of the Commitment Increase shall be the Maturity Date, and (B) any New Money DIP Loans made pursuant to any Commitment Increase shall rank *pari passu* in right of payment and security with the existing New Money DIP Loans of the applicable Class. Each consent or amendment to any Loan Document requested by GS Lenders in connection with the establishment of a Commitment Increase may, without the consent of any of the Lenders, effect such amendments to this Agreement and the other Loan Documents as may be reasonably necessary or appropriate, in the opinion of GS Lenders, to effect the provisions of this Section 2.01(c).

     (d)     All Loans and all other Obligations owing hereunder with respect to the Loans should be paid in full no later than the Maturity Date.

         Section 2.02.  *Loans.* (a) Each Loan shall be made as part of a Borrowing consisting of Loans made by the Lenders ratably in accordance with their applicable Term Loan Commitments; *provided, however*, that

the failure of any Lender to make any Loan shall not in itself relieve any other Lender of its obligation to lend hereunder (it being understood, however, that no Lender shall be responsible for the failure of any other Lender to make any Loan required to be made by such other Lender). The Loans comprising any Borrowing shall be in an aggregate principal amount that is (i) an integral multiple of $1,000,000 or (ii) equal to the remaining available balance of the applicable Term Loan Commitments.

(b)    Subject to Sections 2.08 and 3.02 each Borrowing shall be comprised entirely of ABR Loans or Eurodollar Loans. Each Lender may at its option make any Eurodollar Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; *provided* that any exercise of such option shall not affect the obligation of the Borrowers to repay such Loan to such Lender in accordance with the terms of this Agreement. Borrowings of more than one Type may be outstanding at the same time; *provided, however*, that the Lead Borrower shall not be entitled to request any Borrowing that, if made, would result in more than five Borrowings outstanding hereunder at any time. For purposes of the foregoing, Borrowings having different Interest Periods, regardless of whether they commence on the same date, shall be considered separate Borrowings.

(c)    Each Lender shall make each Loan to be made by it hereunder on the Closing Date, or, in the case of any Loans funded pursuant to the First Amendment Effective Date Commitment, on the First Amendment Effective Date, or, in the case of any Loans funded pursuant to any other Commitment Increase, the applicable Increase Date, in each case, by wire transfer of immediately available funds to such account in New York City as the Administrative Agent may designate not later than 1:00 p.m., New York City time, and the Administrative Agent shall promptly credit the amounts so received to an account designated by the Lead Borrower in the applicable Borrowing Notice.

(d)    Unless the Administrative Agent shall have received notice from a Lender prior to the date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's portion of such Borrowing, the Administrative Agent may assume that such Lender has made such portion available to the Administrative Agent on the date of such Borrowing in accordance with paragraph (c) above and the Administrative Agent may, in reliance upon such assumption, make available to the Borrowers on such date a corresponding amount. If the Administrative Agent shall have so made funds available then, to the extent that such Lender shall not have made such portion available to the Administrative Agent, such Lender and the Borrowers severally agree to repay to the Administrative Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date such amount is made available to the Borrowers to but excluding the date such amount is repaid to the Administrative Agent at (i) in the case of the Borrowers, a rate per annum equal to the interest rate applicable at the time to the Loans comprising such Borrowing and (ii) in the case of such Lender, a rate determined by the Administrative Agent to represent its cost of overnight or short-term funds (which determination shall be conclusive absent manifest error). If such Lender shall repay to the Administrative Agent such corresponding amount, such amount shall constitute such Lender's Loan as part of such Borrowing for purposes of this Agreement.

Section 2.03.    *Borrowing Procedure.*    In order to request a Borrowing, the Lead Borrower shall notify the Administrative Agent of such request by electronic delivery to the Administrative Agent of a written Borrowing Notice, (a) in the case of a Eurodollar Borrowing, not later than 12:00 (noon), New York City time, three Business Days before a proposed Borrowing (or, in the case of a proposed Borrowing on the Closing Date and the First Amendment Effective Date, one Business Day before), and (b) in the case of an ABR Borrowing, not later than 12:00 noon, New York City time, one Business Day before a proposed Borrower. Each such Borrowing Notice shall be irrevocable and shall specify the following information: (i) the Class of Loans to be borrowed and whether such Borrowing is to be a Eurodollar Borrowing or an ABR Borrowing; (ii) the date of such Borrowing (which shall be a Business Day); (iii) the identity of the DIP Funding Account to which funds are to be disbursed; (iv) the amount of such Borrowing; and (v) if such Borrowing is to be  Eurodollar Borrowing, the Interest Period with respect thereto; *provided, however*, that, notwithstanding any contrary specification in any Borrowing Notice, each requested Borrowing shall comply with the requirements set forth in Section 2.02. If no election as to the Type of Borrowing is specified in any such notice, then the requested Borrowing shall be a Eurodollar Borrowing. If no Interest Period with respect to any Eurodollar Borrowing is specified in any such notice, then the Lead Borrower shall be deemed to have selected an Interest Period of one month's duration. The Administrative Agent shall

29

promptly advise the applicable Lenders of any notice given pursuant to this Section 2.03 (and the contents thereof), and of each Lender's portion of the requested Borrowing.

Section 2.04.  *Evidence of Debt.*

(a)    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrowers to such Lender resulting from each Loan made by such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.

(b)    The Administrative Agent shall maintain accounts in which it will record (i) the amount of each Loan made hereunder, the Class and Type thereof and, if applicable, the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrowers to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder from the Borrowers or any Guarantor and each Lender's share thereof.

(c)    The entries made in the accounts maintained pursuant to paragraphs (a) and (b) above shall be prima facie evidence of the existence and amounts of the obligations therein recorded; *provided, however*, that (i) the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligations of the Borrowers to repay the Loans in accordance with their terms and (ii) in the event of any conflict between the accounts set forth in paragraphs (a) and (b) above and the Register, the amounts set forth in the accounts maintained pursuant to the Register shall prevail.

(d)    Any Lender may request that Loans made by it hereunder be evidenced by a Term Note.  In such event, the Borrowers shall execute and deliver to such Lender a Term Note payable to such Lender and its registered assigns in accordance with Section 10.04.  Notwithstanding any other provision of this Agreement, in the event any Lender shall request and receive a Term Note, the interests represented by such Term Note shall at all times (including after any assignment of all or part of such interests pursuant to Section 10.04) be represented by one or more promissory notes payable to the payee named therein or its registered assigns.

Section 2.05.  *Fees.*  (a) The Borrowers shall pay to the Administrative Agent such fees in the amounts and at the times specified as may be agreed to in writing from time to time by the Loan Parties or any of its Subsidiaries and the Administrative Agent, including, without limitation, all amounts owing under the Fee Letter (the "**Fees**").

(b)    All Fees shall be paid on the dates due, in immediately available funds, to the Administrative Agent. Once paid, none of the Fees shall be refundable under any circumstances.

Section 2.06.  *Interest on Loans.*  (a) Subject to the provisions of Section 2.07, the Loans comprising each ABR Borrowing shall bear interest (computed on the basis of the actual number of days elapsed over a year of 360 days and calculated from and including the date of such Borrowing to but excluding the date of repayment thereof) at a rate per annum equal to the Alternate Base Rate plus the Applicable Margin.

(b)    Subject to the provisions of Section 2.07, the Loans comprising each Eurodollar Borrowing shall bear interest (computed on the basis of the actual number of days elapsed over a year of 360 days) at a rate per annum equal to the Adjusted LIBO Rate for the Interest Period in effect for such Borrowing plus the Applicable Margin.

(c)    Interest on each Loan shall be payable on the Interest Payment Dates applicable to such Loan except as otherwise provided in this Agreement.  The Alternate Base Rate or Adjusted LIBO Rate, as applicable, for each Interest Period or day within an Interest Period, as the case may be, shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

30

Section 2.07.  *Default Interest.*  During the continuance of any Default or Event of Default, the Borrowers shall pay interest on all amounts owing by it hereunder at a fluctuating interest rate per annum at all times, after as well as before judgment, equal to the rate otherwise applicable to such Loan pursuant to Section 2.06 plus 2.00% per annum.

Section 2.08.  *Alternate Rate of Interest.*  In the event, and on each occasion, that on the day two Business Days prior to the commencement of any Interest Period for a Eurodollar Borrowing the Administrative Agent shall have determined that Dollar deposits in the principal amounts of the Loans comprising such Borrowing are not generally available in the London interbank market, or that the rates at which such Dollar deposits are being offered will not adequately and fairly reflect the cost to the majority of Lenders of making or maintaining Eurodollar Loans during such Interest Period, or that reasonable means do not exist for ascertaining the Adjusted LIBO Rate, the Administrative Agent shall, as soon as practicable thereafter, give written or fax notice of such determination to the Lead Borrower and the Lenders.  In the event of any such determination, until the Administrative Agent shall have revoked such notice, any request by the Lead Borrower for a Eurodollar Borrowing pursuant to Section 2.03 shall be deemed to be a request for an ABR Borrowing. Each determination by the Administrative Agent under this Section 2.08 shall be conclusive absent manifest error.

Section 2.09.  *Termination and Reduction of Commitments.*  (a) On each date of funding of a Loan by a Lender hereunder, such Lender's Term Loan Commitment shall be reduced by the principal amount of the Loan funded by such Lender.  To the extent not terminated earlier, the Term Loan Commitments shall terminate on the DIP Termination Date.

Section 2.10.  *[Reserved].*

Section 2.11.  *Repayment of Term Borrowings.*  All Loans shall be due and payable on the DIP Termination Date without further application to or order from the Bankruptcy Court, together with accrued and unpaid interest on the principal amount to be paid to but excluding the date of payment, or earlier, if otherwise required by the terms hereof.

Section 2.12.  *Voluntary Prepayment*  (a) Subject to Section 2.12(b), the Borrowers shall have the right at any time and from time to time to prepay any Borrowing of Term DIP Loans, in whole or in part, upon at least three Business Days' prior written notice (or telephone notice promptly confirmed by written notice); provided, however, that each partial prepayment shall be in an amount that is an integral multiple of $250,000 and not less than $500,000.

(b)    Voluntary prepayments of Term DIP Loans pursuant to this Section 2.12 shall be applied (i) *first,* toward the repayment of the Class A DIP Loans then outstanding on a pro rata basis and (ii) *thereafter,* toward the repayment of the Class B New Money DIP Loans then outstanding on a pro rata basis.

(c)    Each notice of prepayment shall specify the prepayment date and the principal amount of each Borrowing (or portion thereof) to be prepaid, shall be irrevocable and shall commit the Borrowers to prepay such Borrowing by the amount stated therein on the date stated therein; *provided, however*, that if such prepayment is in connection with a refinancing, then the Lead Borrower may condition such notice on the effectiveness of such refinancing (*provided*, that the provisions of Section 3.05 shall apply to any prepayment that is not made as a result of the failure of such condition).  All prepayments under this Section 2.12 shall be subject to Section 3.05 but otherwise without premium or penalty.  All prepayments under this Section 2.12 shall be accompanied by accrued and unpaid interest on the principal amount to be prepaid to but excluding the date of payment.

Section 2.13.  *Mandatory Prepayments.*

(a)    In each case, subject to Section 2.13(b) below,

(i)    *[Reserved].*

31

(ii)    If (1) the Borrowers or any Subsidiary Dispose of any property or assets, including in connection with the Required Liquidation (other than, so long as the Prepetition ABL Credit Agreement is in effect, as contemplated by Section 6.20), (2) any Casualty Event occurs, which results in the realization or receipt by the Borrowers or a Subsidiary of Net Proceeds, (3) any cash or cash equivalents cash collateralizing any letter of credit agreement are returned to the Borrower or its Subsidiaries for its own account, or (4) the Borrowers or any Subsidiary receive any extraordinary receipts, the Borrowers shall cause to be prepaid on or prior to the date which is three (3) Business Days after the date of the realization or receipt by the Borrowers or any Subsidiary of such Net Proceeds an aggregate principal amount of Term DIP Loans in an amount equal to 100% of all Net Proceeds realized or received.  For the avoidance of doubt, any cash or cash equivalents cash collateralizing any letter of credit agreement that are returned to the Borrower pursuant to subsection (3) hereof shall remain subject to the existing and continuing liens in favor of the Prepetition Term Agent for the benefit of the Prepetition Term Lenders pursuant to the Prepetition Term Loan Documents and any additional liens thereon granted pursuant to the terms of the Order.

(iii)    On the date of receipt by the Borrowers or any of their Subsidiaries of cash proceeds from a capital contribution to, or the issuance of any Equity Interests of, the Borrowers or any of their Subsidiaries (other than issuances of Equity Interests by a Subsidiary to the Borrowers and capital contributions by a Borrower to a Subsidiary), the Borrowers shall prepay an aggregate principal amount of the Term DIP Loans equal to 100% of such Net Proceeds received therefrom no later than five (5) Business Days following receipt thereof by such Person.

(iv)    If any Borrower or any Subsidiary incurs or issues any Indebtedness after the Closing Date (other than Indebtedness permitted under Section 7.03), such Borrower shall cause to be prepaid an aggregate principal amount of Term DIP Loans in an amount equal to 100% of all Net Proceeds received therefrom on or prior to the date which is one (1) Business Day after the receipt by such Borrower or such Subsidiary of such Net Proceeds.

(b)    With respect to any mandatory prepayment under this Section 2.13, subject to the Prepetition Intercreditor Agreement and the Orders and the Agency Agreement, the Borrowers shall cause to be prepaid, in the order set forth below, on or prior to the date which is three (3) Business Days after the date of the realization or receipt by the Borrowers or any Subsidiary of such Net Proceeds:

(i)    *first*, an amount equal to 100% of such proceeds, which shall be applied as a mandatory prepayment of the Class A DIP Loans and the Prepetition Obligations, if any, on a pro rata basis (with such payments on the Prepetition Obligations payable to the Prepetition Term Agent); and

(ii)    *second,* an amount equal to 100% of such proceeds that remain, which shall be applied as a mandatory prepayment of the Class B New Money DIP Loans on a pro rata basis until $10,000,000 of Class B New Money DIP Loans are outstanding, and then, an amount equal to 50% of such proceeds that remain shall be applied pro rata as a mandatory prepayment of the remaining Class B New Money DIP Loans and the other 50% of such proceeds shall be deposited into the General Purpose Segregated Operating Account and shall be used for purposes consistent with Section 7.10(b).

(c)    The Lead Borrower shall notify the Administrative Agent or the Prepetition Term Agent, as applicable, in writing of any mandatory prepayment of Term DIP Loans or Prepetition Obligations, as applicable, required to be made pursuant to Section 2.13 at least three (3) Business Days prior to the date of such prepayment. Each such notice shall specify the date of such prepayment and provide a reasonably detailed calculation of the amount of such prepayment.  With respect to the prepayment of Term DIP Loans, the Administrative Agent will promptly notify each applicable Lender of the contents of the Lead Borrower's prepayment notice and of such Lender's Pro Rata Share or other applicable share of the prepayment.

(d)      *Funding Losses, Etc*.  All prepayments under this Section 2.13 shall be accompanied by accrued and unpaid interest on the principal amount to be prepaid to but excluding the date of payment and shall be made on a day prior to the last day of an Interest Period therefor together with any amounts owing in respect of such Loan pursuant to Section 3.05.

(e)      *Make- Whole Amount*.  On or prior to the Maturity Date, (i) voluntary prepayments of Class A DIP Loans pursuant to Section 2.12 and (ii) mandatory prepayments of Class A DIP Loans pursuant to Section 2.13(a)(ii), in each case, shall be accompanied by a payment equal to the Make-Whole Amount, which for the avoidance of doubt shall be in addition to the amount of Class A DIP Loans so prepaid, to the extent sufficient proceeds from the event or events giving rise to such mandatory prepayment are available to pay such Make-Whole Amount; provided, however, that in the case of prepayments under clause (ii) above, the Make-Whole Amount shall not be paid unless the Carve-Out and the Supplemental Carve-Out have first been funded in full.

Section 2.14.  *Pro Rata Treatment*.  Except as required under Section 3.02, each Borrowing, each payment or prepayment of principal of any Loan, each payment of interest on the Loans, each reduction of the New Money DIP Loans and each conversion of any Borrowing to or continuation of any Borrowing as a Borrowing of any Type shall be allocated pro rata among the Lenders of the applicable Class in accordance with their respective applicable Term Loan Commitments (or, if such Term Loan Commitments shall have expired or been terminated, in accordance with the respective principal amounts of their outstanding Loans) and any other amounts required hereunder, shall, except as otherwise expressly provided herein, be made to the Administrative Agent and for the ratable account of the Persons holding the applicable Obligations, provided, in all cases that any such payments described above shall be made without set off, recoupment, counterclaim or deduction of any kind..  Each Lender agrees that in computing such Lender's portion of any Borrowing to be made hereunder, the Administrative Agent may, in its discretion, round each Lender's percentage of such Borrowing to the next higher or lower whole Dollar amount.

Section 2.15.  *Sharing of Setoffs*.  With respect to each Class of Loan, each Lender agrees that if it shall, through the exercise of a right of banker's lien, setoff or counterclaim against the Borrowers or any other Loan Party, or pursuant to a secured claim under Section 506 of Title 11 of the United States Code or other security or interest arising from, or in lieu of, such secured claim, received by such Lender under any applicable bankruptcy, insolvency or other similar law or otherwise, or by any other means, obtain payment (voluntary or involuntary) in respect of any Loan or Loans of such Class as a result of which the unpaid principal portion of its Loans of such Class shall be proportionately less than the unpaid principal portion of the Loans held by any other Lender, it shall be deemed simultaneously to have purchased from such other Lender at face value, and shall promptly pay to such other Lender the purchase price for, a participation in the Loans of such Class held by such other Lender, so that the aggregate unpaid principal amount of the Loans and participations in Loans held by each Lender shall be in the same proportion to the aggregate unpaid principal amount of all Loans of such Class then outstanding as the principal amount of its Loans of such Class prior to such exercise of banker's lien, setoff or counterclaim or other event was to the principal amount of all Loans of such Class outstanding prior to such exercise of banker's lien, setoff or counterclaim or other event; *provided, however*, that (i) if any such purchase or purchases or adjustments shall be made pursuant to this Section 2.15 and the payment giving rise thereto shall thereafter be recovered, such purchase or purchases or adjustments shall be rescinded to the extent of such recovery and the purchase price or prices or adjustment restored without interest, and (ii) the provisions of this Section 2.15 shall not be construed to apply to any payment made by the Borrowers pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant.  The Borrowers and Holdings expressly consent to the foregoing arrangements and agree that any Lender holding a participation in a Loan deemed to have been so purchased may exercise any and all rights of banker's lien, setoff or counterclaim with respect to any and all moneys owing by the Borrowers and Holdings to such Lender by reason thereof as fully as if such Lender had made a Loan directly to the Borrowers in the amount of such participation.

Section 2.16.  *Payments*.  (a) The Borrowers shall make each payment (including principal of or interest on any Borrowing or any Fees or other amounts due and payable) hereunder and under any other Loan

Document not later than 12:00 (noon), New York City time, on the date when due in immediately available Dollars, without setoff, defense or counterclaim. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. Each such payment shall be made to the Administrative Agent at its offices at 200 West Street, New York, NY 10282 or such other office notified by the Administrative Agent to the Lead Borrower in accordance with Section 10.01. The Administrative Agent shall promptly distribute to each Lender any payments received by the Administrative Agent on behalf of such Lender.

(b)      Except as otherwise expressly provided herein, whenever any payment (including principal of or interest on any Borrowing or any Fees or other amounts) hereunder or under any other Loan Document shall become due, or otherwise would occur, on a day that is not a Business Day, such payment may be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of interest or Fees, if applicable.

Section 2.17. *Joint and Several Liability of Borrowers*. Each Borrower is accepting joint and several liability hereunder and under the other Loan Documents in consideration of the financial accommodations to be provided by the Agent and the Lenders under this Agreement, for the mutual benefit, directly and indirectly, of each Borrower and in consideration of the undertakings of the other Borrowers to accept joint and several liability for the Obligations.

(a)      Each Borrower, jointly and severally, hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with the other Borrowers, with respect to the payment and performance of all of the Obligations (including any Obligations arising under this Section 2.17), it being the intention of the parties hereto that all the Obligations shall be the joint and several obligations of each Borrower without preferences or distinction among them.

(b)      If and to the extent that any Borrower shall fail to make any payment with respect to any of the Obligations as and when due or to perform any of the Obligations in accordance with the terms thereof, then in each such event the other Borrowers will make such payment with respect to, or perform, such Obligation until such time as all of the Obligations are paid in full.

(c)      The Obligations of each Borrower under the provisions of this Section 2.17 constitute the absolute and unconditional, full recourse Obligations of each Borrower enforceable against each Borrower to the full extent of its properties and assets, irrespective of the validity, regularity or enforceability of the provisions of this Agreement (other than this Section 2.17(c)) or any other circumstances whatsoever.

(d)      Except as otherwise expressly provided in this Agreement and the Orders, and to the extent permitted by applicable law, each Borrower hereby waives notice of acceptance of its joint and several liability, notice of any Loans issued under or pursuant to this Agreement, notice of the occurrence of any Default, Event of Default, or of any demand for any payment under this Agreement, notice of any action at any time taken or omitted by Agent or Lenders under or in respect of any of the Obligations, any requirement of diligence or to mitigate damages and, generally, to the extent permitted by applicable law, all demands, notices and other formalities of every kind in connection with this Agreement (except as otherwise provided in this Agreement). Each Borrower hereby assents to, and waives (to the extent permitted by applicable law) notice of, any extension or postponement of the time for the payment of any of the Obligations, the acceptance of any payment of any of the Obligations, the acceptance of any partial payment thereon, any waiver, consent or other action or acquiescence by Agent or Lenders at any time or times in respect of any default by any Borrower in the performance or satisfaction of any term, covenant, condition or provision of this Agreement, any and all other indulgences whatsoever by Agent or Lenders in respect of any of the Obligations, and the taking, addition, substitution or release, in whole or in part, at any time or times, of any security for any of the Obligations or the addition, substitution or release, in whole or in part, of any Borrower. Without limiting the generality of the foregoing, each Borrower assents to any other action or delay in acting or failure to act on the part of any Agent or Lender with respect to the failure by any Borrower to comply with any of its respective Obligations, including, without limitation, any failure strictly or diligently to assert any right or

to pursue any remedy or to comply fully with applicable laws or regulations thereunder, which might, but for the provisions of this Section 2.17 afford grounds for terminating, discharging or relieving any Borrower, in whole or in part, from any of its Obligations under this Section 2.17, it being the intention of each Borrower that, so long as any of the Obligations hereunder remain unsatisfied, the Obligations of each Borrower under this Section 2.17 shall not be discharged except by performance and then only to the extent of such performance.  The Obligations of each Borrower under this Section 2.17 shall not be diminished or rendered unenforceable by any winding up, reorganization, arrangement, liquidation, reconstruction or similar proceeding with respect to any other Borrower or any Agent or Lender.

(e)    Each Borrower represents and warrants to Agent and Lenders that such Borrower is currently informed of the financial condition of Borrowers and of all other circumstances which a diligent inquiry would reveal and which bear upon the risk of nonpayment of the Obligations.  Each Borrower further represents and warrants to Agent and Lenders that such Borrower has read and understands the terms and conditions of the Loan Documents.  Each Borrower hereby covenants that such Borrower will continue to keep informed of Borrowers' financial condition and of all other circumstances which bear upon the risk of nonpayment or nonperformance of the Obligations.

(f)    The provisions of this Section 2.17 are made for the benefit of Agent, each Lender, and their respective successors and assigns, and may be enforced by it or them from time to time against any or all Borrowers as often as occasion therefor may arise and without requirement on the part of Agent, any Lender, or any of their successors or assigns first to marshal any of its or their claims or to exercise any of its or their rights against any Borrower or to exhaust any remedies available to it or them against any Borrower or to resort to any other source or means of obtaining payment of any of the Obligations hereunder or to elect any other remedy.  The provisions of this Section 2.17 shall remain in effect until all of the Obligations shall have been paid in full or otherwise fully satisfied.  If at any time, any payment, or any part thereof, made in respect of any of the Obligations, is rescinded or must otherwise be restored or returned by Agent or any Lender upon the insolvency, bankruptcy or reorganization of any Borrower, or otherwise, the provisions of this Section 2.17 will forthwith be reinstated in effect, as though such payment had not been made.

(g)    Each Borrower hereby agrees that it will not enforce any of its rights of contribution or subrogation against any other Borrower with respect to any liability incurred by it hereunder or under any of the other Loan Documents, any payments made by it to Agent or Lenders with respect to any of the Obligations or any collateral security therefor until such time as all of the Obligations have been paid in full in cash.  Any claim which any Borrower may have against any other Borrower with respect to any payments to any Agent or any Lender hereunder are hereby expressly made subordinate and junior in right of payment, without limitation as to any increases in the Obligations arising hereunder or thereunder, to the prior payment in full in cash of the Obligations and, in the event of any insolvency, bankruptcy, receivership, liquidation, reorganization or other similar proceeding under the laws of any jurisdiction relating to any Borrower, its debts or its assets, whether voluntary or involuntary, all such Obligations shall be paid in full in cash before any payment or distribution of any character, whether in cash, securities or other property, shall be made to any other Borrower therefor.

(h)    Each Borrower hereby agrees that after the occurrence and during the continuance of any Default or Event of Default, such Borrower will not demand, sue for or otherwise attempt to collect any indebtedness of any other Borrower owing to such Borrower until the Obligations shall have been paid in full in cash.  If, notwithstanding the foregoing sentence, such Borrower shall collect, enforce or receive any amounts in respect of such indebtedness, such amounts shall be collected, enforced and received by such Borrower as trustee for Agent, and such Borrower shall deliver any such amounts to Agent for application to the Obligations in accordance with the terms herein.

Section 2.18. *No Discharge; Survival of Claims.*  Until payment in full of the Loans and all other Obligations, each of the Borrowers and the Guarantors agree that (a) the Obligations hereunder shall not be discharged by the entry of an order confirming a plan of reorganization or liquidation in any Chapter 11 Case (and each of the Borrowers and the Guarantors, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waive

any such discharge) and (b) the Term DIP Claims and the Liens granted to the Agents pursuant to the Orders and described in this Section 2.18 shall not be affected in any manner by the entry of an order confirming a plan of reorganization or liquidation in any Chapter 11 Case.

Section 2.19. *[Reserved]*.

Section 2.20. *Waiver of any Pari or Priming Rights*. On and after the Closing Date, and on behalf of themselves and their estates, and for so long as any Obligations shall be outstanding, the Borrowers and the Guarantors hereby irrevocably waive any right to seek, pursuant to Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any Lien of equal or greater priority than the Liens securing the Obligations, or to approve a claim of equal or greater priority than the Obligations, in each case, other than as contemplated by the Orders.

# ARTICLE 3
### TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY

Section 3.01. *Taxes*. (a) Except as provided in this Section 3.01 or as required by an applicable Law, any and all payments made by or on account of the Borrowers or any Guarantor under any Loan Document to any Lender or Agent shall be made free and clear of and without deduction or withholding for any Taxes, excluding (i) Taxes imposed on or measured by net income, however denominated, and franchise (and similar) Taxes imposed on it in lieu of net income Taxes, (ii) Taxes attributable to the failure by the relevant Lender or Agent to deliver the documentation required to be delivered pursuant to clause (d) of this Section 3.01, (iii) Taxes imposed by a jurisdiction as a result of any connection between such Lender or Agent and such jurisdiction other than any connection arising from executing, delivering, being a party to, engaging in any transactions pursuant to, performing its obligations under, or enforcing any Loan Document, (iv) any branch profits Taxes imposed by the United States or any similar Tax imposed by any other jurisdiction in which the Borrowers or any Guarantor (as appropriate) is located, (v) any U.S. federal tax that is in effect and would be required to be withheld with respect to amounts payable hereunder at such time the Lender or Agent becomes a party to this Agreement, or designates a new lending office, except to the extent such Lender or Agent's assignor, if any, was entitled at the time of designation of a new lending office (or assignment) to receive additional amounts with respect to such withholding tax pursuant to this Section 3.01 and (vi) any U.S. federal withholding Taxes imposed under FATCA (all such non-excluded Taxes, being hereinafter referred to as "**Indemnified Taxes**"). If the Borrowers, any Guarantor or other applicable withholding agent shall be required by any Laws to deduct any Taxes from or in respect of any sum payable under any Loan Document to any Agent or any Lender, (i) the applicable withholding agent shall make such deductions, (ii) the applicable withholding agent shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable Laws, (iii) if such Tax is an Indemnified Tax or Other Tax (as defined below), the sum payable by the Borrowers or Guarantor shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 3.01), such Agent or Lender (as the case may be) receives an amount equal to the sum it would have received had no such deductions been made, and (iv) within thirty (30) days after the date of such payment (or, if receipts or evidence are not available within thirty (30) days, as soon as possible thereafter), if the Borrowers or any Guarantor is the applicable withholding agent, the applicable withholding agent shall furnish to such Agent or Lender (as the case may be) the original or a copy of a receipt evidencing payment thereof or other evidence reasonably acceptable to such Agent or Lender.

(b)      In addition but without duplication of any obligation pursuant to Section 3.01(a), the Borrowers agree to pay any and all present or future stamp, court or documentary taxes and any other excise, property, intangible or mortgage recording taxes, or charges or levies of the same character, imposed by any Governmental Authority, which arise from any payment made under any Loan Document or from the execution, delivery, performance, enforcement or registration of, or otherwise with respect to, any Loan Document (including additions to tax, penalties and interest related thereto) excluding, in each case, such amounts that result from an Agent or Lender's Assignment and Acceptance, grant of a participation, transfer or assignment to or designation of a new applicable lending office or other office for receiving payments under any Loan Document (collectively, "**Assignment Taxes**") except for Assignment Taxes resulting from an assignment that is requested or required in

36

writing by the Lead Borrower (all such non-excluded taxes described in this Section 3.01(b) being hereinafter referred to as "**Other Taxes**").

(c)      Without duplication of any obligation pursuant to Section 3.01(a) or (b), the Borrowers and each Guarantor agree to indemnify each Agent and each Lender for (i) the full amount of Indemnified Taxes and Other Taxes paid by such Agent or Lender and (ii) any reasonable expenses arising therefrom or with respect thereto, provided such Agent or Lender, as the case may be, provides Borrowers or Guarantor with a written statement thereof setting forth in reasonable detail the basis and calculation of such amounts.

(d)      Each Lender and Agent shall, at such times as are reasonably requested by the Lead Borrower or the Administrative Agent, provide the Lead Borrower and the Administrative Agent with any documentation prescribed by Law certifying as to any entitlement of such Lender or Agent to an exemption from, or reduction in, withholding tax with respect to any payments to be made to such Lender under the Loan Documents.  Each such Lender and Agent shall, whenever a lapse in time or change in circumstances renders such documentation obsolete or inaccurate in any material respect, deliver promptly to the Lead Borrower and the Administrative Agent updated or other appropriate documentation (including any new documentation reasonably requested by the applicable withholding agent) or promptly notify the Lead Borrower and the Administrative Agent of its inability to do so. Unless the applicable withholding agent has received forms or other documents satisfactory to it indicating that payments under any Loan Document to or for a Lender are not subject to withholding tax or are subject to such Tax at a rate reduced by an applicable tax treaty, the Lead Borrower, the Administrative Agent or other applicable withholding agent shall withhold amounts required to be withheld by applicable Law from such payments at the applicable statutory rate. Notwithstanding the foregoing, a Lender shall not be required to deliver any form pursuant to this clause (d) that such Lender is not legally able to deliver.  In addition, each Lender and Agent shall deliver to the Lead Borrower and the Administrative Agent such other tax forms or other documents as shall be prescribed by applicable Law, to the extent applicable, (x) as may be necessary for the Borrowers and the Administrative Agent to comply with their obligations under the FATCA and to demonstrate that payments to such Lender or Agent under this Agreement and the other Loan Documents are exempt from any United States federal withholding tax imposed pursuant to FATCA or (y) to allow the Lead Borrower and the Administrative Agent to determine the amount to deduct or withhold under FATCA from a payment hereunder.  For purposes of this clause (d), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.  Without limiting the foregoing:

(i)      Each Lender and Agent that is a United States person (as defined in Section 7701(a)(30) of the Code) shall deliver to the Lead Borrower and the Administrative Agent on or before the date on which it becomes a party to this Agreement two properly completed and duly signed original copies of Internal Revenue Service Form W-9 certifying that such Lender or Agent (as the case may be) is exempt from federal backup withholding.

(ii)      Each Lender and Agent that is not a United States person (as defined in Section 7701(a)(30) of the Code) shall deliver to the Lead Borrower and the Administrative Agent on or before the date on which it becomes a party to this Agreement whichever of the following is applicable:

(A)      In the case of a Lender claiming eligibility for the benefits of an income tax treaty to which the United States is a party, two properly completed and duly signed original copies of Internal Revenue Service Form W-8BEN or W-8BEN-E (or any successor forms), and such other documentation as required under the Code,

(B)      two properly completed and duly signed original copies of Internal Revenue Service Form W-8ECI (or any successor forms) and, in the case of an Agent, a withholding certificate that satisfies the requirements of Treasury Regulation Sections 1.1441-1(b)(2)(iv) and 1.1441-1(e)(3)(v) as applicable to a U.S. branch that has agreed to be treated as a U.S. person for withholding tax purposes,

37

(C)    in the case of a Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (A) a certificate substantially in the form of Exhibit E-1, E-2, E-3 or E-4, as applicable (any such certificate a "**United States Tax Compliance Certificate**") and (B) two properly completed and duly signed original copies of Internal Revenue Service Form W-8BEN or W-8BEN-E, or

(D)    to the extent a Lender is not the beneficial owner (for example, where the Lender is a partnership, or is a participant holding a participation granted by a participating Lender), Internal Revenue Service Form W-8IMY (or any successor forms) of the Lender, accompanied by a Form W-8ECI, W-8BEN or W-8BEN-E, United States Tax Compliance Certificate, Form W-9, Form W-8IMY or any other required information from each beneficial owner, as applicable (provided that, if one or more beneficial owners are claiming the portfolio interest exemption, the United States Tax Compliance Certificate may be provided by such Lender on behalf of such beneficial owner).

(E)    Each Lender and Agent shall deliver to the Lead Borrower and the Administrative Agent two further original copies of any previously delivered form or certification (or any applicable successor form) on or before the date that any such form or certification expires or becomes obsolete or inaccurate and promptly after the occurrence of any event requiring a change in the most recent form previously delivered by it to the Lead Borrower or the Administrative Agent, or promptly notify the Lead Borrower and the Administrative Agent that it is unable to do so. Each Lender and Agent shall promptly notify the Administrative Agent at any time it determines that it is no longer in a position to provide any previously delivered form or certification to the Lead Borrower or the Administrative Agent.

(F)    If a payment made to a Lender or Agent under any Loan Document would be subject to U.S. federal withholding tax imposed under FATCA if such Lender or Agent were to fail to comply with the applicable reporting requirements of FATCA, such Lender or Agent shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by Laws and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable Laws and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine whether such Lender or Agent has or has not complied with such Person's obligations under FATCA and, if necessary, to determine the amount to deduct and withhold from such payment. Solely for purposes on this Section 3.01(d)(ii)(F), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(e)    Any Lender or Agent claiming any additional amounts payable pursuant to this Section 3.01 shall use its reasonable efforts to change the jurisdiction of its lending office (or take any other measures reasonably requested by the Lead Borrower) if such a change or other measures would reduce any such additional amounts (or any similar amount that may thereafter accrue) and would not, in the sole determination of such Lender, result in any unreimbursed cost or expense or be otherwise materially disadvantageous to such Lender.

(f)    If any Lender or Agent determines, in its sole discretion exercised in good faith, that it has received a refund in respect of any Indemnified Taxes or Other Taxes as to which indemnification or additional amounts have been paid to it by the Borrowers pursuant to this Section 3.01 (including by the payment of additional amounts pursuant to this Section 3.01), it shall promptly remit such refund to the Borrowers or Guarantor, net of all out-of-pocket expenses of the Lender or Agent, as the case may be and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund net of any Taxes payable by any Agent or Lender on such interest); *provided* that the Borrowers and Guarantors, upon the request of the Lender or Agent, as the case may be, agree promptly to return such refund (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to such party in the event such party is required to repay such refund to the relevant

Governmental Authority.  Notwithstanding anything to the contrary in this clause (f), in no event will the Lender or Agent be required to pay any amount to the Borrower or Guarantor pursuant to this clause (f) the payment of which would place such Lender or Agent in a less favorable net after-Tax position than such Lender or Agent would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This section shall not be construed to require the Administrative Agent or any Lender to make available its tax returns (or any other information relating to Taxes that it deems confidential) to the Borrowers or any other person.

(g)    Each party's obligations under this Section 3.01 shall survive any assignment of rights by, or the replacement of, a Lender, the termination of the Term Loan Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

Section 3.02.  *Illegality.*  If any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable lending office to make, maintain or fund Eurodollar Loans, or to determine or charge interest rates based upon the LIBO Rate, then, on notice thereof by such Lender to the Lead Borrower through the Administrative Agent, any obligation of such Lender to make or continue Eurodollar Loans shall be suspended until such Lender notifies the Administrative Agent and the Lead Borrower that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice, the Borrowers shall upon demand from such Lender (with a copy to the Administrative Agent), prepay, either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Eurodollar Loans to such day, or promptly, if such Lender may not lawfully continue to maintain such Eurodollar Loans.  Upon any such prepayment or conversion, the Borrowers shall also pay accrued interest on the amount so prepaid or converted and all amounts due, if any, in connection with such prepayment or conversion under Section 3.05.  Each Lender agrees to designate a different lending office if such designation will avoid the need for such notice and will not, in the good faith judgment of such Lender, otherwise be materially disadvantageous to such Lender.

Section 3.03.  *[Reserved]*.

Section 3.04.  *Increased Cost and Reduced Return; Capital Adequacy; Reserves on Eurodollar Loans.*  (a) If any Lender reasonably determines that as a result of the introduction of or any change in or in the interpretation of any Law, in each case after the Closing Date, or such Lender's compliance therewith, there shall be any increase in the cost to such Lender of agreeing to make or making, funding or maintaining any Eurodollar Loans, or a reduction in the amount received or receivable by such Lender in connection with any of the foregoing (excluding for purposes of this Section 3.04(a) any such increased costs or reduction in amount resulting from (i) Indemnified Taxes or Other Taxes covered by Section 3.01 or (ii) reserve requirements contemplated by Section 3.04(c) or reflected in the Adjusted LIBO Rate) and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Eurodollar Loan (or of maintaining its obligations to make any Loan), or to reduce the amount of any sum received or receivable by such Lender, then from time to time within fifteen (15) days after demand by such Lender setting forth in reasonable detail such increased costs (with a copy of such demand to the Administrative Agent given in accordance with Section 3.06), the Borrowers shall pay to such Lender such additional amounts as will compensate such Lender for such increased cost or reduction.

(b)    If any Lender determines that the introduction of any Law regarding capital adequacy or any change therein or in the interpretation thereof, in each case after the Closing Date, or compliance by such Lender (or its lending office) therewith, has the effect of reducing the rate of return on the capital of such Lender or any entity controlling such Lender as a consequence of such Lender's obligations hereunder (taking into consideration its policies with respect to capital adequacy and such Lender's desired return on capital), then from time to time upon demand of such Lender setting forth in reasonable detail the charge and the calculation of such reduced rate of return (with a copy of such demand to the Administrative Agent given in accordance with Section 3.06), the Borrowers shall pay to such Lender such additional amounts as will compensate such Lender or controlling entity for such reduction within fifteen (15) days after receipt of such demand.

(c)     Except to the extent already reflected in the Adjusted LIBO Rate, the Borrowers shall pay to each Lender, (i) as long as such Lender shall be required to maintain reserves with respect to liabilities or assets consisting of or including Eurodollar funds or deposits, additional interest on the unpaid principal amount of each applicable Eurodollar Loan of the Borrowers equal to the actual costs of such reserves allocated to such Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive in the absence of manifest error), and (ii) as long as such Lender shall be required to comply with any reserve ratio requirement or analogous requirement of any other central banking or financial regulatory authority imposed in respect of the maintenance of the Term Loan Commitments or the funding of any Eurodollar Loans of the Borrowers, such additional costs (expressed as a percentage per annum and rounded upwards, if necessary, to the nearest five decimal places) equal to the actual costs allocated to such Term Loan Commitment or Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive absent manifest error) which in each case shall be due and payable on each date on which interest is payable on such Loan, provided the Borrowers shall have received at least fifteen (15) days' prior notice (with a copy to the Administrative Agent) of such additional interest or cost from such Lender.  If a Lender fails to give notice fifteen (15) days prior to the relevant Interest Payment Date, such additional interest or cost shall be due and payable fifteen (15) days from receipt of such notice.

(d)     Failure or delay on the part of any Lender to demand compensation pursuant to this Section 3.04 or Section 3.01 shall not constitute a waiver of such Lender's right to demand such compensation; provided that the Borrower shall not be required to compensate a Lender pursuant to Section 3.01 or this Section 3.04 for any amounts incurred or reductions suffered more than nine months prior to the date that such Lender notifies a Borrower of the change in law or payment of Tax giving rise to the incurrence of such amount or reduction, and of such Lender's intention to claim compensation therefor (except that, if the change in law giving rise to such amount incurred or reduction is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

(e)     If any Lender requests compensation under this Section 3.04, then such Lender will, if requested by the Lead Borrower, use commercially reasonable efforts to designate another lending office for any Loan affected by such event; *provided* that such efforts are made on terms that, in the reasonable judgment of such Lender, cause such Lender and its lending office(s) to suffer no material economic, legal or regulatory disadvantage, and *provided further* that nothing in this Section 3.04(e) shall affect or postpone any of the Obligations of the Borrowers or the rights of such Lender pursuant to Section 3.04(a), (b), (c) or (d).

Section 3.05.  *Funding Losses.*     Upon written demand of any Lender (with a copy to the Administrative Agent) from time to time, which demand shall set forth in reasonable detail the basis for requesting such amount, the Borrowers shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense actually incurred by it as a result of:

(i)     any payment or prepayment of any Loan of the Borrowers on a day prior to the last day of the Interest Period for such Loan; or

(ii)     any failure by the Borrowers (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any Loan of the Borrowers on the date or in the amount notified by the Borrowers;

including an amount equal to the excess, as reasonably determined by such Lender, of (1) its cost of obtaining funds for the Loan that is the subject of such event for the period from the date of such event to the last day of the Interest Period in effect (or that would have been in effect) for such Loan over (2) the amount of interest likely to be realized by such Lender in redeploying the funds released or not utilized by reason of such event for such period, but excluding loss of anticipated profits.

Section 3.06.  *Matters Applicable to all Requests for Compensation.*  (a) Any Agent or any Lender claiming compensation under this Article 3 shall deliver a certificate to the Lead Borrower setting forth the

40

additional amount or amounts to be paid to it hereunder which shall be conclusive in the absence of manifest error. In determining such amount, such Agent or such Lender may use any reasonable averaging and attribution methods.

(b)      With respect to any Lender's claim for compensation under Section 3.01, 3.02 or 3.04, the Borrowers shall not be required to compensate such Lender for any amount incurred more than one hundred and eighty (180) days prior to the date that such Lender notifies the Lead Borrower of the event that gives rise to such claim; *provided* that, if the circumstance giving rise to such claim is retroactive, then such 180-day period referred to above shall be extended to include the period of retroactive effect thereof.  If any Lender requests compensation by the Borrowers under Section 3.04, the Borrowers may, by notice from the Lead Borrower to such Lender (with a copy to the Administrative Agent), suspend the obligation of such Lender to make or continue from one Interest Period to another, until the event or condition giving rise to such request ceases to be in effect (in which case the provisions of Section 3.06(c) shall be applicable); *provided* that such suspension shall not affect the right of such Lender to receive the compensation so requested.

(c)      If the obligation of any Lender to make or continue any Eurodollar Loan, or to convert ABR Loans into Eurodollar Loans shall be suspended pursuant to Section 3.06(b) hereof, such Lender's applicable Eurodollar Loans shall be automatically converted into ABR Loans (or, if such conversion is not possible, repaid) on the last day(s) of the then current Interest Period(s) for such Eurodollar Loans (or, in the case of an immediate conversion required by Section 3.02, on such earlier date as required by Law) and, unless and until such Lender gives notice as provided below that the circumstances specified in Section 3.02 or 3.04 hereof that gave rise to such conversion no longer exist:

(i)      to the extent that such Lender's Eurodollar Loans have been so converted, all payments and prepayments of principal that would otherwise be applied to such Lender's applicable Eurodollar Loans shall be applied instead to its ABR Loans; and

(ii)      all Loans that would otherwise be made or continued from one Interest Period to another by such Lender as Eurodollar Loans shall be made or continued instead as ABR Loans (if possible), and all ABR Loans of such Lender that would otherwise be converted into Eurodollar Loans shall remain as ABR Loans.;

(d)      If any Lender gives notice to the Lead Borrower (with a copy to the Administrative Agent) that the circumstances specified in Section 3.02 or 3.04 hereof that gave rise to the conversion of any of such Lender's Eurodollar Loans pursuant to this Section 3.06 no longer exist (which such Lender agrees to do promptly upon such circumstances ceasing to exist) at a time when Eurodollar Loans made by other Lenders under the applicable Term DIP Facility are outstanding, if applicable, such Lender's ABR Loans shall be automatically converted, on the first day(s) of the next succeeding Interest Period(s) for such outstanding Eurodollar Loans, to the extent necessary so that, after giving effect thereto, all Loans held by the Lenders holding Eurodollar Loans under such Term DIP Facility and by such Lender are held pro rata (as to principal amounts, interest rate basis, and Interest Periods) in accordance with their respective Term Loan Commitments for the applicable Term DIP Facility.

(e)      Notwithstanding anything herein to the contrary, the Dodd Frank Wall Street Reform and Consumer Protection Act, and all requests, rules, guidelines and directives promulgated thereunder, shall be deemed to have been adopted after the Closing Date, regardless of the date enacted or adopted.

Section 3.07.  *[Reserved]*.

Section 3.08.  *Survival.*  All of the Borrowers' obligations under this Article 3 shall survive termination of the Term Loan Commitments and repayment of all other Obligations hereunder.

# ARTICLE 4
### CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

Section 4.01.  *Conditions Precedent to Closing Date.*  The obligation of each Lender to make a Borrowing hereunder on the Closing Date is subject to the satisfaction or due waiver in accordance with Section 10.08 of each of the following conditions precedent on or prior to the date that is not more than two (2) Business Days after the Interim Order Entry Date, except as otherwise agreed between the Borrower, the Administrative Agent and the Required Lenders:

(a)    The Administrative Agent shall have received executed counterparts of this Agreement and the other Loan Documents executed by each party hereto and thereto, each of which shall be in form and substance satisfactory to the Required Lenders.

(b)    *[Reserved]*.

(c)    The Chapter 11 Cases shall have been commenced in the Bankruptcy Court and all of the "first day orders" and all related pleadings to be entered at the time of commencement of the Chapter 11 Cases or shortly thereafter shall be in form and substance reasonably satisfactory to the Required Lenders.

(d)    The Administrative Agent shall have received the Approved Budget.

(e)    The Interim Order shall have been entered by the Bankruptcy Court within three (3) Business Days of the Petition Date and the Administrative Agent shall have received a true and complete copy of such order, and such order, be in full force and effect and shall not have been reversed, modified, amended, stayed or vacated absent prior written consent of the Administrative Agent and the Required Lenders.

(f)    Other than the Interim Order, there shall not exist any law, regulation, ruling, judgment, order, injunction or other restraint that prohibits, restricts or imposes a materially adverse condition on the Term DIP Facility or the exercise by the Administrative Agent at the direction of the Lenders of its rights as a secured party with respect to the Collateral.

(g)    The Administrative Agent shall have received UCC, tax and judgment lien searches and other appropriate evidence, in form and substance satisfactory to the Administrative Agent.

(h)    The Administrative Agent shall have received appropriate UCC-1 financing statements for filing under the UCC of each jurisdiction of organization of each Loan Party.

(i)    The Administrative Agent shall have received customary certificates of resolutions or other action, incumbency certificates of Responsible Officers of each Loan Party evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party and (B) certificates (including Organization Documents and good standing certificates) relating to the organization, existence and good standing of each Loan Party in its jurisdiction of organization, in each case, as certified by the Secretary or an Assistant Secretary of such Loan Party.

(j)    *[Reserved]*;

(k)    The representations and warranties set forth in Article 5 and in each other Loan Document shall be true and correct in all material respects (without duplication of any materiality qualifier) on and as of the date of such Borrowing with the same effect as though made on and as of such date, except to the extent such

representations and warranties expressly relate to an earlier date, in which case they shall be true and correct in all material respects (without duplication of any materiality qualifier) as of such earlier date; *provided*, that any such representation and warranty that is qualified by "materiality", "material adverse effect" or similar language shall be true and correct in all respects (after giving effect to such qualification therein) on and as of the date of such Borrowing with the same effect as though made on and as of such date or such earlier date, as applicable.

(l)    Other than the Chapter 11 Cases or as stayed upon the commencement of the Chapter 11 Cases, there shall exist no action, suit, investigation, litigation or proceeding pending or threatened in any court or before any arbitrator or governmental instrumentality that (i) except as disclosed on Schedule 5.06 hereto, if adversely determined, could reasonably be expected to result in a Material Adverse Effect or (ii) restrains, prevents or imposes or can reasonably be expected to impose materially adverse conditions upon the Term DIP Facility, the Collateral or the transactions contemplated thereby.

(m)    Other than the Orders, all governmental and third party consents and approvals necessary in connection with entry into the Term DIP Facility shall have been obtained (without the imposition of any conditions that are not acceptable to the Administrative Agent and the Required Lenders).

(n)    No Default or Event of Default shall exist or would result from such proposed Borrowing or from the application of the proceeds therefrom.

(o)    There has been no event or circumstance, either individually or in the aggregate, that could reasonably be expected to have a Material Adverse Effect.

(p)    The Administrative Agent shall have received a Borrowing Notice in accordance with the requirements hereof.

(q)    The Borrowers shall have paid to the Administrative Agent and Lenders all fees and expenses then due and payable under the Loan Documents subject to and in accordance with the Interim Order, including all reasonable and document out-of-pocket fees, costs, disbursements and expense of (i) the Administrative Agent (including, in the case of counsel, to all reasonable fees, costs, disbursements and expenses of the Administrative Agent's outside counsel, King & Spalding LLP, Sullivan & Cromwell LLP, as special tax counsel, and McGuire Woods, as local Virginia counsel in connection with the Debtors' Chapter 11 Cases), (ii) AlixPartners, LLP, as financial advisor to the Lenders (pursuant to that certain letter of engagement dated as of January 3, 2019, by and among King & Spalding LLP, AlixPartners, LLP, the Administrative Agent, and Gymboree Group, Inc.), and (iii) any other professional advisors retained by the Administrative Agent or their counsel, on or before the Closing Date, shall have been paid in full in cash, to the extent invoiced to the Borrower no later than one (1) Business Day prior to the Closing Date.

(r)    All material motions and other documents to be filed with and submitted to the Bankruptcy Court (provided that any of the foregoing relating to the Term DIP Facilities shall be deemed material) and the approval thereof shall be in form and substance reasonably satisfactory to the Required Lenders.

(s)    The Borrowers shall have entered into the Stalking Horse Agreement and shall have filed the IP and Online Business Bid Procedures Motion.

(t)    The Borrowers shall have entered into the Agency Agreement.

Section 4.02.    *Conditions to each Borrowing after the Closing Date.*  Each Lender shall make a Borrowing of Term DIP Loans to be made by it after the Closing Date subject only to the following conditions precedent:

(a)    No Default or Event of Default shall exist or would result from such proposed Borrowing or from the application of the proceeds therefrom.

43

(b)    The representations and warranties set forth in Article 5 and in each other Loan Document shall be true and correct in all material respects (without duplication of any materiality qualifier) on and as of the date of such Borrowing with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case they shall be true and correct in all material respects (without duplication of any materiality qualifier) as of such earlier date; *provided*, that any such representation and warranty that is qualified by "materiality", "material adverse effect" or similar language shall be true and correct in all respects (after giving effect to such qualification therein) on and as of the date of such Borrowing with the same effect as though made on and as of such date or such earlier date, as applicable.

(c)    The Final Order shall have been entered by the Bankruptcy Court and the Administrative Agent shall have received a true and complete copy of such order, and such order shall be in full force and effect and shall not have been reversed, modified, amended, stayed or vacated absent prior written consent of the Administrative Agent at the direction of the Required Lenders.

(d)    The making of such proposed Borrowing shall comply with the Approved Budget, subject to any Permitted Variances.

(e)    The making of such Term DIP Loans shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently.

(f)    Other than the Orders, there shall not exist any law, regulation, ruling, judgment, order, injunction or other restraint that prohibits, restricts or imposes a materially adverse condition on the Term DIP Facilities or the exercise by the Administrative Agent at the direction of the Required Lenders of its rights as a Secured Party with respect to the Collateral.

# ARTICLE 5
## REPRESENTATIONS AND WARRANTIES

Each of Holdings, the Borrowers and each of the Subsidiary Guarantors party hereto represents and warrants to the Administrative Agent, the Collateral Agent and each of the Lenders that:

Section 5.01.  *Existence, Qualification and Power; Compliance with Laws.*  Each Loan Party and each Subsidiary (a) is a Person duly organized or formed, validly existing and in good standing (where relevant) under the Laws of the jurisdiction of its incorporation or organization, (b) solely to the extent expressly permitted by the Orders and other orders of the Bankruptcy Court, as applicable, has all requisite power and authority to (i) own or lease its assets and carry on its business as currently conducted and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party and, in the case of the Borrowers, to borrow hereunder, (c) is duly qualified and in good standing (where relevant) under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, (d) is in compliance with all Laws, orders, writs and injunctions, unless stayed by the Chapter 11 Cases, and (e) has all requisite governmental licenses, authorizations, consents and approvals to operate its business as currently conducted unless stayed by the Chapter 11 Cases; except in each case, referred to in clause (a) (other than with respect to any Loan Party), (b), (c), (d) or (e), to the extent that failure to do so, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect. Neither the Borrower nor any other Loan Party is an EEA Financial Institution.

Section 5.02.  *Authorization; No Contravention.*  Subject to the entry and the terms of the Orders, the execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party, are within such Loan Party's corporate or other powers, (a) have been duly authorized by all necessary corporate or other organizational action, and (b) do not (i) contravene the terms of any of such Person's Organization Documents, (ii) conflict with or result in any breach or contravention of, or the creation of (or the requirement to create) any Lien under (other than as permitted by Section 7.01), or require any payment to be made under (x) any Post-Petition Contractual Obligation to which such Person is a party or affecting such Person or the properties of such Person or

any of its Subsidiaries or (y) any material order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; or (iii) violate any material Law; except with respect to any conflict, breach or contravention or payment (but not creation of Liens) referred to in clause (ii)(x), to the extent that such violation, conflict, breach, contravention or payment, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

Section 5.03. *Governmental Authorization; Other Consents.*  Other than the Orders, no approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with (a) the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, (b) the grant by any Loan Party of the Liens granted by it pursuant to the Collateral Documents, (c) the perfection or maintenance of the Liens created under the Collateral Documents (including the priority thereof) or (d) the exercise by the Administrative Agent, the Collateral Agent or any Lender of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents, except for (i) any filings and registrations necessary to perfect the Liens on the Collateral granted by the Loan Parties in favor of the Secured Parties, (ii) the approvals, consents, exemptions, authorizations, actions, notices and filings which have been duly obtained, taken, given or made and are in full force and effect and (iii) those approvals, consents, exemptions, authorizations or other actions, notices or filings, the failure of which to obtain or make, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

Section 5.04. *Binding Effect.*  This Agreement and each other Loan Document has been duly executed and delivered by each Loan Party that is a party thereto.  Subject to the entry and the terms of the Orders, this Agreement and each other Loan Document constitutes a legal, valid and binding obligation of each such Loan Party, enforceable against each Loan Party that is a party thereto in accordance with its terms, except as such enforceability may be limited by Debtor Relief Laws and by general principles of equity.

Section 5.05. *Financial Statements; No Material Adverse Effect.*

(a)     The financial statements of the Company and its Subsidiaries as of the last day of the most recent fiscal quarter for which such statements were delivered have been prepared in good faith, based on assumptions believed by the Borrowers to be reasonable as of the date of delivery thereof. The forecasts of income statements of the Borrowers and their Subsidiaries which have been furnished to the Administrative Agent prior to the Closing Date have been prepared in good faith on the basis of the assumptions stated therein, which assumptions were believed to be reasonable at the time of preparation of such forecasts, it being understood that actual results may vary from such forecasts and that such variations may be material.

(b)     Since the Petition Date, except for the Chapter 11 Cases, there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

(c)     As of the Petition Date, neither Holdings, the Borrowers nor any of their Subsidiaries has any Indebtedness or other obligations or liabilities, direct or contingent (other than (i) the liabilities reflected on Schedule 5.05, (ii) obligations arising under the Loan Documents, and (iii) liabilities incurred in the ordinary course of business that, either individually or in the aggregate, have had or could reasonably be expected to have a Material Adverse Effect).

Section 5.06. *Litigation.*  Except for the Chapter 11 Cases and as specifically disclosed on Schedule 5.06 hereto, there are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of Holdings or the Borrowers, threatened in writing, at law, in equity, in arbitration or before any Governmental Authority, by or against Holdings, the Borrowers or any of their Subsidiaries or against any of their properties or revenues that, either individually or in the aggregate could reasonably be expected to have a Material Adverse Effect.

Section 5.07.  *Compliance With Laws; No Default.*  (a) Neither Holdings or the Borrowers nor any of their Subsidiaries is in default under or with respect to, or a party to, any Post-Petition Contractual Obligation that could, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)    None of Holdings, the Borrowers or any of their Subsidiaries or any of their respective properties or assets is in violation of, nor will the continued operation of their properties and assets as currently conducted violate, any law, rule or regulation (including any zoning, building, Environmental Law, ordinance, code or approval or any building permits) or any restrictions of record or agreements affecting the Real Property or is in default with respect to any unstayed judgment, writ, injunction, decree or order of any Governmental Authority, where such violation or default, individually or in the aggregate could reasonably be expected to result in a Material Adverse Effect.

Section 5.08.  *Ownership of Property; Liens; Casualty Events.*  (a) Each of Holdings, the Borrowers and their Subsidiaries has good record title to, or valid leasehold interests in, or easements or other limited property interests in, all its properties and assets, free and clear of all Liens except for minor defects in title that do not materially interfere with its ability to conduct its business or to utilize such assets for their intended purposes and Liens permitted by Section 7.01 and except where the failure to have such title could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)    As of the Closing Date, Schedule 5.08 contains a true and complete list of each Real Property owned by Holdings, the Borrowers and their Subsidiaries.

(c)    As of the Closing Date, except as otherwise disclosed in writing to the Collateral Agent, no Loan Party has received any notice of, nor has any knowledge of, the occurrence (and still pending as of the Closing Date) or pendency or contemplation of any Casualty Event affecting all or any portion of Real Property.

Section 5.09.  *Environmental Matters.*  Except as could not reasonably be expected to have, individually or in the aggregate a Material Adverse Effect or as set forth on Schedule 5.09 hereto:

(a)    Each Loan Party and each Subsidiary is and has been in compliance with all Environmental Laws, which includes obtaining and maintaining all applicable Environmental Permits required under such Environmental Laws to carry on the business of the Loan Parties and their Subsidiaries unless stayed by the Chapter 11 Cases;

(b)    the Loan Parties and their Subsidiaries have not received any written notice that alleges any of them is in violation of or potentially liable under any Environmental Laws and none of the Loan Parties and their Subsidiaries nor any of the Real Property is the subject of any claims, investigations, liens, demands, or judicial, administrative or arbitral proceedings pending or, to the knowledge of the Borrowers, threatened in writing, under any Environmental Law or to revoke or modify any Environmental Permit held by any of the Loan Parties or their Subsidiaries;

(c)    there has been no Release, discharge or disposal of Hazardous Materials on, to, at, under or from any Real Property or facilities owned or leased by any of the Loan Parties or their Subsidiaries, or, to the knowledge of the Borrowers, Real Property formerly owned, operated or leased by any Loan Party or any Subsidiary or arising out of the conduct of the Loan Parties or their Subsidiaries that could reasonably be expected to require investigation, remedial activity or corrective action or cleanup or could reasonably be expected to result in the Borrowers or any other Loan Party or Subsidiary incurring liability relating to Environmental Laws; and

(d)    there are no facts, circumstances or conditions arising out of or relating to the operations of the Loan Parties or their Subsidiaries or any Real Property or facilities currently or previously owned or leased by the Loan Parties or any Subsidiary that could reasonably be expected to require investigation, remedial activity or corrective action or cleanup or could reasonably be expected to result in the Borrowers or any other Loan Party or Subsidiary incurring any Environmental Liability.

46

Section 5.10.  *Taxes*  Except as disclosed on Schedule 5.10 hereto, each of the Loan Parties and their Subsidiaries have timely filed all tax returns required to be filed, and have paid all Taxes levied or imposed upon them or their properties, that are due and payable (including in their capacity as a withholding agent), except those which are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with GAAP or the payment of which are stayed by Chapter 11 Cases.  There is no proposed Tax deficiency or assessment known to any Loan Party against any Loan Party or any Subsidiary, except as disclosed on Schedule 5.10 hereto.

Section 5.11.  *ERISA Compliance, Etc.*  (a) Except as could not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, each Plan is in compliance with the applicable provisions of ERISA, the Code and other Federal or state Laws (and the regulations and published interpretations thereunder).

(b)     As of the Closing Date, (i) no Plan is a Multiemployer Plan; nor is any Plan subject to Section 302 or Title IV of ERISA or Section 412 of the Code and (ii) no Loan Party, Subsidiary or any of their respective ERISA Affiliates nor any predecessor thereof (A) has in the past six years sponsored, maintained or contributed to, any Plan subject to Title IV of ERISA or (B) has in the past six years contributed to any Multiemployer Plan.

(c)     (i) No Loan Party, Subsidiary or any of their respective ERISA Affiliates has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Plan (other than premiums due and not delinquent under Section 4007 of ERISA); (ii) no Loan Party, Subsidiary or any of their respective ERISA Affiliates has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Sections 4201 or 4243 of ERISA with respect to a Multiemployer Plan; and (iii) no Loan Party, Subsidiary or any of their respective ERISA Affiliates has engaged in a transaction that could be subject to Sections 4069 or 4212(c) of ERISA, except, with respect to each of the foregoing clauses of this Section 5.11(c), as could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

(d)     The Plans and Foreign Pension Plans of the Loan Parties and the Subsidiaries are funded to the extent required by Law or otherwise to comply with the requirements of any material Law applicable in the jurisdiction in which the relevant pension scheme is maintained, in each case, except as could not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

Section 5.12.  *Subsidiaries.*  As of the Closing Date, no Loan Party has any direct or indirect Subsidiaries other than those specifically disclosed in Schedule 5.12, and all of the outstanding Equity Interests owned by the Loan Parties (or a Subsidiary of any Loan Party) in such Subsidiaries have been validly issued and are fully paid and (if applicable) non-assessable and all Equity Interests owned by a Loan Party (or a Subsidiary of any Loan Party) in such Subsidiaries are owned free and clear of all Liens except (a) those created under the Collateral Documents, the Carve-Out or the Prepetition Term Loan Documents or the Prepetition ABL Documents and (b) any non-consensual Lien that is permitted under Section 7.01.  As of the Closing Date, Schedule 5.12(b) sets forth the ownership interest of Holdings, the Borrowers and any other Subsidiary thereof in each Subsidiary, including the percentage of such ownership.

Section 5.13.  *Margin Regulations; Investment Company Act.*  (a) No Loan Party or Subsidiary is engaged nor will it engage, principally, or as one of its important activities, in the business of purchasing or carrying Margin Stock, or extending credit for the purpose of purchasing or carrying Margin Stock, and no proceeds of any Borrowings will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, for any purpose that entails a violation of, or that is inconsistent with, the provisions of the Regulations of the Board, including Regulation T, U or X.

(b)     Neither Holdings, nor the Borrowers, nor any of their Subsidiaries is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

Section 5.14.  *Disclosure.*  No confidential information memorandum, report, financial statement, certificate or other written information furnished by or on behalf of any Loan Party (other than projected financial information, pro forma financial information and information of a general economic or industry nature) to any Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (as modified or supplemented by other information so furnished) when taken as a whole contains or will contain any material misstatement of fact or omits or will omit to state any material fact necessary to make the statements therein (when taken as a whole), in the light of the circumstances under which they were or will be made, not materially misleading.  With respect to projected financial information and pro forma financial information, each of Holdings and the Borrowers represents that such information was prepared in good faith based upon assumptions believed to be reasonable at the time of preparation; it being understood that such projections may vary from actual results and that such variances may be material.

Section 5.15.  *Labor Matters.*  Except as, in the aggregate, could not reasonably be expected to have a Material Adverse Effect, or as set forth on Schedule 5.15:  (a) there are no strikes or other labor disputes against the Borrowers or any of their Subsidiaries pending or, to the knowledge of the Borrowers, threatened in writing; (b) hours worked by and payment made to employees of the Borrowers or any of its Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Laws dealing with such matters; and (c) all payments due from the Borrowers or any of their Subsidiaries on account of employee health and welfare insurance have been paid or accrued as a liability on the books of the relevant party.

Section 5.16.  *Intellectual Property; Licenses, Etc.*  (a) Holdings, the Borrowers and their Subsidiaries own, license or possess the right to use all of the trademarks, service marks, trade names, domain names, copyrights, patents, patent rights, licenses, technology, software, know-how, trade secrets, database rights, design rights and other intellectual property rights (and all registrations and applications for registration of any of the foregoing) (collectively, "**IP Rights**"), in each case reasonably necessary for the conduct of their respective businesses as currently conducted, except to the extent that the failure to own, license or possess the right to use such IP Rights, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect, and, such IP Rights do not conflict with the rights of any Person, except to the extent such conflicts, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(b)    The conduct of the business of Holdings, the Borrowers or any of their Subsidiaries does not infringe, misappropriate or otherwise violate any IP Rights held by any Person, except for such infringements, misappropriations or violations, which, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.  There is no claim, investigation, suit or proceeding pending or, to the knowledge of the Borrowers, threatened in writing, against Holdings, the Borrowers or any of their Subsidiaries (i) challenging the validity of any IP Rights held by any of them or (ii) alleging that their respective use of any IP Rights or the conduct of their respective businesses infringes, misappropriates, or otherwise violates the IP Rights of any other Person, in each case, which either individually or in the aggregate could reasonably be expected to have a Material Adverse Effect.

(c)    As of the Closing Date, Schedule 5.16(c) contains a true and complete list of all patents, patent applications, registered trademarks, trademark applications, material registered copyrights and material copyright applications that are owned by Holdings, the Borrowers or any of their Subsidiaries and all such IP Rights are valid and in full force and effect, except to the extent the failure of such IP Rights to be valid and in full force and effect could not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

Section 5.17.  *[Reserved].*

Section 5.18.  *[Reserved].*

Section 5.19.  *Collateral Documents.*  The provisions of the Interim Order and Final Order, as applicable, are effective to create in favor of the Administrative Agent for the benefit of the Secured Parties a legal, valid and enforceable security interest (subject, in the case of any Collateral, to Liens permitted by Section 7.01) on

all right, title and interest of the respective Loan Parties in the Collateral described therein (with such priority as provided for in the Order). Except for filings contemplated hereby and as provided in the applicable Order, no filing or other action will be necessary to perfect the Liens on any Collateral under the Laws of the United States of America.

Section 5.20.  *[Reserved].*

Section 5.21.  *Sanctions; Anti-Corruption Laws; Anti-Money Laundering Laws.*

(a)    None of Holdings, any of its Subsidiaries or any of their respective directors, officers or, to the knowledge of any Loan Party, employees, agents, advisors or other Affiliates is a Sanctioned Person.  Each of Holdings and its Subsidiaries and their respective directors, officers and, to the knowledge of any Loan Party, employees, agents, advisors and Affiliates is in compliance with (i)  Sanctions, (ii)  Anti-Corruption and Anti-Bribery Laws, and (iii)  Anti-Terrorism and Anti-Money Laundering Laws.   No part of the proceeds of any Borrowing has or will be used, directly or, to any Loan Party's knowledge (upon reasonable inquiry), indirectly, (A) for the purpose of financing any activities or business of or with any Sanctioned Person or in any Sanctioned Country to the extent such activities are in violation of Sanctions, (B) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value to any Person in violation of any Anti-Corruption and Anti-Bribery Laws, (C) otherwise in any manner that would result in a violation of Sanctions, Anti-Terrorism and Anti-Money Laundering Laws, or Anti-Corruption and Anti-Bribery Laws by any Person.

(b)    Holdings and its Subsidiaries have established and currently maintain policies, procedures and controls that are designed (and otherwise comply with applicable law) to ensure that each of Holdings, its Subsidiaries, and each Controlled entity, and each of their respective directors, officers, employees and agents, is and will continue to be in compliance with all applicable current and future Sanctions, Anti-Terrorism and Anti-Money Laundering Laws, and Anti-Corruption and Anti-Bribery Laws.

Section 5.22.  *Capitalization*.  The Equity Interests of each of Holdings and its Subsidiaries has been duly authorized and validly issued and is fully paid and non assessable.  Except as set forth on Schedule 5.22, as of the date hereof, there is no existing option, warrant, call, right, commitment or other agreement to which Holdings or any of its Subsidiaries is a party requiring, and there is no membership interest or other Equity Interests of Holdings or any of its Subsidiaries outstanding which upon conversion or exchange would require, the issuance by Holdings or any of its Subsidiaries of any additional membership interests or other Equity Interests of Holdings or any of its Subsidiaries or other securities convertible into, exchangeable for or evidencing the right to subscribe for or purchase, a membership interest or other Equity Interests of Holdings or any of its Subsidiaries.  Schedule 5.22 correctly sets forth the ownership interest of Holdings and each of its Subsidiaries in their respective Subsidiaries as of the Closing Date.

Section 5.23.  *Chief Executive Office*.  Schedule 5.23 lists each Loan Party's jurisdiction of organization, legal name and organizational identification number, if any, and the location of such Loan Party's chief executive office or sole place of business, in each case as of the date hereof, and such Schedule 5.23 also lists all jurisdictions of organization and legal names of such Loan Party for the five years preceding the Closing Date.

Section 5.24.  *Insurance*.

(a)    Holdings, the Borrowers and their Subsidiaries maintain with financially sound and reputable insurance companies, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts (after giving effect to any self-insurance reasonable and customary for similarly situated Persons engaged in the same or similar businesses as the Borrowers and their Subsidiaries) as are customarily carried under similar circumstances by such other Persons.

49

(b)    Holdings, the Borrowers and their Subsidiaries carry and maintain commercial general liability insurance including the "broad form CGL endorsement" (or equivalent coverage) and coverage on an occurrence basis against claims made for personal injury (including bodily injury, death and property damage) and umbrella liability insurance against any and all claims, in each case in amounts and against such risks as are customarily maintained by companies engaged in the same or similar industry operating in the same or similar locations.

Section 5.25.    *Deposit Accounts and Other Accounts*.    Schedule 5.25 lists all banks and other financial institutions securities intermediary or commodity intermediary at which any Loan Party maintains deposit, securities, commodities or similar accounts as of the Closing Date, and such Schedule correctly (x) identifies the name, address and any other relevant contact information reasonably requested by Agent with respect to each depository or intermediary, the name in which the account is held, a description of the purpose of the account, and the complete account number therefor and (y) indicates whether such accounts shall be subject to Account Control Agreement in accordance with the Collateral and Guarantee Requirement.

Section 5.26.    *Approved Budget*.    The initial Approved Budget, attached hereto as Schedule I, will be delivered to the Administrative Agent on or prior to the Closing Date, and each subsequent Approved Budget was prepared in good faith based upon assumptions the Borrower believed to be reasonable assumptions on the date of delivery of the then-applicable Approved Budget.    To the knowledge of the Borrower, no facts exist that (individually or in the aggregate) would result in any material change in the Approved Budget.    The Borrower shall deliver to the Administrative Agent updates to the Approved Budget in accordance with Section 6.17. The initial Approved Budget delivered on the Closing Date and each Approved Budget will be delivered thereafter pursuant to Section 6.17 hereof are based on a good faith estimates and assumptions believed by management of the Borrowers to be reasonable and fair in light of current conditions and facts known to the Borrowers at the time delivered (it being understood that such Approved Budgets and the assumptions on which they were based, may or may not prove to be correct).

Section 5.27. *Chapter 11 Cases; Orders.*

(a)    The Chapter 11 Cases were commenced on the Petition Date in accordance with applicable Laws and proper notice thereof was given for (i) the motion seeking approval of the Loan Documents and the Interim Order and Final Order, (ii) the hearing for the entry of the Interim Order, and (iii) the hearing for the entry of the Final Order (provided that notice of the final hearing will be given as soon as reasonably practicable after such hearing has been scheduled).    The Debtors shall give, on a timely basis as specified in the Interim Order or the Final Order, as applicable, all notices required to be given to all parties specified in the Interim Order or Final Order, as applicable.

(b)    After the entry of the Interim Order, and pursuant to and to the extent permitted in the Interim Order and the Final Order, the Obligations will constitute allowed administrative expense claims in the Chapter 11 Cases having priority over all administrative expense claims and unsecured claims against the Debtors now existing or hereafter arising, of any kind whatsoever, including all administrative expense claims of the kind specified in Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under Section 364(c)(l) of the Bankruptcy Code, subject to (i) the Carve-Out and (ii) the priorities set forth in the Interim Order or Final Order, as applicable.

(c)    After the entry of the Interim Order and pursuant to and to the extent provided in the Interim Order and the Final Order, the Obligations will be secured by a valid and perfected Lien on all of the Collateral subject, as to priority, to the extent set forth in the Interim Order or the Final Order.

(d)    The Interim Order (with respect to the period on and after entry of the Interim Order and prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be, is in full force and effect and has not been reversed, stayed (whether by statutory stay or otherwise), vacated, or, without the Administrative Agent's consent, modified or amended.    The Loan Parties are in compliance in all material respects with the Interim Order or Final Order, as applicable.

(e)    Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Interim Order or the Final Order, as the case may be, upon the DIP Termination Date (whether by acceleration or otherwise) of any of the Obligations, the Administrative Agent and Lenders shall be entitled to immediate payment of such Obligations and to enforce the remedies provided for hereunder or under applicable Laws, without further notice, motion or application to, hearing before, or order from, the Bankruptcy Court.

# ARTICLE 6
### Affirmative Covenants

From and after the Closing Date, so long as any Lender shall have any Term Loan Commitment hereunder or any Loan or other Obligation hereunder which is accrued or payable shall remain unpaid or unsatisfied (other than contingent obligations not due and payable), then from and after the Closing Date, Holdings and the Borrowers shall and shall (except in the case of the covenants set forth in Sections 6.01, 6.02 and 6.03) cause each of the Subsidiaries to:

Section 6.01.    *Financial Statements, Reports, Etc..*  In the case of the Borrowers, Lead Borrower shall deliver to the Administrative Agent for prompt further distribution to each Lender:

(a)    as soon as available, but in any event within thirty (30) days after the end of each month, monthly consolidated financial statements of the Borrowers and their subsidiaries certified by the chief financial officer of the Lead Borrower; and

(b)    as soon as available, but in any event within three (3) days after the Borrowers' receipt of such request, any financial or other information reasonably requested by the Administrative Agent or Required Lenders.

Documents required to be delivered pursuant to this Section 6.01 may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrowers (or any direct or indirect parent of the Borrowers) posts such documents, or provides a link thereto, on the website on the Internet at www.gymboree.com; or (ii) on which such documents are posted on the Borrowers' behalf on IntraLinks/IntraAgency or another relevant website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); *provided* that: (i) upon written request by the Administrative Agent, the Lead Borrower shall deliver paper copies of such documents to the Administrative Agent for further distribution to each Lender until a written request to cease delivering paper copies is given by the Administrative Agent and (ii) the Lead Borrower shall notify (which may be by facsimile or electronic mail) the Administrative Agent of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents. Each Lender shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such documents from the Administrative Agent and maintaining its copies of such documents.

Section 6.02.    *Certificates; Other Information.*  Lead Borrower shall deliver to the Administrative Agent for prompt further distribution to each Lender:

(a)    promptly after the furnishing thereof, copies of any requests or notices received by any Loan Party or Subsidiary (other than in the ordinary course of business) or material statements or material reports furnished to any holder of Indebtedness or debt securities of any Loan Party or of any of its Subsidiaries, not otherwise required to be furnished to the Lenders pursuant to any clause of this Section 6.02;

(b)    promptly after the same are available and to the extent feasible not later than three (3) days prior to the filing thereof (other than in exigent circumstances in which case as soon as practicable), all material pleadings, motions, applications and any other documents to be filed by or on behalf of the Loan Parties and any other written reports given to the US Trustee and to any official committee relating to the operations, business, assets, properties or financial condition of the Loan Parties;

(c)      promptly, such additional information regarding the business, legal, financial or corporate affairs of the Loan Parties or any of their respective Subsidiaries, or compliance with the terms of the Loan Documents, as the Administrative Agent or any Lender through the Administrative Agent may from time to time reasonably request;

(d)      *[Reserved]*;

(e)      promptly after the request by any Lender, all documentation and other information that such Lender reasonably requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act;

(f)      promptly after the receipt thereof by Holdings or the Borrowers or any of their Subsidiaries, a copy of any final form "management letter" received by any such Person from its certified public accountants and the management's response thereto; and

(g)      on the second Budget Testing Date immediately following the Closing Date and on every other Budget Testing Date thereafter, a proposed updated budget.

Section 6.03.   *Notices.*   Promptly after a Responsible Officer of Holdings, the Borrowers or any Subsidiary Guarantor has obtained knowledge thereof, notify the Administrative Agent:

(a)      of the occurrence of any Default, Event of Default, or any "Default" or "Event of Default" as defined in the Prepetition Term Loan Agreement or with respect to other material Indebtedness;

(b)      of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect;

(c)      of the filing or commencement of, or any threat or notice of intention of any person to file or commence, any action, suit, litigation or proceeding, whether at law or in equity by or before any Governmental Authority (other than the Chapter 11 Cases), (i) against Holdings, the Borrowers or any of their Subsidiaries that could reasonably be expected to result in a Material Adverse Effect or (ii) with respect to any Loan Document, and any material development with respect thereto; and

(d)      of the occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, could reasonably be expected to result in liabilities of a Loan Party, any Subsidiary or any of their respective ERISA Affiliates.

(e)      (1) as soon as reasonably practicable and to the extent not inconsistent with any duty of confidentiality, in advance of filing with the Bankruptcy Court or delivering to the Committee appointed in a Chapter 11 Case, if any, or to the U.S. Trustee, as the case may be, the Final Order, all material proposed orders and pleadings that (x) impact the legal or economic rights of the Secured Parties or that are materially adverse to the interests of the Secured Parties or (y) inconsistent with the Approved Budget or the terms of the Loan Documents, in each case related to (A) the Chapter 11 Cases and (B) the Prepetition Term Loan, this Agreement and the credit facilities contemplated thereby and/or any sale contemplated in accordance with the milestones set forth in Section 6.19 and any plan of reorganization and/or any disclosure statement related thereto (each of which material proposed orders or pleadings must, to the extent related to the foregoing, be in form and substance reasonably satisfactory to the Required Lenders), and (2) substantially simultaneously with the filing with the Bankruptcy Court or delivering to the Committee appointed in any Chapter 11 Case, if any, or to the U.S. Trustee, as the case may be, monthly operating reports and all other notices, filings, motions, pleadings or other information concerning the financial condition of the Loan Parties or their Subsidiaries or the Chapter 11 Cases that may be filed with the Bankruptcy Court or delivered to the Committee appointed in any Chapter 11 Case, if any, or to the U.S. Trustee;

Each notice pursuant to this Section shall be accompanied by a written statement of a Responsible Officer of the Lead Borrower (x) that such notice is being delivered pursuant to Section 6.03(a), (b), (c) or (d) (as applicable)

and (y) setting forth details of the occurrence referred to in Section 6.03(a), (b), (c) or (d), as applicable, and stating what action the Lead Borrower has taken and proposes to take with respect thereto.

Section 6.04.  *[Reserved]*.

Section 6.05.  *Preservation of Existence, Etc.*  (a) Preserve, renew and maintain in full force and effect its legal existence under the Laws of the jurisdiction of its organization except in a transaction permitted by Section 7.04 or Section 7.05 and (b) obtain, maintain, renew, extend and keep in full force and effect all rights (including IP Rights), privileges (including its good standing where applicable in the relevant jurisdiction), permits, licenses and franchises necessary or desirable in the normal conduct of its business, except, in the case of clause (a) (other than with respect to any Loan Party) or (b), to the extent that failure to do so could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 6.06.  *Maintenance of Properties.*  Except if the failure to do so could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (a) maintain, preserve and protect all of its properties and equipment necessary in the operation of its business in good working order, repair and condition, ordinary wear and tear excepted and fire, casualty or condemnation excepted, and (b) make all necessary renewals, replacements, modifications, improvements, upgrades, extensions and additions thereof or thereto in accordance with prudent industry practice and in the normal conduct of its business.

Section 6.07.  *Maintenance of Insurance.*  (a) *Generally*.  Maintain with financially sound and reputable insurance companies, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts (after giving effect to any self-insurance reasonable and customary for similarly situated Persons engaged in the same or similar businesses as the Borrowers and their Subsidiaries) as are customarily carried under similar circumstances by such other Persons (it being agreed that the insurance maintained as of the Closing Date is reasonably satisfactory to the Administrative Agent).

(b)  *Requirements of Insurance*.  Not later than sixty (60) days after the Closing Date (or such longer period as the Administrative Agent may agree in writing in its discretion), all insurance required pursuant to Section 6.07(a) (x) to provide (and to continue to provide at all times thereafter) that it shall not be canceled, modified or not renewed (i) by reason of nonpayment of premium upon not less than 10 days' prior written notice thereof by the insurer to the Administrative Agent and the Collateral Agent (giving the Administrative Agent and the Collateral Agent the right to cure defaults in the payment of premiums) or (ii) for any other reason upon not less than 30 days' prior written notice thereof by the insurer to the Administrative Agent and the Collateral Agent (the Lead Borrower shall deliver a copy of the policy (and to the extent any such policy is cancelled or renewed, a renewal or replacement policy) or other evidence thereof to the Administrative Agent and the Collateral Agent, or insurance certificate with respect thereto) and (y) to name the Collateral Agent as additional insured on behalf of the Secured Parties (in the case of liability insurance) or loss payee (in the case of property insurance), as applicable (and to continue to so name the Collateral Agent at all times thereafter).

(c)  *[Reserved]*.

(d)  Carry and maintain commercial general liability insurance including the "broad form CGL endorsement" (or equivalent coverage) and coverage on an occurrence basis against claims made for personal injury (including bodily injury, death and property damage) and umbrella liability insurance against any and all claims, in each case in amounts and against such risks as are customarily maintained by companies engaged in the same or similar industry operating in the same or similar locations naming the Collateral Agent as an additional insured, on forms reasonably satisfactory to the Collateral Agent.

(e)  Notify the Administrative Agent and the Collateral Agent promptly whenever any separate insurance concurrent in form or contributing in the event of material loss with that required to be maintained under this Section 6.07 is taken out by the Borrowers or another Loan Party; and promptly deliver to the Administrative

Agent and the Collateral Agent a duplicate original copy of such policy or policies, or an insurance certificate with respect thereto.

Section 6.08. *Compliance with Laws.* Comply with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property, except if the failure to comply therewith could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or such compliance is stayed by the Chapter 11 Cases or expressly prohibited by the Orders.

Section 6.09. *Books and Records.* Maintain proper books of record and account, in which entries are made that are full, true and correct in all material respects and are in conformity with GAAP and which reflect all material financial transactions and matters involving the assets and business of Holdings, the Borrowers or a Subsidiary, as the case may be, including, without limitation, bank statements and evidence of all deposits into and withdrawals from any DIP Funding Account and the Class B Segregated Operating Account, and furnish copies of such books and records promptly upon request from the Administrative Agent.

Section 6.10. *Inspection Rights.*

Permit representatives and independent contractors of the Administrative Agent and each Lender to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants (subject to such accountants' customary policies and procedures), all at the expense of the Borrowers and at any time during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Borrowers. The Administrative Agent and the Lenders shall give the Borrowers the opportunity to participate in any discussions with the Borrowers' independent public accountants.

Section 6.11. *Additional Collateral.* At the Borrowers' expense, take all action necessary or reasonably requested by the Required Lenders, the Administrative Agent or the Collateral Agent to ensure that the Collateral and Guarantee Requirement continues to be satisfied, including:

(a)    The Obligations are secured by a first-priority security interest in all the Equity Interests of the Borrowers solely to the extent expressly permitted by the Orders.

(b)    Within five (5) Business Days following the Closing Date (or such later date as the Administrative Agent may agree in its sole discretion) and, in any event, before making any distribution from proceeds of any Collateral or Term DIP Loans; the Borrowers must obtain an account control agreement in form and substance reasonably satisfactory to the Administrative Agent (an "**Account Control Agreement**") for each DIP Funding Account and each Segregated Operating Account.

Section 6.12. *Compliance with Environmental Laws.* Except, in each case, to the extent that the failure to do so could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, or is otherwise stayed by the Chapter 11 Cases, comply, and take all reasonable actions to cause all lessees and other Persons operating or occupying its properties to comply, with all applicable Environmental Laws and Environmental Permits; obtain and renew all Environmental Permits necessary for its operations and properties; and, in each case to the extent the Loan Parties or their Subsidiaries are required by Environmental Laws, conduct any investigation, remedial or other corrective action necessary to address Hazardous Materials at any property or facility in accordance with applicable Environmental Laws.

Section 6.13. *Further Assurances.*

(a)    Borrowers shall take all necessary or advisable steps to commence and complete the Required Liquidation within the time period consented to in writing by the Administrative Agent and Lenders in their sole discretion.

(b)    Promptly upon reasonable request by the Administrative Agent or the Collateral Agent (i) correct any material defect or error that may be discovered in the execution, acknowledgment, filing or recordation of any Collateral Document or other document or instrument relating to any Collateral, and (ii) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as the Administrative Agent or the Collateral Agent may reasonably request from time to time in order to carry out more effectively the purposes of the Loan Documents and to cause the Collateral to remain perfected.  If the Required Lenders, Administrative Agent or the Collateral Agent reasonably determine that they are required by applicable Law to have appraisals prepared in respect of each Real Property of any Loan Party subject to a mortgage, the Borrowers shall cooperate with the Required Lenders, Administrative Agent and/or Collateral Agent, as applicable, in obtaining such appraisals and pay all costs and expenses relating thereto.

Section 6.14.  *[Reserved].*

Section 6.15.  *[Reserved].*

Section 6.16.  *[Reserved].*

Section 6.17.  *Approved Budget and Variance Report.*

(a)    The use of Loans and other extensions of credit by the Loan Parties under this Agreement and the other Loan Documents shall be limited in accordance with the Approved Budget (subject to Permitted Variances). The initial Approved Budget shall depict, on a weekly and line item basis for the first thirteen (13) week period from the Closing Date, (1) (i) projected cash receipts, (ii) projected disbursements (including ordinary course operating expenses, bankruptcy-related expenses (including professional fees and expenses of the Loan Parties' professionals and advisors budgeted on a weekly basis), asset sales and any other fees and expenses relating to the Loan Documents), (iii) net cash flow, and, (iv) the Term DIP Facility availability and total available liquidity, and (v) the Anticipated Ordinary Business Expense Shortfalls with respect to the period set forth in the Approved Budget and (2) the other items set forth therein and such other information requested by the Administrative Agent, and such initial Approved Budget shall be approved by, and in form and substance reasonably satisfactory to, the Administrative Agent (it being acknowledged and agreed that the initial Approved Budget attached hereto as Schedule I is approved by and satisfactory to the Administrative Agent).  The Approved Budget shall be updated, modified or supplemented by the Borrower from time to time and upon the reasonable request of the Administrative Agent, but in any event the Approved Budget shall be updated and distributed by the Borrower not less than one time in each two (2) consecutive week period, and each such updated, modified or supplemented budget shall not be deemed an Approved Budget unless the Administrative Agent shall have approved such budget; *provided, however,* that in the event the Administrative Agent objects, the current Approved Budget shall remain the Approved Budget until and the Administrative Agent and the Loan Parties agree as to an updated, modified or supplemented budget.  Each Approved Budget delivered to the Administrative Agent shall be accompanied by such supporting documentation as reasonably requested by the Administrative Agent.  Each Approved Budget shall be prepared in good faith based upon assumptions which the Loan Parties believe to be reasonable. For the avoidance of doubt, except to the extent such payment is expressly permitted under the Approved Budget or expressly approved by the Bankruptcy Court, the Loan Parties shall obtain written consent from the Administrative Agent prior to paying any cure costs or other amounts to be paid in connection with the assumption of any material contract in accordance with the Bankruptcy Code.

(b)    No later than 12:00 (noon), New York City time on the Tuesday following each Budget Testing Date, the Borrowers shall deliver to the Administrative Agent for prompt distribution to each Lender: (x) a Variance Report certified by a Responsible Officer of the Borrower and Holdings, substantially in form attached hereto as Exhibit F and including, for the avoidance of doubt the spreadsheet or other document demonstrating the backup for the calculation set forth therein or otherwise as reasonably acceptable to the Administrative Agent in its sole discretion, setting forth all the variances, on a line-item and aggregate basis, from the amount set forth for such week as compared to (1) the most recently Approved Budget delivered prior to such Variance Report on a weekly and Test Period basis (which shall be subject to the variances set forth herein), and (2) the most recent Weekly Cash

Flow Forecast (as applicable) delivered by the Debtors, in each case, on a weekly and cumulative basis. Each such Variance Report shall include explanations for all material variances and shall be certified by the Chief Financial Officer or Chief Restructuring Officer of the Borrowers; and

(c)      The Administrative Agent and the Lenders (i) shall have no duty to monitor compliance by the Loan Parties with the Approved Budget and (ii) shall not be obligated to pay (directly or indirectly from the Collateral) any unpaid expenses incurred or authorized to be incurred pursuant to any Approved Budget.  The line items in the Approved Budget for payment of interest, expenses and other amounts (including, without limitation, professional fees) to the Administrative Agent and the Lenders are estimates only, and the Loan Parties remain obligated to pay any and all Obligations in accordance with the terms of the Loan Documents and the applicable Order regardless of whether such amounts exceed such estimates.  Nothing in any Approved Budget (including any estimates of a loan balance in excess of borrowing base restrictions) shall constitute an amendment or other modification of any Loan Document or any of the borrowing base restrictions or other lending limits set forth therein. The Administrative Agent and the Lenders acknowledge and agree that the line items in the Approved Budget for payment of professional fees are estimates only, and the Loan Parties remain obligated to pay any and all professional fees in accordance with their agreements with respect thereto (and subject to the Bankruptcy Court's approval, as applicable) and nothing herein shall preclude or prohibit the payment of professional fees.

Section 6.18  *Update Calls*.  On each Monday, Wednesday and Friday (or, in the event that such day is not a Business Day then on the Business Day immediately following) during the Chapter 11 Cases (until such time as the Term DIP Loans and the Obligations have been repaid in full), the Borrowers' professionals shall host a telephonic meeting for the Lenders and their professionals at which the Borrowers' professionals shall provide an update to the Lenders (and make themselves available for questions) with respect to the financial and operating performance of the Loan Parties and their estates, and the progress of the Required Liquidation.

Section 6.19.  *Milestones.*  Ensure that each of the milestones set forth below is achieved in accordance with the applicable timing referred to below (or such later dates as may be approved in writing by the Required Lenders in their reasonable discretion):

(a)      The Bankruptcy Court's entry of the Interim Order authorizing and approving the Term DIP Facilities including the Term Loan Commitments, all documents and lender fees related thereto, and the payment of the fees and expenses of the Administrative Agent's and Lenders' advisors no later than three (3) Business Days after the Petition Date.

(b)      No later than three (3) Business Days after the Petition Date, the Bankruptcy Court shall have entered an order, in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders, authorizing the Debtors to establish procedures to protect the value of the Debtors' net operating loss carryforwards and certain other tax attributes.

(c)      No later than thirty-five (35) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Final Order authorizing and approving on a final basis the Term DIP Facilities (including the Term Loan Commitments, all documents and lender fees related thereto, and the payment of the fees and expenses of the Administrative Agent's and Lenders' advisors).

(d)      No later than sixty (60) calendar days after the Petition Date, the Debtors shall file Acceptable Plan and an Acceptable Disclosure Statement.

(e)      No later than ninety-five (95) calendar days after the Petition Date, the Bankruptcy Court shall have entered an order approving the Acceptable Disclosure Statement and voting and solicitation procedures for the Acceptable Plan.

(f)    No later than one hundred and thirty-two (132) calendar days after the Petition Date, the Bankruptcy Court shall have entered an order, in form and substance reasonably satisfactory to the Administrative Agent at the direction of the Required Lenders, confirming an Acceptable Plan.

(g)    The effective date of the Acceptable Plan having occurred not later than one hundred and forty-six (146) calendar days following the Petition Date.

(h)    On the Petition Date, the Debtors shall file (x) a motion (the "**IP and Online Business Sale Motion**"), in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders, requesting an order from the Bankruptcy Court approving the sale (the "**IP and Online Business Sale**") of substantially all of the Debtors' intellectual property assets and online businesses, together with such other assets and contracts as are required to operate such assets (including leases and lease designations as determined by the Stalking Horse Bidder as defined below) (the "**IP and Online Business Assets**")  pursuant to Section 363 of the Bankruptcy Code, (y) a stalking horse agreement (the "**Stalking Horse Agreement**"), in form and substance acceptable to the Required Lenders, providing for an acquisition vehicle selected by the Required Lenders to acquire the IP and Online Business Assets through a credit bid of all or a portion of the Term DIP Claims (the "**Stalking Horse Bidder**"), and (z) a motion (the "**IP and Online Business Bid Procedures Motion**") in form and substance acceptable to the Required Lenders requesting an order from the Bankruptcy Court approving bidding procedures relating to the solicitation of qualified bids of the IP and Online Business Assets.

(i)    On the Petition Date, the Debtors shall file a motion (the "**Lease Rejection Motion**") seeking approval of lease rejection procedures reasonably acceptable to the Administrative Agent;

(j)    On the Petition Date, the Debtors shall file a motion (the "**GOB and Lease Sale Motion**") requesting an order from the Bankruptcy Court pursuant to Section 363 of the Bankruptcy Code authorizing the Debtors to (x) enter into an agency or other liquidation agreement, in form and substance acceptable to the Required Lenders (the "**Agency Agreement**") and conduct the GOB sales pursuant to the terms thereof and (y) sell, in connection with a marketing process reasonably acceptable to the Required Lenders, certain of the Debtors' real property leases (the "**Lease Sale**"), with such sale to be concluded by no later than February 28, 2019.

(k)    No later than three (3) calendar days after the Petition Date**,** the Bankruptcy Court shall have entered an Interim Order approving the GOB and Lease Sale Motion.

(l)    *[Reserved];*

(m)    No later than fourteen (14) calendar days after the Petition Date, the Debtors shall have obtained an order of the Bankruptcy Court approving the IP and Online Business Sale Motion (the "**IP and Online Business Sale Order**"), in form and substance satisfactory to the Administrative Agent and the Required Lenders.  The IP and Online Business Sale Order shall, among other things, (1) approve the Stalking Horse Agreement and (2) require that the proceeds from the IP and Online Business Sale be applied to the Obligations including the outstanding Prepetition Obligations, if any, if the Lenders are not the winning bidder.

(n)    No later than fourteen (14) calendar days after the Petition Date, the Debtors shall have obtained an order of the Bankruptcy Court approving the IP and Online Business Bid Procedures Motion (the "**IP and Online Business Bid Procedures Order**"), in form and substance satisfactory to the Administrative Agent and the Required Lenders.

(o)    No later than fourteen (14) calendar day after the Petition Date, the Bankruptcy Court shall have entered a Final Order approving the GOB and Lease Sale Motion.

(p)    No later than twenty-eight (28) calendar days after the Petition Date, the Debtors shall provide the Administrative Agent (for distribution to the Lenders) with copies of all bids received by the Debtors in connection with the IP and Online Business Sale and the Lease Sale.

(q)       No later than forty-two (42) calendar days after the Petition Date, an auction with respect to the IP and Online Business Sale shall have been completed in accordance with the IP and Online Business Bid Procedures Order.

(r)       No later than March 15, 2019, the Bankruptcy Court shall have entered an order approving the Lease Rejection Motion.

(s)       No later than March 15, 2019, the Bankruptcy Court shall have entered an order approving the IP and Online Business Sale.

(t)       No later than March 15, 2019, the Debtors shall have consummated the IP and Online Business Sale.

Section 6.20.  *Collateral Proceeds*.  All proceeds resulting from any Disposition of, or Casualty Event relating to, any property or assets constituting Term Priority Collateral shall be deposited into the General Purpose Segregated Operating Account in accordance with the Order. So long as the Prepetition ABL Credit Agreement is in effect, subject to the Prepetition Intercreditor Acknowledgment, any proceeds resulting from any Disposition, or Casualty Event relating to, any property or assets constituting ABL Priority Collateral (including all proceeds resulting from, or received in connection with, the Agency Agreement) shall be applied to the repayment of the Prepetition ABL Credit Agreement in accordance with the Order.

Section 6.21.  *Bankruptcy Covenants*.  Notwithstanding anything in the Loan Documents to the contrary, the Debtors shall comply with all material covenants, terms and conditions and otherwise perform all obligations set forth in the Orders.

(a)       Each Loan Party shall deliver or cause to be delivered for review and comment, as soon as commercially reasonable and to the extent not inconsistent with any duty of confidentiality and in any event at least two (2) Business Days prior to filing (other than in exigent circumstances) all material pleadings, motions and other documents (provided that any of the foregoing relating to the Term DIP Facility shall be deemed material) to be filed on behalf of the Loan Parties with the Bankruptcy Court to King & Spalding and shall consult in good faith with such counsel regarding the form and substance of any such proposed filing.  If not otherwise provided by the Bankruptcy Court's electronic docketing system, the Borrowers shall provide (x) copies to the Administrative Agent of all pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of the Debtors with the Bankruptcy Court, distributed by or on behalf of the Debtors to any Committee, filed with respect to the Chapter 11 Cases or filed with respect to any Loan Document and (y) such other reports and information as the Administrative Agent may, from time to time, reasonably request.  In connection with the Chapter 11 Cases, the Debtors shall give the proper notice for (x) the motions seeking approval of the Loan Documents and the Orders and (y) the hearings for the approval of the Orders.  The Borrowers shall give, on a timely basis as expressly specified in the Orders, all notices required to be given to all parties specified in the Orders.

(b)       Each Loan Party shall maintain a cash management system as in effect on the Petition Date and as authorized by the Bankruptcy Court pursuant to orders approving the first day motions filed by the Loan Parties

(c)       The Lead Borrower shall deliver, or cause to be delivered the Approved Budget on a bi-weekly basis according to the terms set forth herein. Each Loan Party shall not make or commit to make any payments other than those set forth in the Approved Budget, subject to Permitted Variances.  Further, (i) actual aggregate disbursements (excluding disbursements made to the Loan Parties' professionals and Lenders' professionals) shall not exceed the aggregate amount of disbursements in the Approved Budget for the applicable period by more than the Permitted Variance, (ii) actual aggregate disbursements made to the Loan Parties' professionals shall not exceed the aggregate amount of such disbursements in the Approved Budget for the applicable period by more than the Permitted Variance, (iii) for any given day on which the Loan Parties intend to make any single disbursement in an amount in excess of $100,000 or aggregate disbursements in an amount in excess of $1,000,000 (in each case, other than any pre-approved ACH disbursements), the Loan Parties shall have delivered to the Administrative Agent a

notice at least one Business Day prior to such disbursement, together with all payment information including without limitation, the amount of such payment, the intended recipient, and any other information reasonably requested by the Administrative Agent, and (iv) actual aggregate cash receipts (excluding proceeds from the Term DIP Facility that may be deemed a receipt) during the applicable period shall not be less than the aggregate amount of such cash receipts in the Approved Budget for such period by more than the Permitted Variance; provided, however, that a Default or Event of Default shall not be deemed to occur on account of the failure to meet one of such aggregate cash receipts covenants if the Debtors receive sufficient additional receipts within three (3) Business Days after the applicable date of determination that, when added to the receipts as of the applicable date of determination, would enable the Loan Parties to satisfy such covenant.

(d)    Each Loan Party shall, as promptly as practicable, to the extent it wouldn't violate any duty of confidentiality by which it is bound, deliver or cause to be delivered to the Administrative Agent and the Lenders copies of any term sheets, proposals, or other material documents, from any party, related to (i) the restructuring of the Loan Parties, or (ii) the sale of assets of one or all of the Loan Parties.

# ARTICLE 7
## NEGATIVE COVENANTS

So long as any Lender shall have any Term Loan Commitment hereunder or any Loan or other Obligation (other than contingent obligations not due and owing) hereunder which is accrued or payable shall remain unpaid or unsatisfied, then from and after the Closing Date:

Section 7.01.    *Liens.*    Neither Holdings nor the Borrowers shall, nor shall they permit any Subsidiary to, directly or indirectly, create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than the following:

(a)    Liens created pursuant to any Loan Document, Prepetition Term Loan Document, or Prepetition ABL Document;

(b)    Liens existing on the Closing Date and listed on Schedule 7.01(b);

(c)    Liens for taxes, assessments or governmental charges that are not yet due and payable and in an aggregate amount not to exceed $250,000 or that are being contested in good faith and by appropriate actions, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(d)    statutory or common law Liens of landlords, sublandlords, carriers, warehousemen, mechanics, materialmen, repairmen, construction contractors or other like Liens, or other customary Liens (other than in respect of Indebtedness) in favor of landlords, in each case arising in the ordinary course of business that secure amounts that are not yet due and payable and in an aggregate amount not to exceed $250,000;

(e)    solely to the extent expressly permitted in the Orders, (i) pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation and (ii) pledges and deposits in the ordinary course of business securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to the Borrowers or any of their Subsidiaries;

(f)    deposits to secure the performance of bids, trade contracts, governmental contracts and leases to which any Loan Party is a party (in the case of each of the foregoing, other than for Indebtedness), statutory obligations, surety, stay, customs and appeal bonds, performance bonds and other obligations of a like nature of any Loan Party (including those to secure health, safety and environmental obligations),  in each case solely to the extent permitted by the Approved Budget;

(g)    easements, rights-of-way, restrictions (including zoning restrictions), encroachments, protrusions and other similar encumbrances and minor title defects affecting Real Property that do not in the aggregate materially impair the use, value, or marketability of such Real Property or interfere with the ordinary conduct of the business of Holdings, the Borrowers and their Subsidiaries, taken as a whole;

(h)    leases, non-exclusive licenses, subleases or non-exclusive sublicenses granted to others in the ordinary course of business which are in effect on the Closing Date and listed on Schedule 7.01(h), and do not (i) interfere in any material respect with the business of Holdings, the Borrowers and their Subsidiaries, taken as a whole or (ii) secure any Indebtedness;

(i)    Subject to the priorities provided in the applicable Order, Liens in favor of customs and revenue authorities arising as a matter of Law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(j)    Liens (i) of a collection bank arising under Section 4-210 of the Uniform Commercial Code on items in the course of collection and (ii) arising in the ordinary course of business in favor of a banking or other financial institution arising as a matter of Law or under customary general terms and conditions encumbering deposits or other funds maintained with a financial institution (including the right of set-off) and that are within the general parameters customary in the banking industry or arising pursuant to such banking institutions general terms and conditions;

(k)    Liens in favor of the liquidator pursuant to the Required Liquidation;

(l)    any interest or title (and all encumbrances and other matters affecting such interest or title) of a lessor, sublessor, licensor or sublicensor under leases, subleases, licenses or sublicenses entered into by the Borrowers or any of their Subsidiaries in the ordinary course of business and consistent with the Approved Budget; *provided*, that no such lease or sublease shall constitute a Capitalized Lease;

(m)    Liens existing on the Closing Date that arise out of conditional sale, title retention, consignment or similar arrangement for sale of goods entered into by the Borrowers or any of their Subsidiaries in the ordinary course of business permitted by this Agreement;

(n)    Liens existing on the Closing Date that encumber reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business and not for speculative purposes;

(o)    Liens that are customary contractual rights of set-off (i) relating to the establishment of depository relations with banks in the ordinary course of business and not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of the Borrowers or any of their Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrowers or any of their Subsidiaries or (iii) relating to purchase orders and other agreements entered into with customers of the Borrowers or any of their Subsidiaries in the ordinary course of business;

(p)    (i) zoning, building, entitlement and other land use regulations by Governmental Authorities with which the normal operation of the business complies, and (ii) any zoning or similar law or right reserved to or vested in any Governmental Authority to control or regulate the use of any real property that does not materially interfere with the ordinary conduct of the business of Holdings, the Borrowers and their Subsidiaries, taken as a whole;

(q)    Liens arising from precautionary Uniform Commercial Code financing statements or similar filings;

(r)    Liens on insurance policies in effect on the Closing Date and the proceeds thereof securing Indebtedness permitted under this Agreement in connection with the financing of the insurance premiums with respect thereto;

(s)     Liens on the Collateral granted to provide adequate protection solely to the extent expressly permitted by the Interim Order (and, when entered, the Final Order)

Notwithstanding the foregoing, any Lien permitted under this Section 7.01 (solely to the extent expressly permitted by the Orders) shall at all times be junior and subordinate to the Liens under the Loan Documents and the applicable Order securing the Obligations. The prohibitions provided for in this Section 7.01 specifically include any effort by any Debtor, any Committee or any other party in interest in the Chapter 11 Cases, as applicable, to create or pursue any claims, Liens or interest that would be senior or pari passu to those of the Administrative Agent and the Lenders, in each case, other than as set forth in the applicable Orders and irrespective of whether such claims, Liens or interests may be "adequately protected."

Section 7.02.    *Investments.*  Neither Holdings nor the Borrowers shall, nor shall they permit any Subsidiary to, directly or indirectly, make or hold any Investments, except:

(a)     Investments that exist on the Closing Date by Holdings, the Borrowers or any of their Subsidiaries in assets that were Cash Equivalents when such Investment was made;

(b)     Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors and other credits to suppliers in the ordinary course of business, in each case, solely to the extent expressly permitted by the Approved Budget;

(c)     Investments that exist on the Closing Date, (i) by Holdings in the Borrowers and (ii) by the Borrowers or any Subsidiary in any Loan Party (other than Holdings);

(d)     Investments consisting of transactions permitted under Sections 7.01, 7.03 (other than 7.03(c)), 7.04, 7.05, 7.06 and 7.13;

(e)     Investments in the ordinary course of business that exist on the Closing Date, consisting of UCC Article 3 endorsements for collection or deposit and UCC 4 customary trade arrangements with customers consistent with past practices;

(f)     Investments (i) existing on the Closing Date and set forth on Schedule 7.02(c) and (ii) existing on the Closing Date by any Loan Party in any other Loan Party;

(g)     Investments (including debt obligations and Equity Interests) received in connection with the bankruptcy or reorganization of suppliers and customers or in settlement of delinquent obligations of, or other disputes with, customers and suppliers arising in the ordinary course of business or upon the foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment; and

(h)     Investments expressly permitted by the Approved Budget (including with respect to any Permitted Variances).

Section 7.03.    *Indebtedness.*  Neither Holdings nor the Borrowers shall, nor shall they permit any Subsidiary to, directly or indirectly, create, incur, assume or suffer to exist any Indebtedness, except:

(a)     (i) Indebtedness of any Loan Party under the (x) Loan Documents, (y) the Prepetition Term Loan Documents as in effect on the Closing Date and (z) the Carve-Out, and (ii) the Prepetition ABL Indebtedness;

(b)     Indebtedness outstanding on the Closing Date and listed on Schedule 7.03(b);

(c)     Guarantees by Holdings, the Borrowers and any Subsidiary in respect of Indebtedness of the Borrowers or any Subsidiary of the Borrowers otherwise permitted hereunder and in an amount, in each case, not to exceed the underlying amount permitted hereunder;

(d)     Indebtedness in respect of Capitalized Leases in effect on the Petition Date;

(e)     Indebtedness that exists on the Closing Date representing deferred compensation, phantom equity plan obligations, severance, and health and welfare retirement benefits to current and former employees and other services providers of Holdings, the Borrowers and their Subsidiaries (or their beneficiaries), provided that, in each case, such Indebtedness was originally incurred in the ordinary course of business and consistent with past practices;

(f)     Indebtedness that exists on the Closing Date in respect of treasury, depository, credit card, debit card and cash management services or automated clearinghouse transfer of funds, overdraft or any similar services incurred in the ordinary course of business;

(g)     Indebtedness that exists on the Closing Date consisting of (i) the financing of insurance premiums or (ii) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(h)     Indebtedness that exists on the Closing Date incurred by the Borrowers or any of their Subsidiaries in respect of letters of credit, bank guarantees, bankers' acceptances or similar instruments issued or created in the ordinary course of business, including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness incurred in the ordinary course of business with respect to reimbursement-type obligations regarding workers compensation claims; provided that any reimbursement obligations in respect thereof are reimbursed within 30 days following the incurrence thereof;

(i)     obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by the Borrowers or any of their Subsidiaries or obligations in respect of letters of credit, bank guarantees or similar instruments related thereto, in each case in the ordinary course of business or consistent with past practice and not in connection with the borrowing of money or Swap Contracts; and

(j)     Indebtedness expressly permitted by the Approved Budget (including with respect to any Permitted Variances).

Notwithstanding any of the foregoing, and except for the Carve-Out, no Indebtedness permitted under this Section 7.03 shall be permitted to have administrative expense claim status under the Bankruptcy Code that is senior to or pari passu with the superpriority administrative expense claims of the Administrative Agent and the Lenders as set forth herein and solely to the extent expressly permitted by the applicable Order.

Section 7.04.   *Fundamental Changes.*   Other than as contemplated hereby or to the extent otherwise contemplated by the Approved Budget or Orders, neither Holdings nor the Borrowers shall, nor shall they permit any Subsidiary to, directly or indirectly, merge, dissolve, liquidate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person.

Section 7.05.   *Dispositions.*   Neither Holdings nor the Borrowers shall, nor shall they permit any Subsidiary to, directly or indirectly, make any Disposition, except:

(a)     Dispositions permitted by the Bankruptcy Court of obsolete or worn out property, whether now owned or hereafter acquired, in the ordinary course of business and Dispositions in the ordinary course of business of property no longer used or useful in the conduct of the business of Holdings, the Borrowers or any of their Subsidiaries (for the avoidance of doubt it shall not be in the ordinary course of business to sell property constituting all or substantially all of a business unit, line of business or division);

(b)      Dispositions in accordance with the Required Liquidation;

(c)      transfers of property subject to Casualty Events upon the receipt (where practical) of the Net Proceeds of such Casualty Event;

(d)      Dispositions listed on Schedule 7.05(d);

(e)      Dispositions or discounts without recourse of accounts receivable in connection with the compromise or collection thereof in the ordinary course of business (and not in connection with any factoring or similar arrangement);

(f)      transactions on or about the Closing Date to consummate, or in connection with, the Acceptable Plan;

(g)      Dispositions of Cash Equivalents that exist on the Closing Date;

(h)      leases, subleases, licenses or sublicenses (including the provision of software under an open source license), in each case in the ordinary course of business as in effect on the Closing Date or permitted under the Agency Agreement, and which do not materially interfere with the business of Holdings, the Borrowers or any of their Subsidiaries;

(i)      termination of store leases as so approved by the Bankruptcy Court; and

(j)      Dispositions in accordance with the Orders.

Section 7.06.    *Restricted Payments.*  Except to the extent expressly permitted by the Approved Budget and the Orders, neither Holdings nor the Borrowers shall, nor shall they permit any Subsidiary to, directly or indirectly, declare or make, directly or indirectly, any Restricted Payment.

Section 7.07.    *Change in Nature of Business.*  Except to the extent expressly contemplated in connection with the Required Liquidation or as so ordered by the Bankruptcy Court, the Borrowers shall not, nor shall the Borrowers permit any of their Subsidiaries to, directly or indirectly, engage in any material line of business substantially different from those lines of business conducted by the Borrowers and their Subsidiaries on the Closing Date or any business reasonably related, complementary, synergistic or ancillary thereto or reasonable extensions thereof.

Section 7.08.    *Transactions with Affiliates.*  Except to the extent expressly permitted by the Approved Budget and the Orders, in accordance with the Approved Budget Neither Holdings nor the Borrower shall, nor shall they permit any Subsidiary to, directly or indirectly, enter into any transaction of any kind with any of its Affiliates, whether or not in the ordinary course of business, other than (i) as expressly contemplated in connection with the Required Liquidation or as expressly permitted by the Bankruptcy Court and (ii) transactions set forth on Schedule 7.08. Notwithstanding the foregoing, each of Holdings or the Borrower may capitalize or forgive any Indebtedness owed to it by a Subsidiary.

Section 7.09.    *Burdensome Agreements.*  Neither Holdings nor the Borrowers shall, nor shall they permit any Subsidiary to, directly or indirectly, enter into or permit to exist any Contractual Obligation (other than this Agreement or any other Loan Document) that limits the ability of (a) any Subsidiary that is not a Guarantor to make Restricted Payments to the Borrowers or any Guarantor or to make or repay loans or advances to or otherwise transfer assets to or make Investments in the Borrowers or any Subsidiary that is a Guarantor or (b) any Loan Party to create, incur, assume or suffer to exist Liens on property of such Person to secure the Obligations; *provided* that the foregoing clauses (a) and (b) shall not apply to Contractual Obligations which (i) exist on the Closing Date and (to the extent not otherwise permitted by this Section 7.09) are listed on Schedule 7.09 hereto (ii) arise in connection with any Disposition permitted by Section 7.04 or 7.05 and relate solely to the assets or Person subject to such

Disposition, (iii) are negative pledges and restrictions on Liens in favor of any holder of Indebtedness permitted under Section 7.03 but solely to the extent any negative pledge relates to the property financed by such Indebtedness, (iv) are customary restrictions on leases, subleases, licenses or asset sale agreements otherwise permitted hereby so long as such restrictions relate only to the assets subject thereto and exist on the Closing Date, (v) are customary provisions restricting subletting or assignment of any lease governing a leasehold interest of the Borrowers or any Subsidiary entered into in the ordinary course of business, (vi) are customary provisions restricting assignment of any agreement entered into in the ordinary course of business, (vii) are restrictions on cash or other deposits imposed by customers under contracts entered into in the ordinary course of business, (viii) [reserved], (ix) arise in connection with cash or other deposits permitted under Sections 7.01 and 7.02 and limited to such cash or deposit and (x) arise under applicable law or any applicable rule, regulation or order.

Section 7.10.  *Use of Proceeds.*

(a)    Class A New Money DIP Loans. The proceeds of the Class A New Money DIP Loans shall be deposited into the General Purpose DIP Funding Account, and may be used solely in accordance with the Approved Budget (subject to the Permitted Variance). The proceeds of the New Money DIP Loans made on the First Amendment Effective Date (the "**First Amendment DIP Loans**") shall be (i) used solely to fund (x) the $280,000 severance payment and (y) the $400,000 incentive payment, each to be paid to the to the designated recipients thereof, as agreed to in writing by Administrative Agent and set forth in the  Debtors' *Motion for Entry of and Order (I) Approving their (A) Key Employee Retention Plans and (B) Key Employee Incentive Plan, and (II) Granting Related Relief filed with the Bankruptcy Court on February 5, 2019 [Docket No. 195]* (the "**First Amendment Designated Expenses**")*;* and (ii) immediately deposited into and maintained in a segregated deposit account, subject to an Account Control Agreement, which shall not be commingled with any other funds or proceeds at any time. If following the approval of the forgoing motion, at any time during the Chapter 11 Cases the Borrowers are no longer obligated to pay the First Amendment Designated Expenses or any portion thereof, the Borrowers shall immediately repay to Lender the applicable amount of First Amendment DIP Loans.  Any First Amendment DIP Loans that are repaid pursuant to this Section 7.10 shall be treated as mandatory prepayments pursuant to Section 2.13 hereof; provided that any amounts repaid pursuant to this Section 7.10 shall be not be subject to Section 2.13(e) (Make-Whole Amount). In the event of any Class A New Money DIP Loans made pursuant to a Commitment Increase after the First Amendment Effective Date, the proceeds of such Class A New Money DIP Loans shall be used solely to fund the Borrowers' exercise of the J&J Option under the Agency Agreement, in accordance with the Approved Budget (subject to the Permitted Variance).

(b)    Class B New Money DIP Loans. The proceeds of any Borrowing of Class B New Money DIP Loans shall be used solely for Anticipated Ordinary Business Expense Shortfalls determined as of the date of such proposed Borrowing, as evidenced by the Loan Parties and reasonably satisfactory to the Lenders prior to such proposed Borrowing. The proceeds of the Class B New Money DIP Loans shall be deposited into the Class B DIP Funding Account, and may be used in accordance with the Approved Budget (subject to Permitted Variances), but solely to fund expenditures that are (i) by the Loan Parties under Section 162 of the Code, as determined by the Lenders or (ii) amounts included in the cost of goods sold, in each case excluding Expenses (as such term is defined in the Agency Agreement) to the extent payable or reimbursable by the Agent (as such term is defined in the Agency Agreement) pursuant to the terms of the Agency Agreement, unless otherwise agreed to by the Administrative Agent in its sole discretion in connection with the issuance of any Class B New Money DIP Loans made pursuant to a Commitment Increase.

No proceeds of any Loan shall be used to object, contest or raise any defense to the validity of any Lien pursuant to the Prepetition Term Loan Documents or the Loan Documents or to investigate or prosecute such a claim.

Nothing herein shall in any way prejudice or prevent the Administrative Agent or the Lenders from objecting, for any reason, to any requests, motions, or applications made in the Bankruptcy Court, including any application of final allowances of compensation for services rendered or reimbursement of expenses incurred under

Sections 105(a), 330 or 331 of the Bankruptcy Code, by any party in interest (and each such order shall preserve the Administrative Agent's and the Lenders' right to review and object to any such requests, motions or applications).

Section 7.11. *Negative Pledge.* Neither Holdings nor the Borrowers shall, nor shall they permit any Subsidiary to, create or permit to subsist any Lien over any of its assets, including, without limitation, any Leasehold Property of the Loan Parties, other than the Liens permitted by Section 7.01.

Section 7.12. *Fiscal Year.* Neither Holdings nor the Borrowers shall make any change in its fiscal year or fiscal quarters (it being understood that the Borrowers' fiscal year ends on the Saturday closest to January 31 of each year, and that each of the first three fiscal quarters of each fiscal year of the Borrowers ends on the Saturday closest to each of April 30, July 31 and October 31, respectively); provided, however, that Holdings may, upon the prior written consent of the Administrative Agent, change its and the Borrowers' fiscal year and fiscal quarters to any other fiscal year (and any other fiscal quarters) reasonably acceptable to the Administrative Agent, in which case, Holdings and the Administrative Agent will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary to reflect such changes.

Section 7.13. *Prepayments, Etc. of Indebtedness.* Make any payment of principal or interest or otherwise on account of any Prepetition Obligations (excluding obligations under the Prepetition ABL Documents), other than (i) as expressly permitted by the Bankruptcy Court (ii) payments made in compliance in all material respects with the Approved Budget (including Permitted Variances), (iii) payments agreed to in writing by the Required Lenders and (iv) payments expressly permitted by the Order and, if necessary, authorized by the Bankruptcy Court.

Section 7.14. *Permitted Activities.* With respect to Holdings, engage in any material operating or business activities (other than to a de minimis extent) or have any material assets or liabilities; *provided,* that, to the extent not otherwise prohibited under Article 7, the following shall be permitted:  (i) its ownership of the Equity Interests of Borrowers and activities incidental thereto, (ii) the maintenance of its legal existence (including the ability to incur fees, costs and expenses relating to such maintenance), (iii) the performance of its obligations with respect to the Loan Documents and any other Indebtedness permitted hereunder, (iv) participating in tax, accounting and other administrative matters as a member of the consolidated group and the provision of administrative and advisory services (including treasury and insurance services) to its Subsidiaries of a type customarily provided by a holding company to its Subsidiaries, (v) holding any cash or property (but not operate any property), (vi) providing indemnification to officers and directors, (vii) making and receiving of any Investments permitted hereunder, and (viii) any activities incidental to the foregoing.  Holdings shall not incur any Liens on Equity Interests of the Borrowers other than Liens securing the Obligations, the Carve-Out, Prepetition Obligations, and Liens permitted pursuant to the Order, and Holdings shall not own any Equity Interests other than those of the Borrowers.

Section 7.15. *[Reserved].*

Section 7.16. *Chapter 11 Modifications.* Except as permitted pursuant to the terms of this Agreement and solely as expressly permitted by the Order, no Loan Party shall:

(a)    Make or permit to be made any change, amendment or modification, or any application or motion for any change, amendment or modification, to the Bankruptcy Court Orders if such change, amendment or modification adversely affects the Agents and the Lenders hereunder in any material respect.

(b)    Incur, create, assume or suffer to exist or permit any other Lien which is pari passu with or senior to the claims of the Administrative Agent and the Lenders hereunder, except for the Carve-Out, and Liens in favor of the Prepetition ABL Agent in accordance with the terms of the Orders.

(c)    Seek or consent to any order seeking authority to take any action that is prohibited by the terms of this Agreement or the other Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement or any of the other Loan Documents.

Section 7.17. *Segregated Operating Accounts and DIP Funding Accounts.*

(a)    No Loan Party shall create, incur, assume or suffer to exist (i) any Lien upon the DIP Funding Accounts other than the first priority Lien created in favor of the Agent under the Loan Documents or (ii) any Lien upon a Segregated Operating Account other than the first priority Lien created in favor of the Agent under the Loan Documents. For the avoidance of doubt, each Segregated Operating Account and each DIP Funding Account shall constitute Term Priority Collateral.

(b)    *[Reserved].*

(c)    No Loan Party shall make or permit to be made any payment or withdrawal from a DIP Funding Account or Segregated Operating Account except in accordance with the Approved Budget (subject to Permitted Variances), as expressly permitted in the Orders, or the express terms of this Agreement.

(d)    The Loan Parties shall not fund nor pay any expenses set forth in Section 7.10(b) out of any account, or by any other means, other than by payments from the Class B Segregated Operating Account.

For the avoidance of doubt, the Borrowers shall not be permitted to establish or maintain any deposit accounts other than the Segregated Operating Accounts and DIP Funding Accounts, unless such deposit accounts are subject to Account Control Agreements or used exclusively for payroll; *provided* that the Borrower may maintain deposit accounts that are not subject to Account Control Agreements solely containing funds (i) held in trust for the benefit of third parties in connection with bidding procedures approved by the Bankruptcy Court and (ii) used to remit sales tax payments (provided such sales tax payments are made in the ordinary course).

Section 7.18. *Right of Subrogation.*    Assert any right of subrogation or contribution against any other Loan Party.

Section 7.19. *Subsidiaries.* The Loan Parties shall not and shall not cause or permit their Subsidiaries to directly or indirectly establish, create or acquire any new Subsidiary.

# ARTICLE 8
### EVENTS OF DEFAULT AND REMEDIES

Section 8.01.    *Events of Default.*    Any of the following from and after the Closing Date shall constitute an event of default (an "**Event of Default**"):

(a)    *Non-Payment.*    Any Loan Party shall fail to pay any principal or interest on the Term DIP Loan, or any fee, indemnity or other amount payable under this Agreement or any other Loan Document when due and in the case of such fee, indemnity or other amount payable, such nonpayment continues for three (3) Business Days (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise); or

(b)    *Specific Covenants.*    Any Loan Party fails to perform or observe any term, covenant or agreement contained in (i) Sections 5.26, 6.17(c), 6.20, 6.21 or Article 7;  (ii) Sections 6.19; provided that if (A) any such Default described in this clause (ii) is of a type that is capable of being cured and (B) such Default could not materially adversely impact the Lenders' Liens on the Collateral, such Default shall not constitute an Event of Default for two (2) Business Days after the occurrence of such Default so long as the Loan Parties are diligently pursuing the cure of such Default; (iii) Sections 6.01 through 6.18, provided that if (A) any such Default described in this clause (iii) is of a type that is capable of being cured and (B) such Default could not materially adversely impact the Lenders' Liens on the Collateral, such Default shall not constitute an Event of Default for five (5) Business Days after the occurrence of such Default so long as the Loan Parties are diligently pursuing the cure of such Default; or

(c)      *Other Defaults.*  Any Loan Party fails to perform or observe any other term, covenant or agreement (not specified in Section 8.01(a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for ten (10) days after the earlier of (i) notice thereof by the Administrative Agent to the Borrowers and (ii) knowledge thereof by the Borrowers; *provided*, *however*, that such notice and opportunity to cure shall not apply if any such Default is not capable of being cured within such period; or

(d)      *Representations and Warranties.*  Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of the Borrowers or any other Loan Party herein, in any other Loan Document, or in any document required to be delivered in connection herewith or therewith (including, without limitation, any Approved Budget or Variance Report) shall be incorrect or misleading in any material respect when made or deemed made; or

(e)      *Cross-Default*.  Except for defaults occasioned by the filing of the Chapter 11 Cases, entry into this Agreement and defaults resulting from obligations with respect to which the Bankruptcy Code prohibits any Loan Party or any Subsidiary from complying or permits any Loan Party or Subsidiary not to comply, any Loan Party or any Subsidiary (i) fails to make any payment after the applicable grace period with respect thereto, if any, (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Indebtedness (other than Indebtedness hereunder) or (ii) fails to observe or perform any other agreement or condition relating to any such Indebtedness, or any other event occurs, the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity; or

(f)      *Judgments*.  There is entered against any Loan Party or any Subsidiary a final judgment or order for the payment of money (to the extent not covered by independent third-party insurance as to which the insurer has been notified of such judgment or order and has not denied  coverage) and such judgment or order shall not have been satisfied, vacated, discharged or stayed or bonded pending an appeal for a period of forty-five (45) consecutive days; or

(g)      *Invalidity of Loan Documents*.  (i) Any material provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder (including as a result of a transaction permitted under Section 7.04 or 7.05) or as a result of acts or omissions by the Administrative Agent or Collateral Agent or any Lender or the satisfaction in full of all the Obligations, ceases to be in full force and effect; or any Loan Party contests in writing the validity or enforceability of any provision of any Loan Document or the validity or priority of a Lien as required by the Collateral Documents on a material portion of the Collateral; or any Loan Party denies in writing that it has any or further liability or obligation under any Loan Document (other than as a result of repayment in full of the Obligations), or purports in writing to revoke or rescind any Loan Document, or (ii) any challenge by or on behalf of any Loan Party, receiver, trustee, custodian, conservator, monitor, liquidator, rehabilitator, administrator, administrative receiver or similar officer for any Loan Party or for all or any material part of its property to the validity of any Loan Document or the applicability or enforceability of any Loan Document or the validity or priority of a Lien as required by the Collateral Documents on a material portion of the Collateral strictly in accordance with the subject Loan Document's terms or which seeks to void, avoid, limit, or otherwise adversely affect any security interest created by or in any Loan Document or any payment made pursuant thereto; or

(h)      *Change of Control*.  There occurs any Change of Control; or

(i)      *Collateral Documents*.  (i) Any Collateral Document after delivery thereof pursuant to Section 4.02, 6.11 or 6.13 shall for any reason (other than pursuant to the terms hereof or thereof including as a result of a transaction permitted under Section 7.04 or 7.05) cease to create a valid and perfected Lien, with the priority required by the Collateral Documents on and security interest in any material portion of the Collateral purported to be covered thereby, subject to Liens permitted under Section 7.01, (A) except to the extent that any such perfection

67

or priority is not required pursuant to the Collateral and Guarantee Requirement or results from the failure of the Administrative Agent or the Collateral Agent to maintain possession of certificates actually delivered to it representing securities pledged under the Collateral Documents or to file Uniform Commercial Code continuation statements and (B) except as to Collateral consisting of Real Property to the extent that such losses are covered by a lender's title insurance policy and such insurer has not denied coverage or (ii) any of the Equity Interests of the Lead Borrower ceasing to be pledged pursuant to the Security Agreement free of Liens other than Liens created by the Security Agreement or any nonconsensual Liens arising solely by operation of Laws; or

(j)    *ERISA*.    (i) An ERISA Event that, alone or together with any other ERISA Events that have occurred, has resulted or could reasonably be expected to result in liability of a Loan Party, any Subsidiary or any of their respective ERISA Affiliates, or (ii) a Loan Party, any Subsidiary or any of their respective ERISA Affiliates fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its Withdrawal Liability under Section 4201 of ERISA under a Multiemployer Plan; or

(k)    *Chapter 11 Cases*. There occurs any of the following in the Chapter 11 Cases:

(i)    filing of a plan of reorganization by the Debtors that is not an Acceptable Plan;

(ii)    any of the Debtors shall file a pleading seeking to modify or otherwise alter any of the Orders in a manner that is materially adverse to the Lenders without the prior consent of the Required Lenders;

(iii)    entry of an order without the prior consent of the Required Lenders amending, supplementing or otherwise altering any of the Orders in a manner materially adverse to the Lenders;

(iv)    reversal, vacation or stay of the effectiveness of any Order for a period in excess of seven (7) calendar days without the prior consent of the Required Lenders;

(v)    any material violation of the terms of any Order by any of the Debtors and such violation shall go unremedied for two (2) Business Days;

(vi)    dismissal of the Chapter 11 Cases or conversion of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code, or the Debtors' filing of (or supporting another party in the filing of, or failure to promptly object to) a motion seeking the foregoing relief;

(vii)    appointment of a Chapter 11 trustee without the consent of the Required Lenders, or the Debtors' filing of (or supporting another party in the filing of, or failure to promptly object to) a motion seeking the foregoing relief;

(viii)    termination of the Stalking Horse Agreement so long as such termination (x) was not caused by, or the result of, a breach by the Stalking Horse Bidder of its obligations thereunder, or (y) is the result of a party other than the Stalking Horse Bidder winning the auction with respect to the IP and Online Business Sale;

(ix)    any sale of all or substantially all assets of the Debtors (other than ABL Priority Collateral for so long as the Prepetition ABL Indebtedness remains outstanding) pursuant to Section 363 of the Bankruptcy Code or entry into an agreement obligating any Debtor to consummate any such sale, other than the IP and Online Business Sale or the Lease Sale or the Required Liquidation, unless (i) the proceeds of such sale are used to indefeasibly satisfy the  Obligations in full in cash, or (ii) such sale is consented to by the Administrative Agent at the direction of the Required Lenders;

(x)      appointment of a responsible officer or examiner with enlarged powers relating to the operation of the business of the Borrower or any Guarantor without the consent of the Required Lenders (which appointment shall not have been reversed, stayed or vacated within seven (7) calendar days);

(xi)      failure to meet a milestone set forth in Section 6.19, unless extended or waived within two (2) business days by the consent of the Administrative Agent at the direction of the Required Lenders;

(xii)      granting of relief from the automatic stay in the Chapter 11 Cases to permit foreclosure or enforcement on Collateral of any of the Debtors (subject to customary exceptions, including, without limitation, relief with respect to immaterial assets and insurance programs);

(xiii)      the Debtors' filing of (or supporting another party in the filing of) a motion seeking entry of, or the entry of an order, granting any superpriority claim or lien (except as contemplated herein) which is senior to or pari passu with the Term DIP Claims;

(xiv)      entry of an order without the prior consent of the Required Lenders permitting the Debtors to obtain financing or grant security interests pursuant to Section 364 of the Bankruptcy Code;

(xv)      the Debtors' challenge (or support of any other person's challenge) to the validity or enforceability of any of the obligations of the parties under the Loan Documents;

(xvi)      payment of or granting adequate protection with respect to prepetition debt, other than as expressly provided herein, in the Orders, or consented to by the Required Lenders;

(xvii)      expiration or termination of exclusivity by the Debtors or the filing of a plan of reorganization without the prior consent of the Required Lenders;

(xviii)      cessation of the Term DIP Facility Liens to be valid, perfected and enforceable in all respects;

(xix)      any of the Debtors uses cash collateral or Term DIP Loans for any item other than those set forth in, and in accordance with, the Approved Budget (subject to Permitted Variances) and as approved by the Bankruptcy Court, the Carve-Out or prepays any pre-petition debt (other than Prepetition ABL Indebtedness as permitted by the Orders) , except with the prior consent of the Required Lenders;

(xx)      entry of an order denying or terminating the Debtors' authorization to use cash collateral, except with the prior consent of the Required Lenders;

(xxi)      Permitted Variances under the Approved Budget are exceeded for any period of time, subject to the proviso to the Permitted Variances covenant;

(xxii)      any uninsured judgments are entered with respect to any Post-Petition liabilities against any of the Debtors or any of their respective properties in a combined aggregate amount in excess of $100,000, unless stayed, vacated or satisfied for a period of twenty (20) days after entry thereof;

(xxiii)      any Debtor asserting any right of subrogation or contribution against any other Debtor until all borrowings under the Term DIP Facilities are paid in full and the commitments are terminated;

(xxiv)      the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against the Administrative Agent, any Lender, or any other Loan Party or any of the Collateral;

(xxv)    the failure of Lead Borrower to deliver a proposed updated budget no later than the Thursday of the second week after delivery of the initial Approved Budget and on each Thursday of the second week thereafter;

(xxvi)    the failure of Lead Borrower to deliver a Variance Report on any Budget Testing Date; and

(xxvii)    entry of an order avoiding or permitting recovery of any portion of the payments made on account of the Indebtedness owing under this Agreement or the other Loan Documents or the Prepetition Term Loan Agreement.

Section 8.02. *Remedies Upon Event of Default.*

(a)    If any Event of Default occurs and is continuing, then, and in any such event, without further order from the Bankruptcy Court, and subject to the terms of the Orders, the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the Administrative Agent and the Required Lenders to exercise all rights and remedies provided for in the Loan Documents, and to take any or all of the following actions without further order  of or application to the Bankruptcy Court (as applicable) which Administrative Agent may, and at the request of the Required Lenders shall, take any or all of the following actions, in each case, subject to the Carve-Out and the Supplemental Carve-Out: (i) immediately terminate or limit the Loan Parties' limited use of any cash collateral; (ii) cease making any Loans under the Term DIP Facility to the Loan Parties; (iii) declare all Obligations to be immediately due and payable; (iv) freeze monies or balances in the Loan Parties' accounts; (v) immediately set-off any and all amounts in accounts maintained by the Loan Parties with the Administrative Agent or the Lenders against the Obligations, or otherwise enforce any and all rights against the Collateral in the possession of any of the applicable Secured Parties, including, without limitation, disposition of  the Collateral solely for application  towards the Obligations; and (vi) take any other actions or exercise any other rights or remedies permitted under the Orders, the Loan Documents or applicable law to effect the repayment of the Obligations; provided, however, that prior to the exercise of any right in clauses (i), (iv), (v) or (vi) of this paragraph, the Administrative Agent shall be required to provide three (3) Business Days written notice to the Loan Parties of the Administrative Agent's intent to exercise its rights and remedies; provided, further, that neither the Loan Parties, the Committee nor any other party-in-interest shall have the right to contest the enforcement of the remedies set forth in the Orders and the Loan Documents on any basis other than an assertion that an Event of Default has not occurred or has been cured within the cure periods expressly set forth in the applicable Loan Documents.

(b)    Except as expressly provided above in this Section 8.02, to the maximum extent permitted by applicable law, presentment, demand, protest and all other notices of any kind are hereby expressly waived.

Further, for the avoidance of doubt, upon the occurrence and during the continuance of any Event of Default, the Borrowers shall not be permitted to withdraw any funds from a DIP Funding Account or a Segregated Operating Account, other than to fund the Carve-Out and the Supplemental Carve-Out, without the prior written consent of the Required Lenders regardless of whether Administrative Agent shall have formally exercised dominion over either the DIP Funding Accounts or the Segregated Operating Accounts, as applicable.

Section 8.03. *Application of Funds*. After the exercise of remedies provided for in Section 8.02, any amounts received on account of the Obligations and such other proceeds remaining in (i) the DIP Funding Account shall be applied in accordance with Section 2.11 hereof and (ii) the Segregated Operating Accounts shall be applied by the Administrative Agent as set forth in the Orders.

# ARTICLE 9
## THE ADMINISTRATIVE AGENT AND THE COLLATERAL AGENT

Each Lender hereby irrevocably appoints the Administrative Agent and the Collateral Agent (for purposes of this Article 9, the Administrative Agent and the Collateral Agent are referred to collectively as the "**Agents**") its agent and authorizes the Agents to take such actions on its behalf and to exercise such powers as are delegated to

such Agent by the terms of the Loan Documents, together with such actions and powers as are reasonably incidental thereto. Without limiting the generality of the foregoing, the Agents are hereby expressly authorized to (i) execute any and all documents (including releases) with respect to the Collateral and the rights of the Secured Parties with respect thereto, as contemplated by and in accordance with the provisions of this Agreement and the Collateral Documents (including, for the avoidance of doubt, the Prepetition Intercreditor Agreement and any amendment or supplement expressly contemplated thereby) and (ii) negotiate, enforce or settle any claim, action or proceeding affecting the Lenders in their capacity as such, at the direction of the Required Lenders, which negotiation, enforcement or settlement will be binding upon each Lender.

The institution serving as the Administrative Agent and/or the Collateral Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent, and such bank and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with Holdings, the Borrowers or any Subsidiary or other Affiliate thereof as if it were not an Agent hereunder.

Neither Agent shall have any duties or obligations except those expressly set forth in the Loan Documents. Without limiting the generality of the foregoing, (a) neither Agent shall be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (b) neither Agent shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby that such Agent is instructed in writing to exercise by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 10.08), and (c) except as expressly set forth in the Loan Documents, neither Agent shall have any duty to disclose, nor shall it be liable for the failure to disclose, any information relating to Holdings, the Borrowers or any of the Subsidiaries that is communicated to or obtained by the bank serving as Administrative Agent and/or Collateral Agent or any of its Affiliates in any capacity. Neither Agent shall be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 10.08) or in the absence of its own gross negligence or willful misconduct. Neither Agent shall be deemed to have knowledge of any Default unless and until written notice thereof is given to such Agent by Holdings, the Lead Borrower or a Lender, and neither Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered thereunder or in connection therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document, (iv) the validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Article 4 or elsewhere in any Loan Document, other than to confirm receipt of items expressly required to be delivered to such Agent.

Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper Person. Each Agent may also rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. Each Agent may consult with legal counsel (who may be counsel for the Borrowers), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

Each Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by it. Each Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of each Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the Term DIP Facilities as well as activities as Agent.

Subject to the appointment and acceptance of a successor Agent as provided below, either Agent may resign at any time by notifying the Lenders and the Lead Borrower.  Upon any such resignation, the Required Lenders shall have the right, and to the extent no Event of Default exists, in consultation with the Lead Borrower to appoint a successor.  If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 5 days after the retiring Agent gives notice of its resignation, then the retiring Agent may (subject to receipt of any consent described above), on behalf of the Lenders, appoint a successor Agent which shall be a bank with an office in New York, New York, or an Affiliate of any such bank.  If no successor Agent has been appointed pursuant to the immediately preceding sentence by the 5th day after the date such notice of resignation was given by such Agent, such Agent's resignation shall become effective and the Required Lenders shall thereafter perform all the duties of such Agent hereunder and/or under any other Loan Document until such time, if any, as the Required Lenders appoint a successor Administrative Agent and/or Collateral Agent, as the case may be.  Upon the acceptance of its appointment as Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations hereunder.  The fees payable by the Borrowers to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Lead Borrower and such successor.  After an Agent's resignation hereunder, the provisions of this Article and Section 10.05 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while acting as Agent.

Each Lender acknowledges that it has, independently and without reliance upon the Agents or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon the Agents or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement or any other Loan Document, any related agreement or any document furnished hereunder or thereunder.

# ARTICLE 10
### MISCELLANEOUS

Section 10.01.  *Notices; Electronic Communications.*  Notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by fax, as follows:

(a)    if to the Lead Borrower, Borrowers,  Holdings or any other Loan Party, to it at:

Gymboree Group, Inc.
Attn:  Kimberly Holtz MacMillan
    Vice President and General Counsel
71 Stevenson Street
San Francisco, CA  94105
415-278-7228 (phone)
415-278-7562 (fax)
kimberly_macmillan@gymboree.com

    and

with a copy to (which copy shall not constitute notice):

Milbank, Tweed, Hadley & McCloy LLP
Attention: Evan Fleck & Al Pisa
28 Liberty Street
New York, NY 10010
Telephone: (212) 530-5000

and

Kutak Rock LLP
Attention: Michael A. Condyles
901 East Byrd Street, Suite 1000
Richmond, VA 23119

(b)    if to the Administrative Agent, to:

Special Situations Investing Group, Inc.
c/o Goldman, Sachs & Co. LLC
200 West Street, 26th Floor
New York, NY 10282
Attention:  Legal Department
Email: gs-legal-amssg@gs.com

with a copy (which copy shall not constitute notice) to:

King & Spalding LLP
1185 Avenue of the Americas
New York, NY 10036
Attention: W. Todd Holleman, Esq.
Telephone: (212) 556 2258
Facsimile: (212) 556 2222
Email: tholleman@kslaw.com

(c)    if to a Lender, to it at its address (or fax number) set forth on Schedule 2.01 or in the Assignment and Acceptance pursuant to which such Lender shall have become a party hereto;

(d)    for all notices required to be delivered pursuant to Sections 6.17 or 6.21(c) hereof, or for any notice otherwise being delivered to Lenders from any Borrower with respect to the budget, Approved Budget, or Variance Report, notice shall also be required to be provided to such other parties as directed by the Administrative Agent.

All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt if delivered by hand or overnight courier service or sent by fax or on the date five (5) Business Days after dispatch by certified or registered mail if mailed, in each case delivered, sent or mailed (properly addressed) to such party as provided in this Section 10.01 or in accordance with the latest unrevoked direction from such party given in accordance with this Section 10.01.  As agreed to among Holdings, the Borrowers, the Administrative Agent and the applicable Lenders from time to time, notices and other communications may also be delivered by e-mail to the e-mail address of a representative of the applicable Person provided from time to time by such Person.

The Borrowers hereby agree, unless directed otherwise by the Administrative Agent or unless the electronic mail address referred to below has not been provided by the Administrative Agent to the Lead Borrower, that it will, or will cause its Subsidiaries to, provide to the Administrative Agent all information, documents and other materials that it is obligated to furnish to the Administrative Agent pursuant to the Loan Documents or to the Lenders under Article 6, including all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication that (1) is or relates to a Borrowing Notice, (2) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefor, (3) provides notice of any Default or Event of Default under this Agreement or any other Loan Document or (4) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement and/or any Borrowing or other extension of credit hereunder (all such non-excluded communications being referred to herein

73

collectively as "**Communications**"), by transmitting the Communications in an electronic/soft medium that is properly identified in a format reasonably acceptable to the Administrative Agent to an electronic mail address as directed by the Administrative Agent.  In addition, the Borrowers agree, and agrees to cause its Subsidiaries, to continue to provide the Communications to the Administrative Agent or the Lenders, as the case may be, in the manner specified in the Loan Documents but only to the extent requested by the Administrative Agent.

The Borrowers hereby acknowledge that (a) the Administrative Agent will make available to the Lenders materials and/or information provided by or on behalf of the Borrowers hereunder (collectively, the "**Borrower Materials**") by posting the Borrower Materials on Intralinks or another similar electronic system (the "**Platform**") and (b) certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to Holdings (or any parent thereof) or the Borrowers or any of their respective securities) (each, a "**Public Lender**").  The Borrowers hereby agree that (w) all Borrower Materials that are to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Borrowers shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as not containing any material non-public information with respect to Holdings (or any parent thereof) or the Borrowers or any of their respective securities for purposes of United States federal and state securities laws (provided, however, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 10.16); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated as "Public Investor;" and (z) the Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not marked as "Public Investor." Notwithstanding the foregoing, the following Borrower Materials shall be marked "PUBLIC", unless the Lead Borrower notifies the Administrative Agent promptly that any such document contains material non-public information: (1) the Loan Documents and (2) notification of changes in the terms of the Term DIP Facilities.

Each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Law, including United States Federal and state securities laws, to make reference to Communications that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to Holdings (or any parent thereof) or the Borrowers or any of their respective securities for purposes of United States Federal or state securities laws.

THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE".    NEITHER THE ADMINISTRATIVE AGENT NOR ANY OF ITS RELATED PARTIES WARRANTS THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS OR THE ADEQUACY OF THE PLATFORM AND EACH EXPRESSLY DISCLAIMS LIABILITY FOR ERRORS OR OMISSIONS IN THE COMMUNICATIONS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS IS MADE BY THE ADMINISTRATIVE AGENT OR ANY OF ITS RELATED PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM.  IN NO EVENT SHALL THE ADMINISTRATIVE AGENT OR ANY OF ITS RELATED PARTIES HAVE ANY LIABILITY TO ANY LOAN PARTY, ANY LENDER OR ANY OTHER PERSON FOR DAMAGES OF ANY KIND, WHETHER OR NOT BASED ON STRICT LIABILITY AND INCLUDING DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF ANY LOAN PARTY'S OR THE ADMINISTRATIVE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET, EXCEPT TO THE EXTENT THE LIABILITY OF ANY SUCH PERSON IS FOUND IN A FINAL RULING BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED PRIMARILY FROM SUCH PERSON'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

The Administrative Agent agrees that the receipt of the Communications by the Administrative Agent at its e-mail address set forth above shall constitute effective delivery of the Communications to the Administrative Agent for purposes of the Loan Documents. Each Lender agrees that receipt of notice to it (as provided in the next sentence) specifying that the Communications have been posted to the Platform shall constitute effective delivery of the Communications to such Lender for purposes of the Loan Documents. Each Lender agrees to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Lender's e-mail address to which the foregoing notice may be sent by electronic transmission and that the foregoing notice may be sent to such e-mail address.

Nothing herein shall prejudice the right of the Administrative Agent or any Lender to give any notice or other communication pursuant to any Loan Document in any other manner specified in such Loan Document.

Section 10.02. *Survival of Agreement.* All covenants, agreements, representations and warranties made by the Borrowers or Holdings herein and in the certificates or other instruments prepared or delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the Lenders and shall survive the making by the Lenders of the Loans, regardless of any investigation made by the Lenders or on their behalf or that any Agent or Lender may have had notice of any Default or Event of Default at the time of any Borrowing, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any Fee or any other amount payable under this Agreement or any other Loan Document is outstanding and unpaid and so long as the Term Loan Commitments have not been terminated. The provisions of Sections 3.01, 3.04, 3.05 and 10.05 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment of any of the Loans, the expiration of the Term Loan Commitments, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of the Administrative Agent, the Collateral Agent or any Lender.

Section 10.03. *Binding Effect.* This Agreement shall become effective when it shall have been executed by the Borrowers, each other Loan Party party hereto on the Closing Date, Holdings and the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto.

Section 10.04. *Successors and Assigns.*

(a) Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the permitted successors and assigns of such party; and all covenants, promises and agreements by or on behalf of the Borrowers, Holdings, the Administrative Agent, the Collateral Agent or the Lenders that are contained in this Agreement shall bind and inure to the benefit of their respective successors and permitted assigns.

(b) Each Lender may assign to one or more Eligible Assignees all or a portion of its interests, rights and obligations under this Agreement (including all or a portion of the Loans at the time owing to it), with the prior written consent of the Administrative Agent (not to be unreasonably withheld or delayed); *provided, however*, that (i) the amount of the Term Loan Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to the Administrative Agent) shall be in an integral multiple of, and not less than, $1,000,000 (or, if less, the entire remaining amount of such Lender's Term Loan Commitment or Loans of the relevant Class); *provided* that simultaneous assignments by two or more Related Funds shall be combined for purposes of determining whether the minimum assignment requirement is met, (ii) the parties to each assignment shall (A) execute and deliver to the Administrative Agent an Assignment and Acceptance via an electronic settlement system acceptable to the Administrative Agent or (B) if previously agreed with the Administrative Agent, manually execute and deliver to the Administrative Agent an Assignment and Acceptance, and, in each case, shall pay to the Administrative Agent a processing and recordation fee of $3,500; *provided* that (x) simultaneous assignments by two or more Related Funds shall require the payment of a single processing and recordation fee of $3,500 and (y) such processing and recordation fee may be waived or reduced in the sole discretion of the Administrative Agent, and (iii) the assignee, if

75

it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire (in which the assignee shall designate one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Loan Parties and their Related Parties or their respective securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable Laws, including Federal and state securities laws) and all applicable tax forms.  Upon acceptance and recording pursuant to paragraph (e) of this Section 10.04, from and after the effective date specified in each Assignment and Acceptance, (A) the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement and (B) the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 3.01, 3.04, 3.05 and 10.05).

(c)    By executing and delivering an Assignment and Acceptance, the assigning Lender thereunder and the assignee thereunder shall be deemed to confirm to and agree with each other and the other parties hereto as follows:  (i) such assigning Lender warrants that it is the legal and beneficial owner of the interest being assigned thereby free and clear of any adverse claim and the outstanding balances of its Term DIP Loans without giving effect to assignments thereof which have not become effective, are as set forth in such Assignment and Acceptance, (ii) except as set forth in (i) above, such assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement, or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement, any other Loan Document or any other instrument or document furnished pursuant hereto, or the financial condition of the Borrowers or any Subsidiary or the performance or observance by the Borrowers or any Subsidiary of any of its obligations under this Agreement, any other Loan Document or any other instrument or document furnished pursuant hereto; (iii) such assignee represents and warrants that it is an Eligible Assignee legally authorized to enter into such Assignment and Acceptance; (iv) such assignee confirms that it has received a copy of this Agreement and the other Loan Documents, together with copies of the most recent financial statements referred to in Section 5.05 or delivered pursuant to Section 6.01 and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (v) such assignee will independently and without reliance upon the Administrative Agent, the Collateral Agent, such assigning Lender or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement; (vi) such assignee appoints and authorizes the Administrative Agent and the Collateral Agent to take such action as agent on its behalf and to exercise such powers under this Agreement and the other Loan Documents as are delegated to the Administrative Agent and the Collateral Agent, respectively, by the terms hereof or thereof, together with such powers as are reasonably incidental thereto; and (vii) such assignee agrees that it will perform in accordance with their terms all the obligations which by the terms of this Agreement are required to be performed by it as a Lender.

(d)    The Administrative Agent, acting for this purpose as an agent of the Borrowers, shall maintain at one of its offices in The City of New York a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Term Loan Commitment of, and principal amount of and the interest on the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**").  The entries in the Register shall be conclusive absent manifest error and the Borrowers, the Administrative Agent, the Collateral Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrowers, the Collateral Agent and any Lender, at any reasonable time and from time to time upon reasonable prior notice.  This Section 10.04(d) shall be construed so that the Loans are at all times maintained in "registered form" within the meaning of Section 163(f), 871(h)(2) and 881(c)(2) of the Code and any related Treasury regulations (or any other relevant or successor provisions of the Code or of such Treasury regulations).

(e)    Upon its receipt of, and consent to, a duly completed Assignment and Acceptance executed by an assigning Lender and an assignee, an Administrative Questionnaire completed in respect of the assignee (unless the

assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) above, if applicable, and the written consent of the Administrative Agent and, if required, the Borrowers to, such assignment and any applicable tax forms, the Administrative Agent shall promptly (i) accept such Assignment and Acceptance and (ii) record the information contained therein in the Register. No assignment shall be effective unless it has been recorded in the Register as provided in this paragraph (e).

(f)     Each Lender may without the consent of the Borrowers or the Administrative Agent sell participations to one or more banks or other Persons in all or a portion of its rights and obligations under this Agreement (including all or a portion of its Term Loan Commitment and the Loans owing to it); *provided, however*, that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) the participating banks or other Persons shall be entitled to the benefit of the cost protection provisions and restrictions contained in Sections 3.01, 3.04 and 3.05 to the same extent as if they were Lenders (subject to the requirements and limitations therein, including the requirements under Section 3.01(d), it being understood that the documentation required under Section 3.01(d) shall be delivered to the participating Lender, to the same extent as if it were a Lender and had acquired its interest by assignment, but with respect to any particular participant, to no greater extent than the Lender that sold the participation to such participant and only if such participant has complied with the requirements of such provisions as if it were a Lender) and (iv) the Borrowers, the Administrative Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement, and such Lender shall retain the sole right to enforce the obligations of the Borrowers relating to the Loans and to approve any amendment, modification or waiver of any provision of this Agreement (*provided* that the agreement or instrument pursuant to which such Lender has sold a participation may provide that such Lender shall not agree to the following amendments without the consent of such participating bank or Person hereunder: amendments, modifications or waivers decreasing any fees payable to such participating bank or Person hereunder or the amount of principal of or the rate at which interest is payable on the Loans in which such participating bank or Person has an interest, extending any scheduled principal payment date or date fixed for the payment of interest on the Loans in which such participating bank or Person has an interest, increasing or extending the Term Loan Commitments in which such participating bank or Person has an interest, releasing all or substantially all of the Guarantors (other than in connection with the sale of any such Guarantor in a transaction permitted by Section 7.05) or releasing all or substantially all of the Collateral or the Term Priority Collateral).  Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrowers, maintain a register on which it enters the name and address of each participant and the principal amounts (and interest thereon) of each participant's interest in the Loans or other Obligations under this Agreement (the "**Participant Register**"); *provided*, that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any participant or any information relating to a participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Treasury Regulation Section 5f.103-1 and Section 1.163-5(b)(1) of the proposed United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and the Borrowers, the Lenders and each Agent shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement, notwithstanding notice to the contrary.

(g)     Any Lender or participant may, in connection with any assignment or participation or proposed assignment or participation pursuant to this Section 10.04, disclose to the assignee or participant or proposed assignee or participant any information relating to the Borrowers furnished to such Lender by or on behalf of the Borrowers; *provided* that, prior to any such disclosure of information designated by the Borrowers as confidential, each such assignee or participant or proposed assignee or participant shall execute an agreement whereby such assignee or participant shall agree (subject to customary exceptions) to preserve the confidentiality of such confidential information on terms no less restrictive than those applicable to the Lenders pursuant to Section 10.16.

(h)     Any Lender may at any time assign all or any portion of its rights under this Agreement to secure extensions of credit to such Lender or in support of obligations owed by such Lender; *provided* that no such

assignment shall release a Lender from any of its obligations hereunder or substitute any such assignee for such Lender as a party hereto.

(i)    Notwithstanding anything to the contrary contained herein, any Lender (a "**Granting Lender**") may grant to a special purpose funding vehicle (an "**SPV**"), identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrowers, the option to provide to the Borrowers all or any part of any Loan that such Granting Lender would otherwise be obligated to make to the Borrowers pursuant to this Agreement; *provided* that (i) nothing herein shall constitute a commitment by any SPV to make any Loan, (ii) if an SPV elects not to exercise such option or otherwise fails to provide all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof and (iii) the Granting Lender shall for all purposes remain the Lender hereunder.  The making of a Loan by an SPV hereunder shall utilize the Term Loan Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender.  Each party hereto hereby agrees that no SPV shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender).  In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior indebtedness of any SPV, it will not institute against, or join any other Person in instituting against, such SPV any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under the laws of the United States or any State thereof.  In addition, notwithstanding anything to the contrary contained in this Section 10.04, any SPV may (i) with notice to, but without the prior written consent of, the Borrowers and the Administrative Agent and without paying any processing fee therefor, assign all or a portion of its interests in any Loans to the Granting Lender or to any financial institutions (consented to by the Borrowers and Administrative Agent) providing liquidity and/or credit support to or for the account of such SPV to support the funding or maintenance of Loans and (ii) disclose on a confidential basis any non-public information relating to its Loans to any rating agency, commercial paper dealer or provider of any surety, guarantee or credit or liquidity enhancement to such SPV.

(j)    Neither Holdings nor the Borrowers shall assign or delegate any of its rights or duties hereunder without the prior written consent of the Administrative Agent and each Lender, and any attempted assignment without such consent shall be null and void.

Section 10.05.  *Expenses; Indemnity.*  (a) The Borrowers and Holdings agree, jointly and severally, (i) to pay or reimburse the Administrative Agent and the Collateral Agent for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the preparation, due diligence, negotiation, syndication and execution of this Agreement and the other Loan Documents, and any amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transactions contemplated thereby are consummated), and the consummation and administration of the transactions contemplated hereby and thereby, including, without limitation, the reasonable and documented out-of-pocket fees for appraisers, field examiners, AlixPartners, LLP as financial advisor, and all Attorney Costs (which shall be limited to King & Spalding LLP (and one local counsel in each reasonably necessary and relevant material jurisdiction for each group and, in the event of a conflict of interest, one additional counsel of each type to similarly situated parties (which shall exclude in any event costs of in-house counsel and any other advisor not approved by the Borrowers) and Sullivan & Cromwell LLP, as tax counsel,) and (ii) from and after the Closing Date, to pay or reimburse the Administrative Agent, the Collateral Agent and each Lender for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the enforcement (whether through negotiations, legal proceedings or otherwise) of any rights or remedies under this Agreement or the other Loan Documents (including all such costs and expenses incurred during any legal proceeding, including any proceeding under any Debtor Relief Law, and including all respective Attorney Costs which shall be limited to Attorney Costs of one counsel to the Administrative Agent and the Lenders (and one local counsel in each reasonably necessary and relevant material jurisdiction for each group and, in the event of any conflict of interest, one additional counsel of each type to similarly situated parties)) and related costs and expenses of professional advisors.  The foregoing costs and expenses shall include all reasonable search, filing, recording and title insurance charges and fees related thereto, and other reasonable out-of-pocket expenses incurred by any Agent.

78

(b)      Whether or not the transactions contemplated hereby are consummated, from and after the Closing Date, the Loan Parties shall, jointly and severally, indemnify and hold harmless the Administrative Agent, the Collateral Agent, each Lender, and the directors, officers, employees, controlling persons, partners, advisors, agents, attorneys, trustees and other representatives of each of the foregoing (collectively the "**Indemnitees**") from and against any and all actual losses, damages, claims, liabilities and expenses (including Attorney Costs which shall be limited to Attorney Costs of one counsel to the Administrative Agent and the Lenders (and, if reasonably necessary, one local counsel in each applicable jurisdiction and, in the event of any actual conflict of interest, one additional counsel for each type of similarly situated affected parties) and Sullivan & Cromwell LLP as tax counsel to the Administrative Agent, and settlement costs) of any kind or nature whatsoever which may at any time be imposed on, incurred by or asserted or awarded against any such Indemnitee in any way relating to or arising out of or in connection with (i) the execution, delivery, enforcement, performance or administration of any Loan Document or any other agreement, letter or instrument delivered in connection with the transactions contemplated thereby, (ii) any Term Loan Commitment or Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or Release of Hazardous Materials at, on, under or from any property or facility currently or formerly owned, leased or operated by the Loan Parties or any Subsidiary, or any Environmental Liability related in any way to any Loan Parties or any Subsidiary or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or threatened claim, investigation, litigation or proceeding) and regardless of whether any Indemnitee is a party thereto in all cases, whether or not caused by or arising, in whole or in part, out of the negligence of an Indemnitee; *provided* that, notwithstanding the foregoing, such indemnity shall not, as to any Indemnitee, be available to the extent that such losses (excluding loss profits), damages, claims, liabilities and expenses resulted from (x) the gross negligence, willful misconduct or material breach in bad faith of such Indemnitee or of any affiliate, director, officer, employee, counsel, agent or attorney-in-fact of such Indemnitee, as determined by the final non-appealable judgment of a court of competent jurisdiction, (y) a material breach of its obligations under the Loan Documents by such Indemnitee or of any affiliate, director, officer, employee, counsel, agent or attorney-in-fact of such Indemnitee as determined by the final non-appealable judgment of a court of competent jurisdiction or (z) any dispute solely among the Indemnitees other than (1) any claim against an Indemnitee in its capacity or in fulfilling its role as Administrative Agent, Collateral Agent or similar role and (2) any claim arising out of any act or omission of the Borrowers or any of its Affiliates.  No Indemnitee shall be liable for any damages arising from the use by others of any information or other materials obtained through IntraLinks or other similar information transmission systems in connection with this Agreement.   In the case of a claim, investigation, litigation or other proceeding to which the indemnity in this Section 10.05 applies, such indemnity shall be effective whether or not such claim, investigation, litigation or proceeding is brought by any Loan Party, any Subsidiary of any Loan Party, any Loan Party's directors, stockholders or creditors or other Affiliates or an Indemnitee or any other Person, whether or not any Indemnitee is otherwise a party thereto and whether or not any of the transactions contemplated hereunder or under any of the other Loan Documents are consummated.  For the avoidance of doubt, this paragraph shall not apply with respect to Taxes that are the subject of, or excluded from, Section 3.01.

(c)      To the extent that any Loan Party fails to pay any amount required to be paid by them to the Administrative Agent or the Collateral Agent under paragraph (a) or (b) of this Section, each Lender severally agrees to pay to the Administrative Agent or the Collateral Agent such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; *provided* that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent or the Collateral Agent in its capacity as such.  For purposes hereof, a Lender's "***pro rata share***" shall be determined based upon its share of the sum of the outstanding Term DIP Loans and unused Term Loan Commitments at the time.

(d)      To the extent permitted by applicable Law, (i) no Loan Party shall assert, and each hereby waives, any claim against any Indemnitee and (ii) no Indemnitee shall assert, and each hereby waives, any claim against any Loan Party, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby or any Loan or the use of the proceeds thereof (whether before or after the Closing Date).

(e)    The provisions of this Section 10.05 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment of any of the Loans, the expiration of the Term Loan Commitments, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of the Administrative Agent, the Collateral Agent or any Lender.  All amounts due under this Section 10.05 shall be payable within 10 Business Days after written demand therefor.

Section 10.06.  *[Reserved]*.

Section 10.07.    *Applicable Law.*    EXCEPT TO THE EXTENT SUPERSEDED BY THE BANKRUPTCY CODE, THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (OTHER THAN AS EXPRESSLY SET FORTH IN OTHER LOAN DOCUMENTS) SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.

Section 10.08.  *Waivers; Amendment.*  (a) No failure or delay of the Administrative Agent, the Collateral Agent or any Lender in exercising any power or right hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Administrative Agent, the Collateral Agent and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or any other Loan Document or consent to any departure by the Borrowers or any other Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) below, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  No notice or demand on the Borrowers or Holdings in any case shall entitle the Borrowers or Holdings to any other or further notice or demand in similar or other circumstances.

(b)    Neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified except (x) in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Borrowers, Holdings and the Required Lenders and (y) except as otherwise described below, in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by each party thereto with the consent of the Required Lenders; *provided, however*, that no such agreement shall (i) decrease the principal amount of, or extend the scheduled maturity date of or any scheduled principal payment date or scheduled date for the payment of any interest on any Loan, or waive or excuse any such payment or any part thereof (other than with respect to any default interest), or decrease the rate of interest on any Loan (other than with respect to any default interest), without the prior written consent of each Lender directly adversely affected thereby (it being understood that the waiver of (or amendment to the terms of) any mandatory prepayment of the Loans shall not constitute a postponement of any date scheduled for the payment of principal or interest or decrease or waiver), (ii) increase or extend the Term Loan Commitment of any Lender without the prior written consent of such Lender (it being understood that a waiver of any condition precedent or of any Default, mandatory prepayment or mandatory reduction of the Term Loan Commitments shall not constitute an extension or increase of any Term Loan Commitment of any Lender), (iii) amend or modify the pro rata requirements of Section 2.14, the provisions of Section 10.04(j) or the provisions of this Section or release all or substantially all of the Guarantors (other than in connection with the sale of such Guarantors in a transaction permitted by Section 7.04 or 7.05) or all or substantially all of the Collateral or of the Term Priority Collateral (other than as permitted hereby), without the prior written consent of each Lender directly adversely affected thereby (or, in the case of Section 10.04(j), each Lender), (iv) change the provisions of any Loan Document in a manner that by its terms adversely affects the rights of Lenders holding Loans of one Class differently from the rights of Lenders holding Loans of any other Class without the prior written consent of the Required Class Lenders with respect to each adversely affected Class, (v) modify the protections afforded to an SPV pursuant to the provisions of Section 10.04(i) without the written consent of such SPV, (vi) reduce the percentage contained in the definition of the term "Required Lenders" without the prior written consent of each Lender (it being understood that, with the consent of the Required Lenders (if such consent is otherwise required), additional extensions of credit pursuant to this Agreement may be included in the determination

80

of the Required Lenders on substantially the same basis as the Term Loan Commitments on the Closing Date),(vii) modify the definition of "Required Class Lenders" without the consent of the Required Class Lenders with respect to each Class of Loans or Term Loan Commitments or (viii) change or have the effect of changing pro rata treatment of any payments (including voluntary and mandatory prepayments) without the prior written consent of each Lender directly adversely affected thereby; *provided further* that no Lender consent is required to effect any amendment expressly contemplated by Section 7.12; *provided further* that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent or the Collateral Agent hereunder or under any other Loan Document without the prior written consent of the Administrative Agent or the Collateral Agent, as applicable.

(c)    The Administrative Agent and the Borrowers may amend any Loan Document to correct administrative errors or omissions, or to effect administrative changes that are not adverse to any Lender. Notwithstanding anything to the contrary contained herein, such amendment shall become effective without any further consent of any other party to such Loan Document.

(d)    Notwithstanding anything set forth herein, in connection with a sale or other disposition under Section 363 of the Bankruptcy Code, the Agents and the Lenders agree that, at the direction of the Required Lenders, the Administrative Agent shall 'credit bid' any amount of the Obligations as directed by the Required Lenders.

Section 10.09. *Interest Rate Limitation.* Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable Law (collectively the "**Charges**"), shall exceed the maximum lawful rate (the "**Maximum Rate**") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan or participation in accordance with applicable Law, the rate of interest payable in respect of such Loan or participation hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan or participation but were not payable as a result of the operation of this Section 10.09 shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or participations or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

Section 10.10. *Entire Agreement.* This Agreement, the Fee Letter and the other Loan Documents constitute the entire contract between the parties relative to the subject matter hereof. Any other previous agreement among the parties with respect to the subject matter hereof is superseded by this Agreement and the other Loan Documents. Nothing in this Agreement or in the other Loan Documents, expressed or implied, is intended to confer upon any Person (other than the parties hereto and thereto, their respective successors and assigns permitted hereunder and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent, the Collateral Agent and the Lenders) any rights, remedies, obligations or liabilities under or by reason of this Agreement or the other Loan Documents.

Section 10.11. *WAIVER OF JURY TRIAL.* EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.11.

Section 10.12. *Severability.* In the event any one or more of the provisions contained in this Agreement or in any other Loan Document should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be

affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction). The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

Section 10.13. *Counterparts.* This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original but all of which when taken together shall constitute a single contract, and shall become effective as provided in Section 10.03. Delivery of an executed signature page to this Agreement by facsimile or other electronic imaging transmission shall be as effective as delivery of a manually signed counterpart of this Agreement.

Section 10.14. *Headings.* Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

Section 10.15. *Jurisdiction; Consent to Service of Process.* (a) ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT SHALL BE BROUGHT IN THE BANKRUPTCY COURT, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH LOAN PARTY HEREBY IRREVOCABLY ACCEPTS IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE BANKRUPTCY COURT. EACH LOAN PARTY HEREBY IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF THE BANKRUPTCY COURT AND IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO THE BORROWER AGENT AT ITS ADDRESS FOR NOTICES AS SET FORTH HEREIN. THE LOAN PARTIES AGREE THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE ADMINISTRATIVE AGENT AND THE LENDERS TO SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANY LOAN PARTY IN ANY OTHER JURISDICTION. EACH LOAN PARTY HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE JURISDICTION OR LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN SUCH COURT AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. TO THE EXTENT THAT ANY LOAN PARTY HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY FROM JURISDICTION OF ANY COURT OR FROM ANY LEGAL PROCESS (WHETHER THROUGH SERVICE OR NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OR OTHERWISE) WITH RESPECT TO ITSELF OR ITS PROPERTY, EACH LOAN PARTY HEREBY IRREVOCABLY WAIVES SUCH IMMUNITY IN RESPECT OF ITS OBLIGATIONS UNDER THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS.

(b)    Each of the parties hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the other Loan Documents in any New York State or Federal court. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(c)    Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 10.01. Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

Section 10.16. *Confidentiality.* Each of the Administrative Agent, the Collateral Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' officers, directors, employees and agents, including accountants, legal counsel

and other advisors on a "need to know" basis (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority or quasi-regulatory authority (such as the National Association of Insurance Commissioners), (c) to the extent required by applicable Laws or regulations or by any subpoena or similar legal process, (d) in connection with the exercise of any remedies hereunder or under the other Loan Documents or any suit, action or proceeding relating to the enforcement of its rights hereunder or thereunder, (e) subject to an agreement containing provisions substantially the same as those of this Section 10.16, to (i) any actual or prospective assignee of or participant in any of its rights or obligations under this Agreement and the other Loan Documents or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrowers or any Subsidiary or any of their respective obligations, (f) with the consent of the Borrowers, (g) to the extent such Information becomes publicly available other than as a result of a breach of this Section 10.16 or (h) to the extent necessary or advisable in connection with the Special Indemnity Grantor's obligations set forth in Section 10.23 hereof.  For the purposes of this Section, "**Information**" shall mean all information received from the Borrowers or Holdings and related to the Borrowers or Holdings or their business, other than any such information that was available to the Administrative Agent, the Collateral Agent or any Lender on a nonconfidential basis prior to its disclosure by the Borrowers or Holdings; *provided* that, in the case of Information received from the Borrowers or Holdings after the Closing Date, such information is clearly identified at the time of delivery as confidential or is delivered pursuant to Section 6.01, 6.02 or 6.03 hereof.  Any Person required to maintain the confidentiality of Information as provided in this Section 10.16 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord its own confidential information. For the avoidance of doubt, Lenders shall be able to share Information (A) with any Designated Purchaser (as defined in the Stalking Horse Agreement), and such Designated Purchaser's Affiliates, and/ or its Affiliates' equity owners, directors, officers, employees, representatives, advisors, and actual or potential financing sources and co-investors and (B) with any actual or potential bidder that is approved by the Borrowers pursuant to Section 3.19 of the Stalking Horse Agreement (and such actual or  potential bidder's Affiliates, and/ or its Affiliates' equity owners, directors, officers, employees, representatives, advisors, and actual or potential financing sources and co-investors).

Section 10.17.  *Lender Action.*  Each Lender agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any Loan Party or any other obligor under any of the Loan Documents (including the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures, with respect to any Collateral or any other property of any such Loan Party, unless expressly provided for herein or in any other Loan Document, without the prior written consent of the Administrative Agent.  The provisions of this Section 10.17 are for the sole benefit of the Lenders and shall not afford any right to, or constitute a defense available to, any Loan Party.

Section 10.18.  *USA PATRIOT Act Notice.*  Each Lender and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies Holdings and the Borrowers that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies Holdings and the Borrowers, which information includes the name and address of Holdings and the Borrowers and other information that will allow such Lender or the Administrative Agent, as applicable, to identify Holdings and the Borrowers in accordance with the USA PATRIOT Act.

Section 10.19.  *Collateral And Guaranty Matters.*  The Lenders irrevocably agree:

(a)      that any Lien on any property granted to or held by the Administrative Agent or the Collateral Agent under any Loan Document shall be automatically released (i) upon termination of all Term Loan Commitments hereunder and payment in full of all Obligations (other than contingent obligations not yet accrued or payable (in each case solely to the extent expressly permitted hereunder)), (ii) at the time the property subject to such Lien is Disposed as part of or in connection with any Disposition permitted hereunder or under any other Loan Document to any Person other than a Person required to grant a Lien to the Administrative Agent or the Collateral Agent under the Loan Documents (or, if such transferee is a Person required to grant a Lien to the Administrative Agent or the

Collateral Agent on such asset, at the option of the applicable Loan Party, such Lien on such asset may still be released in connection with the transfer so long as (x) the transferee grants a new Lien to the Administrative Agent or Collateral Agent on such asset substantially concurrently with the transfer of such asset, (y) the transfer is between parties organized under the laws of different jurisdictions and at least one of such parties is a Foreign Subsidiary and (z) the priority of the new Lien is the same as that of the original Lien), (iii) subject to Section 10.08, if the release of such Lien is approved, authorized or ratified in writing by the Required Lenders or (iv) if the property subject to such Lien is owned by a Guarantor, upon release of such Guarantor from its obligations under its Guaranty pursuant to Section 11.10;

(b)    *[Reserved]*; and

(c)    that any Guarantor shall be automatically released from its obligations under the Guaranty as provided in Section 11.10.

Upon request by the Administrative Agent or the Collateral Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's or the Collateral Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guaranty pursuant to this Section 10.19.  In each case as specified in this Section 10.19, the Administrative Agent or the Collateral Agent will (and each Lender irrevocably authorizes the Administrative Agent and the Collateral Agent to), at the Borrowers' expense, execute and deliver to the applicable Loan Party such documents as the Lead Borrower may reasonably request to evidence the release or subordination of such item of Collateral from the assignment and security interest granted under the Collateral Documents, or to evidence the release of such Guarantor from its obligations under the Guaranty, in each case in accordance with the terms of the Loan Documents and this Section 10.19.

Notwithstanding the foregoing, no Lien or Guarantor shall be released or extinguished unless in accordance with a disposition pursuant to the Required Liquidation or otherwise permitted by the Bankruptcy Court.

Section 10.20.  *[Reserved].*

Section 10.21.    *Payments Set Aside.*  To the extent that any payment by or on behalf of the Borrowers or any other Loan Party is made to any Agent or any Lender, or any Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall, to the fullest extent possible under provisions of applicable Law, be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share of any amount so recovered from or repaid by any Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the applicable Federal Funds Effective Rate from time to time in effect.

Section 10.22.  *No Advisory or Fiduciary Responsibility.*

(a)    In connection with all aspects of each transaction contemplated hereby, each party hereto acknowledges and agrees, and acknowledges its Affiliates' understanding, that (i) the facilities provided for hereunder and any related arranging or other services in connection therewith (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document) are an arm's-length commercial transaction between the Borrowers and its Affiliates, on the one hand, and the Agents and the Lenders, on the other hand, and the Borrowers and its Affiliates are capable of evaluating and understanding and understands and accepts the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents (including any amendment, waiver or other modification hereof or thereof), (ii) in connection with the process leading to such

84

transaction, each of the Agents and the Lenders is and has been acting solely as a principal and is not the financial advisor, agent or fiduciary, for the Borrowers or any of its Affiliates, stockholders, creditors or employees or any other Person, (iii) none of the Agents or the Lenders has assumed or will assume an advisory, agency or fiduciary responsibility in favor of the Borrowers or any of its Affiliates with respect to any of the transactions contemplated hereby or the process leading thereto, including with respect to any amendment, waiver or other modification hereof or of any other Loan Document (irrespective of whether any Agent or Lender has advised or is currently advising the Borrowers or any of its Affiliates on other matters) and none of the Agents or the Lenders has any obligation to the Borrowers or any of its Affiliates with respect to the financing transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents, (iv) the Agents, the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from, and may conflict with, those of the Borrowers and its Affiliates, and none of the Agents or the Lenders has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship and (v) the Agents and the Lenders have not provided and will not provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any other Loan Document) and the Loan Parties have consulted their own legal, accounting, regulatory and tax advisors to the extent they have deemed appropriate. Each Loan Party hereby waives and releases, to the fullest extent permitted by law, any claims that it may have against the Agents and the Lenders with respect to any breach or alleged breach of agency or fiduciary duty under applicable Law relating to agency and fiduciary obligations.

(b)    Each Loan Party acknowledges and agrees that each Lender and any affiliate thereof may lend money to, invest in, and generally engage in any kind of business with, any of the Borrowers, Holdings, any Affiliate thereof or any other person or entity that may do business with or own securities of any of the foregoing, all as if such Lender or Affiliate thereof were not a Lender (or an agent or any other person with any similar role under the Term DIP Facilities) and without any duty to account therefor to any other Lender, Holdings, the Borrowers or any Affiliate of the foregoing. Each Lender and any affiliate thereof may accept fees and other consideration from Holdings, the Borrowers or any Affiliate thereof for services in connection with this Agreement, the Facilities, the commitment letter or otherwise without having to account for the same to any other Lender, Holdings, the Borrowers, any investor or any Affiliate of the foregoing.

Section 10.23. *Special Indemnity Obligation.*

(a)    During the Special Indemnity Period, the Special Indemnity Grantor agrees to indemnify and reimburse the Special Indemnity Beneficiaries, solely to the extent that the Company does not have sufficient assets to satisfy all administrative expenses arising under the Chapter 11 Cases, for any Qualifying Special Indemnity Losses in an aggregate amount not to exceed the Special Indemnity Cap; underlined provided, that the Special Indemnity Grantor shall be assigned, and, entitled to exercise to the fullest extent permitted under Applicable Law, any and all rights of subrogation against any applicable insurance providers of Qualifying Insurance Policies. Notwithstanding anything herein to the contrary, the Special Indemnity Beneficiaries shall be express third party beneficiaries of this Agreement solely for the purpose of (and only to the extent necessary for) enforcing their rights under this Section 10.23. Notwithstanding anything to the contrary herein, this provision and the definitions used herein shall survive termination of this Agreement until, but in any event not later than the last day of the Special Indemnity Period.

(b)    Each of the parties hereto hereby acknowledge that none of the Special Indemnity Grantor, Administrative Agent or any of the Lenders or any of their Affiliates party hereto have instructed or directed in any way the Company, the Loan Parties, the Special Indemnity Beneficiaries, or any of their Related Parties, now or in the future, to take any action to (i) deliver any notices under the WARN Act in the Chapter 11 Cases, or (ii) terminate any employee, including, for the avoidance of doubt, the timing or manner of such termination or any severance, bonus or other amounts payable in connection therewith, and neither the Special Indemnity Grantor, nor any of its officers, directors, partners, employees or agents are liable in any way to the Company, any Loan Party or any Special Indemnity Beneficiary or any third parties as a result of the foregoing.

(c)    The Company shall notify the Administrative Agent for the benefit of the Special Indemnity Grantor in writing within three (3) Business Days of receipt of any claims, demands, actions or causes of action which could

85

result in Qualifying Special Indemnity Losses, whether asserted in a legal, judicial, arbitral or administrative proceeding or action or by notice without institution of such legal, judicial, arbitral or administrative proceeding or action. At any time following the receipt of such written notice by the Administrative Agent, and solely to the extent not prohibited under any applicable Qualifying Insurance Policy, the Special Indemnity Grantor may, at its own expense, in its discretion, and upon prior written notice to such Indemnified Party, assume on behalf of the Company and/or Special Indemnity Beneficiary and conduct with due diligence and in good faith the defense of such claim with counsel selected by Special Indemnity Grantor in its sole discretion.  Neither the Company, nor any Loan Party or Special Indemnity Beneficiary shall enter into any binding settlement agreement in connection with any such claim without the express written consent of the Special Indemnity Grantor.

Section 10.24.   *Acknowledgement and Consent to Bail-In of EEA Financial Institutions.* Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)   the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder that may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)   the effects of any Bail-In Action on any such liability, including, if applicable:

(i)   a reduction in full or in part or cancellation of any such liability;

(ii)   a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)   the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

Section 10.25.   *Conflicts*.   If any provision in this Agreement or any other Loan Document expressly conflicts with any provision in the Interim Order or Final Order, the provisions in the Interim Order or Final Order shall govern and control.

# ARTICLE 11
### GUARANTEE

Section 11.01.   *The Guarantee.*  Each Guarantor hereby jointly and severally with the other Guarantors guarantees, as a primary obligor and not as a surety to each Secured Party and their respective successors and permitted assigns, the prompt payment in full when due (whether at stated maturity, by required prepayment, declaration, demand, by acceleration or otherwise) of the principal of and interest on the Loans made by the Lenders to, the Borrowers, and all other Obligations from time to time owing to the Secured Parties by any other Loan Party under any Loan Document strictly in accordance with the terms thereof (such obligations being herein collectively called the "**Guaranteed Obligations**"); provided that the Guaranteed Obligations of any Guarantor shall in no event include any Excluded Swap Obligations (as defined in the Prepetition Term Loan Agreement) of such Guarantor. The Guarantors hereby jointly and severally agree that if the Borrowers or other Guarantor(s) shall fail to pay in full when due (whether at stated maturity, by acceleration or otherwise) any of the Guaranteed Obligations, the Guarantors will promptly pay the same in cash, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Guaranteed Obligations, the same will be promptly paid

in full when due (whether at extended maturity, by acceleration or otherwise) in accordance with the terms of such extension or renewal.

Section 11.02. *Obligations Unconditional.* The obligations of the Guarantors under Section 11.01 shall constitute a guaranty of payment and to the fullest extent permitted by applicable Law, are absolute, irrevocable and unconditional, joint and several, irrespective of the value, genuineness, validity, regularity or enforceability of the Guaranteed Obligations of the Borrowers or any other Guarantor under this Agreement, or any other agreement or instrument referred to herein, or any substitution, release or exchange of any other guarantee of or security for any of the Guaranteed Obligations, and, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or Guarantor (except for payment in full). Without limiting the generality of the foregoing, it is agreed that the occurrence of any one or more of the following shall not alter or impair the liability of the Guarantors hereunder which shall remain absolute, irrevocable and unconditional under any and all circumstances as described above:

(a)     at any time or from time to time, without notice to the Guarantors, to the extent permitted by Law, the time for any performance of or compliance with any of the Guaranteed Obligations shall be extended, or such performance or compliance shall be waived;

(b)     any of the acts mentioned in any of the provisions of this Agreement or any other agreement or instrument referred to herein or therein shall be done or omitted;

(c)     the maturity of any of the Guaranteed Obligations shall be accelerated, or any of the Guaranteed Obligations shall be amended in any respect, or any right under the Loan Documents or any other agreement or instrument referred to herein or therein shall be amended or waived in any respect or any other guarantee of any of the Guaranteed Obligations or any security therefor shall be released or exchanged in whole or in part or otherwise dealt with;

(d)     any Lien or security interest granted to, or in favor of, any Secured Party or Agent as security for any of the Guaranteed Obligations shall fail to be perfected; or

(e)     the release of any other Guarantor pursuant to Section 11.10.

Section 11.03. *Certain Waivers. Etc.* The Guarantors hereby expressly waive diligence, presentment, demand of payment, protest and, to the extent permitted by Law, all notices whatsoever, and any requirement that any Secured Party exhaust any right, power or remedy or proceed against the Borrowers under this Agreement, or any other agreement or instrument referred to herein or therein, or against any other person under any other guarantee of, or security for, any of the Guaranteed Obligations.  The Guarantors waive, to the extent permitted by Law, any and all notice of the creation, renewal, extension, waiver, termination or accrual of any of the Guaranteed Obligations and notice of or proof of reliance by any Secured Party upon this Guarantee or acceptance of this Guarantee, and the Guaranteed Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred in reliance upon this Guarantee, and all dealings between the Borrowers and the Secured Parties shall likewise be conclusively presumed to have been had or consummated in reliance upon this Guarantee.  This Guarantee shall be construed as a continuing, absolute, irrevocable and unconditional guarantee of payment without regard to any right of offset with respect to the Guaranteed Obligations at any time or from time to time held by Secured Parties, and the obligations and liabilities of the Guarantors hereunder shall not be conditioned or contingent upon the pursuit by the Secured Parties or any other person at any time of any right or remedy against the Borrowers or against any other person which may be or become liable in respect of all or any part of the Guaranteed Obligations or against any collateral security or guarantee therefor or right of offset with respect thereto. This Guarantee shall remain in full force and effect and be binding in accordance with and to the extent of its terms upon the Guarantors and the successors and permitted assigns thereof, and shall inure to the benefit of the Secured Parties, and their respective successors and permitted assigns, notwithstanding that from time to time during the term of this Agreement there may be no Guaranteed Obligations outstanding.  Each Guarantor waives any rights and defenses that are or may become available to it by reason of §§ 2787 to 2855, inclusive, and §§ 2899 and 3433 of the

California Civil Code.  As provided in Section 10.07, the provisions of this Article 11 shall be governed by, and construed in accordance with, the laws of the State of New York.  The foregoing waivers and the provisions hereinafter set forth in this Article 11 which pertain to California law are included solely out of an abundance of caution, and shall not be construed to mean that any of the above-referenced provisions of California law are in any way applicable to this Article 11, to any other provision of this Agreement or to the Obligations.

Section 11.04.  *Reinstatement.*  The obligations of the Guarantors under this Article 11 shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of the Borrowers or other Loan Party in respect of the Guaranteed Obligations is rescinded or must be otherwise restored by any holder of any of the Guaranteed Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise.

Section 11.05.  *Subrogation; Subordination.*  Each Guarantor hereby agrees that until the payment and satisfaction in full in cash of all Guaranteed Obligations (other than contingent obligations) and the expiration and termination of the Term Loan Commitments of the Lenders under this Agreement it shall waive any claim and shall not exercise any right or remedy, direct or indirect, arising by reason of any performance by it of its guarantee in Section 11.01, whether by subrogation or otherwise, against the Borrowers or any other Guarantor of any of the Guaranteed Obligations or any security for any of the Guaranteed Obligations.  Any Indebtedness of any Loan Party to any Person that is not a Loan Party permitted pursuant to Section 7.03(b) shall be subordinated to such Loan Party's Obligations in the manner set forth in, and substantially in the form of, the Intercompany Note evidencing such Indebtedness.

Section 11.06.  *Remedies.*  The Guarantors jointly and severally agree that, as between the Guarantors and the Lenders, the obligations of the Borrowers under this Agreement may be declared to be forthwith due and payable as provided in Section 8.02 (and shall be deemed to have become automatically due and payable in the circumstances provided in Section 8.02) for purposes of Section 11.01, notwithstanding any stay, injunction or other prohibition preventing such declaration (or such obligations from becoming automatically due and payable) as against the Borrowers and that, in the event of such declaration (or such obligations being deemed to have become automatically due and payable), such obligations (whether or not due and payable by the Borrowers) shall forthwith become due and payable by the Guarantors for purposes of Section 11.01.

Section 11.07.  *Instrument for the Payment of Money.*  Each Guarantor hereby acknowledges that the guarantee in this Article 11 constitutes an instrument for the payment of money, and consents and agrees that any Secured Party or Agent, at its sole option, in the event of a dispute by such Guarantor in the payment of any moneys due hereunder, shall have the right to bring a motion-action under New York CPLR Section 3213.

Section 11.08.  *Continuing Guarantee.*  The guarantee in this Article 11 is a continuing guarantee of payment, and shall apply to all Guaranteed Obligations whenever arising.

Section 11.09.  *General Limitation on Guarantee Obligations.*  In any action or proceeding involving any state corporate, limited partnership or limited liability company law, or any applicable state, federal or foreign bankruptcy, insolvency, reorganization or other Law affecting the rights of creditors generally, if the obligations of any Guarantor under Section 11.01 would otherwise be held or determined to be void, voidable, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability under Section 11.01, then, notwithstanding any other provision to the contrary, the amount of such liability shall, without any further action by such Guarantor, any Loan Party or any other person, be automatically limited and reduced to the highest amount (after giving effect to the right of contribution established in Section 11.11) that is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceeding.

Section 11.10.  *Release of Guarantors.*

When all Term Loan Commitments hereunder have terminated, and all Loans or other Obligations hereunder which are accrued and payable have been paid or satisfied, this Agreement and the Guarantees made herein shall terminate with respect to all Obligations, except with respect to Obligations that expressly survive such repayment pursuant to the terms of this Agreement.

Notwithstanding the foregoing, no Guarantor shall be released unless in accordance with a disposition pursuant to the Required Liquidation or otherwise permitted by the Bankruptcy Court.

Section 11.11.  *Right of Contribution.*  Each Guarantor hereby agrees that to the extent that a Subsidiary Guarantor shall have paid more than its proportionate share of any payment made hereunder, such Subsidiary Guarantor shall be entitled to seek and receive contribution from and against any other Guarantor hereunder which has not paid its proportionate share of such payment.  Each Subsidiary Guarantor's right of contribution shall be subject to the terms and conditions of Section 11.05.  The provisions of this Section 11.11 shall in no respect limit the obligations and liabilities of any Subsidiary Guarantor to the Administrative Agent and the Secured Parties, and each Subsidiary Guarantor shall remain liable to the Administrative Agent and the Secured Parties for the full amount guaranteed by such Subsidiary Guarantor hereunder.

Section 11.12.  *Additional Guarantor Waivers and Agreements.*  (a) Each Guarantor understands and acknowledges that if the Collateral Agent or any other Secured Party forecloses judicially or nonjudicially against any real property security for the Obligations, that foreclosure could impair or destroy any ability that such Guarantor may have to seek reimbursement, contribution, or indemnification from the Borrowers or others based on any right such Guarantor may have of subrogation, reimbursement, contribution, or indemnification for any amounts paid by such Guarantor under the Guaranty.  Each Guarantor further understands and acknowledges that in the absence of this paragraph, such potential impairment or destruction of such Guarantor's rights, if any, may entitle such Guarantor to assert a defense to this Guaranty based on Section 580d of the California Code of Civil Procedure as interpreted in Union Bank v. Gradsky, 265 Cal. App. 2d 40 (1968).  By executing this Guaranty, each Guarantor freely, irrevocably, and unconditionally:  (i) waives and relinquishes that defense and agrees that such Guarantor will be fully liable under this Guaranty even though the Collateral Agent or any other Secured Party may foreclose, either by judicial foreclosure or by exercise of power of sale, any deed of trust securing the Obligations; (ii) agrees that such Guarantor will not assert that defense in any action or proceeding which the Administrative Agent, the Collateral Agent or any other Secured Party may commence to enforce this Guaranty; (iii) acknowledges and agrees that the rights and defenses waived by such Guarantor in this Guaranty include any right or defense that such Guarantor may have or be entitled to assert based upon or arising out of any one or more of §§ 580a, 580b, 580d, or 726 of the California Code of Civil Procedure or § 2848 of the California Civil Code; and (iv) acknowledges and agrees that the Secured Parties are relying on this waiver in creating the Obligations, and that this waiver is a material part of the consideration which the Secured Parties are receiving for creating the Obligations.

(b)    Each Guarantor waives all rights and defenses that such Guarantor may have because any of the Obligations is secured by real property.  This means, among other things: (i) the Administrative Agent, the Collateral Agent and the other Secured Parties may collect from such Guarantor without first foreclosing on any real or personal property collateral pledged by the other Loan Parties; and (ii) if the Collateral Agent or any other Secured Party forecloses on any real property collateral pledged by the other Loan Parties: (A) the amount of the Obligations may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price, and (B) the Administrative Agent, the Collateral Agent and the other Secured Parties may collect from such Guarantor even if the Secured Parties, by foreclosing on the real property collateral, have destroyed any right such Guarantor may have to collect from the Borrowers.  This is an unconditional and irrevocable waiver of any rights and defenses such Guarantor may have because any of the Obligations is secured by real property.  These rights and defenses include, but are not limited to, any rights or defenses based upon § 580a, 580b, 580d, or 726 of the California Code of Civil Procedure.

(c)    Each Guarantor waives any right or defense it may have at law or equity, including California Code of Civil Procedure § 580a, to a fair market value hearing or action to determine a deficiency judgment after a foreclosure.

*[Signature Pages Follow]*

## Exhibit C

**Redline of DIP Agreement against A&R DIP Agreement**

**EXECUTION VERSION**

*__As amended by that First Amendment to the DIP Credit Agreement,__*
*__dated as of February [__], 2019__*

**Milbank Comments to K&S DRAFT 2/13/19**

SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT

dated as of

January 18, 2019

among

GYMBOREE GROUP, INC., as Lead Borrower,

THE OTHER BORROWERS PARTY HERETO FROM TIME TO TIME
and, together with the Lead Borrower, as debtors and debtors-in-possession under Chapter 11 of
the Bankruptcy Code

GYMBOREE INTERMEDIATE CORPORATION, as Holdings,

THE OTHER GUARANTORS PARTY HERETO FROM TIME TO TIME,

THE LENDERS PARTY HERETO FROM TIME TO TIME

and

SPECIAL SITUATIONS INVESTING GROUP, INC.,

as Administrative Agent and Collateral Agent

33695309

# TABLE OF CONTENTS

| | Page |
|---|---|
| **ARTICLE 1** DEFINITIONS | 1 |
| Section 1.01 . *Defined Terms.* | 1 |
| Section 1.02 . *Other Interpretive Provisions.* | 24 |
| Section 1.03 . *Accounting Terms* | 25 |
| Section 1.04 . *[Reserved].* | 25 |
| Section 1.05 . *References to Agreements, Laws, Etc.* | 25 |
| Section 1.06 . *Times of Day.* | 25 |
| Section 1.07 . *Timing of Payment of Performance.* | 25 |
| Section 1.08 . *[Reserved].* | 25 |
| Section 1.09 . *[Reserved].* | 25 |
| Section 1.10 . *Certain Accounting Matters.* | 25 |
| Section 1.11 . *Classification of Loans and Borrowings.* | 25 |
| Section 1.12 . *Currency Equivalents Generally.* | 25 |
| **ARTICLE 2** THE CREDITS | 26 |
| Section 2.01 . *Commitments.* | 26 |
| Section 2.02 . *Loans* | 27 |
| Section 2.03 . *Borrowing Procedure.* | 27 |
| Section 2.04 . *Evidence of Debt.* | 28 |
| Section 2.05 . *Fees.* | 28 |
| Section 2.06 . *Interest on Loans.* | 28 |
| Section 2.07 . *Default Interest.* | 29 |
| Section 2.08 . *Alternate Rate of Interest.* | 29 |
| Section 2.09 . *Termination and Reduction of Commitments.* | 29 |
| Section 2.10 . *[Reserved].* | 29 |
| Section 2.11 . *Repayment of Term Borrowings.* | 29 |
| Section 2.12 . *Voluntary Prepayment* | 29 |
| Section 2.13 . *Mandatory Prepayments.* | 29 |
| Section 2.14 . *Pro Rata Treatment.* | 31 |
| Section 2.15 . *Sharing of Setoffs.* | 31 |
| Section 2.16 . *Payments.* | 31 |
| Section 2.17 . *Joint and Several Liability of Borrowers* | 32 |
| Section 2.18 . *No Discharge; Survival of Claims* | 33 |
| Section 2.19 . *[Reserved].* | 34 |
| Section 2.20 . *Waiver of any Pari or Priming Rights* | 34 |
| **ARTICLE 3** TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY | 34 |
| Section 3.01 . *Taxes* | 34 |
| Section 3.02 . *Illegality.* | 37 |
| Section 3.03 . *[Reserved].* | 37 |
| Section 3.04 . *Increased Cost and Reduced Return; Capital Adequacy; Reserves on Eurodollar Loans.* | 37 |
| Section 3.05 . *Funding Losses.* | 38 |
| Section 3.06 . *Matters Applicable to all Requests for Compensation.* | 38 |
| Section 3.07 . *[Reserved].* | 39 |
| Section 3.08 . *Survival.* | 40 |
| **ARTICLE 4** CONDITIONS PRECEDENT TO CREDIT EXTENSIONS | 40 |
| Section 4.01 . *Conditions Precedent to Closing Date.* | 40 |
| Section 4.02 . *Conditions to each Borrowing after the Closing Date.* | 41 |

**ARTICLE 5** REPRESENTATIONS AND WARRANTIES .......................................................... 42
Section 5.01 .  *Existence, Qualification and Power; Compliance with Laws.* .......................... 42
Section 5.02 .  *Authorization; No Contravention.* ................................................................. 42
Section 5.03 .  *Governmental Authorization; Other Consents.* .............................................. 43
Section 5.04 .  *Binding Effect.* ............................................................................................... 43
Section 5.05 .  *Financial Statements; No Material Adverse Effect.* ........................................ 43
Section 5.06 .  *Litigation.* ...................................................................................................... 43
Section 5.07 .  *Compliance With Laws; No Default.* .............................................................. 44
Section 5.08 .  *Ownership of Property; Liens; Casualty Events.* ........................................... 44
Section 5.09 .  *Environmental Matters.* ................................................................................. 44
Section 5.10 .  *Taxes* ............................................................................................................. 45
Section 5.11 .  *ERISA Compliance, Etc.* ................................................................................ 45
Section 5.12 .  *Subsidiaries* ................................................................................................... 45
Section 5.13 .  *Margin Regulations; Investment Company Act.* ............................................. 45
Section 5.14 .  *Disclosure* ..................................................................................................... 46
Section 5.15 .  *Labor Matters.* ............................................................................................... 46
Section 5.16 .  *Intellectual Property; Licenses, Etc* ............................................................... 46
Section 5.17 .  *[Reserved].* .................................................................................................... 46
Section 5.18 .  *[Reserved].* .................................................................................................... 46
Section 5.19 .  *Collateral Documents.* ................................................................................... 46
Section 5.20 .  *[Reserved].* .................................................................................................... 47
Section 5.21 .  *Sanctions; Anti-Corruption Laws; Anti-Money Laundering Laws.* ................ 47
Section 5.22 .  *Capitalization* ................................................................................................ 47
Section 5.23 .  *Chief Executive Office* .................................................................................... 47
Section 5.24 .  *Insurance* ....................................................................................................... 47
Section 5.25 .  *Deposit Accounts and Other Accounts* ........................................................... 48
Section 5.26 .  *Approved Budget* ............................................................................................ 48
Section 5.27 .  *Chapter 11 Cases; Orders.* ............................................................................ 48

**ARTICLE 6** AFFIRMATIVE COVENANTS ..................................................................... 49
Section 6.01 .  *Financial Statements, Reports, Etc.* ............................................................... 49
Section 6.02 .  *Certificates; Other Information.* ..................................................................... 49
Section 6.03 .  *Notices.* .......................................................................................................... 50
Section 6.04 .  *[Reserved].* .................................................................................................... 51
Section 6.05 .  *Preservation of Existence, Etc.* ...................................................................... 51
Section 6.06 .  *Maintenance of Properties.* ............................................................................ 51
Section 6.07 .  *Maintenance of Insurance.* ............................................................................. 51
Section 6.08 .  *Compliance with Laws.* .................................................................................. 52
Section 6.09 .  *Books and Records.* ....................................................................................... 52
Section 6.10 .  *Inspection Rights* ........................................................................................... 52
Section 6.11 .  *Additional Collateral.* .................................................................................... 52
Section 6.12 .  *Compliance with Environmental Laws.* .......................................................... 52
Section 6.13 .  *Further Assurances.* ....................................................................................... 52
Section 6.14 .  *[Reserved].* .................................................................................................... 53
Section 6.15 .  *[Reserved].* .................................................................................................... 53
Section 6.16 .  *[Reserved].* .................................................................................................... 53
Section 6.17 .   *Approved Budget and Variance Report.* ........................................................ 53
Section 6.18 *Update Calls.* .................................................................................................... 54
Section 6.19 . *Milestones* ...................................................................................................... 54
Section 6.20 .  *Collateral Proceeds.* ...................................................................................... 56
Section 6.21 .  *Bankruptcy Covenants.* .................................................................................. 56

ii

**ARTICLE 7** NEGATIVE COVENANTS                                                    57
    Section 7.01 . *Liens.*                                                        57
    Section 7.02 . *Investments.*                                                  59
    Section 7.03 . *Indebtedness.*                                                 59
    Section 7.04 . *Fundamental Changes.*                                          60
    Section 7.05 . *Dispositions.*                                                 60
    Section 7.06 . *Restricted Payments.*                                          61
    Section 7.07 . *Change in Nature of Business.*                                 61
    Section 7.08 . *Transactions with Affiliates.*                                 61
    Section 7.09 . *Burdensome Agreements.*                                        61
    Section 7.10 . *Use of Proceeds*                                               62
    Section 7.11 . *Negative Pledge.*                                              62
    Section 7.12 . *Fiscal Year*                                                   62
    Section 7.13 . *Prepayments, Etc. of Indebtedness.*                            62
    Section 7.14 . *Permitted Activities.*                                         62
    Section 7.15 . *[Reserved].*                                                   63
    Section 7.16 . *Chapter 11 Modifications.*                                     63
    Section 7.17 . *Segregated Operating Accounts and DIP Funding Accounts.*       63
    Section 7.18 . *Right of Subrogation*                                          63
    Section 7.19 . *Subsidiaries*                                                  63

**ARTICLE 8** EVENTS OF DEFAULT AND REMEDIES                                        64
    Section 8.01 . *Events of Default.*                                            64
    Section 8.02 . *Remedies Upon Event of Default.*                               67
    Section 8.03 . *Application of Funds.*                                         68

**ARTICLE 9** THE ADMINISTRATIVE AGENT AND THE COLLATERAL AGENT                     68

**ARTICLE 10** MISCELLANEOUS                                                        69
    Section 10.01 . *Notices; Electronic Communications*                          69
    Section 10.02 . *Survival of Agreement*                                        72
    Section 10.03 . *Binding Effect.*                                              72
    Section 10.04 . *Successors and Assigns.*                                      72
    Section 10.05 . *Expenses; Indemnity.*                                         75
    Section 10.06 . *[Reserved].*                                                  77
    Section 10.07 . *Applicable Law.*                                              77
    Section 10.08 . *Waivers; Amendment*                                           77
    Section 10.09 . *Interest Rate Limitation.*                                    78
    Section 10.10 . *Entire Agreement.*                                            78
    Section 10.11 . *WAIVER OF JURY TRIAL*                                         79
    Section 10.12 . *Severability.*                                                79
    Section 10.13 . *Counterparts.*                                                79
    Section 10.14 . *Headings.*                                                    79
    Section 10.15 . *Jurisdiction; Consent to Service of Process.*                 79
    Section 10.16 . *Confidentiality.*                                             80
    Section 10.17 . *Lender Action.*                                               80
    Section 10.18 . *USA PATRIOT Act Notice.*                                      81
    Section 10.19 . *Collateral And Guaranty Matters.*                             81
    Section 10.20 . *[Reserved].*                                                  81
    Section 10.21 . *Payments Set Aside.*                                          81
    Section 10.22 . *No Advisory or Fiduciary Responsibility.*                     82
    Section 10.23 . *Special Indemnity Obligation.*                                82

Section 10.24 .  *Acknowledgement and Consent to Bail-In of EEA Financial Institutions.* ............... 83
Section 10.25 .  *Conflicts.* ................................................................................................ 83

**ARTICLE 11** GUARANTEE ....................................................................................................... 84
Section 11.01 .  *The Guarantee.* ......................................................................................... 84
Section 11.02 .  *Obligations Unconditional.* ..................................................................... 84
Section 11.03 .  *Certain Waivers. Etc.* ............................................................................... 84
Section 11.04 .  *Reinstatement.* .......................................................................................... 85
Section 11.05 .  *Subrogation; Subordination.* .................................................................... 85
Section 11.06 .  *Remedies.* ................................................................................................. 85
Section 11.07 .  *Instrument for the Payment of Money.* ..................................................... 86
Section 11.08 .  *Continuing Guarantee.* ............................................................................ 86
Section 11.09 .  *General Limitation on Guarantee Obligations.* ....................................... 86
Section 11.10 .  *Release of Guarantors.* ............................................................................ 86
Section 11.11 .  *Right of Contribution.* .............................................................................. 86
Section 11.12 .  *Additional Guarantor Waivers and Agreements.* ..................................... 86

SCHEDULES

| | |
|---|---|
| 1.01 | Subsidiary Guarantors |
| 2.01 | Lenders and Term Loan Commitments |
| 5.05 | Certain Liabilities |
| 5.06 | Pending Litigation |
| 5.08 | Real Property |
| 5.09 | Environmental Matters |
| 5.10 | Taxes |
| 5.12 | Subsidiaries and Other Equity Interests |
| 5.12(b) | Ownership Interests |
| 5.15 | Labor Matters |
| 5.16(c) | Intellectual Property |
| 5.22 | Capitalization |
| 5.23 | Chief Executive Office |
| 5.25 | Deposit Accounts and Other Accounts |
| 7.01(b) | Existing Liens |
| 7.01(h) | Existing Leases |
| 7.02(c) | Existing Investments |
| 7.03(b) | Existing Indebtedness |
| 7.05(d) | Dispositions |
| 7.08 | Transactions with Affiliates |
| 7.09 | Certain Contractual Obligations |
| Schedule I | Approved Budget and Annex of Anticipated Ordinary Business Expense Shortfalls |

EXHIBITS

| | |
|---|---|
| Exhibit A | Form of Administrative Questionnaire |
| Exhibit B | Form of Assignment and Acceptance |
| Exhibit C | Form of Borrowing Notice |
| Exhibit D | Form of Intercompany Note |
| Exhibit E-1 | Form of United States Tax Compliance Certificate (For Non-U.S. Lenders that are not Partnerships) |
| Exhibit E-2 | Form of United States Tax Compliance Certificate (For Non-U.S. Lenders that are Partnerships) |
| Exhibit E-3 | Form of United States Tax Compliance Certificate (For Non-U.S. Participants that are not Partnerships) |
| Exhibit E-4 | Form of United States Tax Compliance Certificate (For Non-U.S. Participants that are Partnerships) |
| Exhibit F | Form of Variance Report |
| Exhibit G | Form of Term Note |
| Exhibit H | Form of Interim Order |

SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT, dated as of January 18, 2019, among GYMBOREE GROUP, INC., a Delaware corporation and a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code ("**Lead Borrower**" or the "**Company**"; and together with each other Person signatory hereto as a "Borrower" as of the date hereof (or that becomes a "Borrower" hereunder after the date hereof in accordance with the terms hereof), are referred to hereinafter each individually as a "**Borrower**", and individually and collectively, jointly and severally, as the "**Borrowers**"), GYMBOREE INTERMEDIATE CORPORATION, a Delaware corporation and a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code ("**Holdings**"), the other Guarantors party hereto from time to time, the Lenders (such term and each other capitalized term used but not defined in this introductory statement having the meaning given it in Article 1), and SPECIAL SITUATIONS INVESTING GROUP, INC., as administrative agent (in such capacity, including any successor thereto, the "**Administrative Agent**") and as collateral agent (in such capacity, including any successor thereto, the "**Collateral Agent**") for the Lenders.

WHEREAS, on January 16, 2019 (the "**Petition Date**"), the (i) Lead Borrower, Holdings, Gymboree Retail Stores, LLC, a California limited liability company, Gymboree Manufacturing, Inc., a California corporation, Gymboree Operations, Inc., a California corporation, Gym-Mark, Inc., a California corporation, Gym-Card, LLC, a Virginia limited liability company, Gymboree Wholesale, Inc., a California corporation, and Gymboree Distribution, Inc., a Delaware corporation (collectively the "**Debtors**" and each individually a "**Debtor**"), commenced Chapter 11 Case No. 19-30258 with the United State Bankruptcy Court for the Eastern District of Virginia (the "**Bankruptcy Court**"). The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

WHEREAS, prior to the Petition Date, the Lenders provided financing to the Borrowers pursuant to that certain Credit Agreement, dated as of September 29, 2017, by and among the Borrower, Holdings, the Prepetition Term Agent, the Lenders, and the other parties party thereto the (the "**Prepetition Term Loan Agreement**").

WHEREAS, the Borrowers have requested, and, upon the terms and conditions set forth in this Agreement, the Lenders have agreed to make available to the Borrowers, a secured, superpriority debtor-in-possession term loan facility in the maximum principal amount of $30,000,000 in the aggregate (the "**Term DIP Facility**"), for the purposes set forth herein;

WHEREAS, each Borrower and each Guarantor has agreed to secure all of their Obligations under the Loan Documents by granting the Administrative Agent, for the benefit of the Administrative Agent and the other Secured Parties, a security interest in and lien upon substantially all of their existing and after-acquired personal and real property (subject to the limitations contained in the Loan Documents and the Orders (as hereinafter defined));

WHEREAS, the Borrowers desire that all Obligations of the Borrowers under the Loan Documents will be joint and several (and guaranteed by each other) and that all of the Guarantors will guaranty all of the Obligations under the Loan Documents.

NOW, THEREFORE, in consideration of the premises and the mutual agreements contained herein, the parties hereto agree as follows:

# ARTICLE 1
## DEFINITIONS

Section 1.01.  *Defined Terms.*  As used in this Agreement, the following terms shall have the meanings specified below:

"**ABL Priority Collateral**" shall have the meaning assigned to such term in the Prepetition Intercreditor Agreement.

"**ABR**" when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

"**Acceptable Confirmation Order**" means an order of the Bankruptcy Court confirming an Acceptable Plan, in form and substance satisfactory to the Required Lenders in their reasonable discretion (as the same may be amended, supplemented, or modified from time to time after entry thereof with the consent of the Required Lenders in their reasonable discretion); *provided* that an order confirming a plan of reorganization that provides for the indefeasible payment in full in cash of the Term DIP Loans and the Prepetition Term Loans and a release of the Agents, the Lenders, the Prepetition Term Agent and the Prepetition Term Lenders shall be deemed an Acceptable Confirmation Order.

"**Acceptable Disclosure Statement**" means the disclosure statement relating to the Acceptable Plan that is satisfactory to the Required Lenders in their reasonable discretion (as the same may be amended, supplemented, or modified from time to time after the initial filing thereof with the consent of the Required Lenders in their reasonable discretion).

"**Acceptable Plan**" means the plan of reorganization or liquidation that is satisfactory to the Required Lenders in their reasonable discretion (as the same may be amended, supplemented, or modified from time to time after the initial filing thereof with the consent of the Required Lenders in their reasonable discretion); *provided* that a plan of reorganization that provides for the indefeasible payment in full in cash of the Term DIP Loans and the Prepetition Term Loans and a release of the Agents, the Lenders, the Prepetition Term Agent and the Prepetition Term Lenders shall be deemed an Acceptable Plan.

"**Account Control Agreement**" shall have the meaning set forth in Section 6.11(b).

"**Adjusted LIBO Rate**" shall mean, with respect to any Eurodollar Borrowing for any Interest Period, an interest rate per annum equal to the greater of (a) 2.00% per annum and (b) the LIBO Rate in effect for such Interest Period.

"**Administrative Agent**" shall have the meaning assigned to such term in the introductory statement to this Agreement.

"**Administrative Questionnaire**" shall mean an Administrative Questionnaire in the form of Exhibit A, or such other form as may be supplied from time to time by the Administrative Agent.

"**Affiliate**" shall mean, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"**Agency Agreement**" shall have the meaning set forth in Section 6.19(j).

"**Agents**" shall have the meaning assigned to such term in Article 9.

"**Agreement**" or "**this Agreement**" shall mean this Superpriority Secured Debtor-In-Possession Credit Agreement, as the same may be amended, supplemented or otherwise modified from time to time.

"**Alternate Base Rate**" shall mean, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus 1/2 of 1%, (c) the Adjusted LIBO Rate for a one month Interest Period on such day (or if such day is not a Business Day, the immediately preceding Business Day) plus 1.00% and (d) zero percent (0%) per annum; provided that, for the avoidance of doubt, the Adjusted LIBO Rate for any day shall be based on the rate determined on such day at approximately 11 a.m. (London time) by reference to the British Bankers' Association Interest Settlement Rates for deposits in Dollars (as set forth by any service selected by the Administrative Agent that has been nominated by the British Bankers' Association as an authorized vendor for the purpose of displaying such rates). If the

Administrative Agent shall have determined (which determination shall be conclusive absent manifest error) that it is unable to ascertain the Federal Funds Effective Rate for any reason, including the inability or failure of the Administrative Agent to obtain sufficient quotations in accordance with the terms of the definition thereof, the Alternate Base Rate shall be determined without regard to clause (b) of the preceding sentence until the circumstances giving rise to such inability no longer exist.  Any change in the Alternate Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate shall be effective on the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate, as the case may be.

**"Amended and Restated Fee Letter" means the amended and restated fee letter entered into on the First Amendment Effective Date, among the Lead Borrower, Holdings and the Administrative Agent.**

"**Anti-Corruption and Anti-Bribery Laws**" shall mean any and all applicable requirements of law related to the prevention of corruption and bribery, including, without limitation, the U.S. Foreign Corrupt Practices Act of 1977, as amended.

"**Anti-Terrorism and Anti-Money Laundering Laws**" shall mean any and all applicable requirements of law related to engaging in, financing, or facilitating terrorism or money laundering, including the PATRIOT Act, The Currency and Foreign Transactions Reporting Act (also known as the "Bank Secrecy Act", 31 U.S.C. §§5311-5330 and 12 U.S.C. §§1818(s), 1820(b) and 1951-1959), Trading With the Enemy Act (50 U.S.C. §1 et seq.), Executive Order 13224 (effective September 24, 2001) and each of the laws, regulations, and executive orders administered by OFAC (31 C.F.R., Subtitle B, Chapter V).

"**Anticipated Ordinary Business Expense Shortfalls**" shall mean the excess of anticipated ordinary course expenditures for the upcoming three-month period over the anticipated cash receipts available to be used for those expenditures. Such anticipated expenditures shall only qualify to the extent that they (i) are anticipated to be deductible by the Loan Parties under Section 162 of the Code, as determined by the Lenders in their reasonable discretion; or (ii) are for the payment of amounts included in the cost of goods sold. Anticipated Ordinary Business Expense Shortfalls shall not take into account professional fees, other non-recurring costs or expenses related to the Chapter 11 Cases or any Expenses (as such term is defined in the Agency Agreement) to the extent payable or reimbursable by the Agent pursuant to the terms of the Agency Agreement. As of the Closing Date, the Anticipated Ordinary Business Expense Shortfalls are as set forth on the Annex attached to Schedule I hereto, which such Annex shall be updated and delivered to the Administrative Agent concurrently with any update to the Approved Budget.

"**Applicable Margin**" shall mean, for any day (a) with respect to any Eurodollar (x) Class A DIP Loan, 8.25% per annum or (y) Class B New Money DIP Loan, 11.25% per annum and (b) with respect to any ABR (x) Class A DIP Loan, 7.25% per annum or (y) Class B New Money DIP Loan, 10.25% per annum.

"**Approved Budget**" means the budget prepared by the Borrower in the form of Schedule I and initially furnished to the Administrative Agent on the Closing Date and which has been approved by the Required Lenders on the date hereof, as the same may be updated, modified or supplemented from time to time and approved by the Administrative Agent as provided in Section 6.17.

"**Assignment and Acceptance**" shall mean an assignment and acceptance entered into by a Lender and an Eligible Assignee, and accepted by the Administrative Agent, in the form of Exhibit B or such other form as shall be approved by the Administrative Agent.

"**Assignment Taxes**" shall have the meaning assigned to such term in Section 3.01(b).

"**Attorney Costs**" shall mean and shall include all reasonable fees, expenses and disbursements of any law firm or other external legal counsel.

3

"**Attributable Indebtedness**" shall mean, on any date, in respect of any Capitalized Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP as in effect on the Closing Date.

"**Australian Dollars**" shall mean lawful money of Australia.

"**Bail-In Action**" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"**Bail-In Legislation**" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time that is described in the EU Bail-In Legislation Schedule.

"**Bankruptcy Code**" shall mean Title 11 of the United States Code (11 U.S.C. Section 101 et seq.) as now or hereafter in effect, or any successor thereto.

"**Bankruptcy Court**" shall have the meaning assigned to such term in the recitals to this Agreement.

"**Board**" shall mean the Board of Governors of the Federal Reserve System of the United States of America.

"**Borrower**" and "**Borrowers**" shall have the meaning assigned to such term in the introductory statement to this Agreement.

"**Borrower Materials**" shall have the meaning assigned to such term in Section 10.01(c).

"**Borrowing**" shall mean Loans of the same Class and Type made, converted or continued on the same date and as to which a single Interest Period is in effect.

"**Borrowing Notice**" shall mean a request by the Lead Borrower in accordance with the terms of Section 2.03 and substantially in the form of Exhibit C, or such other form as shall be approved by the Administrative Agent.

"**Budget Testing Date**" means the date that is the Friday of the first full week after the Closing Date by (no later than 5:00 p.m. (New York time)), and each subsequent Friday (no later than 5:00 p.m. (New York time)). For the avoidance of doubt, the first Budget Testing Date following the Closing Date shall be based on the First Test Period.

"**Business**" means the business of designing, manufacturing, procuring, marketing, licensing, selling (including through retail and outlet stores, concessions and e-commerce sites) and/or distributing contemporary apparel, footwear, and jeanswear products and related accessories (including jewelry and handbags) or any other business reasonably related to the foregoing.

"**Business Day**" shall mean any day other than a Saturday, Sunday or day on which banks in New York City are authorized or required by law to close; *provided, however*, that when used in connection with a Eurodollar Loan, the term "**Business Day**" shall also exclude any day on which banks are not open for dealings in Dollar deposits in the London interbank market.

"**Canadian Dollars**" shall mean lawful money of Canada.

"**Capitalized Leases**" shall mean all leases that have been or are required to be, in accordance with GAAP as in effect on the Closing Date, recorded as capitalized leases; *provided* that for all purposes hereunder the

amount of obligations under any Capitalized Lease shall be the amount thereof accounted for as a liability in accordance with GAAP as in effect on the Closing Date.

"**Carve-Out**" shall have the meaning assigned to such term in the Interim Order or the Final Order, as applicable.

"**Cash Equivalents**" shall mean any of the following types of Investments, to the extent owned by Holdings, the Borrowers or any Subsidiary:

(a)        Dollars, Australian Dollars, Canadian Dollars and euros;

(b)        in the case of any Foreign Subsidiary, such local currencies held by them from time to time in the ordinary course of business and not for speculation;

(c)        direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America), in each case maturing within one year from the date of issuance thereof;

(d)        investments in commercial paper maturing within 270 days from the date of issuance thereof and having, at such date of acquisition, the highest credit rating obtainable from S&P or from Moody's;

(e)        investments in demand deposits, certificates of deposit, banker's acceptances and time deposits maturing within one year from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, the Administrative Agent or any domestic office of any commercial bank organized under the laws of the United States of America or any State thereof that has a combined capital and surplus and undivided profits of not less than $500,000,000 and that issues (or the parent of which issues) commercial paper rated at least "Prime 1" (or the then equivalent grade) by Moody's or "A 1" (or the then equivalent grade) by S&P;

(f)        fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clause (c) above and entered into with a financial institution satisfying the criteria of clause (e) above;

(g)        investments in "money market funds" within the meaning of Rule 2a-7 of the Investment Company Act of 1940, as amended, substantially all of whose assets are invested in investments of the type described in clauses (a) through (e) above; and

(h)        other short-term investments utilized by Foreign Subsidiaries in accordance with normal investment practices for cash management in investments of a type analogous to the foregoing.

"**Casualty Event**" shall mean any event that gives rise to the receipt by the Borrowers or any Subsidiary of any insurance proceeds or condemnation awards in respect of any equipment, fixed assets or Real Property (including any improvements thereon) to replace or repair such equipment, fixed assets or Real Property or as compensation for such condemnation event.

"**CFC Holding Company**" shall have the meaning assigned to such term in the definition of "Excluded Subsidiary".

"**Change of Control**" shall be deemed to occur if:

(a)        any person or group other than Permitted Holders owns more than 50% of the outstanding economic and voting Equity Interests of Holdings; or

(b)        a "**change of control**" (or similar event) shall occur under any Indebtedness for borrowed money; or

(c)        except pursuant to a transaction permitted under this Agreement, Holdings ceases to beneficially own and control, directly or indirectly, 100% on a fully diluted basis of the economic and voting Equity Interests of the Borrower or any of its Subsidiaries.

"**Chapter 11 Cases**" shall mean the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the United States Bankruptcy Court for the Eastern District of Virginia.

"**Charges**" shall have the meaning assigned to such term in Section 10.09.

"**Class**" when used in reference to (a) any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are Term DIP Loans, and (b) any Lender, refers to whether such Lender has a Loan or Term Loan Commitment with respect to a particular Class of Loans or Term Loan Commitments.  For the avoidance of doubt, Class A DIP Loans and Class B New Money DIP Loans shall constitute separate Classes for purposes of this Agreement.

"**Class A Lender**" shall mean any Lender holding a Class A DIP Loan and/or a Class A New Money Commitment.

"**Class A DIP Loans**" shall mean the Class A New Money DIP Loans, if any, and the Roll-Up Loans.

"**Class A New Money Commitment**" shall mean, with respect to each Class A Lender, the commitment, if any, of such Lender to make a Class A New Money DIP Loan hereunder**, as may be increased pursuant to Section 2.01(c) and the First Amendment Effective Date Commitment**.

"**Class A New Money DIP Loans**" shall have the meaning set forth in Section 2.01(a).

"**Class B DIP Funding Account**" shall mean a segregated deposit account where Borrowers maintain the proceeds of any Class B New Money DIP Loans.

"**Class B Lender**" shall mean any Lender holding a Class B New Money Commitment.

"**Class B New Money Commitment**" shall mean, with respect to each Class B Lender, the commitment, if any, of such Lender to make a Class B New Money DIP Loan hereunder**, as may be increased pursuant to Section 2.01(c)**.

"**Class B New Money DIP Loans**" shall have the meaning set forth in Section 2.01(b).

"**Class B Segregated Operating Account**" shall mean the deposit account established by the Borrower for the purpose of receipt of the Class B Withdrawals.

"**Class B Withdrawal**" shall mean a disbursement of funds from the Class B DIP Funding Account.

"**Closing Date**" shall mean January 18, 2019.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"**Collateral**" shall mean all the "**Collateral**" as defined in any Collateral Document or any Order and any assets, property or proceeds that are subject to the Collateral and Guarantee Requirement.

"**Collateral Agent**" shall have the meaning assigned to such term in the introductory statement to this Agreement.

"**Collateral and Guarantee Requirement**" shall mean, at any time, the requirement that:

(a)       on the Closing Date the Administrative Agent and the Collateral Agent shall have received the Security Agreement and the Account Control Agreement, each duly executed by each Loan Party party thereto;

(b)       subject to the Orders and the Prepetition Intercreditor Agreement, the Obligations shall have been secured by a first-priority perfected security interest in substantially all of the Loan Parties' respective assets, both tangible and intangible, real and personal, and all proceeds thereof, including but not limited to (i) a valid and perfected first priority lien and security interest in the "Term Priority Collateral" (as such term is defined in the Prepetition Intercreditor Agreement)**, including, without limitation, the accounts of all of the Loan Parties that constitute Term Priority Collateral** and (ii) a second priority lien and security interest in the "ABL Priority Collateral" (as such term is defined in the Prepetition Intercreditor Agreement) (it being understood that ABL Priority Collateral shall exclude, in any event, all interests in Real Property, including, without limitation, leasehold interests in Real Property **and the accounts of all of the Loan Parties that constitute ABL Priority Collateral**), excluding in any event "Excluded Assets" (as defined in the Security Agreement); and

(c)       subject to the Orders and the Prepetition Intercreditor Agreement, the Obligations shall have been secured by a perfected security interest in, and mortgage lien on, substantially all tangible and intangible assets of the Borrowers and each Guarantor (including Equity Interests and intercompany debt, accounts, inventory, equipment, investment property, contract rights, IP Rights, other general intangibles, Real Property**, deposit accounts, securities accounts** and proceeds of the foregoing), in each case, subject to exceptions and limitations otherwise set forth in this Agreement and the Collateral Documents (to the extent appropriate in the applicable jurisdiction);

"**Collateral Documents**" shall mean, collectively, the Security Agreement, collateral assignments, security agreements, pledge agreements, Intellectual Property Security Agreements or other similar agreements delivered to the Administrative Agent or the Collateral Agent pursuant to Section 4.01, Section 6.11 or Section 6.13 and each of the other agreements, instruments or documents that creates or purports to create a Lien in favor of the Collateral Agent for the benefit of the Secured Parties.

**"Commitment Increase" shall have the meaning assigned to such term in Section 2.01(c).**

"**Committee**" shall mean the official committee of unsecured creditors appointed in the Chapter 11 Case.

"**Commodity Exchange Act**" shall mean the Commodity Exchange Act (7 U.S.C. § 1 *et seq*.), as amended from time to time, and any successor statute.

"**Communications**" shall have the meaning assigned to such term in Section 10.01(c).

"**Company**" shall have the meaning assigned to such term in the introductory statement to this Agreement.

"**Contractual Obligation**" shall mean, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"**Control**" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

7

"**Debtor Relief Laws**" shall mean the Bankruptcy Code of the United States and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**Debtor**" shall have the meaning assigned to such term in the preamble hereto.

"**Default**" shall mean any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"**DIP Funding Account**" shall mean **(i)** the General Purpose DIP Funding Account and the Class B DIP Funding Account, as applicable**, and (ii) solely for the purposes of funding any First Amendment DIP Loans, any other deposit account necessary to segregate the proceeds of the First Amendment DIP Loans pursuant to the terms of Section 7.10(a) hereof, which for the avoidance of doubt, shall be subject to a Account Control Agreement.**

"**DIP Termination Date**" shall mean the date that all Obligations will be due and payable in full in cash, unless otherwise agreed to by the Lenders in writing, which such date shall be the earliest of (i) the date that is two hundred and ten (210) calendar days after the Petition Date, (ii) the consummation of any sale of all or substantially all of the assets of the Debtors pursuant to Section 363 of the Bankruptcy Code (other than the sales contemplated by the Milestones contained herein), (iii) if the Final Order has not been entered, the date that is 35 calendar days after the Petition Date, (iv) the acceleration of the Loans and the termination of the Term Loan Commitments pursuant to an Event of Default, and (v) the substantial consummation of any plan of reorganization or liquidation in the Chapter 11 Cases.

"**Disposition**" or "**Dispose**" shall mean the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction and any sale or issuance of Equity Interests in a Subsidiary) of any property by any Person, including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"**Disqualified Equity Interests**" shall mean any Equity Interest that, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable and the termination of the Term Loan Commitments), (b) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests), in whole or in part, (c) provides for the scheduled payments of dividends in cash, or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is ninety-one (91) days after the Maturity Date; *provided* that if such Equity Interests are issued pursuant to a plan for the benefit of employees of Holdings (or any direct or indirect parent thereof), the Borrowers or their Subsidiaries or by any such plan to such employees, such Equity Interests shall not constitute Disqualified Equity Interests solely because it may be required to be repurchased by the Borrowers or their Subsidiaries, as applicable, in order to satisfy applicable statutory or regulatory obligations.

"**Dollars**" or "**$**" shall mean lawful money of the United States of America.

"**Domestic Subsidiary**" shall mean any Subsidiary that is organized under the Laws of the United States, any state thereof or the District of Columbia; *provided*, that Gymboree Island, LLC, a Puerto Rico entity, shall be deemed not to be a Domestic Subsidiary.

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in any EEA Member Country that is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country that is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country that is a subsidiary of an institution described in clause (a) or clause (b) of this definition and is subject to consolidated supervision with its parent.

"**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"**EEA Resolution Authority**" means any public administrative authority or any other Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Eligible Assignee**" shall mean (i) a Lender, (ii) an Affiliate of a Lender, (iii) a Related Fund of a Lender, and (iv) any other Person (other than a natural person) approved by the Administrative Agent.

"**Environmental Laws**" shall mean all former, current and future federal, state, local and foreign laws (including common law), treaties, regulations, rules, ordinances, codes, decrees, judgments, directives, orders (including consent orders), and agreements in each case, relating to the environment, natural resources, human health and safety or the presence, Release of, or exposure to, hazardous materials, or the generation, manufacture, processing, distribution, use, treatment, storage, transport, recycling or handling of, or the arrangement for such activities with respect to, hazardous materials.

"**Environmental Liability**" shall mean all liabilities, obligations, damages, losses, claims, actions, suits, judgments, orders, fines, penalties, fees, expenses and costs (including administrative oversight costs, natural resource damages and investigation or remediation costs), whether contingent or otherwise, arising out of or relating to (a) compliance or non-compliance with any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"**Environmental Permit**" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"**Equity Interests**" shall mean, with respect to any Person, all of the shares, interests, rights, participations or other equivalents (however designated) of capital stock of (or other ownership or profit interests or units in) such Person and all of the warrants, options or other rights for the purchase, acquisition or exchange from such Person of any of the foregoing (including through convertible securities).

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time.

"**ERISA Affiliate**" shall mean any trade or business (whether or not incorporated) that, together with a Loan Party or any Subsidiary, is treated as a single employer under Section 414(b) or (c) of the Code, or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"**ERISA Event**" shall mean (a) a Reportable Event; (b) the failure to satisfy the minimum funding standard with respect to a Plan within the meaning of Section 412 of the Code or Section 303 or 304 of ERISA, whether or not waived (unless such failure is corrected by the final due date for the plan year for which such failure occurred), (c) a determination that a Plan is or will be in "at risk" status (as defined in Section 303(i)(4) of ERISA or Section 430(i)(4) of the Code); (d) the receipt by a Loan Party, any Subsidiary or any of their respective ERISA Affiliates of notice pursuant to Section 305(b)(3)(D) of ERISA that a Multiemployer Plan is or will be in

"endangered status" or "critical status" (as defined in Section 305(b) of ERISA); (e) the filing pursuant to Section 431 of the Code or Section 304 of ERISA of an application for the extension of any amortization period; (f) the failure to timely make a contribution required to be made with respect to any Plan; (g) the filing of a notice to terminate any Plan if such termination would require material additional contributions in order to be considered a standard termination within the meaning of Section 4041(b) of ERISA; (h) the filing under Section 4041(c) of ERISA of a notice of intent to terminate any Plan or the termination of any Plan under Section 4041(c) of ERISA; (i) the filing pursuant to Section 412(c) of the Code of an application for a waiver of the minimum funding standard with respect to any Plan; (j) the incurrence by a Loan Party, any Subsidiary or any of their respective ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan, other than for the payment of Plan contributions or of premiums to the PBGC; (k) the receipt by a Loan Party, any Subsidiary or any of their respective ERISA Affiliates from the PBGC of any notice of an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan under Section 4042 of ERISA; (l) the receipt by a Loan Party, any Subsidiary or any of their respective ERISA Affiliates of any notice, or the receipt by any Multiemployer Plan from a Loan Party, any Subsidiary or any of their respective ERISA Affiliates of any notice, concerning the imposition of Withdrawal Liability; (m) the occurrence of any event or condition that constitutes grounds under ERISA for the termination of a Plan or the appointment of a trustee to administer a Plan; (n) any Foreign Benefit Event or (o) the occurrence of a nonexempt prohibited transaction (within the meaning of Section 406 of ERISA or Section 4975 of the Code) with respect to any Plan which could reasonably be expected to result in liability to a Loan Party, any Subsidiary or any of their respective ERISA Affiliates.

"**EU Bail-In Legislation Schedule**" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person).

"**Eurodollar**", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"**Event of Default**" shall have the meaning assigned to such term in Article 8.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Excluded Subsidiary**" shall mean (a) any Subsidiary that is not a wholly owned Subsidiary of a Borrower or a Guarantor, (b) [reserved], (c) any Subsidiary that is prohibited by applicable Law or Contractual Obligations existing on the Closing Date (or, in the case of any newly acquired Subsidiary, in existence at the time of acquisition but not entered into in contemplation thereof) from Guaranteeing the Obligations or if Guaranteeing the Obligations would require governmental (including regulatory) consent, approval, license or authorization, (d) any other Subsidiary with respect to which a guarantee could result in an adverse tax or regulatory consequence to Holdings or its Subsidiaries (including as a result of the operation of Section 956 of the Code as determined in good faith by the Lead Borrower, (e) any Subsidiary where the burden or cost of obtaining a guarantee (including any adverse tax or regulatory consequence) outweighs the benefit to the Lenders, as mutually determined by the Lead Borrower and the Administrative Agent, (f) any Foreign Subsidiary of a Borrower or of any other direct or indirect Domestic Subsidiary or Foreign Subsidiary, (g) any special purpose securitization vehicle (or similar entity), (h) any direct or indirect Domestic Subsidiary (x) that is treated as a disregarded entity for federal income tax purposes and (y) substantially all of the assets of which are (1) the Equity Interests of a Foreign Subsidiary (including, for this purpose, any debt or other instrument treated as equity for U.S. federal income tax purposes) in, or debt or other instrument issued by, one or more (A) non-U.S. subsidiaries, each of which is a "controlled foreign corporation" within the meaning of Section 957 of the Internal Revenue Code and/or (B) other CFC Holding Companies and (2) cash, cash equivalents and incidental assets related thereto held on a temporary basis (a "**CFC Holding Company**"); provided that, for the avoidance of doubt, a subsidiary that would otherwise qualify as a CFC Holding Company will not fail to qualify as a CFC Holding Company due to the temporary receipt of cash payments in respect of its stock or debt in a CFC Holding Company so long as such subsidiary promptly distributes

10

such cash), (i) any Domestic Subsidiary that is a Subsidiary of a Foreign Subsidiary that is a controlled foreign corporation within the meaning of Section 957 of the Code, and (j) any joint venture.

"**FATCA**" shall mean Sections 1471 through 1474 of the Code, as in effect on the Closing Date (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any applicable Treasury regulation promulgated thereunder or published administrative guidance implementing such Sections whether in existence on the Closing Date or promulgated or published thereafter, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities entered into in connection with the implementation of the foregoing.

"**Federal Funds Effective Rate**" shall mean, for any day, the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for the day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"**Fee Letter**" shall mean the Fee Letter dated January 18, 2019, among the Lead Borrower, Holdings and the Administrative Agent.

"**Fees**" shall have the meaning assigned to such term in Section 2.05.

"**Final Order**" means the final order of the Bankruptcy Court, approving the Term DIP Facility on a final basis, in form and substance satisfactory to the Administrative Agent and the Required Lenders in their sole discretion, as the same may be amended, modified or supplemented from time to time with the express written consent of the Required Lenders (and with respect to amendments, modifications or supplements that affect the rights or duties of the Administrative Agent).

"**Final Order Roll-Up Loan**" shall have the meaning assigned to such term in Section 2.01(a)(ii).

"**First Amendment DIP Loans**" shall have the meaning assigned to such term in Section 7.10(a).

"**First Amendment Designated Expenses**" shall have the meaning assigned to such term in Section 7.10(a).

"**First Amendment Effective Date Commitment**" shall mean, with respect to each Lender, the commitment, if any, of such Lender to make a Class A New Money DIP Loan on the First Amendment Effective Date.

"**First Test Period**" shall have the meaning assigned to such term in the definition of "Permitted Variance".

"**Foreign Benefit Event**" shall mean, with respect to any Foreign Pension Plan, (a) the existence of unfunded liabilities in excess of the amount permitted under any applicable law or in excess of the amount that would be permitted absent a waiver from applicable governmental authority, (b) the failure to make the required contributions or payments, under any applicable law, on or before the due date for such contributions or payments (including any applicable grace period), (c) the receipt of a notice by applicable Governmental Authority relating to the intention to terminate any such Foreign Pension Plan or to appoint a trustee or similar official to administer any such Foreign Pension Plan, in either case to protect the interests of the participants or to avoid any unreasonable deterioration of the financial condition of the Foreign Pension Plan or any unreasonable increase in liability with respect to the Foreign Pension Plan or alleging the insolvency of any such Foreign Pension Plan, (d) the incurrence by a Loan Party, any Subsidiary or any Affiliate of any liability under applicable law on account of the complete or partial termination of such Foreign Pension Plan or the complete or partial withdrawal of any

participating employer therein or (e) the occurrence of any transaction that is prohibited under any applicable law and that could reasonably be expected to result in the incurrence of any liability by a Loan Party, any Subsidiary or any Affiliate, other than for the payment of Foreign Pension Plan contributions or of premiums to the applicable Governmental Authority.

"**Foreign Lender**" shall mean any Lender that is organized under the laws of a jurisdiction other than that in which the Lead Borrower is located. For purposes of this definition, the United States of America, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"**Foreign Pension Plan**" shall mean any defined benefit plan described in Section 4(b)(4) of ERISA that under applicable law is required to be funded through a trust or other funding vehicle other than a trust or funding vehicle maintained exclusively by a Governmental Authority.

"**Foreign Subsidiary**" shall mean any direct or indirect Subsidiary of the Borrowers which is not a Domestic Subsidiary; *provided*, that Gymboree Canada shall be deemed to be a Foreign Subsidiary.

"**GAAP**" shall mean generally accepted accounting principles in the United States of America, as in effect from time to time; *provided, however*, that if the Lead Borrower notifies the Administrative Agent that the Borrowers request an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Lead Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then, if the Administrative Agent accepts such request from the Lead Borrower, such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith; *provided, further* that GAAP as applied herein with respect to Attributable Indebtedness and Capitalized Leases shall be GAAP as in effect on the Closing Date.

"**General Purpose DIP Funding Account**" shall mean a segregated deposit account where Borrowers maintain the proceeds of any Class A New Money DIP Loans.

"**General Purpose Segregated Operating Account**" means the deposit account established by the Borrower for the purpose of receipt of the General Purpose Withdrawal and proceeds of Term Priority Collateral.

"**General Purpose Withdrawal**" means a disbursement of funds from the General Purpose DIP Funding Account.

"**GOB and Lease Sale Motion**" shall have the meaning set forth in Section 6.19(j).

"**Governmental Authority**" shall mean any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, administrative tribunal, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"**Granting Lender**" shall have the meaning assigned to such term in Section 10.04(i).

 **"GS Lenders" shall mean Special Situations Investing Group, Inc. and Goldman Sachs Specialty Lending Holdings, Inc.**

"**Guarantee**" shall mean, as to any Person, without duplication, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other monetary obligation payable or performable by another Person (the "**primary obligor**") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or

advance or supply funds for the purchase or payment of) such Indebtedness or other monetary obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other monetary obligation of the payment or performance of such Indebtedness or other monetary obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other monetary obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other monetary obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other monetary obligation of any other Person, whether or not such Indebtedness or other monetary obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien) or (c) to be an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation; *provided* that the term "Guarantee" shall not include endorsements for collection or deposit, in either case in the ordinary course of business, or customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or disposition of assets permitted under this Agreement (other than such obligations with respect to Indebtedness). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith.  The term "**Guarantee**" as a verb has a corresponding meaning.

"**Guaranteed Obligations**" shall have the meaning specified in Section 11.01.

"**Guarantors**" shall mean (i) Holdings, (ii) each wholly owned Domestic Subsidiary of Borrowers as of the Closing Date (other than an Excluded Subsidiary) and (iii) each wholly owned Subsidiary that issues a Guarantee of the Obligations after the Closing Date pursuant to Section 6.11 (which Section 6.11, for the avoidance of doubt, does not require that any Excluded Subsidiary provide such a Guarantee) or otherwise.  For avoidance of doubt, the Borrowers may cause any Subsidiary that is not a Guarantor to Guarantee the Obligations by causing such Subsidiary to execute a joinder to this Agreement in form and substance reasonably satisfactory to the Administrative Agent, and any such Subsidiary shall be treated as a Guarantor hereunder for all purposes.

"**Guaranty**" shall mean, collectively, the guaranty of the Obligations by the Guarantors pursuant to this Agreement.

"**Gymboree Canada**" shall mean that certain Subsidiary of Holdings that is organized under the Laws of the province of New Brunswick, Canada as "Gymboree, Inc.".

"**Hazardous Materials**" shall mean (a) any petroleum products, distillates or byproducts and all other hydrocarbons, coal ash, radon gas, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, chlorofluorocarbons and all other ozone-depleting substances and (b) any chemical, material, substance or waste that is prohibited, limited or regulated by or pursuant to any Environmental Law.

"**Holdings**" shall have the meaning assigned to such term in the introductory statement to this Agreement.

"**Increase Date**" shall have the meaning assigned to such term in Section 2.01(c).

"**Indebtedness**" shall mean, as to any Person at a particular time, without duplication, all of the following:

(a)    all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)    the maximum amount (after giving effect to any prior drawings or reductions which may have been reimbursed) of all outstanding letters of credit (including standby and commercial), bankers' acceptances,

bank guaranties, surety bonds, performance bonds and similar instruments issued or created by or for the account of such Person;

(c)        net obligations of such Person under any Swap Contract;

(d)        all obligations of such Person to pay the deferred purchase price of property or services (other than (i) trade accounts payable in the ordinary course of business and (ii) liabilities accrued in the ordinary course);

(e)        indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements and mortgage, industrial revenue bond, industrial development bond and similar financings), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)        all Attributable Indebtedness; and

(g)        all obligations of such Person in respect of Disqualified Equity Interests; whether or not the foregoing would constitute indebtedness or a liability in accordance with GAAP;

(h)        the principal and interest portions of all rental obligations of such Person under any Synthetic Lease, tax retention operating lease, off-balance sheet loan or similar off-balance sheet financing where such transaction is considered borrowed money indebtedness for tax purposes but is classified as an operating lease in accordance with GAAP; and

(i)        to the extent not otherwise included above, all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or joint venturer, except to the extent such Person's liability for such Indebtedness is otherwise limited.  The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date.  The amount of Indebtedness of any Person for purposes of clause (e) that is limited in recourse to the property encumbered thereby shall be deemed to be equal to the lesser of (i) the aggregate unpaid amount of such Indebtedness and (ii) the fair market value of the property encumbered thereby as determined by such Person in good faith.

"**Indemnified Taxes**" shall have the meaning assigned to such term in Section 3.01(a).

"**Indemnitee**" shall have the meaning assigned to such term in Section 10.05(b).

"**Information**" shall have the meaning assigned to such term in Section 10.16.

"**Initial New Money DIP Loans**" shall have the meaning assigned to such term in Section 2.01(a)(ii).

"**Initial Roll-Up Loan**" shall have the meaning set forth in Section 2.01(a)(ii).

"**Intellectual Property Security Agreement**" shall have the meaning given to the term "Grant of Security Interest" in the Security Agreement.

"**Intercompany Note**" shall mean a promissory note substantially in the form of Exhibit D.

14

"**Interest Payment Date**" shall mean (a) with respect to any ABR Loan, the first Business Day of each calendar month, and (b) with respect to any Eurodollar Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part.

"**Interest Period**" shall mean, the period commencing on the date of such Borrowing and ending on the numerically corresponding day (or, if there is no numerically corresponding day, on the last Business Day) in the calendar month that is 1, 2 or 3 months thereafter (or any shorter period agreed by all applicable Lenders), as the Lead Borrower may elect; *provided, however*, that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, (b) any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period and (c) no Interest Period for any Loan shall extend beyond the maturity date of such Loan.  Interest shall accrue from and including the first day of an Interest Period to but excluding the last day of such Interest Period. For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made.

"**Interim Order**" means, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Cases after an interim hearing (assuming satisfaction of the standard prescribed in Section 324 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), together with all extensions, modifications, and amendments thereto, substantially in the form of Exhibit H hereto or otherwise in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders, which, among other matters but not by way of limitation, (i) authorizes, on an interim basis, the Borrowers and Guarantors to execute and perform under the terms of this Agreement and the other Loan Documents and (ii) approves the Initial Roll-Up Loan.

"**Interim Order Entry Date**" means the date on which the Interim Order shall have been entered on the docket of the Bankruptcy Court.

"**Investment**" shall mean, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests or debt or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of Indebtedness of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person, (c) the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person or (d) the purchase or other acquisition of a Store.  For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"**IP and Online Business Assets**" shall have the meaning set forth in Section 6.19(h).

"**IP and Online Business Bid Procedures Motion**" shall have the meaning set forth in Section 6.19(h).

"**IP and Online Business Bid Procedures Order**" shall have the meaning set forth in the Order.

"**IP and Online Business Sale**" shall have the meaning set forth in Section 6.19(h).

"**IP and Online Business Sale Motion**" shall have the meaning set forth in Section 6.19(h).

"**IP Rights**" has the meaning set forth in Section 5.16.

"**J&J Option**" shall have the meaning set forth in the Agency Agreement.

15

"**Laws**" shall mean, collectively, all international, foreign, federal, state and local laws (including common law), statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, requirements, and agreements with, any Governmental Authority.

"**Lease Rejection Motion**" shall have the meaning set forth in Section 6.19(i).

"**Lease Sale**" shall have the meaning set forth in Section 6.19(j).

"**Leasehold Property**" shall mean any leasehold interest of any Loan Party as lessee under any lease of Real Property.

"**Lender**" shall mean each Class A Lender and Class B Lender from time to time party hereto, together with their permitted successors and assigns.

"**LIBO Rate**" shall mean, with respect to any Eurodollar Borrowing for any Interest Period, the rate per annum determined by the Administrative Agent at approximately 11:00 a.m. (London time) on the date that is two Business Days prior to the commencement of such Interest Period by reference to the British Bankers' Association Interest Settlement Rates for deposits in Dollars (as set forth by any service selected by the Administrative Agent that has been nominated by the British Bankers' Association as an authorized information vendor for the purpose of displaying such rates) for a period equal to such Interest Period; *provided* that, to the extent that an interest rate is not ascertainable pursuant to the foregoing provisions of this definition, the "**LIBO Rate**" shall be the interest rate per annum determined by the Administrative Agent to be the average of the rates per annum at which deposits in Dollars are offered for such relevant Interest Period to major banks in the London interbank market in London, England by the Administrative Agent at approximately 11:00 a.m. (London time) on the date that is two Business Days prior to the beginning of such Interest Period.

"**Lien**" shall mean any mortgage, deed of trust, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to Real Property, and any Capitalized Lease or financing lease having substantially the same economic effect as any of the foregoing).

"**Loan**" shall mean any Term DIP Loan.

"**Loan Documents**" shall mean this Agreement and the Collateral Documents, the Fee Letter, the Prepetition Intercreditor Agreement, and any other agreement, instrument, report and other document executed and delivered pursuant hereto or thereto or otherwise evidencing or securing any Obligation.

"**Loan Parties**" shall mean, collectively, the Borrowers and each Guarantor.

"**Make-Whole Amount**" shall mean, with respect to certain prepayments of the Class A DIP Loans as provided in Section 2.13(e) hereof, made on or before the Maturity Date, an amount equal to (i) 4.25% of the aggregate principal amount of the Class A DIP Loans being prepaid on the date of prepayment plus (ii) all required interest payments that would have been due on the Class A DIP Loans being prepaid on the date of prepayment through and including the Maturity Date had such Class A DIP Loans not been so prepaid assuming that all such interest accrues at the Adjusted LIBO Rate (assuming a one-month Interest Period) plus the Applicable Margin for Eurodollar Loans.

"**Margin Stock**" shall have the meaning assigned to such term in Regulation U.

16

"**Master Agreement**" shall have the meaning specified in the definition of "**Swap Contract.**"

"**Material Adverse Effect**" shall mean a (a) material adverse effect on the ability of the Loan Parties (taken as a whole) to fully and timely perform any of their payment obligations under any Loan Document to which the Borrowers or any of the Loan Parties is a party; (b) material adverse effect on the rights and remedies available to the Lenders, the Administrative Agent or the Collateral Agent under any Loan Document; (c) material adverse effect on the legality, validity or enforceability of any Loan Document or the Orders or (d) material adverse effect on the perfection or priority of the Liens granted pursuant to the Loan Documents or the Orders (it being agreed that the commencement of the Chapter 11 Cases and the events leading up to the Chapter 11 Cases shall not be deemed to be a Material Adverse Effect).

"**Maturity Date**" means the DIP Termination Date.

"**Maximum Rate**" shall have the meaning assigned to such term in Section 10.09.

"**Milbank**" mean Milbank, Tweed, Hadley & McCloy LLP.

"**Moody's**" shall mean Moody's Investors Service, Inc., or any successor thereto.

"**Multiemployer Plan**" shall mean any multiemployer plan as defined in Section 4001(a)(3) of ERISA subject to the provisions of Title IV of ERISA to which a Loan Party, any Subsidiary or any of their respective ERISA Affiliates is an "employer" as defined in Section 3(5) of ERISA.

"**Net Proceeds**" shall mean:

(a)    100% of the cash proceeds actually received by the Borrowers or any of their Subsidiaries (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise ~~and~~**, including but not limited to any rent value adjustment or other purchase price adjustment of any kind, and** including casualty insurance settlements and condemnation and similar awards, but in each case only as and when received) from any Disposition or Casualty Event, net of (i) attorneys' fees, accountants' fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, required debt payments and required payments of other obligations that are secured by a senior Lien which is senior in priority of the Lien of the Term DIP Loans in such asset or property on the applicable asset or property (including without limitation principal amount, premium or penalty, if any, interest and other amounts) (other than pursuant to the Loan Documents), other expenses and brokerage, consultant and other fees actually incurred in connection therewith, (ii) in the case of any Disposition or Casualty Event by a non-wholly owned Subsidiary, the pro rata portion of the Net Proceeds thereof (calculated without regard to this clause (ii)) attributable to minority interests and not available for distribution to or for the account of the Borrowers or a wholly owned Subsidiary as a result thereof, (iii) taxes paid or reasonably estimated to be payable as a result thereof (provided, that if the amount of any such estimated taxes exceeds the amount of taxes actually required to be paid in cash in respect of such Disposition or Casualty Event, the aggregate amount of such excess shall constitute Net Proceeds at the time such taxes are actually paid), and (iv) the amount of any reasonable reserve established in accordance with GAAP against any adjustment to the sale price or any liabilities (other than any taxes deducted pursuant to clause (i) above) (x) related to any of the applicable assets and (y) retained by the Borrowers or any of their Subsidiaries including, without limitation, pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations (however, the amount of any subsequent reduction of such reserve (other than in connection with a payment in respect of any such liability) shall be deemed to be Net Proceeds of such Disposition or Casualty Event occurring on the date of such reduction); and

(b)    100% of the cash proceeds from the incurrence, issuance or sale by the Borrowers or any of their Subsidiaries of any Indebtedness, net of all taxes paid or reasonably estimated to be payable as a result thereof and fees (including investment banking fees and discounts), commissions, costs and other expenses, in each case

17

incurred in connection with such issuance or sale, *provided*, that, if the amount of any estimated taxes exceeds the amount of taxes actually required to be paid in cash, the aggregate amount of such excess shall constitute Net Proceeds at the time such taxes are actually paid.

For purposes of calculating the amount of Net Proceeds, fees, commissions and other costs and expenses payable to Holdings, the Borrowers or their Subsidiaries shall be disregarded.

"**New Money DIP Loans**" means Class A New Money DIP Loans and Class B New Money DIP Loans. The aggregate amount of the New Money DIP Loans **on the Closing Date** is $30 million.

"**New Money Term DIP Claims**" shall mean each Lender's claim for amounts owed pursuant to the New Money DIP Loans.

"**Obligations**" shall mean all advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party and its Subsidiaries arising under any Loan Document or otherwise with respect to any Loan, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Loan Party or Subsidiary of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding (or would accrue but for the operation of applicable Debtor Relief Laws), regardless of whether such interest and fees are allowed or allowable claims in such proceeding. Without limiting the generality of the foregoing, the Obligations of the Loan Parties under the Loan Documents (and of their Subsidiaries to the extent they have obligations under the Loan Documents) include (a) the obligation (including guarantee obligations) to pay principal, interest, reimbursement obligations, charges, expenses, fees, Attorney Costs, indemnities and other amounts payable by any Loan Party under any Loan Document and (b) the obligation of any Loan Party to reimburse any amount in respect of any of the foregoing that any Agent or Lender, in its sole discretion, may elect to pay or advance on behalf of such Loan Party.

"**OFAC**" means the Office of Foreign Assets Control of the U.S. Department of the Treasury and any successor Governmental Authority.

"**Order(s)**" means, as applicable, and as the context may require, the Interim Order or the Final Order.

"**Organization Documents**" shall mean (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"**Other Taxes**" shall have the meaning assigned to such term in Section 3.01(b).

"**Participant Register**" shall have the meaning assigned to such term in Section 10.04(f).

"**PBGC**" shall mean the Pension Benefit Guaranty Corporation referred to and defined in ERISA.

"**Permitted Holders**" shall mean means any holder, directly or indirectly, of Equity Interests in Holdings as of the Closing Date and expressly set forth on a list provided to the Administrative Agent on or prior to the Closing Date.

"**Permitted Variance**" shall mean (A) all favorable variances, (B) with respect to actual disbursements made to the Loan Parties' professionals, a variance of no more than 10% on a cumulative basis for each rolling two

week period, (C) with respect to net cash flow (excluding disbursements with respect to the Lenders' professionals) a variance of no more than 10% on a weekly basis, (D) with respect to actual cash receipts, a variance of no more than 10% on a weekly basis (excluding Initial US Guaranty Payments and Initial Canadian Guaranty Payments (each as defined in the Agency Agreement)), and (E) with respect to actual disbursements (other than disbursements specified in clause (A) of this definition and disbursements with respect to the Lenders' professionals) a variance of no more than 7.5% on a weekly basis (each such period, a "**Testing Period**"). The Permitted Variance with respect to each Testing Period shall be determined and reported to the Administrative Agent and the Lenders not later than the Budget Testing Date that concludes such Testing Period.  Additional variances, if any, from the Approved Budget, and any proposed changes to the Approved Budget, shall be subject to the approval of the Administrative Agent as provided in Section 6.17. For the avoidance of doubt, the first Testing Period following the Closing Date shall begin on the Petition Date and continue through and including the Friday of the first full week after the Closing Date (the "**First Test Period**").

"**Person**" shall mean any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"**Petition Date**" shall have the meaning specified in the preamble hereto.

"**Plan**" shall mean any employee pension benefit plan subject to the provisions of Title IV of ERISA or Sections 412 and 430 of the Code or Sections 302 and 303 of ERISA and in respect of which a Loan Party, any Subsidiary or any of their respective ERISA Affiliates is (or if such plan were terminated would under Section 4069 of ERISA be deemed to be) a "contributing sponsor" as defined in Section 4001(a)(13) of ERISA.

"**Platform**" shall have the meaning assigned to such term in Section 10.01(c).

"**Post-Petition**" means the time period commencing immediately upon the filing of the applicable Chapter 11 Case.

"**Prepetition**" means the time period immediately prior to the filing of the applicable Chapter 11 Case.

"**Prepetition ABL Agent**" means (i) Bank of America, N.A. in its capacity as administrative agent under any of the Prepetition ABL Documents, or (ii) any successor administrative agent.

"**Prepetition ABL Collateral Agreement**" means the "Security Agreement", dated as of September 29, 2017 (as amended and supplemented from time to time) by and among the Loan Parties and the Prepetition ABL Agent.

"**Prepetition ABL Collateral Documents**" means, collectively, the Prepetition ABL Collateral Agreement, each of the mortgages, collateral assignments, supplements to all of the foregoing, security agreements, pledge agreements, control agreements or other similar agreements delivered to the Prepetition ABL Agent in connection with the Prepetition ABL Credit Agreement, and each of the other agreements, instruments or documents (including, without limitation, patent, trademark or copyright filings) that creates or purports to create a Lien in favor of the Prepetition ABL Agent for the benefit of the Prepetition ABL Lenders.

"**Prepetition ABL Credit Agreement**" means that certain Amended and Restated Credit Agreement, dated as of September 29, 2017, by and among the Borrower, the Guarantors party thereto, the Prepetition ABL Agent and the Prepetition ABL Lenders, as amended, restated, supplemented or otherwise modified from time to time.

"**Prepetition ABL Documents**" means the Prepetition ABL Credit Agreement, the Prepetition ABL Collateral Documents and each of the other agreements, instruments or documents executed pursuant thereto.

"**Prepetition ABL Indebtedness**" shall mean Indebtedness of Holdings, the Borrower, or any Subsidiary outstanding, or secured, under the Prepetition ABL Documents.

"**Prepetition ABL Lenders**" means the lenders party to the Prepetition ABL Credit Agreement, from time to time, under and as defined in the Prepetition ABL Credit Agreement.

"**Prepetition Intercreditor Acknowledgment**" means that certain Acknowledgment and Agreement, dated as of the Closing Date, by and among the Prepetition Administrative Agent, the Prepetition ABL Agent and the Administrative Agent and acknowledged by the Loan Parties.

"**Prepetition Intercreditor Agreement**" means that certain Intercreditor Agreement dated as of September 29, 2017, by and among the Prepetition ABL Agent and the Prepetition Term Agent, as supplemented by the Prepetition Intercreditor Acknowledgment and as amended, supplemented or otherwise modified prior to the date hereof.

"**Prepetition Obligations**" means "Obligations" (as defined in the Prepetition Term Loan Agreement).

"**Prepetition Term Claim**" shall have the meaning set forth in Section 2.01(a)(ii).

"**Prepetition Term Agent**" means (i) Goldman Sachs Specialty Lending Group, Inc., in its capacity as administrative agent under any of the Prepetition Term Loan Documents, or (ii) any successor administrative agent.

"**Prepetition Term Lenders**" means the lenders party to the Prepetition Term Loan Agreement, from time to time, under and as defined in the Prepetition Term Loan Agreement.

"**Prepetition Term Loan Agreement**" has the meaning set forth in the Recitals.

"**Prepetition Term Loan Documents**" means the "Loan Documents" as defined in the Prepetition Term Loan Agreement.

"**Prepetition Term Loans**" means the "Loans" under and as defined in the Prepetition Term Loan Agreement.

"**Prime Rate**" shall mean the rate of interest per annum determined from time to time by the Administrative Agent as its prime rate in effect at its principal office in New York City and notified to the Lead Borrower.  The prime rate is a rate set by the Administrative Agent based upon various factors including the Administrative Agent's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such rate.

"**Pro Rata Share**" shall mean, for each Class of Loans hereunder and with respect to each Lender within such Class at any time, a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the amount of such Lender's unfunded Term Loan Commitments plus the outstanding principal amount of the Loans held by such Lender under the Term DIP Facility at such time and the denominator of which is the amount of the aggregate unfunded Term Loan Commitments plus the outstanding principal amount of the Loans held by all Lenders under the Term DIP Facility.

"**Public Lender**" shall have the meaning assigned to such term in Section 10.01.

"**Qualified Equity Interests**" shall mean any Equity Interests that are not Disqualified Equity Interests.

"**Qualifying Insurance Policy**" means (i) with respect to any Special Indemnity Beneficiary that is an independent director or officer, an available director and officer liability insurance policy purchased by the

Company or (ii) with respect to any other Special Indemnity Beneficiary, an available director and officer liability insurance policy purchased by the Company or the entity that designated such person as a director.

"**Qualifying Special Indemnity Losses**" mean any and all actual costs, expenses, losses, or liabilities imposed on or suffered by a Special Indemnity Beneficiary directly arising from any failure to pay any amounts payable by the Company or its parent or affiliates under or otherwise required by the WARN Act in the Chapter 11 Cases, (i) that is not covered by such Special Indemnity Beneficiary's Qualifying Insurance Policy or (ii) that is covered by such Special Indemnity Beneficiary's Qualifying Insurance Policy and where Company and/or the Special Indemnity Beneficiary, as applicable, shall have used commercially reasonable efforts to seek coverage under such Qualifying Insurance Policy; provided, however, that no costs, expenses, losses or liabilities shall be deemed Qualifying Special Indemnity Losses to the extent arising in connection with (x) any Special Indemnity Beneficiary's bad faith, gross negligence or willful misconduct, or (y) failure of the Company or any Special Indemnity Beneficiary to comply with the WARN Act or any other Applicable Law (except to the extent that the court considering the relevant claims determines that (A)  failure to pay any amounts payable by the Company under or otherwise required by the WARN Act during the Chapter 11 Cases, or (B) the time when notices required by the WARN ACT were delivered, constitutes bad faith, gross negligence, willful misconduct or a violation of the WARN ACT or other Applicable Law).

"**Real Property**" shall mean, collectively, all right, title and interest (including any leasehold, mineral or other estate) in and to any and all parcels of or interests in real property owned or leased by any Person, whether by lease, license or other means, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures and equipment, all general intangibles and contract rights and other property and rights incidental to the ownership, lease or operation thereof.

"**Register**" shall have the meaning assigned to such term in Section 10.04(d).

"**Regulation T**" shall mean Regulation T of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Regulation U**" shall mean Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Related Fund**" shall mean, with respect to any Lender that is a fund or commingled investment vehicle that invests in bank loans, any other fund that invests in bank loans and is managed or advised by the same investment advisor as such Lender or by an Affiliate of such investment advisor.

"**Related Parties**" shall mean, with respect to any specified Person, such Person's Affiliates and the respective directors, trustees, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"**Release**" shall mean any release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into or through the environment or within or upon any building, structure, facility or fixture.

"**Reportable Event**" shall mean any of the events set forth in Section 4043(c) of ERISA or the regulations issued thereunder, other than events for which the thirty (30) day notice period has been waived with respect to a Plan.

"**Required Class Lenders**" shall mean, as of any date of determination, Lenders of a Class having more than 50% of the sum of the outstanding Loans and unused Term Loan Commitments of the applicable Class.

"**Required Lenders**" shall mean, at any time, subject to the provisions of Section 10.08, Lenders having Loans and unused Term Loan Commitments representing more than 50% of the sum of all Loans outstanding and unused Term Loan Commitments at such time.

"**Required Liquidation**" means the sale contemplated by the Agency Agreement of all or substantially all, or such lesser amount as is agreed by the Required Lenders in their sole discretion, of the assets of the Borrowers commencing on or after the Petition Date on terms and in a manner and with a liquidator satisfactory in all respects to the Administrative Agent and the Required Lenders and pursuant to procedures acceptable to Administrative Agent the Required Lenders and approved by order of the Bankruptcy Court.

"**Responsible Officer**" shall mean the chief executive officer, president, vice president, chief financial officer, treasurer, assistant treasurer, director of treasury or other similar officer of a Loan Party and, as to any document delivered on the Closing Date, any secretary or assistant secretary of such Loan Party.  Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed by the recipient of such document to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed by the recipient of such document to have acted on behalf of such Loan Party.

"**Restricted Payment**" shall mean any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of Holdings, the Borrowers or any Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such Equity Interest of Holdings, the Borrowers or any Subsidiary, or on account of any return of capital to Holdings', the Borrowers' or a Subsidiary's stockholders, partners or members (or the equivalent Persons thereof).

"**Roll-Up**" has the meaning specified in the applicable Order.

"**Roll-Up Facility**" shall have the meaning assigned to such term in Section 2.01(a)(ii).

"**Roll-Up Loan**" shall have the meaning set forth in Section 2.01(a)(ii).

"**Roll-Up Term DIP Facility Claims**" shall mean each Lender's claim under the Roll-Up Facility.

"**S&P**" shall mean Standard & Poor's Ratings Service, or any successor thereto.

"**Sanctioned Country**" shall mean, at any time, a country, region or territory that is, or whose government is, the subject or target of any comprehensive Sanctions, including, as of the Closing Date, the Crimea region of Ukraine, Cuba, Iran, North Korea, Sudan, and Syria.

"**Sanctioned Person**" shall mean, at any time, any Person with whom dealings are restricted or prohibited under Sanctions, including (i) any Person listed in any Sanctions-related list of designated Persons maintained by the U.S. (including by OFAC, the U.S. Department of the Treasury, or the U.S. Department of State), or by the United Nations Security Council, the European Union or any EU member state, Her Majesty's Treasury of the United Kingdom or any other relevant sanctions authority, (ii) any Person located, operating, organized or resident in a Sanctioned Country or (iii) any Person owned or controlled, directly or indirectly, by any such Person described in clause (i) or (ii) of this definition.

"**Sanctions**" shall mean sanctions or trade embargoes enacted, imposed, administered or enforced from time to time by (i) the U.S. government, including those administered by OFAC, U.S. Department of State, or U.S. Department of Treasury, (ii) the United Nations Security Council, the European Union or any of its member states, Her Majesty's Treasury of the United Kingdom, or (iii) any other relevant sanctions authority.

"**Secured Parties**" shall have the meaning assigned to such term in the Security Agreement.

"**Security Agreement**" means the Security Agreement, dated as of the Closing Date, among the Borrower, the guarantors party thereto, and the Collateral Agent.

"**Segregated Operating Accounts**" means collectively, the General Purpose Segregated Operating Account and the Class B Segregated Operating Account.

"**Special Indemnity Beneficiary**" means each natural person that, as of the Petition Date, serves as a director and/or officer of Gymboree Holding Corporation. For the avoidance of doubt, the Debtors and their Affiliates that are not natural Persons are not Special Indemnity Beneficiaries.

"**Special Indemnity Cap**" means $6,000,000.

"**Special Indemnity Grantor**" means Special Situations Investing Group, Inc.

"**Special Indemnity Period**" means the period commencing on the earliest to occur of: (i) the dismissal of the Chapter 11 Cases, (ii) the conversion of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code and (iii) the emergence of the Debtors from the Chapter 11 Cases and ending on the earlier to occur of (i) the date that is three years therefrom and (ii) the date on which the applicable statute of limitations under the WARN Act shall have expired.

"**SPV**" shall have the meaning assigned to such term in Section 10.04(i).

"**Stalking Horse Agreement**" has the meaning set forth in Section 6.19(h).

"**Stalking Horse Bidder**" has the meaning set forth in Section 6.19(h).

"**Store**" means any retail store (which includes any real property, fixtures, equipment, inventory and other property related thereto) operated, or to be operated, by a Borrower or any Subsidiary.

"**Subsidiary**" of a Person shall mean a corporation, partnership, joint venture, limited liability company or other business entity of which (i) a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned or (ii) the management of which is otherwise controlled, directly or indirectly, through one or more intermediaries, or both, by such Person. Unless otherwise specified, all references herein to a "**Subsidiary**" or to "**Subsidiaries**" shall refer to a Subsidiary or Subsidiaries of the Borrowers.

"**Subsidiary Guarantor**" shall mean any Guarantor other than Holdings.  The Subsidiary Guarantors as of the Closing Date are set forth on Schedule 1.01.

"**Supplemental Carve-Out**" shall have the meaning assigned to such term in the Interim Order or the Final Order, as applicable.

"**Swap Contract**" shall mean (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related

23

confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "**Master Agreement**"), including any such obligations or liabilities under any Master Agreement.

"**Swap Termination Value**" shall mean, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"**Synthetic Lease**" shall mean any lease or other agreement for the use or possession of property creating obligations which do not appear as Indebtedness on the balance sheet of the lessee thereunder but which, upon the insolvency or bankruptcy of such Person, may be characterized as Indebtedness of such lessee without regard to the accounting treatment.

"**Taxes**" shall mean all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Term Borrowing**" shall mean a Borrowing comprised of the Term DIP Loans.

"**Term DIP Claims**" shall mean the Prepetition Term Claims, the New Money Term DIP Claims, and the Roll-Up Term DIP Facility Claims, as applicable.

"**Term DIP Facility**" shall have the meaning assigned to such term in the recitals to this Agreement.

"**Term Loan Commitment**" shall mean, with respect to each Lender, such Lender's Class A New Money Commitment and/or Class B New Money Commitment, if any, as such commitment may be (a) reduced from time to time pursuant to Section 2.09 ~~and~~, (b) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to an Assignment and Acceptance**, and (c) increased pursuant to a Commitment Increase, solely to the extent permitted by Section 2.01(c) hereof**. The initial amount of each Lender's Term Loan Commitment is set forth on Schedule 2.01 or, otherwise, in the Assignment and Acceptance pursuant to which such Lender shall have assumed its Term Loan Commitment.  The initial aggregate amount of the Term Loan Commitments as of the Closing Date is $30,000,000.

"**Term DIP Loan(s)**" shall mean the Roll-Up Loan and New Money DIP Loan.

"**Term Note**" means a promissory note of the Borrowers payable to any Lender or its registered assigns, in substantially the form of Exhibit G hereto, evidencing the aggregate Indebtedness of the Borrowers to such Lender resulting from the Term DIP Loans made by such Lender.

"**Term Priority Collateral**" shall have the meaning assigned to such term in the Orders.

"**Testing Period**" shall have the meaning assigned to such term in the definition of "Permitted Variance".

"**Type**", when used in respect of any Loan or Borrowing, shall refer to the Rate by reference to which interest on such Loan or on the Loans comprising such Borrowing is determined. For purposes hereof, the term "**Rate**" shall mean the Adjusted LIBO Rate and the Alternate Base Rate.

"**Uniform Commercial Code**" or "**UCC**" shall mean the Uniform Commercial Code as the same may from time to time be in effect in the State of New York or the Uniform Commercial Code (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"**United States**" and "**U.S.**" mean the United States of America.

"**United States Tax Compliance Certificate**" shall have the meaning assigned to such term in Section 3.01(d).

"**USA PATRIOT Act**" shall mean the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)).

"**Variance Report**" shall mean a report setting forth actual cash receipts and disbursements of the Borrowers for the prior week and setting forth all the variances, on a line-item and aggregate basis, from the amount set forth for such week as compared to (1) the most recent Approved Budget delivered prior to such Variance Report on a weekly and Testing Period basis (which shall be subject to the variances set forth herein), (2) the most recent Weekly Cash Flow Forecast (as applicable) delivered by the Borrowers on a weekly and cumulative basis, and (3) the most recent disbursements to the Loan Parties' professionals on a cumulative basis for each rolling two week period.  Each such Variance Report shall include the explanations for all material variances and shall be certified by the Chief Financial Officer or the Chief Restructuring Officer of the Borrowers.

"**WARN Act**" means the Worker Adjustment and Retraining Notification Act of 1988 or any similar state or local law.

"**Weekly Cash Flow Forecast**" shall mean an updated 13-week cash flow forecast including the spreadsheet or other document demonstrating the backup for the calculation of such forecast, in form and substance satisfactory to the Administrative Agent at the direction of the Required Lenders for the subsequent 13 week period following delivery of the Approved Budget, and each month thereafter during the Chapter 11 Cases.

"**wholly owned**" shall mean, with respect to a Subsidiary of a Person, a Subsidiary of such Person all of the outstanding Equity Interests of which (other than (x) director's qualifying shares and (y) shares issued to foreign nationals to the extent required by applicable Law) are owned by such Person and/or by one or more wholly owned Subsidiaries of such Person.

"**Withdrawal**" means either a General Purpose Withdrawal or a  Class B Withdrawal. "Withdraw" and "Withdrawn" shall have correlative meanings thereto.

"**Withdrawal Liability**" shall mean liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"**Write-Down and Conversion Powers**" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

Section 1.02.  *Other Interpretive Provisions.*  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)        (i)        The words "herein," "hereto," "hereof" and "hereunder" and words of similar import when used in any Loan Document shall refer to such Loan Document as a whole and not to any particular provision thereof.

(ii)        Article, Section, Exhibit and Schedule references are to the Loan Document in which such reference appears.

(iii)        The term "including" is by way of example and not limitation.

(iv)        The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(c)        In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including."

(d)        Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(e)        The word "or" is not exclusive.

Section 1.03.    *Accounting Terms*.    All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, except as otherwise specifically prescribed herein.

Section 1.04.    *[Reserved]*.

Section 1.05.    *References to Agreements, Laws, Etc.*    Unless otherwise expressly provided herein, (a) references to Organization Documents, agreements (including the Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, restatements, extensions, supplements and other modifications thereto, but only to the extent that such amendments, restatements, extensions, supplements and other modifications are not prohibited by any Loan Document; and (b) references to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Law.

Section 1.06.    *Times of Day*.    Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

Section 1.07.    *Timing of Payment of Performance*.    Except as otherwise expressly provided herein, when the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment (other than as described in the definition of Interest Period) or performance shall extend to the immediately succeeding Business Day (subject to Section 2.16(b)).

Section 1.08.    *[Reserved]*.

Section 1.09.    *[Reserved]*.

Section 1.10.    *Certain Accounting Matters*.    Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to any election under Statement of Financial Accounting Standards 159 (or any other Financial Accounting Standard having a similar result or effect)

26

to value any Indebtedness or other liabilities of the Borrowers or any of their Subsidiaries at "fair value", as defined therein.

Section 1.11.  *Classification of Loans and Borrowings.*  For purposes of this Agreement, Loans may be classified and referred to as either Roll-Up Loans or New Money DIP Loans.

Section 1.12.  *Currency Equivalents Generally.*  For purposes of determining compliance with Sections 7.01, 7.02 and 7.03 with respect to any amount of Indebtedness or Investment in a currency other than Dollars, no Default shall be deemed to have occurred solely as a result of changes in rates of currency exchange occurring after the time such Indebtedness or Investment is incurred (so long as such Indebtedness or Investment, at the time incurred, made or acquired, was permitted hereunder).

# ARTICLE 2
### THE CREDITS

Section 2.01.  *Commitments.*

(a)    Class A New Money DIP Loans and Roll-Up Loans.

(i)    Class A New Money DIP Loans. Subject to the terms and conditions as set forth herein and in the Orders and relying upon the representations and warranties herein set forth, each Class A Lender severally and not jointly agrees upon satisfaction of the conditions to Borrowing set forth in Sections 4.01 or 4.02, as applicable, to make to the Borrowers one or more, New Money DIP Loans, if any, denominated in Dollars in an amount not to exceed such Lender's Class A New Money Commitment set forth on Schedule 2.01 (**together with any Commitment Increase allocated by the Administrative Agent pursuant to Section 2.01(c) hereof,** the "**Class A New Money DIP Loans**").

(ii)    Class A Roll-Up Loans.

(A)    On the Closing Date, in connection with the funding of any New Money DIP Loans (the "**Initial New Money DIP Loans**"), the Prepetition Term Lenders shall be deemed to have exchanged a portion of their claims in respect of Prepetition Obligations ("**Prepetition Term Claims**") in an aggregate principal amount equal to the Initial New Money DIP Loans funded on the Closing Date for Loans hereunder (each such Loan deemed to be exchanged, an "**Initial Roll-Up Loan**").

(B)    So long as permitted by the Final Order, upon the entry of the Final Order, the Prepetition Term Lenders shall be deemed to have exchanged the entire remaining outstanding balance of their Prepetition Term Claims for Loans hereunder (each such Loan deemed to be exchanged, a "**Final Order Roll-Up Loan**", and collectively with the Initial Roll-Up Loan, the "**Roll-Up Loans**"). Notwithstanding anything herein or in any other Loan Document to the contrary, if the terms of the Final Order do not permit such additional exchange (or permits an exchange in a lesser amount than the exchange contemplated hereby), the portion of Prepetition Term Claims not permitted to be so exchanged shall remain outstanding as Prepetition Term Claims.

(C)    All Prepetition Term Claims exchanged in accordance with the terms of the Orders and the foregoing clauses (i) and (ii) shall be deemed repaid in full and no longer outstanding. The facility described in this Section 2.01(a)(ii) is referred to herein as the "**Roll-Up Facility**".

(b)    Class B New Money DIP Loans. Subject to the terms and conditions as set forth herein and in the Orders, upon satisfaction of the conditions to Borrowing set forth in Sections 4.01 or 4.02, as applicable, and

relying upon the representations and warranties herein set forth, each Class B Lender severally and not jointly agrees, to make to the Borrowers a New Money DIP Loan denominated in Dollars in an aggregate principal amount not to exceed such Lender's Class B New Money Commitment set forth on Schedule 2.01 (**together with any Commitment Increase allocated by the Administrative Agent pursuant to Section 2.01(c) hereof,** the "**Class B New Money DIP Loans**").

(c)    *[Reserved]***Incremental Increase in Commitments for New Money DIP Loans**.

(i)    **First Amendment Effective Date Class A New Money DIP Loans. As of the First Amendment Effective Date, each of the GS Lenders hereby consents to the First Amendment Effective Date Commitment increase as set forth on Schedule 2.01. Each such GS Lender severally and not jointly agrees to make to the Borrowers a New Money DIP Loan denominated in Dollars in an aggregate principal amount not to exceed such GS Lender's First Amendment Effective Date Commitment.**

(ii)    **Commitment Increase Requests. Subject to the terms and conditions set forth herein, after the entry of the Final Order, and pursuant to and to the extent permitted thereby, Borrowers shall have the right, to request, by written notice to Administrative Agent and GS Lenders one or more additional increases in the Term Loan Commitments in an aggregate amount not to exceed $[37,000,000] (each a "Commitment Increase");** *provided,* **that (a) Borrowers shall only be permitted to request a Commitment Increase during the term of this Agreement from the GS Lenders pursuant to the terms set forth herein, and (b) any Commitment Increase shall be in a minimum amount of $500,000.**

(iii)    **Procedure for Increasing Commitments. Each notice submitted by Borrowers under this Section 2.01(c)(ii) requesting a Commitment Increase shall specify the amount of the Commitment Increase requested. Upon receipt of a notice from the Borrowers for a Commitment Increase, GS Lenders shall have the right (individually or through one or more of its Affiliates) but not the obligation to provide the requested Commitment Increase. Such Commitment Increase, if any, shall become effective (such date, the "Increase Date") upon the satisfaction of terms and conditions satisfactory to the Administrative Agent, including without limitation, each of the following conditions: (1) no Event of Default shall exist on the Increase Date before or after giving effect to such Commitment Increase and the making of the Loans; (2) the Final Order shall have been entered by the Bankruptcy Court; (3) the conditions set forth in Section 4.02; (4) to the extent requested by the Administrative Agent, the Commitment Increase shall be effected pursuant to a supplement to Schedule 2.01 to reflect such Commitment Increase delivered by the Administrative Agent (on behalf of the Lenders) to the Borrowers, each of which shall be in form and substance satisfactory to GS Lenders in their sole discretion; (5) proceeds of Term Loans made pursuant to any Commitment Increase shall be used solely in accordance with Sections 7.10 and 7.17 hereof, (6) subject to Section 2.01(c)(v), the Borrowers shall have paid to Administrative Agent and GS Lenders such additional fees as may be required to be paid by Borrowers pursuant to the Amended and Restated Fee Letter, and (7) for any Commitment Increase and New Money DIP Loan made pursuant thereto, Borrowers shall deliver to the Administrative Agent all such documents requested by the Administrative Agent or GS Lenders relating to the J&J Option under the Agency Agreement or any other anticipated transactions relating to the Commitment Increase, each of which shall be in form, scope and substance reasonably satisfactory to GS Lenders in their sole discretion. For the avoidance of doubt, unless the GS Lenders (or any of their respective Affiliates) request that the Seller (as defined in the Stalking Horse Agreement) exercise the J&J Option (or seek financing in order to exercise such option), no Lender or GS Lender shall have any obligation to provide any Commitment Increase (and in which case the amount of such obligation shall not exceed the lesser of (x) the amount required to consummate the exercise of the J&J Option in accordance with its terms or (y) an amount to be agreed and set forth in the Approved Budget) and any Commitment Increase shall be made in the sole discretion of the GS Lenders. In the event of any Commitment Increase and New Money DIP Loans**

**made pursuant thereto, the Agent shall, in its sole discretion, allocate such Commitment Increase to any single Class or between the Class A New Money Commitments and Class B New Money Commitments.**

**(iv)    Settlement of Outstanding Loans.    On the Increase Date, upon fulfillment of the conditions set forth in this Section 2.01(c), (A) GS Lenders shall make a Class A New Money DIP Loan or Class B New Money DIP Loan, as applicable, to Borrowers in respect of their ratable portion of the Commitment Increase such that 100% of the requested Commitment Increase is funded on the Increase Date, (B) to the extent necessary in connection with such Commitment Increase, Administrative Agent shall effect a settlement of all outstanding New Money DIP Loans, as applicable among Lenders that will reflect the applicable adjustments to the Term Loan Commitments as a result of the Commitment Increase, (C) Administrative Agent shall promptly notify Lenders and the Borrowers of the occurrence and the allocation among Classes of the Commitment Increase to be effected on the Increase Date, (D) Schedule 2.01 shall be deemed modified to reflect the revised Term Loan Commitments of the GS Lenders, and (F) the funded Commitment Increase on the Increase Date shall be deemed a New Money DIP Loan hereunder.**

**(v)    Terms and Provisions of Increase.    The terms and provisions of any Commitment Increase and any New Money DIP Loans made pursuant thereto shall be identical to the New Money DIP Loans and Term Loan Commitments except as expressly set forth herein and, for purposes of this Agreement and the other Loan Documents, all New Money DIP Loans made pursuant to any Commitment Increase shall be deemed to be New Money DIP Loans.  Without limiting the generality of the foregoing, (A) the maturity date of the Commitment Increase shall be the Maturity Date, and (B) any New Money DIP Loans made pursuant to any Commitment Increase shall rank *pari passu* in right of payment and security with the existing New Money DIP Loans of the applicable Class.  Each consent or amendment to any Loan Document requested by GS Lenders in connection with the establishment of a Commitment Increase may, without the consent of any of the Lenders, effect such amendments to this Agreement and the other Loan Documents as may be reasonably necessary or appropriate, in the opinion of GS Lenders, to effect the provisions of this Section 2.01(c).**

(d)    All Loans and all other Obligations owing hereunder with respect to the Loans should be paid in full no later than the Maturity Date.

Section 2.02.    *Loans.* (a) Each Loan shall be made as part of a Borrowing consisting of Loans made by the Lenders ratably in accordance with their applicable Term Loan Commitments; *provided, however,* that the failure of any Lender to make any Loan shall not in itself relieve any other Lender of its obligation to lend hereunder (it being understood, however, that no Lender shall be responsible for the failure of any other Lender to make any Loan required to be made by such other Lender).  The Loans comprising any Borrowing shall be in an aggregate principal amount that is (i) an integral multiple of $1,000,000 or (ii) equal to the remaining available balance of the applicable Term Loan Commitments.

(a)    Subject to Sections 2.08 and 3.02 each Borrowing shall be comprised entirely of ABR Loans or Eurodollar Loans. Each Lender may at its option make any Eurodollar Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; *provided* that any exercise of such option shall not affect the obligation of the Borrowers to repay such Loan to such Lender in accordance with the terms of this Agreement. Borrowings of more than one Type may be outstanding at the same time; *provided, however*, that the Lead Borrower shall not be entitled to request any Borrowing that, if made, would result in more than five Borrowings outstanding hereunder at any time.  For purposes of the foregoing, Borrowings having different Interest Periods, regardless of whether they commence on the same date, shall be considered separate Borrowings.

(b)    Each Lender shall make each Loan to be made by it hereunder on the Closing Date**, or, in the case of any Loans funded pursuant to the First Amendment Effective Date Commitment, on the First Amendment Effective Date, or, in the case of any Loans funded pursuant to any other Commitment Increase, the**

29

**applicable Increase Date, in each case,** by wire transfer of immediately available funds to such account in New York City as the Administrative Agent may designate not later than 1:00 p.m., New York City time, and the Administrative Agent shall promptly credit the amounts so received to an account designated by the Lead Borrower in the applicable Borrowing Notice.

(c)    Unless the Administrative Agent shall have received notice from a Lender prior to the date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's portion of such Borrowing, the Administrative Agent may assume that such Lender has made such portion available to the Administrative Agent on the date of such Borrowing in accordance with paragraph (c) above and the Administrative Agent may, in reliance upon such assumption, make available to the Borrowers on such date a corresponding amount.  If the Administrative Agent shall have so made funds available then, to the extent that such Lender shall not have made such portion available to the Administrative Agent, such Lender and the Borrowers severally agree to repay to the Administrative Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date such amount is made available to the Borrowers to but excluding the date such amount is repaid to the Administrative Agent at (i) in the case of the Borrowers, a rate per annum equal to the interest rate applicable at the time to the Loans comprising such Borrowing and (ii) in the case of such Lender, a rate determined by the Administrative Agent to represent its cost of overnight or short-term funds (which determination shall be conclusive absent manifest error).  If such Lender shall repay to the Administrative Agent such corresponding amount, such amount shall constitute such Lender's Loan as part of such Borrowing for purposes of this Agreement.

Section 2.03.  *Borrowing Procedure*.  In order to request a Borrowing, the Lead Borrower shall notify the Administrative Agent of such request by electronic delivery to the Administrative Agent of a written Borrowing Notice, (a) in the case of a Eurodollar Borrowing, not later than 12:00 (noon), New York City time, three Business Days before a proposed Borrowing (or, in the case of a proposed Borrowing on the Closing Date **and the First Amendment Effective Date**, one Business Day before), and (b) in the case of an ABR Borrowing, not later than 12:00 noon, New York City time, one Business Day before a proposed Borrower.  Each such Borrowing Notice shall be irrevocable and shall specify the following information:  (i) the Class of Loans to be borrowed and whether such Borrowing is to be a Eurodollar Borrowing or an ABR Borrowing; (ii) the date of such Borrowing (which shall be a Business Day); (iii) the identity of the DIP Funding Account to which funds are to be disbursed; (iv) the amount of such Borrowing; and (v) if such Borrowing is to be  Eurodollar Borrowing, the Interest Period with respect thereto; *provided, however*, that, notwithstanding any contrary specification in any Borrowing Notice, each requested Borrowing shall comply with the requirements set forth in Section 2.02.  If no election as to the Type of Borrowing is specified in any such notice, then the requested Borrowing shall be a Eurodollar Borrowing. If no Interest Period with respect to any Eurodollar Borrowing is specified in any such notice, then the Lead Borrower shall be deemed to have selected an Interest Period of one month's duration.  The Administrative Agent shall promptly advise the applicable Lenders of any notice given pursuant to this Section 2.03 (and the contents thereof), and of each Lender's portion of the requested Borrowing.

Section 2.04.  *Evidence of Debt*.

(a)    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrowers to such Lender resulting from each Loan made by such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.

(b)    The Administrative Agent shall maintain accounts in which it will record (i) the amount of each Loan made hereunder, the Class and Type thereof and, if applicable, the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrowers to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder from the Borrowers or any Guarantor and each Lender's share thereof.

(c)      The entries made in the accounts maintained pursuant to paragraphs (a) and (b) above shall be prima facie evidence of the existence and amounts of the obligations therein recorded; *provided, however,* that (i) the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligations of the Borrowers to repay the Loans in accordance with their terms and (ii) in the event of any conflict between the accounts set forth in paragraphs (a) and (b) above and the Register, the amounts set forth in the accounts maintained pursuant to the Register shall prevail.

(d)      Any Lender may request that Loans made by it hereunder be evidenced by a Term Note.  In such event, the Borrowers shall execute and deliver to such Lender a Term Note payable to such Lender and its registered assigns in accordance with Section 10.04.  Notwithstanding any other provision of this Agreement, in the event any Lender shall request and receive a Term Note, the interests represented by such Term Note shall at all times (including after any assignment of all or part of such interests pursuant to Section 10.04) be represented by one or more promissory notes payable to the payee named therein or its registered assigns.

Section 2.05.  *Fees.*  (a) The Borrowers shall pay to the Administrative Agent such fees in the amounts and at the times specified as may be agreed to in writing from time to time by the Loan Parties or any of its Subsidiaries and the Administrative Agent, including, without limitation, all amounts owing under the Fee Letter (the "**Fees**").

(b)      All Fees shall be paid on the dates due, in immediately available funds, to the Administrative Agent.  Once paid, none of the Fees shall be refundable under any circumstances.

Section 2.06.  *Interest on Loans.*  (a) Subject to the provisions of Section 2.07, the Loans comprising each ABR Borrowing shall bear interest (computed on the basis of the actual number of days elapsed over a year of 360 days and calculated from and including the date of such Borrowing to but excluding the date of repayment thereof) at a rate per annum equal to the Alternate Base Rate plus the Applicable Margin.

(b)      Subject to the provisions of Section 2.07, the Loans comprising each Eurodollar Borrowing shall bear interest (computed on the basis of the actual number of days elapsed over a year of 360 days) at a rate per annum equal to the Adjusted LIBO Rate for the Interest Period in effect for such Borrowing plus the Applicable Margin.

(c)      Interest on each Loan shall be payable on the Interest Payment Dates applicable to such Loan except as otherwise provided in this Agreement.  The Alternate Base Rate or Adjusted LIBO Rate, as applicable, for each Interest Period or day within an Interest Period, as the case may be, shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

Section 2.07.  *Default Interest.*  During the continuance of any Default or Event of Default, the Borrowers shall pay interest on all amounts owing by it hereunder at a fluctuating interest rate per annum at all times, after as well as before judgment, equal to the rate otherwise applicable to such Loan pursuant to Section 2.06 plus 2.00% per annum.

Section 2.08.  *Alternate Rate of Interest.*  In the event, and on each occasion, that on the day two Business Days prior to the commencement of any Interest Period for a Eurodollar Borrowing the Administrative Agent shall have determined that Dollar deposits in the principal amounts of the Loans comprising such Borrowing are not generally available in the London interbank market, or that the rates at which such Dollar deposits are being offered will not adequately and fairly reflect the cost to the majority of Lenders of making or maintaining Eurodollar Loans during such Interest Period, or that reasonable means do not exist for ascertaining the Adjusted LIBO Rate, the Administrative Agent shall, as soon as practicable thereafter, give written or fax notice of such determination to the Lead Borrower and the Lenders.  In the event of any such determination, until the Administrative Agent shall have revoked such notice, any request by the Lead Borrower for a Eurodollar

31

Borrowing pursuant to Section 2.03 shall be deemed to be a request for an ABR Borrowing. Each determination by the Administrative Agent under this Section 2.08 shall be conclusive absent manifest error.

Section 2.09.  *Termination and Reduction of Commitments.*  (a) On each date of funding of a Loan by a Lender hereunder, such Lender's Term Loan Commitment shall be reduced by the principal amount of the Loan funded by such Lender.  To the extent not terminated earlier, the Term Loan Commitments shall terminate on the DIP Termination Date.

Section 2.10.  *[Reserved]*.

Section 2.11.  *Repayment of Term Borrowings.*  All Loans shall be due and payable on the DIP Termination Date without further application to or order from the Bankruptcy Court, together with accrued and unpaid interest on the principal amount to be paid to but excluding the date of payment, or earlier, if otherwise required by the terms hereof.

Section 2.12.  *Voluntary Prepayment*  (a) Subject to Section 2.12(b), the Borrowers shall have the right at any time and from time to time to prepay any Borrowing of Term DIP Loans, in whole or in part, upon at least three Business Days' prior written notice (or telephone notice promptly confirmed by written notice); provided, however, that each partial prepayment shall be in an amount that is an integral multiple of $250,000 and not less than $500,000.

(b)     Voluntary prepayments of Term DIP Loans pursuant to this Section 2.12 shall be applied (i) *first*, toward the repayment of the Class A DIP Loans then outstanding on a pro rata basis and (ii) *thereafter,* toward the repayment of the Class B New Money DIP Loans then outstanding on a pro rata basis.

(c)     Each notice of prepayment shall specify the prepayment date and the principal amount of each Borrowing (or portion thereof) to be prepaid, shall be irrevocable and shall commit the Borrowers to prepay such Borrowing by the amount stated therein on the date stated therein; *provided, however*, that if such prepayment is in connection with a refinancing, then the Lead Borrower may condition such notice on the effectiveness of such refinancing (*provided*, that the provisions of Section 3.05 shall apply to any prepayment that is not made as a result of the failure of such condition).  All prepayments under this Section 2.12 shall be subject to Section 3.05 but otherwise without premium or penalty.  All prepayments under this Section 2.12 shall be accompanied by accrued and unpaid interest on the principal amount to be prepaid to but excluding the date of payment.

Section 2.13.  *Mandatory Prepayments.*

(b)     In each case, subject to Section 2.13(b) below,

(i)     *[Reserved]*.

(ii)     If (1) the Borrowers or any Subsidiary Dispose of any property or assets, including in connection with the Required Liquidation (other than, so long as the Prepetition ABL Credit Agreement is in effect, as contemplated by Section 6.20), (2) any Casualty Event occurs, which results in the realization or receipt by the Borrowers or a Subsidiary of Net Proceeds, (3) any cash or cash equivalents cash collateralizing any letter of credit agreement are returned to the Borrower or its Subsidiaries for its own account, or (4) the Borrowers or any Subsidiary receive any extraordinary receipts, the Borrowers shall cause to be prepaid on or prior to the date which is three (3) Business Days after the date of the realization or receipt by the Borrowers or any Subsidiary of such Net Proceeds an aggregate principal amount of Term DIP Loans in an amount equal to 100% of all Net Proceeds realized or received.  For the avoidance of doubt, any cash or cash equivalents cash collateralizing any letter of credit agreement that are returned to the Borrower pursuant to subsection (3) hereof shall remain subject to the existing and continuing liens in favor

32

of the Prepetition Term Agent for the benefit of the Prepetition Term Lenders pursuant to the Prepetition Term Loan Documents and any additional liens thereon granted pursuant to the terms of the Order.

(iii)    On the date of receipt by the Borrowers or any of their Subsidiaries of cash proceeds from a capital contribution to, or the issuance of any Equity Interests of, the Borrowers or any of their Subsidiaries (other than issuances of Equity Interests by a Subsidiary to the Borrowers and capital contributions by a Borrower to a Subsidiary), the Borrowers shall prepay an aggregate principal amount of the Term DIP Loans equal to 100% of such Net Proceeds received therefrom no later than five (5) Business Days following receipt thereof by such Person.

(iv)    If any Borrower or any Subsidiary incurs or issues any Indebtedness after the Closing Date (other than Indebtedness permitted under Section 7.03), such Borrower shall cause to be prepaid an aggregate principal amount of Term DIP Loans in an amount equal to 100% of all Net Proceeds received therefrom on or prior to the date which is one (1) Business Day after the receipt by such Borrower or such Subsidiary of such Net Proceeds.

(c)    With respect to any mandatory prepayment under this Section 2.13, subject to the Prepetition Intercreditor Agreement and the Orders and the Agency Agreement, the Borrowers shall cause to be prepaid, in the order set forth below, on or prior to the date which is three (3) Business Days after the date of the realization or receipt by the Borrowers or any Subsidiary of such Net Proceeds:

(i)    *first*, an amount equal to 100% of such proceeds, which shall be applied as a mandatory prepayment of the Class A DIP Loans and the Prepetition Obligations, if any, on a pro rata basis (with such payments on the Prepetition Obligations payable to the Prepetition Term Agent); and

(ii)    *second,* an amount equal to 100% of such proceeds that remain, which shall be applied as a mandatory prepayment of the Class B New Money DIP Loans on a pro rata basis until $10,000,000 of Class B New Money DIP Loans are outstanding, and then, an amount equal to 50% of such proceeds that remain shall be applied pro rata as a mandatory prepayment of the remaining Class B New Money DIP Loans and the other 50% of such proceeds shall be deposited into the General Purpose Segregated Operating Account and shall be used for purposes consistent with Section 7.10(b).

(d)    The Lead Borrower shall notify the Administrative Agent or the Prepetition Term Agent, as applicable, in writing of any mandatory prepayment of Term DIP Loans or Prepetition Obligations, as applicable, required to be made pursuant to Section 2.13 at least three (3) Business Days prior to the date of such prepayment. Each such notice shall specify the date of such prepayment and provide a reasonably detailed calculation of the amount of such prepayment.  With respect to the prepayment of Term DIP Loans, the Administrative Agent will promptly notify each applicable Lender of the contents of the Lead Borrower's prepayment notice and of such Lender's Pro Rata Share or other applicable share of the prepayment.

(e)    *Funding Losses, Etc*.  All prepayments under this Section 2.13 shall be accompanied by accrued and unpaid interest on the principal amount to be prepaid to but excluding the date of payment and shall be made on a day prior to the last day of an Interest Period therefor together with any amounts owing in respect of such Loan pursuant to Section 3.05.

(f)    *Make- Whole Amount*. On or prior to the Maturity Date, (i) voluntary prepayments of Class A DIP Loans pursuant to Section 2.12 and (ii) mandatory prepayments of Class A DIP Loans pursuant to Section 2.13(a)(ii), in each case, shall be accompanied by a payment equal to the Make-Whole Amount, which for the avoidance of doubt shall be in addition to the amount of Class A DIP Loans so prepaid, to the extent sufficient proceeds from the event or events giving rise to such mandatory prepayment are available to pay such Make-Whole Amount; provided, however, that in the case of prepayments under clause (ii) above, the Make-Whole Amount shall not be paid unless the Carve-Out and the Supplemental Carve-Out have first been funded in full.

33

Section 2.14. *Pro Rata Treatment.* Except as required under Section 3.02, each Borrowing, each payment or prepayment of principal of any Loan, each payment of interest on the Loans, each reduction of the New Money DIP Loans and each conversion of any Borrowing to or continuation of any Borrowing as a Borrowing of any Type shall be allocated pro rata among the Lenders of the applicable Class in accordance with their respective applicable Term Loan Commitments (or, if such Term Loan Commitments shall have expired or been terminated, in accordance with the respective principal amounts of their outstanding Loans) and any other amounts required hereunder, shall, except as otherwise expressly provided herein, be made to the Administrative Agent and for the ratable account of the Persons holding the applicable Obligations, provided, in all cases that any such payments described above shall be made without set off, recoupment, counterclaim or deduction of any kind.. Each Lender agrees that in computing such Lender's portion of any Borrowing to be made hereunder, the Administrative Agent may, in its discretion, round each Lender's percentage of such Borrowing to the next higher or lower whole Dollar amount.

Section 2.15. *Sharing of Setoffs.* With respect to each Class of Loan, each Lender agrees that if it shall, through the exercise of a right of banker's lien, setoff or counterclaim against the Borrowers or any other Loan Party, or pursuant to a secured claim under Section 506 of Title 11 of the United States Code or other security or interest arising from, or in lieu of, such secured claim, received by such Lender under any applicable bankruptcy, insolvency or other similar law or otherwise, or by any other means, obtain payment (voluntary or involuntary) in respect of any Loan or Loans of such Class as a result of which the unpaid principal portion of its Loans of such Class shall be proportionally less than the unpaid principal portion of the Loans held by any other Lender, it shall be deemed simultaneously to have purchased from such other Lender at face value, and shall promptly pay to such other Lender the purchase price for, a participation in the Loans of such Class held by such other Lender, so that the aggregate unpaid principal amount of the Loans and participations in Loans held by each Lender shall be in the same proportion to the aggregate unpaid principal amount of all Loans of such Class then outstanding as the principal amount of its Loans of such Class prior to such exercise of banker's lien, setoff or counterclaim or other event was to the principal amount of all Loans of such Class outstanding prior to such exercise of banker's lien, setoff or counterclaim or other event; *provided, however*, that (i) if any such purchase or purchases or adjustments shall be made pursuant to this Section 2.15 and the payment giving rise thereto shall thereafter be recovered, such purchase or purchases or adjustments shall be rescinded to the extent of such recovery and the purchase price or prices or adjustment restored without interest, and (ii) the provisions of this Section 2.15 shall not be construed to apply to any payment made by the Borrowers pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant. The Borrowers and Holdings expressly consent to the foregoing arrangements and agree that any Lender holding a participation in a Loan deemed to have been so purchased may exercise any and all rights of banker's lien, setoff or counterclaim with respect to any and all moneys owing by the Borrowers and Holdings to such Lender by reason thereof as fully as if such Lender had made a Loan directly to the Borrowers in the amount of such participation.

Section 2.16. *Payments.* (a) The Borrowers shall make each payment (including principal of or interest on any Borrowing or any Fees or other amounts due and payable) hereunder and under any other Loan Document not later than 12:00 (noon), New York City time, on the date when due in immediately available Dollars, without setoff, defense or counterclaim. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. Each such payment shall be made to the Administrative Agent at its offices at 200 West Street, New York, NY 10282 or such other office notified by the Administrative Agent to the Lead Borrower in accordance with Section 10.01. The Administrative Agent shall promptly distribute to each Lender any payments received by the Administrative Agent on behalf of such Lender.

(b)    Except as otherwise expressly provided herein, whenever any payment (including principal of or interest on any Borrowing or any Fees or other amounts) hereunder or under any other Loan Document shall become due, or otherwise would occur, on a day that is not a Business Day, such payment may be made on the next

succeeding Business Day, and such extension of time shall in such case be included in the computation of interest or Fees, if applicable.

Section 2.17.  *Joint and Several Liability of Borrowers*.  Each Borrower is accepting joint and several liability hereunder and under the other Loan Documents in consideration of the financial accommodations to be provided by the Agent and the Lenders under this Agreement, for the mutual benefit, directly and indirectly, of each Borrower and in consideration of the undertakings of the other Borrowers to accept joint and several liability for the Obligations.

(a)    Each Borrower, jointly and severally, hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with the other Borrowers, with respect to the payment and performance of all of the Obligations (including any Obligations arising under this Section 2.17), it being the intention of the parties hereto that all the Obligations shall be the joint and several obligations of each Borrower without preferences or distinction among them.

(b)    If and to the extent that any Borrower shall fail to make any payment with respect to any of the Obligations as and when due or to perform any of the Obligations in accordance with the terms thereof, then in each such event the other Borrowers will make such payment with respect to, or perform, such Obligation until such time as all of the Obligations are paid in full.

(c)    The Obligations of each Borrower under the provisions of this Section 2.17 constitute the absolute and unconditional, full recourse Obligations of each Borrower enforceable against each Borrower to the full extent of its properties and assets, irrespective of the validity, regularity or enforceability of the provisions of this Agreement (other than this Section 2.17(c)) or any other circumstances whatsoever.

(d)    Except as otherwise expressly provided in this Agreement and the Orders, and to the extent permitted by applicable law, each Borrower hereby waives notice of acceptance of its joint and several liability, notice of any Loans issued under or pursuant to this Agreement, notice of the occurrence of any Default, Event of Default, or of any demand for any payment under this Agreement, notice of any action at any time taken or omitted by Agent or Lenders under or in respect of any of the Obligations, any requirement of diligence or to mitigate damages and, generally, to the extent permitted by applicable law, all demands, notices and other formalities of every kind in connection with this Agreement (except as otherwise provided in this Agreement).  Each Borrower hereby assents to, and waives (to the extent permitted by applicable law) notice of, any extension or postponement of the time for the payment of any of the Obligations, the acceptance of any payment of any of the Obligations, the acceptance of any partial payment thereon, any waiver, consent or other action or acquiescence by Agent or Lenders at any time or times in respect of any default by any Borrower in the performance or satisfaction of any term, covenant, condition or provision of this Agreement, any and all other indulgences whatsoever by Agent or Lenders in respect of any of the Obligations, and the taking, addition, substitution or release, in whole or in part, at any time or times, of any security for any of the Obligations or the addition, substitution or release, in whole or in part, of any Borrower.  Without limiting the generality of the foregoing, each Borrower assents to any other action or delay in acting or failure to act on the part of any Agent or Lender with respect to the failure by any Borrower to comply with any of its respective Obligations, including, without limitation, any failure strictly or diligently to assert any right or to pursue any remedy or to comply fully with applicable laws or regulations thereunder, which might, but for the provisions of this Section 2.17 afford grounds for terminating, discharging or relieving any Borrower, in whole or in part, from any of its Obligations under this Section 2.17, it being the intention of each Borrower that, so long as any of the Obligations hereunder remain unsatisfied, the Obligations of each Borrower under this Section 2.17 shall not be discharged except by performance and then only to the extent of such performance.  The Obligations of each Borrower under this Section 2.17 shall not be diminished or rendered unenforceable by any winding up, reorganization, arrangement, liquidation, reconstruction or similar proceeding with respect to any other Borrower or any Agent or Lender.

(e)    Each Borrower represents and warrants to Agent and Lenders that such Borrower is currently informed of the financial condition of Borrowers and of all other circumstances which a diligent inquiry would

35

reveal and which bear upon the risk of nonpayment of the Obligations. Each Borrower further represents and warrants to Agent and Lenders that such Borrower has read and understands the terms and conditions of the Loan Documents. Each Borrower hereby covenants that such Borrower will continue to keep informed of Borrowers' financial condition and of all other circumstances which bear upon the risk of nonpayment or nonperformance of the Obligations.

(f)      The provisions of this Section 2.17 are made for the benefit of Agent, each Lender, and their respective successors and assigns, and may be enforced by it or them from time to time against any or all Borrowers as often as occasion therefor may arise and without requirement on the part of Agent, any Lender, or any of their successors or assigns first to marshal any of its or their claims or to exercise any of its or their rights against any Borrower or to exhaust any remedies available to it or them against any Borrower or to resort to any other source or means of obtaining payment of any of the Obligations hereunder or to elect any other remedy. The provisions of this Section 2.17 shall remain in effect until all of the Obligations shall have been paid in full or otherwise fully satisfied. If at any time, any payment, or any part thereof, made in respect of any of the Obligations, is rescinded or must otherwise be restored or returned by Agent or any Lender upon the insolvency, bankruptcy or reorganization of any Borrower, or otherwise, the provisions of this Section 2.17 will forthwith be reinstated in effect, as though such payment had not been made.

(g)      Each Borrower hereby agrees that it will not enforce any of its rights of contribution or subrogation against any other Borrower with respect to any liability incurred by it hereunder or under any of the other Loan Documents, any payments made by it to Agent or Lenders with respect to any of the Obligations or any collateral security therefor until such time as all of the Obligations have been paid in full in cash. Any claim which any Borrower may have against any other Borrower with respect to any payments to any Agent or any Lender hereunder are hereby expressly made subordinate and junior in right of payment, without limitation as to any increases in the Obligations arising hereunder or thereunder, to the prior payment in full in cash of the Obligations and, in the event of any insolvency, bankruptcy, receivership, liquidation, reorganization or other similar proceeding under the laws of any jurisdiction relating to any Borrower, its debts or its assets, whether voluntary or involuntary, all such Obligations shall be paid in full in cash before any payment or distribution of any character, whether in cash, securities or other property, shall be made to any other Borrower therefor.

(h)      Each Borrower hereby agrees that after the occurrence and during the continuance of any Default or Event of Default, such Borrower will not demand, sue for or otherwise attempt to collect any indebtedness of any other Borrower owing to such Borrower until the Obligations shall have been paid in full in cash. If, notwithstanding the foregoing sentence, such Borrower shall collect, enforce or receive any amounts in respect of such indebtedness, such amounts shall be collected, enforced and received by such Borrower as trustee for Agent, and such Borrower shall deliver any such amounts to Agent for application to the Obligations in accordance with the terms herein.

Section 2.18. *No Discharge; Survival of Claims.* Until payment in full of the Loans and all other Obligations, each of the Borrowers and the Guarantors agree that (a) the Obligations hereunder shall not be discharged by the entry of an order confirming a plan of reorganization or liquidation in any Chapter 11 Case (and each of the Borrowers and the Guarantors, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waive any such discharge) and (b) the Term DIP Claims and the Liens granted to the Agents pursuant to the Orders and described in this Section 2.18 shall not be affected in any manner by the entry of an order confirming a plan of reorganization or liquidation in any Chapter 11 Case.

Section 2.19. *[Reserved].*

Section 2.20. *Waiver of any Pari or Priming Rights.* On and after the Closing Date, and on behalf of themselves and their estates, and for so long as any Obligations shall be outstanding, the Borrowers and the Guarantors hereby irrevocably waive any right to seek, pursuant to Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any Lien of equal or greater priority than the Liens securing the Obligations, or to

approve a claim of equal or greater priority than the Obligations, in each case, other than as contemplated by the Orders.

# ARTICLE 3
### TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY

Section 3.01. *Taxes.* (a) Except as provided in this Section 3.01 or as required by an applicable Law, any and all payments made by or on account of the Borrowers or any Guarantor under any Loan Document to any Lender or Agent shall be made free and clear of and without deduction or withholding for any Taxes, excluding (i) Taxes imposed on or measured by net income, however denominated, and franchise (and similar) Taxes imposed on it in lieu of net income Taxes, (ii) Taxes attributable to the failure by the relevant Lender or Agent to deliver the documentation required to be delivered pursuant to clause (d) of this Section 3.01, (iii) Taxes imposed by a jurisdiction as a result of any connection between such Lender or Agent and such jurisdiction other than any connection arising from executing, delivering, being a party to, engaging in any transactions pursuant to, performing its obligations under, or enforcing any Loan Document, (iv) any branch profits Taxes imposed by the United States or any similar Tax imposed by any other jurisdiction in which the Borrowers or any Guarantor (as appropriate) is located, (v) any U.S. federal tax that is in effect and would be required to be withheld with respect to amounts payable hereunder at such time the Lender or Agent becomes a party to this Agreement, or designates a new lending office, except to the extent such Lender or Agent's assignor, if any, was entitled at the time of designation of a new lending office (or assignment) to receive additional amounts with respect to such withholding tax pursuant to this Section 3.01 and (vi) any U.S. federal withholding Taxes imposed under FATCA (all such non-excluded Taxes, being hereinafter referred to as "**Indemnified Taxes**").  If the Borrowers, any Guarantor or other applicable withholding agent shall be required by any Laws to deduct any Taxes from or in respect of any sum payable under any Loan Document to any Agent or any Lender, (i) the applicable withholding agent shall make such deductions, (ii) the applicable withholding agent shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable Laws, (iii) if such Tax is an Indemnified Tax or Other Tax (as defined below), the sum payable by the Borrowers or Guarantor shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 3.01), such Agent or Lender (as the case may be) receives an amount equal to the sum it would have received had no such deductions been made, and (iv) within thirty (30) days after the date of such payment (or, if receipts or evidence are not available within thirty (30) days, as soon as possible thereafter), if the Borrowers or any Guarantor is the applicable withholding agent, the applicable withholding agent shall furnish to such Agent or Lender (as the case may be) the original or a copy of a receipt evidencing payment thereof or other evidence reasonably acceptable to such Agent or Lender.

(b)    In addition but without duplication of any obligation pursuant to Section 3.01(a), the Borrowers agree to pay any and all present or future stamp, court or documentary taxes and any other excise, property, intangible or mortgage recording taxes, or charges or levies of the same character, imposed by any Governmental Authority, which arise from any payment made under any Loan Document or from the execution, delivery, performance, enforcement or registration of, or otherwise with respect to, any Loan Document (including additions to tax, penalties and interest related thereto) excluding, in each case, such amounts that result from an Agent or Lender's Assignment and Acceptance, grant of a participation, transfer or assignment to or designation of a new applicable lending office or other office for receiving payments under any Loan Document (collectively, "**Assignment Taxes**") except for Assignment Taxes resulting from an assignment that is requested or required in writing by the Lead Borrower (all such non-excluded taxes described in this Section 3.01(b) being hereinafter referred to as "**Other Taxes**").

(c)    Without duplication of any obligation pursuant to Section 3.01(a) or (b), the Borrowers and each Guarantor agree to indemnify each Agent and each Lender for (i) the full amount of Indemnified Taxes and Other Taxes paid by such Agent or Lender and (ii) any reasonable expenses arising therefrom or with respect thereto, provided such Agent or Lender, as the case may be, provides Borrowers or Guarantor with a written statement thereof setting forth in reasonable detail the basis and calculation of such amounts.

(d)    Each Lender and Agent shall, at such times as are reasonably requested by the Lead Borrower or the Administrative Agent, provide the Lead Borrower and the Administrative Agent with any documentation prescribed by Law certifying as to any entitlement of such Lender or Agent to an exemption from, or reduction in, withholding tax with respect to any payments to be made to such Lender under the Loan Documents.  Each such Lender and Agent shall, whenever a lapse in time or change in circumstances renders such documentation obsolete or inaccurate in any material respect, deliver promptly to the Lead Borrower and the Administrative Agent updated or other appropriate documentation (including any new documentation reasonably requested by the applicable withholding agent) or promptly notify the Lead Borrower and the Administrative Agent of its inability to do so.  Unless the applicable withholding agent has received forms or other documents satisfactory to it indicating that payments under any Loan Document to or for a Lender are not subject to withholding tax or are subject to such Tax at a rate reduced by an applicable tax treaty, the Lead Borrower, the Administrative Agent or other applicable withholding agent shall withhold amounts required to be withheld by applicable Law from such payments at the applicable statutory rate.  Notwithstanding the foregoing, a Lender shall not be required to deliver any form pursuant to this clause (d) that such Lender is not legally able to deliver.  In addition, each Lender and Agent shall deliver to the Lead Borrower and the Administrative Agent such other tax forms or other documents as shall be prescribed by applicable Law, to the extent applicable, (x) as may be necessary for the Borrowers and the Administrative Agent to comply with their obligations under the FATCA and to demonstrate that payments to such Lender or Agent under this Agreement and the other Loan Documents are exempt from any United States federal withholding tax imposed pursuant to FATCA or (y) to allow the Lead Borrower and the Administrative Agent to determine the amount to deduct or withhold under FATCA from a payment hereunder.  For purposes of this clause (d), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.  Without limiting the foregoing:

(i)    Each Lender and Agent that is a United States person (as defined in Section 7701(a)(30) of the Code) shall deliver to the Lead Borrower and the Administrative Agent on or before the date on which it becomes a party to this Agreement two properly completed and duly signed original copies of Internal Revenue Service Form W-9 certifying that such Lender or Agent (as the case may be) is exempt from federal backup withholding.

(ii)    Each Lender and Agent that is not a United States person (as defined in Section 7701(a)(30) of the Code) shall deliver to the Lead Borrower and the Administrative Agent on or before the date on which it becomes a party to this Agreement whichever of the following is applicable:

(A)    In the case of a Lender claiming eligibility for the benefits of an income tax treaty to which the United States is a party, two properly completed and duly signed original copies of Internal Revenue Service Form W-8BEN or W-8BEN-E (or any successor forms), and such other documentation as required under the Code,

(B)    two properly completed and duly signed original copies of Internal Revenue Service Form W-8ECI (or any successor forms) and, in the case of an Agent, a withholding certificate that satisfies the requirements of Treasury Regulation Sections 1.1441-1(b)(2)(iv) and 1.1441-1(e)(3)(v) as applicable to a U.S. branch that has agreed to be treated as a U.S. person for withholding tax purposes,

(C)    in the case of a Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (A) a certificate substantially in the form of Exhibit E-1, E-2, E-3 or E-4, as applicable (any such certificate a "**United States Tax Compliance Certificate**") and (B) two properly completed and duly signed original copies of Internal Revenue Service Form W-8BEN or W-8BEN-E, or

(D)    to the extent a Lender is not the beneficial owner (for example, where the Lender is a partnership, or is a participant holding a participation granted by a participating Lender), Internal Revenue Service Form W-8IMY (or any successor forms) of the Lender,

accompanied by a Form W-8ECI, W-8BEN or W-8BEN-E, United States Tax Compliance Certificate, Form W-9, Form W-8IMY or any other required information from each beneficial owner, as applicable (provided that, if one or more beneficial owners are claiming the portfolio interest exemption, the United States Tax Compliance Certificate may be provided by such Lender on behalf of such beneficial owner).

(E)    Each Lender and Agent shall deliver to the Lead Borrower and the Administrative Agent two further original copies of any previously delivered form or certification (or any applicable successor form) on or before the date that any such form or certification expires or becomes obsolete or inaccurate and promptly after the occurrence of any event requiring a change in the most recent form previously delivered by it to the Lead Borrower or the Administrative Agent, or promptly notify the Lead Borrower and the Administrative Agent that it is unable to do so.    Each Lender and Agent shall promptly notify the Administrative Agent at any time it determines that it is no longer in a position to provide any previously delivered form or certification to the Lead Borrower or the Administrative Agent.

(F)    If a payment made to a Lender or Agent under any Loan Document would be subject to U.S. federal withholding tax imposed under FATCA if such Lender or Agent were to fail to comply with the applicable reporting requirements of FATCA, such Lender or Agent shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by Laws and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable Laws and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine whether such Lender or Agent has or has not complied with such Person's obligations under FATCA and, if necessary, to determine the amount to deduct and withhold from such payment. Solely for purposes on this Section 3.01(d)(ii)(F), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(e)    Any Lender or Agent claiming any additional amounts payable pursuant to this Section 3.01 shall use its reasonable efforts to change the jurisdiction of its lending office (or take any other measures reasonably requested by the Lead Borrower) if such a change or other measures would reduce any such additional amounts (or any similar amount that may thereafter accrue) and would not, in the sole determination of such Lender, result in any unreimbursed cost or expense or be otherwise materially disadvantageous to such Lender.

(f)    If any Lender or Agent determines, in its sole discretion exercised in good faith, that it has received a refund in respect of any Indemnified Taxes or Other Taxes as to which indemnification or additional amounts have been paid to it by the Borrowers pursuant to this Section 3.01 (including by the payment of additional amounts pursuant to this Section 3.01), it shall promptly remit such refund to the Borrowers or Guarantor, net of all out-of-pocket expenses of the Lender or Agent, as the case may be and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund net of any Taxes payable by any Agent or Lender on such interest); *provided* that the Borrowers and Guarantors, upon the request of the Lender or Agent, as the case may be, agree promptly to return such refund (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to such party in the event such party is required to repay such refund to the relevant Governmental Authority.  Notwithstanding anything to the contrary in this clause (f), in no event will the Lender or Agent be required to pay any amount to the Borrower or Guarantor pursuant to this clause (f) the payment of which would place such Lender or Agent in a less favorable net after-Tax position than such Lender or Agent would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This section shall not be construed to require the Administrative Agent or any Lender to make available its tax returns (or any other information relating to Taxes that it deems confidential) to the Borrowers or any other person.

(g)      Each party's obligations under this Section 3.01 shall survive any assignment of rights by, or the replacement of, a Lender, the termination of the Term Loan Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

Section 3.02.  *Illegality.*  If any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable lending office to make, maintain or fund Eurodollar Loans, or to determine or charge interest rates based upon the LIBO Rate, then, on notice thereof by such Lender to the Lead Borrower through the Administrative Agent, any obligation of such Lender to make or continue Eurodollar Loans shall be suspended until such Lender notifies the Administrative Agent and the Lead Borrower that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice, the Borrowers shall upon demand from such Lender (with a copy to the Administrative Agent), prepay, either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Eurodollar Loans to such day, or promptly, if such Lender may not lawfully continue to maintain such Eurodollar Loans.  Upon any such prepayment or conversion, the Borrowers shall also pay accrued interest on the amount so prepaid or converted and all amounts due, if any, in connection with such prepayment or conversion under Section 3.05.  Each Lender agrees to designate a different lending office if such designation will avoid the need for such notice and will not, in the good faith judgment of such Lender, otherwise be materially disadvantageous to such Lender.

Section 3.03.  *[Reserved].*

Section 3.04.  *Increased Cost and Reduced Return; Capital Adequacy; Reserves on Eurodollar Loans.*  (a) If any Lender reasonably determines that as a result of the introduction of or any change in or in the interpretation of any Law, in each case after the Closing Date, or such Lender's compliance therewith, there shall be any increase in the cost to such Lender of agreeing to make or making, funding or maintaining any Eurodollar Loans, or a reduction in the amount received or receivable by such Lender in connection with any of the foregoing (excluding for purposes of this Section 3.04(a) any such increased costs or reduction in amount resulting from (i) Indemnified Taxes or Other Taxes covered by Section 3.01 or (ii) reserve requirements contemplated by Section 3.04(c) or reflected in the Adjusted LIBO Rate) and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Eurodollar Loan (or of maintaining its obligations to make any Loan), or to reduce the amount of any sum received or receivable by such Lender, then from time to time within fifteen (15) days after demand by such Lender setting forth in reasonable detail such increased costs (with a copy of such demand to the Administrative Agent given in accordance with Section 3.06), the Borrowers shall pay to such Lender such additional amounts as will compensate such Lender for such increased cost or reduction.

(b)      If any Lender determines that the introduction of any Law regarding capital adequacy or any change therein or in the interpretation thereof, in each case after the Closing Date, or compliance by such Lender (or its lending office) therewith, has the effect of reducing the rate of return on the capital of such Lender or any entity controlling such Lender as a consequence of such Lender's obligations hereunder (taking into consideration its policies with respect to capital adequacy and such Lender's desired return on capital), then from time to time upon demand of such Lender setting forth in reasonable detail the charge and the calculation of such reduced rate of return (with a copy of such demand to the Administrative Agent given in accordance with Section 3.06), the Borrowers shall pay to such Lender such additional amounts as will compensate such Lender or controlling entity for such reduction within fifteen (15) days after receipt of such demand.

(c)      Except to the extent already reflected in the Adjusted LIBO Rate, the Borrowers shall pay to each Lender, (i) as long as such Lender shall be required to maintain reserves with respect to liabilities or assets consisting of or including Eurodollar funds or deposits, additional interest on the unpaid principal amount of each applicable Eurodollar Loan of the Borrowers equal to the actual costs of such reserves allocated to such Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive in the absence of manifest error), and (ii) as long as such Lender shall be required to comply with any reserve ratio requirement or analogous requirement of any other central banking or financial regulatory authority imposed in respect of the maintenance of the Term Loan Commitments or the funding of any Eurodollar Loans of the Borrowers, such

additional costs (expressed as a percentage per annum and rounded upwards, if necessary, to the nearest five decimal places) equal to the actual costs allocated to such Term Loan Commitment or Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive absent manifest error) which in each case shall be due and payable on each date on which interest is payable on such Loan, provided the Borrowers shall have received at least fifteen (15) days' prior notice (with a copy to the Administrative Agent) of such additional interest or cost from such Lender. If a Lender fails to give notice fifteen (15) days prior to the relevant Interest Payment Date, such additional interest or cost shall be due and payable fifteen (15) days from receipt of such notice.

(d)     Failure or delay on the part of any Lender to demand compensation pursuant to this Section 3.04 or Section 3.01 shall not constitute a waiver of such Lender's right to demand such compensation; provided that the Borrower shall not be required to compensate a Lender pursuant to Section 3.01 or this Section 3.04 for any amounts incurred or reductions suffered more than nine months prior to the date that such Lender notifies a Borrower of the change in law or payment of Tax giving rise to the incurrence of such amount or reduction, and of such Lender's intention to claim compensation therefor (except that, if the change in law giving rise to such amount incurred or reduction is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

(e)     If any Lender requests compensation under this Section 3.04, then such Lender will, if requested by the Lead Borrower, use commercially reasonable efforts to designate another lending office for any Loan affected by such event; *provided* that such efforts are made on terms that, in the reasonable judgment of such Lender, cause such Lender and its lending office(s) to suffer no material economic, legal or regulatory disadvantage, and *provided further* that nothing in this Section 3.04(e) shall affect or postpone any of the Obligations of the Borrowers or the rights of such Lender pursuant to Section 3.04(a), (b), (c) or (d).

Section 3.05.    *Funding Losses.*    Upon written demand of any Lender (with a copy to the Administrative Agent) from time to time, which demand shall set forth in reasonable detail the basis for requesting such amount, the Borrowers shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense actually incurred by it as a result of:

(i)     any payment or prepayment of any Loan of the Borrowers on a day prior to the last day of the Interest Period for such Loan; or

(ii)     any failure by the Borrowers (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any Loan of the Borrowers on the date or in the amount notified by the Borrowers;

including an amount equal to the excess, as reasonably determined by such Lender, of (1) its cost of obtaining funds for the Loan that is the subject of such event for the period from the date of such event to the last day of the Interest Period in effect (or that would have been in effect) for such Loan over (2) the amount of interest likely to be realized by such Lender in redeploying the funds released or not utilized by reason of such event for such period, but excluding loss of anticipated profits.

Section 3.06.    *Matters Applicable to all Requests for Compensation.*    (a) Any Agent or any Lender claiming compensation under this Article 3 shall deliver a certificate to the Lead Borrower setting forth the additional amount or amounts to be paid to it hereunder which shall be conclusive in the absence of manifest error. In determining such amount, such Agent or such Lender may use any reasonable averaging and attribution methods.

(b)     With respect to any Lender's claim for compensation under Section 3.01, 3.02 or 3.04, the Borrowers shall not be required to compensate such Lender for any amount incurred more than one hundred and eighty (180) days prior to the date that such Lender notifies the Lead Borrower of the event that gives rise to such claim; *provided* that, if the circumstance giving rise to such claim is retroactive, then such 180-day period referred

41

to above shall be extended to include the period of retroactive effect thereof.  If any Lender requests compensation by the Borrowers under Section 3.04, the Borrowers may, by notice from the Lead Borrower to such Lender (with a copy to the Administrative Agent), suspend the obligation of such Lender to make or continue from one Interest Period to another, until the event or condition giving rise to such request ceases to be in effect (in which case the provisions of Section 3.06(c) shall be applicable); *provided* that such suspension shall not affect the right of such Lender to receive the compensation so requested.

(c)      If the obligation of any Lender to make or continue any Eurodollar Loan, or to convert ABR Loans into Eurodollar Loans shall be suspended pursuant to Section 3.06(b) hereof, such Lender's applicable Eurodollar Loans shall be automatically converted into ABR Loans (or, if such conversion is not possible, repaid) on the last day(s) of the then current Interest Period(s) for such Eurodollar Loans (or, in the case of an immediate conversion required by Section 3.02, on such earlier date as required by Law) and, unless and until such Lender gives notice as provided below that the circumstances specified in Section 3.02 or 3.04 hereof that gave rise to such conversion no longer exist:

(i)      to the extent that such Lender's Eurodollar Loans have been so converted, all payments and prepayments of principal that would otherwise be applied to such Lender's applicable Eurodollar Loans shall be applied instead to its ABR Loans; and

(ii)      all Loans that would otherwise be made or continued from one Interest Period to another by such Lender as Eurodollar Loans shall be made or continued instead as ABR Loans (if possible), and all ABR Loans of such Lender that would otherwise be converted into Eurodollar Loans shall remain as ABR Loans.;

(d)      If any Lender gives notice to the Lead Borrower (with a copy to the Administrative Agent) that the circumstances specified in Section 3.02 or 3.04 hereof that gave rise to the conversion of any of such Lender's Eurodollar Loans pursuant to this Section 3.06 no longer exist (which such Lender agrees to do promptly upon such circumstances ceasing to exist) at a time when Eurodollar Loans made by other Lenders under the applicable Term DIP Facility are outstanding, if applicable, such Lender's ABR Loans shall be automatically converted, on the first day(s) of the next succeeding Interest Period(s) for such outstanding Eurodollar Loans, to the extent necessary so that, after giving effect thereto, all Loans held by the Lenders holding Eurodollar Loans under such Term DIP Facility and by such Lender are held pro rata (as to principal amounts, interest rate basis, and Interest Periods) in accordance with their respective Term Loan Commitments for the applicable Term DIP Facility.

(e)      Notwithstanding anything herein to the contrary, the Dodd Frank Wall Street Reform and Consumer Protection Act, and all requests, rules, guidelines and directives promulgated thereunder, shall be deemed to have been adopted after the Closing Date, regardless of the date enacted or adopted.

Section 3.07.   *[Reserved]*.

Section 3.08.   *Survival.*  All of the Borrowers' obligations under this Article 3 shall survive termination of the Term Loan Commitments and repayment of all other Obligations hereunder.

# ARTICLE 4
### CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

Section 4.01.   *Conditions Precedent to Closing Date.*  The obligation of each Lender to make a Borrowing hereunder on the Closing Date is subject to the satisfaction or due waiver in accordance with Section 10.08 of each of the following conditions precedent on or prior to the date that is not more than two (2) Business Days after the Interim Order Entry Date, except as otherwise agreed between the Borrower, the Administrative Agent and the Required Lenders:

(a)      The Administrative Agent shall have received executed counterparts of this Agreement and the other Loan Documents executed by each party hereto and thereto, each of which shall be in form and substance satisfactory to the Required Lenders.

(b)      *[Reserved].*

(c)      The Chapter 11 Cases shall have been commenced in the Bankruptcy Court and all of the "first day orders" and all related pleadings to be entered at the time of commencement of the Chapter 11 Cases or shortly thereafter shall be in form and substance reasonably satisfactory to the Required Lenders.

(d)      The Administrative Agent shall have received the Approved Budget.

(e)      The Interim Order shall have been entered by the Bankruptcy Court within three (3) Business Days of the Petition Date and the Administrative Agent shall have received a true and complete copy of such order, and such order, be in full force and effect and shall not have been reversed, modified, amended, stayed or vacated absent prior written consent of the Administrative Agent and the Required Lenders.

(f)      Other than the Interim Order, there shall not exist any law, regulation, ruling, judgment, order, injunction or other restraint that prohibits, restricts or imposes a materially adverse condition on the Term DIP Facility or the exercise by the Administrative Agent at the direction of the Lenders of its rights as a secured party with respect to the Collateral.

(g)      The Administrative Agent shall have received UCC, tax and judgment lien searches and other appropriate evidence, in form and substance satisfactory to the Administrative Agent.

(h)      The Administrative Agent shall have received appropriate UCC-1 financing statements for filing under the UCC of each jurisdiction of organization of each Loan Party.

(i)      The Administrative Agent shall have received customary certificates of resolutions or other action, incumbency certificates of Responsible Officers of each Loan Party evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party and (B) certificates (including Organization Documents and good standing certificates) relating to the organization, existence and good standing of each Loan Party in its jurisdiction of organization, in each case, as certified by the Secretary or an Assistant Secretary of such Loan Party.

(j)      *[Reserved];*

(k)      The representations and warranties set forth in Article 5 and in each other Loan Document shall be true and correct in all material respects (without duplication of any materiality qualifier) on and as of the date of such Borrowing with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case they shall be true and correct in all material respects (without duplication of any materiality qualifier) as of such earlier date; *provided*, that any such representation and warranty that is qualified by "materiality", "material adverse effect" or similar language shall be true and correct in all respects (after giving effect to such qualification therein) on and as of the date of such Borrowing with the same effect as though made on and as of such date or such earlier date, as applicable.

(l)      Other than the Chapter 11 Cases or as stayed upon the commencement of the Chapter 11 Cases, there shall exist no action, suit, investigation, litigation or proceeding pending or threatened in any court or before any arbitrator or governmental instrumentality that (i) except as disclosed on Schedule 5.06 hereto, if adversely determined, could reasonably be expected to result in a Material Adverse Effect or (ii) restrains, prevents or

43

imposes or can reasonably be expected to impose materially adverse conditions upon the Term DIP Facility, the Collateral or the transactions contemplated thereby.

(m)    Other than the Orders, all governmental and third party consents and approvals necessary in connection with entry into the Term DIP Facility shall have been obtained (without the imposition of any conditions that are not acceptable to the Administrative Agent and the Required Lenders).

(n)    No Default or Event of Default shall exist or would result from such proposed Borrowing or from the application of the proceeds therefrom.

(o)    There has been no event or circumstance, either individually or in the aggregate, that could reasonably be expected to have a Material Adverse Effect.

(p)    The Administrative Agent shall have received a Borrowing Notice in accordance with the requirements hereof.

(q)    The Borrowers shall have paid to the Administrative Agent and Lenders all fees and expenses then due and payable under the Loan Documents subject to and in accordance with the Interim Order, including all reasonable and document out-of-pocket fees, costs, disbursements and expense of (i) the Administrative Agent (including, in the case of counsel, to all reasonable fees, costs, disbursements and expenses of the Administrative Agent's outside counsel, King & Spalding LLP, Sullivan & Cromwell LLP, as special tax counsel, and McGuire Woods, as local Virginia counsel in connection with the Debtors' Chapter 11 Cases), (ii) AlixPartners, LLP, as financial advisor to the Lenders (pursuant to that certain letter of engagement dated as of January 3, 2019, by and among King & Spalding LLP, AlixPartners, LLP, the Administrative Agent, and Gymboree Group, Inc.), and (iii) any other professional advisors retained by the Administrative Agent or their counsel, on or before the Closing Date, shall have been paid in full in cash, to the extent invoiced to the Borrower no later than one (1) Business Day prior to the Closing Date.

(r)    All material motions and other documents to be filed with and submitted to the Bankruptcy Court (provided that any of the foregoing relating to the Term DIP Facilities shall be deemed material) and the approval thereof shall be in form and substance reasonably satisfactory to the Required Lenders.

(s)    The Borrowers shall have entered into the Stalking Horse Agreement and shall have filed the IP and Online Business Bid Procedures Motion.

(t)    The Borrowers shall have entered into the Agency Agreement.

Section 4.02.  *Conditions to each Borrowing after the Closing Date.*  Each Lender shall make a Borrowing of Term DIP Loans to be made by it after the Closing Date subject only to the following conditions precedent:

(a)    No Default or Event of Default shall exist or would result from such proposed Borrowing or from the application of the proceeds therefrom.

(b)    The representations and warranties set forth in Article 5 and in each other Loan Document shall be true and correct in all material respects (without duplication of any materiality qualifier) on and as of the date of such Borrowing with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case they shall be true and correct in all material respects (without duplication of any materiality qualifier) as of such earlier date; *provided,* that any such representation and warranty that is qualified by "materiality", "material adverse effect" or similar language shall be true and correct in all respects (after giving effect to such qualification therein) on and as of the date of such Borrowing with the same effect as though made on and as of such date or such earlier date, as applicable.

44

(c)      The Final Order shall have been entered by the Bankruptcy Court and the Administrative Agent shall have received a true and complete copy of such order, and such order shall be in full force and effect and shall not have been reversed, modified, amended, stayed or vacated absent prior written consent of the Administrative Agent at the direction of the Required Lenders.

(d)      The making of such proposed Borrowing shall comply with the Approved Budget, subject to any Permitted Variances.

(e)      The making of such Term DIP Loans shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently.

(f)      Other than the Orders, there shall not exist any law, regulation, ruling, judgment, order, injunction or other restraint that prohibits, restricts or imposes a materially adverse condition on the Term DIP Facilities or the exercise by the Administrative Agent at the direction of the Required Lenders of its rights as a Secured Party with respect to the Collateral.

# ARTICLE 5
### REPRESENTATIONS AND WARRANTIES

Each of Holdings, the Borrowers and each of the Subsidiary Guarantors party hereto represents and warrants to the Administrative Agent, the Collateral Agent and each of the Lenders that:

Section 5.01.  *Existence, Qualification and Power; Compliance with Laws.*  Each Loan Party and each Subsidiary (a) is a Person duly organized or formed, validly existing and in good standing (where relevant) under the Laws of the jurisdiction of its incorporation or organization, (b) solely to the extent expressly permitted by the Orders and other orders of the Bankruptcy Court, as applicable, has all requisite power and authority to (i) own or lease its assets and carry on its business as currently conducted and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party and, in the case of the Borrowers, to borrow hereunder, (c) is duly qualified and in good standing (where relevant) under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, (d) is in compliance with all Laws, orders, writs and injunctions, unless stayed by the Chapter 11 Cases, and (e) has all requisite governmental licenses, authorizations, consents and approvals to operate its business as currently conducted unless stayed by the Chapter 11 Cases; except in each case, referred to in clause (a) (other than with respect to any Loan Party), (b), (c), (d) or (e), to the extent that failure to do so, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect. Neither the Borrower nor any other Loan Party is an EEA Financial Institution.

Section 5.02.  *Authorization; No Contravention.*  Subject to the entry and the terms of the Orders, the execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party, are within such Loan Party's corporate or other powers, (a) have been duly authorized by all necessary corporate or other organizational action, and (b) do not (i) contravene the terms of any of such Person's Organization Documents, (ii) conflict with or result in any breach or contravention of, or the creation of (or the requirement to create) any Lien under (other than as permitted by Section 7.01), or require any payment to be made under (x) any Post-Petition Contractual Obligation to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries or (y) any material order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; or (iii) violate any material Law; except with respect to any conflict, breach or contravention or payment (but not creation of Liens) referred to in clause (ii)(x), to the extent that such violation, conflict, breach, contravention or payment, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

Section 5.03.  *Governmental Authorization; Other Consents.*  Other than the Orders, no approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with (a) the execution, delivery or

45

performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, (b) the grant by any Loan Party of the Liens granted by it pursuant to the Collateral Documents, (c) the perfection or maintenance of the Liens created under the Collateral Documents (including the priority thereof) or (d) the exercise by the Administrative Agent, the Collateral Agent or any Lender of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents, except for (i) any filings and registrations necessary to perfect the Liens on the Collateral granted by the Loan Parties in favor of the Secured Parties, (ii) the approvals, consents, exemptions, authorizations, actions, notices and filings which have been duly obtained, taken, given or made and are in full force and effect and (iii) those approvals, consents, exemptions, authorizations or other actions, notices or filings, the failure of which to obtain or make, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

Section 5.04. *Binding Effect.* This Agreement and each other Loan Document has been duly executed and delivered by each Loan Party that is a party thereto. Subject to the entry and the terms of the Orders, this Agreement and each other Loan Document constitutes a legal, valid and binding obligation of each such Loan Party, enforceable against each Loan Party that is a party thereto in accordance with its terms, except as such enforceability may be limited by Debtor Relief Laws and by general principles of equity.

Section 5.05. *Financial Statements; No Material Adverse Effect.*

(a)     The financial statements of the Company and its Subsidiaries as of the last day of the most recent fiscal quarter for which such statements were delivered have been prepared in good faith, based on assumptions believed by the Borrowers to be reasonable as of the date of delivery thereof. The forecasts of income statements of the Borrowers and their Subsidiaries which have been furnished to the Administrative Agent prior to the Closing Date have been prepared in good faith on the basis of the assumptions stated therein, which assumptions were believed to be reasonable at the time of preparation of such forecasts, it being understood that actual results may vary from such forecasts and that such variations may be material.

(b)     Since the Petition Date, except for the Chapter 11 Cases, there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

(c)     As of the Petition Date, neither Holdings, the Borrowers nor any of their Subsidiaries has any Indebtedness or other obligations or liabilities, direct or contingent (other than (i) the liabilities reflected on Schedule 5.05, (ii) obligations arising under the Loan Documents, and (iii) liabilities incurred in the ordinary course of business that, either individually or in the aggregate, have had or could reasonably be expected to have a Material Adverse Effect).

Section 5.06. *Litigation.* Except for the Chapter 11 Cases and as specifically disclosed on Schedule 5.06 hereto, there are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of Holdings or the Borrowers, threatened in writing, at law, in equity, in arbitration or before any Governmental Authority, by or against Holdings, the Borrowers or any of their Subsidiaries or against any of their properties or revenues that, either individually or in the aggregate could reasonably be expected to have a Material Adverse Effect.

Section 5.07. *Compliance With Laws; No Default.* (a) Neither Holdings or the Borrowers nor any of their Subsidiaries is in default under or with respect to, or a party to, any Post-Petition Contractual Obligation that could, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)     None of Holdings, the Borrowers or any of their Subsidiaries or any of their respective properties or assets is in violation of, nor will the continued operation of their properties and assets as currently conducted violate, any law, rule or regulation (including any zoning, building, Environmental Law, ordinance, code or approval or any building permits) or any restrictions of record or agreements affecting the Real Property or is in

46

default with respect to any unstayed judgment, writ, injunction, decree or order of any Governmental Authority, where such violation or default, individually or in the aggregate could reasonably be expected to result in a Material Adverse Effect.

Section 5.08.  *Ownership of Property; Liens; Casualty Events.*  (a) Each of Holdings, the Borrowers and their Subsidiaries has good record title to, or valid leasehold interests in, or easements or other limited property interests in, all its properties and assets, free and clear of all Liens except for minor defects in title that do not materially interfere with its ability to conduct its business or to utilize such assets for their intended purposes and Liens permitted by Section 7.01 and except where the failure to have such title could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)    As of the Closing Date, Schedule 5.08 contains a true and complete list of each Real Property owned by Holdings, the Borrowers and their Subsidiaries.

(c)    As of the Closing Date, except as otherwise disclosed in writing to the Collateral Agent, no Loan Party has received any notice of, nor has any knowledge of, the occurrence (and still pending as of the Closing Date) or pendency or contemplation of any Casualty Event affecting all or any portion of Real Property.

Section 5.09.  *Environmental Matters.*  Except as could not reasonably be expected to have, individually or in the aggregate a Material Adverse Effect or as set forth on Schedule 5.09 hereto:

(a)    Each Loan Party and each Subsidiary is and has been in compliance with all Environmental Laws, which includes obtaining and maintaining all applicable Environmental Permits required under such Environmental Laws to carry on the business of the Loan Parties and their Subsidiaries unless stayed by the Chapter 11 Cases;

(b)    the Loan Parties and their Subsidiaries have not received any written notice that alleges any of them is in violation of or potentially liable under any Environmental Laws and none of the Loan Parties and their Subsidiaries nor any of the Real Property is the subject of any claims, investigations, liens, demands, or judicial, administrative or arbitral proceedings pending or, to the knowledge of the Borrowers, threatened in writing, under any Environmental Law or to revoke or modify any Environmental Permit held by any of the Loan Parties or their Subsidiaries;

(c)    there has been no Release, discharge or disposal of Hazardous Materials on, to, at, under or from any Real Property or facilities owned or leased by any of the Loan Parties or their Subsidiaries, or, to the knowledge of the Borrowers, Real Property formerly owned, operated or leased by any Loan Party or any Subsidiary or arising out of the conduct of the Loan Parties or their Subsidiaries that could reasonably be expected to require investigation, remedial activity or corrective action or cleanup or could reasonably be expected to result in the Borrowers or any other Loan Party or Subsidiary incurring liability relating to Environmental Laws; and

(d)    there are no facts, circumstances or conditions arising out of or relating to the operations of the Loan Parties or their Subsidiaries or any Real Property or facilities currently or previously owned or leased by the Loan Parties or any Subsidiary that could reasonably be expected to require investigation, remedial activity or corrective action or cleanup or could reasonably be expected to result in the Borrowers or any other Loan Party or Subsidiary incurring any Environmental Liability.

Section 5.10.  *Taxes*  Except as disclosed on Schedule 5.10 hereto, each of the Loan Parties and their Subsidiaries have timely filed all tax returns required to be filed, and have paid all Taxes levied or imposed upon them or their properties, that are due and payable (including in their capacity as a withholding agent), except those which are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with GAAP or the payment of which are stayed by Chapter 11

47

Cases.  There is no proposed Tax deficiency or assessment known to any Loan Party against any Loan Party or any Subsidiary, except as disclosed on Schedule 5.10 hereto.

Section 5.11.  *ERISA Compliance, Etc.*  (a) Except as could not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, each Plan is in compliance with the applicable provisions of ERISA, the Code and other Federal or state Laws (and the regulations and published interpretations thereunder).

(b)    As of the Closing Date, (i) no Plan is a Multiemployer Plan; nor is any Plan subject to Section 302 or Title IV of ERISA or Section 412 of the Code and (ii) no Loan Party, Subsidiary or any of their respective ERISA Affiliates nor any predecessor thereof (A) has in the past six years sponsored, maintained or contributed to, any Plan subject to Title IV of ERISA or (B) has in the past six years contributed to any Multiemployer Plan.

(c)    (i) No Loan Party, Subsidiary or any of their respective ERISA Affiliates has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Plan (other than premiums due and not delinquent under Section 4007 of ERISA); (ii) no Loan Party, Subsidiary or any of their respective ERISA Affiliates has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Sections 4201 or 4243 of ERISA with respect to a Multiemployer Plan; and (iii) no Loan Party, Subsidiary or any of their respective ERISA Affiliates has engaged in a transaction that could be subject to Sections 4069 or 4212(c) of ERISA, except, with respect to each of the foregoing clauses of this Section 5.11(c), as could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

(d)    The Plans and Foreign Pension Plans of the Loan Parties and the Subsidiaries are funded to the extent required by Law or otherwise to comply with the requirements of any material Law applicable in the jurisdiction in which the relevant pension scheme is maintained, in each case, except as could not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

Section 5.12.  *Subsidiaries.*  As of the Closing Date, no Loan Party has any direct or indirect Subsidiaries other than those specifically disclosed in Schedule 5.12, and all of the outstanding Equity Interests owned by the Loan Parties (or a Subsidiary of any Loan Party) in such Subsidiaries have been validly issued and are fully paid and (if applicable) non-assessable and all Equity Interests owned by a Loan Party (or a Subsidiary of any Loan Party) in such Subsidiaries are owned free and clear of all Liens except (a) those created under the Collateral Documents, the Carve-Out or the Prepetition Term Loan Documents or the Prepetition ABL Documents and (b) any non-consensual Lien that is permitted under Section 7.01.  As of the Closing Date, Schedule 5.12(b) sets forth the ownership interest of Holdings, the Borrowers and any other Subsidiary thereof in each Subsidiary, including the percentage of such ownership.

Section 5.13.  *Margin Regulations; Investment Company Act.*  (a) No Loan Party or Subsidiary is engaged nor will it engage, principally, or as one of its important activities, in the business of purchasing or carrying Margin Stock, or extending credit for the purpose of purchasing or carrying Margin Stock, and no proceeds of any Borrowings will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, for any purpose that entails a violation of, or that is inconsistent with, the provisions of the Regulations of the Board, including Regulation T, U or X.

(b)    Neither Holdings, nor the Borrowers, nor any of their Subsidiaries is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

Section 5.14.  *Disclosure.*  No confidential information memorandum, report, financial statement, certificate or other written information furnished by or on behalf of any Loan Party (other than projected financial, pro forma financial information and information of a general economic or industry nature) to any Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (as modified or supplemented by other

information so furnished) when taken as a whole contains or will contain any material misstatement of fact or omits or will omit to state any material fact necessary to make the statements therein (when taken as a whole), in the light of the circumstances under which they were or will be made, not materially misleading.  With respect to projected financial information and pro forma financial information, each of Holdings and the Borrowers represents that such information was prepared in good faith based upon assumptions believed to be reasonable at the time of preparation; it being understood that such projections may vary from actual results and that such variances may be material.

Section 5.15.  *Labor Matters.*  Except as, in the aggregate, could not reasonably be expected to have a Material Adverse Effect, or as set forth on Schedule 5.15:  (a) there are no strikes or other labor disputes against the Borrowers or any of their Subsidiaries pending or, to the knowledge of the Borrowers, threatened in writing; (b) hours worked by and payment made to employees of the Borrowers or any of its Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Laws dealing with such matters; and (c) all payments due from the Borrowers or any of their Subsidiaries on account of employee health and welfare insurance have been paid or accrued as a liability on the books of the relevant party.

Section 5.16.  *Intellectual Property; Licenses, Etc.*  (a) Holdings, the Borrowers and their Subsidiaries own, license or possess the right to use all of the trademarks, service marks, trade names, domain names, copyrights, patents, patent rights, licenses, technology, software, know-how, trade secrets, database rights, design rights and other intellectual property rights (and all registrations and applications for registration of any of the foregoing) (collectively, "**IP Rights**"), in each case reasonably necessary for the conduct of their respective businesses as currently conducted, except to the extent that the failure to own, license or possess the right to use such IP Rights, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect, and, such IP Rights do not conflict with the rights of any Person, except to the extent such conflicts, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(c)     The conduct of the business of Holdings, the Borrowers or any of their Subsidiaries does not infringe, misappropriate or otherwise violate any IP Rights held by any Person, except for such infringements, misappropriations or violations, which, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.  There is no claim, investigation, suit or proceeding pending or, to the knowledge of the Borrowers, threatened in writing, against Holdings, the Borrowers or any of their Subsidiaries (i) challenging the validity of any IP Rights held by any of them or (ii) alleging that their respective use of any IP Rights or the conduct of their respective businesses infringes, misappropriates, or otherwise violates the IP Rights of any other Person, in each case, which either individually or in the aggregate could reasonably be expected to have a Material Adverse Effect.

(d)     As of the Closing Date, Schedule 5.16(c) contains a true and complete list of all patents, patent applications, registered trademarks, trademark applications, material registered copyrights and material copyright applications that are owned by Holdings, the Borrowers or any of their Subsidiaries and all such IP Rights are valid and in full force and effect, except to the extent the failure of such IP Rights to be valid and in full force and effect could not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

Section 5.17.  *[Reserved].*

Section 5.18.  *[Reserved].*

Section 5.19.  *Collateral Documents.*  The provisions of the Interim Order and Final Order, as applicable, are effective to create in favor of the Administrative Agent for the benefit of the Secured Parties a legal, valid and enforceable security interest (subject, in the case of any Collateral, to Liens permitted by Section 7.01) on all right, title and interest of the respective Loan Parties in the Collateral described therein (with such priority as provided for in the Order). Except for filings contemplated hereby and as provided in the applicable Order, no

filing or other action will be necessary to perfect the Liens on any Collateral under the Laws of the United States of America.

Section 5.20. *[Reserved].*

Section 5.21. *Sanctions; Anti-Corruption Laws; Anti-Money Laundering Laws.*

(a)    None of Holdings, any of its Subsidiaries or any of their respective directors, officers or, to the knowledge of any Loan Party, employees, agents, advisors or other Affiliates is a Sanctioned Person.  Each of Holdings and its Subsidiaries and their respective directors, officers and, to the knowledge of any Loan Party, employees, agents, advisors and Affiliates is in compliance with (i)  Sanctions, (ii) Anti-Corruption and Anti-Bribery Laws, and (iii)  Anti-Terrorism and Anti-Money Laundering Laws.   No part of the proceeds of any Borrowing has or will be used, directly or, to any Loan Party's knowledge (upon reasonable inquiry), indirectly, (A) for the purpose of financing any activities or business of or with any Sanctioned Person or in any Sanctioned Country to the extent such activities are in violation of Sanctions, (B) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value to any Person in violation of any Anti-Corruption and Anti-Bribery Laws, (C) otherwise in any manner that would result in a violation of Sanctions, Anti-Terrorism and Anti-Money Laundering Laws, or Anti-Corruption and Anti-Bribery Laws by any Person.

(b)    Holdings and its Subsidiaries have established and currently maintain policies, procedures and controls that are designed (and otherwise comply with applicable law) to ensure that each of Holdings, its Subsidiaries, and each Controlled entity, and each of their respective directors, officers, employees and agents, is and will continue to be in compliance with all applicable current and future Sanctions, Anti-Terrorism and Anti-Money Laundering Laws, and Anti-Corruption and Anti-Bribery Laws.

Section 5.22. *Capitalization.*  The Equity Interests of each of Holdings and its Subsidiaries has been duly authorized and validly issued and is fully paid and non assessable.  Except as set forth on Schedule 5.22, as of the date hereof, there is no existing option, warrant, call, right, commitment or other agreement to which Holdings or any of its Subsidiaries is a party requiring, and there is no membership interest or other Equity Interests of Holdings or any of its Subsidiaries outstanding which upon conversion or exchange would require, the issuance by Holdings or any of its Subsidiaries of any additional membership interests or other Equity Interests of Holdings or any of its Subsidiaries or other securities convertible into, exchangeable for or evidencing the right to subscribe for or purchase, a membership interest or other Equity Interests of Holdings or any of its Subsidiaries. Schedule 5.22 correctly sets forth the ownership interest of Holdings and each of its Subsidiaries in their respective Subsidiaries as of the Closing Date.

Section 5.23. *Chief Executive Office.*  Schedule 5.23 lists each Loan Party's jurisdiction of organization, legal name and organizational identification number, if any, and the location of such Loan Party's chief executive office or sole place of business, in each case as of the date hereof, and such Schedule 5.23 also lists all jurisdictions of organization and legal names of such Loan Party for the five years preceding the Closing Date.

Section 5.24. *Insurance.*

(a)    Holdings, the Borrowers and their Subsidiaries maintain with financially sound and reputable insurance companies, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts (after giving effect to any self-insurance reasonable and customary for similarly situated Persons engaged in the same or similar businesses as the Borrowers and their Subsidiaries) as are customarily carried under similar circumstances by such other Persons.

(b)    Holdings, the Borrowers and their Subsidiaries carry and maintain commercial general liability insurance including the "broad form CGL endorsement" (or equivalent coverage) and coverage on an occurrence

50

basis against claims made for personal injury (including bodily injury, death and property damage) and umbrella liability insurance against any and all claims, in each case in amounts and against such risks as are customarily maintained by companies engaged in the same or similar industry operating in the same or similar locations.

Section 5.25. *Deposit Accounts and Other Accounts.* Schedule 5.25 lists all banks and other financial institutions securities intermediary or commodity intermediary at which any Loan Party maintains deposit, securities, commodities or similar accounts as of the Closing Date, and such Schedule correctly (x) identifies the name, address and any other relevant contact information reasonably requested by Agent with respect to each depository or intermediary, the name in which the account is held, a description of the purpose of the account, and the complete account number therefor and (y) indicates whether such accounts shall be subject to Account Control Agreement in accordance with the Collateral and Guarantee Requirement.

Section 5.26. *Approved Budget.* The initial Approved Budget, attached hereto as Schedule I, will be delivered to the Administrative Agent on or prior to the Closing Date, and each subsequent Approved Budget was prepared in good faith based upon assumptions the Borrower believed to be reasonable assumptions on the date of delivery of the then-applicable Approved Budget. To the knowledge of the Borrower, no facts exist that (individually or in the aggregate) would result in any material change in the Approved Budget. The Borrower shall deliver to the Administrative Agent updates to the Approved Budget in accordance with Section 6.17. The initial Approved Budget delivered on the Closing Date and each Approved Budget will be delivered thereafter pursuant to Section 6.17 hereof are based on a good faith estimates and assumptions believed by management of the Borrowers to be reasonable and fair in light of current conditions and facts known to the Borrowers at the time delivered (it being understood that such Approved Budgets and the assumptions on which they were based, may or may not prove to be correct).

Section 5.27. *Chapter 11 Cases; Orders.*

(a)    The Chapter 11 Cases were commenced on the Petition Date in accordance with applicable Laws and proper notice thereof was given for (i) the motion seeking approval of the Loan Documents and the Interim Order and Final Order, (ii) the hearing for the entry of the Interim Order, and (iii) the hearing for the entry of the Final Order (provided that notice of the final hearing will be given as soon as reasonably practicable after such hearing has been scheduled). The Debtors shall give, on a timely basis as specified in the Interim Order or the Final Order, all notices required to be given to all parties specified in the Interim Order or Final Order, as applicable.

(b)    After the entry of the Interim Order, and pursuant to and to the extent permitted in the Interim Order and the Final Order, the Obligations will constitute allowed administrative expense claims in the Chapter 11 Cases having priority over all administrative expense claims and unsecured claims against the Debtors now existing or hereafter arising, of any kind whatsoever, including all administrative expense claims of the kind specified in Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under Section 364(c)(l) of the Bankruptcy Code, subject to (i) the Carve-Out and (ii) the priorities set forth in the Interim Order or Final Order, as applicable.

(c)    After the entry of the Interim Order and pursuant to and to the extent provided in the Interim Order and the Final Order, the Obligations will be secured by a valid and perfected Lien on all of the Collateral subject, as to priority, to the extent set forth in the Interim Order or the Final Order.

(d)    The Interim Order (with respect to the period on and after entry of the Interim Order and prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be, is in full force and effect and has not been reversed, stayed (whether by statutory stay or otherwise), vacated, or, without the Administrative Agent's consent, modified or amended. The Loan Parties are in compliance in all material respects with the Interim Order or Final Order, as applicable.

51

(e)      Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Interim Order or the Final Order, as the case may be, upon the DIP Termination Date (whether by acceleration or otherwise) of any of the Obligations, the Administrative Agent and Lenders shall be entitled to immediate payment of such Obligations and to enforce the remedies provided for hereunder or under applicable Laws, without further notice, motion or application to, hearing before, or order from, the Bankruptcy Court.

# ARTICLE 6
### AFFIRMATIVE COVENANTS

From and after the Closing Date, so long as any Lender shall have any Term Loan Commitment hereunder or any Loan or other Obligation hereunder which is accrued or payable shall remain unpaid or unsatisfied (other than contingent obligations not due and payable), then from and after the Closing Date, Holdings and the Borrowers shall and shall (except in the case of the covenants set forth in Sections 6.01, 6.02 and 6.03) cause each of the Subsidiaries to:

Section 6.01.  *Financial Statements, Reports, Etc..*  In the case of the Borrowers, Lead Borrower shall deliver to the Administrative Agent for prompt further distribution to each Lender:

(a)      as soon as available, but in any event within thirty (30) days after the end of each month, monthly consolidated financial statements of the Borrowers and their subsidiaries certified by the chief financial officer of the Lead Borrower; and

(b)      as soon as available, but in any event within three (3) days after the Borrowers' receipt of such request, any financial or other information reasonably requested by the Administrative Agent or Required Lenders.

Documents required to be delivered pursuant to this Section 6.01 may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrowers (or any direct or indirect parent of the Borrowers) posts such documents, or provides a link thereto, on the website on the Internet at www.gymboree.com; or (ii) on which such documents are posted on the Borrowers' behalf on IntraLinks/IntraAgency or another relevant website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); *provided* that:  (i) upon written request by the Administrative Agent, the Lead Borrower shall deliver paper copies of such documents to the Administrative Agent for further distribution to each Lender until a written request to cease delivering paper copies is given by the Administrative Agent and (ii) the Lead Borrower shall notify (which may be by facsimile or electronic mail) the Administrative Agent of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents. Each Lender shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such documents from the Administrative Agent and maintaining its copies of such documents.

Section 6.02.    *Certificates; Other Information.*    Lead Borrower shall deliver to the Administrative Agent for prompt further distribution to each Lender:

(a)      promptly after the furnishing thereof, copies of any requests or notices received by any Loan Party or Subsidiary (other than in the ordinary course of business) or material statements or material reports furnished to any holder of Indebtedness or debt securities of any Loan Party or of any of its Subsidiaries, not otherwise required to be furnished to the Lenders pursuant to any clause of this Section 6.02;

(b)      promptly after the same are available and to the extent feasible not later than three (3) days prior to the filing thereof (other than in exigent circumstances in which case as soon as practicable), all material pleadings, motions, applications and any other documents to be filed by or on behalf of the Loan Parties and any other written

reports given to the US Trustee and to any official committee relating to the operations, business, assets, properties or financial condition of the Loan Parties;

(c)    promptly, such additional information regarding the business, legal, financial or corporate affairs of the Loan Parties or any of their respective Subsidiaries, or compliance with the terms of the Loan Documents, as the Administrative Agent or any Lender through the Administrative Agent may from time to time reasonably request;

(d)    *[Reserved];*

(e)    promptly after the request by any Lender, all documentation and other information that such Lender reasonably requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act;

(f)    promptly after the receipt thereof by Holdings or the Borrowers or any of their Subsidiaries, a copy of any final form "management letter" received by any such Person from its certified public accountants and the management's response thereto; and

(g)    on the second Budget Testing Date immediately following the Closing Date and on every other Budget Testing Date thereafter, a proposed updated budget.

Section 6.03.  *Notices.*  Promptly after a Responsible Officer of Holdings, the Borrowers or any Subsidiary Guarantor has obtained knowledge thereof, notify the Administrative Agent:

(a)    of the occurrence of any Default, Event of Default, or any "Default" or "Event of Default" as defined in the Prepetition Term Loan Agreement or with respect to other material Indebtedness;

(b)    of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect;

(c)    of the filing or commencement of, or any threat or notice of intention of any person to file or commence, any action, suit, litigation or proceeding, whether at law or in equity by or before any Governmental Authority (other than the Chapter 11 Cases), (i) against Holdings, the Borrowers or any of their Subsidiaries that could reasonably be expected to result in a Material Adverse Effect or (ii) with respect to any Loan Document, and any material development with respect thereto; and

(d)    of the occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, could reasonably be expected to result in liabilities of a Loan Party, any Subsidiary or any of their respective ERISA Affiliates.

(e)    (1) as soon as reasonably practicable and to the extent not inconsistent with any duty of confidentiality, in advance of filing with the Bankruptcy Court or delivering to the Committee appointed in a Chapter 11 Case, if any, or to the U.S. Trustee, as the case may be, the Final Order, all material proposed orders and pleadings that (x) impact the legal or economic rights of the Secured Parties or that are materially adverse to the interests of the Secured Parties or (y) inconsistent with the Approved Budget or the terms of the Loan Documents, in each case related to (A) the Chapter 11 Cases and (B) the Prepetition Term Loan, this Agreement and the credit facilities contemplated thereby and/or any sale contemplated in accordance with the milestones set forth in Section 6.19 and any plan of reorganization and/or any disclosure statement related thereto (each of which material proposed orders or pleadings must, to the extent related to the foregoing, be in form and substance reasonably satisfactory to the Required Lenders), and (2) substantially simultaneously with the filing with the Bankruptcy Court or delivering to the Committee appointed in any Chapter 11 Case, if any, or to the U.S. Trustee, as the case may be, monthly operating reports and all other notices, filings, motions, pleadings or other information concerning the financial condition of the Loan Parties or their Subsidiaries or the Chapter 11 Cases

53

that may be filed with the Bankruptcy Court or delivered to the Committee appointed in any Chapter 11 Case, if any, or to the U.S. Trustee;

Each notice pursuant to this Section shall be accompanied by a written statement of a Responsible Officer of the Lead Borrower (x) that such notice is being delivered pursuant to Section 6.03(a), (b), (c) or (d) (as applicable) and (y) setting forth details of the occurrence referred to in Section 6.03(a), (b), (c) or (d), as applicable, and stating what action the Lead Borrower has taken and proposes to take with respect thereto.

Section 6.04.   *[Reserved]*.

Section 6.05.   *Preservation of Existence, Etc.*  (a) Preserve, renew and maintain in full force and effect its legal existence under the Laws of the jurisdiction of its organization except in a transaction permitted by Section 7.04 or Section 7.05 and (b) obtain, maintain, renew, extend and keep in full force and effect all rights (including IP Rights), privileges (including its good standing where applicable in the relevant jurisdiction), permits, licenses and franchises necessary or desirable in the normal conduct of its business, except, in the case of clause (a) (other than with respect to any Loan Party) or (b), to the extent that failure to do so could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 6.06.   *Maintenance of Properties.*  Except if the failure to do so could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (a) maintain, preserve and protect all of its properties and equipment necessary in the operation of its business in good working order, repair and condition, ordinary wear and tear excepted and fire, casualty or condemnation excepted, and (b) make all necessary renewals, replacements, modifications, improvements, upgrades, extensions and additions thereof or thereto in accordance with prudent industry practice and in the normal conduct of its business.

Section 6.07.   *Maintenance of Insurance.*  (a) *Generally*.  Maintain with financially sound and reputable insurance companies, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts (after giving effect to any self-insurance reasonable and customary for similarly situated Persons engaged in the same or similar businesses as the Borrowers and their Subsidiaries) as are customarily carried under similar circumstances by such other Persons (it being agreed that the insurance maintained as of the Closing Date is reasonably satisfactory to the Administrative Agent).

(b)      *Requirements of Insurance*.  Not later than sixty (60) days after the Closing Date (or such longer period as the Administrative Agent may agree in writing in its discretion), all insurance required pursuant to Section 6.07(a) (x) to provide (and to continue to provide at all times thereafter) that it shall not be canceled, modified or not renewed (i) by reason of nonpayment of premium upon not less than 10 days' prior written notice thereof by the insurer to the Administrative Agent and the Collateral Agent (giving the Administrative Agent and the Collateral Agent the right to cure defaults in the payment of premiums) or (ii) for any other reason upon not less than 30 days' prior written notice thereof by the insurer to the Administrative Agent and the Collateral Agent (the Lead Borrower shall deliver a copy of the policy (and to the extent any such policy is cancelled or renewed, a renewal or replacement policy) or other evidence thereof to the Administrative Agent and the Collateral Agent, or insurance certificate with respect thereto) and (y) to name the Collateral Agent as additional insured on behalf of the Secured Parties (in the case of liability insurance) or loss payee (in the case of property insurance), as applicable (and to continue to so name the Collateral Agent at all times thereafter).

(c)      *[Reserved]*.

(d)      Carry and maintain commercial general liability insurance including the "broad form CGL endorsement" (or equivalent coverage) and coverage on an occurrence basis against claims made for personal injury (including bodily injury, death and property damage) and umbrella liability insurance against any and all claims, in each case in amounts and against such risks as are customarily maintained by companies engaged in the

54

same or similar industry operating in the same or similar locations naming the Collateral Agent as an additional insured, on forms reasonably satisfactory to the Collateral Agent.

(e)    Notify the Administrative Agent and the Collateral Agent promptly whenever any separate insurance concurrent in form or contributing in the event of material loss with that required to be maintained under this Section 6.07 is taken out by the Borrowers or another Loan Party; and promptly deliver to the Administrative Agent and the Collateral Agent a duplicate original copy of such policy or policies, or an insurance certificate with respect thereto.

Section 6.08. *Compliance with Laws.* Comply with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property, except if the failure to comply therewith could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or such compliance is stayed by the Chapter 11 Cases or expressly prohibited by the Orders.

Section 6.09. *Books and Records.* Maintain proper books of record and account, in which entries are made that are full, true and correct in all material respects and are in conformity with GAAP and which reflect all material financial transactions and matters involving the assets and business of Holdings, the Borrowers or a Subsidiary, as the case may be, including, without limitation, bank statements and evidence of all deposits into and withdrawals from any DIP Funding Account and the Class B Segregated Operating Account, and furnish copies of such books and records promptly upon request from the Administrative Agent.

Section 6.10. *Inspection Rights.*

Permit representatives and independent contractors of the Administrative Agent and each Lender to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants (subject to such accountants' customary policies and procedures), all at the expense of the Borrowers and at any time during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Borrowers. The Administrative Agent and the Lenders shall give the Borrowers the opportunity to participate in any discussions with the Borrowers' independent public accountants.

Section 6.11. *Additional Collateral.* At the Borrowers' expense, take all action necessary or reasonably requested by the Required Lenders, the Administrative Agent or the Collateral Agent to ensure that the Collateral and Guarantee Requirement continues to be satisfied, including:

(a)    The Obligations are secured by a first-priority security interest in all the Equity Interests of the Borrowers solely to the extent expressly permitted by the Orders.

(b)    Within five (5) Business Days following the Closing Date (or such later date as the Administrative Agent may agree in its sole discretion) and, in any event, before making any distribution from proceeds of any Collateral or Term DIP Loans; the Borrowers must obtain an account control agreement in form and substance reasonably satisfactory to the Administrative Agent (an "**Account Control Agreement**") for each DIP Funding Account and each Segregated Operating Account.

Section 6.12. *Compliance with Environmental Laws.* Except, in each case, to the extent that the failure to do so could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, or is otherwise stayed by the Chapter 11 Cases, comply, and take all reasonable actions to cause all lessees and other Persons operating or occupying its properties to comply, with all applicable Environmental Laws and Environmental Permits; obtain and renew all Environmental Permits necessary for its operations and properties; and, in each case to the extent the Loan Parties or their Subsidiaries are required by Environmental Laws, conduct any investigation, remedial or other corrective action necessary to address Hazardous Materials at any property or facility in accordance with applicable Environmental Laws.

Section 6.13.  *Further Assurances.*

(a)    Borrowers shall take all necessary or advisable steps to commence and complete the Required Liquidation within the time period consented to in writing by the Administrative Agent and Lenders in their sole discretion.

(b)    Promptly upon reasonable request by the Administrative Agent or the Collateral Agent (i) correct any material defect or error that may be discovered in the execution, acknowledgment, filing or recordation of any Collateral Document or other document or instrument relating to any Collateral, and (ii) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as the Administrative Agent or the Collateral Agent may reasonably request from time to time in order to carry out more effectively the purposes of the Loan Documents and to cause the Collateral to remain perfected.  If the Required Lenders, Administrative Agent or the Collateral Agent reasonably determine that they are required by applicable Law to have appraisals prepared in respect of each Real Property of any Loan Party subject to a mortgage, the Borrowers shall cooperate with the Required Lenders, Administrative Agent and/or Collateral Agent, as applicable, in obtaining such appraisals and pay all costs and expenses relating thereto.

Section 6.14.  *[Reserved].*

Section 6.15.  *[Reserved].*

Section 6.16.  *[Reserved].*

Section 6.17.  *Approved Budget and Variance Report.*

(a)    The use of Loans and other extensions of credit by the Loan Parties under this Agreement and the other Loan Documents shall be limited in accordance with the Approved Budget (subject to Permitted Variances). The initial Approved Budget shall depict, on a weekly and line item basis for the first thirteen (13) week period from the Closing Date, (1) (i) projected cash receipts, (ii) projected disbursements (including ordinary course operating expenses, bankruptcy-related expenses (including professional fees and expenses of the Loan Parties' professionals and advisors budgeted on a weekly basis), asset sales and any other fees and expenses relating to the Loan Documents), (iii) net cash flow, and, (iv) the Term DIP Facility availability and total available liquidity, and (v) the Anticipated Ordinary Business Expense Shortfalls with respect to the period set forth in the Approved Budget and (2) the other items set forth therein and such other information requested by the Administrative Agent, and such initial Approved Budget shall be approved by, and in form and substance reasonably satisfactory to, the Administrative Agent (it being acknowledged and agreed that the initial Approved Budget attached hereto as Schedule I is approved by and satisfactory to the Administrative Agent).  The Approved Budget shall be updated, modified or supplemented by the Borrower from time to time and upon the reasonable request of the Administrative Agent, but in any event the Approved Budget shall be updated and distributed by the Borrower not less than one time in each two (2) consecutive week period, and each such updated, modified or supplemented budget shall not be deemed an Approved Budget unless the Administrative Agent shall have approved such budget; *provided, however,* that in the event the Administrative Agent objects, the current Approved Budget shall remain the Approved Budget until and the Administrative Agent and the Loan Parties agree as to an updated, modified or supplemented budget.  Each Approved Budget delivered to the Administrative Agent shall be accompanied by such supporting documentation as reasonably requested by the Administrative Agent.  Each Approved Budget shall be prepared in good faith based upon assumptions which the Loan Parties believe to be reasonable. **For the avoidance of doubt, except to the extent such payment is expressly permitted under the Approved Budget or expressly approved by the Bankruptcy Court, the Loan Parties shall obtain written consent from the Administrative Agent prior to paying any cure costs or other amounts to be paid in connection with the assumption of any material contract in accordance with the Bankruptcy Code.**

(b)    No later than 12:00 (noon), New York City time on the Tuesday following each Budget Testing Date, the Borrowers shall deliver to the Administrative Agent for prompt distribution to each Lender: (x) a

Variance Report certified by a Responsible Officer of the Borrower and Holdings, substantially in form attached hereto as Exhibit F and including, for the avoidance of doubt the spreadsheet or other document demonstrating the backup for the calculation set forth therein or otherwise as reasonably acceptable to the Administrative Agent in its sole discretion, setting forth all the variances, on a line-item and aggregate basis, from the amount set forth for such week as compared to (1) the most recently Approved Budget delivered prior to such Variance Report on a weekly and Test Period basis (which shall be subject to the variances set forth herein), and (2) the most recent Weekly Cash Flow Forecast (as applicable) delivered by the Debtors, in each case, on a weekly and cumulative basis. Each such Variance Report shall include explanations for all material variances and shall be certified by the Chief Financial Officer or Chief Restructuring Officer of the Borrowers; and

(c)    The Administrative Agent and the Lenders (i) shall have no duty to monitor compliance by the Loan Parties with the Approved Budget and (ii) shall not be obligated to pay (directly or indirectly from the Collateral) any unpaid expenses incurred or authorized to be incurred pursuant to any Approved Budget.  The line items in the Approved Budget for payment of interest, expenses and other amounts (including, without limitation, professional fees) to the Administrative Agent and the Lenders are estimates only, and the Loan Parties remain obligated to pay any and all Obligations in accordance with the terms of the Loan Documents and the applicable Order regardless of whether such amounts exceed such estimates.  Nothing in any Approved Budget (including any estimates of a loan balance in excess of borrowing base restrictions) shall constitute an amendment or other modification of any Loan Document or any of the borrowing base restrictions or other lending limits set forth therein. The Administrative Agent and the Lenders acknowledge and agree that the line items in the Approved Budget for payment of professional fees are estimates only, and the Loan Parties remain obligated to pay any and all professional fees in accordance with their agreements with respect thereto (and subject to the Bankruptcy Court's approval, as applicable) and nothing herein shall preclude or prohibit the payment of professional fees.

Section 6.18  *Update Calls*.  On each Monday, Wednesday and Friday (or, in the event that such day is not a Business Day then on the Business Day immediately following) during the Chapter 11 Cases (until such time as the Term DIP Loans and the Obligations have been repaid in full), the Borrowers' professionals shall host a telephonic meeting for the Lenders and their professionals at which the Borrowers' professionals shall provide an update to the Lenders (and make themselves available for questions) with respect to the financial and operating performance of the Loan Parties and their estates, and the progress of the Required Liquidation.

Section 6.19. *Milestones*.  Ensure that each of the milestones set forth below is achieved in accordance with the applicable timing referred to below (or such later dates as may be approved in writing by the Required Lenders in their reasonable discretion):

(a)    The Bankruptcy Court's entry of the Interim Order authorizing and approving the Term DIP Facilities including the Term Loan Commitments, all documents and lender fees related thereto, and the payment of the fees and expenses of the Administrative Agent's and Lenders' advisors no later than three (3) Business Days after the Petition Date.

(b)    No later than three (3) Business Days after the Petition Date, the Bankruptcy Court shall have entered an order, in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders, authorizing the Debtors to establish procedures to protect the value of the Debtors' net operating loss carryforwards and certain other tax attributes.

(c)    No later than thirty-five (35) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Final Order authorizing and approving on a final basis the Term DIP Facilities (including the Term Loan Commitments, all documents and lender fees related thereto, and the payment of the fees and expenses of the Administrative Agent's and Lenders' advisors).

(d)    No later than sixty (60) calendar days after the Petition Date, the Debtors shall file Acceptable Plan and an Acceptable Disclosure Statement.

(e)     No later than ninety-five (95) calendar days after the Petition Date, the Bankruptcy Court shall have entered an order approving the Acceptable Disclosure Statement and voting and solicitation procedures for the Acceptable Plan.

(f)     No later than one hundred and thirty-two (132) calendar days after the Petition Date, the Bankruptcy Court shall have entered an order, in form and substance reasonably satisfactory to the Administrative Agent at the direction of the Required Lenders, confirming an Acceptable Plan.

(g)     The effective date of the Acceptable Plan having occurred not later than one hundred and forty-six (146) calendar days following the Petition Date.

(h)     On the Petition Date, the Debtors shall file (x) a motion (the "**IP and Online Business Sale Motion**"), in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders, requesting an order from the Bankruptcy Court approving the sale (the "**IP and Online Business Sale**") of substantially all of the Debtors' intellectual property assets and online businesses, together with such other assets and contracts as are required to operate such assets (including leases and lease designations as determined by the Stalking Horse Bidder as defined below) (the "**IP and Online Business Assets**") pursuant to Section 363 of the Bankruptcy Code, (y) a stalking horse agreement (the "**Stalking Horse Agreement**"), in form and substance acceptable to the Required Lenders, providing for an acquisition vehicle selected by the Required Lenders to acquire the IP and Online Business Assets through a credit bid of all or a portion of the Term DIP Claims (the "**Stalking Horse Bidder**"), and (z) a motion (the "**IP and Online Business Bid Procedures Motion**") in form and substance acceptable to the Required Lenders requesting an order from the Bankruptcy Court approving bidding procedures relating to the solicitation of qualified bids of the IP and Online Business Assets.

(i)     On the Petition Date, the Debtors shall file a motion (the "**Lease Rejection Motion**") seeking approval of lease rejection procedures reasonably acceptable to the Administrative Agent;

(j)     On the Petition Date, the Debtors shall file a motion (the "**GOB and Lease Sale Motion**") requesting an order from the Bankruptcy Court pursuant to Section 363 of the Bankruptcy Code authorizing the Debtors to (x) enter into an agency or other liquidation agreement, in form and substance acceptable to the Required Lenders (the "**Agency Agreement**") and conduct the GOB sales pursuant to the terms thereof and (y) sell, in connection with a marketing process reasonably acceptable to the Required Lenders, certain of the Debtors' real property leases (the "**Lease Sale**"), with such sale to be concluded by no later than February 28, 2019.

(k)     No later than three (3) calendar days after the Petition Date, the Bankruptcy Court shall have entered an Interim Order approving the GOB and Lease Sale Motion.

(l)     *[Reserved];*

(m)     No later than fourteen (14) calendar days after the Petition Date, the Debtors shall have obtained an order of the Bankruptcy Court approving the IP and Online Business Sale Motion (the "**IP and Online Business Sale Order**"), in form and substance satisfactory to the Administrative Agent and the Required Lenders. The IP and Online Business Sale Order shall, among other things, (1) approve the Stalking Horse Agreement and (2) require that the proceeds from the IP and Online Business Sale be applied to the Obligations including the outstanding Prepetition Obligations, if any, if the Lenders are not the winning bidder.

(n)     No later than fourteen (14) calendar days after the Petition Date, the Debtors shall have obtained an order of the Bankruptcy Court approving the IP and Online Business Bid Procedures Motion (the "**IP and Online Business Bid Procedures Order**"), in form and substance satisfactory to the Administrative Agent and the Required Lenders.

(o)      No later than fourteen (14) calendar day after the Petition Date, the Bankruptcy Court shall have entered a Final Order approving the GOB and Lease Sale Motion.

(p)      No later than twenty-eight (28) calendar days after the Petition Date, the Debtors shall provide the Administrative Agent (for distribution to the Lenders) with copies of all bids received by the Debtors in connection with the IP and Online Business Sale and the Lease Sale.

(q)      No later than forty-two (42) calendar days after the Petition Date, an auction with respect to the IP and Online Business Sale shall have been completed in accordance with the IP and Online Business Bid Procedures Order.

(r)      No later than March 15, 2019, the Bankruptcy Court shall have entered an order approving the Lease Rejection Motion.

(s)      No later than March 15, 2019, the Bankruptcy Court shall have entered an order approving the IP and Online Business Sale.

(t)      No later than March 15, 2019, the Debtors shall have consummated the IP and Online Business Sale.

Section 6.20. *Collateral Proceeds*. All proceeds resulting from any Disposition of, or Casualty Event relating to, any property or assets constituting Term Priority Collateral shall be deposited into the General Purpose Segregated Operating Account in accordance with the Order. So long as the Prepetition ABL Credit Agreement is in effect, subject to the Prepetition Intercreditor Acknowledgment, any proceeds resulting from any Disposition, or Casualty Event relating to, any property or assets constituting ABL Priority Collateral (including all proceeds resulting from, or received in connection with, the Agency Agreement) shall be applied to the repayment of the Prepetition ABL Credit Agreement in accordance with the Order.

Section 6.21. *Bankruptcy Covenants*. Notwithstanding anything in the Loan Documents to the contrary, the Debtors shall comply with all material covenants, terms and conditions and otherwise perform all obligations set forth in the Orders.

(a)      Each Loan Party shall deliver or cause to be delivered for review and comment, as soon as commercially reasonable and to the extent not inconsistent with any duty of confidentiality and in any event at least two (2) Business Days prior to filing (other than in exigent circumstances) all material pleadings, motions and other documents (provided that any of the foregoing relating to the Term DIP Facility shall be deemed material) to be filed on behalf of the Loan Parties with the Bankruptcy Court to King & Spalding and shall consult in good faith with such counsel regarding the form and substance of any such proposed filing. If not otherwise provided by the Bankruptcy Court's electronic docketing system, the Borrowers shall provide (x) copies to the Administrative Agent of all pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of the Debtors with the Bankruptcy Court, distributed by or on behalf of the Debtors to any Committee, filed with respect to the Chapter 11 Cases or filed with respect to any Loan Document and (y) such other reports and information as the Administrative Agent may, from time to time, reasonably request. In connection with the Chapter 11 Cases, the Debtors shall give the proper notice for (x) the motions seeking approval of the Loan Documents and the Orders and (y) the hearings for the approval of the Orders. The Borrowers shall give, on a timely basis as expressly specified in the Orders, all notices required to be given to all parties specified in the Orders.

(b)      Each Loan Party shall maintain a cash management system as in effect on the Petition Date and as authorized by the Bankruptcy Court pursuant to orders approving the first day motions filed by the Loan Parties

(c)      The Lead Borrower shall deliver, or cause to be delivered the Approved Budget on a bi-weekly basis according to the terms set forth herein. Each Loan Party shall not make or commit to make any payments

other than those set forth in the Approved Budget, subject to Permitted Variances.  Further, (i) actual aggregate disbursements (excluding disbursements made to the Loan Parties' professionals and Lenders' professionals) shall not exceed the aggregate amount of disbursements in the Approved Budget for the applicable period by more than the Permitted Variance, (ii) actual aggregate disbursements made to the Loan Parties' professionals shall not exceed the aggregate amount of such disbursements in the Approved Budget for the applicable period by more than the Permitted Variance, (iii) for any given day on which the Loan Parties intend to make any single disbursement in an amount in excess of $100,000 or aggregate disbursements in an amount in excess of $1,000,000 (in each case, other than any pre-approved ACH disbursements), the Loan Parties shall have delivered to the Administrative Agent a notice at least one Business Day prior to such disbursement, together with all payment information including without limitation, the amount of such payment, the intended recipient, and any other information reasonably requested by the Administrative Agent, and (iv) actual aggregate cash receipts (excluding proceeds from the Term DIP Facility that may be deemed a receipt) during the applicable period shall not be less than the aggregate amount of such cash receipts in the Approved Budget for such period by more than the Permitted Variance; provided, however, that a Default or Event of Default shall not be deemed to occur on account of the failure to meet one of such aggregate cash receipts covenants if the Debtors receive sufficient additional receipts within three (3) Business Days after the applicable date of determination that, when added to the receipts as of the applicable date of determination, would enable the Loan Parties to satisfy such covenant.

(d)    Each Loan Party shall, as promptly as practicable, to the extent it wouldn't violate any duty of confidentiality by which it is bound, deliver or cause to be delivered to the Administrative Agent and the Lenders copies of any term sheets, proposals, or other material documents, from any party, related to (i) the restructuring of the Loan Parties, or (ii) the sale of assets of one or all of the Loan Parties.

# ARTICLE 7
### NEGATIVE COVENANTS

So long as any Lender shall have any Term Loan Commitment hereunder or any Loan or other Obligation (other than contingent obligations not due and owing) hereunder which is accrued or payable shall remain unpaid or unsatisfied, then from and after the Closing Date:

Section 7.01.    *Liens.*    Neither Holdings nor the Borrowers shall, nor shall they permit any Subsidiary to, directly or indirectly, create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than the following:

(a)    Liens created pursuant to any Loan Document, Prepetition Term Loan Document, or Prepetition ABL Document;

(b)    Liens existing on the Closing Date and listed on Schedule 7.01(b);

(c)    Liens for taxes, assessments or governmental charges that are not yet due and payable and in an aggregate amount not to exceed $250,000 or that are being contested in good faith and by appropriate actions, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(d)    statutory or common law Liens of landlords, sublandlords, carriers, warehousemen, mechanics, materialmen, repairmen, construction contractors or other like Liens, or other customary Liens (other than in respect of Indebtedness) in favor of landlords, in each case arising in the ordinary course of business that secure amounts that are not yet due and payable and in an aggregate amount not to exceed $250,000;

(e)    solely to the extent expressly permitted in the Orders, (i) pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation and (ii) pledges and deposits in the ordinary course of business securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the

benefit of) insurance carriers providing property, casualty or liability insurance to the Borrowers or any of their Subsidiaries;

(f)       deposits to secure the performance of bids, trade contracts, governmental contracts and leases to which any Loan Party is a party (in the case of each of the foregoing, other than for Indebtedness), statutory obligations, surety, stay, customs and appeal bonds, performance bonds and other obligations of a like nature of any Loan Party (including those to secure health, safety and environmental obligations),  in each case solely to the extent permitted by the Approved Budget;

(g)       easements, rights-of-way, restrictions (including zoning restrictions), encroachments, protrusions and other similar encumbrances and minor title defects affecting Real Property that do not in the aggregate materially impair the use, value, or marketability of such Real Property or interfere with the ordinary conduct of the business of Holdings, the Borrowers and their Subsidiaries, taken as a whole;

(h)       leases, non-exclusive licenses, subleases or non-exclusive sublicenses granted to others in the ordinary course of business which are in effect on the Closing Date and listed on Schedule 7.01(h), and do not (i) interfere in any material respect with the business of Holdings, the Borrowers and their Subsidiaries, taken as a whole or (ii) secure any Indebtedness;

(i)       Subject to the priorities provided in the applicable Order, Liens in favor of customs and revenue authorities arising as a matter of Law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(j)       Liens (i) of a collection bank arising under Section 4-210 of the Uniform Commercial Code on items in the course of collection and (ii) arising in the ordinary course of business in favor of a banking or other financial institution arising as a matter of Law or under customary general terms and conditions encumbering deposits or other funds maintained with a financial institution (including the right of set-off) and that are within the general parameters customary in the banking industry or arising pursuant to such banking institutions general terms and conditions;

(k)       Liens in favor of the liquidator pursuant to the Required Liquidation;

(l)       any interest or title (and all encumbrances and other matters affecting such interest or title) of a lessor, sublessor, licensor or sublicensor under leases, subleases, licenses or sublicenses entered into by the Borrowers or any of their Subsidiaries in the ordinary course of business and consistent with the Approved Budget; *provided*, that no such lease or sublease shall constitute a Capitalized Lease;

(m)       Liens existing on the Closing Date that arise out of conditional sale, title retention, consignment or similar arrangement for sale of goods entered into by the Borrowers or any of their Subsidiaries in the ordinary course of business permitted by this Agreement;

(n)       Liens existing on the Closing Date that encumber reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business and not for speculative purposes;

(o)       Liens that are customary contractual rights of set-off (i) relating to the establishment of depository relations with banks in the ordinary course of business and not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of the Borrowers or any of their Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrowers or any of their Subsidiaries or (iii) relating to purchase orders and other agreements entered into with customers of the Borrowers or any of their Subsidiaries in the ordinary course of business;

(p)    (i) zoning, building, entitlement and other land use regulations by Governmental Authorities with which the normal operation of the business complies, and (ii) any zoning or similar law or right reserved to or vested in any Governmental Authority to control or regulate the use of any real property that does not materially interfere with the ordinary conduct of the business of Holdings, the Borrowers and their Subsidiaries, taken as a whole;

(q)    Liens arising from precautionary Uniform Commercial Code financing statements or similar filings;

(r)    Liens on insurance policies in effect on the Closing Date and the proceeds thereof securing Indebtedness permitted under this Agreement in connection with the financing of the insurance premiums with respect thereto;

(s)    Liens on the Collateral granted to provide adequate protection solely to the extent expressly permitted by the Interim Order (and, when entered, the Final Order)

Notwithstanding the foregoing, any Lien permitted under this Section 7.01 (solely to the extent expressly permitted by the Orders) shall at all times be junior and subordinate to the Liens under the Loan Documents and the applicable Order securing the Obligations. The prohibitions provided for in this Section 7.01 specifically include any effort by any Debtor, any Committee or any other party in interest in the Chapter 11 Cases, as applicable, to create or pursue any claims, Liens or interest that would be senior or pari passu to those of the Administrative Agent and the Lenders, in each case, other than as set forth in the applicable Orders and irrespective of whether such claims, Liens or interests may be "adequately protected."

Section 7.02.  *Investments.*  Neither Holdings nor the Borrowers shall, nor shall they permit any Subsidiary to, directly or indirectly, make or hold any Investments, except:

(a)    Investments that exist on the Closing Date by Holdings, the Borrowers or any of their Subsidiaries in assets that were Cash Equivalents when such Investment was made;

(b)    Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors and other credits to suppliers in the ordinary course of business, in each case, solely to the extent expressly permitted by the Approved Budget;

(c)    Investments that exist on the Closing Date, (i) by Holdings in the Borrowers and (ii) by the Borrowers or any Subsidiary in any Loan Party (other than Holdings);

(d)    Investments consisting of transactions permitted under Sections 7.01, 7.03 (other than 7.03(c)), 7.04, 7.05, 7.06 and 7.13;

(e)    Investments in the ordinary course of business that exist on the Closing Date, consisting of UCC Article 3 endorsements for collection or deposit and UCC 4 customary trade arrangements with customers consistent with past practices;

(f)    Investments (i) existing on the Closing Date and set forth on Schedule 7.02(c) and (ii) existing on the Closing Date by any Loan Party in any other Loan Party;

(g)    Investments (including debt obligations and Equity Interests) received in connection with the bankruptcy or reorganization of suppliers and customers or in settlement of delinquent obligations of, or other disputes with, customers and suppliers arising in the ordinary course of business or upon the foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment; and

(h)    Investments expressly permitted by the Approved Budget (including with respect to any Permitted Variances).

Section 7.03.  *Indebtedness.*  Neither Holdings nor the Borrowers shall, nor shall they permit any Subsidiary to, directly or indirectly, create, incur, assume or suffer to exist any Indebtedness, except:

(a)    (i) Indebtedness of any Loan Party under the (x) Loan Documents, (y) the Prepetition Term Loan Documents as in effect on the Closing Date and (z) the Carve-Out, and (ii) the Prepetition ABL Indebtedness;

(b)    Indebtedness outstanding on the Closing Date and listed on Schedule 7.03(b);

(c)    Guarantees by Holdings, the Borrowers and any Subsidiary in respect of Indebtedness of the Borrowers or any Subsidiary of the Borrowers otherwise permitted hereunder and in an amount, in each case, not to exceed the underlying amount permitted hereunder;

(d)    Indebtedness in respect of Capitalized Leases in effect on the Petition Date;

(e)    Indebtedness that exists on the Closing Date representing deferred compensation, phantom equity plan obligations, severance, and health and welfare retirement benefits to current and former employees and other services providers of Holdings, the Borrowers and their Subsidiaries (or their beneficiaries), provided that, in each case, such Indebtedness was originally incurred in the ordinary course of business and consistent with past practices;

(f)    Indebtedness that exists on the Closing Date in respect of treasury, depository, credit card, debit card and cash management services or automated clearinghouse transfer of funds, overdraft or any similar services incurred in the ordinary course of business;

(g)    Indebtedness that exists on the Closing Date consisting of (i) the financing of insurance premiums or (ii) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(h)    Indebtedness that exists on the Closing Date incurred by the Borrowers or any of their Subsidiaries in respect of letters of credit, bank guarantees, bankers' acceptances or similar instruments issued or created in the ordinary course of business, including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness incurred in the ordinary course of business with respect to reimbursement-type obligations regarding workers compensation claims; provided that any reimbursement obligations in respect thereof are reimbursed within 30 days following the incurrence thereof;

(i)    obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by the Borrowers or any of their Subsidiaries or obligations in respect of letters of credit, bank guarantees or similar instruments related thereto, in each case in the ordinary course of business or consistent with past practice and not in connection with the borrowing of money or Swap Contracts; and

(j)    Indebtedness expressly permitted by the Approved Budget (including with respect to any Permitted Variances).

Notwithstanding any of the foregoing, and except for the Carve-Out, no Indebtedness permitted under this Section 7.03 shall be permitted to have administrative expense claim status under the Bankruptcy Code that is senior to or pari passu with the superpriority administrative expense claims of the Administrative Agent and the Lenders as set forth herein and solely to the extent expressly permitted by the applicable Order.

Section 7.04.   *Fundamental Changes.*   Other than as contemplated hereby or to the extent otherwise contemplated by the Approved Budget or Orders, neither Holdings nor the Borrowers shall, nor shall they permit any Subsidiary to, directly or indirectly, merge, dissolve, liquidate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person.

Section 7.05.   *Dispositions.*   Neither Holdings nor the Borrowers shall, nor shall they permit any Subsidiary to, directly or indirectly, make any Disposition, except:

(a)      Dispositions permitted by the Bankruptcy Court of obsolete or worn out property, whether now owned or hereafter acquired, in the ordinary course of business and Dispositions in the ordinary course of business of property no longer used or useful in the conduct of the business of Holdings, the Borrowers or any of their Subsidiaries (for the avoidance of doubt it shall not be in the ordinary course of business to sell property constituting all or substantially all of a business unit, line of business or division);

(b)      Dispositions in accordance with the Required Liquidation;

(c)      transfers of property subject to Casualty Events upon the receipt (where practical) of the Net Proceeds of such Casualty Event;

(d)      Dispositions listed on Schedule 7.05(d);

(e)      Dispositions or discounts without recourse of accounts receivable in connection with the compromise or collection thereof in the ordinary course of business (and not in connection with any factoring or similar arrangement);

(f)      transactions on or about the Closing Date to consummate, or in connection with, the Acceptable Plan;

(g)      Dispositions of Cash Equivalents that exist on the Closing Date;

(h)      leases, subleases, licenses or sublicenses (including the provision of software under an open source license), in each case in the ordinary course of business as in effect on the Closing Date or permitted under the Agency Agreement, and which do not materially interfere with the business of Holdings, the Borrowers or any of their Subsidiaries;

(i)      termination of store leases as so approved by the Bankruptcy Court; and

(j)      Dispositions in accordance with the Orders.

Section 7.06.   *Restricted Payments.* Except to the extent expressly permitted by the Approved Budget and the Orders, neither Holdings nor the Borrowers shall, nor shall they permit any Subsidiary to, directly or indirectly, declare or make, directly or indirectly, any Restricted Payment.

Section 7.07.   *Change in Nature of Business.*   Except to the extent expressly contemplated in connection with the Required Liquidation or as so ordered by the Bankruptcy Court, the Borrowers shall not, nor shall the Borrowers permit any of their Subsidiaries to, directly or indirectly, engage in any material line of business substantially different from those lines of business conducted by the Borrowers and their Subsidiaries on the Closing Date or any business reasonably related, complementary, synergistic or ancillary thereto or reasonable extensions thereof.

Section 7.08.   *Transactions with Affiliates.*   Except to the extent expressly permitted by the Approved Budget and the Orders, in accordance with the Approved Budget Neither Holdings nor the Borrower

shall, nor shall they permit any Subsidiary to, directly or indirectly, enter into any transaction of any kind with any of its Affiliates, whether or not in the ordinary course of business, other than (i) as expressly contemplated in connection with the Required Liquidation or as expressly permitted by the Bankruptcy Court and (ii) transactions set forth on Schedule 7.08. Notwithstanding the foregoing, each of Holdings or the Borrower may capitalize or forgive any Indebtedness owed to it by a Subsidiary.

Section 7.09. *Burdensome Agreements.* Neither Holdings nor the Borrowers shall, nor shall they permit any Subsidiary to, directly or indirectly, enter into or permit to exist any Contractual Obligation (other than this Agreement or any other Loan Document) that limits the ability of (a) any Subsidiary that is not a Guarantor to make Restricted Payments to the Borrowers or any Guarantor or to make or repay loans or advances to or otherwise transfer assets to or make Investments in the Borrowers or any Subsidiary that is a Guarantor or (b) any Loan Party to create, incur, assume or suffer to exist Liens on property of such Person to secure the Obligations; *provided* that the foregoing clauses (a) and (b) shall not apply to Contractual Obligations which (i) exist on the Closing Date and (to the extent not otherwise permitted by this Section 7.09) are listed on Schedule 7.09 hereto (ii) arise in connection with any Disposition permitted by Section 7.04 or 7.05 and relate solely to the assets or Person subject to such Disposition, (iii) are negative pledges and restrictions on Liens in favor of any holder of Indebtedness permitted under Section 7.03 but solely to the extent any negative pledge relates to the property financed by such Indebtedness, (iv) are customary restrictions on leases, subleases, licenses or asset sale agreements otherwise permitted hereby so long as such restrictions relate only to the assets subject thereto and exist on the Closing Date, (v) are customary provisions restricting subletting or assignment of any lease governing a leasehold interest of the Borrowers or any Subsidiary entered into in the ordinary course of business, (vi) are customary provisions restricting assignment of any agreement entered into in the ordinary course of business, (vii) are restrictions on cash or other deposits imposed by customers under contracts entered into in the ordinary course of business, (viii) [reserved], (ix) arise in connection with cash or other deposits permitted under Sections 7.01 and 7.02 and limited to such cash or deposit and (x) arise under applicable law or any applicable rule, regulation or order.

Section 7.10. *Use of Proceeds.*

(a)    Class A New Money DIP Loans. The proceeds of the Class A New Money DIP Loans shall be deposited into the General Purpose DIP Funding Account, and may be used solely in accordance with the Approved Budget (subject to the Permitted Variance). **The proceeds of the New Money DIP Loans made on the First Amendment Effective Date (the "First Amendment DIP Loans") shall be (i) used solely to fund (x) the $280,000 severance payment and (y) the $400,000 incentive payment, each to be paid to the to the designated recipients thereof, as agreed to in writing by Administrative Agent and set forth in the Debtors' *Motion for Entry of and Order (I) Approving their (A) Key Employee Retention Plans and (B) Key Employee Incentive Plan, and (II) Granting Related Relief filed with the Bankruptcy Court on February 5, 2019 [Docket No. 195]* (the "First Amendment Designated Expenses"); and (ii) immediately deposited into and maintained in a segregated deposit account, subject to an Account Control Agreement, which shall not be commingled with any other funds or proceeds at any time. If following the approval of the forgoing motion, at any time during the Chapter 11 Cases the Borrowers are no longer obligated to pay the First Amendment Designated Expenses or any portion thereof, the Borrowers shall immediately repay to Lender the applicable amount of First Amendment DIP Loans. Any First Amendment DIP Loans that are repaid pursuant to this Section 7.10 shall be treated as mandatory prepayments pursuant to Section 2.13 hereof; provided that any amounts repaid pursuant to this Section 7.10 shall be not be subject to Section 2.13(e) (Make-Whole Amount). In the event of any Class A New Money DIP Loans made pursuant to a Commitment Increase after the First Amendment Effective Date, the proceeds of such Class A New Money DIP Loans shall be used solely to fund the Borrowers' exercise of the J&J Option under the Agency Agreement, in accordance with the Approved Budget (subject to the Permitted Variance).**

(b)    Class B New Money DIP Loans. The proceeds of any Borrowing of Class B New Money DIP Loans shall be used solely for Anticipated Ordinary Business Expense Shortfalls determined as of the date of such proposed Borrowing, as evidenced by the Loan Parties and reasonably satisfactory to the Lenders prior to such proposed Borrowing. The proceeds of the Class B New Money DIP Loans shall be deposited into the Class B DIP

Funding Account, and may be used in accordance with the Approved Budget (subject to Permitted Variances), but solely to fund expenditures that are (i) by the Loan Parties under Section 162 of the Code, as determined by the Lenders, or (ii) amounts included in the cost of goods sold, in each case excluding Expenses (as such term is defined in the Agency Agreement) to the extent payable or reimbursable by the Agent (as such term is defined in the Agency Agreement) pursuant to the terms of the Agency Agreement**, unless otherwise agreed to by the Administrative Agent in its sole discretion in connection with the issuance of any Class B New Money DIP Loans made pursuant to a Commitment Increase**.

No proceeds of any Loan shall be used to object, contest or raise any defense to the validity of any Lien pursuant to the Prepetition Term Loan Documents or the Loan Documents or to investigate or prosecute such a claim.

Nothing herein shall in any way prejudice or prevent the Administrative Agent or the Lenders from objecting, for any reason, to any requests, motions, or applications made in the Bankruptcy Court, including any application of final allowances of compensation for services rendered or reimbursement of expenses incurred under Sections 105(a), 330 or 331 of the Bankruptcy Code, by any party in interest (and each such order shall preserve the Administrative Agent's and the Lenders' right to review and object to any such requests, motions or applications).

Section 7.11.   *Negative Pledge.*  Neither Holdings nor the Borrowers shall, nor shall they permit any Subsidiary to, create or permit to subsist any Lien over any of its assets, including, without limitation, any Leasehold Property of the Loan Parties, other than the Liens permitted by Section 7.01.

Section 7.12.   *Fiscal Year.*  Neither Holdings nor the Borrowers shall make any change in its fiscal year or fiscal quarters (it being understood that the Borrowers' fiscal year ends on the Saturday closest to January 31 of each year, and that each of the first three fiscal quarters of each fiscal year of the Borrowers ends on the Saturday closest to each of April 30, July 31 and October 31, respectively); provided, however, that Holdings may, upon the prior written consent of the Administrative Agent, change its and the Borrowers' fiscal year and fiscal quarters to any other fiscal year (and any other fiscal quarters) reasonably acceptable to the Administrative Agent, in which case, Holdings and the Administrative Agent will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary to reflect such changes.

Section 7.13.   *Prepayments, Etc. of Indebtedness.*  Make any payment of principal or interest or otherwise on account of any Prepetition Obligations (excluding obligations under the Prepetition ABL Documents), other than (i) as expressly permitted by the Bankruptcy Court (ii) payments made in compliance in all material respects with the Approved Budget (including Permitted Variances), (iii) payments agreed to in writing by the Required Lenders and (iv) payments expressly permitted by the Order and, if necessary, authorized by the Bankruptcy Court.

Section 7.14.   *Permitted Activities.*  With respect to Holdings, engage in any material operating or business activities (other than to a de minimis extent) or have any material assets or liabilities; *provided*, that, to the extent not otherwise prohibited under Article 7, the following shall be permitted:  (i) its ownership of the Equity Interests of Borrowers and activities incidental thereto, (ii) the maintenance of its legal existence (including the ability to incur fees, costs and expenses relating to such maintenance), (iii) the performance of its obligations with respect to the Loan Documents and any other Indebtedness permitted hereunder, (iv) participating in tax, accounting and other administrative matters as a member of the consolidated group and the provision of administrative and advisory services (including treasury and insurance services) to its Subsidiaries of a type customarily provided by a holding company to its Subsidiaries, (v) holding any cash or property (but not operate any property), (vi) providing indemnification to officers and directors, (vii) making and receiving of any Investments permitted hereunder, and (viii) any activities incidental to the foregoing.  Holdings shall not incur any Liens on Equity Interests of the Borrowers other than Liens securing the Obligations, the Carve-Out, Prepetition

Obligations, and Liens permitted pursuant to the Order, and Holdings shall not own any Equity Interests other than those of the Borrowers.

Section 7.15.  *[Reserved].*

Section 7.16.  *Chapter 11 Modifications.*  Except as permitted pursuant to the terms of this Agreement and solely as expressly permitted by the Order, no Loan Party shall:

(a)    Make or permit to be made any change, amendment or modification, or any application or motion for any change, amendment or modification, to the Bankruptcy Court Orders if such change, amendment or modification adversely affects the Agents and the Lenders hereunder in any material respect.

(b)    Incur, create, assume or suffer to exist or permit any other Lien which is pari passu with or senior to the claims of the Administrative Agent and the Lenders hereunder, except for the Carve-Out, and Liens in favor of the Prepetition ABL Agent in accordance with the terms of the Orders.

(c)    Seek or consent to any order seeking authority to take any action that is prohibited by the terms of this Agreement or the other Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement or any of the other Loan Documents.

Section 7.17. *Segregated Operating Accounts and DIP Funding Accounts.*

(a)    No Loan Party shall create, incur, assume or suffer to exist (i) any Lien upon the DIP Funding Accounts other than the first priority Lien created in favor of the Agent under the Loan Documents or (ii) any Lien upon a Segregated Operating Account other than the first priority Lien created in favor of the Agent under the Loan Documents. For the avoidance of doubt, each Segregated Operating Account and each DIP Funding Account shall constitute Term Priority Collateral.

(b)    *[Reserved].*

(c)    No Loan Party shall make or permit to be made any payment or withdrawal from a DIP Funding Account or Segregated Operating Account except in accordance with the Approved Budget (subject to Permitted Variances), as expressly permitted in the Orders, or the express terms of this Agreement.

(d)    The Loan Parties shall not fund nor pay any expenses set forth in Section 7.10(b) out of any account, or by any other means, other than by payments from the Class B Segregated Operating Account.

**For the avoidance of doubt, the Borrowers shall not be permitted to establish or maintain any deposit accounts other than the Segregated Operating Accounts and DIP Funding Accounts, unless such deposit accounts are subject to Account Control Agreements or used exclusively for payroll; *provided* that the Borrower may maintain deposit accounts that are not subject to Account Control Agreements solely containing funds (i) held in trust for the benefit of third parties in connection with bidding procedures approved by the Bankruptcy Court and (ii) used to remit sales tax payments (provided such sales tax payments are made in the ordinary course).**

Section 7.18.  *Right of Subrogation.*  Assert any right of subrogation or contribution against any other Loan Party.

Section 7.19.  *Subsidiaries.* The Loan Parties shall not and shall not cause or permit their Subsidiaries to directly or indirectly establish, create or acquire any new Subsidiary.

67

# ARTICLE 8
## EVENTS OF DEFAULT AND REMEDIES

Section 8.01.  *Events of Default.*  Any of the following from and after the Closing Date shall constitute an event of default (an "**Event of Default**"):

(a)    *Non-Payment.*  Any Loan Party shall fail to pay any principal or interest on the Term DIP Loan, or any fee, indemnity or other amount payable under this Agreement or any other Loan Document when due and in the case of such fee, indemnity or other amount payable, such nonpayment continues for three (3) Business Days (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise); or

(b)    *Specific Covenants.*  Any Loan Party fails to perform or observe any term, covenant or agreement contained in (i) Sections 5.26, 6.17(c), 6.20, 6.21 or Article 7;  (ii) Sections 6.19; provided that if (A) any such Default described in this clause (ii) is of a type that is capable of being cured and (B) such Default could not materially adversely impact the Lenders' Liens on the Collateral, such Default shall not constitute an Event of Default for two (2) Business Days after the occurrence of such Default so long as the Loan Parties are diligently pursuing the cure of such Default; (iii) Sections 6.01 through 6.18, provided that if (A) any such Default described in this clause (iii) is of a type that is capable of being cured and (B) such Default could not materially adversely impact the Lenders' Liens on the Collateral, such Default shall not constitute an Event of Default for five (5) Business Days after the occurrence of such Default so long as the Loan Parties are diligently pursuing the cure of such Default; or

(c)    *Other Defaults.*  Any Loan Party fails to perform or observe any other term, covenant or agreement (not specified in Section 8.01(a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for ten (10) days after the earlier of (i) notice thereof by the Administrative Agent to the Borrowers and (ii) knowledge thereof by the Borrowers; *provided*, *however*, that such notice and opportunity to cure shall not apply if any such Default is not capable of being cured within such period; or

(d)    *Representations and Warranties.*  Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of the Borrowers or any other Loan Party herein, in any other Loan Document, or in any document required to be delivered in connection herewith or therewith (including, without limitation, any Approved Budget or Variance Report) shall be incorrect or misleading in any material respect when made or deemed made; or

(e)    *Cross-Default.*  Except for defaults occasioned by the filing of the Chapter 11 Cases, entry into this Agreement and defaults resulting from obligations with respect to which the Bankruptcy Code prohibits any Loan Party or any Subsidiary from complying or permits any Loan Party or Subsidiary not to comply, any Loan Party or any Subsidiary (i) fails to make any payment after the applicable grace period with respect thereto, if any, (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Indebtedness (other than Indebtedness hereunder) or (ii) fails to observe or perform any other agreement or condition relating to any such Indebtedness, or any other event occurs, the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity; or

(f)    *Judgments.*  There is entered against any Loan Party or any Subsidiary a final judgment or order for the payment of money (to the extent not covered by independent third-party insurance as to which the insurer has been notified of such judgment or order and has not denied  coverage) and such judgment or order shall not have been satisfied, vacated, discharged or stayed or bonded pending an appeal for a period of forty-five (45) consecutive days; or

(g)     *Invalidity of Loan Documents*.  (i) Any material provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder (including as a result of a transaction permitted under Section 7.04 or 7.05) or as a result of acts or omissions by the Administrative Agent or Collateral Agent or any Lender or the satisfaction in full of all the Obligations, ceases to be in full force and effect; or any Loan Party contests in writing the validity or enforceability of any provision of any Loan Document or the validity or priority of a Lien as required by the Collateral Documents on a material portion of the Collateral; or any Loan Party denies in writing that it has any or further liability or obligation under any Loan Document (other than as a result of repayment in full of the Obligations), or purports in writing to revoke or rescind any Loan Document, or (ii) any challenge by or on behalf of any Loan Party, receiver, trustee, custodian, conservator, monitor, liquidator, rehabilitator, administrator, administrative receiver or similar officer for any Loan Party or for all or any material part of its property to the validity of any Loan Document or the applicability or enforceability of any Loan Document or the validity or priority of a Lien as required by the Collateral Documents on a material portion of the Collateral strictly in accordance with the subject Loan Document's terms or which seeks to void, avoid, limit, or otherwise adversely affect any security interest created by or in any Loan Document or any payment made pursuant thereto; or

(h)     *Change of Control*.  There occurs any Change of Control; or

(i)     *Collateral Documents*.  (i) Any Collateral Document after delivery thereof pursuant to Section 4.02, 6.11 or 6.13 shall for any reason (other than pursuant to the terms hereof or thereof including as a result of a transaction permitted under Section 7.04 or 7.05) cease to create a valid and perfected Lien, with the priority required by the Collateral Documents on and security interest in any material portion of the Collateral purported to be covered thereby, subject to Liens permitted under Section 7.01, (A) except to the extent that any such perfection or priority is not required pursuant to the Collateral and Guarantee Requirement or results from the failure of the Administrative Agent or the Collateral Agent to maintain possession of certificates actually delivered to it representing securities pledged under the Collateral Documents or to file Uniform Commercial Code continuation statements and (B) except as to Collateral consisting of Real Property to the extent that such losses are covered by a lender's title insurance policy and such insurer has not denied coverage or (ii) any of the Equity Interests of the Lead Borrower ceasing to be pledged pursuant to the Security Agreement free of Liens other than Liens created by the Security Agreement or any nonconsensual Liens arising solely by operation of Laws; or

(j)     *ERISA*.  (i) An ERISA Event that, alone or together with any other ERISA Events that have occurred, has resulted or could reasonably be expected to result in liability of a Loan Party, any Subsidiary or any of their respective ERISA Affiliates, or (ii) a Loan Party, any Subsidiary or any of their respective ERISA Affiliates fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its Withdrawal Liability under Section 4201 of ERISA under a Multiemployer Plan; or

(k)     *Chapter 11 Cases*.  There occurs any of the following in the Chapter 11 Cases:

(i)     filing of a plan of reorganization by the Debtors that is not an Acceptable Plan;

(ii)     any of the Debtors shall file a pleading seeking to modify or otherwise alter any of the Orders in a manner that is materially adverse to the Lenders without the prior consent of the Required Lenders;

(iii)     entry of an order without the prior consent of the Required Lenders amending, supplementing or otherwise altering any of the Orders in a manner materially adverse to the Lenders;

(iv)     reversal, vacation or stay of the effectiveness of any Order for a period in excess of seven (7) calendar days without the prior consent of the Required Lenders;

(v)    any material violation of the terms of any Order by any of the Debtors and such violation shall go unremedied for two (2) Business Days;

(vi)    dismissal of the Chapter 11 Cases or conversion of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code, or the Debtors' filing of (or supporting another party in the filing of, or failure to promptly object to) a motion seeking the foregoing relief;

(vii)    appointment of a Chapter 11 trustee without the consent of the Required Lenders, or the Debtors' filing of (or supporting another party in the filing of, or failure to promptly object to) a motion seeking the foregoing relief;

(viii)    termination of the Stalking Horse Agreement so long as such termination (x) was not caused by, or the result of, a breach by the Stalking Horse Bidder of its obligations thereunder, or (y) is the result of a party other than the Stalking Horse Bidder winning the auction with respect to the IP and Online Business Sale;

(ix)    any sale of all or substantially all assets of the Debtors (other than ABL Priority Collateral for so long as the Prepetition ABL Indebtedness remains outstanding) pursuant to Section 363 of the Bankruptcy Code or entry into an agreement obligating any Debtor to consummate any such sale, other than the IP and Online Business Sale or the Lease Sale or the Required Liquidation, unless (i) the proceeds of such sale are used to indefeasibly satisfy the  Obligations in full in cash, or (ii) such sale is consented to by the Administrative Agent at the direction of the Required Lenders;

(x)    appointment of a responsible officer or examiner with enlarged powers relating to the operation of the business of the Borrower or any Guarantor without the consent of the Required Lenders (which appointment shall not have been reversed, stayed or vacated within seven (7) calendar days);

(xi)    failure to meet a milestone set forth in Section 6.19, unless extended or waived within two (2) business days by the consent of the Administrative Agent at the direction of the Required Lenders;

(xii)    granting of relief from the automatic stay in the Chapter 11 Cases to permit foreclosure or enforcement on Collateral of any of the Debtors (subject to customary exceptions, including, without limitation, relief with respect to immaterial assets and insurance programs);

(xiii)    the Debtors' filing of (or supporting another party in the filing of) a motion seeking entry of, or the entry of an order, granting any superpriority claim or lien (except as contemplated herein) which is senior to or pari passu with the Term DIP Claims;

(xiv)    entry of an order without the prior consent of the Required Lenders permitting the Debtors to obtain financing or grant security interests pursuant to Section 364 of the Bankruptcy Code;

(xv)    the Debtors' challenge (or support of any other person's challenge) to the validity or enforceability of any of the obligations of the parties under the Loan Documents;

(xvi)    payment of or granting adequate protection with respect to prepetition debt, other than as expressly provided herein, in the Orders, or consented to by the Required Lenders;

(xvii)    expiration or termination of exclusivity by the Debtors or the filing of a plan of reorganization without the prior consent of the Required Lenders;

(xviii)    cessation of the Term DIP Facility Liens to be valid, perfected and enforceable in all respects;

(xix)    any of the Debtors uses cash collateral or Term DIP Loans for any item other than those set forth in, and in accordance with, the Approved Budget (subject to Permitted Variances) and as approved by the Bankruptcy Court, the Carve-Out or prepays any pre-petition debt (other than Prepetition ABL Indebtedness as permitted by the Orders) , except with the prior consent of the Required Lenders;

(xx)    entry of an order denying or terminating the Debtors' authorization to use cash collateral, except with the prior consent of the Required Lenders;

(xxi)    Permitted Variances under the Approved Budget are exceeded for any period of time, subject to the proviso to the Permitted Variances covenant;

(xxii)    any uninsured judgments are entered with respect to any Post-Petition liabilities against any of the Debtors or any of their respective properties in a combined aggregate amount in excess of $100,000, unless stayed, vacated or satisfied for a period of twenty (20) days after entry thereof;

(xxiii)    any Debtor asserting any right of subrogation or contribution against any other Debtor until all borrowings under the Term DIP Facilities are paid in full and the commitments are terminated;

(xxiv)    the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against the Administrative Agent, any Lender, or any other Loan Party or any of the Collateral;

(xxv)    the failure of Lead Borrower to deliver a proposed updated budget no later than the Thursday of the second week after delivery of the initial Approved Budget and on each Thursday of the second week thereafter;

(xxvi)    the failure of Lead Borrower to deliver a Variance Report on any Budget Testing Date; and

(xxvii)    entry of an order avoiding or permitting recovery of any portion of the payments made on account of the Indebtedness owing under this Agreement or the other Loan Documents or the Prepetition Term Loan Agreement.

Section 8.02.  *Remedies Upon Event of Default.*

(a)    If any Event of Default occurs and is continuing, then, and in any such event, without further order from the Bankruptcy Court, and subject to the terms of the Orders, the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the Administrative Agent and the Required Lenders to exercise all rights and remedies provided for in the Loan Documents, and to take any or all of the following actions without further order of or application to the Bankruptcy Court (as applicable) which Administrative Agent may, and at the request of the Required Lenders shall, take any or all of the following actions, in each case, subject to the Carve-Out and the Supplemental Carve-Out: (i) immediately terminate or limit the Loan Parties' limited use of any cash collateral; (ii) cease making any Loans under the Term DIP Facility to the Loan Parties; (iii) declare all Obligations to be immediately due and payable; (iv) freeze monies or balances in the Loan Parties' accounts; (v) immediately set-off any and all amounts in accounts maintained by the Loan Parties with the Administrative Agent or the Lenders against the Obligations, or otherwise enforce any and all rights against the Collateral in the possession of any of the applicable Secured Parties, including, without limitation, disposition of  the Collateral solely for application  towards the Obligations; and (vi) take any other actions or exercise any other rights or remedies permitted under the Orders, the Loan Documents or applicable law to effect the repayment of the Obligations; provided, however, that prior to the exercise of any right in clauses (i), (iv), (v) or (vi) of this paragraph, the Administrative Agent shall be required to provide three (3) Business Days written notice to the Loan Parties of the Administrative Agent's intent to exercise its rights and remedies; provided, further, that neither the Loan Parties, the Committee nor any other party-in-interest shall have the right to contest the enforcement of the remedies set forth in the Orders and the Loan Documents on any basis other than an

assertion that an Event of Default has not occurred or has been cured within the cure periods expressly set forth in the applicable Loan Documents.

(b)        Except as expressly provided above in this Section 8.02, to the maximum extent permitted by applicable law, presentment, demand, protest and all other notices of any kind are hereby expressly waived.

Further, for the avoidance of doubt, upon the occurrence and during the continuance of any Event of Default, the Borrowers shall not be permitted to withdraw any funds from a DIP Funding Account or a Segregated Operating Account, other than to fund the Carve-Out and the Supplemental Carve-Out, without the prior written consent of the Required Lenders regardless of whether Administrative Agent shall have formally exercised dominion over either the DIP Funding Accounts or the Segregated Operating Accounts, as applicable.

Section 8.03.  *Application of Funds*. After the exercise of remedies provided for in Section 8.02, any amounts received on account of the Obligations and such other proceeds remaining in (i) the DIP Funding Account shall be applied in accordance with Section 2.11 hereof and (ii) the Segregated Operating Accounts shall be applied by the Administrative Agent as set forth in the Orders.

# ARTICLE 9
### THE ADMINISTRATIVE AGENT AND THE COLLATERAL AGENT

Each Lender hereby irrevocably appoints the Administrative Agent and the Collateral Agent (for purposes of this Article 9, the Administrative Agent and the Collateral Agent are referred to collectively as the "**Agents**") its agent and authorizes the Agents to take such actions on its behalf and to exercise such powers as are delegated to such Agent by the terms of the Loan Documents, together with such actions and powers as are reasonably incidental thereto.  Without limiting the generality of the foregoing, the Agents are hereby expressly authorized to (i) execute any and all documents (including releases) with respect to the Collateral and the rights of the Secured Parties with respect thereto, as contemplated by and in accordance with the provisions of this Agreement and the Collateral Documents (including, for the avoidance of doubt, the Prepetition Intercreditor Agreement and any amendment or supplement expressly contemplated thereby) and (ii) negotiate, enforce or settle any claim, action or proceeding affecting the Lenders in their capacity as such, at the direction of the Required Lenders, which negotiation, enforcement or settlement will be binding upon each Lender.

The institution serving as the Administrative Agent and/or the Collateral Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent, and such bank and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with Holdings, the Borrowers or any Subsidiary or other Affiliate thereof as if it were not an Agent hereunder.

Neither Agent shall have any duties or obligations except those expressly set forth in the Loan Documents.  Without limiting the generality of the foregoing, (a) neither Agent shall be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (b) neither Agent shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby that such Agent is instructed in writing to exercise by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 10.08), and (c) except as expressly set forth in the Loan Documents, neither Agent shall have any duty to disclose, nor shall it be liable for the failure to disclose, any information relating to Holdings, the Borrowers or any of the Subsidiaries that is communicated to or obtained by the bank serving as Administrative Agent and/or Collateral Agent or any of its Affiliates in any capacity.  Neither Agent shall be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 10.08) or in the absence of its own gross negligence or willful misconduct.  Neither Agent shall be deemed to have knowledge of any Default unless and until written notice thereof is given to such Agent by Holdings, the Lead Borrower or a Lender, and neither Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation

made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered thereunder or in connection therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document, (iv) the validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Article 4 or elsewhere in any Loan Document, other than to confirm receipt of items expressly required to be delivered to such Agent.

Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper Person. Each Agent may also rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. Each Agent may consult with legal counsel (who may be counsel for the Borrowers), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

Each Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by it. Each Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of each Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the Term DIP Facilities as well as activities as Agent.

Subject to the appointment and acceptance of a successor Agent as provided below, either Agent may resign at any time by notifying the Lenders and the Lead Borrower. Upon any such resignation, the Required Lenders shall have the right, and to the extent no Event of Default exists, in consultation with the Lead Borrower to appoint a successor. If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 5 days after the retiring Agent gives notice of its resignation, then the retiring Agent may (subject to receipt of any consent described above), on behalf of the Lenders, appoint a successor Agent which shall be a bank with an office in New York, New York, or an Affiliate of any such bank. If no successor Agent has been appointed pursuant to the immediately preceding sentence by the 5th day after the date such notice of resignation was given by such Agent, such Agent's resignation shall become effective and the Required Lenders shall thereafter perform all the duties of such Agent hereunder and/or under any other Loan Document until such time, if any, as the Required Lenders appoint a successor Administrative Agent and/or Collateral Agent, as the case may be. Upon the acceptance of its appointment as Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations hereunder. The fees payable by the Borrowers to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Lead Borrower and such successor. After an Agent's resignation hereunder, the provisions of this Article and Section 10.05 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while acting as Agent.

Each Lender acknowledges that it has, independently and without reliance upon the Agents or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Agents or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement or any other Loan Document, any related agreement or any document furnished hereunder or thereunder.

## ARTICLE 10
### Miscellaneous

Section 10.01.  *Notices; Electronic Communications.*  Notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by fax, as follows:

(a)    if to the Lead Borrower, Borrowers,  Holdings or any other Loan Party, to it at:

Gymboree Group, Inc.
Attn:  Kimberly Holtz MacMillan
    Vice President and General Counsel
71 Stevenson Street
San Francisco, CA  94105
415-278-7228 (phone)
415-278-7562 (fax)
kimberly_macmillan@gymboree.com

and

with a copy to (which copy shall not constitute notice):

Milbank, Tweed, Hadley & McCloy LLP
Attention:          Evan        Fleck        &        Al        Pisa
28                    Liberty                                Street
New                York,                NY                10010
Telephone:            (212)                        530-5000

and

Kutak                        Rock                        LLP
Attention:        Michael        A.            Condyles
901        East        Byrd        Street,        Suite        1000
Richmond,                    VA                    23119

(b)    if to the Administrative Agent, to:

Special Situations Investing Group, Inc.
c/o Goldman, Sachs & Co. LLC
200 West Street, 26th Floor
New York, NY 10282
Attention:  Legal Department
Email: gs-legal-amssg@gs.com

with a copy (which copy shall not constitute notice) to:

King & Spalding LLP
1185 Avenue of the Americas
New York, NY 10036
Attention: W. Todd Holleman, Esq.
Telephone: (212) 556 2258
Facsimile: (212) 556 2222
Email: tholleman@kslaw.com

(c)      if to a Lender, to it at its address (or fax number) set forth on Schedule 2.01 or in the Assignment and Acceptance pursuant to which such Lender shall have become a party hereto;

(d)      for all notices required to be delivered pursuant to Sections 6.17 or 6.21(c) hereof, or for any notice otherwise being delivered to Lenders from any Borrower with respect to the budget, Approved Budget, or Variance Report, notice shall also be required to be provided to such other parties as directed by the Administrative Agent.

All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt if delivered by hand or overnight courier service or sent by fax or on the date five (5) Business Days after dispatch by certified or registered mail if mailed, in each case delivered, sent or mailed (properly addressed) to such party as provided in this Section 10.01 or in accordance with the latest unrevoked direction from such party given in accordance with this Section 10.01.  As agreed to among Holdings, the Borrowers, the Administrative Agent and the applicable Lenders from time to time, notices and other communications may also be delivered by e-mail to the e-mail address of a representative of the applicable Person provided from time to time by such Person.

The Borrowers hereby agree, unless directed otherwise by the Administrative Agent or unless the electronic mail address referred to below has not been provided by the Administrative Agent to the Lead Borrower, that it will, or will cause its Subsidiaries to, provide to the Administrative Agent all information, documents and other materials that it is obligated to furnish to the Administrative Agent pursuant to the Loan Documents or to the Lenders under Article 6, including all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication that (1) is or relates to a Borrowing Notice, (2) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefor, (3) provides notice of any Default or Event of Default under this Agreement or any other Loan Document or (4) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement and/or any Borrowing or other extension of credit hereunder (all such non-excluded communications being referred to herein collectively as "**Communications**"), by transmitting the Communications in an electronic/soft medium that is properly identified in a format reasonably acceptable to the Administrative Agent to an electronic mail address as directed by the Administrative Agent.  In addition, the Borrowers agree, and agrees to cause its Subsidiaries, to continue to provide the Communications to the Administrative Agent or the Lenders, as the case may be, in the manner specified in the Loan Documents but only to the extent requested by the Administrative Agent.

The Borrowers hereby acknowledge that (a) the Administrative Agent will make available to the Lenders materials and/or information provided by or on behalf of the Borrowers hereunder (collectively, the "**Borrower Materials**") by posting the Borrower Materials on Intralinks or another similar electronic system (the "**Platform**") and (b) certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to Holdings (or any parent thereof) or the Borrowers or any of their respective securities) (each, a "**Public Lender**").  The Borrowers hereby agree that (w) all Borrower Materials that are to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Borrowers shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as not containing any material non-public information with respect to Holdings (or any parent thereof) or the Borrowers or any of their respective securities for purposes of United States federal and state securities laws (provided, however, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 10.16); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated as "Public Investor;" and (z) the Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not marked as "Public Investor." Notwithstanding the foregoing, the following Borrower Materials shall be marked "PUBLIC", unless the Lead Borrower notifies the Administrative Agent

promptly that any such document contains material non-public information: (1) the Loan Documents and (2) notification of changes in the terms of the Term DIP Facilities.

Each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Law, including United States Federal and state securities laws, to make reference to Communications that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to Holdings (or any parent thereof) or the Borrowers or any of their respective securities for purposes of United States Federal or state securities laws.

THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE".   NEITHER THE ADMINISTRATIVE AGENT NOR ANY OF ITS RELATED PARTIES WARRANTS THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS OR THE ADEQUACY OF THE PLATFORM AND EACH EXPRESSLY DISCLAIMS LIABILITY FOR ERRORS OR OMISSIONS IN THE COMMUNICATIONS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS IS MADE BY THE ADMINISTRATIVE AGENT OR ANY OF ITS RELATED PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM.  IN NO EVENT SHALL THE ADMINISTRATIVE AGENT OR ANY OF ITS RELATED PARTIES HAVE ANY LIABILITY TO ANY LOAN PARTY, ANY LENDER OR ANY OTHER PERSON FOR DAMAGES OF ANY KIND, WHETHER OR NOT BASED ON STRICT LIABILITY AND INCLUDING DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF ANY LOAN PARTY'S OR THE ADMINISTRATIVE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET, EXCEPT TO THE EXTENT THE LIABILITY OF ANY SUCH PERSON IS FOUND IN A FINAL RULING BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED PRIMARILY FROM SUCH PERSON'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

The Administrative Agent agrees that the receipt of the Communications by the Administrative Agent at its e-mail address set forth above shall constitute effective delivery of the Communications to the Administrative Agent for purposes of the Loan Documents.  Each Lender agrees that receipt of notice to it (as provided in the next sentence) specifying that the Communications have been posted to the Platform shall constitute effective delivery of the Communications to such Lender for purposes of the Loan Documents.  Each Lender agrees to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Lender's e-mail address to which the foregoing notice may be sent by electronic transmission and that the foregoing notice may be sent to such e-mail address.

Nothing herein shall prejudice the right of the Administrative Agent or any Lender to give any notice or other communication pursuant to any Loan Document in any other manner specified in such Loan Document.

Section 10.02.  *Survival of Agreement.*   All covenants, agreements, representations and warranties made by the Borrowers or Holdings herein and in the certificates or other instruments prepared or delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the Lenders and shall survive the making by the Lenders of the Loans, regardless of any investigation made by the Lenders or on their behalf or that any Agent or Lender may have had notice of any Default or Event of Default at the time of any Borrowing, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any Fee or any other amount payable under this Agreement or any other Loan Document is outstanding and unpaid and so long as the Term Loan Commitments have not been terminated.  The provisions of Sections 3.01, 3.04, 3.05 and 10.05 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment of any of the Loans, the expiration of the Term Loan Commitments, the

invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of the Administrative Agent, the Collateral Agent or any Lender.

Section 10.03.  *Binding Effect.*  This Agreement shall become effective when it shall have been executed by the Borrowers, each other Loan Party party hereto on the Closing Date, Holdings and the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto.

Section 10.04.  *Successors and Assigns.*

(a) Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the permitted successors and assigns of such party; and all covenants, promises and agreements by or on behalf of the Borrowers, Holdings, the Administrative Agent, the Collateral Agent or the Lenders that are contained in this Agreement shall bind and inure to the benefit of their respective successors and permitted assigns.

(b)    Each Lender may assign to one or more Eligible Assignees all or a portion of its interests, rights and obligations under this Agreement (including all or a portion of the Loans at the time owing to it), with the prior written consent of the Administrative Agent (not to be unreasonably withheld or delayed); *provided, however*, that (i) the amount of the Term Loan Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to the Administrative Agent) shall be in an integral multiple of, and not less than, $1,000,000 (or, if less, the entire remaining amount of such Lender's Term Loan Commitment or Loans of the relevant Class); *provided* that simultaneous assignments by two or more Related Funds shall be combined for purposes of determining whether the minimum assignment requirement is met, (ii) the parties to each assignment shall (A) execute and deliver to the Administrative Agent an Assignment and Acceptance via an electronic settlement system acceptable to the Administrative Agent or (B) if previously agreed with the Administrative Agent, manually execute and deliver to the Administrative Agent an Assignment and Acceptance, and, in each case, shall pay to the Administrative Agent a processing and recordation fee of $3,500; *provided* that (x) simultaneous assignments by two or more Related Funds shall require the payment of a single processing and recordation fee of $3,500 and (y) such processing and recordation fee may be waived or reduced in the sole discretion of the Administrative Agent, and (iii) the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire (in which the assignee shall designate one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Loan Parties and their Related Parties or their respective securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable Laws, including Federal and state securities laws) and all applicable tax forms.  Upon acceptance and recording pursuant to paragraph (e) of this Section 10.04, from and after the effective date specified in each Assignment and Acceptance, (A) the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement and (B) the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 3.01, 3.04, 3.05 and 10.05).

(c)    By executing and delivering an Assignment and Acceptance, the assigning Lender thereunder and the assignee thereunder shall be deemed to confirm to and agree with each other and the other parties hereto as follows:  (i) such assigning Lender warrants that it is the legal and beneficial owner of the interest being assigned thereby free and clear of any adverse claim and the outstanding balances of its Term DIP Loans without giving effect to assignments thereof which have not become effective, are as set forth in such Assignment and Acceptance, (ii) except as set forth in (i) above, such assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement, or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement, any other Loan Document or any other instrument or document furnished pursuant hereto, or the financial

condition of the Borrowers or any Subsidiary or the performance or observance by the Borrowers or any Subsidiary of any of its obligations under this Agreement, any other Loan Document or any other instrument or document furnished pursuant hereto; (iii) such assignee represents and warrants that it is an Eligible Assignee legally authorized to enter into such Assignment and Acceptance; (iv) such assignee confirms that it has received a copy of this Agreement and the other Loan Documents, together with copies of the most recent financial statements referred to in Section 5.05 or delivered pursuant to Section 6.01 and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (v) such assignee will independently and without reliance upon the Administrative Agent, the Collateral Agent, such assigning Lender or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement; (vi) such assignee appoints and authorizes the Administrative Agent and the Collateral Agent to take such action as agent on its behalf and to exercise such powers under this Agreement and the other Loan Documents as are delegated to the Administrative Agent and the Collateral Agent, respectively, by the terms hereof or thereof, together with such powers as are reasonably incidental thereto; and (vii) such assignee agrees that it will perform in accordance with their terms all the obligations which by the terms of this Agreement are required to be performed by it as a Lender.

(d)     The Administrative Agent, acting for this purpose as an agent of the Borrowers, shall maintain at one of its offices in The City of New York a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Term Loan Commitment of, and principal amount of and the interest on the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**").   The entries in the Register shall be conclusive absent manifest error and the Borrowers, the Administrative Agent, the Collateral Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrowers, the Collateral Agent and any Lender, at any reasonable time and from time to time upon reasonable prior notice.  This Section 10.04(d) shall be construed so that the Loans are at all times maintained in "registered form" within the meaning of Section 163(f), 871(h)(2) and 881(c)(2) of the Code and any related Treasury regulations (or any other relevant or successor provisions of the Code or of such Treasury regulations).

(e)     Upon its receipt of, and consent to, a duly completed Assignment and Acceptance executed by an assigning Lender and an assignee, an Administrative Questionnaire completed in respect of the assignee (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) above, if applicable, and the written consent of the Administrative Agent and, if required, the Borrowers, to such assignment and any applicable tax forms, the Administrative Agent shall promptly (i) accept such Assignment and Acceptance and (ii) record the information contained therein in the Register. No assignment shall be effective unless it has been recorded in the Register as provided in this paragraph (e).

(f)     Each Lender may without the consent of the Borrowers or the Administrative Agent sell participations to one or more banks or other Persons in all or a portion of its rights and obligations under this Agreement (including all or a portion of its Term Loan Commitment and the Loans owing to it); *provided, however,* that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) the participating banks or other Persons shall be entitled to the benefit of the cost protection provisions and restrictions contained in Sections 3.01, 3.04 and 3.05 to the same extent as if they were Lenders (subject to the requirements and limitations therein, including the requirements under Section 3.01(d), it being understood that the documentation required under Section 3.01(d) shall be delivered to the participating Lender, to the same extent as if it were a Lender and had acquired its interest by assignment, but with respect to any particular participant, to no greater extent than the Lender that sold the participation to such participant and only if such participant has complied with the requirements of such provisions as if it were a Lender) and (iv) the Borrowers, the Administrative Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement, and such Lender shall retain the sole right to enforce the obligations of the Borrowers relating to the Loans and to approve any amendment, modification or waiver of any provision of this

Agreement (*provided* that the agreement or instrument pursuant to which such Lender has sold a participation may provide that such Lender shall not agree to the following amendments without the consent of such participating bank or Person hereunder: amendments, modifications or waivers decreasing any fees payable to such participating bank or Person hereunder or the amount of principal of or the rate at which interest is payable on the Loans in which such participating bank or Person has an interest, extending any scheduled principal payment date or date fixed for the payment of interest on the Loans in which such participating bank or Person has an interest, increasing or extending the Term Loan Commitments in which such participating bank or Person has an interest, releasing all or substantially all of the Guarantors (other than in connection with the sale of any such Guarantor in a transaction permitted by Section 7.05) or releasing all or substantially all of the Collateral or the Term Priority Collateral). Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrowers, maintain a register on which it enters the name and address of each participant and the principal amounts (and interest thereon) of each participant's interest in the Loans or other Obligations under this Agreement (the "**Participant Register**"); *provided*, that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any participant or any information relating to a participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Treasury Regulation Section 5f.103-1 and Section 1.163-5(b)(1) of the proposed United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and the Borrowers, the Lenders and each Agent shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement, notwithstanding notice to the contrary.

(g)    Any Lender or participant may, in connection with any assignment or participation or proposed assignment or participation pursuant to this Section 10.04, disclose to the assignee or participant or proposed assignee or participant any information relating to the Borrowers furnished to such Lender by or on behalf of the Borrowers; *provided* that, prior to any such disclosure of information designated by the Borrowers as confidential, each such assignee or participant or proposed assignee or participant shall execute an agreement whereby such assignee or participant shall agree (subject to customary exceptions) to preserve the confidentiality of such confidential information on terms no less restrictive than those applicable to the Lenders pursuant to Section 10.16.

(h)    Any Lender may at any time assign all or any portion of its rights under this Agreement to secure extensions of credit to such Lender or in support of obligations owed by such Lender; *provided* that no such assignment shall release a Lender from any of its obligations hereunder or substitute any such assignee for such Lender as a party hereto.

(i)    Notwithstanding anything to the contrary contained herein, any Lender (a "**Granting Lender**") may grant to a special purpose funding vehicle (an "**SPV**"), identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrowers, the option to provide to the Borrowers all or any part of any Loan that such Granting Lender would otherwise be obligated to make to the Borrowers pursuant to this Agreement; *provided* that (i) nothing herein shall constitute a commitment by any SPV to make any Loan, (ii) if an SPV elects not to exercise such option or otherwise fails to provide all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof and (iii) the Granting Lender shall for all purposes remain the Lender hereunder. The making of a Loan by an SPV hereunder shall utilize the Term Loan Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. Each party hereto hereby agrees that no SPV shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender). In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior indebtedness of any SPV, it will not institute against, or join any other Person in instituting against, such SPV any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under the laws of the United States or any State thereof. In addition, notwithstanding anything to the contrary contained in this Section 10.04, any SPV may (i) with notice to, but without the prior written consent of, the Borrowers and the Administrative Agent and without paying any processing fee therefor, assign all or a portion of its interests in any

Loans to the Granting Lender or to any financial institutions (consented to by the Borrowers and Administrative Agent) providing liquidity and/or credit support to or for the account of such SPV to support the funding or maintenance of Loans and (ii) disclose on a confidential basis any non-public information relating to its Loans to any rating agency, commercial paper dealer or provider of any surety, guarantee or credit or liquidity enhancement to such SPV.

(j)     Neither Holdings nor the Borrowers shall assign or delegate any of its rights or duties hereunder without the prior written consent of the Administrative Agent and each Lender, and any attempted assignment without such consent shall be null and void.

Section 10.05.    *Expenses; Indemnity.*    (a) The Borrowers and Holdings agree, jointly and severally, (i) to pay or reimburse the Administrative Agent and the Collateral Agent for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the preparation, due diligence, negotiation, syndication and execution of this Agreement and the other Loan Documents, and any amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transactions contemplated thereby are consummated), and the consummation and administration of the transactions contemplated hereby and thereby, including, without limitation, the reasonable and documented out-of-pocket fees for appraisers, field examiners, AlixPartners, LLP as financial advisor, and all Attorney Costs (which shall be limited to King & Spalding LLP (and one local counsel in each reasonably necessary and relevant material jurisdiction for each group and, in the event of a conflict of interest, one additional counsel of each type to similarly situated parties (which shall exclude in any event costs of in-house counsel and any other advisor not approved by the Borrowers) and Sullivan & Cromwell LLP, as tax counsel,) and (ii) from and after the Closing Date, to pay or reimburse the Administrative Agent, the Collateral Agent and each Lender for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the enforcement (whether through negotiations, legal proceedings or otherwise) of any rights or remedies under this Agreement or the other Loan Documents (including all such costs and expenses incurred during any legal proceeding, including any proceeding under any Debtor Relief Law, and including all respective Attorney Costs which shall be limited to Attorney Costs of one counsel to the Administrative Agent and the Lenders (and one local counsel in each reasonably necessary and relevant material jurisdiction for each group and, in the event of any conflict of interest, one additional counsel of each type to similarly situated parties)) and related costs and expenses of professional advisors.  The foregoing costs and expenses shall include all reasonable search, filing, recording and title insurance charges and fees related thereto, and other reasonable out-of-pocket expenses incurred by any Agent.

(b)     Whether or not the transactions contemplated hereby are consummated, from and after the Closing Date, the Loan Parties shall, jointly and severally, indemnify and hold harmless the Administrative Agent, the Collateral Agent, each Lender, and the directors, officers, employees, controlling persons, partners, advisors, agents, attorneys, trustees and other representatives of each of the foregoing (collectively the "**Indemnitees**") from and against any and all actual losses, damages, claims, liabilities and expenses (including Attorney Costs which shall be limited to Attorney Costs of one counsel to the Administrative Agent and the Lenders (and, if reasonably necessary, one local counsel in each applicable jurisdiction and, in the event of any actual conflict of interest, one additional counsel for each type of similarly situated affected parties) and Sullivan & Cromwell LLP as tax counsel to the Administrative Agent, and settlement costs) of any kind or nature whatsoever which may at any time be imposed on, incurred by or asserted or awarded against any such Indemnitee in any way relating to or arising out of or in connection with (i) the execution, delivery, enforcement, performance or administration of any Loan Document or any other agreement, letter or instrument delivered in connection with the transactions contemplated thereby, (ii) any Term Loan Commitment or Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or Release of Hazardous Materials at, on, under or from any property or facility currently or formerly owned, leased or operated by the Loan Parties or any Subsidiary, or any Environmental Liability related in any way to any Loan Parties or any Subsidiary or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or threatened claim, investigation, litigation or proceeding) and regardless of whether any Indemnitee is a party thereto in all cases, whether or not caused by or arising, in whole or in part, out of the negligence of an Indemnitee; *provided* that, notwithstanding

the foregoing, such indemnity shall not, as to any Indemnitee, be available to the extent that such losses (excluding loss profits), damages, claims, liabilities and expenses resulted from (x) the gross negligence, willful misconduct or material breach in bad faith of such Indemnitee or of any affiliate, director, officer, employee, counsel, agent or attorney-in-fact of such Indemnitee, as determined by the final non-appealable judgment of a court of competent jurisdiction, (y) a material breach of its obligations under the Loan Documents by such Indemnitee or of any affiliate, director, officer, employee, counsel, agent or attorney-in-fact of such Indemnitee as determined by the final non-appealable judgment of a court of competent jurisdiction or (z) any dispute solely among the Indemnitees other than (1) any claim against an Indemnitee in its capacity or in fulfilling its role as Administrative Agent, Collateral Agent or similar role and (2) any claim arising out of any act or omission of the Borrowers or any of its Affiliates.  No Indemnitee shall be liable for any damages arising from the use by others of any information or other materials obtained through IntraLinks or other similar information transmission systems in connection with this Agreement.  In the case of a claim, investigation, litigation or other proceeding to which the indemnity in this Section 10.05 applies, such indemnity shall be effective whether or not such claim, investigation, litigation or proceeding is brought by any Loan Party, any Subsidiary of any Loan Party, any Loan Party's directors, stockholders or creditors or other Affiliates or an Indemnitee or any other Person, whether or not any Indemnitee is otherwise a party thereto and whether or not any of the transactions contemplated hereunder or under any of the other Loan Documents are consummated.  For the avoidance of doubt, this paragraph shall not apply with respect to Taxes that are the subject of, or excluded from, Section 3.01.

(c)     To the extent that any Loan Party fails to pay any amount required to be paid by them to the Administrative Agent or the Collateral Agent under paragraph (a) or (b) of this Section, each Lender severally agrees to pay to the Administrative Agent or the Collateral Agent such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; *provided* that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent or the Collateral Agent in its capacity as such.  For purposes hereof, a Lender's "***pro rata share***" shall be determined based upon its share of the sum of the outstanding Term DIP Loans and unused Term Loan Commitments at the time.

(d)     To the extent permitted by applicable Law, (i) no Loan Party shall assert, and each hereby waives, any claim against any Indemnitee and (ii) no Indemnitee shall assert, and each hereby waives, any claim against any Loan Party, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby or any Loan or the use of the proceeds thereof (whether before or after the Closing Date).

(e)     The provisions of this Section 10.05 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment of any of the Loans, the expiration of the Term Loan Commitments, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of the Administrative Agent, the Collateral Agent or any Lender.  All amounts due under this Section 10.05 shall be payable within 10 Business Days after written demand therefor.

Section 10.06.  *[Reserved].*

Section 10.07.  *Applicable Law.*  EXCEPT TO THE EXTENT SUPERSEDED BY THE BANKRUPTCY CODE, THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (OTHER THAN AS EXPRESSLY SET FORTH IN OTHER LOAN DOCUMENTS) SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.

Section 10.08.  *Waivers; Amendment.*  (a) No failure or delay of the Administrative Agent, the Collateral Agent or any Lender in exercising any power or right hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise

81

thereof or the exercise of any other right or power.  The rights and remedies of the Administrative Agent, the Collateral Agent and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or any other Loan Document or consent to any departure by the Borrowers or any other Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) below, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  No notice or demand on the Borrowers or Holdings in any case shall entitle the Borrowers or Holdings to any other or further notice or demand in similar or other circumstances.

(b)    Neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified except (x) in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Borrowers, Holdings and the Required Lenders and (y) except as otherwise described below, in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by each party thereto with the consent of the Required Lenders; *provided, however*, that no such agreement shall (i) decrease the principal amount of, or extend the scheduled maturity date of or any scheduled principal payment date or scheduled date for the payment of any interest on any Loan, or waive or excuse any such payment or any part thereof (other than with respect to any default interest), or decrease the rate of interest on any Loan (other than with respect to any default interest), without the prior written consent of each Lender directly adversely affected thereby (it being understood that the waiver of (or amendment to the terms of) any mandatory prepayment of the Loans shall not constitute a postponement of any date scheduled for the payment of principal or interest or decrease or waiver), (ii) increase or extend the Term Loan Commitment of any Lender without the prior written consent of such Lender (it being understood that a waiver of any condition precedent or of any Default, mandatory prepayment or mandatory reduction of the Term Loan Commitments shall not constitute an extension or increase of any Term Loan Commitment of any Lender), (iii) amend or modify the pro rata requirements of Section 2.14, the provisions of Section 10.04(j) or the provisions of this Section or release all or substantially all of the Guarantors (other than in connection with the sale of such Guarantors in a transaction permitted by Section 7.04 or 7.05) or all or substantially all of the Collateral or of the Term Priority Collateral (other than as permitted hereby), without the prior written consent of each Lender directly adversely affected thereby (or, in the case of Section 10.04(j), each Lender), (iv) change the provisions of any Loan Document in a manner that by its terms adversely affects the rights of Lenders holding Loans of one Class differently from the rights of Lenders holding Loans of any other Class without the prior written consent of the Required Class Lenders with respect to each adversely affected Class, (v) modify the protections afforded to an SPV pursuant to the provisions of Section 10.04(i) without the written consent of such SPV, (vi) reduce the percentage contained in the definition of the term "Required Lenders" without the prior written consent of each Lender (it being understood that, with the consent of the Required Lenders (if such consent is otherwise required), additional extensions of credit pursuant to this Agreement may be included in the determination of the Required Lenders on substantially the same basis as the Term Loan Commitments on the Closing Date),(vii) modify the definition of "Required Class Lenders" without the consent of the Required Class Lenders with respect to each Class of Loans or Term Loan Commitments or (viii) change or have the effect of changing pro rata treatment of any payments (including voluntary and mandatory prepayments) without the prior written consent of each Lender directly adversely affected thereby; *provided further* that no Lender consent is required to effect any amendment expressly contemplated by Section 7.12; *provided further* that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent or the Collateral Agent hereunder or under any other Loan Document without the prior written consent of the Administrative Agent or the Collateral Agent, as applicable.

(c)    The Administrative Agent and the Borrowers may amend any Loan Document to correct administrative errors or omissions, or to effect administrative changes that are not adverse to any Lender. Notwithstanding anything to the contrary contained herein, such amendment shall become effective without any further consent of any other party to such Loan Document.

(d)    Notwithstanding anything set forth herein, in connection with a sale or other disposition under Section 363 of the Bankruptcy Code, the Agents and the Lenders agree that, at the direction of the Required

Lenders, the Administrative Agent shall 'credit bid' any amount of the Obligations as directed by the Required Lenders.

Section 10.09.  *Interest Rate Limitation*.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable Law (collectively the "**Charges**"), shall exceed the maximum lawful rate (the "**Maximum Rate**") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan or participation in accordance with applicable Law, the rate of interest payable in respect of such Loan or participation hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan or participation but were not payable as a result of the operation of this Section 10.09 shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or participations or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

Section 10.10.  *Entire Agreement*.  This Agreement, the Fee Letter and the other Loan Documents constitute the entire contract between the parties relative to the subject matter hereof.  Any other previous agreement among the parties with respect to the subject matter hereof is superseded by this Agreement and the other Loan Documents.  Nothing in this Agreement or in the other Loan Documents, expressed or implied, is intended to confer upon any Person (other than the parties hereto and thereto, their respective successors and assigns permitted hereunder and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent, the Collateral Agent and the Lenders) any rights, remedies, obligations or liabilities under or by reason of this Agreement or the other Loan Documents.

Section 10.11.  *WAIVER OF JURY TRIAL*.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS.  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.11.

Section 10.12.  *Severability*.  In the event any one or more of the provisions contained in this Agreement or in any other Loan Document should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction).  The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

Section 10.13.  *Counterparts*.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original but all of which when taken together shall constitute a single contract, and shall become effective as provided in Section 10.03.  Delivery of an executed signature page to this Agreement by facsimile or other electronic imaging transmission shall be as effective as delivery of a manually signed counterpart of this Agreement.

Section 10.14.  *Headings.*  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

Section 10.15.  *Jurisdiction; Consent to Service of Process.*  (a) ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT SHALL BE BROUGHT IN THE BANKRUPTCY COURT, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH LOAN PARTY HEREBY IRREVOCABLY ACCEPTS IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE BANKRUPTCY COURT. EACH LOAN PARTY HEREBY IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF THE BANKRUPTCY COURT AND IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO THE BORROWER AGENT AT ITS ADDRESS FOR NOTICES AS SET FORTH HEREIN. THE LOAN PARTIES AGREE THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE ADMINISTRATIVE AGENT AND THE LENDERS TO SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANY LOAN PARTY IN ANY OTHER JURISDICTION. EACH LOAN PARTY HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE JURISDICTION OR LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN SUCH COURT AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. TO THE EXTENT THAT ANY LOAN PARTY HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY FROM JURISDICTION OF ANY COURT OR FROM ANY LEGAL PROCESS (WHETHER THROUGH SERVICE OR NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OR OTHERWISE) WITH RESPECT TO ITSELF OR ITS PROPERTY, EACH LOAN PARTY HEREBY IRREVOCABLY WAIVES SUCH IMMUNITY IN RESPECT OF ITS OBLIGATIONS UNDER THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS.

(b)    Each of the parties hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the other Loan Documents in any New York State or Federal court. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(c)    Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 10.01.  Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

Section 10.16. *Confidentiality.*  Each of the Administrative Agent, the Collateral Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' officers, directors, employees and agents, including accountants, legal counsel and other advisors on a "need to know" basis (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority or quasi-regulatory authority (such as the National Association of Insurance Commissioners), (c) to the extent required by applicable Laws or regulations or by any subpoena or similar legal process, (d) in connection with the exercise of any remedies hereunder or under the other Loan Documents or any suit, action or proceeding relating to the enforcement of its rights hereunder or thereunder, (e) subject to an agreement containing provisions substantially the same as those of this Section 10.16, to (i) any actual or prospective assignee of or participant in any of its rights or obligations under this Agreement and the other Loan Documents or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrowers or any Subsidiary or any of their respective obligations, (f) with the consent of the Borrowers, (g) to the extent such Information becomes publicly available other than as a

84

result of a breach of this Section 10.16 or (h) to the extent necessary or advisable in connection with the Special Indemnity Grantor's obligations set forth in Section 10.23 hereof.  For the purposes of this Section, "**Information**" shall mean all information received from the Borrowers or Holdings and related to the Borrowers or Holdings or their business, other than any such information that was available to the Administrative Agent, the Collateral Agent or any Lender on a nonconfidential basis prior to its disclosure by the Borrowers or Holdings; *provided* that, in the case of Information received from the Borrowers or Holdings after the Closing Date, such information is clearly identified at the time of delivery as confidential or is delivered pursuant to Section 6.01, 6.02 or 6.03 hereof.  Any Person required to maintain the confidentiality of Information as provided in this Section 10.16 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord its own confidential information. For the avoidance of doubt, Lenders shall be able to share Information (A) with any Designated Purchaser (as defined in the Stalking Horse Agreement), and such Designated Purchaser's Affiliates, and/ or its Affiliates' equity owners, directors, officers, employees, representatives, advisors, and actual or potential financing sources and co-investors and (B) with any actual or potential bidder that is approved by the Borrowers pursuant to Section 3.19 of the Stalking Horse Agreement (and such actual or  potential bidder's Affiliates, and/ or its Affiliates' equity owners, directors, officers, employees, representatives, advisors, and actual or potential financing sources and co-investors).

Section 10.17.  *Lender Action.*  Each Lender agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any Loan Party or any other obligor under any of the Loan Documents (including the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures, with respect to any Collateral or any other property of any such Loan Party, unless expressly provided for herein or in any other Loan Document, without the prior written consent of the Administrative Agent. The provisions of this Section 10.17 are for the sole benefit of the Lenders and shall not afford any right to, or constitute a defense available to, any Loan Party.

Section 10.18.  *USA PATRIOT Act Notice.*  Each Lender and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies Holdings and the Borrowers that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies Holdings and the Borrowers, which information includes the name and address of Holdings and the Borrowers and other information that will allow such Lender or the Administrative Agent, as applicable, to identify Holdings and the Borrowers in accordance with the USA PATRIOT Act.

Section 10.19.  *Collateral And Guaranty Matters.*  The Lenders irrevocably agree:

(a)    that any Lien on any property granted to or held by the Administrative Agent or the Collateral Agent under any Loan Document shall be automatically released (i) upon termination of all Term Loan Commitments hereunder and payment in full of all Obligations (other than contingent obligations not yet accrued or payable (in each case solely to the extent expressly permitted hereunder)), (ii) at the time the property subject to such Lien is Disposed as part of or in connection with any Disposition permitted hereunder or under any other Loan Document to any Person other than a Person required to grant a Lien to the Administrative Agent or the Collateral Agent under the Loan Documents (or, if such transferee is a Person required to grant a Lien to the Administrative Agent or the Collateral Agent on such asset, at the option of the applicable Loan Party, such Lien on such asset may still be released in connection with the transfer so long as (x) the transferee grants a new Lien to the Administrative Agent or Collateral Agent on such asset substantially concurrently with the transfer of such asset, (y) the transfer is between parties organized under the laws of different jurisdictions and at least one of such parties is a Foreign Subsidiary and (z) the priority of the new Lien is the same as that of the original Lien), (iii) subject to Section 10.08, if the release of such Lien is approved, authorized or ratified in writing by the Required Lenders or (iv) if the property subject to such Lien is owned by a Guarantor, upon release of such Guarantor from its obligations under its Guaranty pursuant to Section 11.10;

(b)    *[Reserved]*; and

(c)      that any Guarantor shall be automatically released from its obligations under the Guaranty as provided in Section 11.10.

Upon request by the Administrative Agent or the Collateral Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's or the Collateral Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guaranty pursuant to this Section 10.19.  In each case as specified in this Section 10.19, the Administrative Agent or the Collateral Agent will (and each Lender irrevocably authorizes the Administrative Agent and the Collateral Agent to), at the Borrowers' expense, execute and deliver to the applicable Loan Party such documents as the Lead Borrower may reasonably request to evidence the release or subordination of such item of Collateral from the assignment and security interest granted under the Collateral Documents, or to evidence the release of such Guarantor from its obligations under the Guaranty, in each case in accordance with the terms of the Loan Documents and this Section 10.19.

Notwithstanding the foregoing, no Lien or Guarantor shall be released or extinguished unless in accordance with a disposition pursuant to the Required Liquidation or otherwise permitted by the Bankruptcy Court.

Section 10.20.  *[Reserved]*.

Section 10.21.  *Payments Set Aside.*  To the extent that any payment by or on behalf of the Borrowers or any other Loan Party is made to any Agent or any Lender, or any Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall, to the fullest extent possible under provisions of applicable Law, be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share of any amount so recovered from or repaid by any Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the applicable Federal Funds Effective Rate from time to time in effect.

Section 10.22.  *No Advisory or Fiduciary Responsibility.*

(a)      In connection with all aspects of each transaction contemplated hereby, each party hereto acknowledges and agrees, and acknowledges its Affiliates' understanding, that (i) the facilities provided for hereunder and any related arranging or other services in connection therewith (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document) are an arm's-length commercial transaction between the Borrowers and its Affiliates, on the one hand, and the Agents and the Lenders, on the other hand, and the Borrowers and its Affiliates are capable of evaluating and understanding and understands and accepts the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents (including any amendment, waiver or other modification hereof or thereof), (ii) in connection with the process leading to such transaction, each of the Agents and the Lenders is and has been acting solely as a principal and is not the financial advisor, agent or fiduciary, for the Borrowers or any of its Affiliates, stockholders, creditors or employees or any other Person, (iii) none of the Agents or the Lenders has assumed or will assume an advisory, agency or fiduciary responsibility in favor of the Borrowers or any of its Affiliates with respect to any of the transactions contemplated hereby or the process leading thereto, including with respect to any amendment, waiver or other modification hereof or of any other Loan Document (irrespective of whether any Agent or Lender has advised or is currently advising the Borrowers or any of its Affiliates on other matters) and none of the Agents or the Lenders has any obligation to the Borrowers or any of its Affiliates with respect to the financing transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents, (iv) the Agents, the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve

interests that differ from, and may conflict with, those of the Borrowers and its Affiliates, and none of the Agents or the Lenders has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship and (v) the Agents and the Lenders have not provided and will not provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any other Loan Document) and the Loan Parties have consulted their own legal, accounting, regulatory and tax advisors to the extent they have deemed appropriate.  Each Loan Party hereby waives and releases, to the fullest extent permitted by law, any claims that it may have against the Agents and the Lenders with respect to any breach or alleged breach of agency or fiduciary duty under applicable Law relating to agency and fiduciary obligations.

(b)    Each Loan Party acknowledges and agrees that each Lender and any affiliate thereof may lend money to, invest in, and generally engage in any kind of business with, any of the Borrowers, Holdings, any Affiliate thereof or any other person or entity that may do business with or own securities of any of the foregoing, all as if such Lender or Affiliate thereof were not a Lender (or an agent or any other person with any similar role under the Term DIP Facilities) and without any duty to account therefor to any other Lender, Holdings, the Borrowers or any Affiliate of the foregoing. Each Lender and any affiliate thereof may accept fees and other consideration from Holdings, the Borrowers or any Affiliate thereof for services in connection with this Agreement, the Facilities, the commitment letter or otherwise without having to account for the same to any other Lender, Holdings, the Borrowers, any investor or any Affiliate of the foregoing.

Section 10.23. *Special Indemnity Obligation*.

(a)    During the Special Indemnity Period, the Special Indemnity Grantor agrees to indemnify and reimburse the Special Indemnity Beneficiaries, solely to the extent that the Company does not have sufficient assets to satisfy all administrative expenses arising under the Chapter 11 Cases, for any Qualifying Special Indemnity Losses in an aggregate amount not to exceed the Special Indemnity Cap; provided, that the Special Indemnity Grantor shall be assigned, and, entitled to exercise to the fullest extent permitted under Applicable Law, any and all rights of subrogation against any applicable insurance providers of Qualifying Insurance Policies. Notwithstanding anything herein to the contrary, the Special Indemnity Beneficiaries shall be express third party beneficiaries of this Agreement solely for the purpose of (and only to the extent necessary for) enforcing their rights under this Section 10.23.  Notwithstanding anything to the contrary herein, this provision and the definitions used herein shall survive termination of this Agreement until, but in any event not later than the last day of the Special Indemnity Period.

(b)    Each of the parties hereto hereby acknowledge that none of the Special Indemnity Grantor, Administrative Agent or any of the Lenders or any of their Affiliates party hereto have instructed or directed in any way the Company, the Loan Parties, the Special Indemnity Beneficiaries, or any of their Related Parties, now or in the future, to take any action to (i) deliver any notices under the WARN Act in the Chapter 11 Cases, or (ii) terminate any employee, including, for the avoidance of doubt, the timing or manner of such termination or any severance, bonus or other amounts payable in connection therewith, and neither the Special Indemnity Grantor, nor any of its officers, directors, partners, employees or agents are liable in any way to the Company, any Loan Party or any Special Indemnity Beneficiary or any third parties as a result of the foregoing.

(c)    The Company shall notify the Administrative Agent for the benefit of the Special Indemnity Grantor in writing within three (3) Business Days of receipt of any claims, demands, actions or causes of action which could result in Qualifying Special Indemnity Losses, whether asserted in a legal, judicial, arbitral or administrative proceeding or action or by notice without institution of such legal, judicial, arbitral or administrative proceeding or action. At any time following the receipt of such written notice by the Administrative Agent, and solely to the extent not prohibited under any applicable Qualifying Insurance Policy, the Special Indemnity Grantor may, at its own expense, in its discretion, and upon prior written notice to such Indemnified Party, assume on behalf of the Company and/or Special Indemnity Beneficiary and conduct with due diligence and in good faith the defense of such claim with counsel selected by Special Indemnity Grantor in its sole discretion. Neither the Company, nor any Loan Party or Special Indemnity Beneficiary shall enter into any binding settlement

agreement in connection with any such claim without the express written consent of the Special Indemnity Grantor.

Section 10.24.    *Acknowledgement and Consent to Bail-In of EEA Financial Institutions.* Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder that may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

Section 10.25.    *Conflicts.*   If any provision in this Agreement or any other Loan Document expressly conflicts with any provision in the Interim Order or Final Order, the provisions in the Interim Order or Final Order shall govern and control.

# ARTICLE 11
## GUARANTEE

Section 11.01.    *The Guarantee.*   Each Guarantor hereby jointly and severally with the other Guarantors guarantees, as a primary obligor and not as a surety to each Secured Party and their respective successors and permitted assigns, the prompt payment in full when due (whether at stated maturity, by required prepayment, declaration, demand, by acceleration or otherwise) of the principal of and interest on the Loans made by the Lenders to, the Borrowers, and all other Obligations from time to time owing to the Secured Parties by any other Loan Party under any Loan Document strictly in accordance with the terms thereof (such obligations being herein collectively called the "**Guaranteed Obligations**"); <u>provided</u> that the Guaranteed Obligations of any Guarantor shall in no event include any Excluded Swap Obligations (as defined in the Prepetition Term Loan Agreement) of such Guarantor.  The Guarantors hereby jointly and severally agree that if the Borrowers or other Guarantor(s) shall fail to pay in full when due (whether at stated maturity, by acceleration or otherwise) any of the Guaranteed Obligations, the Guarantors will promptly pay the same in cash, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Guaranteed Obligations, the same will be promptly paid in full when due (whether at extended maturity, by acceleration or otherwise) in accordance with the terms of such extension or renewal.

Section 11.02.    *Obligations Unconditional.*   The obligations of the Guarantors under Section 11.01 shall constitute a guaranty of payment and to the fullest extent permitted by applicable Law, are absolute, irrevocable and unconditional, joint and several, irrespective of the value, genuineness, validity, regularity or enforceability of the Guaranteed Obligations of the Borrowers or any other Guarantor under this Agreement, or any

88

other agreement or instrument referred to herein, or any substitution, release or exchange of any other guarantee of or security for any of the Guaranteed Obligations, and, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or Guarantor (except for payment in full). Without limiting the generality of the foregoing, it is agreed that the occurrence of any one or more of the following shall not alter or impair the liability of the Guarantors hereunder which shall remain absolute, irrevocable and unconditional under any and all circumstances as described above:

(a)    at any time or from time to time, without notice to the Guarantors, to the extent permitted by Law, the time for any performance of or compliance with any of the Guaranteed Obligations shall be extended, or such performance or compliance shall be waived;

(b)    any of the acts mentioned in any of the provisions of this Agreement or any other agreement or instrument referred to herein or therein shall be done or omitted;

(c)    the maturity of any of the Guaranteed Obligations shall be accelerated, or any of the Guaranteed Obligations shall be amended in any respect, or any right under the Loan Documents or any other agreement or instrument referred to herein or therein shall be amended or waived in any respect or any other guarantee of any of the Guaranteed Obligations or any security therefor shall be released or exchanged in whole or in part or otherwise dealt with;

(d)    any Lien or security interest granted to, or in favor of, any Secured Party or Agent as security for any of the Guaranteed Obligations shall fail to be perfected; or

(e)    the release of any other Guarantor pursuant to Section 11.10.

Section 11.03.    *Certain Waivers. Etc.*    The Guarantors hereby expressly waive diligence, presentment, demand of payment, protest and, to the extent permitted by Law, all notices whatsoever, and any requirement that any Secured Party exhaust any right, power or remedy or proceed against the Borrowers under this Agreement, or any other agreement or instrument referred to herein or therein, or against any other person under any other guarantee of, or security for, any of the Guaranteed Obligations. The Guarantors waive, to the extent permitted by Law, any and all notice of the creation, renewal, extension, waiver, termination or accrual of any of the Guaranteed Obligations and notice of or proof of reliance by any Secured Party upon this Guarantee or acceptance of this Guarantee, and the Guaranteed Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred in reliance upon this Guarantee, and all dealings between the Borrowers and the Secured Parties shall likewise be conclusively presumed to have been had or consummated in reliance upon this Guarantee. This Guarantee shall be construed as a continuing, absolute, irrevocable and unconditional guarantee of payment without regard to any right of offset with respect to the Guaranteed Obligations at any time or from time to time held by Secured Parties, and the obligations and liabilities of the Guarantors hereunder shall not be conditioned or contingent upon the pursuit by the Secured Parties or any other person at any time of any right or remedy against the Borrowers or against any other person which may be or become liable in respect of all or any part of the Guaranteed Obligations or against any collateral security or guarantee therefor or right of offset with respect thereto. This Guarantee shall remain in full force and effect and be binding in accordance with and to the extent of its terms upon the Guarantors and the successors and permitted assigns thereof, and shall inure to the benefit of the Secured Parties, and their respective successors and permitted assigns, notwithstanding that from time to time during the term of this Agreement there may be no Guaranteed Obligations outstanding. Each Guarantor waives any rights and defenses that are or may become available to it by reason of §§ 2787 to 2855, inclusive, and §§ 2899 and 3433 of the California Civil Code. As provided in Section 10.07, the provisions of this Article 11 shall be governed by, and construed in accordance with, the laws of the State of New York. The foregoing waivers and the provisions hereinafter set forth in this Article 11 which pertain to California law are included solely out of an abundance of caution, and shall not be construed to mean that any of the above-referenced provisions of California law are in any way applicable to this Article 11, to any other provision of this Agreement or to the Obligations.

89

Section 11.04.  *Reinstatement.*  The obligations of the Guarantors under this Article 11 shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of the Borrowers or other Loan Party in respect of the Guaranteed Obligations is rescinded or must be otherwise restored by any holder of any of the Guaranteed Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise.

Section 11.05.  *Subrogation; Subordination.*  Each Guarantor hereby agrees that until the payment and satisfaction in full in cash of all Guaranteed Obligations (other than contingent obligations) and the expiration and termination of the Term Loan Commitments of the Lenders under this Agreement it shall waive any claim and shall not exercise any right or remedy, direct or indirect, arising by reason of any performance by it of its guarantee in Section 11.01, whether by subrogation or otherwise, against the Borrowers or any other Guarantor of any of the Guaranteed Obligations or any security for any of the Guaranteed Obligations.  Any Indebtedness of any Loan Party to any Person that is not a Loan Party permitted pursuant to Section 7.03(b) shall be subordinated to such Loan Party's Obligations in the manner set forth in, and substantially in the form of, the Intercompany Note evidencing such Indebtedness.

Section 11.06.  *Remedies.*  The Guarantors jointly and severally agree that, as between the Guarantors and the Lenders, the obligations of the Borrowers under this Agreement may be declared to be forthwith due and payable as provided in Section 8.02 (and shall be deemed to have become automatically due and payable in the circumstances provided in Section 8.02) for purposes of Section 11.01, notwithstanding any stay, injunction or other prohibition preventing such declaration (or such obligations from becoming automatically due and payable) as against the Borrowers and that, in the event of such declaration (or such obligations being deemed to have become automatically due and payable), such obligations (whether or not due and payable by the Borrowers) shall forthwith become due and payable by the Guarantors for purposes of Section 11.01.

Section 11.07.  *Instrument for the Payment of Money.*  Each Guarantor hereby acknowledges that the guarantee in this Article 11 constitutes an instrument for the payment of money, and consents and agrees that any Secured Party or Agent, at its sole option, in the event of a dispute by such Guarantor in the payment of any moneys due hereunder, shall have the right to bring a motion-action under New York CPLR Section 3213.

Section 11.08.  *Continuing Guarantee.*  The guarantee in this Article 11 is a continuing guarantee of payment, and shall apply to all Guaranteed Obligations whenever arising.

Section 11.09.  *General Limitation on Guarantee Obligations.*  In any action or proceeding involving any state corporate, limited partnership or limited liability company law, or any applicable state, federal or foreign bankruptcy, insolvency, reorganization or other Law affecting the rights of creditors generally, if the obligations of any Guarantor under Section 11.01 would otherwise be held or determined to be void, voidable, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability under Section 11.01, then, notwithstanding any other provision to the contrary, the amount of such liability shall, without any further action by such Guarantor, any Loan Party or any other person, be automatically limited and reduced to the highest amount (after giving effect to the right of contribution established in Section 11.11) that is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceeding.

Section 11.10.  *Release of Guarantors.*

When all Term Loan Commitments hereunder have terminated, and all Loans or other Obligations hereunder which are accrued and payable have been paid or satisfied, this Agreement and the Guarantees made herein shall terminate with respect to all Obligations, except with respect to Obligations that expressly survive such repayment pursuant to the terms of this Agreement.

Notwithstanding the foregoing, no Guarantor shall be released unless in accordance with a disposition pursuant to the Required Liquidation or otherwise permitted by the Bankruptcy Court.

Section 11.11.  *Right of Contribution.*  Each Guarantor hereby agrees that to the extent that a Subsidiary Guarantor shall have paid more than its proportionate share of any payment made hereunder, such Subsidiary Guarantor shall be entitled to seek and receive contribution from and against any other Guarantor hereunder which has not paid its proportionate share of such payment.  Each Subsidiary Guarantor's right of contribution shall be subject to the terms and conditions of Section 11.05.  The provisions of this Section 11.11 shall in no respect limit the obligations and liabilities of any Subsidiary Guarantor to the Administrative Agent and the Secured Parties, and each Subsidiary Guarantor shall remain liable to the Administrative Agent and the Secured Parties for the full amount guaranteed by such Subsidiary Guarantor hereunder.

Section 11.12.  *Additional Guarantor Waivers and Agreements.*  (a) Each Guarantor understands and acknowledges that if the Collateral Agent or any other Secured Party forecloses judicially or nonjudicially against any real property security for the Obligations, that foreclosure could impair or destroy any ability that such Guarantor may have to seek reimbursement, contribution, or indemnification from the Borrowers or others based on any right such Guarantor may have of subrogation, reimbursement, contribution, or indemnification for any amounts paid by such Guarantor under the Guaranty.  Each Guarantor further understands and acknowledges that in the absence of this paragraph, such potential impairment or destruction of such Guarantor's rights, if any, may entitle such Guarantor to assert a defense to this Guaranty based on Section 580d of the California Code of Civil Procedure as interpreted in Union Bank v. Gradsky, 265 Cal. App. 2d 40 (1968).  By executing this Guaranty, each Guarantor freely, irrevocably, and unconditionally:  (i) waives and relinquishes that defense and agrees that such Guarantor will be fully liable under this Guaranty even though the Collateral Agent or any other Secured Party may foreclose, either by judicial foreclosure or by exercise of power of sale, any deed of trust securing the Obligations; (ii) agrees that such Guarantor will not assert that defense in any action or proceeding which the Administrative Agent, the Collateral Agent or any other Secured Party may commence to enforce this Guaranty; (iii) acknowledges and agrees that the rights and defenses waived by such Guarantor in this Guaranty include any right or defense that such Guarantor may have or be entitled to assert based upon or arising out of any one or more of §§ 580a, 580b, 580d, or 726 of the California Code of Civil Procedure or § 2848 of the California Civil Code; and (iv) acknowledges and agrees that the Secured Parties are relying on this waiver in creating the Obligations, and that this waiver is a material part of the consideration which the Secured Parties are receiving for creating the Obligations.

(b)    Each Guarantor waives all rights and defenses that such Guarantor may have because any of the Obligations is secured by real property.  This means, among other things: (i) the Administrative Agent, the Collateral Agent and the other Secured Parties may collect from such Guarantor without first foreclosing on any real or personal property collateral pledged by the other Loan Parties; and (ii) if the Collateral Agent or any other Secured Party forecloses on any real property collateral pledged by the other Loan Parties: (A) the amount of the Obligations may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price, and (B) the Administrative Agent, the Collateral Agent and the other Secured Parties may collect from such Guarantor even if the Secured Parties, by foreclosing on the real property collateral, have destroyed any right such Guarantor may have to collect from the Borrowers.  This is an unconditional and irrevocable waiver of any rights and defenses such Guarantor may have because any of the Obligations is secured by real property.  These rights and defenses include, but are not limited to, any rights or defenses based upon § 580a, 580b, 580d, or 726 of the California Code of Civil Procedure.

(c)    Each Guarantor waives any right or defense it may have at law or equity, including California Code of Civil Procedure § 580a, to a fair market value hearing or action to determine a deficiency judgment after a foreclosure.

*[Signature Pages Follow]*

91