Dennis F. Dunne, Esq. (admitted *pro hac vice*)
Evan R. Fleck, Esq. (admitted *pro hac vice*)
Michael W. Price, Esq. (admitted *pro hac vice*)
**MILBANK LLP**
55 Hudson Yards
New York, New York 10001
Telephone:    (212) 530-5000
Facsimile:    (212) 530-5219

*Co-Counsel for Debtors in Possession*

Michael A. Condyles, Esq. (VA 27807)
Peter J. Barrett, Esq. (VA 46179)
Jeremy S. Williams, Esq. (VA 77469)
Brian H. Richardson, Esq. (VA 92477)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:    (804) 644-1700
Facsimile:    (804) 783-6192

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GYMBOREE GROUP, INC., *et al.*,[1] | ) | Case No. 19-30258 (KLP) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |

## ORDER (I) APPROVING THE SALE OF CERTAIN J&J ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES AND (II) APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION THEREWITH; AND (III) GRANTING RELATED RELIEF

Upon the motion (the "Motion"),[2] of the above-captioned debtors in possession (collectively, the "Debtors"), for entry of an order (this "Order"): (a)(i) approving Bidding Procedures, (ii) approving J&J Stalking Horse Agreement, (iii) scheduling an Auction and approving the form and manner of notice thereof, (iv) Approving Assumption and Assignment Procedures and (v) scheduling a Sale Hearing; (b) approving (i) the Sale(s), free and clear of

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:   Gymboree Group, Inc. (6587); Gymboree Intermediate Corporation (1473); Gymboree Holding Corporation (0315); Gymboree Wholesale, Inc. (6588); Gym-Mark, Inc. (6459); Gymboree Operations, Inc. (6463); Gymboree Distribution, Inc. (8669); Gymboree Manufacturing, Inc. (6464); Gymboree Retail Stores, LLC (6461); Gym-Card, LLC (5720); and Gymboree Island, LLC (1215).  The Debtors' service address is 71 Stevenson Street, Suite 2200, San Francisco, California 94105.

[2]    Capitalized terms not specifically defined herein shall have the meaning assigned to them in the Motion.

Encumbrances and (ii) assumption and assignment of executory contracts and unexpired leases; and (c) granting related relief, all as more fully set forth in the Motion; and upon the Declaration of Stephen Coulombe in Support of First Day Pleadings (the "First Day Declaration"), the Declaration of James Doak in support of the Motion that was attached thereto as Exhibit B (the "Initial Doak Declaration"), and the Supplemental Declaration of James Doak in support of the Motion [Docket No. 463] (the "Supplemental Doak Declaration"); and upon the *Order (I)(A) Approving Bidding Procedures, (B) Approving J&J Stalking Horse Purchase Agreement, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures and (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof and (II) Granting Related Relief* [Docket No. 76] (the "Bidding Procedures Order"); and an auction (the "Auction") having been held on March 1, 2019 in accordance with the Bidding Procedures Order; and the Debtors having filed the *Notice of Successful Bidders, Sale Hearing, and Adjournment of the Adequate Assurance Objection Deadline* [Docket No. 455] and the *Amended Notice of Successful Bidders, Sale Hearing, and Adjournment of the Adequate Assurance Objection Deadline* [Docket No. 457], designating The Gap, Inc. (the "Purchaser") as the Successful Bidder for the assets (the "JJ Assets") purchased pursuant to (x) the Asset Purchase Agreement dated March 1, 2019 (the "JJ Purchase Agreement") between certain of the Debtors and the Purchaser, which JJ Purchase Agreement is attached hereto as Exhibit 1 and (y) the Asset Purchase Agreement and Bill of Sale (the "Inventory Purchase Agreement and together with the JJ Purchase Agreement, the "Purchase Agreement") by and among Gymboree Group, Inc., the Purchaser, and GA Retail, Inc., Tiger Capital Group, LLC, Gordon Brothers Retail Partners, LLC, and Hilco Merchant Resources, LLC (collectively, "Agent"), which Inventory Purchase Agreement is attached hereto

2

as Exhibit 2; and the Sale Hearing having been held on March 4, 2019 to consider the remaining relief requested in the Motion and approval of the Purchase Agreement; and appearances of all interested parties having been noted on the record of the Sale Hearing; and upon all of the proceedings had before this Court (including the testimony and other evidence proffered or adduced at the Sale Hearing); and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference from the United States District Court for the Eastern District of Virginia*, dated July 10, 1984; and this Court having the authority to enter an order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court; and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT**:[3]

A.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b).  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

B.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.      This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).

D.      The statutory predicates for the relief requested in the Motion are (i) Sections 105(a), 363, and 365 of the Bankruptcy Code, (ii) Bankruptcy Rules 2002, 6004, 6006, 9007, 9008 and 9014, and (iii) Local Bankruptcy Rules 2002-1 and 6004-2.

E.      Notice of the Motion and the hearing on the Bidding Procedures and the Sale Hearing was sufficient under the circumstances and no other or further notice need be provided except as set forth in the Bidding Procedures and the Assumption and Assignment Procedures. A reasonable opportunity to object and be heard regarding the relief requested in the Motion has been afforded to parties in interest.

F.      As demonstrated by (i) the First Day Declaration, the Initial Doak Declaration, and the Supplemental Doak Declaration; (ii) the testimony and other evidence proffered or adduced at the hearing with respect to the approval of the bidding procedures held on January 17, 2019 (the "Bidding Procedures Hearing") and the Sale Hearing; and (iii) the representations of counsel made on the record at the Bidding Procedures Hearing and the Sale Hearing, the Debtors and their advisors thoroughly marketed the JJ Assets and conducted the marketing and sale process as set forth in and in accordance with the Motion and the Bidding Procedures Order.

---

[3]      The findings of fact and the conclusions of law stated herein shall constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any finding of fact shall be determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law shall be determined to be a finding of fact, it shall be so deemed.

#4834-6336-7049v6

Based upon the record of these proceedings, all creditors and other parties in interest and all prospective purchasers have been afforded a reasonable and fair opportunity to bid for the assets.

G.    <u>Compliance with Bidding Procedures</u>:  The Debtors conducted a fair and open sale process in a manner reasonably calculated to produce the highest or otherwise best offer for the JJ Assets in compliance with the Bidding Procedures Order.  The sale process and the Bidding Procedures were non-collusive, substantively and procedurally fair to all parties and to each person or entity that desired to participate in the Auction and afforded notice and a full, fair and reasonable opportunity for any person to make a higher or otherwise better offer for the assets.  The Bidding Procedures have been complied with in all material respects by the Debtors and the Purchaser.

H.    <u>Highest and Best Offer</u>:  After the conclusion of the Auction held on March 1, 2019 and in accordance with the Bidding Procedures, the Debtors determined in a valid and sound exercise of their business judgment that the highest and best Qualified Bid for the JJ Assets was that of the Purchaser.  The consideration provided by the Purchaser for the JJ Assets provides fair and reasonable consideration to the Debtors for the sale of the JJ Assets and the assumption of all Assumed Liabilities (as defined and limited in the Purchase Agreement), and the performance of the other covenants set forth in the Purchase Agreement will provide a greater recovery for Debtors' estates than would have been provided by any other available alternative.

I.    <u>Court Approval Required</u>.  Entry of an order approving and authorizing the Debtors' entry into the Purchase Agreement and the Debtors' performance of all the provisions thereof is a necessary condition precedent to the Purchaser's consummation of the Sale.

J.      <u>Business Judgment</u>:    The Debtors' decisions to (i) enter into the Purchase Agreement, (ii) perform under such Purchase Agreement and (iii) amend the Agency Agreement (as defined in the Inventory Purchase Agreement) through the amendment contained in the Inventory Purchase Agreement constitute reasonable exercises of the Debtors' sound business judgment consistent with their fiduciary duties and is in the best interests of the Debtors, their estates, their creditors, and all other parties in interest.   Good and sufficient reasons for the approval of the Purchase Agreement have been articulated by the Debtors.   The Debtors have demonstrated compelling circumstances for the Sale outside:  (i) the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code and (ii) a plan of reorganization, in that, among other things, the immediate consummation of the Sale is necessary and appropriate to preserve and maximize the value of the Debtors' estates.   To maximize the value of the JJ Assets and preserve the viability of the business to which the JJ Assets relate, it is essential that the Sale occur promptly.

K.      <u>Time is of the Essence</u>:    Time is of the essence to implement the Purchase Agreement and to consummate the Sale contemplated thereby without interruption.   Based on the record of the Sale Hearing, and for the reasons stated on the record at the Sale Hearing, in the First Day Declaration, the Initial Doak Declaration, and the Supplemental Doak Declaration, the Sale contemplated by the Purchase Agreement must be consummated as soon as possible following entry of this Sale Order, and in any event by the later of (i) March 15, 2019 and (ii) 5 calendar days after all necessary and regulatory approvals are completed, to maximize the value that the Purchaser may realize from the Sale, and the value that the Debtors may realize from entering into the Purchase Agreement.   Accordingly, cause exists to lift the stay to the extent

6

necessary, as contemplated by Bankruptcy Rules 4001(a) and 6004(h), and permit the immediate effectiveness of this Sale Order.

L.      <u>Sale Free and Clear</u>:  Except for liabilities assumed by the Purchaser pursuant to the Purchase Agreement, a sale of the JJ Assets other than one free and clear of liens, defenses (including rights of setoff and recoupment) and interests, including, without limitation, security interests of whatever kind or nature, all debts, obligations, mortgages, conditional sales or title retention agreements, pledges, deeds of trust, hypothecations, liens, encumbrances, assignments, preferences, debts, easements, charges, suits, licenses, options, rights-of-recovery, rights of first refusal, judgments, orders and decrees of any court or foreign or domestic governmental entity, taxes (including foreign, state and local taxes, including, without limitation, bulk sale taxes), licenses, covenants, restrictions, indentures, instruments, leases, options, off-sets, claims for reimbursement, contribution, indemnity or exoneration, successor, product, environmental, tax, labor, Employee Retirement Income Security Act of 1974 ("<u>ERISA</u>"), wages and benefits, Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 <u>et seq.</u> ("<u>CERCLA</u>"), alter ego and other liabilities, causes of action, contract rights and claims, to the fullest extent of the law, in each case, of any kind or nature (including all "claims" as defined in section 101(5) of the Bankruptcy Code), known or unknown, whether prepetition or postpetition, secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, perfected or unperfected, liquidated or unliquidated, noticed or unnoticed, allowed or disallowed, recorded or unrecorded, contingent or non-contingent, material or non-material, statutory or non-statutory, matured or unmatured, legal or equitable, disputed or undisputed, whether arising prior to or subsequent to the commencement of these Cases, and whether imposed by agreement, understanding, law, equity or otherwise, including any and all such

7

liabilities, causes of action, contract rights and claims arising out of Debtors' continued operations following the Closing Date (as defined in the Purchase Agreement), (collectively, "Encumbrances") and without the protections of this Sale Order would hinder the Debtors' ability to obtain the consideration provided for in the Purchase Agreement and, thus, would impact materially and adversely the value that the Debtors' estates would be able to obtain for the sale of such JJ Assets.   But for the protections afforded to the Purchaser under the Bankruptcy Code and this Sale Order, the Purchaser would not have offered to pay the consideration contemplated in the Purchase Agreement.   In addition, each entity with an Encumbrance upon the JJ Assets, (i) has consented to the Sale or is deemed to have consented to the Sale, (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such interest, or (iii) otherwise falls within the provisions of section 363(f) of the Bankruptcy Code, and therefore, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.   Those holders of Encumbrances who did not object, or who withdrew their objections, to the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.   All holders of Encumbrances are adequately protected—thus satisfying section 363(e) of the Bankruptcy Code—by having their Encumbrances, if any, attach to the proceeds of the Sale (other than proceeds constituting the J&J Option Payment), in the same order of priority and with the same validity, force and effect that such Encumbrances had before the Sale, subject to any rights, claims and defenses of the Debtors or their estates, as applicable, or as otherwise provided herein.   Therefore, approval of the Purchase Agreement and the consummation of the Sale free and clear of Encumbrances is appropriate pursuant to section 363(f) of the Bankruptcy Code and is in the best interests of the Debtors' estates, their creditors and other parties in interest.

#4834-6336-7049v6

M.    The recitation, in the immediately preceding paragraph of this Sale Order, of specific agreements, plans or statutes is not intended, and shall not be construed, to limit the generality of the categories of liabilities, debts, commitments or obligations referred to as "Encumbrances" therein.

N.    In addition to the foregoing, the Court finds and concludes that the JJ Assets may be sold to the Purchaser free and clear of any mechanics' or warehouse liens on the JJ Assets.

O.    The Purchaser would not have entered into the Purchase Agreement and would not consummate the sale of the JJ Assets, thus adversely affecting the Debtors, their estates, creditors, employees and other parties in interest, if such sale was not free and clear of all Encumbrances (other than Permitted Liens and Assumed Liabilities (each as defined in the Purchase Agreement)).    A sale of the JJ Assets, other than one free and clear of all Encumbrances, would yield substantially less value for the Debtors' estates, with less certainty than the Sale.

P.    <u>Arms'-length Sale</u>:   The consideration to be paid by the Purchaser under the Purchase Agreement was negotiated at arm's-length and constitutes reasonably equivalent value and fair and adequate consideration for the JJ Assets under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, the Uniform Voidable Transactions Act, and the laws of the United States, any state, territory, possession thereof or the District of Columbia.   The terms and conditions set forth in the Purchase Agreement are fair and reasonable under these circumstances and were not entered into with the intent to nor for the purpose of, nor do they have the effect of, hindering, delaying or defrauding the Debtors or their creditors under any applicable laws.   None of the Debtors or the Purchaser is entering into the Purchase Agreement or proposing to consummate the Sale through collusion or fraud (for the

purpose of statutory or common law fraudulent conveyance or fraudulent transfer claims, whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof or the District of Columbia or any other applicable jurisdiction).

Q.    Good Faith:   The Debtors, their management and their boards of directors or equivalent governing bodies and the Purchaser and its officers, directors, employees, agents and representatives actively participated in the bidding process and respectively acted in good faith and without collusion.  The Purchase Agreement was negotiated and entered into based upon arm's-length bargaining, without collusion or fraud, and in good faith as that term is used in sections 363(m) and 364(e) of the Bankruptcy Code.  The Purchaser is entering into the Sale in good faith and is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and the court decisions applying or interpreting such provision, and is therefore entitled to the full protection of sections 363(m) and 364(e) of the Bankruptcy Code with respect to all aspects of the transactions contemplated by the Purchase Agreement, including the acquisition of the JJ Assets, and otherwise has proceeded in good faith in all respects in connection with this proceeding.  The Debtors were free to deal with any other party interested in buying or selling on behalf of the Debtors' estate some or all of the JJ Assets.  Neither the Debtors, the Purchaser, nor the Agent have engaged in any conduct that would cause or permit the Sale, the Purchase Agreement, or any related action or the transactions contemplated thereby to be avoided or subject to monetary damages under section 363(n) of the Bankruptcy Code, or that would prevent the application of sections 363(m) or 364(e) of the Bankruptcy Code.  The Purchaser has not violated section 363(n) of the Bankruptcy Code by any action or inaction.  Specifically, the Purchaser has not acted in a collusive manner with any person or entity nor was its bidding or participation in the Auction controlled by any agreement among bidders.  The Purchaser's

prospective performance and payment of amounts owing under the Purchase Agreement will be undertaken in good faith and for valid business purposes and uses.

R.    <u>Insider Status</u>:  The Purchaser is not an "insider" of any Debtor, as that term is defined in section 101(31) of the Bankruptcy Code.  No common identity of directors or controlling stockholders exists between the Purchaser and the Debtors.

S.    <u>Corporate Authority</u>:  Upon entry of this Order, the Debtors have (i) full corporate or other power to execute, deliver and perform their obligations under the Purchase Agreement and all other transactions contemplated thereby and entry into the Purchase Agreement has been duly and validly authorized by all necessary corporate or similar action, (ii) all of the corporate or other power and authority necessary to consummate the Sale, and (iii) taken all actions necessary to authorize and approve the Purchase Agreement and the Sale.  No consents or approvals, other than those expressly provided for herein or in the Purchase Agreement, are required for the Debtors to consummate such transaction.

T.    The Purchaser shall have no obligations with respect to any Encumbrances against or in respect of any of the Debtors or the JJ Assets (other than Permitted Liens and Assumed Liabilities, each as defined in the Purchase Agreement).

U.    The consummation of the Sale is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including sections 105(a), 363(b), 363(f), 363(m) and 363(n) of the Bankruptcy Code and Rules 2002, 4001, 6004 and 9014 of the Bankruptcy Rules.

V.    The JJ Assets constitute property of the Debtors' estates and title thereto is presently vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code.  The Debtors are the sole and rightful owners of the JJ Assets, and no other person has any

#4834-6336-7049v6

ownership right, title, or interest therein, except for the liens and claims described in that certain Final DIP Order[4] and the Interim DIP Order[5] (collectively, the "DIP Orders"), as applicable and the interests of the Agent pursuant to the Agency Agreement and the Agency Agreement Order. The sale of the JJ Assets to the Purchaser will be, as of the Closing Date under the Purchase Agreement or such later date as such JJ Assets are transferred under the Purchase Agreement, a legal, valid and effective transfer of such assets, and each transfer and assignment vests or will vest the Purchaser with all right, title and interest of the Debtors to the JJ Assets free and clear of all Encumbrances (other than Permitted Liens and Assumed Liabilities).[6]

W.    Assumption and Assignment of Contracts:  The assumption and assignment of the Assumed Contracts (as defined in the Purchase Agreement) are an integral part of the Purchase Agreement and may be amended, supplemented or otherwise modified prior to assumption and assignment without further order of this Court with the consent of the Debtors, the applicable counterparty(s) and the Purchaser.  The assumption and assignment of the Assumed Contracts does not constitute unfair discrimination, is in the best interests of the Debtors, their estates, their creditors and all other parties in interest, and represents the reasonable exercise of sound and prudent business judgment by the Debtors.

---

[4]    The Final DIP Order shall mean that certain *Final Order (I) Authorizing The Debtors To Obtain Postpetition Financing, (Ii) Authorizing The Debtors To Use Cash Collateral, (Iii) Granting Liens And Providing Superpriority Administrative Expense Status, (Iv) Granting Adequate Protection To The Prepetition Lenders, (V) Modifying Automatic Stay, And (Vi) Granting Related Relief [Docket No. 348]*

[5]    The Interim DIP Order shall mean that certain *Amended Interim Order (I) Authorizing The Debtors To Obtain Postpetition Financing, (Ii) Authorizing The Debtors To Use Cash Collateral, (Iii) Granting Liens And Providing Superpriority Administrative Expense Status, (Iv) Granting Adequate Protection To The Prepetition Lenders, (V) Modifying Automatic Stay, (Vi) Scheduling A Final Hearing, And (Vii) Granting Related Relief [Docket No. 88].*

[6]    For the avoidance of doubt, the occurrence of the Closing Date shall require the payment of the J&J Option Payment in accordance with the Agency Agreement (as amended by the Inventory Purchase Agreement) at which time the J&J Option shall have been exercised.

X.      The Debtors have met all requirements of section 365(b) of the Bankruptcy Code for each of the Assumed Contracts.  Pursuant to the Purchase Agreement, the Debtors, and, solely with respect to the assumed Cure Costs (as defined in the Purchase Agreement), the Purchaser, has (i) cured (or will cure with respect to any Cure Costs subject to a timely Cure Objection) any default existing prior to the assignment of the Assumed Contracts to the Purchaser in accordance with the terms of the Purchase Agreement, under each of the Assumed Contracts, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code; and (ii) provided compensation or adequate assurance of compensation to any counterparty for actual pecuniary loss to such party resulting from a default prior to the assignment of any of the Assumed Contracts, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code.  Each of the Assumed Contracts shall be assumed and assigned to the Purchaser free and clear of all Encumbrances (other than the Permitted Liens and Assumed Liabilities or otherwise as set forth in the Purchase Agreement) against the Purchaser.

Y.      The Purchaser has demonstrated adequate assurance of its future performance under each Assumed Contract within the meaning of section 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.  Pursuant to section 365(f) of the Bankruptcy Code, the Assumed Contracts to be assumed and assigned under the Purchase Agreement shall be assigned and transferred to, and remain in full force and effect for the benefit of, the Purchaser notwithstanding any provision in the Assumed Contracts or other restrictions prohibiting their assignment or transfer.

Z.      No monetary or non-monetary defaults exist in the Debtors' performance under the Assumed Contracts as of the date of this Sale Order other than the failure to pay amounts equal to the Cure Costs (as defined below) or defaults that are not required to be cured as

contemplated in section 365(b)(1)(A) of the Bankruptcy Code.  In accordance with the terms set forth in the Purchase Agreement and this Sale Order, the Purchaser shall pay the Cure Costs for each of the Assumed Contracts.

AA.    <u>No Successor Liability</u>:  No sale, transfer or other disposition of the JJ Assets pursuant to the Purchase Agreement or entry into the Purchase Agreement will subject the Purchaser or its affiliates, successors or assigns or any of their respective assets (including the JJ Assets) to any liability for claims, obligations or Encumbrances asserted against the Debtors or the Debtors' interests in such JJ Assets by reason of such transfer under any laws, including, without limitation, any bulk-transfer laws or any theory of successor or transferee liability, antitrust, environmental, product line, derivative liability, vicarious liability, alter ego, *de facto* merger or substantial continuity or similar theories.  By virtue of the consummation of the Sale contemplated by the Purchase Agreement, (i) the Purchaser is not a continuation of the Debtors and their respective estates, there is no continuity or continuity of enterprise between Purchaser and the Debtors, there is no common identity between the Debtors and the Purchaser, (ii) the Purchaser is not holding itself out to the public as a continuation of the Debtors or their respective estates, and (iii) the Sale does not amount to a consolidation, merger or *de facto* merger of Purchaser and the Debtors and/or the Debtors' estates.  Accordingly, the Purchaser and its affiliates, successors and assigns are not and shall not be deemed a successor to the Debtors or their respective estates as a result of the consummation of the Sale contemplated by the Purchase Agreement.

BB.    <u>No Sub Rosa Plan</u>:  Entry into the Purchase Agreement and the transactions contemplated thereby neither impermissibly restructure the rights of the Debtors' creditors, nor

impermissibly dictate the terms of a chapter 11 plan of reorganization for the Debtors.  Entry into

the Purchase Agreement does not constitute a sub rosa chapter 11 plan.

CC.    Nothing in the Purchase Agreement creates any third party beneficiary rights in

any entity not a party to the respective Purchase Agreement.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED
THAT**:[7]

### A.    Motion Granted, Objections Overruled

1.    The relief requested in the Motion is GRANTED as set forth herein.  Any

remaining objections to the Motion or the relief requested therein that have not been withdrawn,

waived, or settled, and all reservations of rights included in such objections are overruled on the

merits with prejudice and denied.  All parties and entities given notice of the Motion that failed

to timely object thereto are deemed to consent to the relief sought therein.

2.    This Court's findings of fact and conclusions of law in the Bidding

Procedures Order and the record of the Bidding Procedures Hearing are incorporated herein by

reference.

### B.    The Purchase Agreement Is Approved and Authorized

3.    The Purchase Agreement is approved pursuant to sections 105 and 363 of

the Bankruptcy Code and Rules 2002, 4001, 6004 and 9014 of the Bankruptcy Rules.  The

Debtors are hereby authorized and directed to perform under the Purchase Agreement (and each

of the transactions contemplated thereby is hereby approved in its entirety and is incorporated

herein by reference).  The failure to include specifically any particular provision of the Purchase

Agreement in this Sale Order shall not diminish or impair the effectiveness of such provisions, it

being the intent of this Court that the Purchase Agreement, and all of its provisions and the

---

[7]    To the extent any findings of fact constitute conclusions of law, they are adopted as such, and vice versa.

#4834-6336-7049v6

payments and transactions provided for therein shall be authorized and approved in their entirety, including the amendment of the Agency Agreement effected by the Inventory Purchase Agreement.  Likewise, all of the provisions of this Sale Order are non-severable and mutually dependent.

4.    Subject to the provisions of this Sale Order, the Debtors and the Purchaser are hereby authorized, pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code, to consummate the Sale in accordance with the Purchase Agreement, without any further order of this Court.

5.    Pursuant to section 363(b) of the Bankruptcy Code, and without any further order of this Court, corporate act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any entity , the Debtors, the Purchaser and each of their respective officers, employees and agents are hereby authorized and directed to fully perform under, consummate and implement the terms of the Purchase Agreement together with any and all additional instruments and documents that may be reasonably necessary or desirable to implement and effectuate the terms of the Purchase Agreement, this Sale Order and the Sale (including, without limitation, executing, delivering, filing, recording and issuing any notes, documents, or agreements in connection with this Sale Order and the Sale).

6.    The Debtors are hereby authorized and directed to instruct an escrow agent to (i) hold the Good Faith Deposit (as increased by the Incremental Deposit Amount (as defined in the Bidding Procedures), if applicable) funded by the Successful Bidder in accordance with the Purchase Agreement and release and deliver such Good Faith Deposit pursuant to the terms of such Purchase Agreement, and (b) hold the Good Faith Deposit (as increased by the Incremental Deposit Amount (as defined in the Bidding Procedures), if applicable) funded by

any Backup Bidder, in accordance with the Bidding Procedures, and release and deliver such
Good Faith Deposit upon the earlier of (i) three business days after the closing of a Sale with the
Successful Bidder for the applicable Assets and (ii) 75 days after the date of the Sale Hearing.

        **C.**      **Sale and Transfer Free and Clear of Encumbrances**

        7.      Upon the Closing Date (as defined in the Purchase Agreement), all of the
Debtors' legal, equitable and beneficial right, title and interest in and to, and possession of, the JJ
Assets shall be immediately vested in the Purchaser pursuant to sections 105(a), 363(b)
and 363(f) of the Bankruptcy Code free and clear of Encumbrances (other than Permitted Liens
and Assumed Liabilities); provided, however, that the proceeds of the Sale shall be applied as set
forth herein and thereafter all remaining Encumbrances shall attach to the proceeds of the Sale
(other than the proceeds constituting the J&J Option Payment, as to which no such
Encumbrances shall attach) in the order of their priority, with the same validity, force and effect
that they now have against the JJ Assets (subject with respect to such proceeds to any rights,
claims and defenses the Debtors or any parties in interest may possess with respect thereto).  On
the Closing Date, this Sale Order shall be considered, and constitute for any and all purposes, a
legal, valid, binding, effective and compete general assignment, conveyance and transfer of the
JJ Assets and a bill of sale or assignment transferring indefeasible title in the JJ Assets to the
Purchaser and shall vest Purchaser with good and marketable title to the JJ Assets.  In connection
with the Closing Date, the Purchaser shall pay the portion of the Purchase Price under the
Inventory Purchase Agreement that constitutes the J&J Option Payment directly to the Agent and
the Agent is authorized to accept such payment.

        8.      Subject to the terms of the Purchase Agreement, the holders of claims
related solely to the Permitted Liens and Assumed Liabilities shall have the right to seek
payment directly from the Purchaser on account of the Permitted Liens and Assumed Liabilities;

#4834-6336-7049v6

provided, however, that the Purchaser reserves any and all rights, defenses or objections with regard to such Permitted Liens and Assumed Liabilities, including the Purchaser's rights hereunder and under the Purchase Agreement.

   **D.**  **Order Binding**

   9.  All (i) entities, including all filing agents, filing officers, title agents, title companies or title agents, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, and federal, state and local officials, and (ii) other persons, in each case, who may be required by operation of law, the duties of their office, or contract to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the JJ Assets, shall be authorized and directed to take any such actions in connection with the Sale or this Sale Order, and this Sale Order shall be binding upon such entities or persons. All entities or persons described in this paragraph are authorized and specifically directed to strike all recorded Encumbrances against the JJ Assets from their records, official and otherwise.

   10.  This Sale Order and the terms and provisions of the Purchase Agreement shall be binding on all of the Debtors' creditors (whether known or unknown), the Debtors, the Purchaser, and each of their respective affiliates, successors and assigns, and any affected third parties, including all persons asserting an interest in the JJ Assets, notwithstanding any subsequent appointment of any trustee, party, entity or other fiduciary under any section of the Bankruptcy Code with respect to the forgoing parties, and as to such trustee, party, entity or other fiduciary, such terms and provisions likewise shall be binding.  The provisions of this Sale Order and the terms and provisions of the Purchase Agreement, and any actions taken pursuant hereto or thereto shall survive the entry of any order, which may be entered confirming or consummating any plan(s) of the Debtors or converting these Cases from chapter 11 to chapter 7,

#4834-6336-7049v6

and the terms and provisions of the Purchase Agreement, as well as the rights and interests granted pursuant to this Sale Order and the Purchase Agreement, shall continue in these or any superseding cases and shall be binding upon the Debtors, the Purchaser and their respective successors and permitted assigns.

11.    Except with respect to the Assumed Liabilities, all persons and entities (and their respective successors and assigns), including all debt security holders, equity security holders, affiliates, governmental, tax and regulatory authorities, lenders, customers, vendors, employees, trade creditors, litigation claimants and other creditors or other interest holders holding Encumbrances arising under or out of, in connection with, or in any way relating to, the Debtors, the JJ Assets, the ownership, sale or operation of the JJ Assets and the business prior to the Closing Date or the transfer of JJ Assets to Purchaser, are forever barred, estopped and permanently enjoined from asserting such Encumbrances against the Purchaser, its property or the JJ Assets.  All persons and entities shall be precluded from asserting against the Purchaser, or its assets or properties, any Encumbrances based upon any act or omission, transaction or other activity of any kind or nature of the Debtors that occurred prior to or after the Closing Date. Following the Closing Date, no holder of any Encumbrance shall interfere with the Purchaser's title to or use and enjoyment of the JJ Assets based on or related to any such Encumbrance, or based on any action the Debtors may take in these Cases.

12.    If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens* or other documents or agreements evidencing Encumbrances against or in the JJ Assets shall not have delivered to the Debtors prior to the Closing Date of the Sale(s) in proper form for filing and executed by the appropriate parties termination statements or instruments of satisfaction or release of all Encumbrances that such person or entity has with

respect to such JJ Assets, then only with regard to the JJ Assets that are purchased by the Purchaser pursuant to the Purchase Agreement and this Sale Order, (a) the Debtors are hereby authorized and empowered to cause to be executed and filed such statements, instruments, releases and other documents on behalf of such person or entity with respect to the JJ Assets that are necessary or appropriate to effectuate the Sale, any related agreements and this Sale Order, including amended and restated certificates or articles of incorporation and by-laws or certificates or articles of amendment, and all such other actions, filings, or recordings as may be required under appropriate provisions of the applicable laws of all applicable governmental units or as any of the officers of the Debtors may determine are necessary or appropriate and (b) the Purchaser is hereby authorized and empowered to cause to be filed, registered or otherwise recorded a certified copy of this Sale Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Encumbrances against the Purchaser and the applicable JJ Assets.  This Sale Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department or office.

**E.     Good Faith**

13.     None of the Debtors, the Agent, or the Purchaser has engaged in any action or inaction that would cause or permit the Sale(s) to be avoided or costs or damages to be imposed under section 363(n) of the Bankruptcy Code.  Entry into the Purchase Agreement is undertaken by the parties thereto, without collusion and in good faith, as that term is used in sections 363(m) and 364(e) of the Bankruptcy Code, and the Purchaser shall be entitled to all of the benefits of and protections under sections 363(m) and 364(e) of the Bankruptcy Code.  Because the Purchaser has proceeded in good faith in all respects in connection with this proceeding, and is a "good faith purchaser" within the meaning of Section 363(m) of the

#4834-6336-7049v6

Bankruptcy Code, the reversal or modification on appeal of the authorization provided herein to enter into the Purchase Agreement and consummate the Sale(s) shall not affect the validity of such Sale(s), unless such authorization is duly stayed pending such appeal.  The Sale is not subject to avoidance pursuant to section 363(n) or chapter 5 of the Bankruptcy Code and the Purchaser is entitled to all the protections and immunities thereunder.

      **F.**      **No Successor or Transferee Liability; Release**

      14.      The Purchaser shall not be deemed, as a result of any action taken in connection with the Purchase Agreement, the consummation of the Sale, or the transfer, operation or use of the JJ Assets, to (a) be a legal successor, or otherwise be deemed a successor to the Debtors (other than, for the Purchaser, with respect to any obligations arising after the Closing Date as an assignee under the Assumed Contracts); (b) have, *de facto* or otherwise, merged with or into the Debtors; or (c) be an alter ego or a mere continuation or substantial continuation or successor in any respect of the Debtors, including within the meaning of any foreign, federal, state or local revenue, pension, antitrust, ERISA, tax, labor, employment, welfare and benefits, environmental or other law, rule or regulation (including filing requirements under any such laws, rules or regulations), or under any right or option to effect any forfeiture modification, right of first refusal, or termination of the Debtors' or the Purchaser's interest in the JJ Assets, or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine.

      15.      Except as expressly provided in the Purchase Agreement with respect to Assumed Liabilities, the Purchaser shall have no liability whatsoever with respect to the Debtors' (or their predecessors or affiliates) respective businesses or operations or any of the Debtors' (or their predecessors' or affiliates') obligations (as described below, "Successor or Transferee Liability") based, in whole or part, directly or indirectly, on any theory of derivative, successor

or vicarious liability of any kind or character, or based upon any theory of labor law, employment law, tax law, ERISA, welfare and benefits law, antitrust, environmental, successor or transferee liability, *de facto* merger, alter ego or mere or substantial continuity, labor and employment or products liability, whether known or unknown as of the Closing Date, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated, including any liabilities or non-monetary obligations on account of any settlement or injunction, or any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the JJ Assets or the business prior to the Closing Date or such later time as the Purchaser is assigned and assumes any Assumed Contract.  Except to the extent expressly included in the Assumed Liabilities or otherwise provided for in the Purchase Agreement with respect to WARN liabilities, the Purchaser shall have no liability or obligation under the WARN Act (29 U.S.C. §§ 2101 et seq.), CERCLA or any foreign, federal, state or local labor, employment or environmental law, whether of similar import or otherwise, by virtue of the Purchaser's purchase of the JJ Assets or assumption of the Assumed Liabilities.

16.    The Purchaser has given substantial consideration under the Purchase Agreement for the benefit of the holders of any Encumbrance.  The consideration given by the Purchaser shall constitute valid and valuable consideration for the releases of any potential claims of Successor or Transferee Liability of the Purchaser, which releases shall be deemed to have been given in favor of the Purchaser by all holders of any Encumbrance.  In addition, except as expressly provided in the Purchase Agreement or this Sale Order, and subject to and upon the closing of the Sale, the Debtors hereby waive any and all actions related to, and hereby release the Purchaser and, as applicable, its shareholders, controlling persons, directors, agents, officers, subsidiaries, affiliates, successors, assigns, managers, principals, officers, employees,

#4834-6336-7049v6

investors, advisors, attorneys, professionals, representatives, accountants, investment bankers, and consultants, each in their respective capacity as such, and their respective property, from any and all claims and causes of action arising from, relating to or in connection with the Purchase Agreement and the Sale, whether known or unknown, now existing or hereafter arising, asserted or unasserted, mature or inchoate, contingent or non-contingent, liquidated or unliquidated, material or non-material, disputed or undisputed, and whether imposed by agreement, understanding, law, equity, or otherwise.

17.    Except as expressly provided in the Purchase Agreement with respect to the Assumed Liabilities, nothing in this Sale Order or the Purchase Agreement shall require the Purchaser to (a) continue or maintain in effect, or assume any liability in respect of any employee, pension, welfare, fringe benefit or any other benefit plan, trust arrangement or other agreements to which the Debtors or their affiliates are a party or have any responsibility therefor including medical, welfare and pension benefits payable after retirement or other termination of employment, or (b) assume any responsibility as a fiduciary, plan sponsor or otherwise, for making any contribution to, or in respect of the funding, investment or administration of any employee benefit plan, arrangement or agreement (including pension plans) or the termination of any such plan, arrangement or agreement.

18.    Effective upon the Closing Date, all persons and entities are forever prohibited, estopped and permanently enjoined from commencing or continuing in any matter any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral or other proceeding against the Purchaser, or its assets (including the JJ Assets), or its successors and assigns, with respect to any (a) Encumbrance or (b) Successor or Transferee Liability, including the following actions with respect to clauses (a) and (b): (i) commencing or continuing

in any manner any action or other proceeding pending or threatened; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or other order; (iii) creating, perfecting or enforcing any Encumbrance; (iv) asserting any setoff, right of subrogation or recoupment of any kind; (v) commencing or continuing any action, in any manner or place, that does not comply with, or is inconsistent with, the provisions of this Sale Order or other orders of this Court, or the agreements or actions contemplated or taken in respect hereof; or (vi) revoking, terminating or failing or refusing to renew any license, permit or authorization to operate any of the JJ Assets or conduct any of the businesses operated with such assets.

### G.    Assumption and Assignment of Contracts

19.    Pursuant to sections 105(a) and 365 of the Bankruptcy Code, the Debtors are authorized and directed to assume and assign the Initial Assumed Contracts (as defined below) and the Added Assumed Contracts (defined below) to the Purchaser, pursuant to the terms of the Purchase Agreement, free and clear of all Encumbrances.  The payment of the cure costs due under each Initial Assumed Contract or Added Assumed Contract, as applicable, pursuant to section 365(b) of the Bankruptcy Code by the Purchaser under the Purchase Agreement (the "Cure Costs") (a) shall cure all monetary defaults existing thereunder as of the assignment of the Assumed Contracts to the Purchaser in accordance with the terms of the Purchase Agreement; (b) shall compensate the applicable counterparties to the Assumed Contracts for any actual pecuniary loss resulting from such default; and (c) together with the assumption of the Assumed Contracts and by the Debtors and the assignment of the Assumed Contracts to the Purchaser shall constitute adequate assurance of future performance thereof.

20.    With respect to the counterparty to any Assumed Contract that was identified in the Notice of Possible Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with Sale filed on January 25, 2019 [Docket No. 144] (the

"Cure Notice" and any such Assumed Contract listed therein, an "Initial Assumed Contract")
who did not timely file and serve an objection (each a "Cure Objection"), the Cure Costs shall be
in the amounts indicated by the Debtors in the Cure Notice or the Additional Cure Notice, as
applicable. With respect to any Initial Assumed Contract for which a counterparty timely filed
and served a Cure Objection to the Cure Notice, the Cure Cost shall be in the amount agreed by
the parties or determined by this Court and all such Cure Objections are adjourned to the hearing
on April 11, 2019 at 10:00 a.m. (Prevailing Eastern Time).

21.     The Debtors shall file and serve by not later than 5:00 p.m. (prevailing
eastern time) a notice of proposed assumption and assignment of additional executory contracts
and unexpired leases in connection with sale of the JJ assets (the "Additional Cure Notice") to
any counterparty to an Assumed Contract that was not identified on the Cure Notice (each an
"Added Assumed Contract"). Any  counterparty to an Added Assumed Contract shall have until
5:00 p.m. (prevailing eastern time) on March 11, 2019 to file and serve an objection to the
Debtors' proposed cure amount as indicated in the Additional Cure Notice (each an "Added
Assumed Contract Cure Objection").  With respect to any Added Assumed Contract for which a
counterparty does not timely file and serve an Added Assumed Contract Cure Objection, the
Cure Cost shall be in the amount indicated by the Debtors in the Additional Cure Notice.  With
respect to any Added Assumed Contract for which a counterparty timely files and serves an
Added Assumed Contract Cure Objection, the Cure Cost shall be in the amount agreed by the
parties or determined by this Court.

22.     With respect to any Initial Assumed Contract for which a counterparty
timely filed and served a Cure Objection to the Cure Notice, and with respect to any Added
Assumed Contract for which a counterparty timely files and serves an Added Assumed Contract

Cure Objection, the Purchaser shall reserve funds in an amount sufficient to pay the disputed cure amounts set forth therein in full, and shall promptly pay the Cure Cost as are ultimately agreed by the parties or as determined by this Court.  Notwithstanding anything to the contrary contained herein or in the Purchase Agreement, the Debtors are not at this time assuming, rejecting, or assuming and assigning the Co-Branding License Agreement dated April 5, 2018, by and between Aerin LLC, a Delaware limited liability company, and Gymboree Group, Inc., a Delaware corporation, and Gymboree Manufacturing, Inc., a California corporation (the "Aerin Agreement"),  and the time for the Debtors to assume or reject or assume and assign the Aerin Agreement shall be extended to the April 11, 2019, provided that Purchaser shall attorn to the Debtors' rights under such agreement from the Closing Date through the earlier of April 11, 2019 or the date of the assumption or rejection or assumption and assignment of such agreement.

23.    The Purchaser has provided adequate assurance of future performance under the Assumed Contracts within the meaning of sections 365(b)(1)(c) and 365(f)(2)(B) of the Bankruptcy Code.   Any Adequate Assurance Objections were required to state, with specificity, the legal and factual bases for the objection and were required to have been filed with the Court by, and served so as to be received on the Objection Recipients (as defined in the Bidding Procedures) by no later than March 4, 2019 at 11:00 a.m. (prevailing Eastern time) (the "Adequate Assurance Objection Deadline").  If no timely Adequate Assurance Objection with respect to an Assumed Contract was filed and served on the Objection Recipients by the Adequate Assurance Objection Deadline, (a) the applicable Assumed Contract is hereby deemed subject to assumption and assignment as proposed by the Debtors and the Successful Bidder and (b) the Successful Bidder will be deemed to have provided or to be able to provide adequate

assurance of future performance of the applicable Assumed Contract in satisfaction of section 365(f)(2)(B) of the Bankruptcy Code.

24.      To the extent that any counterparty to an Initial Assumed Contract did not, or Added Assumed Contract does not, timely file a Cure Objection by the deadline to file a Cure Objection or Added Assumed Contract Cure Objection, such counterparty is deemed to have consented to the proposed Cure Cost set forth in Cure Notice or Additional Cure Notice, as applicable.  The counterparties to the Assumed Contracts are forever bound by the applicable Cure Costs and, upon payment of such Cure Costs as provided for herein and in the Purchase Agreement, are hereby enjoined from taking any action against the Purchaser with respect to any claim for cure under the Assumed Contracts, except as set forth in the Purchase Agreement.

25.      Any provision in any Assumed Contract that prohibits, restricts or conditions the assignment of such Assumed Contract (including, without limitation, those of the type described in Sections 365(e)(1) and (f) of the Bankruptcy Code) or allows the counterparty to such Assumed Contract to impose any penalty, fee, increase in payment, profit sharing arrangement or other condition on renewal or extension, or to modify any term or condition upon the assignment of such Assumed Contract, constitutes an unenforceable anti-assignment provision that is void and of no force and effect in connection with the Sale.  All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to the Purchaser of the Assumed Contracts have been satisfied.  Upon the Closing Date, in accordance with sections 363 and 365 of the Bankruptcy Code, the Purchaser shall be fully and irrevocably vested with all right, title and interest of the Debtors under the Assumed Contracts, and such Assumed Contracts shall remain in full force and effect for the benefit of the Purchaser.

26.    Upon the assignment of the Assumed Contracts to the Purchaser in accordance with the terms of the Purchase Agreement (and subject to payment of the Cure Costs as provided in this Order), the Purchaser shall be deemed to be substituted for the Debtors as a party to the applicable Assumed Contract, and the Debtors and their estates shall be released, pursuant to section 365(k) of the Bankruptcy Code, from any liability under the Assumed Contract occurring after such assignment.  The Purchaser shall pay any Cure Costs in accordance with the Purchase Agreement.  There shall be no assignment fees, increases or any other fees charged to the Purchaser or the Debtors as a result of the assumption and assignment of the Assumed Contracts.  The applicable Assumed Contract may be modified solely to identify Purchaser or its designee as the assignee of the Debtors' thereunder.

27.    Except as otherwise provided for herein, each counterparty to an Assumed Contract is forever barred, estopped, and permanently enjoined from asserting against the Debtors or the Purchaser or their respective property in connection with the Sale (a) any assignment fee, acceleration, default, breach or claim or pecuniary loss, termination right, or condition to assignment existing, arising or accruing as of the Closing Date, including, any breach related to or arising out of a change-in-control resulting from the Sale of any provision of such Assumed Contract, or any purported written or oral modification to the Assumed Contract; or (b) any claim, counterclaim, defense, breach, default, condition, setoff or other claim asserted or capable of being asserted against the Debtors existing as of the Closing Date, provided, however, , Purchaser shall be responsible for all obligations arising or occurring under the Assumed Contracts after the Closing Date as provided in the Purchase Agreement, and for the payment of any and all accruing but unbilled obligations with respect to any year-end adjustments or reconciliations when billed in accordance with the terms of the Assumed

#4834-6336-7049v6

Contracts (including for royalties, rents, utilities, taxes, insurance, fees, common area or other maintenance charges, promotional funds, and percentage rent) that become due and owing after the Closing Date (irrespective of whether such obligations accrued or relate to the period before, on, or after the Closing Date); provided, further, without relieving Purchaser of its obligations under this Order or the Purchase Agreement, nothing in this Order or the Purchase Agreement shall relieve the Debtors of their obligations under Section 365(d)(3) of the Bankruptcy Code prior to the assumption and assignment or rejection of any Assumed Contract; provided further, however, that a landlord may seek to recover from the Debtors (but not the Purchaser) indemnification obligations, if any, arising from third-party claims asserted with respect to or arising from the Debtors' use and occupancy prior to the Closing of real property subject to a lease or sublease that is an Assumed Contract prior to the Closing for which the Debtors had a duty to indemnify such landlord pursuant to an Assumed Contract, solely with respect to available insurance coverage that survives the Closing, if any; provided, further, that the Purchaser shall not under any circumstances have any obligations to reimburse or indemnify the landlords, the Debtors, or the Debtors' insurer for any obligations arising from third-party claims asserted with respect to or arising from the Debtors' use and occupancy prior to the Closing of real property subject to a lease or sublease that is an Assumed Contract.

28.     The failure of the Debtors or Purchaser to enforce at any time one or more terms or conditions of any Assumed Contract shall not be a waiver of such terms or conditions, or of the Debtors' or Purchaser's rights to enforce every term and condition of the Assumed Contract.

29.     Other than the Assumed Contracts, the Purchaser shall assume none of the Debtors' other contracts or leases and shall have no liability whatsoever thereunder.

### H.    Other Provisions

30.    <u>Release of Avoidance Actions</u>.  All avoidance claims or causes of action of the Debtors arising under sections 544, 547, 548, 549 and 550 of the Bankruptcy Code and any similar state law and all other claims or causes of action under any other provision of the Bankruptcy Code or applicable Laws, in each case relating to vendors, landlords and service providers used in the Business (as defined in the Purchase Agreement) are and shall be deemed waived as of the Closing Date.

31.    <u>No Alteration of Prepetition ABL Agent and DIP Agent/DIP Lender Claims or Liens</u>.[8] Notwithstanding anything contained in this Sale Order to the contrary, nothing in the Purchase Agreement or this Sale Order shall be deemed to amend, modify, or limit the rights (including, without limitation, the liens, security interests or superpriority claims (if any)) of the Prepetition ABL Agent, the DIP Agent and/or the DIP Lender pursuant to the Prepetition Documents, the DIP Orders, or the DIP Documents, or in respect of the Prepetition Secured Obligations, the DIP Obligations, or the liens, security interests, or superpriority claims (if any) of the Prepetition ABL Agent, the DIP Agent, and the DIP Lender, until the Closing Date.  For the avoidance of doubt, this order is without prejudice to the rights of any party under paragraph 69 of the Final DIP Order; provided, that the rights of (if any) of Deutsche Bank Trust Company Americas, Former Indenture Trustee for the 9.125% Senior Notes Due 2018 (the "<u>Former IT</u>") thereunder shall not attach to the JJ Assets and the Former IT shall not have recourse against the JJ Assets or the Purchaser.

---

[8]    Capitalized terms used in this paragraph but not otherwise defined have the meanings given to them in the Final DIP Order.

32.    <u>No Alteration of Obligations Owed Under Prepetition Documents</u>.[9]

Nothing in the Purchase Agreement or this Sale Order shall be deemed to amend, modify, or limit the rights and claims of the any Prepetition Secured Party pursuant to the DIP Orders or the Prepetition Documents, provided, however, nothing in this Paragraph 32 shall be construed to limit the ability of Purchaser to purchase the JJ Assets free and clear of Encumbrances, including any Encumbrances under the DIP Orders or the Prepetition Documents.  In connection with entry of this Sale Order and the consummation of the Sale, the Debtors and the DIP Agent intend to enter into a new Budget (as defined in the Final DIP Order).  The Debtors, the DIP Agent and the DIP Lenders stipulate and acknowledge that the continued funding and administration of these Cases requires the use of proceeds of Prepetition ABL Priority Collateral (as defined in the Final DIP Order).  The DIP Agent and DIP Lenders further acknowledge and agree that, in exchange for the Prepetition ABL Agent's consent to the use of these proceeds, they shall indemnify the Prepetition ABL Agent against any claims that may be asserted by (i) the Agent (as defined in the Agency Agreement) in connection with any clawback asserted under the Agency Agreement or (ii) the Former IT in connection with, related to, or arising from the transactions described in the Motion of Deutsche Bank Trust Company Americas, Former Indenture Trustee for the 9.125% Senior Notes Due 2018, for Entry of an Order Authorizing the Examination of Certain Parties Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure [Docket No. 404] (the "<u>2004 Motion</u>").  The DIP Agent shall be entitled to assume the defense of any action or claim brought by the Former IT against the Prepetition ABL Agent, subject to the consent of the Prepetition ABL Agent (which consent shall not be unreasonably withheld); <u>provided</u> that the compromise or settlement of any claim or action shall not contain an admission of any liability

---

[9]    Capitalized terms used in this paragraph but not otherwise defined have the meanings given to them in the Final DIP Order.

on the part of the Prepetition ABL Agent and shall include a full release and discharge in favor

of the Prepetition ABL Agent.  In addition, the Debtors hereby acknowledge and agree that the

Prepetition ABL Agent shall be entitled to apply amounts in the Prepetition ABL Indemnity

Reserve against any costs, expenses, and other amounts (including reasonable attorneys' fees)

incurred by the Prepetition ABL Agent in connection with or responding to formal or informal

inquiries and/or discovery requests, any adversary proceeding, cause of action, objection, claim,

defense, or other challenge in connection with, or arising from the transactions described in the

2004 Motion.

33.    <u>No Alteration of Agent's Rights Under the Agency Agreement</u>[10].  Except

as expressly contemplated by the Inventory Purchase Agreement with respect to the exercise of

the J&J Option and the amendments to the Agency Agreement pursuant thereto, nothing in the

Purchase Agreement or this Sale Order shall be deemed to amend, modify, or limit the rights

(including, without limitation, the liens, security interests and charges) of the Agent pursuant to

the Agency Agreement and Amended Order (I) Authorizing Entry into the Agency Agreement,

(II) Authorizing and Approving the Conduct of the Store Closing Sales, and (III) Granting

Certain Related Relief [Docket No. 104] (the "<u>Agency Agreement Order</u>").  Without limiting the

foregoing, nothing in the Purchase Agreement or this Sale Order shall affect or limit in any

manner the continued conduct of the Sale (as defined in and as contemplated by the Agency

Agreement) with respect to the remaining Stores and Merchandise, other than the J&J Stores and

J&J Merchandise subject to the Sale (as defined herein) to the Purchaser.

34.    <u>Excluded Liabilities</u>.  All persons, all Governmental Units (as defined in

sections 101(27) and 101(41) of the Bankruptcy Code) and all holders of Encumbrances, based

---

[10]    Capitalized terms used in this paragraph but not otherwise defined have the meanings given to them in the
Agency Agreement.

#4834-6336-7049v6

upon or arising out of the Excluded Liabilities (as defined in the Purchase Agreement) are hereby

barred and estopped from taking any action against the Purchaser or the JJ Assets to recover

property on account of any claims or causes of action against the Debtors or on account of any

liabilities of the Debtors other than Assumed Liabilities pursuant to the Purchase Agreement.

All persons holding or asserting any Encumbrances with respect to the Excluded Assets are

hereby estopped, permanently enjoined and forever barred from asserting or prosecuting such

Encumbrances against the Purchaser or the JJ Assets for any Liability whatsoever associated

with the Excluded Assets.

35. <u>No Bulk Sales; No Brokers</u>.  No bulk sales law or any similar law of any

state or other jurisdiction shall apply in any way to the Sale(s).  Other than the professionals

retained by the Debtors pursuant to orders of this Court, no brokers were involved in

consummating the Sale(s), and no brokers' commissions shall be due to any person or entity in

connection with the Sale(s).  The Purchaser is not obligated to pay any fee or commission or like

payment to any broker, finder, or financial advisor as a result of the consummation of the Sale.

Notwithstanding the foregoing, the Debtors may be obligated to pay their financial advisor or

investment banker for services rendered in connection with the sale in accordance with other

orders of this Court.

36. <u>Failure to Specify Provisions; Conflicts</u>.  The failure specifically to

mention any particular provisions of the Purchase Agreement or any related agreements in this

Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of

this Court, the Debtors, and the Purchaser that the Purchase Agreement and any related

agreements are authorized and approved in their entirety with such amendments thereto as may

be made by the parties thereto in accordance with this Sale Order.  In the event there is a direct

#4834-6336-7049v6

conflict between the terms of this Sale Order and the terms of the Purchase Agreement, the terms of this Sale Order shall control.

37.    <u>Allocation of Consideration</u>.  All rights of the respective Debtors' estates with respect to the allocation of consideration received from the Purchaser in connection with the Sale are expressly reserved for later determination by this Court and, to the extent consideration is received by any Debtor that is determined to be allocable to another Debtor, such other Debtor shall have a claim against the recipient Debtor with the status of an expense of administration in the case of the recipient Debtor under section 503(b) of the Bankruptcy Code.

38.    <u>Subsequent Plan Provisions</u>.  Nothing contained in any chapter 11 plan to be confirmed in these Cases or any order to be entered in these Cases (including any order entered after conversion of these chapter 11 cases to cases under chapter 7 of the Bankruptcy Code) shall alter, conflict with, or derogate from, the provisions of the Purchase Agreement or this Sale Order.  In the event there is a direct conflict between the terms of this Sale Order and the terms of any subsequent chapter 11 plan or any order to be entered in these Cases (including any order entered after conversion of these Cases to cases under chapter 7 of the Bankruptcy Code), the terms of this Sale Order shall control.

39.    <u>Further Assurances</u>.  From time to time, as and when requested, all parties to the Sale(s) shall execute and deliver, or cause to be executed and delivered, all such documents, statements and instruments and shall take, or cause to be taken, all such further or other actions as the requesting party may reasonably deem necessary or desirable to consummate the Sale, including such actions as may be reasonably necessary to vest, perfect, or confirm or record or otherwise in the Purchaser its right, title and interest in and to the JJ Assets.

#4834-6336-7049v6

40.     <u>Governing Terms</u>.  To the extent this Sale Order is inconsistent with any

prior order or pleading in these Cases, the terms of this Sale Order shall govern.  To the extent

there is any inconsistency between the terms of this Sale Order and the terms of the Purchase

Agreement (including all ancillary documents executed in connection therewith), the terms of

this Sale Order shall govern.

41.     <u>Modifications</u>.    The Purchase Agreement and any related agreements,

documents or other instruments may be modified, amended or supplemented by the parties

thereto and in accordance with the terms thereof, without further order of this Court; <u>provided</u>

that any such modification, amendment or supplement does not have a material adverse effect on

the Debtors' estates.

42.     <u>Automatic Stay</u>.    The automatic stay pursuant to section 362 of the

Bankruptcy Code is hereby modified with respect to the Debtors to the extent necessary, without

further order of this Court, to allow the Purchaser to deliver any notice provided for in the

Purchase Agreement and allow the Purchaser to take any and all actions permitted or required

under the Purchase Agreement in accordance with the terms and conditions thereof.    The

Purchaser shall not be required to seek or obtain any further relief from the automatic stay under

section 362 of the Bankruptcy Code to enforce any of its remedies under the Purchase

Agreement or any other sale-related document.

43.     <u>No Stay of Order</u>.  Notwithstanding Bankruptcy Rules 6004(h), 6006(d)

and 7062, this Sale Order shall be effective and enforceable immediately upon entry and its

provisions shall be self-executing.  Neither the Debtors nor the Purchaser shall be required to

execute or file releases, termination statements, assignments, consents, or other instruments in

order to effectuate, consummate and implement the provisions of this Sale Order.  Any party

objecting to this Sale Order must exercise due diligence in filing an appeal and obtaining a stay prior to the Closing Date or risk its appeal being foreclosed as moot.

44.     <u>Servers and IT Equipment</u>.  Upon consummation of the Sale, and to the extent applicable, the Debtors shall retain originals or copies of, and preserve in accordance with their discovery obligations, all hard copy documents and data and information that constitute Assets and any other document, data or information stored on or in servers, backup devices, mobile devices, electronic storage devices, or miscellaneous IT equipment, in each case, that constitutes Assets, currently in the Debtors' possession, custody, or control pertaining to pending or threatened litigation or necessary to administer these Cases  (including, without limitation, necessary to allow the Debtors and the Agent to conduct the Sale (as defined in and in the manner contemplated by, the Agency Agreement).

45.     <u>Notice of Sale Closing Date</u>.   Within  one  (1) business  day  of  the occurrence of the Closing Date of the Sale, the Debtors shall file and serve a notice of same, substantially in the form attached hereto as <u>Exhibit 3</u> (the "<u>Notice of Sale Closing Date</u>").

46.     <u>Retention of Jurisdiction</u>.  This Court shall retain jurisdiction to interpret, implement, and enforce the terms and provisions of this Sale Order, the Bidding Procedures Order, and the Purchase Agreement, including all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith, and decide any issues or disputes concerning this Sale Order and the Purchase Agreement or the rights and duties of the parties hereunder or thereunder, including the interpretation of the terms, conditions, and provisions hereof and thereof, the status, nature, and extent of the JJ Assets.

47.     Nothing in this Order, the Purchase Agreement, or any transition services agreement thereunder shall authorize (1) the transfer of any Oracle America, Inc. or Oracle

Credit Corporation (together, "Oracle") license agreement to any third party; or (2) use of any

Oracle license agreement that is inconsistent with the relevant license grant including, but not

limited to, exceeding the number of authorized users, shared use or license splitting, absent

Oracle's express prior written consent.

48.     The Purchaser (and the Agent, solely with respect to terms that relate to

the Agency Agreement, the J&J Option, and/or the J&J Option Payment) has standing to seek to

enforce the terms of this Order.

49.     The Debtors are authorized to take all actions necessary or appropriate to

effectuate the relief granted pursuant to this Order.

50.     The requirements set forth in Bankruptcy Rule 6004(a) are satisfied.

51.     All time periods set forth in this Order shall be calculated in accordance

with Bankruptcy Rule 9006(a).

Dated:      Mar 4 2019                                  /s/ Keith L. Phillips
_____          _____
          Richmond, Virginia                    UNITED STATES BANKRUPTCY JUDGE


                    Entered on Docket: Mar 4 2019

#4834-6336-7049v6

WE ASK FOR THIS:

*/s/ Brian H. Richardson*
Michael A. Condyles, Esq. (VA 27807)
Peter J. Barrett, Esq. (VA 46179)
Jeremy S. Williams, Esq. (VA 77469)
Brian H. Richardson, Esq. (VA 92477)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:     (804) 644-1700
Facsimile:     (804) 783-6192

- and -

Dennis F. Dunne, Esq. (admitted *pro hac vice*)
Evan R. Fleck, Esq. (admitted *pro hac vice*)
Michael W. Price, Esq. (admitted *pro hac vice*)
**MILBANK LLP**
55 Hudson Yards
New York, New York 10001
Telephone:     (212) 530-5000
Facsimile:     (212) 530-5219

*Co-Counsel for Debtors in Possession*

CERTIFICATION OF ENDORSEMENT
UNDER LOCAL BANKRUPTCY RULE 9022-1(C)

Pursuant to Local Bankruptcy Rule 9022-1(C), I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

*/s/ Brian H. Richardson*

Exhibit 1

EXECUTION VERSION

ASSET PURCHASE AGREEMENT

dated as of March 1, 2019

by and among

THE GAP, INC.,
as Buyer,

and

GYMBOREE GROUP, INC.

and

ITS SUBSIDIARIES SIGNATORY HERETO,
as Sellers

# TABLE OF CONTENTS

**Page**

ARTICLE 1 DEFINITIONS ..................................................................................................... 1

    1.1     Defined Terms ................................................................................................ 1
    1.2     Interpretation ............................................................................................... 13

ARTICLE 2 TRANSFER OF ASSETS AND ASSUMPTION OF LIABILITIES .................................. 14

    2.1     Assets to be Acquired .................................................................................. 14
    2.2     Excluded Assets .......................................................................................... 17
    2.3     Liabilities to be Assumed by Buyer ............................................................ 18
    2.4     Excluded Liabilities .................................................................................... 19
    2.5     [Reserved] ................................................................................................... 20
    2.6     Non-Assignment of Assumed Contracts ..................................................... 20
    2.7     Assumption and Assignment of Executory Contracts ................................. 21

ARTICLE 3 CLOSING; PURCHASE PRICE .......................................................................... 21

    3.1     Closing; Transfer of Possession; Certain Deliveries................................... 21
    3.2     Consideration .............................................................................................. 22
    3.3     Allocation of Purchase Price ...................................................................... 22

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF SELLERS ...................................... 23

    4.1     Organization ................................................................................................ 23
    4.2     Due Authorization, Execution and Delivery; Enforceability ...................... 23
    4.3     Governmental Consents .............................................................................. 23
    4.4     No Conflicts ................................................................................................ 23
    4.5     Title to Acquired Assets ............................................................................. 24
    4.6     Litigation; Orders ....................................................................................... 24
    4.7     Employment and ERISA Matters ............................................................... 25
    4.8     Environmental ............................................................................................. 26
    4.9     Taxes ........................................................................................................... 26
    4.10    Compliance with Laws; Permits ................................................................. 27
    4.11    Contracts ..................................................................................................... 27
    4.12    Insurance Claims ........................................................................................ 27
    4.13    Intellectual Property ................................................................................... 27
    4.14    Anti-Corruption and Sanctions .................................................................. 28
    4.15    Data Privacy ................................................................................................ 28
    4.16    Sufficiency .................................................................................................. 29
    4.17    Exclusive Representations and Warranties ................................................. 29

ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF BUYER ........................................ 29

    5.1     Organization ................................................................................................ 29
    5.2     Due Authorization, Execution and Delivery; Enforceability ...................... 29
    5.3     Governmental Approvals ............................................................................ 30
    5.4     No Conflicts ................................................................................................ 30
    5.5     Availability of Funds and Financial Capability .......................................... 30
    5.6     Adequate Assurances Regarding Executory Contracts ............................... 30
    5.7     Condition and Location of Acquired Assets ............................................... 30
    5.8     Exclusive Representations and Warranties ................................................. 30
    5.9     No Other Representations or Warranties of Sellers; Disclaimers ................ 31

# TABLE OF CONTENTS
(continued)

Page

ARTICLE 6 COVENANTS OF THE PARTIES .................................................................. 32

| | | |
|---|---|---|
| 6.1 | Conduct of Jewel Business Pending the Closing ....................................... | 32 |
| 6.2 | Back-Up Bidder ......................................................................................... | 33 |
| 6.3 | Access ........................................................................................................ | 33 |
| 6.4 | Public Announcements .............................................................................. | 33 |
| 6.5 | Tax Matters ................................................................................................ | 34 |
| 6.6 | Approvals; Reasonable Best Efforts; Notification; Consent...................... | 34 |
| 6.7 | Employee Matters ...................................................................................... | 35 |
| 6.8 | Further Assurances .................................................................................... | 37 |
| 6.9 | Bankruptcy Court Filings........................................................................... | 37 |
| 6.10 | Cure Costs .................................................................................................. | 37 |
| 6.11 | Preservation of Books and Records .......................................................... | 37 |
| 6.12 | Bulk Transfer Laws ................................................................................... | 38 |
| 6.13 | Overhead and Shared Services; Transition Services.................................. | 38 |
| 6.14 | Payments from Third Parties After Closing .............................................. | 38 |
| 6.15 | Letters of Credit ........................................................................................ | 39 |
| 6.16 | Notification of Certain Matters ................................................................. | 39 |
| 6.17 | Confidentiality .......................................................................................... | 40 |
| 6.18 | Communication With Other Bidders ......................................................... | 40 |
| 6.19 | Personally Identifiable Information .......................................................... | 40 |
| 6.20 | Sell-Off of Inventory ................................................................................ | 40 |
| 6.21 | Asset Identification ................................................................................... | 41 |

ARTICLE 7 CONDITIONS TO OBLIGATIONS OF THE PARTIES ................................ 41

| | | |
|---|---|---|
| 7.1 | Conditions Precedent to Obligations of Buyer ......................................... | 41 |
| 7.2 | Conditions Precedent to the Obligations of Sellers .................................. | 42 |
| 7.3 | Frustration of Conditions Precedent ......................................................... | 43 |

ARTICLE 8 TERMINATION ............................................................................................. 43

| | | |
|---|---|---|
| 8.1 | Termination of Agreement......................................................................... | 43 |
| 8.2 | Consequences of Termination................................................................... | 44 |

ARTICLE 9 MISCELLANEOUS ....................................................................................... 44

| | | |
|---|---|---|
| 9.1 | Expenses .................................................................................................... | 44 |
| 9.2 | Assignment ................................................................................................ | 44 |
| 9.3 | Parties in Interest ...................................................................................... | 44 |
| 9.4 | Releases ..................................................................................................... | 45 |
| 9.5 | Notices ....................................................................................................... | 45 |
| 9.6 | Choice of Law............................................................................................ | 46 |
| 9.7 | Entire Agreement; Amendments and Waivers........................................... | 46 |
| 9.8 | Counterparts; Facsimile and Electronic Signatures .................................. | 46 |
| 9.9 | Severability................................................................................................ | 46 |
| 9.10 | Headings .................................................................................................... | 46 |
| 9.11 | Exclusive Jurisdiction and Specific Performance ..................................... | 47 |
| 9.12 | WAIVER OF RIGHT TO TRIAL BY JURY............................................ | 47 |
| 9.13 | Survival ..................................................................................................... | 47 |
| 9.14 | Computation of Time................................................................................. | 48 |

**TABLE OF CONTENTS**
(continued)

9.15  Time of Essence ........................................................................................................ 48
9.16  Non-Recourse ........................................................................................................... 48
9.17  Disclosure Schedules ................................................................................................ 48
9.18  Sellers' Representative; Dealings Among Sellers ..................................................... 48
9.19  Mutual Drafting ........................................................................................................ 49
9.20  Fiduciary Obligations ............................................................................................... 49

**EXHIBITS**

Exhibit A      Form of Sale Order
Exhibit B      Form of Transition Services Agreement

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT, dated as of March 1, 2019 (the "Agreement Date"), is made and entered into by and among Gymboree Group, Inc., a Delaware corporation ("Gemstone"), and each of Gemstone's Subsidiaries listed on the signature page hereto (together with Gemstone, "Sellers" and each, a "Seller"), and The Gap, Inc., a Delaware corporation ("Buyer"). Each Seller and Buyer are referred to herein individually as a "Party" and collectively as the "Parties".

## WITNESSETH:

**WHEREAS**, Sellers are currently engaged in the Jewel Business;

**WHEREAS**, on January 17, 2019, Gemstone and certain other Sellers filed a voluntary petition and commence a case (collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the Bankruptcy Court (the date of such filing, the "Petition Date");

**WHEREAS**, the Chapter 11 Cases are being jointly administered by the Bankruptcy Court under case number 19-30258 (KLP) and are titled In re: Gymboree Group, Inc., *et al*., Debtors; and

**WHEREAS**, on the terms and subject to the conditions set forth herein and subject to the approval of the Bankruptcy Court, (a) Sellers wish to sell to Buyer, and Buyer wishes to purchase from Sellers, the Acquired Assets as of the Closing, and (b) Buyer is willing to assume from Sellers the Assumed Liabilities as of the Closing.

**NOW**, **THEREFORE**, in consideration of the representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Parties hereto agree as follows:

## ARTICLE 1
## DEFINITIONS

1.1     Defined Terms. As used herein, the terms below shall have the following respective meanings:

"Acquired Assets" shall have the meaning specified in Section 2.1.

"Acquired Business Information" shall mean all books, financial information, records, files, ledgers, documentation, instruments, research, papers, data, marketing materials and information, sales or technical literature or similar information that, in each case, is in the possession or control of any Seller and, in each case, is Relating to the Jewel Business or primarily or exclusively related to the Acquired Assets, including, for the avoidance of doubt, (i) files and assignment documentation pertaining to existence, availability, registrability or ownership of any of the Transferred Intellectual Property and documentation of the development, conception or reduction to practice thereof and (ii) all information and documentation pertaining to product history, historical financial performance records, including SKU levels, and other product information with respect to all products related to the Jewel Business.

"Additional Assets" shall have the meaning specified in Section 6.21.

"Additional Lease" shall have the meaning specified in Section 2.1(e).

"<u>Affiliate</u>" shall, with respect to any Person, mean any other Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the Person specified, where "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of a Person, through ownership of voting securities or rights, by contract, as trustee, executor or otherwise.

"<u>Agreement</u>" shall mean this Asset Purchase Agreement, together with the exhibits and the Disclosure Schedules, in each case as amended, restated, supplemented or otherwise modified from time to time.

"<u>Agreement Date</u>" shall have the meaning specified in the preamble.

"<u>Allocation</u>" shall have the meaning specified in <u>Section 3.3</u>.

"<u>Alternative Transaction</u>" shall mean (i) any investment in, financing of, capital contribution or loan to, or restructuring or recapitalization of a Seller or any Affiliate of a Seller (including any exchange of all or a substantial portion of a Seller's or its Affiliates' outstanding debt obligations for equity securities of one or more Sellers or their respective Affiliates), (ii) any merger, consolidation, share exchange or other similar transaction to which a Seller or any of its Affiliates is a party that has the effect of transferring, directly or indirectly, all or a substantial portion of the assets of, or any issuance, sale or transfer of equity interests in, a Seller, the Acquired Assets or the Jewel Business, (iii) any direct or indirect sale of all or a substantial portion of the assets of, or any issuance, sale or transfer of equity interests in, a Seller, the Acquired Assets or the Jewel Business or (iv) any other transaction, including a plan of liquidation or reorganization (in any jurisdiction, whether domestic, foreign, international or otherwise), in each instance (A) that transfers or vests ownership of, economic rights to, or benefits in all or a substantial portion of the Acquired Assets or the Jewel Business to any party other than Buyer and (B) whether or not such transactions are entered into in connection with any bankruptcy, insolvency or similar Proceedings; <u>provided</u>, <u>however</u>, that notwithstanding the foregoing, any investment in, financing of, capital contribution or loan to, or any sale of assets of, a Seller or any Affiliate of a Seller that would not reasonably be expected to, individually or in the aggregate, interfere with or impede the Transactions, interfere with, limit or modify any of Buyer's rights or privileges hereunder or result in the imposition of any liabilities or costs on Buyer or any of its Affiliates shall not be considered an "Alternative Transaction".

"<u>Anti-Corruption Laws</u>" shall mean applicable laws enacted to prohibit bribery and corruption, including the U.S. Foreign Corrupt Practices Act of 1977 (as amended), the UK Bribery Act 2010, and applicable laws enacted to implement the OECD Convention on Combating Bribery of Foreign Officials in International Business Transactions.

"<u>Anti-Corruption Prohibited Activity</u>" shall mean (a) using funds in violation of Anti-Corruption Laws for unlawful contributions, gifts, or entertainment, or other unlawful expenses relating to political activity, or (b) making or taking an act in furtherance of an offer, promise, or authorization of any bribe, rebate, payoff, influence payment, kickback or other similar payment, whether directly or indirectly to any Governmental Entity or to any private commercial entity for the purpose of either gaining an improper business advantage or encouraging the recipient to violate the policies of his or her employer or to breach an obligation of good faith or loyalty in violation of Anti-Corruption Laws.

"<u>Anti-Money Laundering Laws</u>" shall mean applicable laws relating to money laundering and terrorism financing, including the USA PATRIOT Act of 2001, the U.S. Money Laundering Control Act of 1986, as amended; the applicable financial recordkeeping and reporting requirements of the U.S. Currency and Foreign Transaction Reporting Act of 1970, as amended; the EU Anti-Money Laundering

Directives and any laws, decrees, administrative orders, circulars, or instructions implementing or interpreting the same; and other similar applicable laws and regulations.

"Approved Budget" shall have the meaning specified in the DIP Facility.

"Assignment and Assumption Agreement" shall mean one or more assignment and assumption agreements to be entered into by Sellers and Buyer concurrently with the Closing in a form mutually agreed to by the Parties.

"Assumed Contracts" shall have the meaning specified in Section 2.1(e).

"Assumed Liabilities" shall have the meaning specified in Section 2.3.

"Auction" shall have the meaning specified in the Bidding Procedures.

"Avoidance Actions" shall mean any and all claims for relief of any Seller under chapter 5 of the Bankruptcy Code.

"Back-Up Bidder" shall have the meaning specified in Section 6.2.

"Bankruptcy Code" shall have the meaning specified in the recitals.

"Bankruptcy Court" shall mean the United States Bankruptcy Court for the Eastern District of Virginia (Richmond Division).

"Bankruptcy Rules" shall mean the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases, and the general, local and chambers rules of the Bankruptcy Court.

"Benefit Plan" shall mean any employee benefit plan (as defined in Section 3(3) of ERISA) or any deferred compensation, bonus, pension, retirement, profit sharing, savings, incentive compensation, stock purchase, stock option or other equity or equity-linked compensation, disability, death benefit, hospitalization, medical, dental, life, employment, retention, change in control, termination, severance, separation, vacation, sick leave, holiday pay, paid time off, leave of absence, fringe benefit, compensation, incentive, insurance, welfare or any similar plan, program, policy, practice, agreement or arrangement (including any funding mechanism therefor), written or oral, whether or not subject to ERISA, and whether funded or unfunded, in each case that is adopted, sponsored, maintained, entered into, contributed to, or required to be maintained or contributed to, by any Seller or any Subsidiary of any Seller for the benefit of any Employee, or pursuant to or in connection with which any Seller or any Subsidiary of any Seller could have any Liabilities in respect of any Employee or beneficiary of any Employee.

"Bidding Procedures" shall mean the bid procedures in the form annexed as Exhibit 1 to the Bidding Procedures Order.

"Bidding Procedures Order" shall mean the Order of the Bankruptcy Court dated January 17, 2019, and appearing as item number 76 on the docket of the Bankruptcy Court in the Chapter 11 Cases.

"Business Day" shall mean any day other than a Saturday, Sunday or a legal holiday on which banking institutions in the State of New York are not required to open.

"Buyer" shall have the meaning specified in the preamble.

"Buyer Material Adverse Effect" shall mean a material adverse effect on the ability of Buyer to consummate the Transactions.

"Buyer Released Parties" shall have the meaning specified in Section 9.4.

"Chapter 11 Cases" shall have the meaning specified in the recitals.

"Claim" shall mean all actions, claims, counterclaims, suits, proceedings, rights of action, causes of action, Liabilities, losses, damages, remedies, penalties, judgments, settlements, costs, expenses, fines, disbursements, demands, reasonable costs, fees and expenses of counsel, including in respect of investigation, interest, demands and actions of any nature or any kind whatsoever, known or unknown, disclosed or undisclosed, accrued or unaccrued, matured or unmatured, choate or inchoate, legal or equitable, and arising in tort, contract or otherwise, including any "claim" as defined in the Bankruptcy Code.

"Closing" shall have the meaning specified in Section 3.1(a).

"Closing Date" shall have the meaning specified in Section 3.1(a).

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Contract" shall mean any contract, agreement, indenture, note, bond, loan, instrument, lease, conditional sales contract, purchase order, mortgage, license, franchise, insurance policy, letter of credit, commitment or other binding arrangement or commitment, whether or not in written form, that is binding upon a Person or any of its property.

"Credit Agreement" shall mean that certain Credit Agreement, dated as of September 29, 2017, by and among Gemstone, as lead borrower, Gymboree Intermediate Corporation, as a guarantor, Goldman Sachs Specialty Lending Group, Inc., in its capacity as Administrative Agent, and the lenders and other parties party thereto.

"Cure Costs" shall mean all cure costs that must be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assumed Contracts as finally determined by the Bankruptcy Court.

"Designated Purchasers" shall have the meaning specified in Section 2.1.

"DIP Facility" shall mean that certain Superpriority Secured Debtor-in-Possession Credit Agreement, dated as of January 18, 2019, by and among Gemstone, the other Borrowers (as defined therein) party thereto from time to time, Gymboree Intermediate Corporation, a Delaware corporation, the other Guarantors (as defined therein) party thereto from time to time, each a debtor and debtor-in-possession in cases pending under chapter 11 of the Bankruptcy Code, the Lenders (as defined therein) and Special Situations Investing Group, Inc., a Delaware corporation, as Administrative Agent and Collateral Agent.

"Disclosure Schedules" shall mean the disclosure schedules, delivered by Sellers and Buyer concurrently with the execution and delivery of this Agreement, as amended from time to time in accordance with and subject to the terms hereof.

"E-Commerce Platform" shall mean the series of software and hardware applications including computer hardware and cloud servers, that are integrated into, and through which Sellers sell inventory to consumers who place orders for such inventory through, the www.JanieandJack.com (and similar

permutations thereof) websites, including the Contracts pursuant to which such software and hardware applications are owned or licensed by Sellers.

"Employees" shall mean all individuals, as of the date hereof, whether or not actively at work as of the date hereof, who (i) are employed by any of the Sellers or their Subsidiaries, (ii) provide services in connection with the Jewel Business, and (iii) are listed on Schedule 6.7(a), together with individuals who are hired in respect of the Jewel Business after the date hereof and prior to the Closing.

"Employee List" shall have the meaning specified in Section 6.7(a).

"Employee Offer List" shall have the meaning specified in Section 6.7(a).

"Employment Offer" shall have the meaning specified in Section 6.7(b).

"Environmental Laws" shall mean all Laws relating to pollution, storage, transport, release of, contamination by, or exposure to Hazardous Materials, or protection of the environment, natural resources, human safety, or human health (to the extent related to exposure to Hazardous Materials).

"Equipment" shall have the meaning specified in Section 2.1(f).

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" shall mean any Person that, by reason of its relationship with any Seller, is aggregated with such Seller under Section 414 of the Code.

"Excluded Assets" shall have the meaning specified in Section 2.2.

"Excluded Contracts" shall mean all Contracts other than Assumed Contracts.

"Excluded Information" shall mean (i) any personnel records, books, files or other documentation relating to any employees; provided that any personnel records (including without limitation those pertaining to training, performance, salary, compensation, benefits, visa status, and I-9 information) relating to the Transferred Employees shall not be Excluded Information to the extent that Sellers can provide such records to Buyer in compliance with Law, (ii) any Tax records, (iii) any books, records, files, ledgers, documentation or similar information that any Seller is required by Law (including Laws relating to privilege or privacy) or by any Contract to retain and/or not to disclose; provided that to the extent any such information described in this clause (iii) relates to the Jewel Business, Sellers will disclose the existence of such confidential information and the applicable contract or agreement to which it relates and Sellers will use their respective commercially reasonable efforts to seek waivers from the relevant third party in order to provide Buyer such information and (iv) all records and reports prepared by or for any Seller or its Affiliates or Representatives in connection with the sale of Sellers, any of their Affiliates or any of their respective businesses or any portion thereof (including the Jewel Business), including all analyses relating thereto so prepared or received, all confidentiality agreements with prospective purchasers thereof and all bids and expressions of interest received from third parties with respect thereto; provided that this clause (iv) will not exclude any diligence information regarding the Acquired Assets, the Assumed Liabilities or the Jewel Business that was provided or made available to other bidders or potential bidders in connection with the Auction process.

"Excluded Liabilities" shall have the meaning specified in Section 2.4.

"Export Control and Customs Laws" shall mean applicable export control laws and regulations, including the EC Regulation 428/2009 and the implementing laws and regulations of the EU member states; the U.S. Export Administration Act, U.S. Export Administration Regulations, U.S. Arms Export Control Act, U.S. International Traffic in Arms Regulations, and their respective implementing rules and regulations; the U.K. Export Control Act 2002 (as amended and extended by the Export Control Order 2008); and all import laws administered by all applicable Governmental Entities, including the Tariff Act of 1930, as amended, the Trade Act of 1974, the Trade Expansion Act of 1962, and other Laws and programs administered or enforced by the U.S. Department of Commerce, U.S. International Trade Commission, U.S. Customs and Border Protection, and U.S. Immigration and Customs Enforcement and their predecessor agencies.

"Facilities" shall mean all buildings and fixtures owned or leased by Sellers, located on the Leased Real Property and Relating to the Jewel Business, but excluding for the avoidance of doubt (i) power lines, pipelines, telephone lines and other improvements and fixtures owned by public utilities furnishing utilities to the Leased Real Property, and (ii) rail lines, pipelines and other improvements and fixtures owned by third parties and located on existing easements for such purpose which encumber the Leased Real Property.

"FIRPTA Affidavit" shall mean an affidavit of each Seller (or, if such Seller is a disregarded entity for U.S. federal income tax purposes, its regarded owner) that is a U.S. Person, sworn to under penalty of perjury, setting forth such Seller's (or, if applicable, regarded owner's) name, address and U.S. federal tax identification number and stating that such Seller (or, if applicable, regarded owner) is not a "foreign person" within the meaning of Section 1445 of the Code and otherwise complying with the Treasury Regulations issued pursuant to Section 1445 of the Code.

"Fraud" shall mean an actual and intentional misrepresentation of material facts with respect to (i) the making of any representation or warranty of Sellers set forth in Article 4 or in any other Transaction Document or (ii) the certifications of Sellers set forth in the certificates delivered by Sellers pursuant to Section 7.1(c), in each case which satisfies all of the elements of common law fraud under applicable Law.

"GAAP" shall mean generally accepted accounting principles as in effect from time to time in the United States.

"Gemstone" shall have the meaning specified in the preamble.

"Good Faith Deposit" shall have the meaning specified in the Bidding Procedures.

"Governmental Entity" shall mean any federal, state, provincial, local, municipal, foreign, multinational, international or other (a) government, (b) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal), or (c) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature, including any arbitration tribunal or stock exchange.

"Hazardous Material" shall mean any material, substance or waste defined, listed or regulated as a "contaminant" or "pollutant" or as "hazardous" or "toxic" (or words of similar meaning or intent) under any applicable Environmental Law, including materials exhibiting the characteristics of ignitability, corrosivity, reactivity or toxicity, as such terms are defined in connection with hazardous materials, hazardous wastes or hazardous or toxic substances in any applicable Environmental Law and including asbestos, petroleum and petroleum breakdown constituents and polychlorinated biphenyls.

"HSR Act" shall mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and any successor law and the rules and regulations thereunder or under any successor law.

"Incremental Deposit Amount" shall have the meaning specified in the Bidding Procedures.

"Indebtedness" of any Person shall mean, without duplication: (i) the principal of and premium (if any) in respect of (A) indebtedness of such Person for money borrowed and (B) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable; (ii) all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable and other accrued current liabilities arising in the Ordinary Course of Business); (iii) all obligations of such Person under leases required to be capitalized in accordance with GAAP; (iv) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction; (v) all obligations of the type referred to in clauses (i) through (iv) of any Persons for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guarantees of such obligations; and (vi) all obligations of the type referred to in clauses (i) through (v) of other Persons secured by any Lien on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"Intellectual Property" shall mean any and all worldwide rights in and to all intellectual property rights or assets (whether arising under statutory or common law, contract or otherwise), which include all of the following items: (i) inventions, discoveries, processes, designs, tools, molds, techniques, developments and related improvements whether or not patentable; (ii) patents, patent applications, industrial design registrations and applications therefor, divisions, divisionals, continuations, continuations-in-part, reissues, substitutes, renewals, registrations, confirmations, re-examinations, extensions and any provisional applications, requests for continuing examinations or continuing prosecution applications, or any such patents or patent applications, and any foreign or international equivalent of any of the foregoing; (iii) trademarks (whether registered, unregistered or pending), historical trademark files, trade dress, service marks, service names, trade names, brand names, product names, logos, distinguishing guises and indicia, domain names, internet rights (including IP Addresses and AS numbers), social media addresses and accounts, corporate names, fictitious names, other names, symbols (including business symbols), slogans, translations of any of the foregoing and any foreign or international equivalent of any of the foregoing and all goodwill associated therewith and (to the extent transferable by Law) any applications and/or registrations in connection with the foregoing and all advertising and marketing collateral including any of the foregoing ("Trademarks"); (iv) work specifications, tech specifications, databases and artwork; (v) technical scientific and other know-how and information (including promotional material), trade secrets, confidential information, methods, processes, practices, formulas, designs, design rights, patterns, assembly procedures, and specifications; (vi) drawings, prototypes, molds, models, tech packs, artwork, archival materials and advertising materials, copy, commercials, images, artwork and samples; (vii) rights associated with works of authorship including copyrights, moral rights, design rights, rights in databases, copyright applications, copyright registrations, rights existing under any copyright laws and rights to prepare derivative works; (viii) work for hire; (ix) all tangible embodiments of, and all intangible rights in, the foregoing; (x) the right to sue for infringement and other remedies against infringement of any of the foregoing, including the right to sue and collect for past infringement; and (xi) rights to protection of interests in the foregoing under the laws of all jurisdictions.

"Interim Period" shall have the meaning specified in Section 6.1.

"Inventory" shall mean any inventories of finished goods, children's clothing and apparel and packaging and supplies.

"<u>Inventory Purchase Agreement</u>" shall mean that certain Asset Purchase Agreement and Bill of Sale, dated on or about March 1, 2019 by and among Gemstone, Buyer and, solely with respect to paragraphs 1 and 2 (e) thereof, GA Retail, Inc., Tiger Capital Group, LLC, Gordon Brothers Retail Partners, LLC, and Hilco Merchant Resources, LLC.

"<u>Jewel Brick and Mortar Business</u>" shall mean Sellers' business of operating brick-and-mortar retail stores under the "Janie and Jack®" brand name and selling children's clothing and apparel under the "Janie and Jack®" brand name or related Trademarks included in the Transferred Trademarks at such retail store locations.

"<u>Jewel Business</u>" shall mean the "Janie and Jack®" business as conducted as of the Agreement Date, including (i) the Jewel E-Commerce Business, (ii) the Jewel Brick and Mortar Business and (iii) designing, sourcing, importing, marketing, advertising, promoting, distributing and selling children's clothing and apparel under the brand name "Janie and Jack®" through distribution and sales to domestic and international customers and distributors and through the Jewel Brick and Mortar Business and/or the Jewel E-Commerce Business; <u>provided</u> that, in each case, if the context expressly refers to the conduct of the Jewel Business following the Closing, then the "Jewel Business" shall refer to such business as conducted by Buyer and its Affiliates following the Closing.

"<u>Jewel E-Commerce Business</u>" shall mean Sellers' businesses of (i) owning, exploiting, and licensing the brand name "Janie and Jack®" (and certain other Trademarks included in the Transferred Intellectual Property, including under the Assumed Contracts) and (ii) distributing and selling children's clothing and apparel under the brand name "Janie and Jack®" through the E-Commerce Platform; <u>provided</u> that, in each case, if the context expressly refers to the conduct of the Jewel E-Commerce Business following the Closing, then the "Jewel E-Commerce Business" shall refer to such business as conducted by Buyer and its Affiliates following the Closing.

"<u>Jewel Inventory</u>" shall mean any Inventory under the "Janie and Jack®" brand name or related Trademarks included in the Transferred Trademarks utilized in the conduct of the Jewel Business.

"<u>Knowledge</u>" shall mean, with respect to Sellers, the actual knowledge of the Chief Executive Officer, Chief Financial Officer or General Counsel of Gemstone after due inquiry.

"<u>Law</u>" shall mean any federal, state, provincial, local, foreign, international or multinational constitution, statute, law, ordinance, regulation, rule, code, Order, principle of common law, or decree enacted, promulgated, issued, enforced or entered by any Governmental Entity, or court of competent jurisdiction, or other requirement or rule of law.

"<u>Leased Real Property</u>" shall have the meaning specified in <u>Section 2.1(e)</u>.

"<u>Liabilities</u>" shall mean, as to any Person, all debts, adverse Claims, liabilities, commitments, responsibilities, and obligations of any kind or nature whatsoever, direct or indirect, absolute or contingent, whether accrued or unaccrued, vested or otherwise, liquidated or unliquidated, whether known or unknown, and whether or not actually reflected, or required to be reflected, in such Person's balance sheet or other books and records.

"<u>Lien</u>" shall have the meaning specified in section 101(37) of the Bankruptcy Code and shall include any pledge, option, charge, lien, debentures, trust deeds, hypothecation, easement, security interest, right-of-way, encroachment, mortgage, deed of trust, defect of title, restriction on transferability, restriction on use or other encumbrance, in each case whether imposed by agreement, law, equity or otherwise.

"Liquidation Agreement" shall mean that certain Agency Agreement, dated as of the Agreement Date, by and among Gemstone and its Subsidiaries party thereto, on the one hand, and GA Retail, Inc., Tiger Capital Group, LLC, Gordon Brothers Retail Partners, LLC, and Hilco Merchant Resources, LLC (collectively, the "Agent"), on the other hand, approved by the Bankruptcy Court.

"Local Bankruptcy Rules" shall mean the Local Bankruptcy Rules for the Eastern District of Virginia (Richmond Division) applicable to all cases in such district governed by the Bankruptcy Code.

"Multiemployer Plan" shall mean a "multiemployer plan" as defined in Section 3(37) of ERISA.

"Necessary Consent" shall have the meaning specified in Section 2.6.

"Neutral Accountant" shall mean a national independent accounting firm selected by Buyer and reasonably acceptable to Sellers.

"Notices" shall have the meaning specified in Section 9.5.

"Order" shall mean any judgment, order, injunction, writ, ruling, decree, stipulation, determination, decision, verdict, or award of any Governmental Entity.

"Ordinary Course of Business" shall mean that an action taken by a Person will be deemed to have been taken in the "Ordinary Course of Business" only if that action is taken in the ordinary course of business of such Person, consistent with past practices, recognizing that Sellers have filed the Chapter 11 Cases.

"Outside Back-Up Date" shall mean the date that is sixty (60) days after the date of the Sale Hearing (as defined in the Bidding Procedures).

"Overhead and Shared Services" shall mean the ancillary, corporate or other shared services or processes that are provided by Gemstone or its Affiliates to (i) the Jewel Business and (ii) any Retained Business, including services and processes relating to: travel; meeting management and entertainment; labor; office supplies (including copiers and faxes); personal telecommunications (including e-mail); computer/telecommunications maintenance and support; software application and data hosting services; energy/utilities; procurement and supply arrangements; advertising and marketing; treasury; public relations, legal and regulatory matters; risk management (including workers' compensation); payroll; procurement cards and travel cards; telephone/data connectivity; disaster recovery; accounting; tax; internal audit; executive management; quality control and oversight; product design and engineering; human resources and employee relations management; employee benefits; credit, collections and accounts payable; property management; facility management; site security; asset management; supply chain and manufacturing; global trade compliance; and customs and excise matters; provided, however, that for the avoidance of doubt, Overhead and Shared Services shall not include any Acquired Assets.

"Owned Equipment" shall have the meaning specified in Section 2.1(f).

"Party" or "Parties" shall have the meaning specified in the preamble.

"Permits" shall mean permits, licenses, registrations, certificates of occupancy, approvals, consents, clearances and other authorizations issued by any Governmental Entity.

"Permitted Liens" shall mean: (a) Liens for Taxes not yet due and payable or which are being contested in good faith by appropriate proceedings; (b) statutory liens of landlords, carriers, warehousemen,

mechanics, and materialmen incurred in the Ordinary Course of Business for sums not yet due; (c) liens incurred or deposits made in the Ordinary Course of Business in connection with workers' compensation, unemployment insurance and other types of social security; (d) applicable zoning, subdivision, building and other land use Laws and other land use restrictions that do not impair the present use of the subject Real Property; (e) liens or encumbrances that arise solely by reason of acts of Buyer or its successors and assigns or otherwise consented to by Buyer in accordance with the terms of this Agreement; (f) easements, covenants, conditions, restrictions and other similar encumbrances on Real Property that arise in the Ordinary Course of Business; (g) non-exclusive licenses granted in the Ordinary Course of Business; or (h) any Lien that will be removed or released by operation of the Sale Order or any other Order of the Bankruptcy Court, including, without limitation, any Lien granted or incurred in connection with an Order of the Bankruptcy Court and any Lien granted or incurred in connection with the Credit Agreement, the DIP Facility or that certain Credit Agreement, dated as of September 29, 2017, by among Gemstone and certain of its affiliates, as the loan parties thereunder, Bank of America, N.A., as administrative agent and collateral agent thereunder, and the lenders from time to time party thereto.

"Person" shall mean an individual, a partnership, a joint venture, a corporation, a business trust, a limited liability company, a trust, an unincorporated organization, a joint stock company, a labor union, an estate, a Governmental Entity or any other entity.

"Personal Information" shall have the meaning specified in Section 4.15.

"Petition Date" shall have the meaning specified in the recitals.

"PII" shall have the meaning specified in Section 6.19.

"Post-Closing Covenant" shall have the meaning specified in Section 9.13.

"Proceeding" shall mean any action, arbitration, audit, known investigation (including a notice of preliminary investigation or formal investigation), notice of violation, hearing, litigation or suit (whether civil, criminal or administrative), other than the Chapter 11 Cases, commenced, brought, conducted or heard by or before any Governmental Entity, including but not limited to any and all such actions related to restitution or remission in criminal proceedings and civil forfeiture and confiscation proceedings under the Law of any jurisdiction.

"Properties" shall have the meaning specified in Section 4.8(a).

"Property Taxes" shall mean all Real Property Taxes, personal property Taxes and similar ad valorem Taxes.

"Purchase Price" shall have the meaning specified in Section 3.2.

"Real Property" shall mean any real estate, land, building, structure, improvement or other real property of any kind or nature whatsoever owned, leased or occupied by any Person, and all appurtenant and ancillary rights thereto, including easements, covenants, water rights, sewer rights and utility rights.

"Registered IP" shall have the meaning specified in Section 4.13(a).

"Relating to the Jewel Business" shall mean used primarily or exclusively in the operation or conduct of the Jewel Business as conducted as of the date hereof.

"Representative" shall mean, with respect to any Person, such Person's officers, directors, managers, employees, agents, representatives and financing sources (including any investment banker, financial advisor, accountant, legal counsel, consultant, other advisor, agent, representative or expert retained by or acting on behalf of such Person or its Subsidiaries).

"Restricted Party" shall mean (a) any Person or government that is the subject of Sanctions, (b) any Person resident in or organized under the laws of any country or territory that is the subject of country- or territory-wide Sanctions (including Cuba, Iran, North Korea, Syria, or the Crimea region) or (c) owned or controlled by a Person or Persons described in clause (a) or (b).

"Retained Business" shall mean, collectively, any and all businesses and operations conducted by any Seller and/or any of its Affiliates other than the Jewel Business provided that "Retained Business" does not include the Transferred Intellectual Property.

"Sale Hearing" shall mean the hearing conducted by the Bankruptcy Court to approve the Transactions pursuant to the Sale Order.

"Sale Motion" shall mean the motion filed by Seller in the Bankruptcy Court dated January 17, 2019, and an appearing as item number 26 on the docket of the Bankruptcy Court in the Chapter 11 Cases.

"Sale Order" shall mean the Order of the Bankruptcy Court in the form attached hereto as Exhibit A, as may be modified with Buyer's consent (such consent not to be unreasonably withheld).

"Sanctions" shall mean economic or financial sanctions or trade embargoes imposed, administered, or enforced from time to time by (a) the U.S. government (including the U.S. Department of State and the Office of Foreign Assets Control of the U.S. Department of the Treasury), (b) the United Nations Security Council, (c) the European Union, (d) Her Majesty's Treasury of the United Kingdom, or (e) other relevant sanctions authority with jurisdiction over any Party.

"Seller" or "Sellers" shall have the meaning specified in the preamble.

"Seller Fundamental Representations" shall have the meaning specified in Section 7.1(a).

"Sellers Material Adverse Effect" shall mean any change, effect, event, occurrence, circumstance, state of facts or development that, individually or in the aggregate (taking into account all other such changes, effects, events, occurrences, circumstances, states of facts or developments), (a) has had, or would reasonably be expected to have, a material adverse effect on the ability of Sellers to consummate the Transactions or (b) has had, or would reasonably be expected to have, a material adverse effect on the Jewel Business, including the Acquired Assets and the Assumed Liabilities, taken as a whole; provided, however, that with respect to clause (b) only, the term "material adverse effect" shall not include any change, effect, event, occurrence, circumstance, state of facts or development that, directly or indirectly, alone or taken together, arising out of or attributable to: (i) any change generally affecting the international, national or regional markets applicable to the Jewel Business; (ii) any changes in, or effects arising from or relating to, national or international political or social conditions, including the engagement by the United States or any other country in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military, cyber or terrorist attack upon the United States or any other country, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, asset, equipment or personnel of the United States; (iii) changes in, or effects arising from or relating to, financial, banking, or securities markets (including (A) any disruption of any of the foregoing markets, (B) any change in currency exchange rates, (C) any decline or rise in the price of any security, commodity, contract or index and (D) any increased cost, or decreased availability, of

capital or pricing or terms related to any financing for the transactions contemplated by this Agreement); (iv) changes in Law, GAAP or official interpretations of the foregoing; (v) acts of nature, including outbreaks of illness or health emergencies, hurricanes, storms, floods, earthquakes and other natural disasters or force majeure events; (vi) the effect of any action contemplated by, or failure to take any action prohibited by, this Agreement; (vii) the pendency of the Chapter 11 Cases or the financial condition of Sellers; (viii) any failure, in and of itself, to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items (but, for the avoidance of doubt, not the underlying causes of any such failure to the extent such underlying cause is not otherwise excluded from the definition of Sellers Material Adverse Effect); (ix) changes or effects that arise from any seasonal fluctuations in the Jewel Business; (x) any matters arising out of the Chapter 11 Cases, including changes arising from, or effects of, any motion, application, pleading or Order filed under or in connection with, the Chapter 11 Cases and any objections in the Bankruptcy Court to (A) this Agreement and the other Transaction Documents and the transactions contemplated hereby and thereby, (B) the reorganization of Sellers and any related plan of reorganization or disclosure statement, or (C) the Bidding Procedures or the Sale Motion; (xi) the departure of officers or directors of any Seller after the Agreement Date; (xii) the execution and delivery of this Agreement or the announcement thereof or consummation of the Transactions or the identity, nature or ownership of Buyer, including the impact thereof on the relationships, contractual or otherwise, of the Jewel Business with employees, customers, lessors, suppliers, vendors or other commercial partners; and (xiii) any action taken by any Seller at the request of, or with the consent of, Buyer; which, in the case of any of the foregoing <u>clauses (i)</u> through <u>(v)</u> does not disproportionately affect the Jewel Business relative to other companies that participate in the markets and industries applicable to the Jewel Business.

"<u>Sellers Released Parties</u>" shall have the meaning specified in <u>Section 9.4</u>.

"<u>Sellers' Representative</u>" shall have the meaning specified in <u>Section 9.18</u>.

"<u>Shared Contract</u>" shall mean any Contract (other than any Assumed Contract) to which any Seller or any other Subsidiary of a Seller is a party and that inures to the benefit or burden of, or otherwise relates to, both (i) the Jewel Business and (ii) any other business of any Seller or any of their Subsidiaries (including any Retained Business).

"<u>Subsidiary</u>" shall mean, with respect to any Person (a) a corporation, a majority of whose capital stock with voting power, under ordinary circumstances, to elect directors is at the time, directly or indirectly, owned by such Person, by a subsidiary of such Person, or by such Person and one or more subsidiaries of such Person, (b) a partnership in which such Person or a subsidiary of such Person is, at the date of determination, a general partner of such partnership, or (c) any other Person (other than a corporation) in which such Person, a subsidiary of such Person or such Person and one or more subsidiaries of such Person, directly or indirectly, at the date of determination thereof, has (i) at least a majority ownership interest thereof or (ii) the power to elect or direct the election of a majority of the directors or other governing body of such Person.

"<u>Successful Bidder</u>" shall mean, if an Auction is conducted, the prevailing party with respect to the Acquired Assets at the conclusion of such Auction.

"<u>Tax</u>" or "<u>Taxes</u>" shall mean any and all taxes, assessments, levies, duties or other governmental charge imposed by any Governmental Entity, including any income, alternative or add-on minimum, accumulated earnings, franchise, capital stock, environmental, profits, windfall profits, gross receipts, sales, use, value added, transfer, registration, stamp, premium, excise, customs duties, severance, Real Property, personal property, ad valorem, occupancy, license, occupation, employment, payroll, social security, disability, unemployment, withholding, corporation, inheritance, value added, stamp duty reserve,

estimated or other tax, assessment, levy, duty (including duties of customs and excise) or other governmental charge of any kind whatsoever, including any payments in lieu of taxes or other similar payments, chargeable by any Tax Authority together with all penalties, interest and additions thereto, whether disputed or not.

"Tax Authority" shall mean any taxing or other authority (whether within or outside the U.S.) competent to impose Tax.

"Tax Return" shall mean any and all returns, declarations, reports, documents, Claims for refund, or information returns, statements or filings which are supplied or required to be supplied to any Tax Authority or any other Person, including any schedule or attachment thereto, and including any amendments thereof.

"Transaction Documents" shall mean this Agreement and any agreement, instrument or other document entered into pursuant to the terms hereof, including the Transition Services Agreement and the Assignment and Assumption Agreement.

"Transactions" shall mean the transactions contemplated by this Agreement to be consummated at the Closing, including the purchase and sale of the Acquired Assets and the assumption of the Assumed Liabilities as provided for in this Agreement.

"Transfer Tax" or "Transfer Taxes" shall mean any sales, use, transfer, conveyance, documentary transfer, stamp, recording or other similar Tax imposed upon the sale, transfer or assignment of property or any interest therein or the recording thereof, and any penalty, addition to Tax or interest with respect thereto, but such term shall not include any Tax on, based upon or measured by, the net income, gains or profits from such sale, transfer or assignment of the property or any interest therein.

"Transferable Permits" shall have the meaning specified in Section 2.1(j).

"Transferred Employee" shall have the meaning specified in Section 6.7(b).

"Transferred Intellectual Property" shall have the meaning specified in Section 2.1(a).

"Transferred Trademarks" shall have the meaning specified in Section 2.1(a)(iii).

"Transition Services Agreement" shall mean that certain Transition Services Agreement in the form attached hereto as Exhibit B.

"U.S. Person" shall mean any Person that is a "United States person" as defined in Section 7701(a)(30) of the Code.

"WARN Act" shall mean the Worker Adjustment and Retraining Notification Act of 1988 and any similar Law, including any other Law of any jurisdiction relating to plant closings or mass layoffs.

1.2    Interpretation.

(a)    Whenever the words "include," "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "without limitation."

(b)    Words denoting any gender shall include all genders. Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(c)      A reference to any Party to this Agreement or any other agreement or document shall include such Party's successors and permitted assigns.

(d)      A reference to any legislation or to any provision of any legislation shall include any modification or re-enactment thereof, any legislative provision substituted therefor and all regulations and statutory instruments issued thereunder or pursuant thereto.

(e)      All references to "$" and dollars shall be deemed to refer to United States currency.

(f)      All references to any financial or accounting terms shall be defined in accordance with GAAP.

(g)      The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Disclosure Schedule and exhibit references are to this Agreement unless otherwise specified. All article, section, paragraph, schedule and exhibit references used in this Agreement are to articles, sections and paragraphs of, and schedules and exhibits to, this Agreement unless otherwise specified.

(h)      The meanings given to terms defined herein shall be equally applicable to both singular and plural forms of such terms.

(i)      When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is not a Business Day, the period in question shall end on the next succeeding Business Day. All references herein to time are references to New York City time, unless otherwise specified herein.

(j)      If a word or phrase is defined, its other grammatical forms have a corresponding meaning.

(k)      A reference to any agreement or document (including a reference to this Agreement) is to the agreement or document as amended or supplemented, except to the extent prohibited by this Agreement or that other agreement or document.

(l)      Exhibits, Schedules and Annexes to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

## ARTICLE 2
## TRANSFER OF ASSETS AND ASSUMPTION OF LIABILITIES

2.1      <u>Assets to be Acquired</u>. Subject to the entry of the Sale Order, and the terms and conditions of this Agreement and the Sale Order, at the Closing, Sellers shall sell, convey, assign, transfer and deliver to Buyer (or one or more Persons (including any Affiliates of Buyer), as designated by Buyer in writing to Gemstone prior to the Sale Hearing (each, a "<u>Designated Purchaser</u>"), which such writing shall indicate which Acquired Asset shall be purchased, acquired and accepted by each such Person), and Buyer or Designated Purchasers, as applicable, shall purchase, acquire and accept, all of the right, title and interest, free and clear of all Liens (other than Liens included in the Assumed Liabilities and Permitted Liens or as otherwise set forth in the Sale Order), of Sellers in each and all of the Acquired Assets. "<u>Acquired Assets</u>" shall mean all properties, assets, interests and rights of every nature, tangible and intangible, of Sellers, real

or personal, now existing or hereafter acquired, whether or not reflected on the books or financial statements of Sellers as the same shall exist on the Closing Date Relating to the Jewel Business (other than the Excluded Assets), and in any event, including the following assets:

(a)    all Intellectual Property Relating to the Jewel Business owned by Sellers, or in which Sellers have any interest or right, including (all such Intellectual Property in this Section 2.1(a), collectively, the "Transferred Intellectual Property"):

(i)    the copyright registrations set forth in Schedule 2.1(a)(i);

(ii)    the internet domain name registrations and social media accounts set forth in Schedule 2.1(a)(ii) as well as all content, graphics, and artistic works displayed on the websites and social media sites and all copyrights therein;

(iii)    the Trademark applications and registrations set forth in Schedule 2.1(a)(iii) (the "Transferred Trademarks"), including the historical trademark files and any common law rights available anywhere in the world that are the subject of such registrations, together with all goodwill associated therewith, including the right to sue and collect for past infringement, and all common law rights to the trademarks that are the subject of such Transferred Trademarks;

(iv)    any and all of Sellers' right, title and interest to the name "Janie and Jack", or any derivation thereof;

(v)    any and all agreements where Seller has acquired a license from a third party for use of the third party trademarks in the Jewel Business and that are set forth in Schedule 2.1(a)(v); and

(vi)    any software and mobile applications (and copyrights therein) and licenses, maintenance service agreements, current statements of work and any amendments thereto, customizations, custom codes and extensions related thereto (whether done by any Seller or a third party on behalf of any Seller) and all master service agreements related to information technology services, in each case, used in the operation of the Jewel Business, including as set forth in Schedule 2.1(a)(vi);

(b)    subject to Section 8.11 of the Liquidation Agreement, the E-Commerce Platform, including all information technology hardware, software and data collection systems used in connection therewith that are owned, leased or licensed by Sellers or any of their Subsidiaries and all copyright rights therein;

(c)    all goodwill associated with the Jewel Business, the Acquired Assets and the Assumed Liabilities (excluding, for the avoidance of doubt, any and all goodwill to the extent associated with the Excluded Assets);

(d)    except as set forth in Section 2.2(c) and Section 2.2(e), and subject to the right of Sellers to retain copies (at their expense and subject to Section 6.17 and only to the extent and for the purposes expressly set forth in Section 2.2(c) and Section 2.2(e)), all Acquired Business Information in the possession or reasonable control of any Seller and whether in hard or electronic format;

(e)    (i) those leases and other Contracts (together with all of Sellers' deposits thereunder, and all of Sellers' rights and interests in on-order and undelivered goods associated therewith)

entered into by any Seller and Relating to the Jewel Business listed on Schedule 2.1(e)(i) (collectively with all other Contracts contemplated by this Section 2.1, the "Assumed Contracts"), and (ii) all right, title and leasehold interest of Sellers in the real property set forth on Schedule 2.1(e)(ii), together with all right, title and leasehold interest of Sellers in the buildings, structures, fixtures and improvements erected thereon, including the Facilities, and all rights, privileges, easements, licenses and other appurtenances relating thereto (collectively, the "Leased Real Property");

(f)    all (i) Sellers' owned equipment, machinery, furniture, spare parts, fixtures and improvements Relating to the Jewel Business (the "Owned Equipment"), (ii) rights of Sellers to the equipment, machinery, furniture, spare parts, fixtures and improvements which are leased pursuant to an Assumed Contract (collectively with the Owned Equipment, the "Equipment"), and (iii) rights of Sellers to the warranties, express or implied, and licenses received from manufacturers and sellers of the Equipment;

(g)    except with respect to any Avoidance Action or Unperfected Commercial Tort Claims (as defined in the Order of the Bankruptcy Court approving the DIP Facility), all Claims of any Seller (including for royalties, fees or other income, past, present or future infringement, misappropriation or violation of, any of the Transferred Intellectual Property) to the extent arising from or relating to or in connection with the Acquired Assets or the Assumed Liabilities (regardless of whether or not asserted by any Seller), all of the proceeds from the foregoing which are accrued and unpaid as of the Closing, all rights of indemnity, warranty rights, guaranties received from vendors, suppliers or manufacturers, rights of contribution, rights to refunds, rights of reimbursement and other rights of recovery possessed by any Seller against other Persons and the prosecution files of Sellers related thereto, in each case, to the extent related to the Acquired Assets or the Assumed Liabilities (regardless of whether such rights are currently exercisable);

(h)    all data and information relating to, or derived from, identified or identifiable customers, including purchase files and branded loyalty promotion programs and other similar information related to customer purchases and other engagement with the Jewel Business, including personal information (such as name, address, telephone number, e-mail address, device and advertising identifiers, customer or email keys or other persistent identifiers, browsing information, preferences, badges, segments and any other database information) and customer purchase history at a transaction level (including dollar amounts, dates, and items purchased, but excluding from the foregoing any non-tokenized credit card numbers or related customer payment source, social security numbers, or other information to the extent prohibited by Law) relating to customers of, or collected through or used in the operation of (i) the Jewel Business, (ii) the E-Commerce Platform or any similar e-commerce platform owned, operated or controlled by Sellers, (iii) any catalog sales, other online or print mailing or similar distribution channels, (iv) partner e-commerce platforms or retail stores or (v) any customer lists, in each case, in the possession or reasonable control of the Sellers; provided that, with respect to clauses (ii), (iii), (iv) and (v) of this Section 2.1(h), solely to the extent Relating to the Jewel Business;

(i)    all rights to insurance proceeds Relating to the Jewel Business;

(j)    all Permits Relating to the Jewel Business, but only if and to the extent that such Permits are transferable by Sellers to Buyer or Designated Purchaser, as the case may be, by assignment or otherwise (including upon request or application to a Governmental Entity or any third party, or which will pass to Buyer or Designated Purchaser, as the case may be, as successor in title to the Acquired Assets by operation of Law) (the "Transferable Permits");

(k)    all current assets Relating to the Jewel Business as of immediately prior to the Closing, excluding accounts receivable;

(l)  all deposits and prepaid expenses of Sellers relating to any of the Assumed Contracts, including (i) security deposits with third party suppliers, vendors, service providers or landlord and lease and rental payments, (ii) tenant reimbursements, (iii) prepaid Property Taxes and (iv) pre-payments, but excluding any deposits or other amounts paid by or on behalf of Sellers to vendors with respect to purchase orders for Inventory;

(m)  all Real Property Relating to the Jewel Business (other than the Leased Real Property, which is the subject of Section 2.1(e)(ii)) and any buildings, improvements and fixtures thereon and furniture threat;

(n)  all Jewel Inventory in Sellers' possession; and

(o)  those personnel records (including without limitation those pertaining to training, performance, salary, compensation, benefits, visa status, and I-9 information) relating to the Transferred Employees that can be transferred to Buyer, Designated Purchaser or one of their respective Affiliates under applicable Law.

2.2  Excluded Assets. Notwithstanding anything to the contrary in this Agreement, the Acquired Assets do not include, and in no event shall Sellers be deemed to sell, transfer, assign, convey or deliver and Sellers shall retain, all right, title and interest to, Sellers' right, title or interest in or to any of the following properties, interests, rights and assets of Sellers (collectively, the "Excluded Assets"):

(a)  each Seller's rights under this Agreement or any of the Transaction Documents (including the right to receive the Purchase Price);

(b)  all of Sellers' or any of their respective Affiliates' certificates of incorporation and other organizational documents, qualifications to conduct business as a foreign entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock certificates and other documents relating to the organization, maintenance and existence of any Seller or any of its Affiliates as a corporation, limited liability company or other entity;

(c)  all books and records related to Taxes paid or payable by any Seller or any of its Affiliates; provided that Buyer shall be entitled to copies of Tax Returns in respect of Property Taxes relating to the Acquired Assets or copies of any portions of such documents relating to the Acquired Assets;

(d)  all shares of capital stock or other equity interests of any Seller or any of its Affiliates or securities convertible into or exchangeable or exercisable for shares of capital stock or other equity interests of any Seller or any of its Affiliates, including the entities listed on Schedule 2.2(d);

(e)  any (i) personnel records pertaining to any employees of Sellers or any of their respective Affiliates other than Transferred Employees, and any personnel records for Transferred Employees that cannot be transferred to Buyer or one of its Affiliates under applicable Law, (ii) copies of any book, record, literature, list and any other written or recorded information constituting Acquired Business Information that has been provided to Buyer and to which Sellers and their respective Affiliates in good faith determine they are reasonably likely to need access for *bona fide* business, tax or legal purposes (including, for the avoidance of doubt, the provision of services under the Transition Services Agreement), (iii) Excluded Information or (iv) other books and records, in either case, that Sellers and their respective Affiliates are required by Law to retain, including Tax Returns, taxpayer and other identification numbers, financial statements and corporate or other entity filings; provided that, to the extent permitted by applicable Law, Buyer shall have the right to obtain copies of any portions of such retained books and

records to the extent that such portions relate to the Jewel Business or any Acquired Asset or are otherwise necessary for Buyer to comply with applicable Law;

(f)      (i) all assets, properties, interests and other rights of every nature in respect of the Benefit Plans and any other compensation or benefit plans, programs, arrangements, or agreements of Sellers or any of their Subsidiaries, in each case including all associated funding media, assets, reserves, credits and service agreements, and all documents created, filed or maintained in connection therewith, together with any applicable insurance policies related thereto, (ii) all employment, personnel and compensation records relating to any current or former employee of any Seller or any Subsidiary of any Seller who is not, and does not become, a Transferred Employee, and (iii) those portions of employment, personnel and compensation records relating to the Transferred Employees that cannot be transferred to Buyer or one of its Affiliates under applicable Law;

(g)      all Permits and pending applications therefor to the extent not Relating to the Jewel Business;

(h)      all Claims that Sellers or any of their respective Affiliates may have against any third Person with respect to any Excluded Assets or Excluded Liabilities;

(i)      all cash and cash equivalents, securities, security entitlements, instruments and other investments of Sellers and all bank accounts and security accounts, including any cash collateral that is collateralizing any letters of credit;

(j)      all Excluded Contracts and all prepaid expenses related thereto;

(k)      except as set forth in Section 2.1(i), all insurance policies and rights to proceeds thereof (and Buyer acknowledges that, as of the Closing, the Acquired Assets and the Jewel Business shall cease to be insured by any insurance policies of any Seller or any of their Subsidiaries);

(l)      all Inventory that is not Jewel Inventory;

(m)      any documents and agreements relating to the Chapter 11 Cases or to the sale or other disposition of the Jewel Business, the Acquired Assets or any other asset of any Seller or any of its Affiliates other than those to be delivered to Buyer in accordance with this Agreement;

(n)      all prepayments, good faith and other bid deposits submitted by any third party under the terms of the Bidding Procedures Order;

(o)      all Avoidance Actions and all other avoidance actions, including fraud, self-dealing, fraudulent transfer, or similar claims against any officer or director of any Seller or any of its Affiliates and all Unperfected Commercial Tort Claims (as defined in the Order of the Bankruptcy Court approving the DIP Facility); and

(p)      all assets, properties, interests and rights of any Seller used primarily or exclusively in the operation or conduct of the Retained Business as conducted as of the date hereof, except for any such assets, properties, interests and rights described or identified in Section 2.1 or on Schedule 2.1.

2.3      Liabilities to be Assumed by Buyer. Subject to the terms and conditions of this Agreement, at the Closing, Sellers shall assign to Buyer or Designated Purchasers, as applicable, and Buyer or Designated Purchasers, as applicable, shall assume from Sellers and pay when due, perform and discharge,

in due course, without duplication, each of the Assumed Liabilities. "Assumed Liabilities" shall mean solely the following Liabilities:

(a)      all Liabilities of Sellers under each of the Assumed Contracts that become due from and after the Closing Date;

(b)      all Cure Costs;

(c)      all Liabilities (i) related to the Transferred Employees arising on or after the date such applicable Employee becomes a Transferred Employee, including under the WARN Act; (ii) in respect of accrued and unpaid vacation or personal time off related to the Transferred Employees, and (iii) in respect of accrued base salary, store bonuses or other wages related to the Transferred Employees;

(d)      all Transfer Taxes;

(e)      all Liabilities related to Property Taxes imposed upon or assessed directly against the Acquired Assets attributable to the period commencing on the Closing Date; and

(f)      all Liabilities incurred from or after and arising from or after the Closing with respect to or relating to the ownership or operation of any of the Acquired Assets or Relating to the Jewel Business.

Notwithstanding the foregoing and for the avoidance of doubt, Assumed Liabilities shall not include any Liability relating to or arising out of any violation of Law by, or any Claim against, any Seller or any breach, default or violation by any Seller of or under any Assumed Contracts, other than the Cure Costs.

2.4      Excluded Liabilities. Notwithstanding anything in this Agreement to the contrary, Buyer shall not and does not assume, and shall be deemed not to have assumed and shall not be obligated to pay, perform, discharge or in any other manner be liable or responsible for any Liabilities of Sellers, whether existing on the Closing Date or arising thereafter, other than the Assumed Liabilities, including those relating to or arising out of any of the following (collectively, the "Excluded Liabilities"):

(a)      all costs and expenses incurred or to be incurred by Sellers in connection with this Agreement and the consummation of the Transactions, except as otherwise provided in the Transition Services Agreement;

(b)      all Liabilities (i) related to any current or former employee of any Seller or of any Subsidiary of any Seller (other than all Liabilities related to the Transferred Employees arising on or after the date such applicable Employee becomes a Transferred Employee, including under the WARN Act) and (ii) under any Benefit Plan (including all assets, trusts, insurance policies and administration service contracts related thereto);

(c)      all Liabilities for any and all Taxes of Sellers (including any Liability of Sellers for the Taxes of any other Person under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local or foreign Law), as a transferee or successor, by Contract or otherwise) except for Taxes for which Buyer or Designated Purchaser is liable pursuant to Section 2.3(d), Section 2.3(e) and/or Section 2.3(f);

(d)      all Liabilities under the corporate headquarters lease for the Retained Business;

(e)    all Liabilities arising out of, relating to or with respect to any and all Employees, and contractors of Sellers or any of their Subsidiaries or Affiliates arising at any time before Closing;

(f)    all Liabilities to any broker, finder or agent or similar intermediary for any broker's fee, finders' fee or similar fee or commission relating to the transactions contemplated by this Agreement for which any Seller or its Affiliates are responsible;

(g)    all Liabilities, or corrective or remedial obligations with respect to Facilities or operation of the Jewel Business (including any related offsite disposal locations) which arises under or relates to any Environmental Laws (including without limitation any relating to exposure to Hazardous Materials) except to the extent the facts or conditions underlying such Liability or obligation are caused after Closing; and

(h)    all Liabilities arising out of, concerning, in connection with, or relating to the Real Property (other than the Leased Real Property), the Retained Business or the Proceedings listed on <u>Schedule 4.6</u>;

<u>provided</u> that in the event of any conflict between <u>Section 2.3</u> and this <u>Section 2.4</u>, <u>Section 2.4</u> will control.

2.5    [Reserved]

2.6    <u>Non-Assignment of Assumed Contracts</u>.

(a)    Notwithstanding anything in this Agreement to the contrary, this Agreement shall not constitute an agreement to assign any Assumed Contract which, after giving effect to the provisions of Section 365 of the Bankruptcy Code, is not assignable or transferable without the consent of any Person, other than the Sellers, any of their respective Affiliates or Buyer, to the extent such consent shall not have been given prior to the Closing; <u>provided</u>, <u>however</u>, that (i) the Sellers shall use, whether before or after the Closing, its commercially reasonable efforts to obtain all necessary consents (each, a "<u>Necessary Consent</u>") to the assignment and transfer thereof, it being understood that, to the extent the foregoing shall require any action by the Sellers that would, or would continue to, have an adverse effect on the business of Buyer or any of its Affiliates after the Closing, such action shall require the prior written consent of Buyer, and (ii) in the event that any Assumed Contract is deemed not to be assigned pursuant to clause (i) of this <u>Section 2.6(a)</u>, the Sellers shall (A) use commercially reasonable efforts to obtain such necessary consents as promptly as practicable after the Closing and (B) cooperate in good faith in any lawful and commercially reasonable arrangement reasonably proposed by Buyer, including subcontracting, licensing or sublicensing to Buyer any or all of any Seller's rights and obligations with respect to any such Assumed Contract, under which Buyer shall obtain (without infringing upon the legal rights of such third party or violating any Law) the economic rights and benefits under such Assumed Contract with respect to which such Necessary Consent has not been obtained. Upon satisfying any requisite consent requirement applicable to such Assumed Contract after the Closing, such Assumed Contract shall promptly be transferred and assigned to Buyer in accordance with the terms of this Agreement. These commercially reasonable efforts shall not require any material payment or other material consideration from the Sellers or Buyer (other than the Cure Costs, which shall be the responsibility of Buyer), and any such consent shall contain terms and conditions reasonably acceptable to the Parties. For the avoidance of doubt, the term "material" in the prior sentence means material in the context of the relevant Assumed Contract.

(b)    Subject to <u>Section 2.6(a)</u>, if after the Closing (i) Buyer or any of its Affiliates holds any Excluded Assets or Excluded Liabilities or (ii) any Seller or any of their Affiliates holds any Acquired Assets or Assumed Liabilities, Buyer or the applicable Seller, will promptly transfer (or cause to be transferred) such assets or assume (or cause to be assumed) such Liabilities to or from (as the case may be)

the other party. Prior to any such transfer, the party receiving or possessing any such asset will hold it in trust for such other party.

2.7    <u>Assumption and Assignment of Executory Contracts</u>. Sellers shall provide timely and proper written notice of the motion seeking entry of the Sale Order to all parties to any executory Contracts to which any Seller is a party that are Assumed Contracts and take all other actions necessary to cause such Contracts to be assumed by Sellers and assigned to Buyer pursuant to Section 365 of the Bankruptcy Code, as applicable, to the extent that such Contracts are Assumed Contracts. At the Closing, Sellers shall, pursuant to the Sale Order and the Assignment and Assumption Agreement, assume and assign to Buyer (the consideration for which is included in the Purchase Price), all Assumed Contracts that may be assigned by any such Seller to Buyer pursuant to Sections 363 and 365 of the Bankruptcy Code, as applicable, subject to provision by Buyer of adequate assurance as may be required under Section 365 of the Bankruptcy Code and payment by Buyer of the Cure Costs in respect of Assumed Contracts pursuant to and in accordance with Section 365 of the Bankruptcy Code, as applicable, and the Sale Order. At the Closing, Buyer shall assume, and thereafter in due course and in accordance with its respective terms pay, fully satisfy, discharge and perform all of the obligations under each Assumed Contract (other than in respect of the Cure Costs, the payment of which shall be the responsibility of Buyer) pursuant to Section 365 of the Bankruptcy Code, as applicable.

**ARTICLE 3**
**CLOSING; PURCHASE PRICE**

3.1    <u>Closing; Transfer of Possession; Certain Deliveries</u>.

(a)    The consummation of the Transactions (the "<u>Closing</u>") shall take place on the second Business Day after the satisfaction of all of the conditions set forth in <u>Article 7</u> (or the waiver thereof by the Party entitled to waive that condition) or on such other date as the Parties hereto shall mutually agree. The Closing shall be held at the offices of Milbank LLP, 55 Hudson Yards, New York NY 10001, at 10:00 a.m., local time, unless the Parties hereto otherwise agree. The actual date of the Closing is herein called the "<u>Closing Date</u>".

(b)    At the Closing, Sellers shall deliver to Buyer:

(i)    an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Gemstone certifying that the conditions set forth in <u>Section 7.1(a)</u> and <u>Section 7.1(b)</u> have been satisfied;

(ii)    an electronic copy of the information required under <u>Section 2.1(b)</u>, <u>Section 2.1(d)</u> and <u>Section 2.1(h)</u>, except with respect to e-mails, which Buyer may retrieve from Sellers at its sole cost and expense upon reasonable prior request and in a commercially reasonable manner (it being understood that Sellers shall cooperate and work with Buyer in good faith in connection with any such request);

(iii)    a duly executed bill of sale, in a form mutually agreed to by the Parties, transferring the Acquired Assets to Buyer;

(iv)    the duly executed Transition Services Agreement;

(v)    the duly executed Assignment and Assumption Agreement;

(vi)    for each Seller (or if any Seller is a disregarded entity for U.S. federal income tax purposes, its regarded owner) that is a U.S. Person, a duly executed FIRPTA Affidavit from each such Seller (or, if such Seller is a disregarded entity for U.S. federal income tax purposes, its regarded owner); and

(vii)    duly executed lease assignments in a form reasonably satisfactory to Sellers and Buyer, or Sale Order(s) of the Bankruptcy Court, as shall be required to convey to Buyer all of Sellers' interests in respect of the Leased Real Property, which lease assignments shall be in recordable form, duly executed and acknowledged.

(c)    At the Closing, Buyer shall deliver to Sellers:

(i)    the Closing Consideration (as defined below) by wire transfer of immediately available funds to an account designated in writing by Sellers;

(ii)    an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Buyer certifying that the conditions set forth in <u>Section 7.2(a)</u> and <u>Section 7.2(b)</u> have been satisfied;

(iii)    the duly executed Transition Services Agreement; and

(iv)    the duly executed Assignment and Assumption Agreement.

3.2    <u>Consideration</u>. The aggregate consideration for the Acquired Assets shall be (i) $35,000,000 (the "<u>Purchase Price</u>") and (ii) the assumption of the Assumed Liabilities.  The consideration payable to the Sellers by Buyer at Closing shall equal the Purchase Price <u>minus</u> the Good Faith Deposit <u>minus</u> the Incremental Deposit Amount paid by Buyer before the Closing (if any) (the "<u>Closing Consideration</u>").

3.3    <u>Allocation of Purchase Price</u>. (i) The sum of the Purchase Price and the amount of the Assumed Liabilities (to the extent properly taken into account under the Code) shall be allocated between Sellers and (ii) the amount allocated to the Acquired Assets sold by each such Seller shall be further allocated among such Acquired Assets in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder (the "<u>Allocation</u>"). The Allocation shall be delivered by Buyer to Sellers within ninety (90) days after the Closing. Sellers will have the right to raise reasonable objections to the Allocation within thirty (30) days after Buyer's delivery thereof, in which event Buyer and Sellers will negotiate in good faith to resolve such dispute. If Buyer and Sellers cannot resolve such dispute within fifteen (15) days after Sellers notify Buyer of such objections, such dispute with respect to the Allocation shall be resolved promptly by the Neutral Accountant, the costs of which shall be shared in equal amounts by Buyer, on the one hand, and Sellers, on the other hand. The decision of the Neutral Accountant in respect of the Allocation shall be final and binding upon Buyer and Sellers. Buyer and Sellers shall file all Tax Returns (including, but not limited to, Internal Revenue Service Form 8594) consistent with the Allocation absent a change in Law; <u>provided</u>, <u>however</u>, that nothing contained herein shall prevent Buyer or any Seller from settling any proposed deficiency or adjustment by any Tax Authority based upon or arising out of the Allocation, and neither Buyer nor any Seller shall be required to litigate before any court any proposed deficiency or adjustment by any Tax Authority challenging such Allocation. Buyer and Sellers shall promptly notify and provide the other with reasonable assistance in the event of an examination, audit, or other proceeding relating to Taxes regarding the Allocation of the Purchase Price and the amount of the Assumed Liabilities pursuant to this <u>Section 3.3</u>. Notwithstanding any other provisions of this Agreement, the foregoing agreement shall survive the Closing Date without limitation.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as set forth in the Disclosure Schedules, Sellers jointly and severally hereby represent and warrant to Buyer, as of the Agreement Date and the Closing Date as follows:

4.1     Organization.

(a)     Each Seller is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization and has all requisite corporate power and authority to own, lease, develop and operate the Acquired Assets and to carry on the Jewel Business as now being conducted.

(b)     Each Seller (i) is duly qualified or licensed to do business as a foreign corporation or limited liability company, as applicable, and is in good standing under the Laws of each jurisdiction where the nature of the property owned or leased by it or the nature of the Jewel Business makes such qualification or license necessary, except where any such failure to be so qualified or licensed, individually in the aggregate, would not result in a Sellers Material Adverse Effect, and (ii) pursuant to Sections 1107 and 1108 of the Bankruptcy Code and the Orders of the Bankruptcy Court, has all necessary corporate or limited liability company power and authority to own and operate its properties, to lease the property it operates under lease and to conduct the Jewel Business as debtor-in-possession.

4.2     Due Authorization, Execution and Delivery; Enforceability. Each Seller has all requisite corporate or limited liability company power and authority to execute and deliver this Agreement and the other Transaction Documents to which it is (or will become at Closing) a party and to perform its obligations hereunder and thereunder (subject, in the case of the obligation to consummate the Transactions, to the entry of the Sale Order). The execution, delivery and performance by each of Sellers of this Agreement and the other Transaction Documents to which it is (or will become at Closing) a party and the consummation of the Transactions have been duly and validly authorized by all requisite corporate or limited liability company action, as applicable, on the part of each such Seller and no other corporate or limited liability company action, as applicable, on the part of each such Seller is necessary to authorize this Agreement and such other Transaction Documents and to consummate the Transactions (subject, in the case of the obligation to consummate the Transactions, to the entry of the Sale Order). This Agreement and the other Transaction Documents to which each of Sellers is (or will become at Closing) party have been (or will be) duly and validly executed and delivered by each such Seller and (assuming the due authorization, execution and delivery by all parties hereto and thereto, other than such Seller) constitute (or will constitute) valid and binding obligations of each such Seller enforceable against each such Seller in accordance with their terms (subject to the entry of the Bidding Procedures Order and, in the case of the obligation to consummate the Transactions, to the entry of the Sale Order).

4.3     Governmental Consents. No notice to, consent, approval or authorization of or designation, declaration or filing with any Governmental Entity is required by any Seller with respect to such Sellers' execution, delivery and performance of any Transaction Document to which it is (or will become at Closing) a party or the consummation of the Transactions, except (a) as may be required under the HSR Act, (b) the Sale Order having been entered by the Bankruptcy Court, (c) notices, filings and consents required in connection with the Chapter 11 Cases and (d) any consent, approval or authorization of or designation, declaration or filing with any Governmental Entity the failure of which to be made or obtained would not, individually or in the aggregate, be, or reasonably be expected to be, material to the Acquired Assets taken as a whole.

4.4     No Conflicts. Subject to the receipt of the Necessary Consents set forth on Schedule 4.4 and the Sale Order having been entered by the Bankruptcy Court, the execution, delivery and performance

by such Seller of any Transaction Document to which such Seller is (or will become at Closing) a party, and the consummation of the Transactions, does not and will not (a) conflict with or result in any breach of any provision of its certificate of incorporation or bylaws or comparable governing documents, (b) without giving effect to <u>Section 2.6</u>, conflict with or result in the breach of the terms, conditions or provisions of or constitute a default (or an event with which notice or lapse of time or both would become a default) under, or give rise to any right of termination, acceleration or cancellation of any right or obligation or to a loss of any benefit under any provision of any Assumed Contract, (c) result in a violation of any Law or Order applicable to it or (d) result in the creation or imposition of any Lien on any Acquired Asset other than Permitted Liens, except, in the case of <u>clauses (b)</u>, <u>(c)</u> and/or <u>(d)</u>, as would not, individually or in the aggregate, be, or reasonably be expected to be, material to the Acquired Assets, taken as a whole.

4.5    <u>Title to Acquired Assets</u>.

(a)    Except for Permitted Liens, Sellers have good and valid title to the material Acquired Assets (other than the Leased Real Property, which is addressed in <u>Section 4.5(b)</u>). No Subsidiaries or Affiliates of Gemstone, other than Sellers, hold any material assets, other than Excluded Assets, Relating to the Jewel Business.

(b)    Each lease, ground lease, sublease, license, option or other agreement related to the Leased Real Property to which any Seller is a party is a legal, valid, binding and enforceable obligation of the applicable Seller and each such lease, ground lease, sublease, license, option or other agreement is in full force and effect, except as would not, individually or in the aggregate, be, or, reasonably expected to be, material to the Acquired Assets, taken a as a whole.

(c)    Sellers are not in default under any such leases, ground leases, subleases, licenses, options or other agreements, and no condition exists which (with notice or lapse of time or both) would constitute a default by any Seller thereunder or, to the Knowledge of Sellers, by the other parties thereto, except as would not, individually or in the aggregate, be, or, reasonably be expected to be, material to the Acquired Assets, taken a as a whole.

(d)    Except (i) as set forth in the Liquidation Agreement and (ii) as otherwise provided in this <u>Section 4.5</u>, the Leased Real Property is (A) subject to no Liens, other than Permitted Liens and (B) not subject to any statutory liens of landlords, carriers, warehousemen, mechanics, and materialmen, except as set forth in the applicable lease, ground lease, sublease, license, option or other agreement related to the Leased Real Property.

(e)    Sellers have delivered to or made available to Buyer via the "Project Jewel" virtual data room maintained by Intralinks Inc. (https://services.intralinks.com/web/index.html?#workspace/6333625/) true, accurate and complete copies of (i) each lease, ground lease or sublease, and each material license option or other agreement related to the Leased Real Property, (ii) all material easements, covenants, conditions, restrictions and other similar encumbrances on the Leased Real Property, and (iii) each material non-exclusive license related to the Leased Real Property.

4.6    <u>Litigation; Orders</u>. Except for the Chapter 11 Cases and any adversary proceedings or contested motions commenced in connection therewith, or as set forth on <u>Schedule 4.6</u>, (a) there is no Claim, Proceeding or Order pending, outstanding or, to any Seller's Knowledge, threatened against any Seller or any of their respective Affiliates (i) that would reasonably be expected to be material to the Jewel Business, the Employees, contractors of Sellers or the Acquired Assets or (ii) that seeks to restrain or prohibit or otherwise challenge the consummation, legality or validity of the transactions contemplated hereby and (b) as of the Agreement Date, there is no Proceeding by any Seller or any of their respective

Affiliates pending, or which a Seller or any such Affiliate has commenced preparations to initiate, against any other Person relating to or affecting the Jewel Business or the Acquired Assets.

4.7    <u>Employment and ERISA Matters</u>.

(a)    All Employees of Sellers and their Subsidiaries are "at will" employees. Sellers and their Subsidiaries have not employed or engaged any employee or independent contractor who cannot be dismissed whether currently or immediately after the transactions contemplated by this Agreement, without cause, without payment of severance or other compensation, and without further liability other than Claims addressed in <u>Section 4.7(d)</u>.

(b)    No Employee is or within the past three (3) years has been covered by a collective bargaining or similar labor agreement with any union or employee organization representing or purporting to represent employees of Seller or any Subsidiary of any Seller.

(c)    Except as set forth on <u>Schedule 4.7(c)</u>, in the three (3) years prior to the Closing (i) with respect to the Jewel Business, no Seller or any Subsidiary of any Seller has experienced any labor strike, work stoppage, slowdown, lockout, concerted refusal to work overtime or other similar labor disruption against any Seller or any Subsidiary of any Seller and, to the Knowledge of Sellers, none of the foregoing is currently pending or threatened; (ii) no Seller or any Subsidiary of any Seller has received written notice from any Governmental Entity of any charge, complaint or Proceeding pending or threatened before or by the National Labor Relations Board, the Equal Employment Opportunity Commission, or any other Governmental Entity in connection with the Jewel Business; (iii) to the Knowledge of Sellers, no union organizational campaign is pending or threatened with respect to any Employee; and (iv) to the Knowledge of Sellers, there have not been any activities or proceedings by any labor union to represent any Employee except, in the case of each of clauses (i)-(iv) that have not had and would not reasonably be expected to have, individually or in the aggregate, a Sellers Material Adverse Effect.

(d)    Except as set forth on <u>Schedule 4.7(d)</u>, with respect to the Jewel Business, each Seller and each Subsidiary of each Seller is, and has been at all times since January 17, 2016, in compliance in all material respects with all applicable Laws pertaining to labor and employment, including Laws pertaining to terms and conditions of employment, collective bargaining, wages, hours of work, discrimination, retaliation, employee privacy, and occupational safety and health. Sellers and their Subsidiaries have paid and/or properly accrued all wages and other compensation due to all current and former employees and independent contractors including without limitation all overtime pay, vacations/PTO or vacation/PTO pay, holidays or holiday pay, sick days or sick pay, commissions, bonuses, and incentive compensation. All current and former employees of Sellers and their Subsidiaries who have been classified as exempt under the FLSA or any state wage and hour Laws have been properly classified and treated as such and properly compensated for all time worked in accordance with the FLSA and state wage and hour Laws. All individuals who have provided services to Sellers and their Subsidiaries as independent contractors have been properly classified as independent contractors, rather than as employees, for purposes of all applicable Laws and Employee Benefit Plans. All employees of Sellers and their Subsidiaries who work in the United States are legally authorized to work in the United States.

(e)    Neither Sellers nor their Subsidiaries is a party to, or otherwise bound by, any Order, consent decree with, or citation by, any Governmental Entity relating to employees or employment practices. Neither Sellers nor their Subsidiaries have received within the past three years any notice of intent by any government agency responsible for the enforcement of labor or employment laws to conduct an audit or investigation relating to any of them.

(f)      No Seller, no Subsidiary of any Seller and no ERISA Affiliate contributes to or within the past six years has had an obligation to contribute to: (i) a plan subject to Title IV of ERISA or the minimum funding standards of Section 302 of ERISA or Section 412 of the Code; (ii) a Multiemployer Plan; (iii) a multiple employer plan (within the meaning of Section 4063 or 4064 of ERISA or Section 413(c) of the Code); or (iv) a multiple employer welfare arrangement (within the meaning of Section 3(40) of ERISA), in each case that could result in any material Liability to Buyer.

(g)      Except as set forth on Schedule 4.7(g), neither the entry into this Agreement nor the consummation of the Transactions would be reasonably expected to: (i) result in the payment or provision to any Employee who is or becomes a Transferred Employee of any material payment or benefit in the nature of compensation from any Seller or any Subsidiary of any Seller, or any increase in any of the foregoing or (ii) accelerate the vesting or payment timing of any compensatory rights or benefits to any Employee who is or becomes a Transferred Employee.

4.8      Environmental. Except as would not, individually or in the aggregate, be, or would reasonably be expected to be, material to the Acquired Assets taken as a whole:

(a)      None of the Real Property currently or formerly owned, leased or operated by or on behalf of any Seller (including soil and groundwater under such Real Property) (the "Properties") that are part of the Jewel Business is the subject of any pending or, to the Knowledge of Sellers, threatened Proceeding by any Governmental Entity or any other Person regarding a release of any Hazardous Materials;

(b)      To the Knowledge of Sellers, Hazardous Materials have not been stored, used, or released by any Seller or in a quantity or manner at, from or on any Property or at any off-site location, which, individually or in the aggregate, would reasonably be expected to result in any Liability of any Seller with respect to the Acquired Assets to pay for or perform any remedial action;

(c)      Sellers, with respect to the Jewel Business, have not received any written notice from any Governmental Entity or any other Person regarding any pending or threatened Proceedings or other Liability regarding the release or disposal of Hazardous Materials or any actual or alleged violation of or other Liability under Environmental Laws; and

(d)      Sellers have delivered or made available to Buyer copies of all material environmental reports, audits, and assessments prepared by or for Sellers or their Affiliates that are in Sellers' possession or reasonable control, as well as all material correspondence with Governmental Entities or other Persons relating to material environmental conditions or other material environmental matters at any Property or otherwise concerning the operation of the Jewel Business.

Notwithstanding anything to the contrary contained in this Agreement, the representations and warranties in this Section 4.8 are the sole representations and warranties of Sellers relating to environmental matters or Environmental Laws.

4.9      Taxes.

(a)      There are no material Liens on any of the Acquired Assets that arose in connection with, or are attributable to, any Seller's failure to pay any Tax.

(b)      Except as set forth on Schedule 4.9(b), there is no material dispute or claim concerning any Tax Liability of any Seller, with respect to the Jewel Business or the Acquired Assets, claimed, raised, or threatened by any Governmental Entity in writing.

(c)    Except as set forth on Schedule 4.9(c), each Seller has timely filed all material U.S. federal, State and other Tax Returns that it was required to file under applicable Law with respect to the Jewel Business or the Acquired Assets, and (i) all such Tax Returns are true, correct, and complete in all material respects, and (ii) all material Taxes with respect to the Jewel Business or the Acquired Assets due (whether or not shown on such Tax Returns) have been fully and timely paid (other than any Taxes not due as of the date of the filing of the Chapter 11 Cases as to which subsequent payment was prohibited by reason of the Chapter 11 Cases and any Taxes that are the subject of a Permitted Lien).

4.10    Compliance with Laws; Permits. The Jewel Business has been operated in compliance with all applicable Laws, and no Seller has received any written notice of any alleged material violation of applicable Law from any Governmental Entity or other Person Relating to the Jewel Business, in either case except as would not, individually or in the aggregate be, or would reasonably be expected to be, material to the Acquired Assets taken as a whole. Sellers hold all material Permits necessary or required pursuant to applicable Law for the operation of the Jewel Business as presently conducted and for the ownership, lease or operation of the Jewel Business and the construction of any material improvements currently under construction on the Leased Real Property. To Sellers' Knowledge, (a) no Seller has received written notice of any material default under any Permit Relating to the Jewel Business and (b) no violations exist in respect of such Permits, except for such non-compliance and such facts, conditions or circumstances, the existence of which would not, individually or in the aggregate, be, or would reasonably be expected to be, material to the Acquired Assets taken as a whole.

4.11    Contracts. Subject to receipt of the Necessary Consents and compliance with Section 6.10, (i) subject to the entry of the Sale Order, each of the Assumed Contracts is in full force and effect and constitutes a valid and binding obligation of the applicable Seller, and, to the Knowledge of Sellers, each other party thereto, and (ii) no Seller is in breach or default in any material respect under any of the Assumed Contracts and, to the Knowledge of Sellers, the other parties to such Contracts are not in breach or default in any material respect thereunder (and in each such case no event exists that with the passage of time or the giving of notice would constitute such material breach or default in any material respect, result in a loss of material rights, result in the payment of any damages or penalties or result in the creation of any Liens thereunder or pursuant thereto other than Permitted Liens). To Sellers' Knowledge, none of the Assumed Contracts have been cancelled or otherwise terminated by Sellers or any counterparty thereto, and neither Sellers nor any counterparty has delivered any written notice to the other party to such Assumed Contract regarding any such cancellation or termination of an Assumed Contract.

4.12    Insurance Claims. Schedule 4.12 contains a true, correct and complete list of all insurances policies as of the Agreement Date (including the names and insurers and policy numbers) that are owned by any Seller or name any Seller as an insured or loss payee and that are Relating to the Jewel Business and a description of all material pending claims under each of such insurance policies pertaining to the ownership and operation of the Jewel Business or the Acquired Assets. Sellers have within the past three (3) years reported all known material Claims or incidents to the respective insurers that have issued current and prior insurance policies insuring the Jewel Business to the extent that any such Claims or incidents would reasonably be expected to create a covered event under the terms and conditions of such policies and Sellers were required to report them pursuant to the terms of the policies.

4.13    Intellectual Property.

(a)    Schedule 4.13(a) sets forth a true, correct and complete list of all material Intellectual Property that is, as of the Agreement Date, issued, registered, or subject to an application for registration that is Transferred Intellectual Property (the "Registered IP").

(b)     Sellers own all Registered IP and all Transferred Intellectual Property free and clear of all Liens (other than Permitted Liens), and such Registered IP remains pending or in full force and effect and has not expired or been cancelled, in each case except as would not, individually or in the aggregate, be, or reasonably be expected to be, material to the Acquired Assets taken as a whole.

(c)     To the Knowledge of Sellers, (i) the Registered IP is valid and enforceable except as enforceability may be limited by applicable bankruptcy, insolvency or similar Laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability and (ii) the past three (3) years of use and current use by Sellers of the Transferred Intellectual Property owned by or licensed to Sellers does not infringe or otherwise violate any Intellectual Property of any other Person except as would not, individually or in the aggregate, be, or reasonably be expected to be, material to the Acquired Assets taken as a whole. Except as provided for in Schedule 4.13(c), there is no Proceeding pending or, to the Knowledge of Sellers, threatened, alleging any such infringement or violation of any Seller's rights in or to the Registered IP or other Transferred Intellectual Property owned by Sellers, except as would not, individually or in the aggregate, be, or reasonably be expected to be, material to the Acquired Assets taken as a whole. Except as provided for in Schedule 4.13(c), to the Knowledge of Sellers, no Person is infringing or otherwise violating the Registered IP or other Transferred Intellectual Property owned by Sellers.

4.14    Anti-Corruption and Sanctions.

(a)     Each Seller and each of such Seller's Subsidiaries, and, to the Knowledge of Sellers, all of their respective directors, officers, agents or employees, has been for the past five (5) years and currently is in compliance in all material respects with, Anti-Corruption Laws and Sanctions, Anti-Money Laundering Laws and Export Control and Customs Laws.

(b)     None of Sellers or any of their Subsidiaries, or, to the Knowledge of Sellers, any directors, officers, agents or employees or Affiliates of Sellers or any of their Subsidiaries, or any other Person acting on their behalf has, (i) directly or indirectly, engaged in any Anti-Corruption Prohibited Activity, (ii) directly or indirectly engaged in any transaction or other business with a Restricted Party in violation of applicable Sanctions, or (iii) been or is the subject of any investigation by any Governmental Entity concerning compliance with Anti-Corruption Laws, Anti-Money Laundering Laws, Export Control and Customs Laws, or Sanctions. None of Sellers or any of their Subsidiaries, nor to the Knowledge of Sellers any of their respective officers, directors, employees, Affiliates or agents acting on their behalf, is a Restricted Party.

4.15    Data Privacy. In connection with its collection, storage, transfer (including transfer across national borders) and/or use of any personally identifiable information from any individuals, including any customers, prospective customers, employees and/or other third parties (collectively "Personal Information"), to the Knowledge of Sellers, each Seller is and, during the last four (4) years, has been in compliance with all applicable Laws in all relevant jurisdictions except as would not, individually or in the aggregate, be, or would reasonably be expected to be, material to the Acquired Assets taken as a whole and has obtained all necessary rights from the individuals and other third parties and complied in all material respects with all other requirements under applicable Laws to enable the use of such Personal Information for the purposes of the Jewel Business (as is customary in the retail and e-commerce industries) following Closing. Each Seller has commercially reasonable physical, technical, organizational and administrative security measures in place to protect all Personal Information collected by it or on its behalf from and against unauthorized access, use and/or disclosure in accordance with applicable Laws and to the Knowledge of the Sellers there have been no security incidents which have resulted in the accidental or unlawful destruction, loss, alteration or unauthorized disclosure of or access to Personal Information during the last four (4) years.

4.16    Sufficiency. Except as set forth on Schedule 4.16, the Acquired Assets constitute all of the material assets, properties, rights and interests sufficient for the operation of the Jewel Business in substantially the same manner as operated as of the Agreement Date.  As of the date hereof, Sellers do not own, hold or have any interest in the Jewel Inventory.

4.17    Exclusive Representations and Warranties. Except for the representations and warranties contained in this Article 4 (as modified by the Disclosure Schedules) and the other Transaction Documents, none of Sellers nor their respective Affiliates, nor any of their respective Representatives, makes or has made any other representation or warranty on behalf of Sellers or otherwise in respect of Sellers or the Jewel Business. Except for the representations and warranties contained in this Article 4 (as modified by the Disclosure Schedules) and the other Transaction Documents, each Seller (a) expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Acquired Assets (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials) and (b) disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Buyer or its Affiliates or Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Buyer by any Representative of Sellers or any of their respective Affiliates). Sellers make no representations or warranties to Buyer regarding the probable success or profitability of the Jewel Business. The disclosure of any matter or item in any schedule hereto will not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material or that such matter would result in a Sellers Material Adverse Effect.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represent and warrant to Sellers, as of the Agreement Date, except as set forth on the Disclosure Schedules, as follows:

5.1    Organization. Buyer is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization. Buyer has all necessary corporate power and authority to own and operate its properties, to lease the property it operates under lease and to conduct its business.

5.2    Due Authorization, Execution and Delivery; Enforceability. Buyer has all requisite corporate power and authority to execute and deliver this Agreement and the other Transaction Documents to which it is (or will become at Closing) a party and to perform its obligations hereunder and thereunder. The execution, delivery and performance by Buyer of this Agreement and the other Transaction Documents to which it is (or will become at Closing) a party and the consummation of the Transactions have been duly and validly authorized by all requisite corporate action on the part of Buyer and no other corporate action on the part of Buyer is necessary to authorize this Agreement and such other Transaction Documents and to consummate the Transactions (subject, in the case of the obligation to consummate the Transactions, to the entry of the Sale Order). This Agreement and the other Transaction Documents to which Buyer is (or will become at Closing) party have been (or will be) duly and validly executed and delivered by Buyer and (assuming the due authorization, execution and delivery by all parties hereto and thereto, other than Buyer) constitute (or will constitute) valid and binding obligations of Buyer enforceable against Buyer in accordance with their terms (subject to the entry of the Bidding Procedures Order and, in the case of the obligation to consummate the Transactions, to the entry of the Sale Order), in each case except as enforceability may be limited by applicable bankruptcy, insolvency or similar Laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability.

5.3     Governmental Approvals. No notice to, consent, approval or authorization of or designation, declaration or filing with any Governmental Entity is required by Buyer with respect to Buyer's execution and delivery of any Transaction Document to which it is (or will become at Closing) a party or the consummation of the Transactions, except (a) as may be required under the HSR Act, (b) the Sale Order having been entered by the Bankruptcy Court, and (c) any consent, approval or authorization of or designation, declaration or filing with any Governmental Entity the failure of which to be made or obtained would not, individually or in the aggregate, be reasonably expected to result in a Buyer Material Adverse Effect.

5.4     No Conflicts. The execution, delivery and performance by Buyer of any Transaction Document to which Buyer is (or will become at Closing) a party and the consummation of the Transactions, does not and will not (a) conflict with or result in any breach of any provision of its certificate of incorporation or bylaws or comparable governing documents, (b) conflict with or result in the breach of the terms, conditions or provisions of or constitute a default (or an event which with notice or lapse of time or both would become a default) under, or give rise to any right of termination, acceleration or cancellation under, any material Contract of Buyer, or (c) result in a violation of any Law or Order applicable to it, except, in the case of clauses (b) and (c), as would not, individually or in the aggregate, result in a Buyer Material Adverse Effect.

5.5     Availability of Funds and Financial Capability. To the extent that any portion of the Purchase Price is payable in cash, Buyer, as of the Closing, will have sufficient funds available to it to pay the cash portion of the Purchase Price on the Closing Date and to enable Buyer to perform all of its obligations under this Agreement. Immediately after giving effect to the consummation of the Transactions: (a) the fair saleable value (determined on a going concern basis) of the assets of Buyer will be greater than the total amount of its Liabilities; (b) Buyer will be solvent and able to pay its respective debts and obligations in the Ordinary Course of Business as they become due; (c) no transfer of property is being made and no obligation is being incurred in connection with the Transactions with the intent to hinder, delay or defraud either present or future creditors of Buyer in connection with the Transactions; (d) Buyer has not incurred, nor plans to incur, debts beyond its ability to pay as they become absolute and matured; and (e) Buyer will have adequate capital to carry on the Jewel Business and all businesses in which it is about to engage.

5.6     Adequate Assurances Regarding Executory Contracts. Buyer (or such of Buyer's Affiliates which will be assuming any Assumed Contract in connection with the assumption and assignment of the Assumed Contracts by the Sellers) is and will be capable of providing adequate assurance of future performance of such Assumed Contract as required by the provisions of the Bankruptcy Code.

5.7     Condition and Location of Acquired Assets. Except as otherwise expressly set forth in this Agreement, Buyer understands and agrees that the Acquired Assets are furnished "as is", "where is" and, subject only to the representations and warranties contained in Article 4, with all faults, limitations and defects (hidden and apparent) and, subject to the representations and warranties contained in Article 4, without any other representation or warranty of any nature whatsoever and without any guarantee or warranty (whether express or implied) as to their title, quality, merchantability or their fitness for Buyer's intended use or a particular purpose or any use or purpose whatsoever.

5.8     Exclusive Representations and Warranties. Except for the representations and warranties contained in this Article 5 (as modified by the Disclosure Schedules), none of Buyer, its Affiliates, nor any of their respective Representatives, makes or has made any other representation or warranty on behalf of Buyer. Except for the representations and warranties contained in this Article 5 (as modified by the Disclosure Schedules), Buyer disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to

Sellers or their respective Affiliates or Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Sellers by any Representative of Buyer or any of their respective Affiliates). The disclosure of any matter or item in any schedule hereto will not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material or that such matter would result in a Buyer Material Adverse Effect.

5.9    No Other Representations or Warranties of Sellers; Disclaimers.

(a)    NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, EXCEPT AS AND TO THE EXTENT EXPRESSLY SET FORTH IN THIS AGREEMENT AND IN THE TRANSACTION DOCUMENTS, BUYER ACKNOWLEDGES AND AFFIRMS THAT SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, AND DISCLAIM ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, STATEMENT OR INFORMATION MADE OR COMMUNICATED (ORALLY OR IN WRITING) TO BUYER (INCLUDING ANY OPINION, INFORMATION, OR ADVICE THAT MAY HAVE BEEN PROVIDED TO BUYER BY ANY RESPECTIVE AFFILIATE OR REPRESENTATIVE OF SELLERS OR BY ANY INVESTMENT BANK OR INVESTMENT BANKING FIRM, SELLERS' COUNSEL, OR ANY OTHER AGENT, CONSULTANT, OR REPRESENTATIVE OF SELLERS). OTHER THAN AS SET FORTH HEREIN OR IN THE OTHER TRANSACTION DOCUMENTS, BUYER FURTHER ACKNOWLEDGES AND AFFIRMS THAT SELLERS MAKE NO REPRESENTATION, COVENANT OR WARRANTY, EXPRESS OR IMPLIED, AS TO THE ACCURACY OR COMPLETENESS OF ANY FILES, RECORDS OR DATA HERETOFORE OR HEREAFTER FURNISHED IN CONNECTION WITH THE ACQUIRED ASSETS (INCLUDING WITHOUT LIMITATION IN ANY CONFIDENTIAL INFORMATION STATEMENT OR MEMORANDUM, MANAGEMENT PRESENTATION, OR DOCUMENT MADE AVAILABLE IN A DATAROOM). OTHER THAN AS SET FORTH HEREIN OR IN THE OTHER TRANSACTION DOCUMENTS, ANY AND ALL SUCH FILES, RECORDS AND DATA FURNISHED BY SELLERS ARE PROVIDED AS A CONVENIENCE, AND ANY RELIANCE ON OR USE OF THE SAME SHALL BE AT BUYER'S SOLE RISK. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EXCEPT AS SET FORTH IN THE TRANSACTION DOCUMENTS, BUYER FURTHER ACKNOWLEDGES AND AFFIRMS THAT SELLERS EXPRESSLY DISCLAIM ANY REPRESENTATION OR WARRANTY, EXPRESS, IMPLIED, AT COMMON LAW, BY STATUTE, OR OTHERWISE, RELATING TO (A) THE TITLE TO ANY OF THE ACQUIRED ASSETS, (B) THE CONDITION OF THE ACQUIRED ASSETS (INCLUDING ANY IMPLIED OR EXPRESS WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR CONFORMITY TO MODELS OR SAMPLES OF MATERIALS), IT BEING UNDERSTOOD THAT, OTHER THAN AS SET FORTH HEREIN OR IN THE OTHER TRANSACTION DOCUMENTS, THE ASSETS ARE BEING SOLD "AS IS," "WHERE IS," AND "WITH ALL FAULTS AS TO ALL MATTERS," (C) FREEDOM FROM HIDDEN OR REDHIBITORY DEFECTS OR VICES, (D) ANY INFRINGEMENT BY SELLERS OF ANY PATENT OR PROPRIETARY RIGHT OF ANY THIRD PARTY, AND (E) ANY INFORMATION, DATA, OR OTHER MATERIALS.

(b)    Buyer acknowledges and affirms that it has made its own independent investigation, analysis, and evaluation of the transactions contemplated hereby and the Acquired Assets (including Buyer's own estimate and appraisal of the extent and value of the Acquired Assets). Buyer acknowledges that in entering into this Agreement, it has relied on the aforementioned investigation. Buyer hereby irrevocably covenants to refrain from, directly or indirectly, asserting any claim, or commencing, instituting, or causing to be commenced, any Proceeding of any kind against Sellers or any of their respective Affiliates or Subsidiaries, alleging facts contrary to the foregoing acknowledgment and affirmation.

## ARTICLE 6
## COVENANTS OF THE PARTIES

6.1    <u>Conduct of Jewel Business Pending the Closing</u>. During the period from the date of this Agreement and continuing until the earlier of the termination of this Agreement in accordance with its terms and the Closing (the "<u>Interim Period</u>"), except (x) as may be required by Order of the Bankruptcy Court (<u>provided</u> that no Seller directly or indirectly petitioned, sought, requested or moved for such order of the Bankruptcy Court or authorized, supported or directed any other Person to petition, seek, request or move for such Order of the Bankruptcy Court), (y) as contemplated in the Liquidation Agreement, or (z) as contemplated by the Approved Budget, Sellers shall carry on the Jewel Business in the Ordinary Course of Business and, to the extent consistent therewith, use commercially reasonable efforts to preserve the Jewel Business intact and preserve the goodwill of and relationships with Governmental Entities, customers, suppliers, employees and others having business dealings with the Jewel Business. Notwithstanding the first sentence of this <u>Section 6.1</u>, during the Interim Period, except (I) as contemplated in the Liquidation Agreement or (II) as contemplated by the Approved Budget, Sellers shall not, and shall cause their Affiliates not to, directly or indirectly, without the prior written consent of Buyer:

(a)    modify, amend, terminate, waive any material rights or obligations under or otherwise seek to reject any Assumed Contract, other than amendments of the Assumed Contracts in the Ordinary Course of Business that are not material to the Jewel Business;

(b)    lease, license, surrender, relinquish, sell, transfer, convey, assign or otherwise dispose of any interest in any Acquired Assets other than (i) Acquired Assets that are not material to the Jewel Business in the Ordinary Course of Business, (ii) pursuant to an Order of the Bankruptcy Court (<u>provided</u> that no Seller directly or indirectly petitioned, sought, requested or moved for such order of the Bankruptcy Court or authorized, supported or directed any other Person to petition, seek, request or move for such Order of the Bankruptcy Court), and (iii) abandoning or permitting to lapse Registered IP that is not material to the Jewel Business or otherwise in the Ordinary Course of Business;

(c)    mortgage, pledge or subject to Liens (other than Permitted Liens) any of the material Acquired Assets or any part thereof;

(d)    except as required by any Benefit Plan or as required by applicable Law, (i) increase the compensation in any material respect of any Employee who is or becomes a Transferred Employee or (ii) accelerate the vesting or payment of the compensation payable to any Employee who is or becomes a Transferred Employee;

(e)    institute, settle, compromise or agree to settle any (i) material Proceeding (other than the Chapter 11 Cases) before any Governmental Entity relating to the Acquired Assets or the Jewel Business or (ii) any pending or threatened Claim that could give rise to Liabilities that are not Assumed Liabilities, or modify in any manner that is adverse to the Jewel Business or the Acquired Assets, rescind, reject or terminate a Transferable Permit (or application therefor) relating to the Acquired Assets;

(f)    with respect to any Acquired Asset, (i) make, change or revoke any material Tax election, (ii) change any annual Tax accounting period, (iii) enter into any agreement with respect to material Taxes or apply for any Tax ruling, (iv) file any amended Tax Return, (v) settle or compromise any Tax Liability or Claim for a Tax refund, (vi) surrender any right to Claim a refund for Taxes, (vii) incur any material Tax Liability outside of the Ordinary Course of Business, (viii) consent to an extension of the statute of limitations applicable to any Tax Claim or assessment (other than pursuant to extensions of time to file Tax Returns obtained in the Ordinary Course of Business) or (ix) change (or request any

Governmental Entity to change) any material aspect of its method of accounting for Tax purposes, in each case, except as required by applicable Law; or

(g)    enter into any Contract to do any of the foregoing.

Nothing contained in this Agreement is intended to give Buyer or its Affiliates, directly or indirectly, the right to control or direct the business of Sellers prior to the Closing.

6.2    <u>Back-Up Bidder</u>. If an Auction is conducted, and Buyer is not the Successful Bidder for the Acquired Assets, Buyer shall, in accordance with and subject to the Bidding Procedures, be required to serve as the back-up bidder if Buyer is the next highest or otherwise best bidder for the Acquired Assets at the Auction (the party that is the next highest or otherwise best bidder at the Auction after the Successful Bidder, the "<u>Back-Up Bidder</u>") and, if Buyer is the Back-Up Bidder, Buyer shall, notwithstanding <u>Section 8.1(b)(ii)</u>, be required to keep its bid to consummate the Transactions on the terms and conditions set forth in this Agreement (as the same may be improved upon by Buyer in the Auction) open and irrevocable until the Outside Back-Up Date. Following the Auction, if the Successful Bidder fails to consummate the applicable Alternative Transaction as a result of a breach or failure to perform on the part of such Successful Bidder, then Buyer, if Buyer is the Back-Up Bidder, will be deemed to have the new prevailing bid, and Sellers may seek authority to consummate the Transactions on the terms and conditions set forth in this Agreement (as the same may be improved upon by Buyer in the Auction) with the Back-Up Bidder.

6.3    <u>Access</u>. Subject to applicable Law, during the Interim Period, Sellers (a) shall give Buyer and its Representatives reasonable access during normal business hours to the offices, properties, officers, employees, accountants, auditors, counsel and other representatives, books and records of Sellers in each case to the extent relating to the Jewel Business, as Buyer reasonably deems necessary in connection with effectuating the transactions contemplated by this Agreement (b) shall furnish to Buyer and its Representatives such financial, operating and property data to the extent relating to the Jewel Business and other information as Buyer and its Representatives reasonably request and (c) shall cooperate reasonably with Buyer in its investigation of the Jewel Business. It is acknowledged and understood that no investigation by Buyer or other information received by Buyer shall operate as a waiver or otherwise affect any representation, warranty or other agreement given or made by Sellers hereunder. Buyer agrees that any on-site inspections of any of the Leased Real Property shall be conducted in the presence of Sellers or their Representatives. All inspections shall be conducted so as not to interfere unreasonably with the use of any of the Leased Real Property by Sellers. Notwithstanding the foregoing, Buyer shall not (i) have, by virtue of this <u>Section 6.3</u>, any additional access or investigation right to the extent it relates to the negotiation of this Agreement or the Transactions or (ii) conduct or cause to be conducted any sampling, testing, or subsurface or otherwise invasive investigation of the air, soil, surface water, groundwater, building materials or other environmental media (commonly known as a Phase II environmental assessment) at any property of Sellers, including any Leased Real Property. Buyer agrees to indemnify and hold Sellers and their Affiliates and their respective Representatives harmless of and from all actions, Claims, investigations, deficiencies, costs and expenses (including attorneys' fees and expenses) that arise out of or relate to physical injuries arising from Buyer's inspection of the Acquired Assets (other than to the extent any of the foregoing results from the willful misconduct of the Person seeking such indemnification), and notwithstanding anything to the contrary in this Agreement, such obligation to indemnify shall survive Closing or any termination of this Agreement.

6.4    <u>Public Announcements</u>. Buyer and Sellers will consult with each other before issuing, and provide each other the opportunity to review and comment upon, any press release or public announcement of this Agreement and the Transactions, and neither Buyer nor any Seller shall issue any such press release or public announcement without the prior approval of the other Party, in each case except as may be required

by Law, court process (including the filing of this Agreement with the Bankruptcy Court as an exhibit to the Sale Motion) or by obligations pursuant to any listing agreement with any national securities exchange. Buyer and each Seller shall cause its Affiliates and Representatives to comply with this <u>Section 6.4</u>.

6.5     <u>Tax Matters</u>.

(a)     All Transfer Taxes arising out of the transfer of the Acquired Assets pursuant to this Agreement shall be borne by Buyer. Sellers and Buyer shall cooperate to timely prepare and file any Tax Returns relating to such Transfer Taxes, including any Claim for exemption or exclusion from the application or imposition of any Transfer Taxes. Buyer or Sellers, as applicable, shall file all necessary documentation and returns with respect to such Transfer Taxes when due, and shall promptly, following the filing thereof, furnish a copy of such return or other filing and a copy of a receipt showing payment of any such Transfer Tax to the other Parties hereto. Buyer shall pay all such Transfer Taxes when due. Notwithstanding the foregoing, Sellers shall be reimbursed by Buyer with respect to any such Transfer Taxes paid by Sellers.

(b)     Each of Buyer, on the one hand, and Sellers, on the other hand, shall furnish or cause to be furnished to the other, upon request, as promptly as practicable, such information and assistance relating to the Acquired Assets and the Jewel Business as is reasonably necessary for filing of all Tax Returns, including any Claim for exemption or exclusion from the application or imposition of any Taxes, the preparation for any audit by any Tax Authority and the prosecution or defense of any Proceeding relating to any Tax Return.

(c)     Buyer and Sellers will use their commercially reasonable efforts to minimize any Transfer Taxes payable in connection with the transfer of the Acquired Assets pursuant to this Agreement, including the transfer via electronic transmission of all assets capable of being so transmitted.

6.6     <u>Approvals; Reasonable Best Efforts; Notification; Consent</u>.

(a)     Subject to the terms and conditions of this Agreement, each Party shall use its reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other Parties in doing, all things necessary, proper or advisable under applicable Law to consummate and make effective the Transactions. Without limiting the generality of the foregoing, the Parties will, at Buyer's sole cost and expense, use their respective reasonable best efforts to (i) prepare and file as soon as practicable all forms, registrations and notices relating to the consents of Governmental Entities that are required by applicable Law to be filed in order to consummate Transactions that are material to the Jewel Business or to Buyer and its Affiliates (with respect to any filing required under the HSR Act, within five (5) Business Days following the Agreement Date, and with respect to any other such filing, as soon as reasonably possible), and take such actions as are reasonably necessary to obtain any consents from, or to avoid any action or proceeding by, any Governmental Entity relating to such approvals, including any Notification and Report Forms in connection with the HSR Act or approvals required under Environmental Law, including notifications and approvals necessary to transfer Permits, licenses and other authorizations required under Environmental Law (to the extent such Permits, licenses and other authorizations are transferable), (ii) take all actions necessary to transfer the Acquired Assets, (iii) take all actions necessary to cause all conditions set forth in <u>Article 7</u> to be satisfied as soon as practicable (iv) lift or rescind any existing Order preventing, prohibiting or delaying the consummation of the Transactions, (v) effect all necessary registration, applications, notices and other filings required by applicable Law, including, as applicable to Sellers, under the Bankruptcy Code, and (vi) execute and deliver any additional instruments necessary to fully carry out the purposes of this Agreement; <u>provided</u>, <u>however</u>, that nothing in this Agreement, including this <u>Section 6.6</u> shall require Buyer to (A) consent to any material condition or material concession required by any Governmental Entity or third party; (B) consent to any

divestitures of any material subsidiary or material assets of Buyer or its Affiliates, or of the Jewel Business or the Acquired Assets or accept any material limitation on or material condition on the manner in which any of the foregoing conducts their business; (C) pay any material amounts required or requested by any Governmental Entity; or (D) accept an agreement to hold separate any material portion of any business or of any material assets of any material subsidiary of Buyer or its Affiliates, or of the Jewel Business or the Acquired Assets. Buyer and Sellers shall not, and shall cause their respective Affiliates not to, take any action that would reasonably be expected to prevent or materially delay the approval of any Governmental Entity of any of the filings referred to in this <u>Section 6.6(a)</u>.

(b)        Each Party shall (i) respond as promptly as reasonably practicable to any inquiries or requests for additional information and documentary material received from any Governmental Entity relating to the matters described in <u>Section 6.6(a)</u>, (ii) not extend any waiting period or agree to refile under the HSR Act (except with the prior written consent of the other Parties hereto, which consent shall not be unreasonably withheld, conditioned or delayed) and (iii) not enter into any agreement with the any Governmental Entity agreeing not to consummate the Transactions.

(c)        In connection with and without limiting the foregoing, each Party shall, subject to applicable Law and except as prohibited by any applicable representative of any applicable Governmental Entity: (i) promptly notify the other Parties of any material written communication to that Party from any Governmental Entity concerning this Agreement or the Transactions, and permit the other Parties to review in advance (and to consider any comments made by the other Parties in relation to) any proposed written communication to any of the foregoing; (ii) not participate in or agree to participate in any substantive meeting, telephone call or discussion with any Governmental Entity in respect of any filings, investigation or inquiry concerning this Agreement or the Transactions unless it consults with the other Parties in advance and, to the extent permitted by such Governmental Entity, gives the other Parties the opportunity to attend and participate in such meeting, telephone call or discussion; and (iii) subject to the attorney-client and similar applicable privileges, furnish outside legal counsel for the other Parties with copies of all correspondence, filings, and written communications (and memoranda setting forth the substance thereof) between such Party and its Affiliates and their respective Representatives, on the one hand, and any Governmental Entity or its members or their respective staffs, on the other hand, with respect to this Agreement and the Transactions; <u>provided</u>, <u>however</u>, that any such Party may limit the disclosure of filings to protect confidential information, including limiting dissemination of filings to an "outside counsel only" basis.

6.7        <u>Employee Matters</u>.

(a)        <u>Employee Offer List</u>. No later than ten (10) Business Days following the Agreement Date, Sellers shall deliver to Buyer <u>Schedule 6.7(a)(i)</u>, setting forth a list of each Employee and contractor, together with each Employee's employing entity, work location (city, state/province, country), job title, base compensation (including salary or hourly rate, as applicable), active/leave status, credited service date, treatment by Sellers and their respective Subsidiaries of any United States employee as exempt or non-exempt, and whether or not subject to an agreement providing for anything other than "at will" employment (the "<u>Employee List</u>").  Not less than ten (10) days prior the anticipated Closing, Buyer shall make available to Sellers <u>Schedule 6.7(a)(ii)</u>, setting forth a list of each Person on the Employee List to whom Buyer has determined to make an offer of employment in connection with the Closing (the "<u>Employee Offer List</u>").

(b)        <u>Transferred Employees</u>. Unless an earlier offer is otherwise required by applicable Law, approximately ten (10) days prior to the anticipated Closing, Buyer may, or may cause one of its Subsidiaries to, make an offer of employment, on such terms and conditions as Buyer may determine in its sole discretion to each Person on the Employee Offer List who then remains employed by any Seller or any

Subsidiary of any Seller (each, an "Employment Offer"). Each Person who accepts an Employment Offer (or any other offer of employment from Buyer or one of its Subsidiaries) and who commences or continues employment with Buyer or its Subsidiaries effective following the Closing (whether or not such offer is first made following the Closing Date and/or such employment commences following the Closing Date) shall be deemed a "Transferred Employee" for purposes of this Agreement.

(c)　　　COBRA and HIPAA. Effective after the Closing, Buyer will, or will cause one of its Affiliates to, be responsible for all Liabilities arising after the Closing with respect to Transferred Employees and their eligible dependents in respect of health insurance under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, the Health Insurance Portability and Accountability Act of 1996, Sections 601, et seq. and Sections 701, et seq. of ERISA, Section 4980B and Sections 9801, et seq. of the Code and applicable state or similar Laws.

(d)　　　No Rights. Nothing in this Section 6.7, express or implied, shall (i) create any third party beneficiary right in any Person (other than the Parties), including any Employee, any other current or former employee or service provider of any Seller or any Subsidiary of any one or more Sellers, any participant in any Benefit Plan, or any dependent or beneficiary thereof, or any right to continued employment or service with any Seller, Buyer or any of their respective Subsidiaries or Affiliates; (ii) be deemed to constitute an amendment to any Benefit Plan or any other compensation or benefit plan, program, policy, agreement or arrangement, or to guarantee or require the employment or service of any Person for any length of time, or with any particular level of any element of compensation or benefit, except as may be required under applicable Law; or (iii) be interpreted to prevent or restrict Buyer or any of its Affiliates from modifying or terminating the employment or terms of employment of any Transferred Employee, including the amendment or termination of any employee benefit or compensation plan, program or arrangement, after the Closing Date. Except as specifically set forth in this Agreement: (X) Buyer shall not be obligated to assume, continue or maintain any Benefit Plans; (Y) no assets or liabilities of the Benefits Plans shall be transferred to, or assumed by, Buyer or Buyer's benefit plans; (Z) Sellers and their Subsidiaries shall be solely responsible for funding and/or paying any benefits under any of the Benefit Plans, including any termination benefits and other employee entitlements accrued under such plans by or attributable to employees of any of the Sellers and their Subsidiaries.

(e)　　　Cooperation. Buyer and Sellers shall, and shall cause their respective Subsidiaries to, reasonably cooperate with each other (including sharing documentation and providing assistance) in connection with the transition of the Transferred Employees pursuant to, and the compliance with, the requirements of this Section 6.7. Sellers shall permit, and cause their respective Subsidiaries to permit, Buyer to contact and make arrangements with such Seller's or Subsidiary's employees regarding employment or prospective employment by Buyer after the Closing and for the purpose of ensuring the continuity of the Jewel Business, and each Seller agrees not to discourage, and to cause their Subsidiaries not to discourage, any such employees from consulting with Buyer. The Sellers shall, and shall cause their respective Subsidiaries to, make available to Buyer such personnel and similar information as Buyer may request with respect to any Transferred Employee, including compensation and employment records.

(f)　　　WARN Act. On the Closing Date, Sellers shall provide to Buyer Schedule 6.7(f), setting forth a list, by date and location, of all employee terminations or layoffs (whether individually or as a group) implemented by any Seller or any Subsidiary of any Seller during the ninety (90) day period preceding the Closing. From and after the Closing, Buyer will, and will cause its Affiliates to, provide any required notice under the WARN Act and otherwise comply with the WARN Act with respect to any "plant closing" or "mass layoff" (as defined in the WARN Act) or group termination or similar event affecting any Transferred Employee.

6.8     <u>Further Assurances</u>. The Parties agree to (a) furnish upon request to each other such further information, (b) execute, acknowledge and deliver to each other such other documents and (c) do such other acts and things, all as the other Party may reasonably request for the purpose of carrying out the intent of this Agreement and the Transaction Documents; <u>provided</u> that nothing in this <u>Section 6.8</u> or this Agreement shall prohibit Sellers from ceasing operations or winding up their affairs following the Closing.

6.9     <u>Bankruptcy Court Filings</u>.

(a)     Promptly upon the selection of Buyer as the Successful Bidder, Sellers shall execute this Agreement and shall pursue the entry of the Sale Order. Sellers shall use commercially reasonable efforts to comply (or obtain an Order from the Bankruptcy Court waiving compliance) with all requirements under the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules in connection with obtaining approval of the Sale Order. Sellers shall consult with Buyer and its Representatives concerning the Sale Order, any other Orders of the Bankruptcy Court relating to the Transactions, and the bankruptcy proceedings in connection therewith, and use commercially reasonable efforts to provide Buyer with copies of applications, pleadings, notices, proposed Orders and other documents relating to such proceedings as soon as reasonably practicable prior to filing. In furtherance of the foregoing, Sellers shall provide Buyer with a reasonable opportunity to review and comment on all material motions to be filed in the Chapter 11 Cases that relate to the Transactions, to the extent practicable, prior to their filing with the Bankruptcy Court.

(b)     Buyer agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of Sale Order and a finding of adequate assurance of future performance by Buyer or Designated Purchaser, as applicable, under the Assumed Contracts, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under section 363(m) of the Bankruptcy Code; <u>provided</u>, <u>however</u>, in no event shall Buyer or Sellers be required to agree to any amendment of this Agreement.

(c)     Sellers further covenant and agree that, after the execution of this Agreement by the Sellers, the terms of any reorganization or liquidation plan submitted to the Bankruptcy Court by either or both of them, or any other court for confirmation or sanction, shall not be intended to (or reasonably likely to) supersede, abrogate, nullify or restrict the terms of this Agreement in any material respect, or prevent the consummation or performance of the Transactions, in each case except as expressly permitted pursuant to <u>Section 6.2</u> or the Bidding Procedures.

6.10     <u>Cure Costs</u>. On the Closing Date, Sellers shall transfer and assign the Assumed Contracts to Buyer or Designated Purchaser, as applicable, pursuant to Section 365 of the Bankruptcy Code and the Sale Order. Buyer or Designated Purchaser, as applicable, shall assume all Assumed Contracts from Sellers, as of the Closing Date pursuant to the Sale Order.  In connection with the assumption and assignment of the Assumed Contracts, Buyer or Designated Purchaser, as applicable, shall cure any monetary defaults under the Assumed Contracts by payment of any Cure Costs (or create reserves therefor) as determined in accordance with the Bidding Procedures Order. Buyer or Designated Purchaser, as applicable, shall be responsible for demonstrating and establishing adequate assurance of future performance before the Bankruptcy Court with respect to the Assumed Contracts.

6.11     <u>Preservation of Books and Records</u>. After the Closing Date, Buyer shall provide to Sellers and their respective Affiliates and Representatives (after reasonable notice and during normal business hours and without charge to Sellers other than the costs of copying, if any) reasonable access to, including the right to make copies of, all books and records included in and otherwise related to the Acquired Assets,

to the extent necessary to permit Sellers to determine any matter relating to its rights and obligations hereunder or to any period ending on or before the Closing Date (for example, for purposes of any Tax or accounting audit or any claim or litigation matter, but not for any dispute or claim between Buyer and Seller in connection with this Agreement, the Transaction Documents or otherwise), for periods prior to the Closing and shall preserve such books and records until the later of (i) such period as shall be consistent with Buyer's records retention policy in effect from time to time, (ii) the retention period required by applicable Law, (iii) the conclusion of all bankruptcy proceedings relating to the Chapter 11 Cases or (iv) in the case of books and records relating to Taxes, the expiration of the statute of limitations applicable to such Taxes. Such access shall include access to any information in electronic form to the extent reasonably available. Buyer acknowledges that Sellers have the right to retain originals or copies of all of books and records included in or related to the Acquired Assets for periods prior to the Closing.

6.12    Bulk Transfer Laws. The Parties intend that pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any security interests in the Acquired Assets, including any liens or claims arising out of the bulk transfer laws, and the parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order. In furtherance of the foregoing, each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the transactions contemplated by this Agreement.

6.13    Overhead and Shared Services; Transition Services.

(a)    Except as set forth in the Transition Services Agreement, Buyer acknowledges and agrees that, effective as of the Closing Date: (i) all Overhead and Shared Services provided to the Jewel Business shall cease; and (ii) Sellers and their Affiliates shall have no further obligation to provide any such Overhead and Shared Services to the Jewel Business.

(b)    Except as set forth in the Transition Services Agreement, Buyer agrees to assume responsibility for, and pay all expenses in connection with, removing, transporting or relocating all Acquired Assets that, at the Closing, are located at any of the facilities or Real Property of any Seller or any of their Affiliates, and which, if reasonably requested by Buyer, have been packaged by any Seller (which packaging shall be at Buyer's cost and expense) for transport, other than any Acquired Assets that will be used by Sellers in connection with their performance of the Transition Services Agreement. Such removal, transportation or relocation shall be completed by Buyer within thirty (30) days following the Closing Date or, in the case of Acquired Assets used by Sellers in connection with their performance of the Transition Services Agreement, within thirty (30) days following the termination or expiration of the applicable service(s) under the Transition Services Agreement or as otherwise specifically provided in the Transition Services Agreement. Sellers agree, from and after the Closing Date or the date of termination of the Transition Services Agreement, to provide Buyer, its agents and employees, reasonable access to such facilities during reasonable business hours and upon reasonable notice for purposes of removing such Acquired Assets. Sellers shall have no Liability to Buyer in connection with the storage at, or removal from, such facilities of such Acquired Assets after the Closing, and risk of loss with respect to such Acquired Assets shall pass to Buyer upon the Closing. Buyer shall be responsible for the costs of repairing any damage to such facilities resulting from the removal of such Acquired Assets therefrom after the Closing Date.

6.14    Payments from Third Parties After Closing. Subject to any applicable terms in the Transition Services Agreement, in the event that any Seller receives any payment from a third party (other than Buyer or any of its Affiliates) after the Closing Date pursuant to any of the Assumed Contracts (or with respect to the operation by Buyer of the Jewel Business or any Acquired Asset during the post-Closing period) and to the extent such payment is not in respect of an Excluded Asset or an Excluded Liability,

Sellers shall forward such payment, as promptly as practicable but in any event within thirty (30) days after such receipt, to Buyer (or other entity nominated by Buyer in writing to Sellers) and notify such third party to remit all future payments (in each case, to the extent such payment is in respect of any post-Closing period with respect to the Jewel Business and is not in respect of an Excluded Asset or an Excluded Liability) pursuant to the Assumed Contracts to Buyer (or such other entity). Notwithstanding anything to the contrary in this Agreement, in the event that Buyer or any of its Affiliates receives any payment from a third party after the Closing on account of, or in connection with, any Retained Business and/or any Excluded Asset, Buyer shall forward such payment, as promptly as practicable but in any event within thirty (30) days after such receipt, to Sellers (or other entity nominated by Sellers in writing to Buyer) and notify such third party to remit all future payments on account of or in connection with the Retained Business and any Excluded Assets to Sellers (or such other entity).

6.15    Letters of Credit. On the Closing Date, Buyer shall, at its sole cost and expense, (i) use commercially reasonable efforts to replace any letters of credit, banker's acceptance or similar credit transactions that secure any Assumed Liabilities of Sellers or their Affiliates Relating to the Jewel Business and (ii) cause such letters of credit, banker's acceptance or similar credit transactions to be released and returned to the Sellers.

6.16    Notification of Certain Matters.

(a)    Gemstone will promptly notify Buyer of: (i) any written notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement, except with respect to any consent the failure of which to be obtained would not be, or reasonably be expected to be, material to the Acquired Asset; (ii) any written notice or other communication from any Governmental Entity (other than the Chapter 11 Cases) related to or in connection with the transactions contemplated by this Agreement; and (iii) promptly upon discovery thereof, any material variances from, or the existence or occurrence of any event, fact or circumstance arising after the execution of this Agreement that would reasonably be expected to cause any of the representations and warranties contained in Article 4 to be untrue or inaccurate in a manner that would reasonably be expected to cause the conditions set forth in Section 7.1 not to be satisfied.

(b)    Sellers shall use their reasonable best efforts to deliver to Buyer the following additional information (as of the Agreement Date) within ten (10) Business Days after the Agreement Date:

(i)    a true and correct list of all material Benefit Plans;

(ii)    with respect to the material Benefit Plans, true and complete copies of the plan documents and any amendments thereto;

(iii)    a true and complete list of all Contracts Relating to the Jewel Business or that are otherwise material to the Jewel Business, and true and complete copies of all such Contracts, each as amended as of the Agreement Date;

(iv)    a true and correct list of any letters of credit, banker's acceptance or similar credit transactions that secure any Assumed Liabilities of Sellers or their Affiliates Relating to the Jewel Business;

(v)    a true, accurate and complete list of each lease, ground lease, sublease, license, option or other agreement related to the Leased Real Property; and

(vi)    a true and complete list of each Necessary Consent.

6.17    <u>Confidentiality</u>.

(a)    Upon and for a period of one (1) year following the Closing, Sellers shall, and shall cause their respective Affiliates and representatives to, keep confidential all non-public information regarding the Acquired Assets or the Jewel Business, except for (i) such public disclosure as Sellers and its counsel may reasonably determine to be required under any applicable Law, regulation, stock exchange requirement or Order (<u>provided</u> that Sellers will provide Buyer with prior written notice of any such disclosure to the extent permitted by applicable Law and, where applicable and reasonably requested by Buyer and at Buyer's sole cost and expense, Sellers will use commercially reasonable efforts to cooperate with Buyer to obtain a protective order or other confidential treatment or otherwise limit the scope of information that is required to be disclosed, and Sellers shall only disclose that portion of such information as Sellers are advised by its in counsel in writing is required to be disclosed) and (ii) disclosure to its representatives solely to the extent that such parties need to know such information and agree to be bound by confidentiality obligations no less protective than those set forth in this <u>Section 6.17</u>. Sellers will be responsible for any disclosure by their respective Affiliates and representatives of any such non-public information regarding the Acquired Assets or the Jewel Business to the same degree as if such disclosure were made by Sellers.

(b)    During the Interim Period, Buyer shall, and shall cause its Affiliates, Designated Purchasers (if any) and representatives to, abide by the confidentiality provisions set forth in that certain Confidentiality Agreement, dated as of December 14, 2018, by and between Gemstone and Buyer.

6.18    <u>Communication With Other Bidders</u>. Unless prohibited by Law, Buyer (and its representatives) may, with the prior written approval of Sellers (which such approval may be granted or withheld in Sellers' sole discretion) initiate, participate or agree to participate in any meeting or engage in substantive discussion with any potential bidders in the Auction regarding this Agreement, the Transactions, the Jewel Business, the Auction, the Retained Business or any matter related thereto (including discussions regarding potential joint bidding arrangements or stalking horse bids with respect to specific parts of the Jewel Business). Gemstone and its representatives shall have the right to attend and participate in any such discussions, subject to appropriate confidentiality arrangements, and Buyer and its representatives shall cooperate and work together in good faith with Gemstone and its representatives, and keep Gemstone and its representatives reasonably informed, in connection with any such meeting or substantive discussion.

6.19    <u>Personally Identifiable Information</u>. Buyer acknowledges that the Acquired Assets include personally identifiable information within the meaning of Section 363(b) of the Bankruptcy Code, including personal information about the Sellers' customers (such Acquired Assets collectively, "<u>PII</u>"). In connection therewith, from and after the Closing, Buyer shall: (a) maintain appropriate security controls and procedures (technical, operational, managerial and otherwise) to protect PII, (b) abide by all Laws applicable to PII and (c) take such further actions with respect to PII as may be agreed between the Parties in their discretion. Buyer further agrees that it shall (i) abide by Sellers' privacy policies and privacy-related covenants made in Sellers' terms of service that were in effect as of the Petition Date with respect to such PII (it being understood that Buyer may revise such policies and terms as provided by such policies and terms), (ii) respect prior requests of customers to opt out of receipt of marketing messages (to the extent Sellers make Buyer aware of such requests; <u>provided</u>, that Buyer shall seek to obtain such information from Sellers) and (iii) use personal information only for the purposes of continuing Jewel Business operations and continuing to provide similar goods and services to customers, including marketing the products and services related to Acquired Assets or as otherwise permitted by Sellers' privacy policies or privacy-related covenants made in Sellers' terms of service.

6.20    <u>Sell-Off of Inventory</u>. From and after the Closing, Sellers shall use commercially reasonable efforts to enforce any covenant included in any agreement to which any Seller is a party that

restricts, conditions or limits the ability of any Person to sell Inventory manufactured for the Jewel Business and Seller shall not amend, modify or waive any such covenant without the prior written consent of Buyer.

6.21    <u>Asset Identification</u>. If Sellers gain Knowledge of any property, asset, interest and right of every nature, tangible and intangible, of Sellers, real or personal, now existing or hereafter acquired, whether or not reflected on the books or financial statements of Sellers as the same shall exist on the Closing Date, Relating to the Jewel Business that is neither (i) an Acquired Asset nor (ii) an Excluded Asset under <u>Section 2.2(a)</u> through <u>Section 2.2(k)</u> or <u>Section 2.2(i)</u> or <u>Section 2.2(k)</u> through <u>Section 2.2(o)</u> (the "<u>Additional Assets</u>"), then at the written request of Buyer and without any further consideration, Sellers shall use their reasonable best efforts to (a) execute and deliver to Buyer such other instruments of sale, transfer, conveyance, assignment and confirmation; (b) provide such materials and information; and (c) take such other actions, as Buyer may reasonably deem necessary or desirable in order to transfer, convey, and assign to Buyer, to confirm Buyer's title to the Additional Assets. Notwithstanding anything to the contrary set forth herein, the Additional Assets shall be Acquired Assets for all purposes of this Agreement.

# ARTICLE 7
## CONDITIONS TO OBLIGATIONS OF THE PARTIES

7.1    <u>Conditions Precedent to Obligations of Buyer</u>. The obligation of Buyer to consummate the Transactions is subject to the satisfaction (or written waiver by Buyer in Buyer's sole discretion) at or prior to the Closing Date of each of the following conditions:

(a)    Accuracy of Representations and Warranties. The representations and warranties of Sellers (i) set forth in Section 4.1 (*Organization*) and Section 4.2 (*Due Authorization*) (collectively, the "Seller Fundamental Representations") shall be true and correct in all respects and (ii) set forth in Article 4 (other than the Seller Fundamental Representations) shall be true and correct (disregarding all qualifications or limitations as to "materiality" or "Sellers Material Adverse Effect" and words of similar import set forth therein), except where the failure of such representations or warranties to be true and correct would not reasonably be expected to have a Sellers Material Adverse Effect, in the case of each of clauses (i) and (ii), as of the Agreement Date and at and as of the Closing as though made at and as of the Closing (in each case, except to the extent expressly made as of another date, in which case as of such date as if made at and as of such date).

(b)    <u>Performance of Obligations</u>. Sellers shall have performed in all material respects all obligations and agreements contained in this Agreement required to be performed by them on or prior to the Closing Date.

(c)    <u>Officer's Certificate</u>. Buyer shall have received a certificate, dated the Closing Date, of an executive officer of each Seller to the effect that the conditions specified in <u>Sections 7.1(a)</u> and <u>7.1(b)</u> above have been fulfilled and/or waived.

(d)    <u>Antitrust Approval</u>. All applicable waiting periods under the HSR Act related to the Transactions shall have expired or been terminated, if required.

(e)    <u>Sale Order</u>. After notice and a hearing as defined in Section 102(1) of the Bankruptcy Code, the Bankruptcy Court shall have entered the Sale Order, and such Sale Order shall be in full force and effect and shall not have been reversed, stayed, modified, amended or vacated, and as to which the time to appeal or seek certiorari or move for a vacatur, new trial, reargument or rehearing has expired, and no appeal or petition for certiorari or other proceedings for a vacatur, new trial, reargument or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the Order was

appealed or from which certiorari was sought or the vacatur, new trial, reargument or rehearing shall have been denied or resulted in no modification of such Order.

(f)    No Order. No court or other Governmental Entity has issued, enacted, entered, promulgated or enforced any Law or Order (that is final and non-appealable and that has not been vacated, withdrawn or overturned) restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement.

(g)    No Sellers Material Adverse Effect.  No Sellers Material Adverse Effect has occurred since the date hereof that is continuing.

(h)    Selection of Buyer as Successful Bidder.  Buyer shall have been selected as Successful Bidder.

(i)    Inventory Purchase Agreement.  The Inventory Purchase Agreement shall be in full force and effect.

7.2    Conditions Precedent to the Obligations of Sellers. The obligation of Sellers to consummate the Transactions is subject to the satisfaction (or written waiver by Sellers) at or prior to the Closing Date of each of the following conditions:

(a)    Accuracy of Representations and Warranties. The representations and warranties of Buyer (i) set forth in Section 5.1 (*Organization*) and Section 5.2 (*Due Authorization*), shall be true and correct in all material respects and (ii) set forth in Article 5 (other than those described in clause (i)) shall be true and correct (disregarding all qualifications or limitations as to "materiality" or "Buyer Material Adverse Effect" and words of similar import set forth therein), except where the failure of such representations or warranties to be true and correct would not reasonably be expected to have a Buyer Material Adverse Effect, in the case of each of clauses (i) and (ii), as of the Agreement Date and at and as of the Closing as though made at and as of the Closing (in each case, except to the extent expressly made as of another date, in which case as of such date as if made at and as of such date).

(b)    Performance of Obligations. Buyer shall have performed in all material respects all obligations and agreements contained in this Agreement required to be performed by it on or prior to the Closing Date.

(c)    Officer's Certificate. Sellers shall have received a certificate, dated the Closing Date, of an executive officer of Buyer to the effect that the conditions specified in Sections 7.2(a) and 7.2(b) above have been fulfilled and/or waived.

(d)    Antitrust Approval. All applicable waiting periods under the HSR Act related to the Transactions shall have expired or been terminated, if required.

(e)    Sale Order. After notice and a hearing as defined in Section 102(1) of the Bankruptcy Code, the Bankruptcy Court shall have entered the Sale Order, and such Sale Order shall be in full force and effect and shall not have been reversed, stayed, modified, amended or vacated, and as to which the time to appeal or seek certiorari or move for a vacatur, new trial, reargument or rehearing has expired, and no appeal or petition for certiorari or other proceedings for a vacatur, new trial, reargument or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the Order was appealed or from which certiorari was sought or the vacatur, new trial, reargument or rehearing shall have been denied or resulted in no modification of such Order.

(f)     No Order. No court or other Governmental Entity has issued, enacted, entered, promulgated or enforced any Law or Order (that is final and non-appealable and that has not been vacated, withdrawn or overturned) restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement.

7.3     Frustration of Conditions Precedent. None of Buyer or Sellers may rely on the failure of any condition set forth in this Article 7, as applicable, to be satisfied if such failure was caused by such Party's failure to use, as required by this Agreement, its reasonable best efforts to consummate the Transactions contemplated hereby.

## ARTICLE 8
## TERMINATION

8.1     Termination of Agreement. This Agreement may be terminated and the Transactions abandoned at any time prior to the Closing:

(a)     by written agreement of Sellers and Buyer;

(b)     by either Sellers or Buyer:

(i)     if there shall be any Law that makes consummation of the Transactions illegal or otherwise prohibited, or if any Order permanently restraining, prohibiting or enjoining Buyer or Sellers from consummating the Transactions is entered and such Order shall become final, provided, however, that no termination may be made by a Party under this Section 8.1(b)(i) if the issuance of such Order was caused by the breach or action or inaction of such Party;

(ii)     subject to Section 6.2, upon the filing of a motion by a Seller to approve an Alternative Transaction or the Bankruptcy Court's entry of an order approving an Alternative Transaction; or

(iii)     if (A) a trustee or an examiner with expanded powers is appointed in any of the Chapter 11 Cases or (B) any of the Chapter 11 Cases is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code;

(c)     by Buyer if (i) there shall have been a breach by any Seller of any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in Section 7.1, or (ii) any other event or condition shall result in any Seller being incapable of satisfying one or more conditions set forth in Section 7.1, and in either case such breach or other event or condition shall be incapable of being cured or, if capable of being cured, shall not have been cured within twenty (20) days after written Notice thereof shall have been received by Sellers; provided, that as of such date, Buyer is not in breach of this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in Section 7.2;

(d)     by Buyer if, subject to Section 6.2, Buyer is not selected as the Successful Bidder or the Back-Up Bidder at the Auction;

(e)     by Sellers, if (i) there shall have been a breach by Buyer of any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in Section 7.2, or (ii) any other event or condition shall result in Buyer being incapable of satisfying one or more conditions set forth in Section 7.2, and in either case such breach or other event or condition shall be incapable of being cured or,

if capable of being cured, shall not have been cured within twenty (20) days after written Notice thereof shall have been received by Buyer; provided that as of such date, any Seller is not in breach of this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in Section 7.1;

(f)    by Buyer if a Sale Order has not been entered on or before March 15, 2019, and by Buyer or Sellers if the Closing shall not have occurred on or before March 15, 2019; provided, however, that a Party shall be permitted to terminate this Agreement pursuant to this Section 8.1(f) only if such Party is not itself in material breach of any of its representations, warranties, covenants or agreements contained herein;

(g)    by Sellers if the governing body of any Seller determines, upon advice from outside legal counsel, that proceeding with the Transactions or failing to terminate this Agreement would violate its or such governing body's fiduciary obligations under applicable Law, including to pursue an Alternative Transaction. For the avoidance of doubt, and subject to the terms and conditions of this Agreement (including Buyer's right to terminate this Agreement in accordance with this Section 8.1(g)), Sellers retain the right to pursue any transaction or restructuring strategy that, in Sellers' business judgment, will maximize the value of their estates, provided however, that if Sellers terminate this Agreement (other than pursuant to Section 7.1(e)) at any time after Buyer has been selected as the Successful Bidder, Sellers shall promptly return Buyer's Good Faith Deposit and Incremental Deposit Amount, if applicable; and

(h)    by written notice from Buyer to Gemstone, if Buyer is neither the Successful Bidder nor the Backup Bidder following the Auction.

8.2    Consequences of Termination. In the event of any termination of this Agreement by either or both of Buyer and Sellers pursuant to Section 8.1, written Notice thereof shall be given by the terminating Party to the other Parties hereto, specifying the provision hereof pursuant to which such termination is made, this Agreement shall thereupon terminate and become void and of no further force and effect (other than Section 6.4 (*Public Announcements*), this Section 8.2 (*Consequences of Termination*) and Article 9 (*Miscellaneous*) and to the extent applicable in respect of such Sections and Article, Article 1 (*Definitions*)), and the Transactions shall be abandoned without further action of the Parties hereto, except that such termination shall not relieve (a) Sellers of their Liability to make payments required by Section 8.1(g) or (b) any Party of any Liability for Fraud or willful breach of this Agreement.

## ARTICLE 9
## MISCELLANEOUS

9.1    Expenses. Except as set forth in this Agreement and whether or not the Transactions are consummated, each Party hereto shall bear all costs and expenses incurred or to be incurred by such Party in connection with this Agreement and the consummation of the Transactions.

9.2    Assignment. Neither this Agreement nor any of the rights or obligations hereunder may be assigned by Sellers without the prior written consent of Buyer, or by Buyer without the prior written consent of Sellers; provided, that Buyer may assign its rights and obligations to a Designated Purchaser so long as Buyer remains primarily liable for its obligations. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns including any liquidating trustee, responsible Person or similar representative for Sellers or Sellers' estate appointed in connection with the Chapter 11 Cases.

9.3    Parties in Interest. This Agreement shall be binding upon and inure solely to the benefit of Sellers (and their estates), Buyer and their respective successors or permitted assigns, and nothing in this

Agreement, express or implied, is intended to or shall confer upon any other Person any rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement except as expressly set forth herein.

9.4    <u>Releases</u>. Effective as of the Closing:  (a) Sellers hereby release Buyer and its Affiliates and the equityholders, directors, managers, officers, employees, members, partners, limited partners, agents and representatives of Buyer and its Affiliates (collectively, the "<u>Buyer Released Parties</u>") from any and all Liabilities, actions, rights of action, contracts, indebtedness, obligations, Claims, causes of action, suits, damages, demands, costs, expenses and attorneys' fees whatsoever, of every kind and nature, known or unknown, disclosed or undisclosed, accrued or unaccrued, existing at any time, in all circumstances arising prior to Closing, that any Seller or its respective Affiliates and all such Persons' respective successors and assigns, have or may have against any of Buyer Released Parties; provided that the foregoing shall not release any rights under this Agreement or any other Transaction Document; and (b) Buyer hereby releases Sellers and their respective Affiliates, and the equityholders, directors, managers, officers, employees, members, partners, limited partners, agents and representatives of Sellers and their respective Affiliates (collectively, the "<u>Sellers Released Parties</u>") from any and all Liabilities, actions, rights of action, contracts, indebtedness, obligations, Claims, causes of action, suits, damages, demands, costs, expenses and attorneys' fees whatsoever, of every kind and nature, known or unknown, disclosed or undisclosed, accrued or unaccrued, existing at any time, in all circumstances arising prior to Closing, that Buyer and its Affiliates and all of its and their respective successors and assigns, have or may have against any of Sellers Released Parties in relation to Gymboree Holding Corporation, a Delaware corporation, or any of its Subsidiaries (including Sellers), or the Transactions contemplated hereby; provided that the foregoing shall not release any rights under this Agreement or any other Transaction Document.

9.5    <u>Notices</u>. All notices, demands, requests, consents, approvals or other communications (collectively, "<u>Notices</u>") required or permitted to be given hereunder or that are given with respect to this Agreement shall be in writing and shall be personally served, delivered by a nationally recognized overnight delivery service with charges prepaid, or transmitted by hand delivery, or facsimile or electronic mail, addressed as set forth below, or to such other address as such Party shall have specified most recently by written Notice. Notice shall be deemed given on the date of service or transmission if personally served or transmitted by facsimile or electronic mail with confirmation of receipt; <u>provided</u> that if delivered or transmitted on a day other than a Business Day or after 5:00 p.m. New York time, notice shall be deemed given on the next Business Day. Notice otherwise sent as provided herein shall be deemed given on the next Business Day following timely deposit of such Notice with an overnight delivery service:

If to any Seller or Sellers' Representative:

> Gymboree Group, Inc.
> 71 Stevenson Street, Suite 2200
> San Francisco, CA 94105
> Attention:       Jon W. Kimmins and Kimberly Holtz MacMillan
> Email:            jon_kimmins@gymboree.com and
>                        kimberly_macmillan@gymboree.com

With copies (which shall not constitute notice) to:

> Milbank LLP
> 55 Hudson Yards
> New York, NY 10001
> Attention:       Evan R. Fleck and Scott W. Golenbock
> Email:            efleck@milbank.com and sgolenbock@milbank.com

If to Buyer:          The Gap, Inc.
                    Two Folsom Street
                    San Francisco, CA 94105
                    Attention:     Julie Gruber
                    Email:       julie_gruber@gap.com

With copies (which shall not constitute notice) to:

                    Orrick, Herrington & Sutcliffe, LLP
                    405 Howard Street
                    San Francisco, CA 94105-2669
                    Attention:     Brett Cooper
                    Email:       bcooper@orrick.com

Rejection of or refusal to accept any Notice, or the inability to deliver any Notice because of changed address of which no Notice was given, shall be deemed to be receipt of the Notice as of the date of such rejection, refusal or inability to deliver.

9.6    <u>Choice of Law</u>. This Agreement shall be construed and interpreted, and the rights of the Parties shall be determined, in accordance with the Laws of the State of New York, without giving effect to any provision thereof that would require or permit the application of the substantive laws of any other jurisdiction.

9.7    <u>Entire Agreement; Amendments and Waivers</u>. This Agreement, the Sale Order, and all Transaction Documents and all certificates and instruments delivered pursuant hereto and thereto constitute the entire agreement among the Parties pertaining to the subject matter hereof and supersede all prior agreements, understandings, negotiations, and discussions, whether oral or written, of the Parties. This Agreement may be amended, supplemented or modified, and any of the terms, covenants, representations, warranties or conditions may be waived, only by a written instrument executed by Buyer and Sellers, or in the case of a waiver, by the Party waiving compliance. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), and no such waiver shall constitute a continuing waiver unless otherwise expressly provided.

9.8    <u>Counterparts; Facsimile and Electronic Signatures</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. Counterparts to this Agreement may be delivered via facsimile or electronic mail. In proving this Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the Party against whom enforcement is sought.

9.9    <u>Severability</u>. The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement. In the event that any of the provisions of this Agreement shall be held by a court or other tribunal of competent jurisdiction to be illegal, invalid or unenforceable, such provisions shall be limited or eliminated only to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect.

9.10    <u>Headings</u>. The table of contents and the headings of the Articles and Sections herein are inserted for convenience of reference only and are not intended to be a part of, or to affect the meaning or interpretation of, this Agreement.

9.11    Exclusive Jurisdiction and Specific Performance.

(a)    Subject to Section 9.11(b), without limiting any Party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any Claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transactions, and (ii) any and all Proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive Notices at such locations as indicated in Section 9.5. For the avoidance of doubt, this Section 9.11 shall not apply to any Claims that Buyer or its Affiliates may have against any third party following the Closing.

(b)    Notwithstanding anything herein to the contrary, in the event the Chapter 11 Cases of Sellers are closed or dismissed, the Parties hereby agree that all Claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transactions, shall be heard and determined exclusively in any federal court sitting in the Borough of Manhattan in the City of New York or, if that court does not have subject matter jurisdiction, in any state court located in the City and County of New York (and, in each case, any appellate court thereof), and the Parties hereby consent to and submit to the jurisdiction and venue of such courts.

(c)    Buyer acknowledges that Sellers would be damaged irreparably in the event that the terms of this Agreement are not performed by Buyer in accordance with its specific terms or otherwise breached or Buyer fails to consummate the Closing and that, in addition to any other remedy that Sellers may have under law or equity, Sellers shall be entitled to seek injunctive relief to prevent breaches of the terms of this Agreement and to seek to enforce specifically the terms and provisions hereof that are required to be performed by Buyer. Buyer further agrees that no Seller shall be required to obtain, furnish or post any bond or similar instrument in connection with or as a condition to obtaining any remedy referred to in this Section 9.11, and irrevocably waives any right it may have to require the obtaining, furnishing or posting of any such bond or similar instrument.

(d)    Sellers acknowledge that Buyer would be damaged irreparably in the event that the terms of this Agreement are not performed by Sellers in accordance with its specific terms or otherwise breached or Sellers fail to consummate the Closing and that, in addition to any other remedy that Buyer may have under law or equity, Buyer shall be entitled to seek injunctive relief to prevent breaches of the terms of this Agreement and to seek to enforce specifically the terms and provisions hereof that are required to be performed by Sellers. Each Seller further agrees that Buyer shall not be required to obtain, furnish or post any bond or similar instrument in connection with or as a condition to obtaining any remedy referred to in this Section 9.11, and irrevocably waives any right it may have to require the obtaining, furnishing or posting of any such bond or similar instrument.

9.12    WAIVER OF RIGHT TO TRIAL BY JURY. SELLERS AND BUYER HEREBY WAIVE TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). FOR THE AVOIDANCE OF DOUBT, THIS SECTION 9.12 SHALL NOT APPLY TO ANY CLAIMS THAT BUYER OR ITS AFFILIATES MAY HAVE AGAINST ANY THIRD PARTY FOLLOWING THE CLOSING.

9.13    Survival. Each and every representation and warranty contained in this Agreement shall expire and be of no further force and effect as of the Closing. Each and every covenant and agreement contained in this Agreement (other than the covenants contained in this Agreement which by their terms

are to be performed (in whole or in part) by the Parties following the Closing (each, a "Post-Closing Covenant")) shall expire and be of no further force and effect as of the Closing. Each Post-Closing Covenant shall survive the Closing until the earlier of (a) performance of such Post-Closing Covenant in accordance with this Agreement or, (b) (i) if time for performance of such Post-Closing Covenant is specified in this Agreement, sixty (60) days following the expiration of the time period for such performance or (ii) if time for performance of such Post-Closing Covenant is not specified in this Agreement, the expiration of the applicable statute of limitations with respect to any claim for any failure to perform such Post-Closing Covenant; provided that if a written notice of any claim with respect to any Post-Closing Covenant is given prior to the expiration thereof then such Post-Closing Covenant shall survive until, but only for purposes of, the resolution of such claim by final, non-appealable judgment or settlement.

9.14    Computation of Time. In computing any period of time prescribed by or allowed with respect to any provision of this Agreement that relates to Sellers or the Chapter 11 Cases, the provisions of rule 9006(a) of the Federal Rules of Bankruptcy Procedure shall apply.

9.15    Time of Essence. Time is of the essence of this Agreement.

9.16    Non-Recourse. No past, present or future director, manager, officer, employee, incorporator, member, partner or equity holder of any Seller shall have any Liability for any Liabilities of such Seller under this Agreement or for any Claim based on, in respect of, or by reason of the Transactions.

9.17    Disclosure Schedules. Except as set forth in this Agreement, the inclusion of any information (including dollar amounts) in Disclosure Schedules shall not be deemed to be an admission or acknowledgment by any Party that such information is required to be listed on such section of the relevant schedule or is material to or outside the Ordinary Course of Business of any Person. The information contained in this Agreement, the exhibits hereto and the Disclosure Schedules is disclosed solely for purposes of this Agreement, and no information contained herein or therein shall be deemed to be an admission by any Party to any third party of any matter whatsoever (including any violation of any Law or breach of contract). Unless the context otherwise requires, all capitalized terms used in the Disclosure Schedules shall have the respective meanings assigned in this Agreement. The Disclosure Schedules set forth items of disclosure with specific reference to the particular Section or subsection of this Agreement to which the information in the Disclosure Schedules relates; provided, however, that any information set forth in one Section of the Disclosure Schedules will be deemed to apply to each other section or subsection thereof to which its relevance is reasonably apparent on its face.

9.18    Sellers' Representative; Dealings Among Sellers. By its execution and delivery of this Agreement, each Seller hereby irrevocably constitutes and appoints Gemstone as its true and lawful agent and attorney-in-fact (the "Sellers' Representative"), with full power of substitution to act in such Seller's name, place and stead with respect to all Transactions and all terms and provisions of this Agreement, and to act on such Seller's behalf in any Proceeding, and to do or refrain from doing all such further acts and things, and execute all such documents as Sellers' Representative shall deem necessary or appropriate in connection with the Transactions. The appointment of Sellers' Representative shall be deemed coupled with an interest and shall be irrevocable, and Buyer, its Affiliates and any other Person may conclusively and absolutely rely, without inquiry, upon any action of Sellers' Representative on behalf of Sellers in all matters referred to herein or contemplated hereby including any direction regarding the amount of any payment to any Seller. Buyer shall have no obligation of any nature whatsoever for determining any allocation of any payments among Sellers. Without limiting the generality of the foregoing, absent specific direction by Sellers' Representative, Buyer shall be deemed to have fulfilled its obligations hereunder absolutely with respect to any amounts payable by it under or pursuant to this Agreement or the delivery of any instruments if Buyer shall pay any such amounts or deliver such instruments to Sellers' Representative. All Notices delivered by Buyer (whether prior to or following the Closing) to Sellers' Representative

(whether pursuant hereto or otherwise) for the benefit of Sellers shall constitute valid and timely Notice to all of Sellers.

9.19    <u>Mutual Drafting</u>. This Agreement is the result of the joint efforts of Buyer and Sellers, and each provision hereof has been subject to the mutual consultation, negotiation and agreement of the Parties and there is to be no construction against any Party based on any presumption of that Party's involvement in the drafting thereof.

9.20    <u>Fiduciary Obligations</u>. Nothing in this Agreement, or any document related to the Transactions contemplated hereby, without limiting in any way Buyer's rights and remedies set forth in this Agreement, will require any Seller or any of their respective governing bodies, directors, officers or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the duly authorized officers of Sellers and Buyer as of the date first above written.

**<u>BUYER</u>**:

THE GAP, INC.

By: _____
Name:
Title:

By: _____
Name:
Title:

**SELLERS**:

GYMBOREE GROUP, INC.


By: _____
Name:
Title:


GYMBOREE RETAIL STORES, LLC


By: _____
Name:
Title:


GYM-CARD, LLC


By: _____
Name:
Title:


GYMBOREE MANUFACTURING, INC.


By: _____
Name:
Title:


GYMBOREE DISTRIBUTION, INC.


By: _____
Name:
Title:


GYMBOREE OPERATIONS, INC.


By: _____
Name:
Title:

[Signature Pages to Asset Purchase Agreement]

GYMBOREE ISLAND, LLC

By: _____
Name:
Title:

GYM-MARK, INC.

By: _____
Name:
Title:

GYMBOREE WHOLESALE, INC.

By: _____
Name:
Title:

Exhibit 2

Execution Draft

## ASSET PURCHASE AGREEMENT AND BILL OF SALE

This Asset Purchase Agreement and Bill of Sale (this "<u>Agreement</u>") is made and entered into as of March 1, 2019 by and among Gymboree Group, Inc., a Delaware corporation ("<u>Gymboree</u>") and The Gap, Inc., a Delaware corporation ("<u>Buyer</u>") and, solely with respect to Sections 1 and 2(b) hereof, GA Retail, Inc., Tiger Capital Group, LLC, Gordon Brothers Retail Partners, LLC, and Hilco Merchant Resources, LLC (collectively, "<u>Agent</u>"). Capitalized terms used but not defined herein have the meanings set forth in that certain Agency Agreement dated as of January 17, 2019 (the "<u>Agency Agreement</u>") by and among Gymboree and Agent. The parties hereto agree as follows:

1.  <u>Agency Agreement.</u>

(a)    The Agency Agreement is hereby amended to permit the exercise of the J&J Option through and including the date hereof and to extend the J&J Option Period to the Closing Date (as defined below). This Agreement shall serve as an Option Notice setting the Closing Date as the J&J Option Effective Date.

(b)    Notwithstanding Section 16.12(b) of the Agency Agreement, Agent shall be entitled to conduct the Sale at the J&J Stores as a "going out of business", "store closing" or "everything must go" sale.  Upon receipt of the J&J Option Payment (as amended hereunder), Agent and Gymboree shall immediately discontinue the Sale at the J&J Stores and the sale of any Janie and Jack Merchandise on the Ecommerce Platform and shall remove or cause to be removed all sale signage and advertising relating to the Assets.

(c)    The Agent agrees that upon the receipt of the J&J Option Payment, any rights, claims, or interests the Agent had in the Assets (as defined below) shall be extinguished and released.

(d)    The amount of the J&J Option Payment provided in Section 16.12(d) shall be amended and increased by $650,000 in the aggregate.

(e)    Effective upon receipt of the J&J Option Payment, Section 3.1(a) of the Agency Agreement shall be deemed to be amended to provide that the Guaranty Percentage shall be reduced to 79.0% of the aggregate Cost Value of the Merchandise and the Guaranteed Amount shall be calculated excluding Janie and Jack Merchandise, Exhibit 3.1(b)(1) shall be effective rather than Exhibit 3.1(b) and Exhibit 3.1(c)(1) shall be effective rather than Exhibit 3.1(c).

2.  <u>Purchase and Sale of Assets.</u>

(a)    For good and valuable consideration of the Purchase Price (as defined below) and the assumption of the Assumed Liabilities (as defined below), the receipt and adequacy of which Gymboree hereby acknowledges, as of the Closing, Gymboree hereby irrevocably sells, assigns, transfers, conveys, grants, bargains and delivers to Buyer (or one or more persons, including any affiliates of Buyer, as designated by Buyer in writing to Gymboree prior to the Closing), all of its right, title and interest in and to all inventory and FF&E related to the Janie and Jack brand of Gymboree (and any goodwill related thereto), including (i) the remaining Janie and Jack Merchandise and any Additional Agent Merchandise purchased for the J&J Stores and (ii) any other assets that were subject to the option set forth in Section 16.12 of the Agency Agreement (collectively, the "<u>Assets</u>").

(b)    The purchase price for the Assets shall equal (i) the Cost Value of the Assets that are Merchandise, plus (ii) the actual cost (with no profit or lift) of the Assets that are Additional Agent Merchandise, plus (iii) $10,000,000 (the "<u>Purchase Price</u>"). On the Closing Date, Buyer shall pay the

Purchase Price by wire transfer of immediately available funds to the accounts set forth in payment instructions from Gymboree that shall provide for the J&J Option Payment to be received by the Agent and the remainder of the Purchase Price to be received by Gymboree. Gymboree shall indemnify and hold harmless Buyer for any liabilities incurred by Buyer resulting from the misallocation of the Purchase Price among each Agent entity or between Agent and Gymboree. In the event there is any reconciliation required of the J&J Option Payment any adjustment of such amount shall be paid by Gymboree to the Agent or the Agent to Gymboree, as applicable.

(c)    Buyer hereby assumes, and Gymboree hereby assigns to Buyer, all obligations or liabilities of Gymboree directly related to the Assets that arise in, and are solely related to, the post-Closing period (the "Assumed Liabilities"). Gymboree shall not be liable for, and as between Buyer and Gymboree, Buyer shall be solely liable for and obligated to discharge all Assumed Liabilities. Buyer shall not be liable for, and as between Buyer and Gymboree, Gymboree shall be solely liable for and obligated to discharge all obligations or liabilities related to the Assets that are not Assumed Liabilities.

(d)    The consummation of the transactions contemplated by this Agreement (the "Closing") shall occur contingent upon, and effective concurrently with, the consummation of the transactions contemplated by that certain Asset Purchase Agreement dated on or about the date hereof by and among Buyer, Gymboree and certain subsidiaries of Gymboree (or on such other date as the parties hereto may mutually agree). The Closing shall be held at the offices of Gymboree, at 10:00 a.m., local time, unless the parties hereto otherwise agree. The actual date of the Closing is herein called the "Closing Date".

3.    Representations and Warranties of Gymboree.

(a)    Gymboree has good and marketable title to the Assets, free and clear of any encumbrances or liens, other than the interests of the Agent and the Debtors' DIP Lenders, all of which are to be released on the Closing Date.

(b)    Subject to entry of an appropriate order by the United States Bankruptcy Court for the Eastern District of Virginia, Gymboree has all requisite power and authority to execute and deliver and perform its obligations under this Agreement.

(c)    Subject to entry of an appropriate order by the United States Bankruptcy Court for the Eastern District of Virginia, the execution and delivery of this Agreement and performance by Gymboree of its obligations hereunder, and all transactions contemplated hereby, have been duly and validly authorized by all necessary action on the part of Gymboree. Subject to entry of an appropriate order by the United States Bankruptcy Court for the Eastern District of Virginia, this Agreement has been duly executed and delivered by Gymboree; and this Agreement constitutes, and such agreements and documents when executed and delivered will constitute, the valid and binding obligations of Gymboree, enforceable in accordance with its respective terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization or similar laws from time to time in effect affecting creditor's rights generally and by legal and equitable limitations on the availability of specific remedies.

4.    Representations and Warranties of Buyer.

(a)    Buyer has all requisite power and authority to execute and deliver and perform its obligations under this Agreement.

(b)    The execution and delivery of this Agreement and performance by Buyer of its obligations hereunder, and all transactions contemplated hereby, have been duly and validly authorized by all necessary action on the part of Buyer. This Agreement has been duly executed and delivered by Buyer;

and this Agreement constitutes, and such agreements and documents when executed and delivered will constitute, the valid and binding obligations of Buyer, enforceable in accordance with their respective terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization or similar laws from time to time in effect affecting creditor's rights generally and by legal and equitable limitations on the availability of specific remedies.

(c)     Buyer acknowledges and agrees that: (i) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer has relied solely upon its own investigation and the express representations and warranties of Gymboree set forth in Section 3 and the Agent set forth in Section 5; and (ii) neither Gymboree, Agent, nor any other person has made any representation or warranty as to Gymboree, Agent or this Agreement, except as expressly set forth in Section 3 or 5, as applicable.

5.     Representations and Warranties of Agent.

(a)     Agent has all requisite power and authority to execute and deliver and perform its obligations under this Agreement.

(b)     The execution and delivery of this Agreement and performance by Agent of its obligations hereunder, and all transactions contemplated hereby, have been duly and validly authorized by all necessary action on the part of Agent. This Agreement has been duly executed and delivered by Agent; and this Agreement constitutes, and such agreements and documents when executed and delivered will constitute, the valid and binding obligations of Agent, enforceable in accordance with its respective terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization or similar laws from time to time in effect affecting creditor's rights generally and by legal and equitable limitations on the availability of specific remedies.

6.     Bankruptcy Court Approval. All obligations of Gymboree and Agent hereunder are conditioned on the entry of an order by the United States Bankruptcy Court for the Eastern District of Virginia in form reasonably acceptable to Gymboree and Agent authorizing the execution and consummation of this Agreement.

7.     Disclaimer of Warranties. EXCEPT SOLELY FOR THE REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 3, GYMBOREE MAKES NO REPRESENTATION OR WARRANTY WHATSOEVER WITH RESPECT TO THE ASSETS OR THE ASSUMED LIABILITIES, INCLUDING ANY (A) WARRANTY OF MERCHANTABILITY; (B) WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE; (C) WARRANTY OF TITLE; OR (D) WARRANTY AGAINST INFRINGEMENT OF INTELLECTUAL PROPERTY RIGHTS OF A THIRD PARTY; WHETHER ARISING BY LAW, COURSE OF DEALING, COURSE OF PERFORMANCE, USAGE OF TRADE OR OTHERWISE. BY ACCEPTING THIS AGREEMENT, BUYER ACKNOWLEDGES THAT IT HAS NOT RELIED ON ANY REPRESENTATION OR WARRANTY MADE BY GYMBOREE OR AGENT, OR ANY OTHER PERSON ON GYMBOREE'S OR AGENT'S BEHALF.

8.     Further Assurances. The parties hereto agree to execute such further documents and instruments and to take such further actions as such other party may reasonably deem necessary or desirable in furtherance of the transactions contemplated by this Agreement.

9.     Governing Law. This Agreement is governed by, and construed in accordance with, the laws of the State of New York, without regard to the conflict of laws provisions thereof to the extent such principles or rules would require or permit the application of the laws of any jurisdiction other than those of the State of New York.

10.    _Expenses_. Each of the parties hereto shall pay its own respective costs and expenses incurred or to be incurred by it in the negotiation and preparation of this Agreement and carrying out the transactions contemplated by this Agreement, including legal fees.

11.    _Entire Agreement; Amendment_. This Agreement, together with all schedule and exhibits hereto, constitutes the entire agreement among the parties hereto pertaining to the subject matter hereof and supersedes all prior and contemporaneous agreements, understandings, negotiations and discussions, whether oral or written, of the parties, and there are no representations, warranties or other agreements among the parties hereto in connection with the subject matter hereof except as set forth specifically herein or contemplated hereby. This Agreement may not be amended nor provisions waived except for by written instrument signed by all Parties.

12.    _Notices_. All notices and communications provided for pursuant to this Agreement shall be in writing and sent by email, by hand, or by Federal Express or other recognized overnight delivery service, as follows:

If to Agent:

GA RETAIL, INC.
21255 Burbank Blvd, Suite 400
Woodland Hills, CA 91367
Attn: Scott K Carpenter
Email: scarpenter@greatamerican.com

HILCO MERCHANT RESOURCES, LLC
5 Revere Drive, Suite 206
Northbrook, IL 60062
Attention: Ian S. Fredericks
Tel: (847) 418-2075
Fax: (847) 897-0859
Email: ifredericks@hilcotrading.com

GORDON BROTHERS RETAIL PARTNERS, LLC
Prudential Tower
800 Boylston Street
Boston, MA 02119
Attn: Mackenzie Shea
Tel: 617.422.6519
Email: mshea@gordonbrothers.com

TIGER CAPITAL GROUP, LLC
350 North LaSalle Street, 11th Floor
Chicago, IL 60654
Attn: Mark P. Naughton
Tel: (312) 894-6081
Fax: (617) 523-3007
Email: mnaughton@tigergroup.com

with a copy (which shall not constitute notice) to:

GREENBERG TRAURIG

> Attn: Jeffrey M. Wolf
> One International Place
> Suite 2000
> Boston, MA 02110
> Tel: 617 310 6041
> Email: wolfje@gtlaw.com

If to Gymboree:
> Gymboree Group, Inc.
> 71 Stevenson Street, Suite 2200
> San Francisco, CA 94105
> Attention:     Jon W. Kimmins and Kimberly Holtz MacMillan
> Email:  jon_kimmins@gymboree.com and
>       kimberly_macmillan@gymboree.com

With a copy (which shall not constitute notice) to:

> Milbank LLP
> 55 Hudson Yards
> New York, NY 10001
> Attention:     Evan R. Fleck and Scott W. Golenbock
> Email:  efleck@milbank.com and sgolenbock@milbank.com

If to Buyer:

> The Gap, Inc.
> Two Folsom Street
> San Francisco, CA 94105
> Attention: Julie Gruber
> Email: julie_gruber@gap.com

with a copy (which shall not constitute notice) to:

> Orrick, Herrington & Sutcliffe, LLP
> 405 Howard Street
> San Francisco, CA 94105-2669
> Attention: Brett Cooper
> Email: bcooper@orrick.com

13.    <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

*[Signature Page Follows]*

        IN WITNESS WHEREOF the Parties have duly executed and delivered this Agreement as of the
date first written above.

                                                **BUYER**:

                                                THE GAP, INC.

                                                By:   _____
                                                Name:
                                                Title:

                                                By:   _____
                                                Name:
                                                Title:

ASSET PURCHASE AGREEMENT AND BILL OF SALE

IN WITNESS WHEREOF the Parties have duly executed and delivered this Agreement as of the date first written above.

**GYMBOREE**:

GYMBOREE GROUP, INC.
By: _____
Name:
Title:

**AGENT:**

GA RETAIL, INC.

By: _____
Name:
Title:

HILCO MERCHANT RESOURCES, LLC

By: _____
Name:
Title:

GORDON BROTHERS RETAIL PARTNERS, LLC

By: _____
Name:
Title:

TIGER CAPITAL GROUP, LLC

By: _____
Name:
Title:

Exhibit 3

Dennis F. Dunne, Esq. (admitted *pro hac vice*)
Evan R. Fleck, Esq. (admitted *pro hac vice*)
Michael W. Price, Esq. (admitted *pro hac vice*)
**MILBANK LLP**
55 Hudson Yards
New York, New York 10001
Telephone:      (212) 530-5000
Facsimile:      (212) 530-5219

Michael A. Condyles, Esq. (VA 27807)
Peter J. Barrett, Esq. (VA 46179)
Jeremy S. Williams, Esq. (VA 77469)
Brian H. Richardson, Esq. (VA 92477)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:      (804) 644-1700
Facsimile:      (804) 783-6192

*Co-Counsel for Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| GYMBOREE GROUP, INC., *et al.,*[1] | ) | Case No. 19-30258 (KLP) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) |  |

## NOTICE OF CLOSING DATE OF J&J SALE

WHEREAS on March 4, 2019 the Bankruptcy Court entered the Order (I) Approving The Sale Of Certain J&J Assets Free And Clear Of Liens, Claims, Interests And Encumbrances And (II) Approving The Assumption And Assignment Of Executory Contracts And Unexpired Leases In Connection Therewith; And (III) Granting Related Relief which approved the Sale of the JJ Assets pursuant to the Purchase Agreement:

PLEASE TAKE NOTICE that the Closing Date (as defined in the Purchase Agreement) occurred on _____, 2019.

---

[1]        The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:  Gymboree Group, Inc. (6587); Gymboree Intermediate Corporation (1473); Gymboree Holding Corporation (0315); Gymboree Wholesale, Inc. (6588); Gym-Mark, Inc. (6459); Gymboree Operations, Inc. (6463); Gymboree Distribution, Inc. (8669); Gymboree Manufacturing, Inc. (6464); Gymboree Retail Stores, LLC (6461); Gym-Card, LLC (5720); and Gymboree Island, LLC (1215).  The Debtors' service address is 71 Stevenson Street, Suite 2200, San Francisco, California 94105.