# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

|  |  |
|---|---|
| In re: | |
| GEMSTONE SOLUTIONS GROUP, INC., *et al.*, | Case No. 19-30258 (KLP) |
| | Chapter 11 |
| | (Jointly Administered) |
| Debtors. | |

**OBJECTION OF THE UNITED STATES TRUSTEE TO DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE DISCLOSURE STATEMENT, (II) APPROVING SOLICITATION AND NOTICE MATERIALS; (III) APPROVING FORMS OF BALLOTS AND ELECTION FORMS; (IV) ESTABLISHING SOLICITATION AND VOTING PROCEDURES; (V) ESTABLISHING PROCEDURES FOR ALLOWING CERTAIN CLAIMS FOR VOTING PURPOSES; (VI) SCHEDULING A CONFIRMATION HEARING; AND (VII) ESTABLISHING NOTICE AND OBJECTION PROCEDURES**

John P. Fitzgerald, III, Acting United States Trustee for Region Four (the "UST"),[1]

through his counsel, in furtherance of the duties and responsibilities set forth in 28 U.S.C.

§ 586(a)(3) and (5) and pursuant to 11 U.S.C. §§ 307, the Federal Rules of Bankruptcy

Procedure, and the Local Bankruptcy Rules for this District, hereby files his objection to the

Debtors' Motion for Entry of an Order (I) Approving the Disclosure Statement (as defined

herein), (II) Approving Solicitation and Notice Materials; (III) Approving Forms of Ballots and

Election Forms; (IV) Establishing Solicitation and Voting Procedures; (V) Establishing

Procedures for Allowing Certain Claims for Voting Purposes; (VI) Scheduling a Confirmation

Hearing; and (VII) Establishing Notice and Objections Procedures (the "Solicitation Procedures

---

[1] Unless otherwise defined herein, capitalized terms shall have the definition assigned to them in the Disclosure Statement or the Plan.

Kenneth N. Whitehurst, III, AUST (Va. Bar. No. 48919)
Shannon Pecoraro, Esq. (Va. Bar No. 46864)
Office of the United States Trustee
701 East Broad Street - Suite 4304
Richmond, VA 23219
Telephone (804) 771-2310
Facsimile (804) 771-2330

Motion").[2]  *See* ECF Doc. Nos. 1325 and 1326.  In support of his objection, the UST represents
and alleges as follows:

## PRELIMINARY STATEMENT

After over a year of navigating through Chapter 11, the Disclosure Statement and
underlying Plan currently before the Court reinforce what many long-feared—administrative
insolvency.  Despite the inability to pay all administrative claimants in full, aside from the
professionals who had previously negotiated a carve-out with the secured lenders, the Debtors
received approval of a streamlined procedure for settling administrative claims in an attempt to
be able to propose a confirmable plan.

The Debtors have now presented a Plan and Disclosure Statement that encompasses the
settlement agreements recently reached with various administrative claimants and proposes to
pay administrative claimants with whom they have yet to settle either (a) in full, to the extent
they opt-out of a settlement provision or (b) a reduced amount of their claim, to the extent they
opt-in or fail to opt-out.

The Debtors now seek approval of the Disclosure Statement, which describes a Plan that
is unconfirmable.  Accordingly, the UST objects to the approval of the Disclosure Statement and
to the approval of the procedures for its solicitation for the following reasons:

- The Disclosure Statement lacks sufficient information regarding the proposed
substantive consolidation under the Plan.

- It lacks sufficient information regarding the Acquisition Agreement for the
purchase of the equity interests or assets of Certified Art and Collectibles which is
to be approved as part of the confirmation process.

- The Disclosure Statement describes a Plan and the solicitation procedures
contemplate a process whereby administrative claimants are deemed to consent to

---

[2] To the extent not defined herein, capitalized terms shall have the meaning assigned to them in the Disclosure
Statement or Plan.

a reduced amount of their claim simply by abstaining from returning an election ballot and opting out of the proposed settlement provision.

- The Disclosure Statement lacks adequate information in that, among other things, it (a) fails to provide any financial information, including a liquidation analysis or financial projections; (b) fails to identify the Disbursing Agent or provide information as to the terms of his or her retention; and (c) contemplates filing significant documents and information in a Plan Supplement without providing creditors and parties in interest sufficient time to review prior to the confirmation objection or voting deadlines.

- The Plan and Disclosure Statement contemplate granting third-party releases and grant exculpations to a myriad of entities and individuals through provisions which are overly broad and do not satisfy the *Behrmann* factors applicable in the Fourth Circuit.

- The Plan and Disclosure Statement contemplate the ratification or implementation of bonus or severance programs with terms not previously approved by the Court, without providing sufficient information regarding the changes to be implemented to these existing programs, the employees covered by any such payments, and how the awards contemplated satisfy the requirements of the Bankruptcy Code.

## JURISDICTION, VENUE & CONSTITUTIONAL AUTHORITY TO ENTER A FINAL ORDER

1.      The Court has jurisdiction to consider this matter under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(1).  Venue is proper in this district under 28 U.S.C. § 1408.  The Court has constitutional authority to enter a final order in this matter.  If it is determined that the bankruptcy judge does not have the constitutional authority to enter a final order or judgment in this matter, the UST consents to the entry of a final order or judgment by this Court in this matter.

2.      John P. Fitzgerald, III is the acting UST for Region 4, which includes Richmond, under 28 U.S.C. § 581(a)(7).  Pursuant to 11 U.S.C. § 307, the UST has standing to appear and be heard on any issue in a case or proceeding under the Bankruptcy Code.

3.      Pursuant to 28 U.S.C. § 586(a)(3), the UST is statutorily obligated to monitor the administration of cases commenced under the Bankruptcy Code, 11 U.S.C. § 101 *et seq*.

Specifically, he is charged with a number of supervisory responsibilities in reorganization

bankruptcy cases under chapter 11 of the Bankruptcy Code, including monitoring plans and

disclosure statements filed in Chapter 11 cases.  28 U.S.C. § 586(a)(3)(B).

### **FACTUAL BACKGROUND**

4.    **General Background**

1.    On January 16, 2019 (the "Petition Date"), Gymboree Group, Inc. and 10 of its

affiliated companies (collectively, the "Debtors") each filed a voluntary petition under Chapter 11

of the Bankruptcy Code.  On January 17, 2019, the Court entered an order authorizing joint

administration and procedural consolidation of the chapter 11 cases pursuant to Bankruptcy Rule

1015(b).  *See* ECF Docket No. 60.

2.    The Debtors remain in possession of their assets and continue to manage their

business as debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  To

date, no trustee or examiner has been appointed in these Chapter 11 cases.

3.    On January 23, 2019, the UST appointed the Official Committee of Unsecured

Creditors pursuant to Section 1102(a)(1) of the Bankruptcy Code (the "Creditors' Committee").

*See* ECF Docket No. 126.

4.    On March 4, 2019, the Court entered the *(a) Order (I) Approving the Sale of Certain

J&J Assets Free and Clear of Liens, Claims, Interests and Encumbrances and (II) Approving the

Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection

Therewith; and (III) Granting Related Relief [ECF Doc No. 484] and (b) Order (I) Approving the

Sale of Certain Gymboree and Crazy 8 Assets Free and Clear of Liens, Claims, Interests and

Encumbrances and (II) Approving the Assumption and Assignment of Executory Contracts and

Unexpired Leases in Connection Therewith; and (III) Granting Related Relief [ECF Doc. No.*

*487]*, which, together, approved the sale of substantially all of the Debtors' assets.  The closing dates for such sales occurred on March 4, 2019 and April 4, 2019, respectively.

5.      On or about July 17, 2020, the Debtors filed a motion for an order approving omnibus relief in aid of administration of the post-sale residual estates, including the approval of a streamlined procedure for settling administrative claims (the "Omnibus Relief Motion," and the procedures proposed therein, the "Claim Settlement Procedures").  *See* ECF Doc. No. 873.   The Claim Settlement Procedures sought to establish August 24, 2019 as the last date and time to file proofs of claim on account of administrative claims that are not claims seeking section 503(b)(9) priority and that arise on or prior to July 31, 2019.  *See* Omnibus Relief Motion at ¶ 14.  They also contemplated that the Debtors would be allowed to negotiate, in their sole discretion, with any claimant asserting an administrative claim to reach a settlement. *Id.* at ¶ 13. The settlement would then have to be provided to the Committee and the DIP Lender, who would have three business days to object to the proposed claim settlement.  *Id.*   In the event no objection was timely interposed, the claim settlement would be deemed approved by the Court.  *Id.*  An order approving the Omnibus Relief Motion, slightly revised to address some issues raised by the UST, was entered on or about August 9, 2019.  *See* ECF Doc. No. 957.

6.      On or about January 31, 2020, the Debtors filed the Disclosure Statement for Debtor's Joint Chapter 11 Plan of Reorganization (the "Disclosure Statement") and the Joint Chapter 11 Plan of Reorganization (the "Plan").  The Disclosure Statement and underlying Plan contemplate classifying claims into six classes, as follows:

| Class | Impairment | Voting Rights | Projected Plan Recovery |
|---|---|---|---|
| 1 – Prepetition ABL Claims | Impaired | Entitled to Vote | 99%-100% |
| 2 – Other Secured Claims | Unimpaired | Deemed to Accept/Not Entitled to Vote | 100% |
| 3a – General Unsecured Claims | Impaired | Deemed to Reject/Not Entitled to Vote | 0% |

| 3b – Deficiency Claims | Impaired | Entitled to Vote | 0% |
| 4 – Intercompany Claims | Impaired | Deemed to Reject/Not Entitled to Vote | N/A |
| 5 – Interests in Gemstone Solutions | Impaired | Deemed to Reject/Not Entitled to Vote | 0% |
| 6 – Interests in Subsidiary Debtors | Either (i) Unimpaired or (ii) Impaired | Either (i) Deemed to Accept/Not Entitled to Vote or (ii) Deemed to Reject/Not Entitled to Vote | N/A |

7.      With respect to administrative claimants, the Plan and Disclosure Statement contemplated that to the extent they entered into a settlement pursuant to the Claim Settlement Procedures, they would receive the treatment specified in their specific settlement.  *See* Disclosure Statement at Art. I.C.1.a, p. 3.  To the extent settlements have not been entered into, the Disclosure Statement and Plan provide for the following treatment:

> Each other Holder of an Administrative Claim will have the opportunity to timely elect, on its Election Form, to opt-out of the Plan Administrative Claim Settlement. To the extent a Holder timely opts out of the Plan Administrative Claim Settlement or its Administrative Claim is subject to the Supplemental Administrative Claims Bar Date, such Holder will receive, unless otherwise agreed by such Holder and the Debtors or the Reorganized Debtors, as applicable, or unless a Final Order provides otherwise, in full and final satisfaction of its Allowed Administrative Claim, Cash equal to the Allowed amount of such Administrative Claim promptly after the date on which such Administrative Claim becomes an Allowed Claim.

> If the Holder becomes a Plan Administrative Claim Settlement Claimant by electing not to opt out of the Plan Administrative Claim Settlement, such Holder will have its Administrative Claim Allowed in the amount set forth in the Debtors' books and records, or in such amount as may otherwise be (i) agreed to by such Holder, the Debtors, and Plan Sponsor, or (ii) ordered by the Court.  In addition, each Plan Administrative Claim Settlement Claimant will have the right to choose, on its Election Form, to receive, at its election, in full and final satisfaction of its Allowed Administrative Claim, either (i) Cash equal to 60% of the Allowed amount of such Claim to be paid within ten (10) Business Days of the Effective Date (the "Expedited Treatment") or (ii) (a) Cash equal to 32.5% of the Allowed amount of such Claim to be paid within ten (10) Business Days of the Effective Date and (b) the Additional Administrative Recovery within ten (10) Business Days of the Monetization Date (the "Deferred Treatment").

> The Debtors will have the discretion to elect Expedited Treatment or Deferred Treatment for a Holder who becomes a Plan Administrative Claim Settlement Claimant but does not make an election on its Election Form.

*See id;* Plan at Art. II.A.1.a.

## **OBJECTION**

I.      **Legal Framework**

The basic structure of Chapter 11 of the Bankruptcy Code is a system where a plan of

reorganization or liquidation is proposed to the creditors who then vote on whether to accept or

reject the plan.  11 U.S.C. §§ 1121, 1125-1129.  After the plan is voted upon, the Court

determines whether the plan can be "confirmed" by determining whether the statutory

requirements for confirmation are met.  11 U.S.C. § 1129.  Once the plan is "confirmed," it

becomes a contract between the reorganized debtors and all of their creditors that replaces all of

the debtors' prior obligations.  *See, e.g., In re Shenandoah Realty Partners, L.P.*, 287 B.R. 867,

871 (Bankr. W.D. Va. 2002); *In re Lacy*, 183 B.R. 890, 892 n.1 (Bankr. D. Colo. 1995); 11

U.S.C. § 1141.

In order to provide creditors with the information necessary to make an informed vote on

the plan, the Bankruptcy Code requires the proponent of the plan to provide creditors with a

"disclosure statement."  11 U.S.C. § 1125(b).  The purpose of the disclosure statement is to

provide creditors with information about the debtor, the plan, and their treatment thereunder

necessary for creditors to make an informed and reasoned vote.  *See, e.g.*, *In re Monnier Bros*,

755 F.2d 1336, 1342 (8th Cir. 1985) ("[t]he primary purpose of a disclosure statement is to give

the creditors the information they need to decide whether to accept the plan"); *In re Forest

Grove, LLC*, 448 B.R. 729, 737 (Bankr. D.S.C. 2011) ("[t]he purpose of a disclosure statement is

to clearly provide creditors with information regarding the debtor's plan and their treatment

under that plan"); *In re Phoenix Petroleum Co.*, 278 B.R. 385, 392 (Bankr. E.D. Pa. 2001) ("the

general purpose of the disclosure statement is to provide 'adequate information' to enable

'impaired' classes of creditors and interest holders to make an informed judgment about the

proposed plan and determine whether to vote in favor of or against that plan").

Precisely what information must be contained in a disclosure statement varies depending on the particulars of the case.  Generally speaking, however, a disclosure statement must contain "adequate information," which is defined as:

> [I]nformation of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records ... that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan.

11 U.S.C. § 1125(a).

"Adequate information" for disclosure statement purposes has been described as "all information that is reasonably necessary to permit creditors and parties-in-interest to fairly and effectively evaluate the plan."  *In re Robert's Plumbing & Heating, LLC*, Case No. 10-23221, 2011 WL 2972092 at * 2 (Bankr. D. Md., July 20, 2011); *see also In re A.H. Robbins Co., Inc.*, Case No. 98-1080, 1998 WL 637401 at * 3 (4th Cir. 1998) (adequate information means "sufficient information to permit a reasonable, typical creditor to make an informed judgment about the merits of the proposed plan").

Courts have held that the following types of information should be included in a disclosure statement:

    i.   The circumstances that gave rise to the filing of the case;
    ii.   A complete description of the available assets and their value;
    iii.  The anticipated future income of the debtor;
    iv.  The source of the information provided in the disclosure statement;
    v.   The condition and performance of the debtor while in chapter 11;
    vi.  Information regarding claims against the estate;
    vi.  A liquidation analysis setting forth the estimated return that creditors would receive under chapter 7;
    vii.  The accounting and valuation methods used to produce the financial information in the disclosure statement;
    viii. A summary of the plan;
    ix.  An estimate of all administrative expenses, including attorneys' fees and accountant's fees;

      x.   The collectability of any accounts receivable;

     xii.  Any financial information, valuations or pro forma projections that would be relevant to creditors' determination of whether to accept or reject the plan;

    xiii. Information relevant to the risks being taken by the creditors and interest holders;

    xiv. The actual or projected value that can be obtained from avoidable transfers;

    xv.  The existence, likelihood and possible success of non-bankruptcy litigation; and

    xvi. The tax consequences of the plan.

*See, e.g., Collier on Bankruptcy* ¶ 1125.02[2].

Here, not only does the Solicitation Procedure Motion propose solicitation or tabulation procedures that are solely to the Debtors' advantage and do not comply with the Bankruptcy Code or the Bankruptcy Rules, but the Disclosure Statement also fails to provide sufficient disclosure appropriate to the circumstances of these cases for the reasons set forth in greater detail below.

## A. The Disclosure Statement Lacks Sufficient Information Regarding the Proposed Substantive Consolidation Under the Plan.

The Plan provides that it "constitutes a separate Plan for each of the Debtors and does not effectuate a substantive consolidation of the Debtors or their Estates." *See* Plan at Introduction, p. 4. The Disclosure Statement, on the contrary, provides:

Solely for purposes of voting on, and receiving Distributions under, the Plan, the Estates are deemed to be substantively consolidated, *i.e.*, (a) all assets and liabilities of the Debtors will be deemed to be assets and liabilities, respectively, of a single Estate; (b) all guarantees by one Debtor of the obligations of any other Debtor will be deemed eliminated, (c) any joint or several liability of any of the Debtors will be deemed to be one obligation of the Debtors; and (d) each Proof of Claim filed in the case of any Debtor will be deemed filed against all Debtors and will be deemed one Claim against and a single obligation of the Debtors. This deemed substantive consolidation will not affect (a) the legal and corporate structures of the Debtors; (b) the right of the Holders of Allowed Claims to receive Distributions from any insurance policies or proceeds of such policies; (c) any Liens granted or arising at any time prior to the Effective Date or the priority of those Liens; or (d) the rights

of the Debtors to contest alleged setoff or recoupment rights on the grounds of lack
of mutuality under section 553 of the Bankruptcy Code and other applicable law.

*See* Disclosure Statement at Art. I.A, p. 2.

The language in the Disclosure Statement and Plan appear inconsistent.  Moreover, while
the Disclosure Statement seeks to substantively consolidate the Debtors' estates, it is silent as to
the reasons as to why the equitable remedy is appropriate in these cases.  "Substantive
consolidation has no express statutory basis but is a product of judicial gloss*." Union Sav. Bank
v. Augie/Restivo Baking Co. (In re Augie/Restive Baking Co.)*, 860 F.2d 515, 518 (2d Cir. 1988)
(internal citations omitted).  The bankruptcy court's authority to grant substantive consolidation
derives from the court's general discretionary equitable powers. *See In re Continental Vending
Machine Corp*., 517 F.2d 997, 1000 (2d Cir. 1975); *see also, Federal Deposit Ins. Corp. v.
Colonial Realty Co*., 966 F.2d 57 (2d Cir. 1992) (the authority for substantive consolidation is
found in the bankruptcy court's general equitable powers set forth in 11 U.S.C. § 105).

The Disclosure Statement should be amended to provide clarity as to the substantive
consolidation relief sought within the Plan.  Furthermore, because the decision as to whether
substantive consolidation is proper in a case is a fact-intensive exercise, the Disclosure Statement
should provide additional information as to the Debtors' reason why substantive consolidation in
these cases would ensure the equitable treatment to all creditors and should be approved under
Fourth Circuit law.  *See, e.g. In re Gordon Properties, LLC,* 478 B.R. 750 (E.D. Va. 2012)
(citing *Stone v. Eacho*, 127 F.2d 284 (4th Cir. 1942)).

## II.   The Disclosure Statement Lacks Sufficient Information Regarding the Acquisition Agreement for the Purchase of the Equity Interests or Assets of Certified Art and Collectibles.

The Disclosure Statement provides for the reorganization of the Debtors, with the New
Equity Interests being issued to the Holder of Allowed DIP Claims.  *See* Disclosure Statement at

Art. I.A, p. 1.  Moreover, the Reorganized Debtors will be capitalized by the provision of an Exit

Facility by Goldman Sachs Specialty Lending Group, L.P. (the "Plan Sponsor").  *Id.*  The Exit

Facility would, in turn, fund the payment of certain Administrative Claims, Priority Claims, fund

the Reorganized Debtors' general corporate expenses and the Reorganized Debtor's purchase of

a controlling interest in Certified Art and Collectibles.  *Id.*  More specifically, the Disclosure

Statement provides that:

> Certified Art and Collectibles is developing a system utilizing tags embedded with
> Near Field Communication antennas to provide electronic verification of the
> authenticity of art, memorabilia, and other items.  Following the acquisition, the
> Reorganized Debtors intend to rename Certified Art and Collectibles as LuxVerity,
> complete its development, and market and operate its products.

*See Disclosure Statement*, Art. I.A, p. 2.

While the connection between the Debtors' business and Certified Art and

Collectibles is far from clear, the Disclosure Statement and Plan further provide that on

the Effective Date, the Reorganized Debtors will enter into an acquisition agreement for

the purchase of the interests or assets of Certified Art and Collectibles (the "CAC

Acquisition"), and that confirmation of the Plan will be deemed approval of the CAC

Acquisition and the Acquisition Documents, as well as "all transactions contemplated

thereby, and all actions to be taken, undertakings to be made, and obligations to be

incurred by the Reorganized Debtors in connection therewith."  *See* Disclosure Statement

at Art. V.B.11, p. 30; Plan at Art. III.L, p. 21.  Said differently, the Disclosure Statement

and underlying Plan are requesting approval of documents and transactions which are

vaguely described and whose terms are undisclosed.  The Disclosure Statement should be

amended, at a minimum, (i) to provide additional information regarding (a) the

connection between the Debtors' business and Certified Art and Collectibles, (b) any

impact that the creation or acquisition of LuxVerity would have on any of the Debtors'

creditors, and (ii) to attach the Acquisition Documents whose approval is sought as part

of the Plan confirmation to the Plan Supplement.

### III. Administrative Claimants Against the Debtors Should Not Be Deemed to Have Consented to their Treatment Under the Plan.

As set forth above, the Court recently approved the Claim Settlement Procedures.  Under

the Disclosure Statement and underlying Plan, each administrative claimant that has entered into

a settlement with the Debtors pursuant to the approved procedures will receive the treatment

clearly consented to in their respective settlements.  *See* Disclosure Statement at Art. I.C.1.a, p.

3; Plan at Art. II.A.1.a.  To the extent administrative claimants have not entered into a settlement,

they will receive an election form, granting them the opportunity to opt-out of the Plan

Administrative Claim Settlement.  If they opt-out of the Plan Administrative Claim Settlement or

to the extent the administrative claim accrues between August 1, 2019 and the Effective Date,

then those administrative claimants would receive (unless agreed to otherwise or unless an order

of the Court provides otherwise) full payment of their Allowed administrative claim.  If they do

not opt out, the Plan Administrative Claim Settlement contemplates payment of administrative

claimants less than the full amount of their claims; rather, they would be able to elect one of the

following treatments:

    i.    Agreeing to receive, in full and final satisfaction of its Allowed Administrative Claim, Cash equal to 60% of the Allowed amount of such Claim to be paid within ten (10) business days of the Effective Date; or

    ii.    Agreeing to receive, in full and final satisfaction of its Allowed Administrative Claim:

        a.    Cash equal to 32.5% of the Allowed amount of such Claim to be paid within ten (10 business days of the Effective Date and

b.      The Additional Administrative Recovery[3] within ten (10) Business Days of the Monetization Date.

*See* Disclosure Statement at Art. I.C.1.a, p. 3; Plan at Art. II.A.1.a.  Notably, to the extent that an administrative claimant fails to return the election ballot, then such claimant shall be deemed to have consented to the treatment of their claim in accordance with the Plan Administrative Claim Settlement.   Said differently, what the Plan proposes and what the Disclosure Statement summarizes is in essence a procedure whereby administrative claimants who have yet to settle with the Debtors will be given a choice:  Either (i) opt out of the proposed treatment and receive full payment or (ii) opt in the settlement provision and receive a partial payment of their claim (most likely on a faster timeline than if they opted out).  If, however, they fail to respond, they will be deemed to have consented and opted-in to the less favorable treatment of their administrative claim.

A chapter 11 plan cannot be confirmed unless administrative claimants are paid in full or agree to alternate treatment.  11 U.S.C. § 1129.  Section 1129(a)(9) expressly provides that "[e]xcept to the extent that the holder of a particular claim has *agreed* to a different treatment of such claim, the plan provides that (A) with respect to a claim of a kind specified in section 507(a)(2) or 507(a)(3) of this title, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amounts of such claim."  *See* 11 U.S.C. §1129(a)(9) (Emphasis added).  Black's Law Dictionary defines the term "agree" as "to concur; come into harmony; give mutual assent; unite in mental action; exchange promises;

---

[3] "Additional Administrative Recovery" is defined as "a Cash payment to Plan Administrative Claim Settlement Claimants who elect Deferred Treatment equal to such Claimants *pro rata* share, together with all other Holders that elect Deferred Treatment (including pursuant to an Individual Administrative Claim Settlement) of up to 50% of the LC Cash Collateral, which shall in no event exceed 57.5% of the amount of such Claimants Allowed Administrative Claim."  *See* Plan at Arti. I.A.2, p. 1.

make an agreement; arrange; to settle." Thus, simply abstaining from returning an election ballot

and opting out of the proposed settlement <u>does not</u> constitute "consent".

Establishing consent by silence or failure to opt-out is inconsistent with basic contract

principles.  *See*, *e.g. In re Emerge Energy Services, LP*, 2019 WL 7634308 (Dec. 5, 2019 Bankr.

Del.) ("For the Court to infer consent from the nonresponsive creditors and equity holders, the

Debtors must show under basic contract principles that the court may construe silence as

acceptance because (1) the creditors and equity holders accepted a benefit knowing that the

Debtors, as offerors, expected compensation; (2) the Debtors gave the creditors and equity

holders reason to understand that assent may be manifested by silence or inaction, and the

creditors and equity holders remained silent and inactive intending to accept the offer; or (3)

acceptance by the creditors and equity holders can be presumed due to previous dealings

between the parties.").  Here, the Debtors cannot do so.  While the administrative claimants are

being paid some of their claims regardless of whether they opt-in or opt-out, the Bankruptcy

Code clearly provides for their claims to be paid in full unless they specifically agree to different

terms.  Moreover, while the Election Form has bold language indicating that failure to opt out or

to return the ballot would entitle them to less reasonable treatment, failure to return the Election

Form does not per se evidence their consent to the less favorable treatment; rather, it can be

easily explained as inattentiveness, mistake, or lack of understanding of the legal intricacies of

the ballots received.  What the Plan and Disclosure Statement propose is simply not "consent" or

"agreement" as required by 11 U.S.C. § 1129(a)(9), and the Plan should be deemed to be

unconfirmable.

**IV.    Provisions Which Require Amendments, Clarifications, or That Raise Objections to the Disclosure Statement.**

In addition to the issues raised above, the UST also objects to the following provisions in the Disclosure Statement and/or Plan and requests that they be amended or that the Debtors provide justification for those provisions:

a. **Lack of financial information:** The Disclosure Statement is completely void of any financial information. There is no liquidation analysis to support the best interest test set forth at Art. VI.a.3 of the Disclosure Statement and the Financial Projections that are supposed to be attached at Exhibit C to support the Plan's feasibility are also "forthcoming". Moreover, there is no indication as to when such documents will be filed. The UST requests that those documents be filed along with the Plan Supplement at least ten (10) business days before the deadline to vote on or object to the Plan.

b. **Plan Supplement:** The Plan and the Disclosure Statement contemplate that the Plan Supplement, which will include many key documents and information (including the identity of the Board of Directors, the list of leases and contracts to reject, and the Exit Facility Documents) will be filed with the Court five (5) days before the deadline to object to Confirmation.. *See* Disclosure Statement at Art. I.H; Plan at Art. I.A.85. Because the Plan Supplement will contain important documents with important information for parties in interest to determine whether they have objections to the Plan and for creditors to determine whether to vote in favor of the Plan, it should be filed with the Court and provided to all parties in interest by no later than ten (10) business days of the deadline to vote on or object to the Plan.

c. **Disbursing Agent**:  The Disclosure Statement provides that the Debtors or the Reorganized Debtors, as applicable, will designate "one or more entities (which may be the Reorganized Debtors) to effectuate the distributions under the Plan." *See* Disclosure Statement at Art. V.B.3, p. 27; Plan at Art. III.D.1. *See also* Plat at Art. I.A.33 ("Disbursing Agent" means "an Entity appointed to make the distributions required by the Plan after the Effective Date, which may be the Reorganized Debtors"). Moreover, the Disclosure Statement and Plan also provide that the Disbursing Agent shall be paid reasonable fees and expenses, without specifying what they are. The Disclosure Statement and Plan should be amended to provide that the identity of the Disbursing Agent and the terms of the fee structure she or he is entitled to shall be disclosed and provided for in the Plan Supplement to be filed within ten (10) business days of the deadline to vote on or object to the Plan.

d. **Reporting Requirements:** The Disclosure Statement and Plan shall be amended to clarify the entity that will be responsible for filing periodic reporting requirements with the Court following the confirmation of the Plan.

e. **Pending Litigation:** The Disclosure Statement discusses the adversary proceeding and ongoing litigation that Deutsche Bank Trust Company Americas ("DBTCA") filed against the Debtors as well as other individuals, seeking various relief. *See* Disclosure Statement at Art. IV.O.  The Defendants filed a motion to dismiss the adversary proceeding, which his currently under advisement.  The parties filed a joint motion seeking a mediator, and the hearing is currently scheduled for March 12, 2020.  The Disclosure Statement should be amended to disclose how a judgment in favor of the defendants would impact the current Plan and/or the treatment of creditors currently contemplated under the Plan.

V.    **The Disclosure Statement Does Not Give Adequate Information Regarding the Third-Party Release and Exculpation Clauses.**

Both the Disclosure Statement and the Plan contain provisions for the release and exculpation of various non-debtor parties by other non-debtor parties from all sorts of liability. *See* Disclosure Statement at Art.V.H.1 and Art. V.H.2; Plan, Art. IX.A- B.  As described more fully below, the Debtors have not demonstrated the appropriateness of these provisions.

Without reciting the release clauses in their entirety, the provisions contemplated for in the Plan cause all of Debtors' creditors to release and hold harmless non-debtor parties (the "Released Parties") from any liability for anything occurring prior to the Effective Date <u>unless</u> (a) they abstain from voting on the Plan and opt-out of the releases; (b) they vote to reject the Plan and opt-out of the releases; or (c) they are deemed to reject the Plan <u>and</u> object to the Plan. The Released Parties include :

(a) The Debtors
(b) The Estates
(c) The Creditors' Committee and its members
(d) The DIP Agent and the DIP Lenders
(e) The Prepetition ABL Agent and the Prepetition ABL Lenders
(f) The Prepetition Term Loan Agent and the Prepetition Term Loan Lenders and
(g) The Representatives of (a)-(g), which shall include, among other entities, any successor, predecessors, officers, directors, partners, limited partners, general partners, shareholders, managers, investment managers, Affiliates, employees, agents, attorneys, advisors or other professionals.

*See* Plan, Art. I.A.102 (definition of "Released Parties"); Art. IX.B

The exculpation clause provides that more or less the same parties are free from any claims related to, or arising out of, the Chapter 11 Cases, unless the act or omission constituted fraud or willful misconduct.  *See* Plan, Art. VIII.G.

Although there is no *per se* prohibition against imposing releases of non-debtors by other non-debtors, those releases are not appropriate in every case, or even in most cases.  *See In re A.H. Robins Co., Inc.*, 880 F.2d 694, 702 (4th Cir. 1989).  Whether such releases and exculpatory clauses are appropriate is dependent upon the facts and circumstances of each particular case.  *Behrmann v. National Heritage Foundation*, 663 F.3d 704, 711 (4th Cir. 2011).  Approval of non-debtor releases and exculpatory clauses "should be granted cautiously and infrequently."  *Id.* at 712.

In *Behrmann*, the Fourth Circuit enumerated several factors that should be considered in determining whether third-party releases are appropriate, including but not limited to the following:

> (a)   There is an identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate;
> (b)   The non-debtor has contributed substantial assets to the reorganization;
> (c)   The injunction is essential to reorganization, namely, the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor;
> (d)   The impacted class, or classes, has overwhelmingly voted to accept the plan;
> (e)   The plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction;
> (f)   The plan provides an opportunity for those claimants who choose not to settle to recover in full;
> (g)   The bankruptcy court made a record of specific factual findings that support its conclusions;
> (h)   A close connection between the causes of action against the third party and the causes of action against the debtor; and
> (i)   The plan of reorganization provides for payment of substantially all of

the claims affected by the injunction.[4]

In *Behrmann*, the Court also made clear that in order to support these types of releases, the Bankruptcy Court must "find facts sufficient to support its legal conclusion that a particular debtor's circumstances entitle it to such relief." *Behrmann*, 663 F.3d at 706-07.  Indeed, in *Behrmann*, the Fourth Circuit reversed the bankruptcy court's legal conclusion that the releases at issue there were "essential" and "integral" to the transactions contemplated in the Plan because the Court failed to support its conclusions with concrete factual findings.  *Id.* at 708, 712-13 (record citations omitted).[5]  On remand, the Bankruptcy Court, applying the factors set forth in the *Behrmann* opinion, determined that the facts did not support allowing the releases.  That finding was affirmed by both the District Court and the Fourth Circuit.  *National Heritage Foundation, Inc. v. Highbourne Foundation*, 760 F.3d 344, 347, 352 (4th Cir. 2014).  Thus, it is clear that a plan containing such release provisions cannot be confirmed in the absence of a significant evidentiary presentation demonstrating facts supporting such relief.  *Behrmann*, 663 F.3d at 713.

A.    **The Proposed "Opt-Out" Procedure Regarding the Releases is Insufficient to Demonstrate Consent**

The Debtors appear to be taking the position that the third-party releases described in the Disclosure Statement and Plan are consensual under the circumstances.  Under the Plan, the Disclosure Statement, and the Solicitation Procedures Motion, the third-party releases would be effective against any creditor or interest holder that, among other things:

---

[4] The Fourth Circuit compiled this non-exhaustive list from *Class Five Nev. Claimants v. Dow Corning Corp.* (*In re Dow Corning Corp.*), 280 F.3d 649, 658 (6th Cir. 2002), and *In re Railworks Corp.*, 345 B.R. 529, 536 (Bankr. D. Md. 2006).  The Fourth Circuit described these factors as "instructive."  *Behrmann*, 663 F.3d at 712.

[5] According to the Fourth Circuit, the Bankruptcy Court's conclusions were "meaningless in the absence of specific factual findings explaining" them.  *Behrmann*, 663 F.3d at 713.  Thus, among the Fourth Circuit's instructions to the Bankruptcy Court on remand was, "to set forth specific factual findings supporting its conclusions."  *Id.*

1. Votes in favor of the Plan;
2. Is deemed to have accepted the Plan or enters into a settlement with the Debtors of their Claim and its treatment under the Plan;
3. Abstains from voting on the Plan and does not "opt out" of the Third-Party Release Provisions;
4. Votes to reject the Plan and does not "opt out" of the Third-Party Release Provisions; or
5. Is deemed to reject the Plan and does not object to confirmation of the Plan.

*See* Plan at Art.IX.B.2.

Although some courts have permitted third-party releases in a Chapter 11 plan based upon consent alone, the Fourth Circuit does not appear to be one of those courts.  In *Behrmann,* the Fourth Circuit stated that consent is one fact that the Court should consider in determining whether to permit third party releases.  *Behrmann*, 663 F.3d at 712 ("No case has tolerated nondebtor release absent the finding of circumstances that may be characterized as unique."). Even those cases that have allowed third-party releases based upon consent alone have varied on what is required to demonstrate consent.  What courts have made clear, however, is that releases of non-debtors must be accompanied by the releasing creditors' "unambiguous" consent.  *See In re Congoleum Corp.*, 362 B.R. 167, 194 (Bankr. D. N.J. 2007) (quoting *In re Arrowmill Dev. Corp.*, 211 B.R. 297, 507 (Bankr. D. N.J. 1997) (for a release to be consensual, the creditor must have "unambiguously manifested assent to the release of the nondebtor from liability on its debt.")).  *See also In re SunEdison*, 576 B.R. 453 (Bankr. S.D. N.Y. 2017); *In re Chassix Holdings, Inc.,* 533 B.R. 64 (Bankr. S.D.N.Y. 2015).   In other words, silence is not consent when a party has no duty to speak.  *See SunEdison*, 576 B.R. at 458.

In *In re Arrowmill Dev. Corp.,* one of the first to find consent as a stand-alone basis for allowing third-party releases, the court held that merely failing to vote or even merely voting for the plan was insufficient to demonstrate consent.  Rather, the affected creditor must unambiguously manifest assent to the release:

> [I]t is not enough for a creditor to abstain from voting for a plan, or even to simply vote "yes" as to the plan.  Rather the "validity of the release ... hinge[s] upon principles of straight contract law or quasi-contract law rather than upon the bankruptcy court's confirmation order.  Thus, the court must ascertain whether the creditor unambiguously manifested asset to the release of the nondebtor from liability on its debt.

> In this case, creditor Delliturri did not vote for the plan and clearly did not manifest any asset to have his claim against John Caglianone released.  Accordingly [the release provisions of the plan] do not release Mr. Caglianone from any liability he may have had to Mr. Delliturri.

211 B.R. at 507 (citations omitted).

Similarly, in *In re Washington Mutual, Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011), the court held that mere "opt out" procedures were insufficient, particularly with respect to creditors who did not return ballots:

> [T]he Court concludes that the opt out mechanism is not sufficient to support the third party releases anyway, particularly with respect to parties who do not return a ballot (or are not entitled to vote in the first place).  Failing to return a ballot is not a sufficient manifestation of consent to a third party release.  Therefore, the Court concludes that any third party release is effective only with respect to those who affirmatively consent to it by voting in favor of the Plan and not opting out of the third party releases.

*Id.* at 355 (citations omitted).  *See also In re Specialty Equip. Cos.,* 3 F.3d 1043, 1047 (7th Cir. 1993) ("Unlike the injunction created by the discharge of a debt, a consensual release does not inevitably bind individual creditors.  It binds only those creditors voting in favor of the plan of reorganization.  As a consequence, a creditor who votes to reject the Plan or abstains from voting may still pursue any claims against third-party nondebtors."); *In re Oneida Ltd.*, 351 B.R. 79, 94 (Bankr. S.D.N.Y. 2006) (holding that the third-party release in the Plan was consensual and passed muster because it provided for releases by "checking a box" on the plan solicitation ballot); *In re Zenith Elec. Corp.*, 341 B.R. 92, 111 (Bankr. D. Del. 1999) (holding a release of a third party's claims "cannot be accomplished without the affirmative agreement of the creditor

affected."). *But see In re Indianapolis Downs, LLC*, 486 B.R. 286, 306 (Bankr. D. Del. 2013)

(approving third party releases that bound certain unimpaired creditors who were deemed to

accept the plan as well as impaired creditors who abstained from voting on the Plan or who voted

to reject the plan and did not otherwise opt out of the releases).

More recently, the court in *In re Chassix Holdings, Inc.* was faced with a similar issue

and ultimately held that the releases would only apply to (a) any holder of a claim who voted to

accept the plan and (b) any holder of a claim who voted to reject the plan but who affirmatively

elected to provide the releases by checking the appropriate box on the ballot form – or, in other

words, "opted in" the releases.  553 B.R. 64, 82 (Bankr. S.D.N.Y. 2015). With respect to

creditors who were entitled to vote but abstained, the court noted:

> [U]nder the circumstances of this case it would be inappropriate to treat such
> inaction as a "consent" to third party releases. . . .  The relatively small
> recoveries that were initially proposed, and the widely-publicized fact that
> other creditor groups had endorsed the proposed Plan, could easily have
> prompted an even higher-than-usual degree of inattentiveness or inaction
> among affected creditors in these cases.  Furthermore, many creditors may
> simply have assumed that a package that related to the Debtors' bankruptcy
> case must have related only to the dealings with the Debtors and would not
> affect their claims against other parties.  Charging all inactive creditors with
> full knowledge of the scope and implications of the proposed third party
> releases, and implying a "consent" to the third party releases based on the
> creditors' inactions, is simply not realistic or fair, and would stretch the
> meaning of "consent" beyond the breaking point.

*Id*. at 80-81.  *See also In re Emerge Energy Services LP,* 2019 WL 7634308, at 23

(Bankr. D. Del. Dec. 5, 2019) ("[T]he Court cannot on the record before it find that the

failure of a creditor or equity holder to return a ballot or Opt-Out Form manifested

their intent to provide a release. Carelessness, inattentiveness, or mistake are three

reasonable alternative explanations.").

"Opt out" procedures are problematic in that creditors may be "caught asleep at the

switch." If a creditor is truly consenting to the release provisions, then that creditor will have no problem "opting in" to the provision. As discussed above, *Behrmann* makes clear that third-party releases are to be approved only in extraordinary circumstances. Such releases are the exception, not the rule. If, however, the Court permits such releases by consent alone, and particularly by consent manifested merely by the failure to opt-out, those provisions will become the norm and will be included in every Chapter 11 Plan. Indeed, if the Court allows confirmation of plans including such provisions based solely on the failure to affirmatively "opt out," there is no reason for a debtor to ever leave such a provision out of the plan since that debtor is likely to get at least a few creditors to inadvertently "consent" to the releases.

If the Court is inclined to allow releases by consent alone, the Court should follow those courts that require strict evidence of actual consent by the affected parties. Said differently, the UST requests that the following changes be made to the Disclosure Statement, ballots, or Plan:

- The Disclosure Statement and the Plan should specify that any creditor or interest holder who abstains from voting or fails to return a ballot should not be deemed to have consented to the third-party releases.

- The Disclosure Statement, the Plan, and the ballots should be amended to provide that creditors classified as "unimpaired" should not be deemed to have consented to the third-party releases; rather, they should be given an option to "opt in" of the third-party releases.

- The Disclosure Statement, the Plan, and the ballots should be amended to provide that creditors who reject the plan do not have to opt-out of the releases; but rather should be deemed to have rejected the third-party releases as well.

- The Disclosure Statement and the Plan should be amended to provide that creditors who are deemed to have rejected the plan should have similarly be deemed to have rejected the third-party releases without having to object to the Plan.

*See In re Chassix Holdings, Inc.,* 533 B.R. 64 (Bankr. S.D.N.Y. 2015).

## B.  The Exculpation Clauses are Impermissibly Broad and Lack the Required Exception for Court Approved Suits.

In addition to the fact that entitlement to the exculpation provisions has not been demonstrated, the exculpation clause here is impermissibly broad on its face because, *inter alia*, (i) it is too broad in respect to who is exculpated (for example, it exculpates entities such as the Disbursing Agent whose identity is not even disclosed and the prepetition lenders and their respective directors, officers, agents, advisors and professionals), (ii) it does not provide an exception allowing for suits against the exculpated parties where prior court approval is obtained, (iii) it does not contain a carve-out for acts or omissions that constitute gross negligence, breach of fiduciary duty, or willful violation of federal or state laws or regulations, and (iv) it does not include protection from the breaches or violations of their professional responsibilities.

In *In re National Heritage Foundation, Inc.*, 478 B.R. 216 (Bankr. E.D. Va. 2012), *aff'd, National Heritage Foundation v. Highbourne Foundation*, 760 F.3d 344 (4th Cir. 2014), the court addressed exculpation clauses such as the one in this Plan.  There, the court recognized that exculpation provision are permissible only if they are "properly limited and not over broad."  *Id.* at 234.

In order to avoid over-breadth, exculpation clauses must be:

> (a) narrowly tailored to meet the needs of the bankruptcy estate;
> (b) limited to parties who have performed necessary and valuable duties in connection with the case;
> (c) limited to acts and omissions taken in connection with the bankruptcy case; and
> (d) must not purport to release any pre-petition claims.

*Id.*  Here, the clause is not narrowly tailored to meet the needs of the bankruptcy estates and is not limited to parties who have performed necessary and valuable duties in connection with the cases.  The exculpation is with respect to any act taken or omitted to be taken "before the

Effective Date" but does not limit the exculpated actions to ones that occurred post-petition. Furthermore, the term "Representatives" is so broad that it encompasses neither creditors nor professionals and may involve people who had no direct involvement with any action taken during the pendency of the bankruptcy proceedings.  Similarly, the Plan proposes to exculpate the Disbursing Agent and his or her respective agents – all entities that will not be in existence until after the effective date of the Plan.  Thus, under the Fourth Circuit standards, these entities have no place in an exculpation clause.

Finally, to be permissible, an exculpation clause must contain a "gatekeeper function by which the Court may, in its discretion, permit an action to go forward against the exculpated parties." *National Heritage*, 478 B.R. at 234.  The exculpation clause here contains no such exception.  Accordingly, the Disclosure Statement should be amended to provide a legal justification for the Exculpation Clause sought to be included in the Plan.

### C.    The Release and Exculpation Clauses Contain no Carve-Out for Governmental Claims.

To the extent that the Court allows for any releases or exculpation to the Debtors, the UST requests that language carving out Governmental claims from the proposed releases be included. At a minimum, the plan proponents must add language to the Disclosure Statement and Plan substantially in the form set forth below:

> Nothing in this Plan discharges, releases, precludes, or enjoins: (i) any liability to any Governmental Unit that is not a Claim; (ii) any Claim of a Governmental Unit arising on or after the Effective Date; (iii) any police or regulatory liability to a Governmental Unit on the part of any Entity as the owner or operator of property after the Effective Date; or (iv) any liability to a Governmental Unit on the part of any Person other than the Debtors. Nor shall anything in the Plan enjoin or otherwise bar a Governmental Unit from asserting or enforcing, outside this Court, any liability described in the preceding sentence. Nothing in this Plan divests any tribunal of any jurisdiction it may have law to adjudicate any defense based on this paragraph of the Plan.

### D.   Conclusion Regarding Release and Exculpation Provisions for the Purpose of the Hearing on the Disclosure Statement.

While consideration of the release and exculpation provisions is, arguably, a matter for a confirmation hearing rather than a hearing on approval of a proposed disclosure statement, the absence of a discussion of the facts and factors germane to the appropriateness of the provisions deprives creditors of a meaningful understanding of the rationale, justification, and effect of the releases, and the likelihood that they will be approved.  Those are the heart of the issue in disclosure.  Moreover, because approval for the form of the ballots is being sought, the UST objects to their current form and requests that the Court deny the Solicitation Procedures Motion unless the ballots are amended as set forth above.

## VI.   The Plan Violates Section 503(c) of the Bankruptcy Code

The Plan includes a provision regarding the continuance of severance and bonus programs:

> On the Effective Date, the Reorganized Debtors shall assume and ratify the Severance Plan [6] and establish the Emergence Benefit Programs, [7] which shall continue or replace the Existing Benefit Programs (in each case, on terms substantially similar to or <u>more favorable</u> to the Remaining Employees[8] than the Existing Benefit Programs). Following the Effective Date, the Reorganized Debtors shall not amend or modify the Severance Plan to reduce the severance amounts or otherwise modify any entitlements of either Insider Participant (as defined in the Omnibus Order) without the prior written consent of such Insider Participant.

*See* Plan at Art. III.C; Disclosure Statement, Art. V.C.1 (Emphasis added).  If this Court confirms the Plan, then on the Effective Date, the "Emergence Benefit Program" could be

---

[6] "Severance Plan" is defined as "the severance plans and programs approved by the Bankruptcy Court pursuant to the Omnibus Order and any agreements entered into with the Remaining Employees to implement the terms of such plans and programs."  *See* Plan at Art. I.A.111.

[7] "Emergence Benefit Programs" means "the Benefit Programs for the Remaining Employees after the Effective Date, including, without limitation, the Severance Plan and any other Existing Benefit Program that is assumed or <u>otherwise replaced</u> as contemplated by the Plan."  *See* Plan at Art. I.A.43 (Emphasis added).

[8] "Remaining Employees" is defined as "the Debtors' employees on the Effective Date that remain to the employed by the Reorganized Debtors."  *See* Plan at Art. I.A.104.

ratified and put in place to provide the "Remaining Employees" with bonuses or severance payments not previously approved by prior order of the Court. *Id.*

The Debtors bear the burden of establishing that any of the Emergence Benefit Programs satisfy all of the Bankruptcy Code's requirements. *See GT Advanced Tech., Inc. v. Harrington*, 2015 WL 4459502, *5 (Bankr. D.N.H. July 21, 2015) (*citing In re Hawker Beechcraft, Inc.*, 489 B.R. 308, 313 (Bankr. S.D.N.Y. 2012)). While the Debtors may argue that payment of any bonus or severance under the Emergence Benefit Programs would not be made until after confirmation; and thus they are not subject to section 503(c), the plain text of section 503(c) does <u>not</u> draw a distinction between awards made to insiders pre-confirmation versus post-confirmation. *See* 11 U.S.C. § 503(c)(1). Notably, because section 503(c) speaks to the allowance as well as the payment of obligations, it applies with equal force regardless of whether the payment is to be made by the debtor prior to plan confirmation, or whether the successor of the debtor is directed to make such a payment after emergence from bankruptcy. *See In re AMR Corp.*, 490 B.R. 158, 167-68 (Bankr. S.D.N.Y. 2013); *In re Dana Corp.*, 351 B.R. 96, 102 (Bankr. S.D.N.Y. 2006) (applying 11 U.S.C. § 503(c) to bonus and severance payments that were to be made to debtor's insider upon emergence from bankruptcy); *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 171-72 (Bankr. D.N.J. 2010) (holding severance provision invalid under section 503(c)(2) notwithstanding fact that severance was to be paid after plan effective date by reorganized debtor).

Neither the Disclosure Statement nor Plan provide any information as to the identity or insider status of the recipients of any such Emergence Benefit Programs, the programs contemplated, the amounts of the bonus or severance to be paid out, and the metrics or

thresholds for any such payment.  The language essentially gives the Reorganized Debtors

the right to ratify or assume any Emergence Benefit Program that the Debtors put in place

and/or modify such plan without Court approval.  In short, it is a blank check which can be

used to compensate unknown individuals with unknown amounts based on unknown

performance metrics.  Given the vague nature of the provision, it cannot be determined if

the provision regarding the Emergence Benefit Programs, as described, implicates or is

subject to 11 U.S.C. § 503(c).  Accordingly, the Disclosure Statement should be amended

to provide additional information regarding the bonus or severance programs contemplated

for the Remaining Employees.

## <u>CONCLUSION AND RESERVATION OF RIGHTS</u>

In light of the foregoing, the Plan cannot be confirmed, as it fails to comply with Sections

1122, 1123, and 1129(a)(9) of the Bankruptcy Code.  Given that the Plan is incapable of

confirmation, the Court should not approve the Disclosure Statement.  *See, e.g., In re GSC, Inc.,*

453 BR. 132. 1577 n.27 (Bankr. S.D.N.Y. 2011) (citing *In re Quigley Co.*, 377 B.R. 110, 115

(Bankr. S.D.N.Y. 2007) ("An unconfirmable plan is grounds for rejection of the disclosure

statement; a disclosure statement that describes a plan patently unconfirmable on its fact should

not be approved.")).  *See also In re Robert's Plumbing and Heating, LLC*, 2011 WL 29722092

(Bankr. D. Md. July 20, 2011) (same).

The UST reserves his rights to object to other deficiencies at the hearing on the approval

on the Disclosure Statement to the extent that the deficiencies in the Disclosure Statement are not

resolved prior to then or to the extent that amended or additional documents filed after the date of

this Objection are filed and raise the same or additional concerns as highlighted herein.

The UST also submits that, if applicable, the foregoing objections constitute objections to the confirmation of the Plan.

Respectfully submitted,

JOHN P. FITZGERALD, III
Acting United States Trustee
Region Four

By: /s/ Kenneth N. Whitehurst, III
Kenneth N. Whitehurst, III
Assistant United States Trustee

## CERTIFICATE OF SERVICE

I hereby certify that, on February 26, 2020, a true copy of the foregoing was delivered via electronic mail pursuant to the Administrative Procedures of the CM/ECF System for the United States Bankruptcy Court for the Eastern District of Virginia to all necessary parties.

/s/ Kenneth N. Whitehurst, III
Kenneth N. Whitehurst, III